**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RINI EKA A. SOEGIYONO, Administrator of the Estate of NIAR RURI SUNARNIATI SOEGIYONO, deceased, <br><br> Plaintiff, <br><br> v. <br><br> THE BOEING COMPANY, a corporation, <br><br> Defendant. | Lead Case: 1:18-cv-07686 <br><br> Hon. Thomas M. Durkin <br><br> This filing applies to: <br><br> No. 1:19-cv-03415 |

**DEFENDANT THE BOEING COMPANY'S ANSWER AND**
**AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT**

Defendant The Boeing Company ("Boeing"), by and through its attorneys of record, Perkins Coie LLP, hereby answers the Complaint ("Complaint") of Plaintiff Rini Eka A. Soegiyono, Administrator of the Estate of Niar Ruri Sunarniati Soegiyono, deceased (collectively, "Plaintiff"), as follows, in paragraphs numbered to correspond to the paragraph numbers in said Complaint. All facts not specifically admitted are denied.

Boeing also states that the Complaint pertains to an accident on October 29, 2018, that currently is the subject of an ongoing investigation by the Indonesia National Transportation Safety Committee ("NTSC-KNKT"), which has not yet been completed. The United States National Transportation Safety Board ("NTSB") is a party to the NTSC-KNKT investigation, and Boeing is providing technical assistance. Plaintiff's Complaint also contains allegations about the crash of Ethiopia Airlines Flight 302 on March 10, 2019. The crash of Flight 302 is also the subject of an ongoing investigation by Ethiopia's Aircraft Accident Investigation Bureau ("AIB"). The AIB investigation has also not yet been completed. The NTSB is a party to the AIB investigation, and Boeing is providing technical assistance.

Under international law (Section 5.26 of Annex 13 to the Convention on International Civil Aviation) and federal law (49 C.F.R. § 831.13 and 49 U.S.C. § 1114(f)), Boeing is

ANSWER TO COMPLAINT

prohibited at this time from releasing information concerning aviation accidents to any person

not a party to the investigations without prior consultation and approval of the NTSB.

Accordingly, in responding to this Complaint, Boeing has not relied upon information made

known to certain Boeing personnel by the NTSB related to the ongoing accident investigations.

## OVERVIEW

1.      On October 29, 2018, Lion Air Flight JT 610, a Boeing Model 737 MAX 8
aircraft, crashed into the Java Sea off the coast of the Republic of Indonesia. The crash killed all
189 persons on board, including Decedent.

**ANSWER:**

Boeing admits that on October 29, 2018, a Boeing 737-8 aircraft, operated by Lion Air as

Lion Air Flight JT 610 (the "Subject Aircraft") as a commercial flight from Soekarno-Hatta

International Airport, Jakarta, to Depati Amir Airport, Pangkal Pinang, crashed into the Java Sea

off of the coast of Indonesia, and that the crash resulted in the deaths of all 189 occupants

aboard. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 1 and therefore denies them.

2.      Plaintiff is Decedent's loved one and representative. Plaintiff brings this action
under the Illinois Wrongful Death Act, 740 ILCS 180/1 *et seq.*, to recover compensatory and
punitive damages from Boeing, which caused the death of Decedent.

**ANSWER:**

Boeing lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in the first sentence of Paragraph 2 and therefore denies them.  The remaining

allegations contained in Paragraph 2 consist of legal conclusions, to which no response from

Boeing is required; to the extent a response is required, Boeing denies these allegations.

3.      Specifically, Boeing defectively designed a new flight control system for the 737
MAX 8, which utilized a Maneuvering Characteristics Augmentation System ("MCAS") reliant
on information from a single Angle of Attack ("AOA") sensor. Further, Boeing failed to warn,
notify, instruct, or train airlines, pilots, and other important parties of the existence of the MCAS
as well as how to respond to and/or override the MCAS when necessary to safely control the
aircraft. Boeing's design defects and failures to warn, notify, instruct, and train led to the subject
crash.

ANSWER TO COMPLAINT

**ANSWER:**

Boeing denies the allegations contained in Paragraph 3 as written.

4.      Boeing's failures resulted from an emphasis on corporate profit over personal safety. On information and belief, Boeing made improper decisions, at the expense of safety, in developing the 737 MAX 8 in order to: (a) hasten regulatory approval of the model;[1] (b) limit required training of airline pilots on the new model; and (c) obtain important sales contracts from key airline customers.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 4.  The allegations contained in the

footnote to Paragraph 4 consist of legal conclusions to which no response from Boeing is

required; to the extent a response is required, Boeing denies these allegations and notes that any

amendments contemplating the addition of parties must conform to applicable law, including the

Federal Rules of Civil Procedure.

5.      Plaintiff seeks to recover for the grievous harm caused by Boeing's decision-making and to punish such corporate conduct in the hopes of preventing future tragedy.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 5.

**THE PARTIES**

6.      At all relevant times, the Decedent was an individual residing in Indonesia.

**ANSWER:**

Upon information and belief, Decedent was a resident of Indonesia.

7.      Plaintiff is a citizen of Indonesia and is the duly appointed personal representative of the Estate of Decedent.

---

[1] The footnote to Paragraph 4 states as follows: "Plaintiff plans to assert claims against the United States Federal Aviation Administration ("FAA") under the Federal Tort Claims Act, 28 U.S.C. § 2674, after exhausting her administrative remedies under 28 U.S.C. § 2675. Plaintiff believes that the FAA was negligent in its certification of the 737 MAX 8 in a number of ways, including but not limited to: (i) failing to require sufficient testing and data to support changes from the 737 series to the 737 MAX series of aircraft; (ii) delegating excessive authority to Boeing during the regulatory approval process; (iii) failing to require sufficient pilot training for the new model; (iv) failing to require flight manual updates for the model addressing the MCAS; and (v) failing to require Boeing to obtain a new type certificate for the 737 MAX 8 and instead allowing Boeing to obtain a common type rating with existing 737 models."

ANSWER TO COMPLAINT

**ANSWER:**

Upon information and belief, Plaintiff is a citizen of Indonesia. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 7 and therefore denies them.

8.     At all relevant times, Boeing was and is a corporation organized under the laws of Delaware with its worldwide headquarters and principal place of business in Chicago, Illinois.

**ANSWER:**

Boeing admits the allegations contained in Paragraph 8.

## JURISDICTION AND VENUE

9.     Original jurisdiction exists in the District Courts of the United States pursuant to 28 U.S.C. § 1369, commonly known as the Multiparty, Multiforum Trial Jurisdiction Act.

**ANSWER:**

The allegations contained in Paragraph 9 consist of legal conclusions to which no response from Boeing is required; to the extent a response is required, Boeing admits that this Court has subject matter jurisdiction over this matter.

