# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT COURT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| IN RE: Lion Air Flight JT 610 Crash | **Lead Case: 1:18-cv-07686**<br>Original Case No.: 1:19-cv-03415<br><br>Hon. Thomas M. Durkin |

## DECLARATION OF SANJIV N. SINGH IN SUPPORT OF PLAINTIFF RINI SOEGIYONO'S REPLY BRIEF

I, SANJIV N. SINGH, do hereby DECLARE as follows:

### BACKGROUND

1. I am an attorney licensed to practice in the State of California and have been counsel engaged by Plaintiff Rini Soegiyono who is an individual claimant in the above captioned litigation and also aunt to minors F.F.N.W. and F.S.N.W. ("Minor Claimants") named in the above captioned litigation and the subject of the current pending motion to appoint a Guardian Ad Litem. I am co-lead counsel with Brian Kabateck who is admitted pro hac vice in this matter, and who has submitted other declarations accepted by this court in connection with our other Lion Air clients.

2. This declaration is made in support of the Reply Brief we have filed in response to Defendants Opposition to our Motion for Appointment of a Guardian Ad Litem.

3. I first became aware of the Lion Air crash in November of 2018. I have been an attorney for nearly 23 years, and focus my practice on catastrophic loss and injury, corporate litigation, and corporate malfeasance. I have significant experience with protecting minors interests in high profile, complex litigation matters, I am currently lead counsel in the death

1

of Jose Luis Delgado Lopez at the Apple Campus (*Irma Vargas v. Level 10* et al.) where I represent the interests of three toddlers and the surviving spouse of an iron worker who plummeted to his death at the enormous clover shaped Apple Campus in the fall of 2016. We protected the interests of multiple minors in the *Boeing* litigation. I am also co-lead counsel (with my co-counsel in this matter) on the high profile case involving the death of minors Jaliyah Hickman and Camille Brewster due to alleged failure of a government agency to intervene and protect them after repeated complaints of abuse (see *Hickman et al. v. Los Angeles County et al*.) During the same year that I personally discovered that matter through an agency whistleblower who approached me, the UCI Press Freedom and Transparency legal team was moving to unseal the juvenile files for that case. In brief, I am thus familiar with the various complex legal (both civil and criminal) and clinical/child safety issues which can arise when minors' interests must be protected in the context of civil litigation.

4. In this matter, my co-counsel Michael Indrajana, who is of Indonesian heritage and has deep Indonesian roots and who is the trustee for multiple other minor plaintiffs in this matter, was invited by representatives of families who lost loved ones to meet with them in Indonesia and investigate the circumstances of the crash and the facts regarding each family. I sent Mr. Indrajana to Indonesia where he remained for seven months continuously and then returned for significant periods of time after that and was in close contact with me on an almost daily basis. During that time, I also had significant interaction with clients (by Skype, WhatsApp, phone, and other messaging) and specifically in this case, came to know Plaintiff Rini Soegiyono and her efforts to protect the interests of the two minor

children that are subject of this motion. During the life of this matter, we also had multiple other reputable attorneys working with us to investigate claims and related matters for all of our clients. Those firms are Kailimang Ponto[1] and Adams & Co.[2], both highly respected Indonesian law firms known within Indonesia and outside Indonesia for their expertise on Indonesian legal matters.

5. In Mr. Lindquist's declaration, he repeatedly makes references to HLG having agreements with "Mr. Singh." They also use oddly condescending, pejorative adjectives like "frenetic" and "frantic" to describe my communications as if they were personal missives from me rather than emails on behalf of our entire team (which includes at least six U.S. based attorneys from three different firms, and approximately six to eight Indonesian based attorneys from two different reputable law firms). It is unclear why the Hermann Group is choosing this tactic and misstating the facts to the Court. Read together, a person not familiar with the matter would think that I individually handled the entire matter, and that this was some personal crusade of a lone lawyer disrupting their prosecution of claims. He unprofessionally refers to me as "Attorney Sanjiv" (Herrmann Dec. at Paragraph 7), and it is odd that Charles Herrmann does not mention Brian Kabateck once in his declaration.

6. Mr. Lindquist's declaration is deficient and incorrect as follows:

   a. At Paragraph 8, he states the "HLG and Mr. Singh" came to a partial agreement on BFAF Funds. This is incorrect. The Agreement was with all co-counsel representing Plaintiff Soegiyono, not just with me. Attached to this declaration as **Exhibit 1** is

---

[1] http://kailimang-ponto.com/

[2] https://adams.co.id/blog/the-firm/

a true and correct copy of an email thread showing interactions between HLG and our whole team which consisted of Michael Indrajana and Brian Kabateck and myself. It was understood by everyone involved that Mr. Kabateck and I were lead co-counsel on the matter. (The only firm not reflected on the email was local Chicago counsel who were not involved in significant substantive work and were brought in by Mr. Kabateck for a very limited role in our cases.)

b. At Paragraph 9, Mr. Lindquist inaccurately describes communications with our team implying that they received emails from me regarding alleged misconduct. In reality, Mr. Lindquist received emails on behalf of our whole team and then was invited to a private comprehensive meeting with our entire team (Michael Indrajana, Brian Kabateck, myself, and Katherine Bruce, a senior associate from Brian Kabateck' office). We offered significant evidence to Mr. Lindquist for his review, some of which he showed interest in but some of which he declined to review when we offered it to him on condition he would sign an attorneys' eyes only agreement due to our concerns for retaliation by his clients' family. Attached as **Exhibit 2** is a true and correct copy of an email sent by our team to the Herrmann Law Group on January 23, 2020. You can see that Mr. Lindquist remains silent on the offer for attorneys' eyes only access, but instead agrees to meet us in person in San Francisco.

c. It is notable, as shown in Exhibit 2, that Chuck Herrmann appeared largely uninvolved in the matter as far as I could tell. Mr. Lindquist told me on several occasions that Mr. Herrmann's main reason for travel to Indonesia was client

4

development for some release cases and also his need to finalize settlements with families. It was expressly told to me by telephone and in person by Mr. Lindquist that Mr. Herrmann had limited time to deal with the Soegiyono/Wiranofa matter, and that "Chuck has matters in Ethiopia" or words to that effect. Mr. Herrmann several times referred to the Indonesian cases somewhat pejoratively in my opinion, telling us and other counsel that we would never get more than the "Indonesian dollars" similar cases had achieved in the past. We did not listen to Mr. Herrmann on these musings (which both Mr. Indrajana and I found personally distasteful and offensive), and rejected his advice on how to value the Lion Air cases. In fact, we urged him not to devalue his position or the collective position of the other Plaintiffs. We believe Mr. Herrmann's approach not only ran the risk of devaluing the cases in general, but specifically ran the risk of devaluing the Soegiyono and Wiranofa cases.

d. Mr. Herrmann did not even bother to appear by telephone for the important in person meeting with San Francisco. (In sharp contrast, Brian and I recognized that the interests of the orphans were extremely important, and thus both made sure to be directly involved in the meeting and evaluating evidence of Nurdin's misconduct. This disparity of involvement also was a consistent pattern I observed throughout the litigation—our team filed and advocated on behalf of the little girls in both cases starting from May 21, 2019, and we were actually assisting the family even before that as early as February of 2019. Herrmann Law Group did not take any actions on behalf of the orphan girls, to our knowledge, until late in 2019 when

5

they claimed to represent the girls through the purported order of a religious tribunal outside Jakarta.)

e.  In Paragraph 9, Mr. Lindquist states "Mr. Singh claims we authorized him to negotiate for our clients in mediation with Boeing. This is not true." To support his assertion, he refers to emails where I make statements about the custody dispute. My statements are entirely consistent with the settlement agreement. He is correct that of course, as is not disputed, we did not agree on the custody front, and continued to press them to do the right thing there.[3] It was expressly decided at that meeting that we would separate the custody issues from settlement, but that the Kabateck/SNS/ILG team would move forward to settle the cases for the highest value it could but that allocation of the proceeds would remain an open question. Brian, Michael, and I were fine with this as our paramount concern was not to injure the interests of the little girls. There was an express agreement to settle the cases that day, and our team acted on that. It made good sense that this would be the case for several reasons. We believed that our approach was more aggressive than HLG's approach—HLG had publicly made statements implying a lower value for the Indonesian cases, which we did not espouse, and HLG had ignored the claims of the minor girls.

