IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE: Lion Air Flight JT 610 Crash | Lead Case No. 18-cv-07686 |
| This document relates to Case Nos. 19-cv-2982, 19-cv-2979, 19-cv-2987, 19-cv-2980, 19-cv-5214, 19-cv-5215 | Hon. Thomas M. Durkin |

**VERIFIED MOTION FOR RULE TO SHOW CAUSE**

Edelson PC, counsel for Plaintiffs Anice Kasim, Septiana Damayanti, Bian Daniaty Binti Udin Zaenudin, Bias Ramadhan A.S. Bin Misyadi, Dani Andrian, and Puji Lestarti, respectfully requests that the Court issue an order requiring the law firm of Girardi Keese to show cause why it should not be held in contempt for violating six orders of this Court.[1] In support of its motion, Edelson PC submits the attached declarations of Ari J. Scharg and Rafey S. Balabanian, and it further states as follows:

**I. Prefatory Statement**

1.      In these actions, Plaintiffs sought redress for the deaths of their parents in the Lion Air Flight 610 crash ("the Litigation"). Plaintiffs have at all times been represented in the Litigation by two law firms, Los Angeles-based Girardi Keese ("GK") and Chicago-based Edelson PC ("Edelson"). Pursuant to a certain co-counsel agreements, Edelson and GK agreed to divide their labor in the Litigation to promote efficiency. GK attorneys were, among other things and relevant here, solely responsible for handling communications and relationships with the

---

[1]      Because GK attorneys have been the ones in communication with the clients, and because the clients are in Indonesia and do not speak English, Edelson PC has been unable to obtain specific client authorization to file these motions. Nevertheless, Edelson PC believes it has a duty to bring this matter to the Court's attention and therefore submits this motion on its own behalf. If the Court is concerned that there may be an issue regarding standing, Edelson PC notes that the Court could certainly *sua sponte* issue a rule to show cause based on the information provided in this motion.

clients in Indonesia. For its part, Edelson attorneys—in consultation with GK—were responsible for handling certain day-to-day litigation matters and proceedings before this Court.

2. Subject to later Court approval, the parties reached resolution of all six cases after mediated settlement conferences. Pursuant to Fed. R. Civ. P. 17, Edelson attorney Ari Scharg sought and obtained such approval from the Court. (Dkts. 384, 419, 424, 427, 576, 588.) The Court's orders approving the settlements each provided that the settlement funds were to be handled according to the procedure set forth in sealed declarations submitted by Scharg. (*Id.*) Those declarations provided that Boeing was to wire the settlement funds to a trust account held by GK, and that GK would then wire the proceeds to the clients in Indonesia. (Dkts. 380, 411, 421, 426, 575, 587.) While Edelson has never been privy to the actual wire transfer(s) from Boeing to GK, on information and belief, transfer(s) occurred sometime in or around March, 2020, and Boeing has fully funded each of the settlements pursuant to their terms.

3. Unfortunately, despite Boeing having fully funded the settlements many months ago, Edelson has reason to believe that GK has failed to distribute some or all of the settlement proceeds to GK's and Edelson's collective clients as required by the Court's orders. Based on communications with GK attorneys and others, Edelson has become concerned that GK has misappropriated the settlement proceeds that are owed to GK's clients, including possibly by converting those funds and redirecting them to litigation funders, other creditors, and friends and family of GK's sole equity owner, Tom Girardi.

4. As a result, the Court should issue a Rule to Show Cause ordering GK to explain why it should not be held in contempt for violating the Court's orders by failing to distribute the settlement proceeds received from Boeing.

## II. Facts

5. In February 2020, Edelson attorney Ari Scharg ("Scharg") was notified by GK attorney Keith Griffin ("Griffin") that he was beginning to receive executed settlement agreements from the clients. As was the plan, Edelson, in turn, began preparing motions seeking Court approval for each settlement providing for an allocation of settlement proceeds to minor heirs of the decedents, the first of which, was filed on February 21, 2020. (Dkt. 379.) That motion was granted by the Court on February 24, 2020, and the case was dismissed. (Dkt. 384.)

