**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT**
**EASTERN DIVISION**

| | |
|---|---|
| WELLY CHANDRA, et al. ) | |
| ) | |
| Plaintiff, ) | Lead Case 18-cv-7686 |
| ) | Honorable Thomas M. Durkin |
| v. ) | |
| ) | |
| BOEING INTERNATIONAL SALES ) | |
| CORPORATION, a Washington State ) | |
| Profit Corporation, et al. ) | |
| ) | |
| Defendant. ) | |

## RESPONSE TO MOTION FOR RULE TO SHOW CAUSE [Docket #842] BY KEITH GRIFFIN

Keith Griffin, through his attorney, Ryan D. Saba of Rosen Saba, LLP, submits this response pursuant to this Court's order of December 14, 2020. [Docket #848]. This Response shall solely focus on Mr. Griffin.

1. **THE PRIOR PLEADINGS AND ORDERS**. The lawsuits at issue herein are a subset of the cases in the Multidistrict Litigation entitled In re Lion Air Flight JT 610 Crash and were jointly filed by the law firms of Edelson, P.C. and Girardi Keese.

2. After multiple settlement conferences, the lawsuits at issue herein settled. As part of the settlement process, declarations were filed with this Court by Ari Scharg of the Edelson firm seeking Court approval of the settlements for the clients which were minors (under the age of majority). [See, sealed Docket #s 380, 411, 421, 426, 575, 587.]

1

3. In response to the six declarations, the Court issued orders directing that "The settlement funds shall be distributed . . . in accordance with the process identified in Plaintiff's counsel's sealed affidavit." [See, Docket #s 384, 419, 424, 427, 576, 588.] These are the Court orders which serve as the basis for the civil contempt hearing.

4. The "process identified in Plaintiff's counsel's sealed affidavit" states: "The settlement funds for the minor plaintiffs in this case shall be initially paid to a trust account established by Girardi Keese for the benefit of the Plaintiffs, including the minors. . .. Plaintiffs' net proceeds . . . shall be sent as soon as practicable via wire transfer to . . ." Plaintiffs' financial institutions. [See, sealed Docket #s 380, 411, 421, 426, 575, 587.]

5. **THE MOTION.** The Verified Motion for Rule to Show Cause [Docket #842] (the "Motion") filed on December 2, 2020, requested an order requiring the law firm of Girardi Keese to show cause why it should not be held in contempt for violating six orders of this Court. [See, Docket #s 384, 419, 424, 427, 576, 588.] The Motion was not asserted against Mr. Griffin individually.

6. The Motion asserts a violation of six Court orders that Girardi Keese did not wire the settlement proceeds to the clients in Indonesia. [Docket #842 at ¶2.] There is no specific directive or order for Mr. Griffin to individually wire any money. The Motion states: "Edelson, P.C., counsel for Plaintiffs . . . respectfully requests that the Court issue an order requiring the law firm of Girardi Keese to show cause why it should not be held in contempt for violating six orders of this Court."

7. The Motion attributes a communication by Mr. Griffin to Rafey Balabanian in Paragraph 14 that "Girardi is the sole equity owner of GK with sole and exclusive control over the firm's bank accounts, including its client trust accounts." The Motion then states, "As a result, Griffin said those questions could only be answered by Girardi." [Docket #842 at ¶14.]

8. **THE HEARING.** On December 14, 2020, this Court conducted a telephonic hearing regarding the Motion. During the hearing, and thereafter, this Court entered a civil contempt order against the law firm of Girardi Keese and against Tom Girardi individually. [Docket #848 and see generally Transcript of hearing Docket #852.] During the hearing, this Court inquired of Jay Edelson as to "what are the remedies that I can apply to make it the most likely outcome, being that the individual plaintiffs get their money." [Docket 852, at p. 19:6-8.] In response, Mr. Edelson stated, "Well, I think first, all three attorneys and the firm should be held in civil contempt. Even if it is – actually, let me take that back. Let me focus just on -- on Mr. Girardi right now. Mr. Girardi definitely should be held in civil contempt." [Docket #852, at p. 19:11-16.]

