**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE: Lion Air Flight JT 610 Crash | Lead Case No. 18-cv-07686 |
| This document relates to<br>Case Nos. 19-cv-2982, 19-cv-2979, 19-cv-2987, 19-cv-2980, 19-cv-5214, 19-cv-5215 | Hon. Thomas M. Durkin |

**REPLY IN SUPPORT OF**
**VERIFIED MOTION FOR RULE TO SHOW CAUSE**

In its closing remarks at the December 22, 2020 status conference regarding the ongoing contempt proceedings that were initiated against Thomas Girardi ("Girardi"), David Lira ("Lira") and Keith Griffin ("Griffin"), the Court expressed some thoughts as far as whether Lira and Griffin—knowing that Girardi had failed to pay Plaintiffs in accordance with the Court's Orders—should have done something to ensure the Court's Orders were carried out. Specifically, the Court stated:

> Couple thoughts: My order required a transfer of monies paid by Boeing to clients as soon as practicable, after the Boeing money was transferred. It didn't call for installment payments, which is ridiculous. The money should've gone to the clients immediately.
>
> So I think an issue that needs to be addressed, whether it's in reply or addressed at the hearing by attorneys for Mr. Griffin and Mr. Lira, that their knowing of nonpayment give them an obligation to do something more than what they did.
>
> I realize there's a fair amount of -- I don't want to say finger-pointing -- but a fair amount of pointing to Mr. Girardi as someone who controlled the accounts.
>
> But does -- do Mr. Griffin and Mr. Lira as attorneys -- one of whom -- Mr. Griffin I believe had an appearance in this case -- have an obligation to make sure the court order is carried out, because undoubtedly the court order was not carried out.

(Transcript of Proceedings held on 12/22/2020, dkt. 927, at 8:4-21.)

The question raised by the Court—whether Lira and Griffin should have done something more to ensure that Plaintiffs were paid in accordance with the Court's Orders—is a salient one.

1

Edelson believes that both individuals—as partners of Girardi Keese for more than 20 years, both of whom are no doubt well-aware of the public and private allegations against Girardi over the years about misappropriating client funds, and in this case, the lead attorneys responsible for getting the settlements finalized, signed, and funded—absolutely had an obligation to ensure that Girardi didn't haul off and steal Plaintiffs' and co-counsel's money.

Taking it a step further, though, Edelson believes Lira's and Griffin's wrongdoing went beyond mere inaction and moved into the territory of a cover-up. Both took part in misleading Edelson regarding the circumstances surrounding Girardi Keese's failure to make the required payments to Plaintiffs. Indeed, as the Girardi Keese attorneys who Edelson communicated with and relied upon in the Litigation (again, since they were the lead attorneys), Edelson looked to Lira and Griffin when they started asking questions about whether Plaintiffs had been paid. And, in response to Edelson's questions, Lira, Griffin, and Girardi put forth a coordinated false narrative that—at the critical point in time when Boeing was transferring the settlement proceeds to Girardi Keese's client trust account and Girardi was potentially inclined but likely had yet to misappropriate the funds due Plaintiffs—led Edelson to believe that nothing improper or illegal was taking place.

By participating in the cover-up, Lira and Griffin violated the Court's order or, at the very least, aided and abetted Girardi Keese's violations. Accordingly, they can and should be held in civil contempt of court.

## ADDITIONAL FACTUAL BACKGROUND

Based on the statements in Griffin and Lira's responses, some additional discussion of relevant facts is warranted.

To start, there is the matter of Griffin and Lira's status at the firm. Each insists that he was never a partner. (Griffin Resp. ¶ 15; Lira Resp. ¶ 15.) The firm saw it differently. In 2018, Girardi referred to Lira as "my partner" in a court filing. Application for Appointment of Thomas V. Girardi as Lead Counsel for the Consumer Plaintiff Class, *In re Equifax, Inc. Customer Data Security Breach Litig.*, No. 17-md-2800, dkt. 140 at 2 (N.D. Ga. Jan. 31, 2018). And in 2011, Girardi Keese took out a full-page advertisement in U.S. News's "Best Law Firms" publication, referring specifically to "Girardi | Keese partner Keith Griffin." Special Advertising Section, *Best Law Firms*, U.S. News & World Report, at 74 (2011-2012 ed.), *available at* https://issuu.com/bestlawyers/docs/2011-2012bestlawfirms/74. Similarly, while Lira disclaims involvement in Girardi Keese's finances, he was an authorized signatory on Girardi Keese's client trust account from at least 2013 until he left the firm in June 2020. *See* Redacted Girardi Keese Checks, attached hereto as Exhibit A; Declaration of Jerome H. Friedberg, Exhibit F, *Allen v. Girardi Keese*, No. 14-cv-02721, dkt. 105 (C.D. Cal. August 24, 2015).[1]