10.     Venue exists in this District pursuant to 28 U.S.C. § 1391(b) as Defendant Boeing resides in this district. Further, a substantial part of the events or omissions giving rise to the claims occurred in this district, including key technical and financial decisions regarding the development and design of the 737 MAX 8, among other things.

**ANSWER:**

The allegations contained in Paragraph 10 consist of legal conclusions to which no response from Boeing is required; to the extent a response is required, Boeing admits that its principal place of business is located within this District. Boeing denies the remaining allegations contained in Paragraph 10.

## GENERAL ALLEGATIONS

**I.     The 737 MAX 8 is Widely Sold and Used in the United States**

11.     The 737 MAX 8 is the newest and best-selling model of Boeing's 737 series of aircraft, with over three hundred 737 MAX 8's registered worldwide.

ANSWER TO COMPLAINT

**ANSWER:**

Boeing admits that the 737-8 is part of the 737 MAX series of aircraft and that the 737 MAX aircraft are the newest models of Boeing's 737 aircraft. Boeing also admits that it has delivered more than 300 737 MAX aircraft to customers around the world. Boeing denies the remaining allegations contained in Paragraph 11 as written.

12. The 737 MAX 8 is extremely popular in the United States. U.S.-based airlines American Airlines and Southwest Airlines are two of the world's biggest users of the 737 MAX 8. United Airlines uses the 737 MAX 8 model as well. Miami International Airport has the highest number of 737 MAX 8 flight departures in the world. Further, Air Canada operates numerous 737 MAX 8 flights into and out of the Unites States.

**ANSWER:**

Boeing admits that Southwest Airlines, American Airlines, and Air Canada, and United Airlines operate 737 MAX aircraft. Boeing denies the remaining allegations contained in Paragraph 12 as written.

13. At all relevant times, Boeing manufactured the 737 MAX 8 model aircraft, including its component parts, in the United States.

**ANSWER:**

Boeing admits that it manufactured the Subject Aircraft in the United States, except for those components, parts, and systems of the Subject Aircraft that were manufactured by others or outside of the United States, and the components, parts, and systems that were subsequently removed, installed, exchanged, altered, modified, retrofitted, overhauled, or manufactured by others. Boeing denies the remaining allegations contained in Paragraph 13.

14. At all relevant times, Boeing contracted with component part manufacturers in the United States, who supplied Boeing components for the 737 MAX 8.

**ANSWER:**

Boeing admits that it contracted with manufacturers in the United States to produce some components of the 737-8 aircraft. Boeing denies the remaining allegations contained in Paragraph 14 as written.

15. The FAA approved the design of the 737 MAX 8 model aircraft.

ANSWER TO COMPLAINT

**ANSWER:**

Boeing admits that on March 8, 2017, the FAA issued an Amended Type Certificate covering the design of the 737-8 aircraft. Boeing denies the remaining allegations contained in Paragraph 15 as written.

16. At all relevant times, Boeing marketed, manufactured, produced, assembled, and sold the subject aircraft in the United States, including to American Airlines, Southwest Airlines, and United Airlines.

**ANSWER:**

Boeing admits that it marketed, manufactured, produced, assembled, and sold the Subject Aircraft in the United States, except for those components, parts, and systems of the Subject Aircraft that were marketed, manufactured, produced, assembled, or sold by others or outside of the United States, and the components, parts and systems that were subsequently removed, installed, exchanged, altered, modified, retrofitted, overhauled, or manufactured by others. Boeing also admits that American Airlines, Southwest Airlines, and United Airlines operate 737 MAX aircraft. Boeing denies the remaining allegations contained in Paragraph 16.

**II. Boeing Designed the 737 MAX 8 Because of Cost, Competition and Time Concerns**

17. In Spring of 2011, Boeing learned that its long-time customer, American Airlines, was considering whether to place a large order of commercial airplanes with Airbus. Airbus, a foreign competitor of Boeing's, was and is the manufacturer of the comparatively fuel-efficient A320 model aircraft. If Boeing wanted to compete with Airbus on the American Airlines contract, it needed to act quickly.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 17 as written.

18. Boeing decided thereafter that, rather than develop an entirely new design to replace the 737 series, it would update the 737 instead with the 737 MAX model aircraft. The decision saved Boeing years on development time and cost and enabled it to compete for American Airlines' business. A former senior Boeing official confirmed that Boeing decided to update the 737, instead of developing a new model, because it would be far quicker, easier, and cheaper to do so.

**ANSWER:**

Boeing admits that the 737 MAX series are the newest models of Boeing's 737 aircraft. Boeing denies the remaining allegations contained in Paragraph 18 as written.

ANSWER TO COMPLAINT

19.     Updating the 737 model would also ensure faster regulatory approval from the FAA. Moreover, since pilots had been flying the 737 series for years, it would limit the necessity of additional pilot training which, in turn, would diminish the cost to airline customers. Rich Ludtke, a former Boeing engineer who helped design the 737 MAX, said that the company instructed engineers to design the 737 MAX so as to avert a requirement of pilot training. According to Mr. Ludtke, such a directive "was a first" in his 19-year tenure at Boeing.

**ANSWER:**

Boeing admits that the quoted language in Paragraph 19 appears in an article published by the *New York Times*. Boeing denies the remaining allegations contained in Paragraph 19 as written.

20.     Boeing was also under pressure to compete with the fuel-efficiency of the larger engine on the Airbus A320. Accordingly, Boeing implemented a larger and more powerful engine in the MAX than it had in previous 737s. Because of its size, Boeing positioned the engine further forward on the wing of the MAX to provide more ground clearance.

**ANSWER:**

Boeing admits that the size and placement of the engines on the 737-8 differs from that of prior models of the 737 aircraft.  Boeing denies the remaining allegations contained in Paragraph 20 as written.

21.     The size and positioning of the engine had significant consequences. In particular, it altered the aerodynamics of the plane, making it more likely to pitch-up during flight.

**ANSWER:**

Boeing admits that the placement of the 737-8 engines affects the aircraft's aerodynamic characteristics.  Boeing further admits that the size and placement of the engine can affect pitch characteristics. Boeing denies the remaining allegations contained in Paragraph 21 as written.

22.     If the nose of the plane pitches upward at too extreme an angle, the plane can stall and ultimately crash.

**ANSWER:**

Boeing admits that excessively high angle-of-attack can lead to stall.  Boeing denies the remaining allegations contained in Paragraph 22 as written.

## III.     Boeing Implements MCAS to Address the MAX's Tendency to Pitch-Up

23.     To address the MAX's tendency to pitch upward, Boeing added new software to the model, called the Maneuvering Characteristics Augmentation System or "MCAS."