---

[3] Again, it is puzzling why Mr. Lindquist chooses to only name me in his affidavit for most of the allegations about what he thinks happened. In reality, Mr. Lindquist met with four different attorneys on January 30, 2020 at the SFO Signature FBO private jet terminal in a private suite booked by Mr. Kabateck where I personally delivered an intensive PowerPoint and previewed multiple declarations to him in the presence of three other U.S. based attorneys, namely Brian Kabateck, Michael Indrajana, and Katherine Bruce—I did not release evidence to him there because he refused to sign an attorneys eyes only agreement.

f.  Indeed, Mr. Lindquist was very cordial and cooperative at this meeting in January. In addition to agreeing to let us settle the case rather than lose momentum, he approached Mr. Indrajana and me in the parking lot of the terminal and said he wanted to preview a proposal of joint custody. We became suspicious of this sudden move in view of his agreement to let us settle the cases—it seemed motivated by financial interest rather than well being of the girls and so we declined.  We also were suspicious because the same offer had been through an intermediary in Indonesia. The timing was genuinely concerning and seemed financially motivated.

g.  In his declaration, at Paragraph 11 and 12, Mr. Lindquist offers the court supposed evidence of no agreement as to who would pursue settlement and cites to two emails—an October 10, 2019 email and a January 7, 2020 email.  Both of those emails *predate* the January 30, 2020 meeting at the Signature FBO terminal where it was decided and confirmed that we would separate the custody issues from the settlement issues.

h.  It should also be noted that on the same day as the Signature FBO meeting, Mark Lindquist met me a second time for another meeting in the hotel lobby of the Four Seasons in San Francisco before his flight. We discussed at length his views on the case and the plan. He stated expressly that he believed my plan to offer them attorneys eyes only preview of evidence was fair and reasonable, but that "Chuck" had concerns. He even said my proposal was "smart" and put the interests of the girls first. I urged him to get "Chuck" to agree.

7

7. Mr. Lindquist includes an odd non sequitur in his declaration: "To the best of my knowledge, the Lion Air JT610 crash was the first mass disaster aviation litigation case for all of the attorneys present including me." I believe Mr. Lindquist has minimal private practice litigation experience until very recently. Mr. Kabateck and I have a combined experience of 29 and 23 years respectively in private practice and extensive litigation experience, including extensive litigation experience on complex cases involving fatalities, mass torts, cross border issues, etc. I do not believe Mr. Lindquist has this breadth of experience. As stated in Paragraph 3 above, I also have significant experience navigating the interest of minor claimants and related interests of minors in civil litigation. I also have nearly a decade of experience as an internal medicine physician (M.D. from UCSF, and Internal Medicine Residency at Stanford) and I have been since 2012 a VA Palo Alto staff attending in the Emergency Room with extensive experience with victims of trauma, abuse, etc. Thus Mr. Kabateck and I individually and collectively have more than ample requisite experience to navigate the issues and understand the grave dangers posed to the girls. We were deeply concerned that the Herrmann Law Group was spread thin with their large number of clients and relatively small team and seemed financially motivated in their approach to the cases and the interest of the girls. During many of the key interactions, Mr. Lindquist was sent to meet with us and always mentioned that "Chuck" had authorized him to meet with us and move things forward and was tied up in other matters in Ethiopia and elsewhere.

8. On March 2, 2020, we informed Herrmann Law Group of the settlement with Boeing. Later than day, Chuck Herrmann sent a Microsoft Word document in non finalized form to

me a couple of hours later. It appeared very rapidly written, particularly in that it was sent to me in draft form rather than in properly signed PDF format. I cannot include all of it or attach it as it contains jointly privileged information, but I will highlight the non privileged portions as follows:

a. He concedes that "Andri did strike Niyar **on one occasion**. [emphasis added]" We had told them there was violence in the home witnessed by the girls, and that third parties linked Plaintiff Nurdin to the violence, indicating that Nurdin would verbally abuse his son, and the son would react violently after his departure. Supplemental Declaration of Hartini previously submitted in support of Motion at Paragraph 4. Hermann later changes his view in his recent Declaration to say "Andri had physically abused Niar on **two** occasions." I had repeatedly told Mr. Lindquist about the affidavits we had connecting Nurdin to instigating his son's violence, and also the sheer physical resemblance of Nurdin to his son and the trauma that could impose on the little girls. I also conveyed to Mark Lindquist repeatedly the significant evidence showing Nurdin's apparent interest in the assets and money that was supposed to be protected for the Minor Claimants outlined extensively in our Motion.

b. Mr. Herrmann also stated in his March 2, 2020 letter the following: "You just passed on an accusation to the effect that Andri's brother Wahyu, a respected law enforcement officer, threatened the neighborhood "R.T.," a Mr. Hidayat. Entirely false. We interviewed Hidayat in person. He stated Wahyu was polite and professional. There were no threats or intimidation. He invited Wahyu into his home

where their civil conversation ended well." This statement is false. I have personally seen the WhatsApp messages sent by Hidayat where he says that he was intimidated and his wife threatened by Nurdin's family, and most concerningly, it happened while Mr. Lindquist was in Indonesia. The facts concerning this and the screenshots of the WhatsApp communications are addressed in the concurrently filed Declaration of Michael Indrajana, and also below under Paragraph 12.

9. On March 2, 2020, that same day, I sent a response to Mr. Herrmann and refuted all of his statements. I expressly wrote it as a non privileged communication and did not include any privileged information in it. Attached as **<u>Exhibit 3</u>** is a true and correct copy of said email which I sent to Charles Herrmann and Mark Lindquist and their team. I reminded them of their agreement to allow us to settle the case and expressed my deep concerns about the safety of the girls. It should be noted that as of June 3, 2020, an independent and highly respected Indonesian law firm Adams & Co. has filed an urgent request for protection of the Minor Claimants in Indonesia with the Indonesian Commission on Child Protection, asking the Commission to conduct an urgent evaluation and intervention on behalf of the girls. Attached as **<u>Exhibit 4</u>** is a true and correct copy of the Indonesian version and translated version of that complaint.

10. Mr. Lindquist claims in Paragraph 31 of his declaration that "in fact, in an email on February 17, 2020, Mr. Singh was still asking for authority to settle the cases on behalf of our clients." This is 100% incorrect. I have excerpted below the email for the Court's reference and it is included as Ex. 12.11 to the Lindquist declaration. The relevant paragraph reads as follows:

"Whether he will cooperate in all other regards in accordance with (a)--i.e. returning all Soegiyono assets and joint assets for accounting, cooperating and empowering our group on all settlement issues, and agreeing only to take what he is entitled to under Sharia law--however, with the proviso that if the girls' recovery is lowered because of his actions executing a release, his proportionate share on the Wiranofa side (he has no claim at all on Soegiyono) will need to be adjusted."