6. Soon after the order dismissing the case was entered on February 24, 2020, Scharg inquired with Griffin as to when he expected Boeing to fund the settlements. Griffin stated that Boeing would not release the settlement proceeds until they received all of the executed settlement agreements from each of the Lion Air clients. Griffin further stated that he was still waiting on several releases to be executed and returned but expected to receive them shortly.

7. The following week, three more executed settlement agreements were returned by the clients and Edelson secured approval of those agreements, and those cases were also dismissed. (Dkts. 419, 424, 427.) Meanwhile, Griffin and his partner at GK at the time, David Lira ("Lira"), continued to represent that they expected the remaining settlement agreements to be executed by the clients shortly, at which time Boeing would fund the settlements. It would take several more months for the remaining settlement agreements to be executed by the clients.

8. Beginning in April 2020, Edelson attorneys began reaching out to Griffin and Lira on a weekly basis to get an update on the status of the clients executing the settlement agreements and Boeing funding the settlements, the thought being that the clients who had executed the settlement agreements shouldn't have to continue to wait for the others to do the

3

same. Both Griffin and Lira would respond periodically with not much of an update beyond that they were still waiting on a few more executed settlement agreements from the clients, and that nothing could be done to move Boeing off its position that it needed all of the signed settlement agreements before it would release any settlement proceeds.

9. On May 11, 2020, Jay Edelson of Edelson sent Lira an email expressing concern about the delay in finalizing the settlements (particularly in light of Boeing's public pronouncements at the time that it was considering whether to file for bankruptcy) and the need to get them funded for the sake of the clients. Lira responded by email, providing a more detailed explanation of where things stood on specific releases and why it was taking so long for them to be translated and executed by the clients. Lira repeated that Boeing would release the settlement funds when they received the signed releases, but that the funds were coming from insurance and secure in an escrow account, so there was no risk posed by a potential bankruptcy. Lira's explanation was not completely satisfying, but Lira and the other lawyers at GK were the only ones in direct contact with the clients, and Lira's explanation of why it was taking longer for certain of them to execute and return the settlement agreements certainly seemed plausible.

10. Several more weeks passed without any further updates regarding the status of the outstanding settlement agreements. Then, on June 11, 2020, Lira sent an email to Edelson asking to set up a call to discuss the status of the cases. On that call, which occurred on June 16, 2020, Lira informed Edelson attorneys Rafey Balabanian ("Balabanian") and Scharg that he had recently resigned from GK. Lira stated at the time that Boeing had funded the settlements and that the bulk of the funds were received and held by GK. Though Lira was intent on discussing which firm he believed should be held responsible for paying Edelson's share of attorneys' fees (GK or his new firm), Balabanian and Scharg were instead focused on the more fundamental

4

question that they had been asking for several months: Have the clients received their proceeds from the settlements?

11. Lira failed to provide a coherent answer to this question, and instead, on July 6, 2020, sent a letter to Edelson that, without detail, claimed that certain Lion Air clients had received their settlement proceeds, certain clients had not, and that a check to Edelson for some portion of the attorneys' fees owed to them was included with the letter as "partial payment." Edelson did not then, and has not since, cashed this check.

12. A few days later, Edelson responded with a letter to Girardi and Lira, which stated, among other things, "in response to David [Lira]'s cover letter that encloses a check to our firm for some portion of the fees owed on three of the Lion Air cases, we decline to accept any monies until we are given adequate assurances that each and every one of our collective clients who are entitled to settlement monies have, in fact, received the entirety of the monies owed." The letter also requested, again, information about the status of the settlement proceeds owed to the clients.

13. Several days later, Lira responded, but again did not say with any clarity which of the clients had received full settlement payments and whether any were still owed money. Lira also took the position that because he had left GK, he no longer had any ongoing involvement in the cases and since GK was the law firm that had been engaged by and had the attorney-client relationship with the clients, any further questions regarding the status of the settlement proceeds owed to the clients should be directed to Girardi and Griffin.