9. During the December 14, 2020, hearing, David Lira stated: "It was Girardi who controlled the finances and the direction of payments." [Docket 852, at p. 15:5-6.] Mr. Griffin stated: "I never had access, possession, or control of any of the settlement funds in the Lion Air settlement." [Docket 852, at p. 15:18-19.] Mr. Griffin also stated: "as inquiries were coming in from Mr. Balabanian from the Edelson firm about the status, I told him that all of those inquiries needed to be directed to Mr. Girardi because he was the only one that had access to or ability to distribute funds. I would notify Mr. Girardi of the inquiry and wait for his response until he was able to speak with Mr. Balabanian. Every time there was an inquiry made by the Edelson firm, I directed it to Mr. Girardi for his response. I was acting as a go-between between the Edelson firm and Mr. Girardi." [Docket 852, at p. 23:7-16.]

10. Mr. Griffin's statements to this Court are consistent with the statements in the Motion. In the Motion, it states ". . . according to Griffin, Girardi is the sole equity owner of GK with sole and exclusive control over the firm's bank accounts, including its client trust accounts. As a result, Griffin said those questions could only be answered by Girardi." [Docket #842, at ¶14.] The Motion also states, "Balabanian ultimately got an opportunity to speak with

Girardi in late July." [Docket #842, at ¶15.] The Motion continues, "[Balabanian and Girardi] spoke again in late August 2020, at which point the conversation quickly became contentious." [Docket #842, at ¶16.] The Declaration of Balabanian attached to the Motion attested that these statements were true and correct. [Docket #842-2.]

11. Regarding Mr. Griffin, the Court stated, "As to the two individual attorneys, I will give their attorneys – Mr. Griffin, Mr. Lira – I'll give their attorneys a chance to explain why they shouldn't also be held in civil contempt with the same finding relating to the payment of $2 million plus interest." [Docket 852, at p. 38:10-14.]

12. **THE LAW ON CIVIL CONTEMPT.** Civil contempt is intended to compel a party to act and to compensate parties for their losses resulting from non-compliance. *United States v. United Mine Workers of America*, 330 U.S. 258, 303-304 (1947) "A court's civil contempt power rests in its inherent limited authority to enforce compliance with court orders and ensure judicial proceedings are conducted in an orderly manner." *United States v. Dowell*, 257 F.3d 694, 699 (7th Cir. 2001) (quoting *Jones v. Lincoln Elec. Co.,* 188 F.3d 709, 737 (7th Cir. 1999)). To be found in civil contempt, a party "must have violated an order that sets forth in specific detail an unequivocal command from the court." *Dowell*, 257 F.3d at 699.

13. **LEGAL ISSUE PRESENTED.** There is no dispute that the order for Girardi Keese to wire the settlement proceeds to the clients in Indonesia is an unequivocal command from the Court. The instant legal issue presented to this Court is whether the failure of Girardi Keese to abide by this command can be attributable to an employee lawyer Mr. Griffin. There was no order requiring Mr. Griffin individually to perform any task. Nor could there be any such order because Mr. Griffin was not the receiver, nor the beneficiary, of any of the settlement funds. Further, as set forth below, Mr. Griffin had no authority to issue any wires from the Girardi Keese Client Trust account.

14. **GIRARDI KEESE IS AN UNKNOWN BUSINESS ENTITY**. Mr. Griffin is unaware of the business formality of Girardi Keese. A review of the California Secretary of State website "business entity search" does not identify Girardi Keese as a corporation, limited liability company, or limited partnership. Further, a review of the Los Angeles County Registrar-Recorder/County Clerk website does not identify Girardi Keese as a fictitious business name of any person or entity. To the best of Mr. Griffin's knowledge, Mr. Griffin believes that Girardi Keese is a sole proprietorship of Tom Girardi. At no time was Mr. Griffin a recipient of any money from the settlement proceeds of the Lion Air Crash. While Mr. Griffin was employed at Girardi Keese, he was a W2 employee who received a salary as compensation for work performed.

15. Paragraph 7 of the Motion incorrectly states, "Griffin and his partner at GK at the time, David Lira . . ." This statement was attested to by Ari Scharg. [Docket #842-1, ¶4.] At no time was Mr. Griffin a "partner" with David Lira or any other lawyer in the law firm of Girardi Keese.[1]

16. **FIRM'S CLIENT TRUST ACCOUNTS AND OPERATING ACCOUNTS.** While employed with Girardi Keese, Mr. Griffin was not a signatory on the firm's bank accounts and did not have the authority to sign checks for the law firm Client Trust accounts or operating accounts. Further, Mr. Griffin did not have the authority to instruct any Girardi Keese bank to issue money via a wire transfer, which is what the Court's order required Girardi Keese to do. It is Mr. Griffin's belief that the only persons that had the authority to sign checks and initiate wire transfers from the Girardi Keese bank accounts was Tom Girardi and Chris Kamon, who was the bookkeeper of the law firm.