Next, and most importantly, there is the matter of when money came in from Boeing and what actions Lira and Griffin took after that. When Edelson filed its show-cause motion in December 2020, it still did not know exactly when Boeing had funded the settlements. Now, more information is available. According to Griffin's response, Boeing funded four of the settlements that were subject to the Court's Orders between March 4-31, 2020. (Griffin Resp. ¶ 28.) That's the same time period that Edelson began inquiring about whether Boeing has funded the settlements. Specifically, on February 28, 2020, Scharg sent Griffin a series of text messages to understand the status of the settlements. At the end of their text exchange, Scharg

---

[1] Two of the signatures match the signature that appears on the declaration that Lira submitted in this action. The 2020 check does not match that signature but clearly reads "David Lira." Edelson expects that Lira will be able to authenticate the checks in Exhibit A.

Case: 1:18-cv-07686 Document #: 929 Filed: 01/05/21 Page 4 of 15 PageID #:9132

asked whether, in fact, it was the case—as Griffin had represented earlier on a phone call—that Boeing wouldn't "release any of the money until all of the settlement agreements are signed." (See Exhibit 1 to the Supplemental Declaration of Ari J. Scharg, attached hereto as Exhibit B.) Griffin responded by saying "correct." (*Id.*)

As it turned out, according to Griffin's response to the motion for rule to show cause, Boeing funded the settlements as the releases came in between March 4-31, 2020. (Dkt. 903 at 7-9.) It appears, therefore, that it was never true that Boeing refused to fund the settlements until it received all of the releases from Plaintiffs. With each signed release that it received, Boeing wired the required funds for that family to Girardi Keese's client trust account.

Each time Boeing wired money to Girardi Keese during March, Griffin admits that he prepared memos to Girardi advising that the monies needed to be transferred to Plaintiffs. (Lira Resp. ¶¶ 23-27.) And the May 4, 2020 memo that is attached as Exhibit E to Griffin's response reflects that Griffin was fielding many calls by the clients over the prior weekend asking about the status of the monies owed to them. But Griffin did not notify Scharg, or anyone else at Edelson, when the Boeing payments started hitting Girardi Keese's trust account in March. Instead, he offered only misleading statements and lies. On May 5, 2020, Scharg texted Griffin, "Lira hasn't responded to me. Is there an issue that I should be aware of?" to which Griffin responded, later that day, "No issues. He just told me should have final versions in a couple days." (Supp. Scharg Decl. Ex. 1.) On May 11, 2020 at 12:25 Central time, Scharg texted Griffin again to check on the status of the releases and translations, which Scharg believed were holding up the settlement payments. (*Id.*; Supp. Scharg Decl. ¶ 3.) Wire transfers of a portion of the settlement funds were initiated less than two hours later—a fact Edelson did not learn until December. (*See* dkt. 843-2.) In a text exchange that occurred more than two months later, on

June 16, 2020, Scharg asked Griffin "did the Boeing money come in" and Griffin responded that he "actually d[id]n't know" but would "find out." (Supp. Scharg Decl. Ex. 1.) In fact, Griffin knew the exact amounts that were withheld from Plaintiffs; knew that Girardi was refusing to make the required payments; knew that Girardi was violating the Court's order by paying the settlement in unwarranted installments; and acted to cover it up.[2]

For his part, Lira acted in much the same fashion as did Griffin. Lira also promulgated the false narrative that the delay in getting Plaintiffs paid was because Boeing wouldn't release any settlement funds until it received all of the signed releases from Plaintiffs. Lira tries to claim that this statement, which he put in his May 11th email to Jay Edelson, "was an accurate statement of the status of the settlement process for the *second group* of clients, which had been referred to Mr. Lira." (Lira Resp. ¶ 23.) If not an outright lie, the statement is at least extraordinarily misleading.