ANSWER TO COMPLAINT

**ANSWER:**

Boeing admits that the 737-8 design includes the Maneuvering Characteristics Augmentation System ("MCAS") control law. Boeing also admits that the MCAS control law was implemented on the 737 MAX to enhance pitch characteristics in manual flight with flaps up and at elevated angles of attack. Boeing denies the remaining allegations contained in Paragraph 23 as written.

24. MCAS was designed to automatically push the nose of the plane down if the plane's Angle of Attack ("AOA") sensor interpreted the plane's nose pitched-up at a dangerous angle. An AOA sensor measures the angle between airflow and the wing of the plane.

**ANSWER:**

Boeing admits that the MCAS control law was implemented on the 737 MAX to enhance pitch characteristics in manual flight with flaps up and at elevated angles of attack. Boeing also admits that MCAS uses input from the aircraft's angle of attack sensors, which are located on the aircraft's nose. Boeing further admits that MCAS uses data obtained from angle of attack sensors and that the angle of attack sensor measures the difference between the nose direction of the aircraft (the pitch angle) and the angle of the oncoming wind. Boeing denies the remaining allegations contained in Paragraph 24 as written.

25. While Boeing included two AOA sensors on the MAX (one on each side of the plane), MCAS relied on data from just one of the sensors to initiate. As such, if the relevant AOA sensor transmitted incorrect information, MCAS could unnecessarily push the nose of the plane down, resulting in a nosedive.

**ANSWER:**

Boeing admits that the aircraft's angle of attack sensors are located on the aircraft's nose. Boeing also admits that MCAS can be activated by erroneous angle of attack input. Boeing denies the remaining allegations contained in Paragraph 25 as written.

26. The image below illustrates the operation of MCAS in the 737 MAX 8:

ANSWER TO COMPLAINT



**How the new MAX flight-control system operates to prevent a stall**

Air flow

Level flight

**Angle of attack sensor** aligns itself with oncoming air flow.

Air flow

Nose-up flight

The angle of attack, the angle between the wing and the air flow, is fed into the flight computer. If it rises too high, suggesting an approaching stall, the MCAS system activates.

**MCAS (Maneuvering Characteristics Augmentation System)**

The MCAS system automatically swivels the horizontal tail to move the nose down. In the Lion Air crash, the angle of attack sensor fed false information to the flight computer.

**Horizontal tail**

Sources: Boeing, FAA, Indonesia National Transportation Safety Committee, Leeham.net, and The Air Current.

Reporting by DOMINIC GATES,
Graphic by MARK NOWLIN / THE SEATTLE TIMES

**ANSWER:**

Boeing denies the allegations contained in Paragraph 26 as written. In further response, Boeing states that the graphic depicted below Paragraph 26 does not consist of properly pled factual allegations and therefore requires no response from Boeing; to the extent a response is required, Boeing denies the accuracy of the text and images contained in this conclusory graphic as depicted.

**III. Boeing Disregarded Pilots in Designing MCAS**

27. The design of the MCAS made it susceptible to working at cross-purposes with pilots.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 27.

28. Specifically, when the nose of an airplane improperly tilts downward, a pilot's natural reaction is to pull back on the control column (or "yoke") to raise the nose. Whereas in prior 737 models such a reaction would work by triggering "breakout switches that stop any automatic tail movement tending to move the nose of the plane down," such a reaction does not work to counteract the MCAS in the MAX. The MCAS assumes that the yoke is already pulled back in the extreme and prevents further pullback at odds with MCAS' function.

ANSWER TO COMPLAINT

**ANSWER:**

Boeing admits that the quoted language in Paragraph 28 appears in an article published by the *Seattle Times*. Boeing denies the remaining allegations contained in Paragraph 28 as written.

29. Despite incorporating this new automatic system with the potential to work against natural and appropriate pilot behavior when compared with prior models, Boeing did not inform pilots of the MCAS.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 29 as written.

30. Boeing did not include information regarding the MCAS in the flight operations manual. Moreover, pilots were not trained on the MCAS. Training merely consisted of a one-hour session on an iPad without any simulators specific to the MAX model. In short, as stated by Jon Weaks, president of the Southwest Airlines Pilots Association, pilots "were kept in the dark" on the MAX's new flight control system.

**ANSWER:**

Boeing admits that the quoted language in Paragraph 30 appears in an article published by the *Seattle Times*. Boeing also admits that the Flight Crew Operations Manual ("FCOM") for the Subject Aircraft did not include a description of the MCAS control law.  Boeing denies remaining the allegations contained in Paragraph 30 as written.

31. On information and belief, Boeing's non-disclosure of the MCAS was part of an effort to downplay the significance of the new system so that regulatory approval could be obtained quickly and without the need for additional pilot training.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 31.

**IV.    The FAA Enabled Boeing's Failures**

**A.    Overview of the FAA's Safety Review**

32. The FAA has regulatory authority in the U.S. over the approval of aircraft design.

**ANSWER:**

Boeing admits the allegations contained in Paragraph 32.

33. As a part of the regulatory approval process, the FAA may delegate portions of aircraft systems review to the entity seeking approval, such as Boeing. However, the FAA has,

ANSWER TO COMPLAINT

over the years, delegated increasing authority to Boeing to handle more of the work necessary to certify the safety of Boeing airplanes.

**ANSWER:**

Boeing admits that the FAA has the authority to delegate certain aspects of its Type

Certification projects. Boeing denies the remaining allegations contained in Paragraph 33 as

written.

34.    A portion of the FAA's regulatory approval process addresses "System Safety." As defined by the FAA:

> System safety is a specialty within system engineering that supports program risk management. It is the application of engineering and management principles, criteria and techniques to optimize safety. The goal of System Safety is to optimize safety by the identification of safety related risks, eliminating or controlling them by design and/or procedures, based on acceptable system safety precedence….

**ANSWER:**

Boeing admits that the language contained in Paragraph 34 consists of incomplete

quotations from the version of FAA's System Safety Handbook, published in December 2000.

The complete contents of that Handbook speak for themselves. Boeing denies the remaining

allegations contained in Paragraph 34.

35.    FAA Order 8040.4 establishes a five-step approach to safety risk management -- Planning, Hazard Identification, Analysis, Assessment, and Decision.

**ANSWER:**

Boeing admits that the FAA issued Orders 8040.4A and 8040.4B. The contents of those

documents speak for themselves. Boeing denies the remaining allegations contained in Paragraph

35 as written.

36.    With respect to "Hazard" analysis in particular, the FAA requires that both hazard severity and the likelihood of occurrence of the hazard be identified. The guiding principle for the FAA is that the more severe the consequences, the lower the probability of occurrence required to be deemed acceptable.

ANSWER TO COMPLAINT

**ANSWER:**

Boeing admits that the FAA issued Orders 8040.4A and 8040.4B. The contents of those

documents speak for themselves. Boeing denies the remaining allegations contained in Paragraph

36 as written.