It is critical to understand this is not asking for his authorization to conduct settlement talks with Boeing—those were already ongoing as the parties had agreed at the in person meeting with Mark Lindquist. The specific reference in this email was to "all settlement issues" because Nurdin's conduct went well beyond just Boeing and the scope of any settlement would require cooperation on all fronts—for example, he had already seized real property assets and legal documents such as deeds (which had nothing to do with Boeing). It was also clear there would be disputes about allocation within Indonesia, which also had nothing to do with the authorization to settle with Boeing at mediation. Thus, as is plainly stated in the same sentence, I am specifically referring not to authorization to engage in achieving the settlement, but the issues that would follow or existed already. I thus wanted Nurdin to agree that he would "only take what he is entitled to under Sharia law" in view of all of his misconduct. I knew that we needed to force dialogue on the issue at this time because any court order dealing with the settlement would require an allocation, and I also knew that his seizure of assets involved real estate of considerable value as well. For Mr. Lindquist to say that my February 17 email was evidence of me still seeking "authority to settle" is simply not correct and taking the words out of context.

11. Mr. Lindquist states that I had not personally met with and interviewed any of these witnesses in Indonesia. He fails to mention or distorts several important facts: (i) My co-

counsel Mr. Indrajana spent extensive time in Indonesia meeting with relevant witnesses, including Rini Soegiyono and Hibar Soegiyono; (ii) we conducted numerous telephonic meetings, video meetings, WhatsApp meetings, etc. with the witnesses, and had qualified Indonesian attorneys on the ground who also conducted investigations and obtained properly translated affidavits (in sharp contrast to the highly questionable statements which Herrmann Law Group has produced that appear to be inadmissible as evidence for lack of authentication, translation, etc.—see Declaration of Michael Indrajana); (iii) Mr. Lindquist, by his own admission to me, stated to me that the majority of their trip was spent meeting with their other clients, and that they had a very narrow window of time for Nurdin matters—this was stated to me repeatedly; (iv) we had highly trained senior attorneys on the ground in Indonesia who spent significant time meeting with witnesses, and to date those attorneys have spent an estimated 40 to 60 hours interviewing Soegiyono/Wiranofa witnesses, including travel to remote locations to do so; (v) Mr. Hidayat met with not one but two different attorneys from highly reputable Indonesian firms providing services to our clients in Indonesia, and the screen shots of Hidayat admitting intimidation were obtained through these independent investigations—so it is entirely irrelevant whether I met with Hidayat. More importantly, Mr. Lindquist repeatedly told me that he did not have a good working knowledge of the matter, and made it clear to me and our whole team that was the case at our in person meeting in San Francisco.

12. In fact, one of the significant concerns I have about Mr. Herrmann and Mr. Lindquist's methods of investigation is that I believe, whether they intend it or not, they are potentially improperly influencing witnesses by meeting with the witnesses in very questionable

circumstances. The evidence they have offered the court is thus very questionable to say the least. For example:

a.  In Paragraph 28 of his declaration, Mark Lindquist states that he met with Hidayat on the intimidation issue and produced a picture as such and implies that there were three people present. He claims a translator was present and yet we are provided no written translation. He notes that the other person present was an HLG attorney. We sent an investigator/attorney to meet with Hidayat after we saw this picture. That attorney confirmed to me and Michael Indrajana that in fact there were **six people** sent to meet with Hidayat—to date HLG has not disclosed the identity of the other three people—at least one of them must have been taking the picture Lindquist proffers to the Court. **Why they would need six people to get a declaration from a witness who already claimed intimidation is puzzling to say the least.**

b.  We have prepared a side by side comparison of the photo Lindquist has produced and his Exhibits. Attached as **Exhibit 5** is a true and correct copy of the comparison—we took the photo and zoomed in on the contents. We have had several attorneys review it, and all agree (and Mr. Lindquist concedes in his own declaration at Paragraph 28) that the individual sitting at the laptop at the right next to the witness is Ms. Putra, an HLG attorney. She has what appears to be the draft of an affidavit on her screen and the ID of Hidayat on her screen. As stated, we never were provided a written translation. This means that the Affidavit of Hidayat provided to the court is likely written by an HLG attorney, without an independent translator. Indeed, the translator present on the other side of the table has no laptop

in front of her, there is no recording device present, and in fact the translator appears to be there for the benefit of Mark Lindquist. Ms. Putra, as advertised on the HLG website, is Indonesian speaking.

13. In addition to reviewing the Declaration of Mr. Lindquist, I reviewed the declaration of Mr. Charles Herrmann. It contains numerous incorrect or misleading statements as follows:

   a. Mr. Herrmann, like his colleague, implies throughout the declaration that there were numerous allegations by me personally and uses my name (though referring to me as "Attorney Sanjiv" at times rather than my professional name) instead of referring to our whole team throughout his declaration. As evidenced by the motion, all of my written communications and verbal communications were made to them with full authorization of the entire Kabateck/SNS/ILG team, and based on numerous investigations, witness statements, documentary evidence and literally months of investigation.

   b. Mr. Herrmann, at Paragraphs 9 -14, cites the same emails as Mr. Lindquist to argue there was no authorization to settle. This is simply not true. At the in person meeting, as recounted in detail above, which he did not bother to attend telephonically even though he could have done so, in the presence of my other co-counsel Brian Kabateck and Michael Indrajana, Mr. Lindquist authorized us to settle the matter with Boeing but we left open other settlement issues such as allocation and left very open the question of custody where we could reach no agreement.

c.  For the first time, Mr. Herrmann refers to an Indonesian law expert "Dean Sudiro". This person's name was never mentioned to us before—the only individuals mentioned before as Indonesian counsel were an individual and his associates by the name of "Danto." Mr. Herrmann, though he claims his side did not agree to us settling the case with Boeing, returned to us in April, and proposed that we continue talks with Boeing, using the number that Brian and I achieved with Boeing as a starting point to try to get more money from Boeing. The concurrently filed Declaration of Michael Indrajana addressed the issue of HLG's supposed Indonesian lawyers.

d.  In Paragraph 25, Mr. Herrmann again attacks me individually, stating that I personally represented to Boeing we had authority to settle. The representation came from our whole team including Brian Kabateck, and was made in good faith because we did have authority to settle. We had all been present at the January 30, 2020 meeting where it was decided we could proceed to settle the matter, but it was also recognized there would be a likely dispute on custody. Boeing and the Judge knew that custody issues existed, but knew we were working to settle on the monetary settlement amount for all claimants to protect everyone's interests.

e.  On Paragraph 6, Mr. Herrmann points out that he did not speak to the Judge. I have text messages that Mr. Herrmann was in direct contact with Boeing about the Soegiyono and Wiranofa claims. It could be that the dialogue took place in a tripartite fashion—in other words, Mr. Herrmann may be correct that he did not speak individually with Judge O'Connell but instead was communicating with the

Boeing who then communicated with the Judge who then communicated with me. The texts were numerous on various cases (indeed hundreds between Judge O'Connell and our team), and it is quite possible that is what happened and that I read one of Judge O'Connell's texts as indicating that the solution was offered to them by the Judge when in fact the solution was offered through discussion with the Judge and Boeing but actually offered to Mr. Herrmann by Boeing's counsel. It does not matter materially—either way, through settlement communication with either the Judge or Boeing or both, a reasonable solution was proposed. We have numerous settlement privileged emails with Mr. Herrmann from April 2020 that reflect this—likely they are not dispositive in this matter, but they can be shown to the judge in camera if needed.