14. Edelson attorneys continued to press Girardi and Griffin as to the status of the settlement proceeds and whether any clients had yet to be paid. Starting in July 2020, Balabanian took the lead in communicating with Girardi and Griffin. In a series of phone calls that took

5

place over the course of the latter half of July 2020, Griffin indicated that despite Boeing fully funding the settlements, he understood from Girardi that the clients had not received the full amount owed to them and were still owed about half of what was due them—a substantial sum. Griffin stated that he could not elaborate on why such an amount was still owed to certain clients or what the status of the remaining settlement proceeds was because, according to Griffin, Girardi is the sole equity owner of GK with sole and exclusive control over the firm's bank accounts, including its client trust accounts. As a result, Griffin said those questions could only be answered by Girardi. Griffin also claimed that part of the difficulty in speaking with, and delay in getting answers from, Girardi was attributable to Girardi being unavailable in recent weeks due to a serious illness that caused him to be hospitalized and for which he sought treatment.

15. Balabanian ultimately got an opportunity to speak with Girardi in late July. Girardi's explanation regarding the status of the settlement proceeds was extremely convoluted and meandering, and he couched everything in terms of him recovering from the illness for which he was being treated. Girardi asked Balabanian to bear with his inability to give a long and detailed explanation of why payment of the settlement proceeds to the clients had been delayed. Girardi claimed that his illness, which caused him to be away from his firm for several weeks, is what ultimately caused the—in his words—"mistake" of not getting certain clients paid in full, and that he planned to immediately remedy the issue by getting the remaining amount that was owed wired out within a couple of days. Girardi said that he or Griffin would follow up once that occurred.[2]

---

[2] Consistent with what Griffin and Lira were initially saying, Girardi also attributed the delay in paying out the settlement proceeds to the clients to Boeing's refusal to fund the settlement without all of the executed settlement agreements in hand. Girardi also mentioned

6

16. Despite his assurances, Girardi did not follow back up with Balabanian. Instead, Balabanian made several more attempts over the course of the following weeks to reach Girardi to confirm that payment had been made to the clients. They finally spoke again in late August 2020, at which point the conversation quickly became contentious. Girardi stated that he didn't need to explain himself to Balabanian when it came to clients of GK and that, as he promised a few weeks ago, arrangements had been made to pay the remaining monies owed to the clients. Girardi then advised that Griffin would follow up and quickly ended the call.

17. In what started to feel like a recurring theme, though, Balabanian was the one who would need to follow up to confirm Girardi had made good on his promises. Eventually, on or about September 3, 2020, Griffin advised Balabanian that a wire for half of the outstanding amount owed to the clients had been initiated with the other half set to be initiated the following Monday. Griffin stated that he himself had seen confirmation of the wire transfer and could send it to Balabanian, but ultimately that never occurred.

18. Nevertheless, with the payments to the clients seemingly out of the way, the conversation shifted to the fees owed to Edelson on account of the settlements. As Edelson had made clear from the outset, the timing of payment of their fees wasn't of primary concern; since the clients had been paid, Edelson's general position has been that payment of their portion of the fees could be made at any time before the end of the year. To that end, Balabanian requested, and Griffin agreed to provide, a final statement of the fees owed to Edelson, and when they would likely be paid.

---

something about working on and even retaining lawyers for the benefit of the clients to assist with some sort of tax issue affecting the tax treatment of proceeds recovered on account of wrongful death claims, and that getting a determination from the IRS was also holding up finalizing and getting the settlements funded. The conversation was hard to follow at times and this part of it in particular didn't make a whole lot of sense.

19. Then, in November 2020, Edelson received another letter from Lira regarding the settlement proceeds paid to certain other Lion Air clients and how said proceeds were being distributed. Among other things, the letter stated that GK's 50% interest (which included Edelson's portion) in the gross attorney's fees generated from the settlements of certain of the client's cases had been directly transferred to "California Attorney Lending" at the direction of Girardi. Lira also included a check to Edelson as another partial payment of the attorneys' fees owed to them. Edelson did not then, and has not since, cashed this check.

20. Though Edelson was under the impression that the settlement proceeds owed to the clients had finally been paid, Lira's letter once again raised concerns, particularly with regard to Girardi directing settlement proceeds to a litigation funder. As a result, Balabanian reached back out to Griffin to inquire about whether he could provide any more insight into when Edelson could expect payment of its fees.