---

[1]/ Mr. Griffin objects to this statement which is part of the Declaration of Ari Scharg and the Motion at paragraph 7 pursuant to FRE 802 (hearsay) and FRE 602 (lack of foundation and speculation).

17. Mr. Griffin did not have access to the Girardi Keese bank statements, including any bank statements for the law firm's Client Trust accounts. Mr. Griffin did not have permission or the ability to access the law firm's bank accounts via an internet website or mobile application.

18. **THE FINANCIAL OBLIGATION OF GIRARDI KEESE SHOULD NOT BECOME THE PERSONAL OBLIGATION OF KEITH GRIFFIN**. Counsel for Mr. Griffin was unable to find any Federal case law case that is squarely on point with the factual situation here. The specific legal inquiry is whether an individual employee of a law firm can be held responsible for the financial obligation of a law firm when a law firm fails to follow the command of the Court.

19. While not directly on-point, it is well-settled in a corporation setting that "[a] command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt." *Wilson v. United States*, 221 U.S. 361, 367-77, 31 S.Ct. 538, 542-43, 55 L.Ed. 771 (1911).

20. Here, Girardi Keese is not a corporation, but an entity of unknown form, and likely a sole proprietorship. Regardless of the business formation of Girardi Keese, it was Mr. Girardi who was the individual official responsible for the affairs of Girardi Keese. Mr. Griffin did not "prevent compliance" with the Court's orders. Further, Mr. Griffin took appropriate actions within his power to get Mr. Girardi to send the wire transfers as ordered by the Court, and ultimately referred the clients to alternative counsel to sue Girardi Keese.

21. Mr. Griffin told Mr. Girardi to send the wire transfers. The refusal by Mr. Girardi to comply with the Court order should not become the personal responsibility of Mr. Griffin.

22. **KEITH GRIFFIN'S ROLE WITHIN GIRARDI KEESE FOR THE LION AIR CRASH CASES.** As an employee of the law firm, Mr. Griffin performed legal services for the clients arising out of the Lion Air crash case with Mr. Lira and others.

23. To the best of Mr. Griffin's recollection, the first settlement that he worked on was the Sutanto/Kasim matter (also referred to as the "Anice" matter). [Docket #s 380 and 384.] It is Mr. Griffin's understanding that the settlement proceeds were delivered to Girardi Keese trust account by wire transfer on or about March 4, 2020. The same day, Mr. Griffin prepared a memorandum directed to Tom Girardi and copied to Chris Kamon, the firm's bookkeeper, and David Lira. The memorandum identifies the total gross settlement amount and how the funds should be disbursed per the settlement agreement and Court's order. Included in the memorandum was information advising Mr. Girardi that a specific amount of money was "to be wired to the clients per the attached Consent." Attached to the memorandum was a "Closing Statement." The Closing Statement also identified the total amount of recovery and a breakdown of net proceeds. The Closing Statement was signed by Anice Kasim and included wire transfer instructions with Ms. Kasim's bank name and account number. A true and correct redacted copy of this memorandum and Closing Statement is attached hereto as Exhibit "A."

24. To the best of Mr. Griffin's recollection, the second settlement that he worked on was the Huzaifah matter (also referred to as the "Dian" matter). [Docket #s 421 and 424.] It is Mr. Griffin's understanding that the settlement proceeds were delivered to Girardi Keese trust account by wire transfer on or about March 11, 2020. The same day, Mr. Griffin prepared a memorandum directed to Tom Girardi and copied to Chris Kamon and David Lira. The memorandum identifies the total gross settlement amount and how the funds should be disbursed per the settlement agreement and Court's order. Included in the memorandum was information advising Mr. Girardi that a specific amount of money was "to be

wired to the clients per the attached Consent." Attached to the memorandum was a "Closing Statement." The Closing Statement also identified the total amount of recovery and a breakdown of net proceeds. The Closing Statement was signed by Dian Daniaty Binti Udin Zaenudin and included wire transfer instructions with Ms. Daniaty's bank name and account number. A true and correct redacted copy of this memorandum and Closing Statement is attached hereto as Exhibit "B."