In his communications with Edelson up until the June 16th phone conference, Lira did not distinguish between the two groups of clients whatsoever. Moreover, though he recounts in his response an occasion when he "received an inquiry regarding payment of the settlement from one of the clients that had been referred to Mr. Girardi," Lira never advised Edelson of the inquiry or the fact that he had to tell "Mr. Girardi that the funds must be paid immediately" but obviously hadn't been up until that point. (Lira Resp. ¶ 18.)

Lira states that "[s]imilar exchanges with increasing intensity followed with the final confrontation on the day Mr. Lira resigned and left the firm." (*Id.*) But Lira never advised Edelson of any of these confrontations, which were presumably over Girardi's refusal to pay

---

[2] Griffin also makes the puzzling statement that in November, he referred the clients to an attorney to file a lawsuit against Girardi Keese. (Griffin Resp. ¶ 47.) Edelson will seek a more detailed explanation of this purported referral when Griffin testifies.

5

Plaintiffs in accordance with the Court's Orders and the terms of the settlements. Even on the June 16th phone conference, all Mr. Lira reported was that Boeing had, in fact, funded the settlements, but he said nothing of the client inquiries, the confrontations with Girardi over his failure to transfer the money to Plaintiffs, or again, anything about Plaintiffs being paid less than what they were owed. If Edelson wanted to understand the status of the money owed to Plaintiffs and Edelson on what he is now calling the "first group of cases," Lira advised that Edelson would need to speak with Griffin and/or Girardi. Plaintiffs received another installment of their settlement monies on July 6, 2020—the same day that Lira sent Edelson a letter following up from that phone call. (Dkt. 842 ¶ 11.)

Girardi, for his part, is still telling the same story as Griffin and Lira told back in May. On December 9, 2020, Girardi called Scharg and stated, in response to Scharg's greeting: "Oh good. Ari I'm sick as [expletive] and will FedEx the checks on Friday. This is Keith Griffin's fault. He's no longer at the firm." (Supp. Scharg Decl. ¶ 4.) On January 4, 2021, Girardi left a message for Jay Edelson in which he stated:

> This is Tom Girardi. First of all I want you to know that we paid all of the people. We had to wait for releases and we couldn't pay until the releases came through and so they're all paid. And I want to get rid of everybody including your client. So give me a call please. …. Thank you very, very much.[3]

**ARGUMENT IN REPLY**

In their responses, Lira and Griffin try to paint themselves as no different than Edelson in their knowledge of what was going on with the settlement funds here. Simply put, that's preposterous. Far from being outsiders, Lira and Griffin were high-level partners at Girardi

---

[3] The recording of the message can be found at https://edelson.com/wp-content/uploads/20210104.mp3. Edelson notes that no attorney at the firm has spoken to Girardi directly since Mr. Monico filed his appearance on December 11, 2020. They have twice advised Mr. Monico that Girardi continues to leave messages for them.

6

Keese. For a period of months after Girardi Keese received the settlement funds from Boeing into its client trust account, Lira and Griffin engaged in a cover-up designed to prevent Edelson and the Court from learning that the Court's orders were not being followed. The cover-up worked. Even when Edelson filed its motion for a rule to show cause in December 2020, it *still* didn't have evidence sufficient to demonstrate that the Court's orders hadn't been followed. The only reason they have that evidence now is that Girardi, Lira, and Griffin have largely admitted to what happened.

Lira and Griffin focus their defense on their contentions that 1) the Court's orders weren't directed at them; 2) Edelson's failure to understand that money hadn't been distributed had nothing to do with them; and 3) they can't be held to account because only Girardi had the power to comply with the Court's order by making the required payments to the plaintiffs. All of arguments miss the mark, and Lira and Griffin should both be held in contempt.

### A.     Griffin and Lira Were Bound by the Court's Orders as Employees.

First, Griffin and Lira try to escape responsibility by pointing out that the Court's orders were directed at the law firm of Girardi Keese. (Griffin Resp. ¶ 6; Lira Resp. ¶ 36.) It's true that the Court's orders were directed at Girardi Keese, but that does not absolve Griffin and Lira. It is black-letter law that "officers, employees, and other agents of an enjoined party must obey [an] injunction—even though they are not named parties—when they act in their official capacities." *Nat'l Spiritual Assembly of Baha'is of U.S. Under Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of Baha'is of U.S., Inc.*, 628 F.3d 837, 848 (7th Cir. 2010).