37.     Hazard severity is separated into a number of categories in order of most to least
severe, including: Catastrophic, Hazardous, Major, Minor, and No Safety Effect. The most
severe category of accident—Catastrophic—"results in multiple fatalities and/or loss of the
system." The next accident category—Hazardous—results in less severe but nonetheless grave
consequences, such as "[s]erious or fatal injury to small number of occupants of aircraft (except
operators)."

**ANSWER:**

Boeing admits that the FAA issued Orders 8040.4A and 8040.4B. The contents of those

documents speak for themselves. Boeing denies the remaining allegations contained in Paragraph

37 as written.

**B.     The FAA Improperly Delegated Safety Analysis to Boeing**

38.     With respect to the 737 MAX 8, FAA managers pushed FAA engineers to
delegate safety analyses to Boeing itself and to quickly approve Boeing's safety assessments in
the quest for Boeing to catch Airbus and certify the MAX.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 38 as written.

39.     To that end, the FAA specifically delegated the Systems Safety Analysis of the
MCAS to Boeing for the 737 MAX 8.

**ANSWER:**

Boeing admits that, after the FAA evaluation of the 737-8 project, the FAA determined

that certain aspects of the 737-8 Type Certification could be delegated.  This is typical of Type

Certification projects.  Boeing denies the remaining allegations contained in Paragraph 39 as

written.

40.     Evidence indicates that Boeing's Systems Safety Analysis submitted to the FAA
in conjunction with certifying the 737 MAX 8 was flawed in several manners, including that
Boeing: (a) understated the power of the MCAS, which is capable of moving the tail of the plane
more than four times farther than was stated in the initial safety analysis document submitted,
i.e., 0.6 degrees in the submission as compared to a post-crash disclosure of 2.5 degrees;
(b) failed to account for how the MCAS could reset itself each time a pilot responded, thereby

ANSWER TO COMPLAINT

missing the potential impact of the system repeatedly pushing the plane's nose downward; and (c) assessed a failure of the system as "Hazardous," not "Catastrophic" (which should nonetheless, however, have precluded activation of MCAS based on input from a single AOA sensor).

**ANSWER:**

Boeing denies the allegations contained in Paragraph 40 as written.

41.     The confluence of circumstances described above led to the tragedy of Lion Air Flight JT 610.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 41.

**V.      Lion Air Flight JT 610 Crashed on October 29, 2018**

42.     In approximately August 2018, Boeing delivered a newly manufactured 737 MAX 8 aircraft with tail number "PK-LQP" to Lion Air in Indonesia (the "subject aircraft"), knowing that such aircraft would be used by Lion Air for commercial flight operations, including scheduled passenger flights.

**ANSWER:**

Boeing admits that it delivered the Subject Aircraft, which bears Registration No. PK-

LQP, in August 2018, and that Lion Air was its first operator.  Boeing denies the remaining

allegations contained in Paragraph 43.

43.     Prior to October 29, 2018, Boeing designed, manufactured, assembled, and sold the subject aircraft and prepared, published, and provided to Lion Air information including, but not limited to, a 737 MAX 8 flight operations manual ("FOM") regarding the operation of the subject aircraft.

**ANSWER:**

Boeing admits that, prior to October 29, 2018, it designed, manufactured, assembled, and

sold the Subject Aircraft, except for those components, parts, and systems of the Subject Aircraft

that were designed, manufactured, assembled, and sold by others, and the components, parts, and

systems that were subsequently removed, installed, exchanged, altered, modified, retrofitted,

overhauled, or manufactured by others.  Boeing also admits that it provided Lion Air a copy of

the Flight Crew Operations Manual ("FCOM") for the Subject Aircraft.  Boeing denies the

remaining allegations contained in this paragraph as written.

ANSWER TO COMPLAINT

44. On October 29, 2018, Decedent was a passenger on board the subject aircraft operated by Lion Air as Flight JT 610. The flight was scheduled to depart from Jakarta to Pangkal Pinang, a provincial capital of a small island in the Java Sea.

**ANSWER:**

Boeing admits that, on October 29, 2018, the Subject Aircraft, operated by Lion Air as

Lion Air Flight JT 610, was scheduled to depart from Jakarta and arrive in Pangkal Pinang.

Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining

allegations contained in Paragraph 44 and therefore denies them.

45. On the morning of October 29, 2018, the subject aircraft departed from Jakarta's Soekarno – Hatta International Airport at or around 6:21 a.m.

**ANSWER:**

Boeing admits the allegations contained in Paragraph 45.

46. Shortly after takeoff, the crew contacted air traffic controllers and requested a return to Jakarta.

**ANSWER:**

Boeing lacks knowledge or information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 46 and therefore denies them.

47. The subject aircraft received authorization to return, but it did not manage a turnaround.

**ANSWER:**

Boeing lacks knowledge or information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 47 and therefore denies them.

48. The subject aircraft's AOA sensor provided incorrect data to the flight computer, triggering MCAS and repeatedly and unnecessarily pushing the nose of the plane downward. In fact, tracking data indicates that the aircraft pitched up and down like a roller coaster during the 12-minute flight before the plane nose-dived into the Java Sea. Such data indicates that the pilots struggled repeatedly to counteract MCAS without success. Indeed, witnesses saw the subject aircraft banking left, making significant altitude shifts, and then dropping sharply.

**ANSWER:**

Upon information and belief, Boeing admits that the Subject Aircraft's MCAS control

law was activated in response to erroneous angle of attack information, the Subject Aircraft

experienced automatic nose down trim, and in response, among other actions, the flight crew of

ANSWER TO COMPLAINT

-14-

Lion Air Flight JT 610 repeatedly commanded nose up trim. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 48 and therefore denies them.

49.     According to data from flight radars, the plane was at an altitude of about 5,000 feet when its final descent began. The subject aircraft plummeted into the sea and disintegrated upon impact. The crew and passengers, including Decedent, would have suffered unspeakable horror, pain, terror and injury as they plummeted to their deaths.

**ANSWER:**

Boeing admits that the Subject Aircraft crashed into the Java Sea off the coast of Indonesia. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 49 and therefore denies them.

50.     Tragically, during the final minutes of the flight, the captain of the subject aircraft reviewed a technical manual trying in vain to determine what was happening to the plane and why his attempts to counteract the downward tilt of the plane's nose repeatedly failed.

**ANSWER:**

Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 50 and therefore denies them.

51.     Evidence shows that the Lion Air pilot had no chance. During post-crash flight simulations recreating issues experienced on the aircraft, pilots discovered that they had less than 40 seconds to override MCAS and avert a crash.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 51 as written.