14. Both Mr. Lindquist and Mr. Herrmann attempt to offer their "opinions" in their declaration about Rini Soegiyono. For example, in Paragraph 16 and Paragraph 34, Mr. Lindquist implies that his experience as a special prosecutor equips him to evaluate whether the girls were in unsafe conditions. In addition, in Paragraph 33, Mr. Herrmann implies that aviation experience has equipped him to do so. I do not think it is appropriate for any attorney in this matter to imply that their expertise should be dispositive to the Court. But in view of these statements, I will note the following so that the Court at least hears our opinion and the basis for it. As noted above, since 2012, I have been an attending at the VA Palo Alto where I have worked with numerous individuals engaging in behavior that may pose harm to themselves or others where we have to make rapid assessments whether social workers or police or both need to be deployed for safety checks or further intervention due to

concern for harm to self or harm to others, and also where we have to take action if we learn of behavior suggesting one family member preying on the finances of another. The evidence we collected over careful investigation over many month regarding the social isolation imposed on the girls, the evidence of financial misconduct, the evidence of ongoing trauma through various external factors including a grandfather (Nurdin) who has engaged in behavior simply not conducive or appropriate to nurturing development in two young girls—all of this evidence raises very serious clinical and safety concerns and concerns about the financial interests of the girls. It is appalling to me, both as an officer of the court and as a physician, to see individuals making assertions about the welfare of the individuals without having conducted any proper investigation[4] and relying on the biased statements of individuals the majority of whom have significant financial interest in Nurdin retaining custody of the girls. This Court's job of course is to adjudicate only over that which it has jurisdiction, which at present is the appointment of a guardian ad litem for the protection of the girls' financial interests in the settlement. But since the Opposition Brief and supporting declarations are rife with opinions and unsupported statements of the opposing counsel, I feel it is important for the Court to hear a competing viewpoint on the

---

[4] I believe Mr. Lindquist and Mr. Herrmann did a quick "tour" of the matter after telling us they knew little about it. Mr. Lindquist told all of us that he was "just getting up to speed" when he met me at the Four Seasons, and then while in Indonesia, told me repeatedly that the Nurdin issues were not the focus of their trip. Their repeated references to the length of time they spent in Indonesia for client development (particularly in view of Mr. Indrajana's description of some of those client development activities) is misleading and should not be construed as evidence of an in depth investigation. Our team spent **months** investigating the matter with multiple independent investigators and professional attorneys on the ground interviewing witnesses and travelling to remote locations to do so. It appears that the HLG team descended upon a few individuals in a cursory and questionable manner, and have produced affidavits that are conclusory declarations with little or no assertions reflecting primary knowledge.

clinical significance and long term developmental impact of the conduct at issue. It is my opinion, based on the evidence I have seen to date, that the girls need a guardian ad litem to protect their financial interests, and while not within the purview of the Court, I also feel they should not be in the custody of Nurdin.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge or belief based on reliable information.

DATED this 8th day of June 2020, at San Mateo, CA.

SANJIV N. SINGH (CA BAR 193525)
Attorney for Plaintiff Rini Soegiyono

EXHIBIT 1

TO DECLARATION OF SANJIV N. SINGH IN SUPPORT OF
PLAINTIFF RINI SOEGIYONO REPLY BRIEF

 Gmail

**Sanjiv Singh <admin@sanjivnsingh.com>**

---

## TIME SENSITIVE: SOEGIYONO/WIRANOFA Boeing Fund Claim--Will be Submitted by Dec 31st

---

**Sanjiv Singh** <ssingh@sanjivnsingh.com>                      Thu, Jun 4, 2020 at 12:10 PM
To: Sanjiv Singh <admin@sanjivnsingh.com>

Sanjiv N. Singh, JD, MD

**SNS PLC** |1650 South Amphlett Blvd. Suite 220 | San Mateo, CA 94402

Tel: 650-389-2255 | Mobile: 415-816-5548 | Fax: 415-358-4006

Web: WWW.SANJIVNSINGH.COM | E-mail:  SSINGH@SANJIVNSINGH.COM

Confidentiality Notice: This message (including attachments) is a private communication solely for use of the intended recipient(s) and may contain privileged communications, confidential or proprietary information and/or attorney work product. If you are not the intended recipient(s) or believe you received this message in error, notify the sender immediately and then delete this message. Any other use, retention, dissemination or copying is prohibited and may be a violation of law, including the Electronic Communication Privacy Act of 1986.

---------- Forwarded message ---------
From: **Mark Lindquist** <mark@hlg.lawyer>
Date: Mon, Dec 30, 2019 at 9:26 AM
Subject: Re: TIME SENSITIVE: SOEGIYONO/WIRANOFA Boeing Fund Claim--Will be Submitted by Dec 31st
To: Ken Feinberg <KFeinberg@feinberglawoffices.com>
Cc: Sanjiv Singh <ssingh@sanjivnsingh.com>, Charles Herrmann <charles@hlg.lawyer>, Michael Indrajana <michael@indrajana.com>, Brian Kabateck <bsk@kbklawyers.com>, Camille Biros <CBiros@feinberglawoffices.com>, Gary Wingo (g.wingo@arpc.com) <g.wingo@arpc.com>, Jeremy Haynes (Jeremy.Haynes@ankura.com) <Jeremy.Haynes@ankura.com>

Ken and Sanjiv,

HLG is in agreement with Sanjiv's email below.

Thanks, gentlemen.

Mark Lindquist
206.334.2672
www.hlg.lawyer
Herrmann Law Group

On Dec 30, 2019, at 7:34 AM, Ken Feinberg <KFeinberg@feinberglawoffices.com> wrote:

To all:

I thank you for your timely email. It is important that these two claims are filed - even if they are incomplete and subject to change. These claims should be submitted with one law firm representing

each claimant reflected on the claim form with an appropriate signature. Appropriate heirs and beneficiaries can be inserted at a later date along with percentages of distribution. What is most important is that the two claims are submitted asap with a law firm designee reflected in each. We will move forward once the claims are submitted with this information (we assume that the Herrmann Law Group will represent the family of decedent Wiranofa and that Kabateck/Singh will represent the family of Soegiyono).

Ken

P.S. I am in receipt of the email below from Sanjiv Singh. I have no confirmation from Mark or Chuck.

**From:** Sanjiv Singh <ssingh@sanjivnsingh.com>
**Sent:** Sunday, December 29, 2019 1:16 PM
**To:** Mark Lindquist <mark@hlg.lawyer>; Charles Herrmann <charles@hlg.lawyer>; Ken Feinberg <KFeinberg@feinberglawoffices.com>; Michael Indrajana <michael@indrajana.com>; Brian Kabateck <bsk@kbklawyers.com>; Camille Biros <CBiros@feinberglawoffices.com>
**Subject:** TIME SENSITIVE: SOEGIYONO/WIRANOFA Boeing Fund Claim--Will be Submitted by Dec 31st

Dear Ken (and Mark and Chuck):

I am copying all parties so we can get the Fund application in for these two decedents who left behind two orphaned kids.

As you have learned likely from Mark and me over the last two weeks, the firms are working cooperatively to ensure that the Boeing Fund claims get filed. We have agreed that the applications will be submitted, and the counsel for the respective surviving family members will work out distributions either per court order or by agreement. We will do this offline on our own, and all decedent survivors are on board with this.

As such, we have agreed to the following initial logistics without prejudice:

1. HLG will hold BFAF money for decedent Andri Wiranofa in their trust account where it will stay until the parties reach agreement on distribution percentages or there is a court/arbitration order.
2. Kabateck/Singh will hold BFAF money (likely in the Indrajana Law Group trust account) for decedent Niar Ruri Sunarniati Soegiyono in trust until the parties reach agreement on distribution percentages or there is a court/arbitration order.

The parties also agree that the settlement proceed allocation with Boeing has nothing to do with this, nor does the initial deposit into the trust account dictate what the final distribution will be of any such funds.

But all parties agree that since all family members are represented by counsel, the proposed distribution is not the business of Boeing or the Fund and will be handled between the two firms who represent all the survivors with claims.