21. Griffin responded that there had been some "positive developments" but that Girardi was undergoing another medical procedure, so Griffin needed a couple more days to speak with him and report back. After several more days passed, Balabanian again followed up with Griffin and inquired about what he previously characterized as "positive developments." Griffin advised that the positive development was that certain of the Lion Air clients had demanded a call with Girardi to gain an understanding of when they would be paid the balance of the settlement proceeds owed to them. Balabanian responded that his understanding from Girardi and Griffin was that the clients had been paid and the only outstanding obligation was Edelson's attorneys' fees. Griffin stated that that understanding was mistaken, and that Girardi hadn't actually paid the clients as previously represented. Griffin further stated that he was

8

skeptical that Girardi or GK had the financial means to satisfy GK's obligations to those certain Lion Air clients and Edelson.

22. Because, among other things, Griffin's statements make clear that GK has not distributed to the entirety of the settlement proceeds to the clients as required by the Court's orders, the Court should issue a rule to show cause against GK to explain why it should not be held in contempt for violating the Court's orders.

### III. Argument

23. "This court has the inherent power to enforce its orders through civil contempt proceedings." *FTC v. Trudeau*, 567 F. Supp. 2d 1016, 1020 (N.D. Ill. 2007), *aff'd,* 579 F.3d 754 (7th Cir. 2009). "To hold a party ... in civil contempt, the district court must be able to point to a decree from the court which set[s] forth in specific detail an unequivocal command which the party ... in contempt violated." *Arma Yates, LLC v. Arma Care Ctr., LLC*, No. 15 C 7171, 2018 WL 2193141, at *2 (N.D. Ill. May 14, 2018) (Durkin, J.) (quoting *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 738 (7th Cir. 1999)) (alterations in original). "A court may find a nonparty in contempt if that person has actual knowledge of the court order and either abets the party named in the court order or is legally identified with him." *Stotler & Co. v. Able*, 870 F.2d 1158, 1164 (7th Cir. 1989) (quotation marks and alterations omitted).

24. Here, the Court's orders specifically direct the funds received from the settlements to be deposited in an account controlled by GK, which Scharg's declaration identifies by name. The orders further direct GK to remit those funds to the clients by wiring the money to a specific bank in Indonesia. GK had specific knowledge of these orders, which it helped prepare, including by providing the name of the bank for Scharg to include in his sealed declarations.

25.     Edelson has reason to be concerned that GK received the money from Boeing but failed to transmit it to the bank in Indonesia as required by the Court's orders. However, because of the shifting stories of Girardi, Griffin and Lira, as well as GK's refusal to respond to requests for documentation, Edelson is currently unable to offer the type of "clear and convincing evidence" required for a contempt finding. *See Bailey v. Roob*, 567 F.3d 930, 934 (7th Cir. 2009).

26.     Accordingly, Edelson respectfully submits that the appropriate course of action is for the Court to issue a rule to show cause requiring GK to demonstrate, with evidence, that it did not violate the Court's orders. GK's response to that order will determine whether contempt proceedings will be necessary, and, if so, whether that contempt should be civil (to demand compliance) or criminal (to set out consequences for misappropriation of funds that was later corrected).[3]

**WHEREFORE**, Edelson PC respectfully requests that the Court enter an order 1) requiring Girardi Keese to show cause why it should not be held in contempt for violating the Court's orders relating to settlement of these six cases; and 2) granting any such further relief as it deems reasonable and just.

Respectfully submitted,

**EDELSON PC**

Dated: December 2, 2020          /s/ Rafey S. Balabanian

Jay Edelson
jedelson@edelson.com
Benjamin H. Richman
brichman@edelson.com
Ari Scharg

---

[3]     Pursuant to its potential obligations under *In re Himmel*, 125 Ill. 2d 531 (1988), Edelson PC has provided a copy of this motion to the State Bar of California.

ascharg@edelson.com
EDELSON PC
350 North LaSalle St., 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian
rbalabanian@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, CA 94107
Tel: 415.212.9300
Fax: 415.373.9435