25. To the best of Mr. Griffin's recollection, the third settlement that he worked on was the Nawazar matter (also referred to as the "Bias" matter). [Docket #s 426 and 427.] It is Mr. Griffin's understanding that the settlement proceeds were delivered to Girardi Keese trust account by wire transfer on or about March 27, 2020. The following Monday, Mr. Griffin prepared a memorandum directed to Tom Girardi and copied to Chris Kamon and David Lira. The memorandum identifies the total gross settlement amount and how the funds should be disbursed per the settlement agreement and Court's order. Included in the memorandum was information advising Mr. Girardi that a specific amount of money was "to be wired to the clients per the attached Consent." Attached to the memorandum was a "Closing Statement." The Closing Statement also identified the total amount of recovery and a breakdown of net proceeds. The Closing Statement was signed by Bias Ramadhan A.S. Bin Misyadi and included wire transfer instructions with Mr. Ramadhan's bank name and account number. Also attached to the memorandum was a copy of the Confidential Settlement Agreement and Full Release of All Claims. A true and correct redacted copy of this memorandum, Closing Statement and Confidential Settlement Agreement is attached hereto as Exhibit "C."

26. To the best of Mr. Griffin's recollection, the fourth settlement that he worked on was the Fitrasyah matter (also referred to as the "Septiana" matter). [Docket #s 411 and 419.] It is Mr. Griffin's understanding that the settlement proceeds were delivered to Girardi Keese trust account by wire transfer on or prior to March

31, 2020. The same day, Mr. Griffin prepared a memorandum directed to Tom Girardi and copied to Chris Kamon and David Lira. The memorandum identifies the total gross settlement amount and how the funds should be disbursed per the settlement agreement and Court's order. Included in the memorandum was information advising Mr. Girardi that a specific amount of money was "to be wired to the clients per the attached Consent." Attached to the memorandum was a "Closing Statement." The Closing Statement also identified the total amount of recovery and a breakdown of net proceeds. The Closing Statement was signed by Septiana Damayanti and included wire transfer instructions with Ms. Damayanti's bank name and account number. Also attached to the memorandum was a copy of the Confidential Settlement Agreement and Full Release of All Claims. A true and correct redacted copy of this memorandum, Closing Statement and Confidential Settlement Agreement is attached hereto as Exhibit "D."

27. To the best of Mr. Griffin's recollection, the four above memorandums were delivered to each recipient by email and an actual paper copy of the memorandum was delivered to each person's internal firm mailbox.

28. Paragraph 6 of the Motion incorrectly states that soon after February 24, 2020, "Griffin stated that Boeing would not release the settlement proceeds until they received all of the executed settlement agreements from each of the Lion Air clients. Griffin further stated that he was still waiting on several releases to be executed and returned but expected to receive them shortly." This statement was attested to by Ari Scharg. [Docket #842-1, ¶4.] As set forth above, the settlement monies for the four cases at issue herein arrived between March 4-31, 2020. Mr. Griffin believes that Mr. Scharg is confusing waiting on the completion of the allocations with the completion of the settlement agreements. Since this was a global settlement for a group of plaintiffs, Girardi Keese had a third party retired judge allocate the settlement funds amongst the plaintiffs. The settlement could not be funded until the allocation was completed because each settlement release

required the specific individual settlement amount to be included in the settlement agreements.

29. **<u>KEITH GRIFFIN WAS DILIGENT IN COMMUNICATING WITH TOM GIRARDI TO SEND WIRE TRANSFERS TO THE CLIENTS.</u>** In addition to the four settlement distribution memorandums identified above, Mr. Griffin also delivered a memorandum to Tom Girardi on May 4, 2020 stating, "Client funds need to be wired." The memorandum included the amount of money that needed to be wired to each client. Chris Kamon and David Lira were copied on the memorandum. A true and correct redacted copy of the May 4, 2020 memorandum is attached as Exhibit E.

30. On or about June 24, 2020, Rafey Balabanian from the Edelson firm contacted Mr. Griffin to speak about the Lion Air cases. Mr. Griffin believes that Mr. Balabanian wanted to speak with Mr. Girardi about the status of payments on the cases. On June 24, 2020, Mr. Griffin prepared and delivered a memorandum to Tom Girardi which stated, "Need to call Rafey today at the Edelson firm. He is our co-counsel on the Lion Air cases. . . He said that you were going to get back with him on Wednesday about completing payment to the Boeing clients. He is desperate to hear from you." A true and correct copy of the June 24, 2020 memorandum is attached as Exhibit F.