Lira and Griffin cannot escape responsibility because the order was directed at their employer. Regardless of whether they were "partners" at the firm, Lira and Griffin were indisputably high-ranking and long-tenured employees of Girardi Keese. When acting in that

7

capacity, they were required to "make a reasonable and diligent effort to comply" with the Court's orders. *See SEC v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010). As discussed in detail below, they did not.

> **B.** **Lira and Griffin Participated in a Cover Up that Allowed Girardi to Steal Client Funds.**

In any event, it is irrelevant whether the Court's order was directed specifically at Griffin and Lira because "[a] party may also be held liable for knowingly aiding and abetting another to violate a court order." *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 945 (9th Cir. 2014) (citing *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945)). At a minimum, "nonparties who are in active concert or participation with a bound party are themselves bound and may be liable for aiding and abetting the party's contempt." *Nat'l Spiritual Assembly of Baha'is*, 628 F.3d at 848. "There is even authority that anyone who takes steps deliberately to thwart the enforcement of a judicial decree can be hauled into court and dealt with summarily even though he is not named in the decree or acting in concert with someone that is, or violating any source of legal obligations other than the decree itself." *United States v. Bd. of Educ. of City of Chicago*, 11 F.3d 668, 673 (7th Cir. 1993). In sum, "[t]he law does not permit the instigator of contemptuous conduct to absolve himself of contempt liability by leaving the physical performance of the forbidden conduct to others. As a result, those who have knowledge of a valid court order and abet others in violating it are subject to the court's contempt power." *Roe v. Operation Rescue*, 919 F.2d 857, 871 (3d Cir. 1990).

Aiding and abetting liability requires showing "association and participation." *United States v. Beck*, 615 F.2d 441, 448 (7th Cir. 1980). In a criminal case, that means proof "beyond a reasonable doubt the state of mind required for the statutory offense, and the commission of an overt act designed to aid the commission of that offense." *Id.*; *accord Rosemond v. United States*,

8

572 U.S. 65, 71 (2014). In the civil contempt context, the standard is more relaxed. As long as a clear order was violated, state of mind is largely irrelevant. *SEC v. Homa*, No. 99 C 6895, 2004 WL 1093492, at *6 (N.D. Ill. May 13, 2004). Even "subjective good faith" does not insulate a party from a finding of civil contempt. *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1802 (2019). Because the Court has already found that Girardi Keese violated a court order, no further proof of state of mind is required.

That leaves only the question of whether Lira and Griffin committed overt acts in furtherance of Girardi Keese's continuing failure to comply with the Court's orders. And the evidence of such acts is legion. The basis for holding Lira and Griffin in contempt is not that they could have paid the plaintiffs and didn't, or even that they knew about Girardi's failure to pay the plaintiffs and passively failed to do anything about it. Rather, Edelson believes that the evidence presented at the hearing will demonstrate that both Lira and Griffin made specific misstatements and actively omitted material facts, despite Edelson's repeated attempts to get information about the status of the settlements. In other words, they both took affirmative steps to cover up Girardi Keese's continuing violation of the Court's orders. Specifically, Lira and Griffin both perpetuated the false narrative that Boeing wouldn't fund *any* of the settlements—not, as one would assume, and as it turned out, each time a signed settlement agreement came in—unless and until it received releases from *all* Plaintiffs. That false narrative, which Lira and Griffin advanced through specific oral and written communications, kept Edelson's concerns at bay long enough for Girardi to steal and dissipate a large chunk of the clients' settlement funds.

Lira and Griffin's responses make clear not only that they were aware that Plaintiffs hadn't been paid all sums due them, but that they knew Girardi was wrongfully withholding the funds. Griffin now concedes that he knew the settlements had fully funded in March 2020, but in

9

contemporaneous conversations with Edelson, Griffin tried to cover up that fact. On May 4, 2020, Scharg sought an update from Griffin on the status of the settlement. That very same day, Griffin sent a memorandum to Girardi, copying Lira, stating that he had received "[l]ots of messages from Boeing clients over the weekend" and setting out the settlement amounts for the four plaintiffs at issue here. Griffin never gave even the slightest indication to Scharg or any other Edelson attorney that the settlements had been funded, that the clients were asking for their money, or that Griffin was trying to get Girardi to wire the money. To the contrary, in response to a direct text message inquiry, Griffin told Scharg in June 2020 that he *did not know* whether the Boeing money had come in. Edelson believes that at an evidentiary hearing the Court will be able to conclude that this statement was a deliberate lie Griffin told to cover up the fact that Girardi Keese was in continuing violation of the Court's orders.