52.     At the time the subject aircraft and its FOM left the custody and control of Boeing, they were defective and unreasonably dangerous in one or more of the following respects, among other defects:

    a.    The subject aircraft's defective MCAS caused the aircraft's nose to suddenly, without warning, drop and dive steeply, and said event could occur even while under manual control when a pilot would not reasonably expect a flight computer to override one's actions;

    b.    The scenario described in subsection (a) above was not covered in the defective FOM, and Defendant Boeing did not disclose the foregoing or how to recover the plane from the foregoing to Lion Air pilots when Lion Air purchased the subject aircraft;

ANSWER TO COMPLAINT

c.     The subject aircraft received "erroneous input" from one of its defective AOA sensors;

d.     The scenario described in (c) above was not covered in the defective FOM, and Defendant Boeing did not disclose how to recover the plane from the foregoing to Lion Air pilots when Lion Air purchased the subject aircraft;

e.     The subject aircraft and FOM lacked proper and adequate instructions and warnings regarding the design and functions of the MCAS; and

f.     The subject aircraft and FOM lacked proper and adequate instructions and warnings regarding how to correct a malfunctioning MCAS.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 52 as written, including all sub-parts of Paragraph 52.

53.     As a direct and proximate result of one or more of the above-described defective and dangerous conditions in the subject aircraft which caused it to crash into the sea as described above, Decedent's heirs, including minor children, have suffered and will continue to suffer injuries in the form of unspeakable pain, suffering, loss of companionship, and loss of earnings and support, among other damages.

**ANSWER:**

Boeing denies that any action or inaction of Boeing resulted in the death of Plaintiff's decedent. Boeing also denies that Plaintiff is entitled to any relief from Boeing. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 53 and therefore denies them.

## VI.    The FAA and Boeing Issue Directives on MCAS after the Lion Air Crash

54.     Boeing's actions subsequent to the crash show that it failed Lion Air and its passengers with respect to the design of the aircraft as well as the information it provided regarding the aircraft.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 54.

55.     On November 6, 2018, Boeing issued Flight Crew Operations Manual Bulletin No. TBC-19 regarding "Uncommanded Nose Down Stabilizer Trim Due to Erroneous Angle of Attack (AOA) During Manual Flight Only." Therein, for the first time, Boeing explained that a problem could arise on MAX airplanes due to erroneous AOA readings. Boeing further disclosed that pilots would be unable to counteract automatic pushing of the plane's nose downward "unless the stabilizer trim system is deactivated through the use of both STAB TRIM CUTOUT switches[.]"

ANSWER TO COMPLAINT

**ANSWER:**

Boeing admits that it issued Flight Crew Operations Manual Bulletin No. TBC-19 on November 6, 2018. The contents of that document speak for themselves. Boeing denies the remaining allegations contained in Paragraph 55 as written.

56.     On November 7, 2018, the FAA sent an emergency directive to all MAX 8 operators which detailed that pilots can stop a malfunctioning MCAS by merely pressing two buttons. The bulletin further details: "This condition, if not addressed, could cause the flight crew to have difficulty controlling the airplane, and lead to excessive nose-down attitude, significant altitude loss, and possible impact with terrain."

**ANSWER:**

Boeing admits that Federal Aviation Authority Emergency Airworthiness Directive 2018-23-51 was issued on November 7, 2018. The contents of that document speak for themselves. Boeing denies the remaining allegations contained in Paragraph 56 as written.

57.     On November 10, 2018, Boeing sent correspondence to all 737NG/MAX customers, among others, identifying MCAS and explaining its function. Boeing confirmed therein that MCAS was new to 737 MAX models.

**ANSWER:**

Boeing admits that it sent correspondence to all 737NG/MAX customers on November 10, 2018. The contents of that document speak for themselves. Boeing denies the allegations contained in Paragraph 57 as written.

58.     After Boeing issued its warning bulletin, Capt. Mike Michaelis, chairman of the safety committee of the Allied Pilots Association at American Airlines, told pilots: "This is the first description [of the MCAS] you, as 737 pilots, have seen . . . It is not in the American Airlines Flight Manual . . . nor is there a description in the Boeing FCOM (Flight Crew Operation Manual)."

**ANSWER:**

Boeing admits that the quoted language in Paragraph 58 appears in an article published by the *Seattle Times*. Boeing lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 58 and therefore denies them.

59.     The new information prompted one pilot to exclaim in an online chat forum:

We had no idea that this MCAS even existed. It was not mentioned in our manuals anywhere (until today). Everyone on the 737 had to

ANSWER TO COMPLAINT

> go through differences training for the MAX and it was never
> mentioned there either . . . I've been flying the MAX-8 a couple
> times per month for almost a year now, and I'm sitting here
> thinking, what the hell else don't I know about this thing?

**ANSWER:**

Boeing lacks knowledge or information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 59 and therefore denies them.

**VII.    Another 737 MAX 8 Crashes and the FAA Grounds the Aircraft in the U.S.**

60.    On March 10, 2019, another commercial flight involving the Boeing 737 MAX 8,
Ethiopian Airlines Flight 302, crashed shortly after takeoff.

**ANSWER:**

Boeing admits that, on March 10, 2019, a Boeing 737-8 aircraft, a commercial passenger

flight operated by Ethiopian Airlines as Flight 302, crashed.  Boeing denies the remaining

allegations contained in Paragraph 60 as written.

61.    On March 13, 2019, the FAA grounded all Boeing 737 MAX aircrafts in the U.S.

**ANSWER:**

Boeing admits that on March 13, 2019, the FAA imposed operational restrictions on the

737 MAX aircraft.  Boeing denies the remaining allegations contained in Paragraph 61 as

written.

62.    Investigation has shown that both the Lion Air and Ethiopian Airlines flights
experienced similar fluctuations in altitude before crashing, as illustrated below:

ANSWER TO COMPLAINT







**ANSWER:**

Boeing denies the allegations contained in Paragraph 62 as written. In further response, Boeing states that the graphic below Paragraph 62 does not consist of properly pled factual

ANSWER TO COMPLAINT

allegations and therefore requires no response from Boeing; to the extent a response is required, Boeing denies the accuracy of the text and images contained in these conclusory graphics as depicted.

## VIII. Boeing Recognizes the Problems with the MAX's Flight Control System and Announces a "Software Update" to Correct It

63.     Boeing has now recognized the defects in the MAX's flight control system which caused the Lion Air crash.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 63 as written.

64.     Boeing has now claimed that it has "developed an MCAS software update to provide additional layers of protection if the AOA sensors provide erroneous data." Boeing has further claimed that the flight control system "will now compare inputs from both AOA sensors" and that the "MCAS can never command more stabilizer input than can be counteracted by the flight crew pulling back on the column."

**ANSWER:**

Boeing admits that the quoted language in Paragraph 64 reflect excerpts from language available on Boeing's website at https://www.boeing.com/commercial/737max/737-max-software-updates.page.  Boeing denies the remaining allegations contained in Paragraph 64 as written.