6/4/2020  Sanjiv N. Singh - Professional Corporation Mail - FME BEUS 10/21/2020 Years of Air Bearing Data for be Submitte…

Case 1:18-cv-07686 Document #: 594-2 Filed: 06/09/20 Page 22 of 41 PageID #:5464

Please look out for the submissions.  They will come likely from Michael Indrajana or from both Michael and someone from Chuck/Mark's group.  We will coordinate with them to make sure there is no confusion.

Mark and Chuck, please confirm to Ken that you are in agreement so we can get the submissions in.  As noted, Ken, we may have to get some signatures after the holidays, but we will get both applications in to you before 11:59PM PST on December 31st.

Ken, please note this is consistent with my prior email to you and your reply where you indicated that applications submitted before December 31st even without signatures will be considered submitted, and collecting remaining info after that time will not prejudice the application.  (To be candid, I still do not have assurance from you about the statement Boeing's CEO made to Congress that no deadline will be enforced, but that is moot for the purpose of this situation at this time as we will get the applications to you.)

Thank you

Sanjiv

Sanjiv N. Singh, JD, MD

**SNS PLC** |1650 South Amphlett Blvd. Suite 220 | San Mateo, CA 94402

Tel: 650-389-2255 | Mobile: 415-816-5548 | Fax: 415-358-4006

Web: www.sanjivnsingh.com | E-mail:  ssingh@sanjivnsingh.com

Confidentiality Notice: This message (including attachments) is a private communication solely for use of the intended recipient(s) and may contain privileged communications, confidential or proprietary information and/or attorney work product. If you are not the intended recipient(s) or believe you received this message in error, notify the sender immediately and then delete this message. Any other use, retention, dissemination or copying is prohibited and may be a violation of law, including the Electronic Communication Privacy Act of 1986.

EXHIBIT 2

TO DECLARATION OF SANJIV N. SINGH IN SUPPORT OF
PLAINTIFF RINI SOEGIYONO REPLY BRIEF

Case 3:18-cv-07686 Document #: 594-2 Filed: 06/09/20 Page 24 of 41 PageID #:5466

 Gmail

Sanjiv Singh <admin@sanjivnsingh.com>

## SECOND EMAIL: TIME SENSITIVE: SOEGIYONO AND WIRANOFA--MEETING

Mark Lindquist <mark@hlg.lawyer>                                                 Thu, Jan 23, 2020 at 9:35 AM
To: Sanjiv Singh <ssingh@sanjivnsingh.com>
Cc: Charles Herrmann <charles@hlg.lawyer>, Michael Indrajana <michael@indrajana.com>, "Christopher B. Noyes"
<CN@kbklawyers.com>, Brian Kabateck <bsk@kbklawyers.com>, Katherine Bruce <kb@kbklawyers.com>

Sanjiv, Chuck is unavailable as he is flying overseas soon. I will meet with you in San Francisco at a time and place that's
mutually agreeable.

Mark Lindquist
206.334.2672
www.hlg.lawyer
Herrmann Law Group

On Jan 22, 2020, at 5:09 PM, Sanjiv Singh <ssingh@sanjivnsingh.com> wrote:

Chuck and Mark:

Please advise on this.  It will escalate very very quickly if we do not all sit down.  The evidence we have
now is overwhelming--but we do not feel comfortable just sending it to you--mostly because we worry that
your client (Nurdin) will use it to retaliate more than he already has. We will however show it to you in
person.  We will have to discuss some parameters.  It is very very clear to us now that the grandfather
cannot and should not have custody over the girls--we have very credible evidence that his conduct was
outright illegal, that he and his side of the family immediately acted improperly for financial gain, and that he
is likely a danger to the girls.  We believe that you have to put the interests of the girls first--and as such we
want to sit down with you and discuss a way to untangle what he has done.  His actions have cost the girls
already unless we intervene.

On the last point, we also believe there is a significant concern about a firm being able to represent his
interests and the interests of the girls.  Of course, if we can find a way to untangle the damage he has done
to date, and we can do all of this quickly, then we don't really have to get to that.  But I want to be very
clear--there is absolutely no way you can represent him and the interests of the girls.  It would be a conflict
under any applicable jurisdiction.  His conduct has rendered him adverse.

**Finally, and I don't mean this in a dramatic way, but it is very much the truth--internally, we are
absolutely horrified by what we have uncovered.  One of our reasons for wanting to meet you in
person is to handle this as discreetly as possible. We are committed to preventing him from doing
any further harm to the two young girls. Indeed, we would ask that you put the interests of the girls
first and not advise him of our meeting--if he retaliates and harms the girls in any way, we believe it
would be a direct result of informing him that we are having this dialogue. This is not just
speculation but based on the now established conduct and evidence we have.**

Please respond to my email at your earliest and at the very least let us know your intentions.

Sanjiv
Sanjiv N. Singh, JD, MD
SNS PLC |1650 South Amphlett Blvd. Suite 220 | San Mateo, CA 94402
Tel: 650-389-2255 | Mobile: 415-816-5548 | Fax: 415-358-4006
Web: www.sanjivnsingh.com | E-mail:  ssingh@sanjivnsingh.com

Confidentiality Notice: This message (including attachments) is a private communication solely for use of the intended recipient(s) and may contain privileged communications, confidential or proprietary information and/or attorney work product. If you are not the intended recipient(s) or believe you received this message in error, notify the sender immediately and then delete this message. Any other use, retention, dissemination or copying is prohibited and may be a violation of law, including the Electronic Communication Privacy Act of 1986.

On Wed, Jan 22, 2020 at 8:45 AM Sanjiv Singh <ssingh@sanjivnsingh.com> wrote:
Dear Chuck and Mark:

Hope you both are well.  We wanted to extend an invitation to you both to meet, if possible, in San Francisco to discuss these cases.  We can present the evidence we have (which is substantial and compelling--we are glad we took time to analyze and get our evidence organized) and then discuss next steps.

Brian is leaving the country on February 1st--ideally, I would like Brian, Michael and I present and both of you present, but you tell us.  Right now I have a deposition on the 30th in another matter, but I may be able to juggle it if that day can work--I know that day can work for Brian.

Let us know.

Sanjiv

Sanjiv N. Singh, JD, MD
**SNS PLC** | 1650 South Amphlett Blvd. Suite 220 | San Mateo, CA 94402
Tel: 650-389-2255 | Mobile: 415-816-5548 | Fax: 415-358-4006
Web: www.sanjivnsingh.com | E-mail:  ssingh@sanjivnsingh.com

Confidentiality Notice: This message (including attachments) is a private communication solely for use of the intended recipient(s) and may contain privileged communications, confidential or proprietary information and/or attorney work product. If you are not the intended recipient(s) or believe you received this message in error, notify the sender immediately and then delete this message. Any other use, retention, dissemination or copying is prohibited and may be a violation of law, including the Electronic Communication Privacy Act of 1986.

EXHIBIT 3

TO DECLARATION OF SANJIV N. SINGH IN SUPPORT OF
PLAINTIFF RINI SOEGIYONO REPLY BRIEF

6/4/2020　Sanjiv Singh - Professional Corporation Mail - 2020_3_2 Preliminary Response to Your Correspondence re Niar Soegiyono and A…

Case 3:18-cv-07686 Document #: 94-22 Filed: 06/09/20 Page 27 of 41 PageID #:5469

 Gmail

Sanjiv Singh <admin@sanjivnsingh.com>

---

## 2020_3_2 Preliminary Response to Your Correspondence re Niar Soegiyono and Andri Wiranofa

**Sanjiv Singh** <ssingh@sanjivnsingh.com>                               Mon, Mar 2, 2020 at 1:28 PM
To: Charles Herrmann <charles@hlg.lawyer>
Cc: Brian Kabateck <bsk@kbklawyers.com>, Lara Herrmann <lara@hlg.lawyer>, Mark Lindquist <mark@hlg.lawyer>, John Herrmann <john@hlg.lawyer>, Michael Indrajana <michael@indrajana.com>, "Christopher B. Noyes" <CN@kbklawyers.com>, Katherine Bruce <kb@kbklawyers.com>

Dear Mr. Herrmann:

We reject all of your statements as false.  We will proceed accordingly. A few observations:

1..We believe from the moment you declined to see the evidence we have of their misconduct (you refused to review it despite a reasonable offer of attorneys eyes only review), you confirmed what we suspected all along--you are conflicted in your ability to represent the interests of the girls and the grandfather.  We have audio recordings, affidavits, texts, etc that easily rebut the incorrect statements in your letter. You declined to see them--they are objective and come from sources that are not biased.  Why would you decline to see them?  We offered repeatedly, and were told by Mark (a former prosecutor who knew the significance of what I was offering) that you had concerns about accepting them--what concerns?  Wouldn't you have had a duty to look at them?