31. Based upon this memorandum, Mr. Griffin believes that Mr. Girardi and Mr. Balabanian communicated prior to June 24, 2020 about the payments to the clients. Mr. Griffin was not part of the communication and is not aware of what was communicated between Mr. Balabanian and Mr. Girardi. Further, Mr. Griffin has no present recollection if either Mr. Balabanian or Mr. Girardi informed him of the substance of this telephone conversation.

32. On July 14, 2020, Mr. Griffin prepared and delivered to Mr. Girardi another memorandum reminding him of the four Lion Air cases at issue and further reminding him of the balance of money that Girardi Keese needed to wire to the clients.

33. On July 20, 2020, Mr. Balabanian communicated to Mr. Griffin that Mr. Girardi called him and "promised to figure it out." Mr. Griffin understood this to mean that Mr. Balabanian and Mr. Girardi discussed payment of the money in the Lion Air cases and that he would make the payments to the plaintiffs. Mr. Griffin was not part of the telephone conversation between Mr. Balabanian and Mr. Girardi. According to the Motion and declaration of Rafey S. Balabanian, Mr. Balabanian declares that he spoke to Mr. Girardi directly in "late July" 2020. [Docket #842 at ¶15.] During this conversation, Mr. Griffin believes that Mr. Balabanian and Mr. Girardi discussed the "status of settlement proceeds." Mr. Griffin believes that the conversation identified in the Motion and Declaration of Mr. Balabanian in "late July" 2020 is the same conversation that took place on July 20, 2020. It is Mr. Griffin's understanding and belief that Mr. Girardi advised Mr. Balabanian that he had not completed the wire transfers to the clients but that he would "figure it out."

34. On or about July 27, 2020, Mr. Griffin inquired of Mr. Balabanian whether he spoke with Mr. Girardi. Mr. Balabanian confirmed that he had spoken with Mr. Girardi and that Mr. Girardi confirmed to Mr. Balabanian that the clients should be paid (or ready to be paid) by the following Monday.

35. On August 3, 2020, Mr. Balabanian requested an update based on Mr. Girardi's prior representation as set forth above. Mr. Griffin prepared and delivered a memorandum to Tom Girardi which stated, "Just got a message from Rafey at Edelson (co-counsel). He said you told him that clients would be paid in full today. Said he needs to speak to you right away." A true and correct copy of the August 3, 2020 memorandum is attached as Exhibit G. Mr. Griffin communicated to Mr. Balabanian that he provided Mr. Girardi with a note. Mr. Griffin also advised Mr. Balabanian that Mr. Girardi was at the office and provided Mr. Balabanian with the office telephone number. Later the same day, Mr. Balabanian communicated to Mr. Griffin that he attempted to call Mr. Girardi twice, but he was not able to connect with him.

36. On August 12, 2020, Mr. Griffin provided Mr. Balabanian with Mr. Girardi's cell phone number. Later the same day, Mr. Balabanian advised Mr. Griffin that he called Mr. Girardi twice and left him a voicemail. Mr. Griffin communicated to Mr. Balabanian that he asked Mr. Girardi two times to call Mr. Balabanian.

37. On August 13, 2020, Mr. Balabanian advised Mr. Griffin that Mr. Girardi left Mr. Balabanian a voicemail message. Mr. Griffin has not listened to the voicemail message and is unaware of its contents.

38. On August 24, 2020, Mr. Balabanian advised Mr. Griffin that Mr. Balabanian spoke to Tom Girardi. Mr. Griffin was not part of the telephone conversation. Mr. Balabanian communicated to Mr. Griffin that Mr. Girardi told him that "he would have everything wrapped up this week" including payment of Edelson's portion of the attorneys' fees. Mr. Griffin believes the reference in the Motion and the declaration of Mr. Balabanian to a conversation between Mr. Balabanian and Mr. Girardi in "late August 2020" occurred on August 24, 2020. [Docket #842 at ¶16.] The Motion and Mr. Balabanian's declaration state that during this conversation, Mr. Girardi again told Mr. Balabanian that wire transfers had not occurred but that "arrangements had been made to pay the remaining monies owed to the clients."