    Lira says that before he left the firm in June 2020, he had heated exchanges with Girardi about the need to pay the clients what was owed to them, and that "[o]ther people also told Mr. Girardi that the clients had to be paid." (Lira Decl. ¶ 30.) But instead of taking action to help the clients, Lira's overt acts were designed to cover up the contempt. Jay Edelson *directly asked* Lira and Griffin in May if Boeing could fund the settlements for the other clients while waiting on the ones who hadn't settled yet. But Lira dodged the questions, offering only vague statements and platitudes, which he now uses to try to shift the blame for misunderstanding onto Edelson. At the evidentiary hearing, Edelson believes that Lira's explanation—that his statements relate to only the "second group" of cases, and not to the four cases at issue here— will not be credible. Jay Edelson's email does not make that distinction, and neither does the portion of Lira's reply where he states that "Boeing's lawyers have the settlement funds in their trust account so the threat of BK is of no moment[.]" On top of that Lira had received Keith Griffin's memorandum

just a few days earlier but made no mention of it. Lira's communications, at the very least, intentionally omitted material information in response to Edelson's queries.[4]

Setting aside whether Lira and Griffin had an affirmative responsibility to bring that information to the Court, they certainly had an obligation not to take overt acts to perpetuate Girardi Keese's violations of the Court's orders. While there is nothing to refute that Girardi had ultimate control of the accounts and ability to transfer the funds to Plaintiffs, Lira and Griffin—for whatever reason—covered up Girardi's wrongdoing for months. And, it was only after they were pressed time and again that they would give up bits and pieces of information, never providing the full picture of what was actually going on.

Edelson believes that it is no coincidence that Girardi is still leaving messages that push the same, false narrative that Lira and Griffin foisted on Edelson months ago. This was a coordinated cover-up. Lira and Griffin knew from the start that the hold-up wasn't because everyone was waiting on signed releases from Plaintiffs or for Boeing to fund the settlements. The hold-up wasn't a hold-up at all. Girardi converted the settlement proceeds and spent the money, and his former law partners covered it up.

---

[4] The statements made by Lira in his response are all over the place in terms of when and whether he notified Edelson that the funds on the subject settlements had been received by Girardi Keese. Lira claims that during the June 16th phone conference, he informed Balabanian and Scharg that the four settlements had funded *and that Plaintiffs hadn't been paid about half of what they were owed*. (Dkt. 908 ¶ 19.) Only the first part of that statement is true; Balabanian and Scharg do recall Lira stating for the first time on that call that he believed the settlements had been funded, but Lira also said that they would need to speak with Girardi about those funds since he didn't have any information regarding their status. Balabanian's and Scharg's recollection of the call is also consistent with the statements that Lira makes later on in his response, as borne out by the written communications he sent Edelson. Indeed, Lira cites to his letter of July 13, 2020, wherein he states "[l]astly, as to the current status of payment to the four (4) clients settled in late 2019 and referred to Keith and Tom, I do not know the current status. I resigned from Girardi Keese effective on June 13, 2020, and I do not have access to such information." (Dkt. 908 ¶ 27.)

### C. Lira and Griffin Can Be Held in Contempt Regardless of Their Level of Control Over Girardi Keese.

Instead of explaining their misleading and false statements to Edelson attorneys, Lira and Griffin expend a great deal of ink explaining their lack of control over the situation, contending that they were never partners and that they never had the authority to comply with the Court's order by actually wiring the funds.

The first statement is false. The firm held both Griffin and Lira out as partners in litigation materials and advertising materials. Lira and Griffin worked for Girardi for decades, and Lira is married to Girardi's daughter. Lira even had check signing privileges on the firm's client trust account. The idea that they were merely low-level employees is not credible.

Edelson understands the defense that Girardi had sole control over Girardi Keese's trust accounts, and thus, it was factually impossible for Lira and Griffin to intervene in a way—*i.e.*, control the flow of the money—that would have changed the outcome here. But the Court's consideration of civil contempt in this case is not calculated to coerce compliance with its commands. Rather, the purpose of contempt here is to compensate the clients. *See* Transcript of December 14, 2020 Hearing, dkt. 874, at 32:16-19. Whether or not Lira and Griffin could have made the wire transfer themselves is immaterial. If they had been truthful about when the settlement funds came in from Boeing, or at the very least about when clients started leaving messages demanding to know where their money was, this situation could have been prevented or at least mitigated. Instead, they decided to obfuscate, deflect, and lie for a period of months. The results speak for themselves.