65.     On April 4, 2019, Boeing CEO Dennis Muilenburg apologized for the death of passengers in both the Lion Air and Ethiopian Airlines flights. In his apology, Mr. Muilenburg admitted that "it's apparent that in both flights the Maneuvering Characteristics Augmentation System . . . activated in response to erroneous angle of attack information."

**ANSWER:**

Boeing admits that, on April 4, 2019, Boeing's CEO Dennis Muilenburg made a public statement regarding the crashes of Lion Air Flight JT 610 and Ethiopian Airlines Flight 302, and that a complete version of his remarks are available at https://www.boeing.com/commercial/737max/737-max-update.page#/message.  The contents of that statement speak for themselves.  Boeing denies the remaining allegations contained in Paragraph 65 as written.

66.     As of today, all known Boeing 737 MAX airplanes remain grounded.

ANSWER TO COMPLAINT

**ANSWER:**

Boeing admits that the FAA issued an Emergency Order on March 13, 2019 that imposed operational restrictions on the 737 MAX aircraft and that other countries have imposed similar operational restrictions. Boeing denied the remaining allegations contained in Paragraph 66.

### COUNT I
### STRICT PRODUCTS LIABILITY
**(Pursuant to the Illinois Wrongful Death Act, 740 ILCS 1801, et seq.)**

67.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

**ANSWER:**

Boeing incorporates herein by reference its responses to Paragraphs 1–66, *supra*, as if set forth fully herein.

68.     At all relevant times, Boeing did design, manufacture, assemble, inspect, repair, endorse, draft, test, franchise, market, promote, advertise, supply, lease, distribute, and place into the stream of commerce the subject aircraft and FOM.

**ANSWER:**

Boeing admits that it designed, manufactured, assembled, inspected, tested, marketed, sold, and delivered the Subject Aircraft, except for those components, parts, and systems of the Subject Aircraft that were designed, manufactured, assembled, inspected, tested, marketed, sold, and delivered by others, and the components, parts, and systems that were subsequently removed, installed, exchanged, altered, modified, retrofitted, overhauled, or manufactured by others. Boeing also admits that it provided Lion Air a copy of a Flight Crew Operations Manual ("FCOM") for the Subject Aircraft. Boeing denies the remaining allegations contained in this paragraph.

69.     At the time the subject aircraft and FOM left the hands of Boeing, the subject aircraft, FOM, and the components alleged above, were defective and unsafe in manufacture, design, and warnings.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 69.

ANSWER TO COMPLAINT

70.     On or about October 29, 2018, Lion Air and its officers, directors, employees, and/or agents and Decedent were using the subject aircraft and FOM in a reasonable and foreseeable manner. Lion Air and its officers, directors, employees, and/or agents and the Decedent were unaware that said products were unsafe for their intended use. The defective and unsafe conditions of aforesaid products caused the subject aircraft to plummet into an uncontrollable nosedive and crash into the sea. The Decedent was killed as a direct and legal result of the defective and unsafe conditions of said products and the component parts thereof.

**ANSWER:**

Boeing denies that any action or inaction of Boeing resulted in the death of Plaintiff's

decedent.  Boeing lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations contained in Paragraph 70 and therefore denies them.

71.     Boeing knew or should have known of the defects in the design and manufacture of the aforesaid products, which constitutes a hazard for those coming into contact with the aforesaid products and the component parts, and Defendant Boeing failed to notify, warn, and protect those coming into contact with the aforesaid products, and such failure to warn was one of the legal causes of the incident and death of Decedent.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 71.

72.     The aforesaid products failed to perform as safely as an ordinary consumer would have expected when the subject aircraft plummeted into an uncontrollable nose dive and crashed into the sea.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 72 as written.

73.     As a direct and legal result of the acts and omissions of Boeing, Decedent's heirs have been deprived of the love, care, society, comfort, assistance, protection, affection, companionship, guidance, solace, services, and support of said Decedent, and have thereby sustained, and will continue to sustain, pecuniary loss in a sum as yet unascertained.

**ANSWER:**

Boeing denies that any action or inaction of Boeing resulted in the death of Plaintiff's

decedent.  Boeing also denies that Plaintiff is entitled to any relief from Boeing.  Boeing lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

contained in Paragraph 73 and therefore denies them.

WHEREFORE, Plaintiff requests that this Court grant judgment in their favor and against Defendant on Count I and award Plaintiff the following relief:
(1)     Award Plaintiff all compensatory damages available under the law in an amount to be determined at trial;

ANSWER TO COMPLAINT

(2)    Award Plaintiff punitive damages in an amount to be determined at trial;
(3)    Award Plaintiff interest in an amount to be determined by the Court;
(4)    Award Plaintiff court costs in an amount to be determined by the Court; and
(5)    Grant such other relief as this Court deems appropriate and just.

**ANSWER:**

Boeing denies that Plaintiff is entitled to any relief from Boeing.

### COUNT II
### NEGLIGENT PRODUCTS LIABILITY
### (Pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1, et seq.)

74.    Plaintiff realleges and incorporates by reference paragraphs 1-66 as though fully set forth herein.

**ANSWER:**

Boeing incorporates herein by reference its responses to Paragraphs 1–66, *supra*, as if set forth fully herein.

75.    At all times herein mentioned, Boeing so negligently, carelessly, recklessly, and with gross negligence, designed, manufactured, assembled, inspected, repaired, maintained, endorsed, drafted, tested, franchised, supplied, sold, leased, distributed, and placed into the stream of commerce the subject aircraft and FOM, and negligently failed to warn, relative to the said products and components alleged above, and otherwise so negligently conducted itself, so as to directly and legally cause the injuries and damages described herein to Plaintiff.

**ANSWER:**

Boeing denies that any action or inaction of Boeing resulted in the death of Plaintiff's decedent.  Boeing denies the remaining allegations contained in Paragraph 75.

76.    At all times herein mentioned, Defendant Boeing knew, or in the exercise of reasonable care should have known, that the subject aircraft, the FOM and the components alleged above, were defectively and negligently manufactured, designed, assembled, tested, inspected, fabricated, constructed, distributed, marketed, and sold. Defendant Boeing failed to take reasonable steps to avoid exposing consumers, including Decedent, to the dangerous condition of such products, failed to disclose the products' known defects, failed to warn, failed to recall, failed to provide or send subsequent warnings after distribution to consumers, failed to warn Lion Air of the MCAS system, and otherwise so negligently conducted itself, so as to directly and legally cause the injuries and damages described herein to Decedent's heirs, including minor children.

**ANSWER:**

Boeing denies that any action or inaction of Boeing resulted in the death of Plaintiff's decedent.  Boeing denies the remaining allegations contained in Paragraph 76.