2..Also, you absolutely authorized us to negotiate for the global settlement--we told you repeatedly we would do so, and then told you in our in person and phone conversations that is what we are doing.  We all agreed that getting the money out of Boeing's hands was of paramount importance.

3.  I am extremely concerned that your client is endangering the girls as we speak--we have reports of him intimidating them, threatening them, etc.  Your statements are so factually off base and easil rebutted it leaves me with two possible conclusions:  (i)  your client is engaged in criminal conduct to conceal his acts and has provided you falsified evidence or evidence obtained by force (using intimidation tactics such as that employed by his son)  or (ii) you suspect they are not true but are trying to push us to back down, and thereby permitting ongoing emotional abuse, predatory conduct, criminal conduct of your client, with the victims being the two young girls.

Rest assured, we will not back down and will hold accountable every entity involved in what we now view as a concerted effort by your client (and his agents) to prey on two little girls, hold them hostage for financial gain, and to do so in direct violation of the clearly stated wish of their mother.  You now concede that the father hit her--but you say only once.  All due respect, Chuck, do you now how clinically unrealistic that sounds and how emblematic that is of your client's position--as anyone with experience dealing with trauma victims in domestic violence cases would know, it is NEVER just once and citing to that to support your position is incredibly shocking to say the least.  The fact you would believe that leads me to believe your team is not qualified or deeply conflicted in making decisions to protect the interests of these girls.

Please note this is not a settlement privileged communication.  Please be aware of that when you respond.  I intend to use this correspondence and other non privileged correspondence as evidence of the number of times we put you on notice of our concern that the girls were suffering constant abuse, intimidation, emotional isolation, etc at the hands of your client.

Sanjiv
Sanjiv N. Singh, JD, MD
**SNS PLC** |1650 South Amphlett Blvd. Suite 220 | San Mateo, CA 94402
Tel: 650-389-2255 | Mobile: 415-816-5548 | Fax: 415-358-4006
Web: WWW.SANJIVNSINGH.COM | E-mail: SSINGH@SANJIVNSINGH.COM

Confidentiality Notice: This message (including attachments) is a private communication solely for use of the intended recipient(s) and may contain privileged communications, confidential or proprietary information and/or attorney work product. If you are not the intended recipient(s) or believe you received this message in error, notify the sender immediately and then delete this message. Any

EXHIBIT 4

TO DECLARATION OF SANJIV N. SINGH IN SUPPORT OF
PLAINTIFF RINI SOEGIYONO REPLY BRIEF

 Gmail

Michael Indrajana <michael@indrajana.com>

## Fw: Komisi Perlindungan Anak Indonesia (KPAI) - Formulir Pengaduan Online 6738

**Harry Simanjuntak** <harry.simanjuntak@adamscogroup.com>          Wed, Jun 3, 2020 at 2:27 AM
To: Michael Indrajana <michael@indrajana.com>
Cc: David Maruhum Lumbantobing <david@adams.co.id>, "evalina@adams.co.id" <evalina@adams.co.id>

Dear Pak Michael,

Kami informasikan bahwa hari ini kami telah membuat pengaduan ke KPAI secara online sebagaimana email dari KPAI dibawah ini.

Demikian kami informasikan, terima kasih.

Best Regards,
**Harry F. Simanjuntak, SH, MH.**
mobile: +62-81288226853

ADAMS & CO., Counsellors-at-Law
Wisma Bumiputera, Level 15th
Jalan Jenderal Sudirman, Kav. 75
Jakarta 12910, Indonesia
P: +62-21 573.1873
F: +62-21 573.1872

CONFIDENTIALITY AND DISCLAIMER: This email (including its attachments) may contain legally privileged or confidential or exempted-from disclosure information. If you are not the intended addressee, please do not print, copy, save, retransmit, disseminate, rely on or use any part of it; moreover, kindly delete it and indicate to the sender that you have received this email in error. The content of this email does not always reflect views or opinions of ADAMS&CO (the firm) nor its employers, unless otherwise expressly indicated by the firm's authorized representative of this message. Although this email has been scanned for electronic virus-free, ADAMS&CO is not liable for any risks and damages caused by any viruses and dangerous codes infected by this email transmissions; therefore, kindly electronically scan against virus risks, dangerous codes, and the likes, caused by transmissions of this email via internet.

---

**From:** Komisi Perlindungan Anak Indonesia (KPAI) <kpai.go.id@gmail.com>
**Sent:** Wednesday, June 3, 2020 4:24 PM
**To:** pengaduan@kpai.go.id <pengaduan@kpai.go.id>
**Cc:** Harry Simanjuntak <harry.simanjuntak@adamscogroup.com>
**Subject:** Komisi Perlindungan Anak Indonesia (KPAI) - Formulir Pengaduan Online 6738

| Propinsi | DKI Jakarta |
|---|---|
| **Kabupaten/Kota** | KOTA JAKARTA TIMUR |

| | |
|---|---|
| **Tanggal** | 3 Juni 2020 |
| **Jenis Kasus** | Anak Korban Perebutan Hak Kuasa Asuh |
| **Nama Lengkap** | Rini Eka A. Soegiyono |
| **No. KTP/SIM /Passport** | ▮▮▮▮▮▮▮▮ |
| **Email** | harry.simanjuntak@adamscogroup.com |
| **Usia** | 54 |
| **Agama** | Islam |
| **Jenis Kelamin** | Wanita |
| **Kewarganegaraan** | Indonesia |
| **Pekerjaan** | Oil & Gas Industry |
| **Penghasilan** | ▮▮▮▮▮ |
| **Pendidikan** | S1 |
| **Alamat** | Komplek Nuansa Biru No. 19 RT/rw 005/003, Kel. Rambutan, Kec. Ciracas, Jakarta Timur. <br><br> Melalui Kuasa Hukum: <br> Harry F. Simanjuntak, SH, MH, dari kantor Adams & Co, beralamat di Wisma Bumiputera Lt. 15, Jl. Jend. Sudirman Kav. 75, Jakarta 12910 |
| **No. Telepon** | ▮▮▮▮▮ |
| **No. HP** | ▮▮▮▮▮ |
| **Nama Lengkap** | ▮▮▮▮▮▮▮ |
| **Usia** | 13 |
| **Jenis Kelamin** | Wanita |
| **Agama** | Islam |
| **Kewarganegaraan** | Indonesia |
| **Pendidikan** | SMP Sederajat |
| | |
| **Nama Lengkap** | ▮▮▮▮▮▮▮ |
| **Usia** | 9 |

| | |
|---|---|
| **Jenis Kelamin** | Wanita |
| **Agama** | Islam |
| **Kewarganegaraan** | Indonesia |
| **Pendidikan** | SD |
| | |
| **Nama Lengkap** | Nurdin Rakhman Samendawai, SH |
| **Jenis Kelamin** | Pria |
| **Agama** | Islam |
| **Kewarganegaraan** | Indonesia |
| **Pendidikan** | S1 |
| **Pekerjaan** | Pensiunan PNS |
| **Alamat** | Cimanggu Permai I, Blok M2/10, RT 04/03, Kel. Kedung Badak, Kec. Tanah Sereal, Bogor. |

| | |
|---|---|
| **Kronologis** | KRONOLOGIS |

Untuk dan atas nama Klien kami: Rini Soegiyono, saat ini berupaya memperoleh perwalian bagi kedua keponakannya, ███████████████ (13 tahun) ("███████") dan ████ ████████████████████ (9 tahun) ("██████") yang telah ditinggalkan kedua orang tua mereka, Bpk. Andri Wiranofa dan Ny. Niar Ruri Sunarniati Soegiyono (adik kandung dari Rini Soegiyono) dalam kecelakaan Lion Air JT610 pada 29 Oktober 2018