39. On September 3, 2020, Mr. Griffin communicated to Mr. Balabanian that Mr. Girardi sent a wire transfer for about half of the collective balance remaining and owed to the clients. Mr. Girardi told Mr. Griffin that he was going to try to send the balance of the money to the clients "next week." Mr. Griffin communicated this information to Mr. Balabanian. In response, Mr. Balabanian stated, in part, "And what about my firm's fees? He said those were getting paid alongside the clients? What assurance do we have that we're getting the approximate $2.4m we're owed?"

40. Paragraph 17 of the Motion incorrectly states: "Eventually, on or about September 3, 2020, Griffin advised Balabanian that a wire for half of the outstanding amount owed to the clients had been initiated with the other half set

to be initiated the following Monday. Griffin stated that he himself had seen confirmation of the wire transfer and could send it to Balabanian but ultimately that never occurred." Mr. Griffin did not make any such a promise to Mr. Balabanian. Rather, he communicated that Mr. Girardi was going to try to send the balance of the money "next week." Mr. Griffin did not communicate to Mr. Balabanian that he "had seen confirmation of the wire transfer and could send it to Balabanian."

41. On September 22, 2020, Mr. Balabanian communicated with Mr. Griffin that Mr. Edelson was upset that the clients and his firm were not paid the outstanding money. Mr. Griffin responded to Mr. Balabanian that he would contact Mr. Girardi and communicate the message.

42. On or about September 28, 2020, Mr. Girardi told Mr. Griffin that he was going to call Mr. Balabanian. Mr. Griffin communicated this message to Mr. Balabanian. The next day, Mr. Balabanian advised Mr. Griffin that Mr. Girardi did not call him.

43. On September 29, 2020, Mr. Griffin told Mr. Girardi that he needed to call Mr. Balabanian. Mr. Girardi told Mr. Griffin that he would call. It is Mr. Griffin's understanding that Mr. Girardi and Mr. Balabanian had a telephone call on September 30, 2020. Mr. Griffin was not a participant in the telephone conversation. It is Mr. Griffin's understanding from Mr. Balabanian that they had a "nice conversation".

44. On information and belief, Mr. Girardi wrote several letters to the Lion Air clients advising about when he would pay their balances owed. It is Mr. Griffin's belief that Mr. Girardi sent a letter to the clients promising to complete their payments by November 30, 2020.

45. On November 18, 2020, Mr. Griffin prepared and delivered a memorandum to Tom Girardi stating that he must pay the clients the outstanding money that was owed and that the clients were owed interest on the money. Mr. Griffin ended

the memorandum: "This could not be more serious." A true and correct copy of the November 18, 2020 memorandum is attached hereto as Exhibit H.

46. Upon information and belief, Tom Girardi had a meeting with a representative for the clients on November 20, 2020. Mr. Griffin was not part of that meeting and Mr. Griffin does not know exactly what was discussed. However, Mr. Griffin understood that during this meeting Mr. Girardi allegedly told the client representative that he was going to pay the remaining balance to the clients by November 30, 2020 or sooner. Mr. Griffin communicated this information to Mr. Balabanian on November 20, 2020.

47. On or about November 30, 2020, Mr. Griffin contacted the clients' primary attorney representative and referred him to another law firm so that the plaintiffs could file a lawsuit against Girardi Keese.

48. Mr. Griffin, Mr. Edelson, and Mr. Balabanian had a telephone call on or about November 30, 2020. During this call, Mr. Griffin told Mr. Edelson and Mr. Balabanian that Mr. Girardi did not pay the money to the clients as he had promised to do by the end of the month and that he referred the clients to another law firm so that they could file a lawsuit against Girardi Keese.

49. Mr. Griffin resigned his employment with Girardi Keese on December 4, 2020.

50. **CONCLUSION.** Mr. Griffin is devastated and is similarly angered that the clients have not been paid their settlement money as required by the Court order. Mr. Griffin spent months and months trying to get Mr. Girardi to complete his promises and obligations to the clients and this Court. However, holding Mr. Griffin personally responsible for civil contempt is not appropriate based upon the above facts and circumstances. Mr. Griffin respectfully requests that this Court deny the instant Motion against him individually.

Respectively submitted,

/s Ryan D. Saba
Ryan D. Saba
rsaba@rosensaba.com
Rosen Saba, LLP
9350 Wilshire Blvd., Suite 250
Beverly Hills, California 90212
(310) 285-1727

## CERTIFICATE OF SERVICE

I, Ryan Saba, hereby certify that on December 21, 2020, I served a true and correct copy of the foregoing document upon all counsel of record via the Court's CM/ECF System.

                                                              /s Ryan D. Saba