Finally, the fact that Lira and Griffin have been partners at Girardi Keese is not just demographic information. The bigger point is that, given each of their positions at Girardi Keese for more than two decades, there is no question that both individuals witnessed and had specific

12

knowledge of the public and private allegations against Girardi for misappropriation of client funds in this case and others. As such, they were or at least should have been acutely aware of the risk of Girardi potentially committing the same bad acts here. And, certainly, when it came to the point of them having to confront Girardi about the need to transfer the funds to Plaintiffs—only to be met with the back of Girardi's hand—Lira and Griffin should not have concealed what they knew.

Lira's and Griffin's actions are even more egregious when viewed in the broader context of this being hardly the first time that Girardi has been accused of wrongfully withholding client funds. Indeed, such allegations date back more than a decade and include:

- Former workers who were sickened after building fighter jets for Lockheed Martin from the 1960s to the 1980s were represented by Tom Girardi and settled for millions of dollars. Years after those cases settled, those same clients sued Girardi for failing to pay them what they were owed;[5]

- A group of elderly women who developed cancer after taking the hormone-therapy drug Prempro, and later sued Girardi for withholding settlement funds;[6]

- A group of individuals against State Farm for claims arising from the North Ridge Earthquake, and after reaching a settlement, later turned around and sued him, alleging that the firm had not properly disbursed or accounted for the settlement funds and had concealed this conduct from the clients;[7]

- Homeowners in an oil pollution case against Shell, reaching a settlement worth over $100 million. The clients then accused him of providing them with only a fraction of the settlement proceeds and providing no transparency in the distribution process. An article at the time quoted a Girardi client as saying "[a]lmost a year later we received a piddly amount to placate us and a bunch of unfounded excuses why they continue to hold onto our money, said Barbara Post, president of the Carousel Tract

---

[5] *Gutierrez v. Girardi*, No. BC400560 (Cal. Sup. Ct.)
[6] *Allen v. Girardi Keese*, No. 2:14-cv-02721 (C.D. Cal.)
[7] *Britton v. Girardi*, No. BC492978 (Cal. Sup. Ct.)

13

Homeowners Association. We just want what is ours and to get Girardi-Keese out of our lives forever."[8]

In light of the decades-long allegations against Girardi, it is simply not plausible that Lira and Griffin had no reason to believe and guard against Girardi potentially misappropriating the settlement funds here. As attorneys at Girardi Keese for a combined half century, and having lived through years of allegations against Girardi for this exact sort of thing, Lira and Griffin obviously were in a superior position when it came to their knowledge of Girardi's penchant for stealing client funds. Not only did they do nothing to stop it, they both intentionally omitted key details, misled co-counsel, and allowed the damage to be done. For that conduct, which clearly did not comport with the Court's Orders, Lira and Griffin should be held in civil contempt of court.

## CONCLUSION

Edelson PC respectfully requests that the Court hold an evidentiary hearing and thereafter enter an order (1) finding Messrs. Lira and Griffin in civil contempt for violating the Court's orders approving the settlements of these six cases; (2) imposing a civil contempt sanction on each of them, jointly and severally, in the amount of $2,000,000 plus the amount required to pay Multi Rizki the money that is owed to him; (3) entering judgment in that amount in favor of the affected plaintiffs; and (4) granting any such further relief as it deems reasonable and just.

Respectfully submitted,

**EDELSON PC**

Dated: January 5, 2021                                     s/ Jay Edelson

---

[8] Sandy Mazza, *Famed attorney Thomas Girardi accused of hoarding settlement funds for Carson's Carousel residents*, DAILY BREEZE, https://www.dailybreeze.com/2017/07/01/famed-attorney-thomas-girardi-accused-of-hoarding-settlement-funds-for-carsons-carousel-residents/

Jay Edelson
jedelson@edelson.com
Benjamin H. Richman
brichman@edelson.com
Ari J. Scharg
ascharg@edelson.com
EDELSON PC
350 North LaSalle St., 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378


Rafey S. Balabanian
rbalabanian@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, CA 94107
Tel: 415.212.9300
Fax: 415.373.9435