ANSWER TO COMPLAINT

77.     On or about October 29, 2018, Lion Air and its officers, directors, employees, and/or agents and Decedent were using the subject aircraft and FOM in a reasonable and foreseeable manner. Lion Air and its officers, directors, employees, and/or agents and Decedent were unaware that said products were unsafe for their intended use. The defective and unsafe conditions of the foregoing products caused the subject aircraft to fall into an uncontrollable nosedive and crash into the sea. The Decedent was killed as a result of the defective nature of the subject aircraft and FOM.

**ANSWER:**

Boeing denies that any action or inaction of Boeing resulted in the death of Plaintiff's

decedent.  Boeing lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations contained in Paragraph 77 and therefore denies them.

78.     Boeing had a duty, as a designer and manufacturer of goods, to manufacture, design, inspect and test the subject aircraft and FOM to ensure they were safe for use by ordinary consumers.

**ANSWER:**

The allegations contained in Paragraph 78 consist of legal conclusions to which no

response from Boeing is required; to the extent a response is required, Boeing admits that it owes

the duties imposed by applicable law. Boeing denies the remaining allegations in Paragraph 78.

79.     From the time the subject aircraft and FOM were delivered to Lion Air to the time of the crash, the aforesaid products were only used for their intended purpose and were not modified, upgraded, altered, damaged, or substantially changed in any way.

**ANSWER:**

Boeing lacks knowledge or information sufficient to form a belief as to the truth of the

allegations contained in Paragraph 79 and therefore denies them.

80.     As a direct and legal result of the acts and omissions of Defendant Boeing, Decedent's heirs have been deprived of the love, care, society, comfort, assistance, protection, affection, companionship, guidance, solace, services, and support of said Decedent, and have thereby sustained, and will continue to sustain pecuniary loss in a sum as yet unascertained.

**ANSWER:**

Boeing denies that any action or inaction of Boeing resulted in the death of Plaintiff's

decedent.  Boeing also denies that Plaintiff is entitled to any relief from Boeing.  Boeing lacks

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

contained in Paragraph 80 and therefore denies them.

ANSWER TO COMPLAINT

WHEREFORE, Plaintiff requests that this Court grant judgment in their favor and against Defendant on Count II and award Plaintiff the following relief:

(1)     Award Plaintiff all compensatory damages available under the law in an amount to be determined at trial;

(2)     Award Plaintiff punitive damages in an amount to be determined at trial;

(3)     Award Plaintiff interest in an amount to be determined by the Court;

(4)     Award Plaintiff court costs in an amount to be determined by the Court; and

(5)     Grant such other relief as this Court deems appropriate and just.

**<u>ANSWER:</u>**

Boeing denies that Plaintiff is entitled to any relief from Boeing.

**<u>COUNT III</u>**
**CIVIL CONSPIRACY**
**(Pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1, et seq.)**

81.     Plaintiff realleges and incorporates by reference paragraphs 1-66 as though fully set forth herein.

**<u>ANSWER:</u>**

Boeing incorporates herein by reference its responses to Paragraphs 1–66, *supra*, as if set

forth fully herein.

82.     Boeing conspired with and/or agreed to participate in a scheme, plan, and/or device with the FAA and/or agents of the FAA to hastily certify the 737 MAX 8 in violation of U.S. law, in a quest to best a foreign company, Airbus, in the sale of comparable aircrafts.

**<u>ANSWER:</u>**

Boeing denies the allegations contained in Paragraph 82.

83.     Boeing and the FAA and its agents knowingly participated in this conspiracy by concealing, omitting, ignoring, and/or downplaying the safety issues with the 737 MAX 8 aircraft and its flight control system. Such conspiracy was accomplished through the FAA's improper delegation of safety assessments to Boeing and, in turn, Boeing's submission of incomplete and incorrect assessments to the FAA, specifically with respect to the MCAS.

**<u>ANSWER:</u>**

Boeing denies the allegations contained in Paragraph 83.

84.     Boeing committed overt tortious and/or unlawful actions in furtherance of this conspiracy by: (a) failing to adhere to industry standards and regulations in designing the MAX; (b) improperly classifying safety hazards relating to the MAX, including its flight control system; (c) failing to recuse itself from the certification process when it knew it was acting with the sole, or primary, purpose of certifying the MAX quickly so as to compete with Airbus; and (d) pressuring Boeing personnel to design the MAX, and assess such design, in order to obtain quick certification and not for the safety of pilots and passengers.

ANSWER TO COMPLAINT

**ANSWER:**

Boeing denies the allegations contained in Paragraph 84.

85.     As a result, Boeing produced, and the FAA certified, a defective passenger aircraft which caused the deaths of hundreds of people, including Decedent.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 85.

86.     Plaintiff was therefore injured and sustained damages as a direct and proximate result of Boeing's actions and omissions as part of the conspiracy.

**ANSWER:**

Boeing denies the allegations contained in Paragraph 86.

WHEREFORE, Plaintiff requests that this Court grant judgment in _____ favor and against Defendant on Count III and award Plaintiff the following relief:
(1)     Award Plaintiff all compensatory damages available under the law in an amount to be determined at trial;
(2)     Award Plaintiff punitive damages in an amount to be determined at trial;
(3)     Award Plaintiff interest in an amount to be determined by the Court;
(4)     Award Plaintiff court costs in an amount to be determined by the Court; and
(5)     Grant such other relief as this Court deems appropriate and just.

**ANSWER:**

Boeing denies that Plaintiff is entitled to any relief from Boeing.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

### FIRST DEFENSE

1.     The Complaint and all claims for relief therein should be dismissed on the ground of *forum non conveniens*.

### SECOND DEFENSE

2.     Plaintiff's damages, if any, were proximately caused by the acts or omissions of others over whom Boeing had no control or right of control, which may include but are not limited to the flight crew and the operator, and/or said acts or omissions were a superseding and sole, direct, and proximate cause of Plaintiff's damages, if any.

ANSWER TO COMPLAINT

**THIRD DEFENSE**

3.      If Plaintiff was damaged by products originally designed, manufactured, assembled, inspected, tested, or sold by Boeing, those products were subsequently installed, removed, exchanged, altered, modified, retrofitted, repaired, overhauled, remanufactured, improperly maintained, or misused by persons and/or entities other than Boeing, and over whom Boeing had no control or right of control, and such installation, removal, change, alteration, repair, modification, retrofitting, overhauling, remanufacturing, improper maintenance, or misuse proximately caused or contributed to the events alleged in the Complaint and the resulting damages complained of, if any.

**FOURTH DEFENSE**

4.      Actions or omissions of third parties over whom Boeing had no control, which may include but are not limited to any entity that altered, modified, overhauled, or repaired any relevant equipment on the Subject Aircraft, or the flight crew and the operator, were the sole, direct, and proximate cause of the damages, if any, of Plaintiff.