Kami meminta agar KPAI segera bertindak dalam hal ini karena berdasarkan bukti faktual sebagai berikut:

(1) Bahwa anak-anak tersebut sampai hari ini tinggal di rumah orang tua mereka yang sudah meninggal di Dukuh, Jakarta Timur sementara wali mereka yaitu Bpk. Nurdin Rakhman Semendawai dan Ny. Dewi Afriza, yang merupakan orang tua kandung dari almarhum Bpk. Andri Wiranofa dan kakek-nenek dari anak-anak, saat ini tinggal di luar kota yaitu di Bogor. Bpk. Nurdin dan Ny. Dewi telah lanjut usianya dan memiliki kondisi kesehatan yang menghalangi mereka untuk memelihara dan merawat anak-anak tersebut setiap hari. Sebagai hasil dari pandemi Coronavirus dan implementasi Pembatasan Sosial Berskala Besar (PSBB) termasuk pembatasan perjalanan antara Jakarta dan Bogor, baik Bpk. Nurdin dan Ny. Dewi tidak dapat tinggal dan / atau mengunjungi anak-anak tersebut karena mereka tinggal di Bogor sementara anak-anak tinggal di Jakarta.

Perlu dicatat bahwa sangat tidak lazim dan tidak pernah terjadi apabila wali tidak tinggal

bersama dengan anak-anak yang masih di bawah umur yang mereka walikan. Bahwa Bpk. Nurdin dan Ny. Dewi telah lalai dalam merawat ▇▇▇▇ dan ▇▇▇▇ , sehingga KPAI harus melakukan intervensi dan memastikan bahwa anak-anak tersebut terlindungi.

Mengingat pandemi Covid-19 yang berlangsung saat ini dimana pemerintah menerapkan kebijakan PSBB untuk mengurangi penyebaran virus, maka lebih penting daripada sebelumnya bagi anak-anak untuk memperoleh pengawasan dari orang dewasa yang tepat di rumah untuk membantu mereka melanjutkan pendidikan dan memastikan kesehatan dan kesejahteraannya.

(2) Sebelum kematian orang tua mereka, anak-anak menjadi saksi berbagai tindak kekerasan dalam rumah tangga yang dilakukan oleh ayah mereka kepada ibu mereka. Kami memiliki bukti berupa rekaman audio dari para gadis yang memberikan kesaksian tentang apa yang ayah mereka lakukan kepada ibu mereka, serta surat pernyataan tertulis dari asisten rumah tangga yang bekerja dengan orang tua mereka yang secara pribadi menyaksikan tindakan kekerasan yang dilakukan oleh ayah mereka terhadap ibu mereka.

(3) Pengalaman traumatis anak-anak begitu parah sehingga pada suatu saat setelah kematian orang tua mereka, mereka merasa sakit dan muntah ketika melihat mobil kakek-nenek diparkir di depan rumah mereka.

(4) Selanjutnya, Bpk. Nurdin dan Ny. Dewi secara eksplisit melarang anak-anak itu melakukan kontak dengan kerabat ibu mereka yang sudah meninggal, termasuk bibi mereka yaitu Rini Soegiyono, yang pernah tinggal bersama mereka selama hampir 4 (empat) bulan setelah kecelakaan. Ini bertentangan dengan kepentingan anak dan telah merampas hubungan keluarga dan dukungan dari pihak keluarga ibu mereka, termasuk sepupu dan kerabat yang lebih dekat dengan kelompok usia mereka.

(5) Saat ini, kami mewakili Rini Soegiyono sedang berusaha mengurus hak asuh atas anak-anak tersebut dan berkoordinasi dengan penasihat hukum di Amerika Serikat untuk menuntut ke Boeing terkait dengan meninggalnya Ny. Niar Soegiyono. Ada permasalahan hukum yang sensitif untuk menghindari agar tidak terjadi pengalihan penanganan kasus di Amerika menjadi ke Indonesia. Atas saran penasihat hukum, Rini Soegiyono masih menunggu untuk mengajukan tuntutan perwalian sampai masalah di Amerika selesai. Namun, mengingat situasi saat ini dan risiko yang dapat timbul, kami merasa perlu meminta bantuan KPAI untuk memastikan keamanan dan kesejahteraan anak-anak tersebut.

Kami juga melampirkan beberapa bukti, termasuk salinan surat Somasi kami yang dikirimkan kepada Bpk. Nurdin dan tuntutan di Amerika yang sedang berlangsung.

Demikian kami sampaikan, atas kebijaksanaannya kami ucapkan terima kasih.

Kuasa Hukum Rini Soegiyono,

Adams & Co, Counselors at Law

Harry F. Simanjuntak, SH, MH.

HP: 081288226853

| | |
|---|---|
| **IP Address** | 139.194.38.103 |
| **User-Agent (Browser/OS)** | Google Chrome 83.0.4103.61 / Windows |
| **Referrer** | https://www.kpai.go.id/formulir-pengaduan |

**ENGLISH TRANSLATION OF KPAI ONLINE 6738**

**(MINOR NAMES ARE REDACTED PER ECF RULES)**

**Harry Simanjuntak** <harry.simanjuntak@adamscogroup.com> Wed, Jun 3, 2020 at 2:27 AM

To: Michael Indrajana <michael@indrajana.com>

Cc: David Maruhum Lumbantobing <david@adams.co.id>, "evalina@adams.co.id" <evalina@adams.co.id>

Dear Pak Michael,

We hereby inform you that as of today, we have filed the online report to KPAI per the KPAI email below.

We informed you thusly, thank you.

Best Regards,

**Harry F. Simanjuntak, SH, MH.**

mobile: +62-81288226853

ADAMS & CO., Counsellors-at-Law

Wisma Bumiputera, Level 15th

Jalan Jenderal Sudirman, Kav. 75

Jakarta 12910, Indonesia

P: +62-21 573.1873

F: +62-21 573.1872

CONFIDENTIALITY AND DISCLAIMER: This email (including its attachments) may contain legally privileged or confidential or exempted-from disclosure information. If you are not the intended addressee, please do not print, copy, save, retransmit, disseminate, rely on or use any part of it; moreover, kindly delete it and indicate to the sender that you have received this email in error. The content of this email does not always reflect views or opinions of ADAMS&CO (the firm) nor its employers, unless otherwise expressly indicated by the firm's authorized representative of this message. Although this email has been scanned for electronic virus-free, ADAMS&CO is not liable for any risks and damages caused by any viruses and dangerous codes infected by this email transmissions; therefore, kindly electronically scan against virus risks, dangerous codes, and the likes, caused by transmissions of this email via internet.