**FIFTH DEFENSE**

5.      Boeing places in issue the negligence, fault, and responsibility of all persons and entities, which may include but are not limited to any entity that altered, modified, overhauled, or repaired any relevant equipment on the Subject Aircraft, or the flight crew and the operator, that have contributed in any degree to the injuries and damages alleged to have been sustained by Plaintiff.  Judgment against Boeing, if any, should be diminished to an amount that represents Boeing's degree of negligence, fault, or responsibility, if any.

**SIXTH DEFENSE**

6.      Plaintiff's claims may be barred by virtue of failing to properly identify Plaintiff's Special Administrator.

**SEVENTH DEFENSE**

7.      The Subject Aircraft was intended for and sold to a knowledgeable and sophisticated user over whom Boeing had no control.

ANSWER TO COMPLAINT

### EIGHTH DEFENSE

8.     The Subject Aircraft was certified as airworthy by the Federal Aviation Administration and complied with all applicable codes, standards, and regulations of the United States and agencies thereof at the time it was delivered by Boeing.

### NINTH DEFENSE

9.     Boeing complied with all applicable federal, state, and foreign statutes, codes, and administrative regulations existing at the time the Subject Aircraft was manufactured and all applicable standards for design, inspection, testing, warning and manufacture.

### TENTH DEFENSE

10.     The design of the Subject Aircraft and each component thereof that was installed at the time of delivery by Boeing was consistent with or exceeded the "state of the art" at the time of its design and manufacture.

### ELEVENTH DEFENSE

11.     The benefits of the design of the Subject Aircraft and each component thereof outweigh the risks associated therewith, if any.

### TWELFTH DEFENSE

12.     The Complaint and all claims for relief therein should be dismissed on the ground that Plaintiff has failed to join necessary and indispensable parties.

### THIRTEENTH DEFENSE

13.     Plaintiff may lack standing to bring this action.

### FOURTEENTH DEFENSE

14.     An award or judgment rendered in favor of Plaintiff must be reduced by the amount of benefits Plaintiff received, or is entitled to receive, from any source as a result of this accident.

### FIFTEENTH DEFENSE

15.     Some or all of Plaintiff's claims and available damages may be barred by virtue of prior settlements.

ANSWER TO COMPLAINT

### SIXTEENTH DEFENSE

16.     Plaintiff's claims may be barred in whole or in part and/or preempted by federal law.

### SEVENTEENTH DEFENSE

17.     Evidence of subsequent remedial measures is not admissible to prove liability. *See* Federal Rule of Evidence 407.

### EIGHTEENTH DEFENSE

18.     Plaintiff's Complaint fails to state a claim upon which relief can be granted against Boeing and further fails to state facts sufficient to entitle Plaintiff to the relief sought, or to any relief whatsoever, from Boeing.

### NINETEENTH DEFENSE

19.     To the extent that Plaintiff seeks punitive damages, those damages are barred or limited by provisions of the United States Constitution, state constitutions, or other applicable law including, without limitation, proscriptions against double jeopardy and excessive fines and provisions assuring due process of law and equal protections of laws.

### TWENTIETH DEFENSE

20.     Plaintiff's Complaint is premature in that it was filed and served before the completion of the investigations arising from the October 29, 2018 accident at issue, including the ongoing investigation of the Indonesia National Transportation Safety Committee. Boeing reserves the right to add those affirmative defenses that it deems necessary to its defense during or upon the conclusion of investigation and discovery. Boeing further reserves the right to assert any additional affirmative defenses asserted by another defendant and/or allowed by the law of the jurisdiction found to apply in this case

### NOTICE OF THE APPLICABILITY OF THE LAW OF ANOTHER JURISDICTION

Pursuant to Federal Rule of Civil Procedure 44.1, Boeing gives notice that it may raise issues concerning the applicability of the law of another jurisdiction, including but not limited to the laws of other states and/or a foreign country or countries, and reserves the right to assert and

ANSWER TO COMPLAINT

plead such other claims and defenses available to it arising out of the application of the substantive laws of another jurisdiction.

## PRAYER FOR RELIEF & DEMAND FOR JUDGMENT

WHEREFORE, Defendant The Boeing Company prays as follows:

That Plaintiff takes nothing by the Complaint, that the Complaint be dismissed, and that judgment on the Complaint be entered for Boeing;

That Boeing be awarded its costs of suit and attorneys' fees;

That the Court grant such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Defendant The Boeing Company hereby demands trial by jury on all claims and defenses before the Court in this litigation.

DATED: September 20, 2019        **THE BOEING COMPANY**

By: /s/ Gretchen M. Paine _____
*One of its Attorneys*

Bates McIntyre Larson
BLarson@perkinscoie.com
Daniel T. Burley
DBurley@perkinscoie.com
**Perkins Coie LLP**
131 S. Dearborn, Suite 1700
Chicago, Illinois 60603-5559
Phone: (312) 324-8400
Fax: (312) 324-9400

Mack H. Shultz
MShultz@perkinscoie.com
Gretchen M. Paine
GPaine@perkinscoie.com
**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000

ANSWER TO COMPLAINT

## CERTIFICATE OF SERVICE

I, Gretchen M. Paine, certify that on September 20, 2019, I electronically filed the foregoing ***DEFENDANT THE BOEING COMPANY'S ANSWER TO PLAINTIFF'S COMPLAINT*** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to attorneys of record, and by email.

Steven A. Hart
John S. Marrese
HART MCLAUGHLIN & ELDRIDGE, LLC
22 West Washington Street
Suite 1600
Chicago, IL 60602
Phone: (312) 955-0545
Fax: (312) 971-9243
shart@hmelegal.com
jmarrese@hmelegal.com

Brian S. Kabateck (*pro hac vice* pending)
Christopher B. Noyes (*pro hac vice* pending)
KABATECK LLP
633 West 5th Street, Suite 3200
Los Angeles, California 90071
Phone: (213) 217-5000
Fax: (213) 217-5010
bsk@kbklawyers.com
cn@kbklawyers.com

Sanjiv N. Singh (*pro hac vice* pending)
SANJIV N. SINGH, APLC
1650 South Amphlett Blvd. Suite 220
San Mateo CA 94402
Phone: (650) 389-2255
Fax: (415) 358-4006
ssingh@sanjivnsingh.com

I certify under penalty of perjury that the foregoing is true and correct.

DATED this 20th day of September 2019.

 /s/ Gretchen M. Paine
PERKINS COIE LLP
1201 3rd Avenue, Ste 4900
Seattle, WA 98101
Tel: (206) 359-8000
Fax: (206) 359-9000

ANSWER TO COMPLAINT

-31-