From: Komisi Perlindungan Anak Indonesia (KPAI) <kpai.go.id@gmail.com>

Sent: Wednesday, June 3, 2020 4:24 PM

To: Pengaduan@kpai.go.id <pengaduan@kpai.go.id>

Cc: Harry Simanjuntak <harry.simanjuntak@adamscogroup.com>

Subject:

**Subject:** Komisi Perlindungan Anak Indonesia (KPAI) - Formulir Pengaduan Online 6738

| | |
|---|---|
| **Propinsi** | DKI Jakarta |
| **Region/CIty** | CITY OF EAST JAKARTA |
| **Date** | June 3rd, 2020 |
| **Type of Matter** | Minor Victim in Custody Dispute |
| **Full Name** | Rini Eka A. Soegiyono |
| **No. KTP/SIM/Passport** | ███████ |
| **Email** | harry.simanjuntak@adamscogroup.com |
| **Age** | 54 |
| **Religion** | Islam |
| **Gender** | Female |
| **Citizenship** | Indonesian |
| **Occupation** | Oil & Gas Industry |
| **Income** | ███████ |
| **Education** | S1 |

| | |
|---|---|
| **Address** | Komplek Nuansa Biru No. 19 RT/rw 005/003, Kel. Rambutan, Kec. Ciracas, Jakarta Timur. |
| | Power of Attorney: |
| | Harry F. Simanjuntak, SH, MH, dari kantor Adams & Co, beralamat di Wisma Bumiputera Lt. 15, Jl. Jend. Sudirman Kav. 75, Jakarta 12910 |
| **Telephone No.** | ███████ |
| **Cell No.** | ████████ |
| **Full Name** | ████████████ |
| **Age** | 13 |
| **Gender** | Female |
| **Religion** | Islam |
| **Citizenship** | Indonesia |
| **Education** | Middle School or Equivalent |

| | |
|---|---|
| **Full Name** | ████████████ |
| **Age** | 9 |
| **Gender** | Wanita |
| **Religion** | Islam |
| **Citizenship** | Indonesia |

| Education | Elementary School |
|-----------|-------------------|

| Full Name | Nurdin Rakhman Samendawai, SH |
|-----------|-------------------------------|
| Gender | Male |
| Religion | Islam |
| Citizenship | Indonesia |
| Education | S1 |
| Occupation | Retired Government Employee |
| Address | Cimanggu Permai I, Blok M2/10, RT 04/03, Kel. Kedung Badak, Kec. Tanah Sereal, Bogor. |

| Chronology | Chronology |
|-----------|-----------|
| | On behalf of our client, Rini Soegiyono, who is currently seeking the custody of her two nieces, ███████████████ (Age 13) ("F████") and F████ ███████████████ (Age 9) ("████████") who lost both of their parents, Mr. Andri Wiranofa and Mrs. Niar Ruri Sunarniati Soegiyono, on October 29th, 2018 in the Lion Air JT610 crash; |
| | We request that KPAI act urgently on this matter because based on the following key factual evidence: |
| | (1) That the girls as of today live in their deceased parents' home at Dukuh, East Jakarta while their legal guardians, Mr. Nurdin Rakhman Semendawai and Mrs. Dewi Afriza, the biological parents of Mr. Andri Wiranofa and paternal grandparents of the girls, currently live out of town in Bogor. Mr. Nurdin and Mrs. |

Dewi are elderly and have existing health conditions that prevent them from nurturing and taking care the girls on a daily basis. As a result of the Coronavirus pandemic and the implementation of the large scale social distancing (PSBB) including travel restrictions between Jakarta and Bogor, both Mr. Nurdin and Mrs. Dewi are not able to live and/or visit the girls because they live in Bogor while the girls live in Jakarta.

It should be noted that it is extremely unusual and unheard of for legal guardians of two minor girls not to live together with the minors they have guardianship over. We believe by the virtue of the living arrangements alone, Mr. Nurdin and Mrs. Dewi have been negligent in the care of F.F.N.W. and F.S.N.W., and that KPAI should intervene and ensure that F.F.N.W. and F.S.N.W.'s needs are taken care of.

Given the current ongoing coronavirus emergency such that the country is currently ongoing a large scale social distancing efforts to mitigate the outbreak of the virus, it is more important than ever for children to have proper adult supervision at home to help them continue their education and ensure their health and well-being.

(2) Prior to the death of their parents, the girls were subjected to witnessing numerous domestic violence act perpetrated by their father to their mother. We have audio recordings of the girls testifying what their father did to their mother that we can provide, as well as written affidavits of domestic servants who worked with their parents who personally witnessed the acts of violence perpetrated by their father against their mother.

(3) The girls' traumatic experience were so severe that at one point after the death of their parents, they would physically get ill and throw up upon seeing their grandparents' car parked in front of their house.

(4) Furthermore, Mr. Nurdin and Mrs. Dewi explicitly forbade the girls from having contact with their deceased mother's relatives, including their aunt, Rini Soegiyono, who lived and stayed with them for nearly 4 months after the accident. This is against the girls' best interest and deprive them of their reliable family network and support from their mother's side of the family, including cousins and relatives closer to their age group.

(5) Currently, our firm is representing Mrs. Rini Soegiyono in seeking custody of the girls and coordinating with U.S. counsel in representing Ms. Soegiyono's wrongful death action against Boeing. There are sensitive legal issues that we are carefully navigating to avoid having the American cases transferred to Indonesia. On advice of counsel, Ms. Soegiyono waited to file the petition for guardianship until the U.S. matter is resolved. However, given the current situation and the risks posed to the girls well being, we believe it is necessary to request KPAI's immediate assistance in the matter to ensure that the girls well being are taken care of.

We are also attaching several key pieces of evidence, including a copy of our demand letter sent to Mr. Nurdin and a copy of the pending U.S. Motion for appointing Guardian ad litem for the girls in the pending U.S. case.

Respectfully submitted, and we appreciate your wisdom and thank you,

Attorney for Rini Soegiyono,
Adams & Co, Counselors at Law
Harry F. Simanjuntak, SH, MH.

HP: 081288226853

| IP Address | 139.194.38.103 |
| --- | --- |
| User-Agent (Browser/OS) | Google Chrome 83.0.4103.61 / Windows |
| Referrer | https://www.kpai.go.id/formulir-pengaduan |

EXHIBIT 5

TO DECLARATION OF SANJIV N. SINGH IN SUPPORT OF
PLAINTIFF RINI SOEGIYONO REPLY BRIEF



1. Hidayat Siman

2. HLG Associate Zaskia Putri

3. HLG Attorney Mark Lindquist

4. HLG Translator Ms. Felly

5. Affidavit of Hidayat Siman (on screen)

6. Hidayat Siman ID (corner of laptop)

**5**

### AFFIDAVIT OF HIDAYAT SIMAN

I, Hidayat Siman, first being duly sworn upon oath do testify as follows:

1. My date of birth is March 6, 1958. An accurate copy of my Indonesian Identification Card is attached hereto. I am over the age of 18 and competent to testify to matters in this affidavit;

2. On or around in 2000, I was elected to be R.T., RT008/RW004, Dukuh, Kramat Jati, East Jakarta. An accurate copy of the latest appointment letter for my position is attached hereto;

3. Both Andri and Niar resided in RT008/RW004. To the best of my knowledge, Andri and Niar resided since 2013.

4. The first time I met with Wahyu Madurannyah Putra was on the day of the crash, October 29, 2018.

5. The next time I met Wahyu was on Friday afternoon, February 21, 2020. Wahyu came to my house escorted by the security of Nuansa Dukuh, namely Tugiman. Tugiman showed Wahyu my house. I was not there at that time and Wahyu met with my wife.

6. Wahyu asked my wife about a copy of her ID card that was given to lawyers. On or around 1:00 pm, Wahyu called me asking my whereabouts. I told him I was home;

7. Later in the afternoon on the same day, Wahyu came to my house. He asked about the copy of an ID card of my wife, which he said was given to lawyers. I told him I am not aware of that. The only time I

NURDIN-084

**6**

