```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   WELLY CHANDRA, et al.,              )
                                         )
 4                      Plaintiffs,      )
                                         )
 5   -vs-                                )
                                         )  Case No. 18 C 7686
 6   THE BOEING INTERNATIONAL SALES      )
     CORPORATION, a Washington           )  Chicago, Illinois
 7   State Profit Corporation, et        )  December 8, 2021
     al.,                                )  10:00 a.m.
 8                                       )
                        Defendants.      )
 9

10            TRANSCRIPT OF PROCEEDINGS - Volume 1
             BEFORE THE HONORABLE THOMAS M. DURKIN
11
     APPEARANCES:
12
     For Edelson PC:       MR. ALEXANDER G. TIEVSKY
13                         MR. JAY EDELSON
                           MR. J. ELI WADE-SCOTT
14                         MS. AMY B. HAUSMANN
                           Edelson PC
15                         350 North LaSalle Street, 14th Floor,
                           Chicago, Illinois  60654
16
     For Keith Griffin:    MR. RYAN D. SABA
17                         Rosen Saba, LLP
                           9350 Wilshire Boulevard, Suite 250
18                         Beverly Hills, California  90212

19
     For David Lira:       MS. EDITH R. MATTHAI
20                         MS. LEIGH ROBIE
                           Robie & Matthai
21                         350 South Grand Avenue, Suite 3950
                           Los Angeles, California  90071
22
     Court Reporter:       KELLY M. FITZGERALD, CSR, RMR, CRR
23                         Official Court Reporter
                           United States District Court
24                         219 South Dearborn Street, Room 1420
                           Chicago, Illinois  60604
25                         Telephone:  (312) 818-6626
                           kmftranscripts@gmail.com
```

1      (Proceedings heard in open court:)

2           THE COURT:  All right.  Let's call the case.

3      (Off the record.)

4           THE COURT:  All right.  Let's get that straightened

5  out.

6           We're off the record.

7      (Off the record.)

8           THE COURT:  Let's call the case.

9           THE CLERK:  This is Case No. 18 CV 7686, In Re

10  Lion Air 610 Crash.

11           For the record, could I please have the attorneys

12  state their names one at a time, please, in the same order

13  that we did off the record a moment ago.

14           MR. EDELSON:  Jay Edelson of Edelson.

15           MR. WADE-SCOTT:  J. Eli Wade-Scott of Edelson.

16           MR. TIEVSKY:  Alexander Tievsky of Edelson.

17           MS. HAUSMANN:  Amy Hausmann of Edelson.

18           MS. MATTHAI:  Edith Matthai, Robie & Matthai, on

19  behalf of Mr. Lira.

20           MR. SABA:  Ryan Saba of Rosen Saba on behalf of

21  Mr. Griffin.

22           MS. ROBIE:  Lee Robie on behalf of Mr. Lira.

23           MR. WISNER:  Floyd Wisner on behalf of plaintiffs.

24           THE COURT:  All right.  And Mr. Griffin and Mr. Lira

25  are present in court, correct?

1          MR. LIRA:  Yes, Your Honor.

2          MR. GRIFFIN:  Yes.

3          THE COURT:  Very good.  All right.  I believe we have

4    a hookup where certain people were given the credentials to

5    allow for them to view the proceedings; is that correct,

6    Emily?

7          THE CLERK:  Yes, it is.

8          THE COURT:  Okay.  And those were given in particular

9    to some of the plaintiffs in this case so that they could

10   watch this, should they choose to do so, from their homes or

11   from an office.

12         Okay.  I received a timeline from the parties.  It

13   was filed under seal because it contains settlement amounts.

14   Thank you for that.  It obviously took a lot of work to

15   prepare, and I appreciate that.

16         I also received a list of witnesses -- or list of

17   exhibits.  Are there hard copies of these exhibits available?

18         MR. TIEVSKY:  For the exhibits for the Edelson firm,

19   we have hard copy binders for counsel, for the witness, and

20   for the Court.

21         THE COURT:  Okay.  All right.

22         MR. TIEVSKY:  If we could place the binder by the

23   witness stand, I think it would be helpful in terms of the

24   examination.

25         THE COURT:  That's fine.  That's fine.  But I would

1    like a copy myself.

2            MR. TIEVSKY:  Of course.

3            THE COURT:  What is the plan?  I did allow the

4    Edelson firm to pursue the matter.  I think those are the

5    words I used.  Although I expect I'll have questions myself

6    and I'm going to allow, of course, counsel for Mr. Griffin and

7    Mr. Lira to liberally ask questions they deem appropriate.

8            Who do you have in mind to call as witnesses?

9            MR. TIEVSKY:  We intend to call Mr. Griffin,

10   Mr. Lira, Mr. Scharg, and Mr. Balabanian.

11           THE COURT:  All right.  In that order?

12           MR. TIEVSKY:  Yes, Your Honor.

13           THE COURT:  Okay.  Is Mr. Griffin prepared to go on

14   the stand?

15           MR. GRIFFIN:  Yes.

16           MR. SABA:  Your Honor, real quickly, could we go over

17   housekeeping issues?

18           THE COURT:  Go ahead.

19           MR. SABA:  Thank you, Your Honor.

20           THE COURT:  And you can all sit.  The most important

21   thing is you speak into the microphone, not that you stand.

22   There's no reason to stand because my court reporter picks up

23   things on the microphone better than she does if you say it in

24   court because she's hooked in and she has ear phones on.  If

25   you're making objections or have other things you want to

1   address, if you're going to stand or move around, you need to

2   be either in front of the mic at the podium, in front of the

3   mic at the ELMO, or wear a portable mic.  But I'm not

4   requiring you to stand for objections because it's not

5   necessary, and it's more helpful for her to actually have you

6   speaking into a mic.

7           So that's the first housekeeping matter, so that's

8   done.

9           Go ahead.

10          MR. SABA:  I know you made a statement before, but I

11  would be appreciative if you made a statement again for

12  anybody that's viewing this live feed that it should not be

13  rebroadcast, republished or in any way used in any media or

14  for any other purposes other than watching the live stream.

15          THE COURT:  That's correct.  That's on the order, the

16  order that set up this hearing.  There's criminal penalties

17  associated with taking a matter in federal court, recording

18  it.  So if someone gets this live feed and is recording it in

19  any way, they're violating the law.  They cannot do that.

20          So if anyone is on this call or has a live feed,

21  you've been warned.  It was part of the docket entry that

22  allowed people to participate in a live feed, but it's

23  reinforced by what I just said.

24          MR. SABA:  My second housekeeping matter, Your Honor,

25  is we do recognize that our prior due process objections have

1   been overruled.  However, out of an abundance of caution and

2   so that there's no argument later that there might be a

3   waiver, we would like to state affirmatively that we are still

4   asserting those due process objections that were previously

5   set forth in the various pretrial filings with this Court.

6           THE COURT:  That applies to both Mr. Griffin and

7   Mr. Lira.  Your briefs filed earlier, the many briefs that

8   have been filed in this case, preserve objections you've

9   raised to both the proceeding and the manner in which the

10  proceeding has taken place.

11          As I've said before, I believe this is a factual

12  inquiry.  What law applies, which is a matter of some contest

13  between the parties, is not necessary to resolve until I've

14  heard the facts.  I don't think that any party is prejudiced

15  by a lack of definitive statement by me as to the standards by

16  which we're going to be applying the facts.  I'll give you

17  that opportunity if necessary, and that's how we'll proceed.

18  But I don't view anybody being prejudiced.  You may disagree,

19  but I don't believe anyone is being prejudiced by having this

20  proceeding proceed in the manner in which I'm going to allow

21  it.

22          Okay.  Anything else then from attorneys for

23  Mr. Griffin?

24          MR. SABA:  Yes, Your Honor.  My last housekeeping

25  matter is that we request that any potential witnesses in this

1    hearing, other than Mr. Griffin and Mr. Lira, be removed from

2    the courtroom and be precluded from watching the live feed or

3    reading any transcripts until after they've testified.

4           THE COURT:  All right.

5           Is the attorney for Mr. Lira joining in that,

6    Ms. Matthai?

7           MS. MATTHAI:  Yes, Your Honor.

8           THE COURT:  All right.

9           Any objection by attorneys for Edelson?

10          MR. TIEVSKY:  Your Honor, we would like our company

11   representative, that is, Mr. Edelson, to be permitted to stay.

12   You know, Edelson PC is our client; Mr. Edelson is the CEO.

13          THE COURT:  Any objection of that by that defendants?

14   By "defendants," I don't really mean defendants.  The other

15   side by Mr. Lira and Mr. Griffin?

16          MR. SABA:  Your Honor, I don't see Edelson as a

17   client in this case.  They are *amicus curiae* counsel.  They

18   have plenty of representatives in this courtroom.  I count

19   approximately ten.  I don't think it's necessary.  Mr. Edelson

20   is a potential witness in this case, I think.

21          THE COURT:  Are you going to be calling him as part

22   of your case?

23          MR. TIEVSKY:  No, Your Honor.

24          THE COURT:  Are you going to be calling him in your

25   case?

1    MR. SABA:  It's our intention to, depending on how

2  the facts play out.

3    THE COURT:  All right.  What's the argument on why he

4  should remain if he's going to be hearing testimony that may

5  relate to conversations he was involved in?

6    MR. TIEVSKY:  At the end of the day, I am an attorney

7  and I do represent a client internally at my firm.  But I

8  answer to people, and those people I think do have a right to

9  see what proceedings are happening here in this courtroom.

10  Our general counsel, Mr. Balabanian, is also a witness.  We

11  are calling him.  We're not asking for him to be allowed to

12  stay, but we need a member of senior management to be here.

13    THE COURT:  Yeah, just as I think your clients are --

14  Mr. Lira is going to be in the courtroom when Mr. Griffin

15  testifies.  Mr. Griffin is going to be in the courtroom when

16  Mr. Lira testifies.  I'll let Mr. Edelson stay.

17    The key parties, the key witnesses in this case

18  beyond -- in this proceeding, as far as I can tell, are

19  Mr. Griffin, Mr. Lira, and then the primary contact they had

20  at Edelson, which I think was Mr. Balabanian.  Is that

21  correct?  And Mr. Scharg.  Those are the two primary.  I saw

22  Mr. Edelson 's name pop up in some of the briefs and in some

23  of the parts of the timeline, but he is not, as I viewed it,

24  at least, the primary contact between the parties in

25  California.  So I'll let him stay.

1           If at some point I think it's necessary to change my

2    ruling on that, I will, but I don't view him as a -- one of

3    the primary witnesses in this case.  So I'll let him stay in

4    the sense that he is a representative of Edelson PC.  They're

5    attorneys, but he's also a representative because you pointed

6    the fingers at the firm just as they pointed the fingers at

7    you.

8            All right.  Anything else from attorneys for

9    Mr. Griffin?

10           MR. SABA:  No, Your Honor.  Thank you.

11           THE COURT:  And for Mr. Lira?

12           MS. MATTHAI:  Yes, a couple of things, Your Honor, on

13    the scope of this hearing.

14           THE COURT:  Sure.

15           MS. MATTHAI:  I believe that there's no contention

16    that the clients that we've referred to as the Girardi/Lira

17    clients and for which the money went through Mr. Koushan's

18    trust account and was promptly paid to the clients are not in

19    issue in this hearing.  However, I was not able to get a

20    definitive answer from that, on that from the Edelson firm.

21    And so we have Mr. Koushan standing by for a potential video

22    appearance, and we have your court staff standing by for the

23    potential of having to make the arrangements to make that

24    happen.

25            And I would simply ask for clarification as to

1   whether there is any claim that any of -- that this proceeding

2   needs to go forward as to those clients who were promptly paid

3   after the Boeing monies were received.

4           THE COURT:  All right.  Any objection to having that

5   witness excused by the Edelson firm?

6           MR. TIEVSKY:  We have no need to call that witness

7   or, you know, have to, but I will say that the -- the fact

8   that people whose money went to the Koushan firm were paid and

9   people whose money went to the Girardi firm were not paid will

10  be an issue in this hearing.

11          THE COURT:  Well, that's just a fact which I don't

12  think anybody is disputing.

13          MR. TIEVSKY:  Right.

14          THE COURT:  And if that's the case, there's no need

15  to involve a witness just to confirm that the process worked

16  as it should have worked.

17          MR. TIEVSKY:  There may be some questions about why

18  money was directed to Mr. Koushan as opposed to the Girardi

19  Keese firm.

20          THE COURT:  You need Mr. Koushan to answer that?

21          MR. TIEVSKY:  No, we don't need Mr. Koushan to answer

22  it, but I don't want Ms. Matthai to be surprised when that

23  issue comes up and say, well, now we want to ask Mr. Koushan

24  that question.

25          THE COURT:  I'll deal with relevancy objections as

1    they come up on that, but it looks like Mr. Koushan can be

2    excused which I think was the point of your --

3              MS. MATTHAI:  That was the point, Your Honor.

4              THE COURT:  He can be excused.

5              MS. MATTHAI:  Thank you, Your Honor.

6              And then, finally, we would also ask for

7    clarification as to whether the Rizki matter is part of this

8    proceeding.  There were -- it was not a part of the order to

9    show cause.  This Court -- we identified it at the first

10   hearing when this Court inquired as to whether there was

11   another case, and we advised that that case did exist.  We had

12   not known what had happened with the funds.  Mr. Girardi's

13   counsel answered that question.

14             But the Rizki case is, of course, different because

15   of the fact that it is not -- there were no minors in that

16   case.  And so the only order that exists as to the Rizki case

17   as far as I understand is the order of this Court dismissing

18   the action which we recognize the Court stated has a

19   continuing jurisdiction component to it.  However, there's no

20   directive in that order to my client or frankly to anyone else

21   other than the -- that the matter be dismissed and that it be

22   resolved and the funds be paid.  It does obviously require

23   payment of the funds.

24             But we -- in the Boeing stipulation, all counsel had

25   agreed that that was not part of this case.  And so we wish to

1    try to confirm that as we launch on this evidentiary hearing.

2             THE COURT:  Well, I would like to know what happened

3    to Rizki, the Rizki funds.  I think it's important for me to

4    find out.  And I have some questions about it, and I would

5    love to have them answered.  We could even do it -- if you're

6    going to give me brief opening statements, which I'll allow if

7    you want to, you don't have to, but I would like some

8    explanation of that at some point during these proceedings.

9             I am -- because I didn't approve that settlement

10   because it didn't involve minors, there's just the general

11   question of Boeing paying money.  Presumably Boeing paid on

12   the Rizki claim.

13            MS. MATTHAI:  There is no dispute that Boeing paid on

14   the Rizki claim.  The Girardi firm has stated that

15   Mr. Rizki -- well, counsel for the Girardi firm has stated

16   that they think that Mr. Rizki has been paid -- had not been

17   paid.  We do not have information that he was paid, but we

18   also don't -- I mean, at least my client doesn't have

19   information beyond that.

20            THE COURT:  Was Edelson -- did you have a fee-sharing

21   arrangement with Girardi on Rizki?

22            MR. TIEVSKY:  On Mr. Multi's, yes, we did.

23            THE COURT:  All right.  What name are we using for

24   that?

25            MR. TIEVSKY:  So in Indonesia, most people do not

1    really have family names.  So his full name is Multi Rizki.

2    So he's either a Mr. Multi Rizki or Mr. Multi.

3            THE COURT:  Okay.

4            Mr. Wisner, you represent him, correct?

5            MR. WISNER:  I do, Your Honor.

6            THE COURT:  Come up to the mic, please.

7            MR. WISNER:  Oh, I'm sorry.

8            THE COURT:  You can come up to the podium.

9            MR. WISNER:  Oh, okay.

10           I do represent him, Your Honor, and what's been said

11   about it not being a subject of Your Honor's order is true.

12   However, I think there's -- obviously issues are the same, and

13   there's going to be collateral estoppel that's going to apply.

14   So I join in the statement that we should get into that one,

15   too.  He was not paid.  He's owed over a million dollars.

16           THE COURT:  Well, he was not paid at all or he was

17   not paid --

18           MR. WISNER:  He was not paid at all.  He's one that

19   was not paid at all.

20           THE COURT:  Okay.  And is that one where Boeing

21   funded it?

22           MR. WISNER:  Yes.

23           THE COURT:  The money went to the Girardi Keese firm

24   and it just never found its way to Mr. Multi Rizki?

25           MR. WISNER:  Exactly.

1    THE COURT:  All right.  Well, since we're all here

2  and anybody who may have knowledge of that possibly will be on

3  the witness stand, I would like to know more about that, too,

4  because even though I didn't approve the order, I have -- it

5  was a case filed in front of me.

6    Was it actually dismissed, or did this --

7    MR. WISNER:  Yes.  Yes.

8    THE COURT:  It got dismissed based on the

9  understanding, anyone would understand this, that the payments

10  went to the attorneys and presumably proper procedures were

11  followed where the money that Boeing sent to the firm would

12  have been then sent on to the client who was due the money.

13    I'm hearing from the attorney for Mr. Multi Rizki

14  that he didn't get the money, any of it, correct?

15    MR. WISNER:  Any of it.

16    THE COURT:  And rather than reconvene a separate

17  hearing, I'd rather we cover that in this hearing, too.

18    So that answers your question, Ms. Matthai.

19    MS. MATTHAI:  Thank you, Your Honor.

20    THE COURT:  Okay.  Anything else by way of

21  preliminaries?

22    MS. MATTHAI:  No, Your Honor.

23    THE COURT:  Anything else from the Edelson firm?

24  I'll speak to it as the Edelson firm, but anything else from

25  the Edelson firm on preliminaries?

1    MR. TIEVSKY:  There is one preliminary matter,

2  Your Honor.

3    THE COURT:  Go ahead.

4    MR. TIEVSKY:  So in our pretrial memorandum, we

5  identified two possible ways that Mr. Griffin and Mr. Lira

6  could be held accountable, contempt and inherent power

7  sanctions.  I just wanted to make sure that it was clear on

8  the record that they were each on notice that both were

9  possible before this hearing started.

10    THE COURT:  Everyone is on notice of what the other

11  person filed, the other side filed.  You've got them.  Whether

12  or not I adopt the positions by either side is not really

13  what's up today unless we have enough time to argue about the

14  effect of the facts that are elucidated, that are brought

15  forth in these proceedings, but I'm not going to get into the

16  legal arguments because those are things we can do on the

17  phone.  I can't do that with witnesses on the stand, and I

18  would rather we used our time for that.

19    MR. TIEVSKY:  Thank you, Your Honor.

20    THE COURT:  Okay.  Does either side want to make any

21  brief opening statements?

22    MR. EDELSON:  Your Honor, we're happy to give a brief

23  opening.  We're happy to waive it as well.

24    THE COURT:  I've read every word everyone has filed

25  so I'm not asking for it unless you want to do it.

1    Edelson firm, do you want to make a brief opening

2 statement?

3    MR. EDELSON:  If they're willing to waive, too, we're

4 happy to waive and just get into the testimony.

5    THE COURT:  How about on the defense?

6    MS. MATTHAI:  May I speak with my client?

7    THE COURT:  Yes, ma'am.

8  (Counsel conferring.)

9    MS. MATTHAI:  I think we would wish to make a brief

10 statement.

11    THE COURT:  Okay.  And how about on behalf of

12 Mr. Griffin?  You can decide after Ms. Matthai makes her

13 statement.

14    MR. SABA:  I guess it would depend.  If plaintiff --

15 or if Edelson is going to make one, I'll make one.  If they're

16 not --

17    THE COURT:  You're on notice --

18    MR. SABA:  I agree with Mr. Edelson if he waives.

19    THE COURT:  Ms. Matthai is going to do one.  Does

20 Edelson want to start?

21    MR. EDELSON:  I'll be very brief.

22    Your Honor, just for housekeeping, where would you

23 like me to speak.

24    THE COURT:  You can speak in front of the podium or

25 the ELMO if you're going to use an exhibit.  Stay away from

1    mentioning anything about what you were going to say if you

2    were called as a witness.

3           MR. EDELSON:  That's not -- thank you, Your Honor.

4           First, Your Honor, thank you for taking time to have

5    this two-day hearing.  We understand that you're in the middle

6    of a very long and detailed trial so we appreciate that.

7           THE COURT:  That trial is over.

8           MR. EDELSON:  Is it over?  Congratulations for that.

9           I want to focus on two things.  We understand this is

10    mostly a fact-finding mission.  So I'm not going to spend a

11    whole lot of time doing a traditional opening.  I'm certainly

12    not going to make argument.  I want to focus on two things.

13           One is we've heard from the -- I'm going to call them

14    the defendants, Mr. Lira and Mr. Griffin, that they're just

15    W-2 employees.  That's been just the bell they've been

16    sounding over and over again as if they're just people in the

17    mail room and they were handing deliveries out and they didn't

18    know what was in it and they should have no culpability.

19    There's no question that if that were the case, if they were

20    just bystanders and they were just working at the firm, we

21    wouldn't be here.

22           What we're going to be able to demonstrate over the

23    next two days is that each of Mr. Griffin and Mr. Lira had a

24    series of choices that they had to make.  And each time they

25    had a choice to make, they decided to protect their own

1    interests, the interests of Mr. Girardi, and just abandon

2    their clients.

3            The first thing that happened we all know is the case

4    is settled, the relevant cases, and I'm talking about both

5    Mr. Multi and then the minors.  I'll just talk about them as

6    the relevant cases.  The cases were settled by March of 2020.

7    By April of 2020, the money was delivered to the Girardi Keese

8    firm by Boeing as required.

9            So what happened right after that?  We've got the

10   first choice, first choice that each of the defendants had to

11   make.  They start getting e-mails from clients right away

12   saying "Where's our money?"  They had a choice to make.  They

13   could have said the money is in; they didn't.  Instead, they

14   decided to conceal.

15           Mr. Lira did something even more, though.  Mr. Lira

16   has the ability to write checks.  You kind of heard a lot of

17   noise suggesting that's not true.  He does.  We got checks

18   with his signature on them.  Even though he knew the money was

19   in, even though he knew that the clients had not received

20   them, were saying "we want our money," he started writing

21   checks, check after check, to other people and to former

22   clients.  And we'll get into that a little bit later because

23   one of the big questions is where did the money go?  And it is

24   important.  It's not the central part of our presentation, but

25   it is relevant here.

1      Next thing that happens is there's a lot of

2   discussion in May about getting some money to the clients, and

3   a decision is made that only half of the money is -- that is

4   owed to the clients is going to be paid.  That's a decision

5   made by the Girardi Keese firm.

6      Mr. Griffin was directly involved in that.  He

7   actually has -- there's a written memo where he directs

8   specific amounts to be given to the clients but not the full

9   amounts.  Even though he knows the full amounts are in, he

10  knows the full amounts are owed, these were the two principal

11  attorneys in the case, they knew what the settlements were,

12  they knew what the Court's order was, he directs that only

13  half the money is going to go out.

14     Well, what was Mr. Lira doing at this time?  He was

15  very involved, too.  He was seeing all of this take place,

16  this decision made that half the money was going to be sent.

17  And then the question that the Girardi Keese firm had to

18  answer is what do we say to the clients?  How do we explain to

19  them that they're not getting the full amount of the money?

20     And Tom Girardi had a couple of thoughts about that

21  consistent with what David and Keith were telling our firm --

22  and by our firm, I'm talking about Mr. Scharg and

23  Mr. Balabanian.  They came up with a number of excuses.  One

24  is there are some tax problems and maybe we can't -- you know,

25  tax issues and we can't give money right away.  And the other

1   was there were delays in Boeing actually distributing the

2   money.  We both -- they knew that wasn't true.

3         Mr. Lira actually said in a written correspondence,

4   we can't go with this tax angle -- and I'm paraphrasing, this

5   is not an exact quote -- we can't go with this tax angle, the

6   clients are too smart.  They're going to figure that out.  And

7   he tries to pull back some of the letters which mention these

8   issues, and he's able to pull back some of them but not

9   others.  Of course, he never says to the clients this is all

10  part of a fraud that's going on.  Instead, he's just trying to

11  do damage control.  And to make it clear that it was damage

12  control, Mr. Lira says personally, quote, "I wouldn't send any

13  of these letters.  They are lies that can come back to haunt

14  Tom."  After the letters go out, Mr. Lira reacts again and

15  says, "Tom is going to have to be ready for an onslaught of

16  inquiries.  They all talk and other victims have received

17  their compensation."

18        You're going to also hear testimony that in addition

19  to them covering this up and stealing from the clients and

20  seeing that lies were being told, they also had a pattern of

21  lies to us.  We thought this was going to be much more the

22  focus of this two-day hearing.  It's not really as important

23  now that we see the direct concealment to the clients.  But

24  you'll hear it's the same notes of there were delays because

25  of Boeing and there were tax issues and everything is going to

1    work out; and, of course, that never happened.

2           Now, the big question Your Honor asked when we were

3    in front of you the first time when we were seeking to hold

4    Mr. Girardi in contempt was what happened to the money.  The

5    answer -- and this will not be -- if this were the focus of

6    this hearing, it would be -- it would be a three-month trial.

7    But we -- you are going to see notes of this, and it's really

8    important, which is the Girardi firm was running a Ponzi

9    scheme for many, many years.  That's what was happening with

10   the money.  You will see that when money came in, one of the

11   first things that Mr. Lira did was send money to a previous

12   client who hadn't been paid.  You'll see that in their -- in

13   the correspondence between the firm and with other third

14   parties, there are references to other cases, oh, it looks

15   like Tom is playing the same -- pulling the same page from the

16   same play book as the previous case.  Again, I'm paraphrasing.

17   I'm not quoting.  And those other cases, it's the same thing

18   where it was Tom lying, delaying payments, and not paying

19   clients.

20          That's where a lot of the money went.  Ponzi scheme

21   money comes in, let's pay previous clients, and let's hope

22   that money is going to come in another case and we'll pay

23   these clients.  That's why they wanted to delay, delay, delay.

24   They were hoping I think that money would come in.

25          But it was also being used for other purposes, too.

1    It was being used for operating expenses.  Mr. Griffin and

2    Mr. Lira are going to testify, I'm sure, that they were paid

3    handsomely during this time.  So as they knew, the clients

4    weren't getting paid and the money that the firm had was

5    client money only.  They were still accepting checks,

6    accepting payments from those stolen funds.  And they were

7    doing that not for the first month, not for the second month,

8    not for the third month, but through the whole time until they

9    left the firm.  They kept getting money.

10         We're also going to be able to demonstrate that the

11   money was being used for just the firm's largess, paying off

12   Lamborghini bills which we understand was for Tom's wife,

13   Erika Jayne, paying enormous credit card fees.  Mr. Lira and

14   Mr. Griffin knew all of this.  They made a decision, a series

15   of decisions that they wanted to keep their lifestyle.  They

16   were complicit in so many things over the years, that in their

17   mind they had to keep quiet and just hope that it wasn't the

18   end of the Ponzi scheme, that they were struck squarely in the

19   middle of it.  And unfortunately for them and unfortunately

20   for their clients, that wasn't true, the money ran out, and

21   that's why we're here today.

22         THE COURT:  All right.  Two questions.  Mr. Girardi,

23   as I understand it, was -- we had this on the record because

24   his attorney was on the line -- would, if called as a witness

25   in this case, exercise his Fifth Amendment privilege.

1          Edelson firm agree with that?

2          MR. EDELSON:  Correct.

3          THE COURT:  Attorneys for Griffin and Lira agree with

4     that?

5          MS. MATTHAI:  Yes, Your Honor.

6          MR. SABA:  Yes, Your Honor.

7          THE COURT:  All right.  And Chris Kamon, who is

8     apparently the CFO or bookkeeper or some type of financial

9     person at Girardi Keese, I don't know if I had the attorney

10    for Mr. Kamon on the line to acknowledge that he would take

11    the Fifth Amendment -- exercise the Fifth Amendment privilege

12    if called as a witness.  Is that your understanding he would?

13         MR. EDELSON:  Correct, Your Honor.

14         THE COURT:  Did you have communications with his

15    attorney?

16         MR. TIEVSKY:  So I did speak to his attorney at

17    Skadden.  I explained that Mr. Girardi had taken the Fifth and

18    that I knew Mr. Kamon had taken the Fifth in other

19    proceedings, but he did not specifically represent to me that

20    Mr. Kamon would take the Fifth in this proceeding.

21         THE COURT:  Who is his attorney?

22         MR. TIEVSKY:  It's Jack DiCanio at Skadden Arps.

23         THE COURT:  Okay.  Have you had an actual

24    representation from his attorney that he would exercise his

25    Fifth Amendment privilege in these proceedings if called?

1    MS. MATTHAI:  The representation that was made to me

2  was that Mr. Kamon did not wish to come to these proceedings.

3  And he did not specifically tell me that he would take the

4  Fifth.  He gave a very Skadden-esque answer to that question.

5    THE COURT:  All right.  I won't even ask to follow up

6  on that.

7    How about for Mr. Griffin?

8    MR. SABA:  Your Honor, I have not communicated with

9  this lawyer, but I can tell you that he did take the Fifth

10  Amendment privilege in a deposition in which it occurred in

11  the bankruptcy court.

12    THE COURT:  Okay.  Here's what we're going to do.

13    Contact the attorney for Mr. Kamon, the attorney at

14  Skadden Arps.  Let that person know that Mr. Kamon will be due

15  in this Court tomorrow morning at 10:00 absent a letter from

16  the attorney indicating that his client will exercise his

17  Fifth Amendment privilege if called as a witness.  Otherwise,

18  he's here tomorrow morning.  Okay?  I expect we'll get a

19  letter, but that's the way we're going to do it because I want

20  it on the record.  I don't want any lingering -- there was a

21  request by one of the attorneys saying that Mr. Griffin and

22  Mr. Kamon were unavailable.  I want to make sure that

23  Mr. Kamon is truly unavailable -- I'm sorry -- Mr. Girardi and

24  Mr. Kamon are unavailable.  Mr. Girardi is unavailable because

25  of his -- exercising his Fifth Amendment privilege.  I want to

1    make sure that's true with Mr. Kamon before we let him go.

2           MR. TIEVSKY:  I could send an e-mail to Mr. DiCanio

3    now.

4           THE COURT:  Please do that.  Let me know what

5    response you get.  It's got to be a letter or an e-mail

6    officially from an attorney from Mr. Kamon saying if called as

7    a witness in this proceeding he would exercise his Fifth

8    Amendment privilege.  Absent that, he's here tomorrow morning

9    at 10:00.

10          Okay.  Thank you.

11          MR. EDELSON:  Thank you, Your Honor.

12          THE COURT:  All right.  Ms. Matthai.

13          MS. MATTHAI:  Thank you.

14          Good morning.  We thank you for having this in-person

15   hearing and for holding this matter in abeyance until we could

16   come here personally despite the troubles that the entire

17   country has had for the last almost two years now.

18          This Court has defined a scope of this hearing that

19   it's a fact-finding exercise.  However, I think it is

20   important to just touch on a couple of points, that it is a

21   contempt hearing.  It is not a hearing on a violation of an

22   injunction.  Two different sets of laws apply.  And it's also

23   important as we go through the statements and the witnesses,

24   it's going to take a careful ear to hear what is said.

25          Repeatedly, Mr. Edelson used the words "they."  This

1    is a hearing about Mr. Lira and Mr. Griffin.  It is not a

2    hearing about the despicable acts that Mr. Girardi has done.

3    We know what he did.  There isn't any question what he did.

4    But Mr. Lira is not Mr. Girardi.  Mr. Griffin is not

5    Mr. Girardi.  The question here before this Court is should

6    these two lawyers be held in contempt.

7            Now, in order to evaluate that matter, this Court has

8    to consider who Tom Girardi was, what Girardi & Keese was, and

9    how that firm operated.  In a couple of hearings, this Court

10   has made what are extremely logical assumptions, such as these

11   gentlemen worked there so they must know where the files are.

12   You cannot imagine how untrue, logical but untrue, that

13   assumption is.  The assumption that these men knew what was

14   going on in Girardi Keese at all points is untrue.

15           Tom Girardi was an amazing figure in the Los Angeles

16   legal community for 50 years.  And it is an extraordinary

17   story because from sometime around the 1970s, Mr. Girardi

18   embarked upon a planned exercise of establishing influence,

19   establishing influences with the judges.  He had schedules of

20   going to meet judges in order to be the buddy.  He was

21   president of I think every single bar association that existed

22   in Los Angeles.  I'm not sure that a bar event happened that

23   the man did not appear in.  He constructed influence with a

24   state bar.  One of the senior lawyers in his office, Howard

25   Miller, became president of the state bar and was president of

1     the state bar.

2             He curried influence with the press.  So it's

3     remarkable how favorable his press was over the years.  He got

4     publicity sometimes simply for what he was doing or a case

5     that he handled, although you'll hear that in later years it

6     was rare.  His practice of law became simply going to

7     mediations and currying fame and influence.

8             He gave money to politicians, governors, law

9     enforcement, DA's races.  Any single area of influence that

10    could have an impact on him, he curried favor in that

11    influence.  And he was beyond narcissistic.  He -- some

12    publicity he received.  He had a radio show.  He paid for

13    that.  He had -- he would obtain the kinds -- he obtained many

14    awards that bar associations willingly gave to him, but he

15    also obtained awards that were the result of contributions or

16    donations or payment.

17            He was -- he was an amazing figure in the Los Angeles

18    legal community.  Some people thought it was great.  Some

19    people shook their head and said, really?

20            But Mr. Griffin and Mr. Lira worked in an office in

21    which this man, Tom Girardi, ruled the roost.  It was his

22    firm.  He did what he wanted to do, when he wanted to do it;

23    and if my client did something that Mr. Girardi did not

24    approve of, Mr. Girardi would say, "This is my firm and don't

25    you ever forget it."  He would call Mike and say that; I heard

1    you did this.  "It's my firm.  Don't you forget it."

2            So the Court is well aware from our pleadings of the

3    two groups of cases that were settled with Lion Air.  And when

4    the first group of cases were settled, Mr. Lira was, of

5    course, aware that they had settled.  Those cases had come to

6    Mr. Girardi.  They were primarily handled by Mr. Griffin, but

7    Mr. Lira obviously worked on them and had some contact with

8    those clients when Mr. Lira knew that the money had come in in

9    March, and in April, for the first time, he learned that the

10   payments had not yet been made.

11           At that point his concern level did not rise.  He

12   wasn't pleased about this, but the office was closed.  There

13   were few people around.  Chris Kamon was not around.  Staff

14   was not around.  There was chaos in L.A.  L.A. had been

15   shut -- the State of California had been shut down with a

16   stay-at-home order.  L.A. had been shut down with a

17   stay-at-home order.  And so the alarm bells at that point did

18   not go off.

19           But you will hear that around May 11th, May 12th --

20   well, first -- let me correct that.  On May 6th, he got a

21   memorandum that had been written by Mr. Griffin.  Now, it was

22   earlier described as Mr. Griffin directing that only half of

23   the money be paid.  In fact, what the memorandum says is that

24   Tom Girardi has said that only half of the money would be

25   paid.  It was Tom Girardi's direction, and Tom Girardi was, to

1   my client's understanding, the only person in that office that

2   could authorize a wire transfer of those funds.  My client did

3   not understand that he was authorized to make a wire transfer,

4   and to the best of his recollection, and has never made a wire

5   transfer on that account.  He is a second signatory on that

6   account, and you will see in evidence an account opening

7   statement that would suggest that he could be a sole

8   signature.  But that was not his understanding.  That account

9   statement is 12 years old, 11 or 12 years old; and he, to his

10  knowledge, never, ever signed a check on that particular trust

11  account where he was the only signatory.  There was always, to

12  his understanding, supposed to be a second signature, although

13  you will also see the checks and see that there were often

14  checks that appeared only to be signed by Mr. Girardi with no

15  second signature, and there are also checks that were forged

16  with Mr. Lira's name and are not even clever forgeries.

17  There's some that are wobblers.  We're not certain for sure

18  one way or the other, but there are others that are clear

19  forge ries.

20          But Mr. Lira will tell you that the way that that

21  office worked is that he would regularly have a check

22  presented to him.  He did not write checks.  Mr. Kamon wrote

23  checks or someone -- maybe Shirleen, who was an assistant to

24  Mr. Girardi, but Mr. Lira was not writing checks at Tom

25  Girardi's office.  A check would be presented -- a trust

1   account check would be presented to him to sign on a settled

2   case, and he would be given an allocation form which reflected

3   who was to get the money, how much to the client, how much to

4   Girardi Keese for fees, and how much for expenses to be

5   reimbursed to the firm.

6           And then he would be given a check.  He would -- or

7   checks, plural, and he would look at the numbers on those

8   checks, and he would compare it to the disbursement sheet and

9   he would sign the check.

10          In hindsight, he never looked at the -- at the books

11  and records.  He never looked at the account.  He never looked

12  at the statements.  He never looked at the balance.  What he

13  looked at was the disbursement and the fact that Mr. Kamon or

14  someone else from the office had given him the checks to sign.

15          And you will hear that that's what happened here,

16  too, that when the first monies came in, he had a disbursement

17  sheet.  He knew that one of the funds had already arrived.

18  The other was arriving the next day.  He had disbursement

19  sheets that reflected that Girardi Keese was to receive more

20  than $500,000 in fees and costs on those two matters, and he

21  signed a check to Girardi Keese for $500,000 having no idea

22  whatsoever that in the future Mr. Girardi would not wire the

23  money.  Because what he had always understood had happened is

24  that if the fee check was paid, that the client was paid at

25  the same time which was his understanding.  So when he signed

1    that check, he presumed that the money would be wired to the

2    client.

3         Again, on April 15th, he heard that it had not been

4    wired.  The alarm bells were there but not so red hot because

5    of the COVID situation.  But then in May, May 6th, he gets the

6    Kamon -- excuse me, he gets the memorandum done by Mr. Griffin

7    saying that Girardi has instructed that only half be paid.

8         As this Court has previously said, this is not an

9    installment plan.  It was at that point that the alarm bells

10   did go off for Mr. Lira.  And it was that point when his first

11   communications with Mr. Girardi occurred in which he told

12   Mr. Girardi, "You have got to pay this money.  You have to pay

13   these clients and you have to pay them now."  And the answer

14   that he got from Mr. Girardi was that they would be paid.

15        Thereafter, Mr. Lira became aware while he was still

16   at the firm -- now, this starts May 6th -- is aware they have

17   not been paid.  He has discussions, which is a nice word, with

18   Mr. Girardi at that point.  Some of those were shouting

19   matches.  "This is not your money."  "You have got to pay this

20   to the clients."  "You are going to be disbarred."  "You are

21   going to go to jail."  "You are committing a theft."  "You

22   have to pay these clients."

23        And what does Mr. Girardi say?  He says that he will.

24        Why did Mr. Lira believe that he would?  Because

25   Mr. Lira believed that Tom Girardi was not going to commit

1    professional suicide.  Every -- the only thing in the world

2    that Tom Girardi cared about was Tom Girardi and his standing

3    in the legal community and who he was.  Mr. Lira did not

4    believe that Mr. Girardi was going to destroy that by not

5    paying these clients.  And he also believed that Mr. Girardi

6    had the means to do it.  Obviously, at this point, it wasn't

7    going to be done as it should have been done, but Mr. Lira

8    believed that Mr. Girardi, as Mr. Girardi represented, had a

9    great deal of money, and you'll hear from Mr. Lira some of the

10    specifics about what Mr. Girardi represented about his

11    financial condition.

12          So on June the 13th, Mr. Lira has his final shouting

13    match with Mr. Girardi reiterating that he's destroying

14    himself.  He will go to jail.  He's committing a theft.  He

15    will be disbarred.  And Tom assures him it will be taken care

16    of.

17          Mr. Lira leaves the law firm.  And at that point, the

18    clients remain represented by their counsel of record, the

19    Edelson firm and the Girardi firm.  And in June, at about that

20    same time, Mr. Lira makes certain -- Mr. Griffin at the

21    Girardi firm obviously knew that all the money had not been

22    paid to the clients, and Mr. Lira made it clear to the Edelson

23    firm that all the money had not been paid to the clients, and

24    Mr. Lira trusted that Mr. Girardi would pay, that Mr. Griffin

25    would follow up, and that if necessary, the Edelson firm would

1    take whatever steps were necessary if the money was not paid.

2            And you will see the evidence that members of the

3    Edelson firm made the same decision that Mr. Lira made, that

4    in response to Mr. Girardi's promises that the money would be

5    paid, they held off taking any action, although they had

6    considered it, they had considered coming to court, but they

7    believed Mr. Girardi, and they presumed that it was

8    unfathomable that this money would not be paid until finally

9    months after Mr. Lira had left the firm, the lies played out.

10   He hadn't paid the money.  And, in fact, the Edelson firm

11   filed the rule to show cause in connection with these contempt

12   proceedings.

13           Do we stand here and say that Mr. Lira's judgment was

14   perfect?  No, we do not.  But we do say that a lapse in

15   judgment is not contempt of court.  Mr. Lira never intended to

16   violate any order of this Court and never intended to assist

17   Mr. Girardi in violating any order of this Court.  Mr. Lira's

18   desire, as the desire of any decent human being, was that

19   these clients get paid the money that they were due.

20           Thank you.

21           THE COURT:  Thank you.

22           Mr. Saba, do you wish to make a statement?

23           MR. SABA:  I do, Your Honor.  Thank you.

24           THE COURT:  Go ahead.

25           MR. SABA:  Thank you, Your Honor.

1    It should be stated at the outset that Mr. Griffin is

2 devastated and angered that Tom Girardi did not pay the

3 individual clients their settlement money.  There's no doubt

4 about that at all.

5    During this evidentiary hearing, you will learn that

6 Mr. Griffin spent months and months, multiple times a week

7 trying to get Mr. Girardi to complete his promises and

8 obligations to the clients and comply with the court order.

9    Further, this Court will learn that Edelson's lawyers

10 were in direct communication with Mr. Girardi for many months

11 about this issue and had telephone communications with him as

12 early as June of 2020.

13    However, Mr. Girardi deceived Mr. Griffin.

14 Mr. Girardi deceived the Edelson lawyers.  Mr. Girardi

15 deceived the clients.  Mr. Girardi has already been held in

16 contempt of court, and rightfully so.  However, even though

17 Mr. Girardi committed a horrible act of stealing client money,

18 that does not automatically mean that Mr. Griffin should be

19 held in contempt as well.

20    As already stated by Mr. Edelson and Ms. Matthai,

21 there's no dispute that the Court's four orders for these

22 clients were violated.  They were violated because Tom Girardi

23 stole this money.  There is no other reason.

24    It is also undisputed that there was no order from

25 Mr. Griffin to personally perform any act.  There's no order

1 that required Mr. Griffin to personally pay the money.

2 Mr. Griffin did not personally receive any of the money from

3 the settlements.  At no time did Mr. Griffin have the money in

4 his personal possession.  The money was delivered to the

5 Girardi Keese client trust account at Torrey Pines Bank.

6    The question before this Court is whether

7 Mr. Griffin, who is not an equity owner of the law firm, can

8 be held in civil contempt for violation of a court order by

9 Tom Girardi.

10    What is undisputed in this hearing and most important

11 is that when the money was received by Girardi & Keese,

12 Mr. Griffin did not have any legal authority or capability to

13 issue a wire from the Girardi Keese trust account in order to

14 satisfy the court order.

15    Prior to this hearing, Mr. Griffin and Edelson

16 reached a stipulation.  This stipulation is critical and

17 determinative of the issues.  The stipulation reads at Docket

18 1203 --

19    THE COURT:  I've got it, so -- go ahead.

20    MR. SABA:  The key part of the stipulation,

21 Your Honor, is that Mr. Griffin had no legal authority to sign

22 any checks from the client trust account.  He did not have the

23 legal authority to issue any wire transfers from the client

24 trust account.  There will be no evidence to the contrary in

25 this hearing.

1        The evidence in this case is that Mr. Griffin did not

2   have access to the Girardi & Keese bank statements, nor did he

3   have access to mobile applications or websites.

4        It's further undisputed that Mr. Griffin did not

5   prevent Mr. Girardi or anyone at Girardi & Keese from making

6   the payments to the clients.  In fact, the evidence is quite

7   the contrary.  Mr. Griffin spent months trying to get

8   Mr. Girardi to pay the money as ordered by the Court.

9        It should be noted that in order to be held in

10  contempt, there must be clear and convincing evidence that the

11  accused contempter violated a court order.  However, Edelson

12  will attempt to present evidence that they were somehow lied

13  to and, therefore, Mr. Griffin should be held in contempt.

14  The evidence will establish that this is not true and that

15  Mr. Griffin did not lie to the Edelson firm.  But more

16  importantly, that's not the standard in which a person should

17  be held in contempt.

18       The evidence in this case will also show that after

19  Mr. Griffin expended exhaustive efforts to get Mr. Girardi to

20  pay this money and after numerous promises by Mr. Girardi were

21  not fulfilled, Mr. Griffin sought out legal advice on how to

22  handle the situation.  He consulted an attorney associated

23  with the California State Bar.  The attorney gave Mr. Griffin

24  advice.  Mr. Griffin then attempted to follow this advice, but

25  it was unsuccessful.

1      So then Mr. Griffin went beyond the advice that he

2  was given and took it upon himself to contact the referring

3  attorney for the clients and recommend that the clients sue

4  Girardi & Keese for legal malpractice and other claims in

5  order to get their money.  Mr. Griffin even provided the

6  attorney with a name and contact information for a lawyer who

7  was willing to sue the firm.  This took place on Sunday,

8  November 29, 2020.

9      The next day, on Monday, November 30th, Mr. Griffin

10  participated in a telephone call with Jay Edelson and Rafey

11  Balabanian and advised them that Tom Girardi had failed to

12  fulfill another promise and that he had referred the clients

13  to a lawyer to sue Girardi & Keese.  The Edelson attorneys

14  were mad.

15      It was just days later on December 2nd that Edelson

16  filed its verified motion for rule to show cause.  It is that

17  motion that caused this Court to inquire and ultimately hold

18  Mr. Girardi in contempt of court, and it is that motion as to

19  why we're here today.

20      However, this Court will learn from the outset and

21  all the way through the time Mr. Griffin ultimately resigned

22  from Girardi & Keese in December of 2020 that he acted in a

23  diligent manner to communicate with Mr. Girardi about paying

24  the clients their money.

25      For example, upon receiving the money in March of

1    2020, Mr. Griffin immediately wrote memorandums to Mr. Girardi

2    and the firm's financial controller, Chris Kamon, that the

3    money was received, how the money was to be distributed, and

4    provided them with wire instructions.  Mr. Griffin was crystal

5    clear and emphasized that the money needed to be wired to the

6    clients immediately.

7         To that end, when the first payment by Boeing was

8    received by Girardi & Keese from Ms. Anice's settlement, on

9    the same day, Mr. Griffin prepared a memorandum to Tom Girardi

10   identifying that that settlement needed to be paid and how

11   those monies should be wired and to whom.  Mr. Griffin even

12   bolded the text identifying the amount of money that needed to

13   be wired to the clients.  That happened on March 4, 2020.

14        You will also learn, contrary to what Mr. Edelson

15   said in his opening statement, that on April 3, 2020,

16   Mr. Griffin communicated directly with Ms. Anice and advised

17   her that her funds had been received by the law firm and the

18   money was in the firm's client trust account.  That will be

19   Exhibit 165-02.  Mr. Griffin was always candor with the

20   clients, never lied to the clients.

21        Mr. Griffin followed the same course of action when

22   the money was wired by Boeing for the second settlement, and

23   this was on March 11th, and that concerned the settlement for

24   Ms. Dian.  Mr. Griffin prepared memorandums, bolded the text,

25   instructed Mr. Girardi and Mr. Kamon to immediately wire the

1    money.

2           On March 31st, Mr. Griffin prepared two additional

3    memorandums regarding the funds for Mr. Bias and Ms. Septiana.

4    Again, both memorandums included the total settlement amounts

5    and how the money was supposed to be distributed and included

6    bolded sections identifying that the money needed to be wired

7    and included the wire instructions.

8           All four memorandums were delivered to Mr. Girardi

9    and Mr. Kamon by e-mail and by physically handing them a paper

10   copy of the memos.

11          This Court will learn that Mr. Griffin communicated

12   with Mr. Girardi on multiple times each week attempting to get

13   Mr. Girardi to pay the money.  Each time Mr. Girardi would say

14   that he'll pay the clients.  And after numerous times asking

15   Mr. Girardi to pay the money, Mr. Girardi then began to get

16   angry at Mr. Griffin.  At one point Mr. Griffin -- Mr. Girardi

17   was so angry at Mr. Griffin that he told him, "Last time I

18   checked, this is Girardi & Keese, not Girardi and Keith."  And

19   another time he was so angry at Mr. Griffin, he said, "I told

20   you I was handling this and this is above your pay grade."

21          Despite these harsh words, Mr. Griffin continued to

22   tell Mr. Girardi to pay money to the clients and continued to

23   issue numerous memorandums instructing him of the Court's

24   orders and that he needed to pay the money.

25          Around May 6th of 2020, Mr. Girardi finally advised

1   Mr. Griffin that he was going to pay the client half of the

2   money and the other half would be paid in two weeks.  When

3   pressed by Mr. Griffin why Mr. Girardi was only going to pay

4   half the money, Mr. Girardi again lashed out at Mr. Griffin

5   and told him the issue was above his pay grade.

6       The clients did get paid half their money on

7   May 11th.  Let me be clear.  There's no excuse for this.

8   There's absolutely zero excuse to pay clients half their

9   money.  However, this issue was outside Mr. Griffin's control.

10  While Mr. Griffin was upset about this, he did believe

11  Mr. Girardi when he told him the rest of the money was going

12  to be paid in two weeks.

13      This Court will learn that a few days later,

14  Mr. Girardi, through his secretary, prepared letters to the

15  clients that are absolute lies.  The secretary delivered

16  drafts of these letters to Mr. Griffin and Mr. Lira.  The

17  secretary was told by Mr. Lira not to send the letters because

18  they contained lies.  The secretary then told Mr. Lira that

19  she did not send the letters, but then she sent at least two

20  of the letters anyway.  We can only presume that she did so at

21  the instruction of Tom Girardi.  At no time, though, will

22  there be any evidence in this hearing that Mr. Griffin agreed

23  with the contents of the letters or even approved them.

24      Later in mid-2020, the settlement agreements and

25  motions for settlement approval for the other subset of cases

1    that are not part of this hearing began to be executed and

2    filed.  Edelson will try and claim that in 2020 Mr. Griffin

3    misled them by claiming he did not know whether the settlement

4    money was received by Girardi & Keese.  However, Edelson will

5    be intentionally conflating the settlement money of the first

6    four clients with the settlements of the second set of

7    plaintiffs.  These settlements were handled by Mr. Lira, and

8    there's no doubt Edelson knew the money had been received by

9    the Girardi & Keese term for the first four clients.

10          In June, the Edelson firm absolutely knew that half

11   of the money had been paid to the four clients that are at

12   issue here.  Edelson even wrote a letter on July 11th

13   acknowledging this information.

14          During this time period, Mr. Griffin continued to

15   send memorandums to Tom Girardi which the Court will see.  He

16   orally communicated with him telling him he needed to pay the

17   money.

18          Finally, on July 20th, Edelson began to speak with

19   Tom Girardi directly.  Rafey Balabanian spoke with Tom Girardi

20   on the phone, a conversation that Mr. Griffin assisted in

21   getting set up.  However, Mr. Griffin was not invited nor was

22   he included on the call.  It was during this call that

23   Mr. Girardi told Mr. Balabanian that the money not been paid

24   but he had planned to pay the clients within a couple of days.

25   Mr. Balabanian believed him.

1    When Mr. Girardi did not pay, Mr. Griffin continued

2  to tell Mr. Girardi that he needed to pay and gave him

3  additional written memorandums.  Mr. Balabanian and

4  Mr. Girardi spoke again approximately a week later on

5  July 27th.  Mr. Girardi promised Mr. Balabanian that he would

6  pay the clients the money by next Monday.  That also turned

7  out not to be true.

8    Mr. Griffin continued to give Mr. Girardi notes and

9  told him to call Mr. Balabanian.  Mr. Griffin even gave

10  Mr. Balabanian the cell phone number for Mr. Girardi.

11  Mr. Girardi and Mr. Balabanian spoke again on the telephone on

12  August 24th.  This time Mr. Girardi lashed at Mr. Balabanian

13  in a similar way that he lashed out at Mr. Griffin.

14    On September 3rd, Mr. Girardi made another payment of

15  about half of what was owed to the clients.  Mr. Griffin told

16  Mr. Balabanian this information.

17    The same day Mr. Balabanian was concerned about his

18  firm's fees by writing "What about our fees?"  Mr. Griffin

19  continued to speak to Mr. Girardi but to no avail.

20    On September 3rd, Mr. Balabanian had another

21  conversation with Mr. Girardi.  This time Mr. Balabanian

22  described the conversation as nice.  And then Mr. Girardi sent

23  him a funny letter after the conversation.  Again, Mr. Girardi

24  made promises to Mr. Balabanian that he was going to pay the

25  money.  Throughout the month of October, Mr. Griffin continued

1    to try to get Mr. Girardi to pay the money and fulfill his

2    promises, but Mr. Girardi failed to do so.

3            On November 17th, Mr. Griffin advised Mr. Balabanian

4    that the clients wanted to speak to Mr. Girardi about not

5    getting paid.  Mr. Girardi did have a meeting with a client

6    representative on November 20th.  During this meeting,

7    Mr. Girardi promised to pay the money he owed to the clients

8    by November 30th.  It was by November 29th that Mr. Griffin

9    ultimately learned that Mr. Girardi was again not going to

10   meet another deadline, and that's when he contacted the

11   referring attorney for the clients and told them to sue

12   Girardi & Keese.  And it was the next day that Mr. Griffin

13   advised Jay Edelson and Rafey Balabanian that he had referred

14   the clients to a legal malpractice lawyer.

15           THE COURT:  Who was the client representative?

16           MR. SABA:  His name was George Hatcher.

17           THE COURT:  Is he an attorney?

18           MR. SABA:  I'm sorry.  The client representative is

19   different than the attorney.  The attorney's name is Mohamed,

20   and I can't pronounce his last name.

21           THE COURT:  Is he an Indonesian attorney?  Is he an

22   Indonesian attorney?

23           MR. SABA:  No, he's an American attorney.

24           THE COURT:  Mohamed?  All right.  And who is

25   George Hatcher?

1          MR. SABA:  George Hatcher is not the attorney.  He is

2     what we would call the client handler.  He was the individual

3     that when the clients had questions from Indonesia would

4     actually do the communications with Girardi & Keese.  Attorney

5     Mohamed only referred the clients to Girardi & Keese.

6          THE COURT:  Okay.  All right.  Proceed.

7          MR. SABA:  Thank you.

8          The reality is is that Edelson was aware of the

9     nonpayment of funds by June of 2020.  They did not report this

10    issue to this Court in June, July, August, September, October,

11    or November because they, too, just like Mr. Griffin, believed

12    Tom Girardi would pay the money.

13         However, none of this information was included in

14    Edelson's motion for rule to show cause that was ultimately

15    filed on December 2nd.  And there are numerous factual

16    inaccuracies and flat-out misleading portions of the motion

17    and supplicate filings that will be explored during this

18    hearing.

19         As another example, Edelson claimed that Mr. Griffin

20    advised that they could not communicate with Boeing.  That is

21    a complete farce.  Mr. Scharg was in regular contact with

22    Boeing about motions for court approval and other issues

23    related to the settlement.  Nobody prevented Edelson from

24    communicating with Boeing, and they could have easily

25    communicated about this issue.  But they didn't because

1    Mr. Girardi deceived everybody.

2         The reality is Mr. Griffin and the Edelson lawyers

3    were trying to get Mr. Girardi to pay the money, and I truly

4    believe all of them in their hearts thought Tom Girardi was

5    going to pay the money.  I don't think anybody believed

6    Mr. Girardi was not going to pay the money.  However, at the

7    end of the day, it was Mr. Girardi, and Mr. Girardi alone, was

8    the reason why the clients did not get paid.

9         Mr. Griffin's inability to pay the clients will be

10   fully displayed throughout this hearing; and, at the end of

11   the hearing, we will ask you not to hold Mr. Griffin in

12   contempt of court for the legal reasons expressed to you but

13   also because of the factual circumstances that we presented to

14   you.

15        Thank you.

16        THE COURT:  Thank you.

17        All right.  A couple of questions for all the

18   attorneys.  I received a stipulation relating to Boeing which

19   has, it looks like, nine different claims where they talk

20   about their transmission of the money to various accounts.

21        Which are the ones at issue in this case?  Because

22   the names -- you know, because there's single names used.  Do

23   you all have that stipulation?  Can you tell me which ones are

24   at issue?  I see the first one is Damayanti, which I think is

25   Septiana Damayanti.

1          MR. TIEVSKY:  That's correct, Your Honor.

2          THE COURT:  Is that at issue?  Is that one of the

3   four that we're talking about?

4          MR. TIEVSKY:  Yes, Your Honor.

5          MR. SABA:  Yes.

6          THE COURT:  How about Misyadi, M-i-s-y-a-d-i?

7          MR. TIEVSKY:  That's Mr. Bias.

8          THE COURT:  That's Bias.

9          MR. TIEVSKY:  Yes, and Mr. Bias's money is at issue

10  here.

11         THE COURT:  All right.  Anice Kasim, K-a-s-i-m, I

12  believe that's at issue, correct?

13         MR. TIEVSKY:  Correct, Your Honor.

14         THE COURT:  And then there's one called -- the case

15  is titled Zaenudin, Z-a-e-n-u-d-i-n, versus Boeing.  Is that

16  at issue?

17         MR. TIEVSKY:  Yes, that case is at issue.  That's

18  Ms. Dian's case.

19         THE COURT:  What's the first name?

20         MR. TIEVSKY:  Dian.  Her name is Dian Daniaty.

21         THE COURT:  D-i-o-n?

22         MR. TIEVSKY:  D-i-a-n.

23         THE COURT:  D-i-a-n.  Okay.  Then there's Andrian.

24  Is that at issue?

25         MR. TIEVSKY:  Andrian is one of the cases that was

1    paid.

2          THE COURT:  That's paid and no one is contesting

3    otherwise, correct?

4          MR. TIEVSKY:  Correct.

5          THE COURT:  Fully paid?

6          MR. TIEVSKY:  Correct.

7          THE COURT:  Okay.  And Lestari?

8          MR. TIEVSKY:  Fully paid.

9          THE COURT:  Saroinsong?

10         MR. TIEVSKY:  Fully paid to the best of our

11   knowledge.

12         THE COURT:  Okay.  Anggraeni?

13         MR. TIEVSKY:  We believe that was fully paid.

14         THE COURT:  Warti?

15         MR. TIEVSKY:  And that's Mr. Multi Rizki's, and we

16   believe he has not been paid at all.

17         THE COURT:  Got it.  Okay.

18         Call your first witness.

19         Go ahead, Ms. Matthai.

20         MS. MATTHAI:  Sure.  We -- Exhibit 102, and I have a

21   hard copy here, is we tried to agree on naming conventions to

22   try to make this easy, and if the Court would like, I can --

23         THE COURT:  Sure.  Just hand it to my courtroom

24   deputy.

25         MS. MATTHAI:  Also for the court reporter.

**Griffin - Direct by Wade-Scott**

48

1          THE COURT:  All right.

2          MR. TIEVSKY:  Your Honor, if we could ask to have the

3   exhibit system turned on so we could set up here and if I

4   could also deliver binders to the witness stand and to the

5   Court and counsel?

6          THE COURT:  Yes.

7          MR. TIEVSKY:  Thank you.

8          As well I think we're going to run exhibits off this

9   computer, but I can't set it up until -- right now I'm seeing

10  the courtroom.

11         THE CLERK:  Sure.

12         THE COURT:  All right.  Call your first witness.

13         MR. WADE-SCOTT:  Edelson PC calls Mr. Griffin to the

14  stand.

15         THE COURT:  All right.

16         Mr. Griffin, please raise your right hand.

17    (Witness sworn.)

18         THE COURT:  You may begin.

19              KEITH GRIFFIN, WITNESS, DULY SWORN,

20                   DIRECT EXAMINATION

21  BY MR. WADE-SCOTT:

22  Q.  Good morning, Mr. Griffin.

23  A.  Good morning.

24  Q.  You formerly worked at Girardi Keese, correct?

25  A.  Yes.

Griffin - Direct by Wade-Scott

49

1   Q.   Since December of 1999?

2   A.   Actually before that as a law clerk, but I started working

3   as a lawyer in December of 1999.

4   Q.   And you say you left Girardi Keese on December 4, 2020?

5   A.   Yes, sir.

6   Q.   What was your title at Girardi Keese?

7   A.   I was a lawyer, trial lawyer.

8   Q.   Did you have any other titles?

9   A.   No, I did not.

10  Q.   In the course of working at Girardi Keese, you represented

11  clients in connection with the Lion Air plane crash, right?

12  A.   Yes.

13  Q.   Can you see Exhibit 102 on your screen?  It's also there

14  in the binder.

15  A.   I do see it.

16  Q.   In the middle column, there's a column that says

17  plaintiffs.

18         Do you see that?

19  A.   Yes.

20  Q.   The first person there, the name is Anice Kasim.  Did you

21  represent Ms. Kasim -- Ms. Anice, pardon me -- in connection

22  with the Lion Air crash?

23  A.   Yes, she was a client of the law firm.

24  Q.   Did you personally represent Ms. Anice?

25  A.   Well, I certainly performed legal services for Girardi

**Griffin - Direct by Wade-Scott**

1   Keese on behalf of Ms. Kasim, yes.

2   Q.  Did you have an appearance on file in Ms. Anice's case

3   against Boeing?

4   A.  I'm not clear as to whether I had an appearance on file in

5   federal court.  I don't believe I did, but I'm not 100 percent

6   sure.

7   Q.  Ms. Anice's case was initially filed in state court; is

8   that right?

9   A.  That's my understanding, yes.

10  Q.  Did you file an appearance in state court?

11  A.  You know, I would not have done that personally, but I

12  believe that your firm filed *pro hac vice* applications and

13  motions on my behalf.

14  Q.  I'm going to show you what's been marked as Exhibit 125.

15          Do you see that?

16  A.  Yes, I do.

17  Q.  What is Exhibit 125, if you recognize it?  There's a full

18  version in the binder in front of you.

19  A.  It appears to be the verified statement out-of-state

20  attorney pursuant to Supreme Court Rule 707.

21  Q.  Do you recognize this as a filing that you signed with an

22  electronic signature?

23  A.  It has my signature.  I'm sure I would have approved it.

24  I don't have a recollection of doing so, but I don't have any

25  reason to believe I didn't.

Griffin - Direct by Wade-Scott

51

1      MR. WADE-SCOTT:  Edelson offers Exhibit 125 into

2  evidence.

3      THE COURT:  It's admitted.

4    (Said exhibit admitted into evidence.)

5      THE COURT:  I'm going to admit all exhibits that are

6  offered by either side without hearing objection.  If you have

7  an objection, state it; but otherwise, I'm going to assume

8  they're all admissible.  I don't think there's any real

9  foundation issues on most of these.  If there are, speak up

10  and raise your objection; but to save time, I'm just going to

11  admit them all when offered through a witness or through -- or

12  otherwise.

13      Go ahead.

14      MR. WADE-SCOTT:  Thank you, Your Honor.

15  BY MR. WADE-SCOTT:

16  Q.  Do you see paragraph 7 on page 125-2?

17  A.  Yes.

18  Q.  It says, "I have undertaken to become" -- I'm sorry -- "I

19  have undertaken to become familiar with and to comply as if

20  admitted to practice in Illinois with the Rules of the Supreme

21  Court of Illinois, including the Illinois Rules of

22  Professional Conduct and the Supreme Court rules on admission

23  and discipline of attorneys and other Illinois law and

24  practices that pertain to the proceeding."

25      Did I read that right?

**Griffin - Direct by Wade-Scott**

1   A.   It appears you did.

2   Q.   Did you write that text on Exhibit 125?

3   A.   I did not write that text.

4   Q.   Did you verify that it was accurate and complete?

5   A.   Well, I verified the page.

6   Q.   At the bottom of Exhibit 125-2, it says, "I verify the

7   accuracy and completeness of each of the above statements."

8        Did I read that right?

9   A.   You did.

10  Q.   Do you understand that to be what you were doing when you

11  signed at the bottom of 125-2?

12  A.   Yes.

13  Q.   Turning back to Exhibit 102 for a moment.  Below Ms. Anice

14  Kasim, there's another person listed, Septiana Damayanti.  Is

15  that another person you represented in connection with the

16  Lion Air crash?

17  A.   Yes, she was a client of the firm.

18  Q.   Did you similarly file an appearance in the case filed by

19  Ms. Septiana against Boeing?

20  A.   I don't have a specific recollection, but I imagine I

21  probably filed something similar to the one for Ms. Kasim in

22  the state court.

23  Q.   Do you recall performing legal services for Ms. Septiana

24  in the case against Boeing?

25  A.   Oh, certainly.  Yes.

**Griffin - Direct by Wade-Scott**

1   Q.   Below Ms. Septiana, there's a person named Ms. Dian

2   Daniaty Binti Udin Zaenudin.  Did you represent Ms. Dian in

3   connection with the Lion Air crash?

4   A.   Yes, she was a client of the firm.

5   Q.   You provided her with legal services?

6   A.   Yes, similar to Ms. Kasim and Damayanti.

7   Q.   And Bias Ramadhan A.S. Bin Misyadi, is that a person that

8   you represented in connection with the Lion Air crash?

9   A.   Yes, again, another client of Girardi Keese, and yes, I

10  did perform legal services.

11  Q.   Thank you.  In the cases that were filed on behalf of

12  Ms. Anice, Ms. Septiana, Ms. Dian, and Mr. Bias, there were

13  also minor plaintiffs involved, right?

14  A.   Yes, I believe so.

15  Q.   I didn't mean to cut you off.  What did you say?

16  A.   I said yes, I believe so.

17  Q.   Sitting here today, do you have any reason to think there

18  were not minor plaintiffs involved in these cases?

19  A.   No.

20  Q.   The other individuals listed in the plaintiff's column

21  below Mr. Bias, do you also recognize those names?

22  A.   I do.

23  Q.   Were they also clients of Girardi Keese?

24  A.   Yes.

25  Q.   Did you provide each of them with legal services in

**Griffin - Direct by Wade-Scott**

54

1   connection with the Lion Air crash?

2   A.  Well, I mean, I probably worked on each one of those cases

3   in some way or another.  So I would say so.

4   Q.  The last line of Exhibit 102, the last row, I guess it's a

5   table, right?  You agree with me it's a table?

6   A.  This is a table.

7   Q.  That includes a name Multi Rizki.  Do you recall

8   representing Mr. Multi?

9   A.  Yes, he was a client of the law firm.

10  Q.  And you provided him with legal services in connection

11  with this case?

12  A.  I worked on his case, yes.

13  Q.  Edelson PC served as co-counsel for the plaintiffs listed

14  here in column 2?

15  A.  Yes, sir.

16  Q.  And each of these individuals had a case filed against

17  Boeing, right?

18  A.  That's my understanding.  They all at one point in time

19  had a case filed against Boeing.

20  Q.  The first four people on this list, Ms. Anice,

21  Ms. Septiana, Ms. Dian, and Mr. Bias, settled their cases

22  against Boeing, right?

23  A.  Yes, they did.

24  Q.  But they have not received the full amount of their

25  settlement funds, have they?

**Griffin - Direct by Wade-Scott**

1    A.   Well, as of the time that I left the firm, that's correct,

2    they had not received the full amount.

3    Q.   Do you have any reason to think sitting here today that

4    they've gotten their money?

5    A.   I have no idea what, if anything, they've received since I

6    left.

7            THE COURT:  Can we agree they did not get their

8    money?  Plaintiffs, Edelson agrees?

9            MR. WADE-SCOTT:  Edelson certainly agrees.

10           THE COURT:  Does counsel for Mr. Griffin agree?

11           MR. SABA:  Yes.

12           THE COURT:  And for Mr. Lira?

13           MS. MATTHAI:  Yes.

14           THE COURT:  Okay.  All right.  Move on.

15           MR. WADE-SCOTT:  Thank you, Your Honor.

16   BY MR. WADE-SCOTT:

17   Q.   Those four plaintiffs, who we established also had minor

18   plaintiffs in their cases, I'm going to refer to them as the

19   families occasionally.  Do you understand what I mean when I

20   say that?

21   A.   Yes.

22   Q.   These families collectively are owed $2,000,000, right?

23   A.   I believe that's correct.

24   Q.   I want to briefly discuss the process for reaching

25   settlements for these cases.

Griffin - Direct by Wade-Scott

56

1        Boeing agreed to a settlement amount that included

2  multiple families, right?

3  A.  Yes.

4  Q.  And that included Ms. Anice, Ms. Dian, Ms. Septiana, and

5  Mr. Bias?

6  A.  Correct.

7  Q.  After Boeing agreed to a settlement amount for multiple

8  families, the amounts were allocated by a retired judge?

9  A.  That's right.

10  Q.  And then individual releases were created for each family?

11  A.  Correct.

12  Q.  Were the releases translated into Indonesian?

13  A.  Yes.

14  Q.  Who did that?

15  A.  I believe that the lawyers for Boeing did that.

16  Q.  For those families that had minor plaintiffs involved,

17  court approval was required for settlement of those cases,

18  right?

19  A.  That's correct.

20  Q.  So once the individual release was executed, then court

21  approval was the next step for the minor plaintiffs' cases?

22  A.  That's correct.

23  Q.  That was done for Ms. Anice's case, right?

24  A.  Yes, it was done for each of those four cases.

25  Q.  I'm going to refer to them as the four plaintiff families.

1  So for each of the four plaintiff families, court approval was

2  sought and obtained?

3  A.  Yes, sir.

4  Q.  I'm going to show you what's been marked as Exhibit 103.

5          Exhibit 103 is an e-mail that you received from Ari

6  Scharg; is that right?

7  A.  Yes.

8          MR. SABA:  Hang on.  Objection.  There's multiple

9  e-mails.  If we could be more specific about which e-mail

10  we're referring to.

11          THE COURT:  Well, I think it's -- I think to the

12  extent he's listed as a recipient, so be it; and it looks like

13  the first two I can see on the page, he's a recipient.

14          MR. WADE-SCOTT:  I'll clarify.

15          THE COURT:  All right.  Go ahead.

16  BY MR. WADE-SCOTT:

17  Q.  Exhibit 103 is e-mails you received in exchange with

18  Mr. Scharg?

19  A.  Yes.

20  Q.  Attached to the e-mail at the top of this thread was

21  several court orders, right?

22  A.  Yes, sir.

23          MR. WADE-SCOTT:  Edelson offers Exhibit 103 into

24  evidence.

25          THE COURT:  Just assume it's in evidence as you

Griffin - Direct by Wade-Scott

58

1   present it with the witness, and I'll hear objections if

2   anything you're using is objectionable by either side.

3            MR. WADE-SCOTT:  Understood.

4            THE COURT:  Go ahead.

5   BY MR. WADE-SCOTT:

6   Q.  Turning to page 103-4.  There's an order across these two

7   pages, right?

8   A.  Yes.

9   Q.  Do you recognize this as an order that was entered in

10  Ms. Septiana's case?

11  A.  It appears to be, yes.

12  Q.  Paragraph 5 of the order says "The settlement funds shall

13  be distributed to Plaintiff Septiana Damayanti individually

14  and as legal guardian of the minor plaintiffs in accordance

15  with the process identified in plaintiffs' counsel's sealed

16  affidavit."

17           Did I read that right?

18  A.  Yes.

19  Q.  Do you understand that to be the content of the court

20  order in Ms. Septiana's case?

21  A.  Yes.

22  Q.  Do you understand the language of each of the orders for

23  the four plaintiff families' cases to be exactly the same say

24  for the plaintiff's name?

25  A.  Yes, I believe that's true.

**Griffin - Direct by Wade-Scott**

1   Q.  The declaration that was submitted by counsel to each of

2   these families to which this court order refers, have you seen

3   that declaration?

4   A.  I believe -- I believe I have, but I'm not sure.  I

5   believe you're referring to Mr. Scharg's declaration, and I

6   believe I've seen it at some point.

7   Q.  Do you believe you saw the declarations around the time

8   these orders were entered?

9   A.  I believe so.

10  Q.  Do you have any reason to think that you did not see these

11  declarations?

12  A.  Not as I sit here.

13          MR. WADE-SCOTT:  Ms. Wall, is the exhibit display

14  showing to the Zoom or the Webex display?

15          THE CLERK:  No, it's not, just the inside of the

16  courtroom.

17          MR. WADE-SCOTT:  Okay.  I'm going to need to show an

18  exhibit that contains confidential information and that's

19  going to happen several times today.  My request at this point

20  I think is to pull down the public display so that I can show

21  those documents in unredacted form and we'll provide a

22  redacted form immediately after the hearing to be -- we can

23  publicly file them if they're redacted.

24          THE COURT:  That's fine.  The settlement amounts in

25  this case are confidential.  They remain confidential.  They

**Griffin - Direct by Wade-Scott**

60

1   will not be published during this trial.  The parties, of

2   course, all know what the settlement amounts are, but it's not

3   known to the public nor should it be known.  There's pending

4   cases still in this case and the amounts are confidential and

5   will remain so.

6            Okay.  Go ahead.  We'll take down the -- anything on

7   the screen which would be observable by members of the --

8   anyone in this courtroom watching it and anyone in the

9   overflow courtroom watching it.  So can you do that, Emily?

10           THE CLERK:  I can have it just at the witness

11  monitor.

12           THE COURT:  Just the witness monitor and the attorney

13  monitors.  Are they observable from the large screen up there?

14           THE CLERK:  NO.

15           THE COURT:  They are not.  Okay.  Then we can proceed

16  with it being on the witness monitor and the -- and the

17  attorneys' monitors.  No one can see it now.  Everyone who can

18  see it now is permitted to see it because they were attorneys

19  in the case.

20           Go ahead.

21           MR. WADE-SCOTT:  Thank you, Your Honor.

22  BY MR. WADE-SCOTT:

23  Q.  I'm showing you what's been marked Exhibit 204.

24  Exhibit 204 is the declaration that Mr. Scharg submitted in

25  connection with Ms. Anice's case, right?

**Griffin - Direct by Wade-Scott**

61

1    A.   That's what it says.

2    Q.   Do you recall seeing this declaration at or around the

3    time the court order was entered?

4    A.   I believe I did.  I'm not 100 percent sure if I did,

5    but...

6    Q.   You saw the court orders at least, right?

7    A.   I did.  At one point Mr. Scharg sent me all four court

8    orders.

9    Q.   That was Exhibit 103, as Mr. Scharg attached the four

10   court orders, right?

11   A.   Correct.

12   Q.   And each of the orders refers to an affidavit submitted by

13   plaintiffs' counsel?

14   A.   I'm sorry?

15   Q.   Each of the court orders -- you were looking at an example

16   a minute ago -- refers to an affidavit submitted by

17   plaintiffs' counsel, right?

18   A.   Correct.

19   Q.   That sets forth the process for distributing the

20   settlement proceeds?

21   A.   Yes.

22   Q.   Exhibit 204 is one such declaration.  I'm being a little

23   bit careful about declaration, affidavit, but this is the

24   declaration you understand the court order refers to?

25   A.   Yes.

**Griffin - Direct by Wade-Scott**

1  Q.  Paragraph 11 of this declaration says, "The settlement

2  funds for the minor plaintiffs in this case shall be initially

3  paid to a trust account established by Girardi Keese for the

4  benefit of the plaintiffs, including the minors."

5        Did I read that correctly?

6  A.  Yes.

7  Q.  Do you understand that that language appeared in each

8  declaration for the four plaintiff families' cases?

9  A.  Yes.

10 Q.  It continues, "Pursuant to instructions provided to

11 counsel by Plaintiff Kasim in her role as legal guardian for

12 the minor plaintiffs, the plaintiffs' net proceeds identified

13 above shall be sent as soon as practicable via wire transfer"

14 to a bank as the sentence ends that way, right?

15 A.  Yes.

16 Q.  You understand that each declaration submitted by

17 Mr. Scharg included substantially the same language?

18 A.  Yes.

19        THE COURT:  Well, the key question is you were aware

20 of it when the money was sent by Boeing.  There was commitment

21 to put the money in a trust account and then send it off to

22 the clients as soon as practicable, correct?

23        THE WITNESS:  Yes, Your Honor.

24        THE COURT:  And you're not contesting that?

25        THE WITNESS:  No.

**Griffin - Direct by Wade-Scott**

1    THE COURT:  All right.

2    Move on.

3  BY MR. WADE-SCOTT:

4  Q.  Turning back for just a moment to Exhibit 103.  Mr. Lira

5  is copied on this e-mail that includes the court orders,

6  right?

7  A.  Yes, sir.

8  Q.  After the court orders were entered for the four plaintiff

9  families, Perkins Coie began wiring the settlement funds into

10 Girardi Keese's client trust account, right?

11 A.  That's correct.

12 Q.  Ms. Anice's money was wired into the account on March 4,

13 2020; is that right?

14 A.  I'm not -- I'm not sure of the order of each of the four

15 wires and who went first, but I did a memo each time I was

16 notified that funds were received.

17 Q.  I'm showing you a stipulation that the parties filed in

18 the case.  Have you seen this before?

19    THE COURT:  That's the timeline I think you got up

20 right now.

21    MR. WADE-SCOTT:  Yes, it's the timeline.

22    MR. SABA:  I'm sorry.  I don't think this is a

23 stipulation.  It was a guideline because there are a couple of

24 typographical and small errors in there.

25    THE COURT:  There's a stipulation, document 1286

**Griffin - Direct by Wade-Scott**

1   which is sealed, which gives the date the money was paid by

2   Boeing -- dates the monies were paid by Boeing.  And so that's

3   really not a matter of contest, the amounts and the dates.

4              MR. SABA:  Correct.  That was a stipulation.

5              THE COURT:  Right.  So on that part, you can proceed.

6   That's already in evidence.  I understand the dates.  But go

7   ahead with your other questions.

8              MR. WADE-SCOTT:  I'll move on, Your Honor.

9              THE COURT:  Okay.

10             MR. WADE-SCOTT:  We can table the timeline issue for

11  later.

12             THE COURT:  Sure.

13  BY MR. WADE-SCOTT:

14  Q.  You understand that Ms. Anice's money was received in the

15  Girardi Keese account around March 4th?

16  A.  Again, I don't know the order; but if that's what's on the

17  stipulation, then that's what I agreed to.

18             THE COURT:  And, Emily, you can put the public feed

19  on again I think for these, for any documents.

20             Let us know if there's something that's going to have

21  a confidential --

22             MR. WADE-SCOTT:  I'm about to move into another one

23  that's confidential.

24             THE COURT:  Oh, you are?  Never mind.  Go ahead.

25  Sorry.

**Griffin - Direct by Wade-Scott**

65

1    MR. WADE-SCOTT:  Your Honor, it's our intention to

2 not say any confidential information out loud, so it's just a

3 matter of having the exhibits sent out to the public.

4    THE COURT:  Yeah.  They're not on the public screen

5 right now if these exhibits have the amounts.

6 BY MR. WADE-SCOTT:

7 Q.  Exhibit 109 is a memorandum that you sent to Mr. Girardi,

8 right?

9 A.  Yes, it is.

10 Q.  You did that around March 4th?

11 A.  Yes.

12 Q.  KDG here is your initials?

13 A.  Yes.

14 Q.  TVG is Mr. Girardi?

15 A.  Yes.

16 Q.  Chris K. is Mr. Kamon?

17 A.  Yes.

18 Q.  David L. is Mr. Lira?

19 A.  Correct.

20 Q.  So Mr. Girardi, Mr. Kamon, Mr. Lira all received this?

21 A.  Yes.

22 Q.  Around March 4th?

23 A.  Yes.

24 Q.  There's a number of numbers here about what is supposed to

25 be disbursed to where.  Do you agree that all these numbers

**Griffin - Direct by Wade-Scott**

1  are accurate?

2  A.  To the best of my knowledge.

3  Q.  The bolded number there, it says the amount of money and

4  then to be wired to the clients per the attached consent,

5  right?

6  A.  Yes.

7  Q.  That was something that you sent to Mr. Kamon, Mr. Lira,

8  and Mr. Girardi?

9  A.  Yes, sir.

10  Q.  Does the document accurately reflect where the money for

11  this settlement was initially wired?

12  A.  I'm not sure I understand your question.

13  Q.  There's a line on 109-1 that says, "Per the release and

14  court order, the funds are to be disbursed as follows:", and

15  then there's two more lines that has accounts and amount of

16  money.  Is that your understanding of where the money went

17  from Boeing?

18  A.  I assume so.

19  Q.  Exhibit 109 is the memo that you sent in connection with

20  Ms. Anice's case, right?

21        THE COURT:  I'll stop you right here.  Why was money

22  going to California Lending directly from Boeing, do you know?

23  And pull your mask above your nose, if you could.

24        THE WITNESS:  I'm sorry.

25        THE COURT:  That's all right.  Go ahead.

**Griffin - Direct by Wade-Scott**

67

1     THE WITNESS:  I know that in the signed settlement

2  agreement on each of the four cases, there was a provision

3  that a certain amount of money goes to California Attorney

4  Lending.  I was not involved in drafting the settlement

5  agreement, but I know it was in there.

6     THE COURT:  Why?

7     THE WITNESS:  I believe they had some kind of lien on

8  the case.

9     THE COURT:  Okay.  All right.

10    Proceed.

11 BY MR. WADE-SCOTT:

12 Q.  The amount that was wired to California Attorney Lending,

13 to your understanding, that's not money that the clients owed

14 anyone, right?

15 A.  Correct.

16 Q.  That was money the firm owed to California Attorney

17 Lending?

18 A.  I believe so.  I don't have first-hand knowledge of that,

19 but that's my general understanding.

20 Q.  In any event, that was not client money going to

21 California Attorney Lending?

22 A.  I do not believe so, no.

23    THE COURT:  So if California Lending wasn't owed the

24 money, it would just increase the amount of fees going to

25 Girardi Keese, correct?

**Griffin - Direct by Wade-Scott**

1          THE WITNESS:  I believe that's correct.

2          THE COURT:  Okay.  I understand.  Very good.

3          Go ahead.

4  BY MR. WADE-SCOTT:

5  Q.  I'm not sure I got an answer to the question.  This is

6  Ms. Anice's settlement, right?

7  A.  Yes.

8  Q.  Ms. Dian's money came into the Girardi Keese account on

9  March 11, 2020, right?

10 A.  I would need to look at the memo.

11         THE COURT:  If there's similar memos for all three

12 other clients with the bolded amount as the amount to be wired

13 to the client, why don't you just identify those memos and ask

14 the witness if his answer would be the same on each of the

15 memos.  If he needs to see them, he can look at them, but I

16 think we can move that part of it along.

17         MR. WADE-SCOTT:  Understood, Your Honor.  I'm going

18 to show you one -- actually two more memos.  I apologize,

19 Your Honor.

20         THE COURT:  All right.

21 BY MR. WADE-SCOTT:

22 Q.  Exhibit 110, this is Ms. Dian's settlement; is that right?

23 A.  Yes.

24 Q.  This was sent to the same people?

25 A.  Yes.

1  Q.  And it follows largely the same structure with the bolded

2  amount going to the client, right?

3  A.  Yes.

4  Q.  On this one there is a notation at the bottom that says

5  "The net settlement funds of" fund amount "need to be wired to

6  the client per the instructions on the attached closing

7  statement immediately."

8       Do you know why that's on this memo?

9  A.  You know, I don't have a specific recollection of why it's

10 on this memo other than I wanted to make sure that it was

11 clear that the amounts had to be wired.

12 Q.  That's true for each of these cases, right?

13 A.  Yes.

14 Q.  That the amounts needed to be wired immediately?

15 A.  Yes.

16 Q.  You don't remember particularly why you made this point

17 for Ms. Dian?

18 A.  I don't.

19 Q.  Exhibit 111, which was provided, is a similar memo for

20 Mr. Bias?

21 A.  Yes.

22 Q.  It also has all of the numbers to the best of your

23 recollection?

24 A.  Yes.

25 Q.  You prepared a similar memo for Ms. Septiana, right?

**Griffin - Direct by Wade-Scott**

1    A.  Yes, I would have done one for each of them.

2           MR. WADE-SCOTT:  We submitted the memo in connection

3    with Ms. Septiana as Exhibit 112.

4           Your Honor, the next exhibit will also include

5    settlement numbers so we should keep the public feed down.

6           THE COURT:  Okay.

7    BY MR. WADE-SCOTT:

8    Q.  Exhibit 126.

9           Do you recall receiving an e-mail from Mr. George

10   Hatcher on March 11th about sending the settlement money to

11   the clients?

12   A.  I've seen this document in the past couple of weeks, and I

13   do recall now receiving it.

14   Q.  Who is George Hatcher?

15   A.  George Hatcher is a -- I don't know.  He seems to be a

16   jack-of-all-trades.  He's got a business I believe that's

17   called Wrongful Death Consultants.  He has other businesses,

18   too.  But he has, I think, websites relating to plane crashes.

19   And my understanding of Mr. Hatcher is generally that he acts

20   as a -- a client go-between especially on a foreign air crash

21   like this.

22   Q.  Mr. Hatcher was working with you on the Lion Air cases?

23   A.  Yes.

24   Q.  Mr. Hatcher's e-mail says, "Please immediately inform

25   Boeing attorneys in Washington state that the net funds due

### Griffin - Direct by Wade-Scott
71

1   client Dian in the amount of" amount "after deducting attorney

2   fees and costs should be wired directly to Dian per the wire

3   instructions below."

4           Did I read that right?

5   A.  Yes.

6   Q.  Did you receive similar e-mails for the other four -- the

7   other three plaintiff families?

8   A.  I believe we did.

9   Q.  I'm going to show those to you quickly.

10          THE COURT:  Was Hatcher working for your firm,

11  working for the clients, or neither?

12          THE WITNESS:  He did not work for our firm.  I think

13  he was self-employed.

14          THE COURT:  Who paid him?

15          THE WITNESS:  The -- Girardi Keese I think would pay

16  invoices.

17          THE COURT:  So he was paid by Girardi Keese as far as

18  you know?

19          THE WITNESS:  Yes.

20          THE COURT:  All right.  Wasn't paid by the clients?

21          THE WITNESS:  No.

22          THE COURT:  All right.

23          Go ahead.

24  BY MR. WADE-SCOTT:

25  Q.  Exhibit 127, and this is a little longer so you can look

Griffin - Direct by Wade-Scott

1    in the binder if you would like, but it's three other e-mails

2    that you received from Mr. Hatcher on March 11th, right?

3    A.   Yes.

4    Q.   These differ slightly on page 127-1 in that Mr. Hatcher

5    says "Client Bias has requested the Boeing attorneys wire him

6    the funds instead of the funds landing at GK."

7              Did I read that right?

8    A.   Yes.

9    Q.   Do you know why Mr. Hatcher was asking you to have the

10   funds go straight to the clients instead of Girardi Keese?

11   A.   I do not.

12   Q.   Did you ask him at the time?

13   A.   I did not.

14   Q.   On page 127-3, this is a similar e-mail from Mr. Hatcher

15   concerning Ms. Septiana's funds, right?

16   A.   Yes.

17   Q.   It says, "Please inform Boeing attorneys in Washington

18   state that the money due Client Septiana after deducting

19   attorney fees and costs in the amount of" number "should be

20   wired direct to client and not to GK as previously instructed.

21   These are the wishes of the client."

22              It says that, right?

23   A.   Yes.

24   Q.   Did you ask him about this one?

25   A.   I did not.  I just responded to -- I don't know which one

**Griffin - Direct by Wade-Scott**

73

1   of these, but...

2   Q.   Understood.  We'll go back in just a second to the one you

3   responded to.

4           At 127-5, there's a similar e-mail for Ms. Anice's

5   settlement again asking that they be sent directly to her,

6   right?

7   A.   Yes.

8           MS. MATTHAI:  I'm going to object.  I think that

9   misstates the document.

10  BY MR. WADE-SCOTT:

11  Q.   I'll read it.  "It is imperative that you have Chris Kamon

12  wire these funds right away to her as below."

13          Did I read that right?

14  A.   Yes.

15  Q.   Turning back to Exhibit 126 at the top, you respond to

16  Mr. Hatcher's e-mail concerning Ms. Dian, right?

17  A.   Yes.

18  Q.   You say that Boeing won't deviate especially considering

19  it was court approved.  Did I read that right?

20  A.   Well, yeah.  First I started with, "The funding from

21  Boeing is controlled by the settlement agreement which

22  provides for the wiring instructions."

23  Q.   So you told Mr. Hatcher essentially no, we won't wire them

24  directly?

25  A.   Well, sure.

**Griffin - Direct by Wade-Scott**

1    MR. SABA:  Objection.  Misstates the document.

2    THE COURT:  Why don't you explain what you understand

3  the document to mean.

4    THE WITNESS:  Yes.  I was telling Mr. Hatcher that

5  these settlements were controlled not only by a settlement

6  agreement that had specific wire instructions in them but that

7  also that there was a court order approving and incorporating

8  that settlement agreement, and I did not believe that Boeing

9  would have any inclination to deviate or to go against a court

10  order.

11    THE COURT:  Maybe we're jumping ahead, but did this

12  individual, Mr. Hatcher, tell you either then or in the future

13  why the clients wanted the money directly, not to go through

14  Girardi Keese but to be sent to them directly?

15    THE WITNESS:  No, not that I recall.

16    THE COURT:  You never learned the reason for that?

17    THE WITNESS:  No.

18    THE COURT:  Okay.  All right.

19    Proceed.

20  BY MR. WADE-SCOTT:

21  Q.  George@georgehatcher.com, you recognize that as

22  Mr. Hatcher's e-mail address?

23  A.  Yes.

24  Q.  Dlira@girardikeese.com, that's Mr. Lira's address?

25  A.  Yes.

**Griffin - Direct by Wade-Scott**

75

1    Q.  Ckamon@girardikeese.com, that's Mr. Kamon's e-mail

2    address?

3    A.  Yes.

4    Q.  And kgriffin@girardikeese.com, that was your e-mail

5    address?

6    A.  Yes.

7    Q.  Lion Air was not the only international airplane crash

8    case that you worked on while at Girardi Keese, right?

9            MR. SABA:  Objection.  Relevance.

10           THE COURT:  What is the relevance?

11           MR. WADE-SCOTT:  I'll ask a slightly different

12   question that maybe will make that clearer.

13           THE COURT:  All right.  Go ahead.

14   BY MR. WADE-SCOTT:

15   Q.  Did you work on other international airplane crash cases

16   with George Hatcher?

17           MR. SABA:  Objection.  Relevance.

18           THE COURT:  Well, let's hear the answer.

19   BY THE WITNESS:

20   A.  Yes.

21   BY MR. WADE-SCOTT:

22   Q.  Did any of those cases that you worked on with Mr. Hatcher

23   settle?

24   A.  Yes.  I'm sure they did.

25   Q.  Did Girardi Keese handle the settlement funds for any of

**Griffin - Direct by Wade-Scott**

1    those cases?

2              MR. SABA:  Objection.  Relevance of this, Your Honor.

3              THE COURT:  What is the relevance of other cases?

4              MR. WADE-SCOTT:  I'm going to ask whether payments to

5    those clients were delayed.

6              THE COURT:  I suppose it goes to the issue of -- I

7    know -- I've indicated earlier, this is about -- this hearing

8    is about this case.  But in light of the opening statements

9    that people believe Mr. Girardi when he said the check's in

10   the mail, so to speak, knowledge of any witness, whether the

11   Edelson firm or Mr. Lira, Mr. Griffin, that promises by

12   Mr. Girardi in the past had not been kept or there have been

13   delays in payments that were -- should have been paid

14   immediately, I'll allow them into questioning.

15             We're not going to go into the history of Tom

16   Girardi.  I've heard enough of that, and I'm not going to go

17   into all his alleged misdeeds with a variety of other clients.

18   But particular knowledge of a witness to some of that may go

19   to the issue of whether they were on notice in this case and

20   should have taken steps beyond the ones that were taken.

21             Go ahead.

22   BY MR. WADE-SCOTT:

23   Q.  In those cases you worked on with Mr. Hatcher, were the

24   settlement funds to the clients delayed?

25   A.  I don't recall any of the settlement funds being delayed

**Griffin - Direct by Wade-Scott**

1   on any of those cases.

2   Q.  Do you recall working on Egypt Air?

3   A.  Yes.

4   Q.  Were the payments to the clients in that case delayed?

5   A.  I don't know.

6   Q.  Did you work on Egypt Air with Mr. Hatcher?

7   A.  Yes, that was the case that Mr. Hatcher was involved with.

8   Q.  Did you also directly work on it?

9   A.  I'm sorry?

10  Q.  Did you also directly work on Egypt Air?

11          MR. SABA:  Objection, Your Honor.  Now he's answered

12  the question.  Relevance.

13          MR. WADE-SCOTT:  I'm just trying to confirm that that

14  was something he worked on with Mr. Hatcher.

15          THE COURT:  That's fine.  Go ahead.

16  BY THE WITNESS:

17  A.  Yes, I worked with Mr. Hatcher on that case.

18          THE COURT:  And you're not aware of client funds

19  being delayed when they had been funded by the Egypt Air, or

20  whoever the defendant was, you're not aware of any delays once

21  the Egypt Air paid the money to your Girardi Keese trust fund?

22  You're not aware of any delays in the clients actually getting

23  them?

24          THE WITNESS:  I don't have a recollection one way or

25  the other.  I just don't remember.

**Griffin - Direct by Wade-Scott**

1    THE COURT:  Okay.  All right.  Move on.  Because

2   that's the relevant inquiry.  If you're on notice -- that's

3   where I just said what would be relevant.  Apparently that's

4   not within the knowledge of this witness as to that particular

5   set of cases.

6   BY MR. WADE-SCOTT:

7   Q.  Turning back to the four plaintiff families at issue here,

8   was there any agreement with Ms. Anice to pay her settlement

9   funds in installments?

10  A.  No, sir.

11  Q.  Mr. Girardi had no such agreement with her?

12       MR. SABA:  Speculation.

13       THE COURT:  Objection -- the objection is -- you're

14  raising the objection, and it's not speculation.  The witness

15  can say if he knows.  If he doesn't know, don't speculate; but

16  if you know it, so state.

17       THE WITNESS:  I do not know of any agreement between

18  Mr. Girardi and Ms. Anice about paying half, if that was the

19  question.

20  BY MR. WADE-SCOTT:

21  Q.  I'll make this completely universal.  You're not aware of

22  any agreement with Ms. Anice and anyone to pay her in

23  installments?

24  A.  Correct.

25  Q.  You're not aware of any agreements between Ms. Dian and

**Griffin - Direct by Wade-Scott**

1    anyone to pay her settlement money in installments?

2    A.   Correct.  That's true for all four of the cases.

3    Q.   That's true for Ms. Septiana?

4    A.   Yes, sir.

5    Q.   That's true for Mr. Bias?

6    A.   Yes.

7    Q.   By April 1st of 2020, all of the money for the four

8    plaintiff families that we've been discussing had been

9    received by Girardi Keese, right?

10   A.   I believe that's correct.

11   Q.   I'm showing you what's been marked as Exhibit 165 which

12   contains wire information.

13          If you look at page 165-3, there's an e-mail from

14   Ms. Anice to you on March 31st?

15   A.   Yes, I see that.

16   Q.   Did you receive that e-mail?

17   A.   I have no reason to believe I did not.

18   Q.   On March 31, 2020, do you recall the coronavirus pandemic

19   having started at that point in the United States?

20   A.   I believe it had.

21   Q.   Ms. Anice says, "Keith, it's been almost a week since you

22   promised me that you'd give me the information that I wanted.

23   Up till now I have not received any information from you."

24          Did I read that right?

25   A.   Yes.

**Griffin - Direct by Wade-Scott**

80

1    THE COURT:  I don't see anything on this exhibit,

2    maybe you can point it to me, that's confidential other than

3    the last page with the wire confirmation information.

4    MR. WADE-SCOTT:  It's just the last couple of pages,

5    Your Honor, and we put them together.  I can -- I can be

6    careful not to scroll down past --

7    THE COURT:  That's fine.  Let's do that.

8    MR. WADE-SCOTT:  -- 165-3.

9    THE COURT:  Put in the e-mails.  They're public.  Or

10   they should be public.

11   So Emily, if we could put the --

12   THE CLERK:  I switched it on.

13   THE COURT:  Thank you.

14   MR. WADE-SCOTT:  I'm just not going to scroll down.

15   BY MR. WADE-SCOTT:

16   Q.  I read that line correctly, Mr. Griffin?

17   A.  Yes, I believe so.

18   Q.  Do you know what information that she was referring to?

19   A.  I am not -- when she says, "I have not received any

20   information from you," I do not know what she is referring to.

21   THE COURT:  Can you direct me on the e-mail to where

22   you're at?  I want to make sure I'm looking at the same thing

23   you are.

24   MR. WADE-SCOTT:  It's 165-3.

25   THE COURT:  Okay.  That's fine.

1          MR. WADE-SCOTT:  The e-mail -- yep.

2          THE COURT:  And it's the -- it's the e-mail from

3    Anice to Mr. Griffin.

4          MR. WADE-SCOTT:  That's correct.

5          THE COURT:  Okay.  Go ahead.

6    BY MR. WADE-SCOTT:

7    Q.  You understood that to be Ms. Anice's e-mail address,

8    right, Mr. Griffin?

9    A.  Yes.

10   Q.  You corresponded with her on a number occasions at that

11   e-mail address?

12   A.  I believe so.

13   Q.  Did you understand this e-mail from Ms. Anice to be

14   inquiring about the status of her settlement payment?

15   A.  Yes.

16   Q.  And Ms. Anice's payment had come in on March 4th, right?

17   A.  I believe that's correct.

18   Q.  You respond to her on April 2nd.  You say, "Hi, Anice, I

19   hope you're staying healthy.  I have forwarded your request

20   for an update to our accounting department and to

21   Mr. Girardi," right?

22   A.  That's correct.

23   Q.  You say, "Our office is currently closed due to the

24   coronavirus," right?

25   A.  Yes.

**Griffin - Direct by Wade-Scott**

1  Q.  Were Girardi Keese's operations completely shut down at

2  that point?

3  A.  Well, the doors weren't locked, but there were only a

4  handful of people at the office.  I don't believe Mr. Kamon

5  was at the office.  I was generally at the office.  And there

6  were maybe a couple of other lawyers that were at the office

7  during that time.

8  Q.  Was Mr. Lira going to the office?

9  A.  I believe he was.  I'm not 100 percent sure.  We were on

10 different floors, but I believe he was.

11 Q.  Was Girardi Keese still making payments to clients in

12 March of 2020?

13 A.  I don't know.

14      MR. SABA:  Speculation.

15      THE COURT:  You're talking about other clients or

16 these clients?

17      MR. WADE-SCOTT:  Other clients.

18      THE COURT:  All right.  If -- the witness answered he

19 doesn't know, but I just wanted you to clarify the question.

20      All right.  Go ahead.

21 BY MR. WADE-SCOTT:

22 Q.  You're not aware of whether Girardi Keese was making

23 payments to any clients in March of 2020?

24 A.  I am not aware.

25 Q.  Was Girardi Keese making payments to anyone in March of

**Griffin - Direct by Wade-Scott**

1    2020?

2    A.  I have -- I do not know.

3            THE COURT:  Were you getting paid in March of 2020?

4            THE WITNESS:  Yes.

5            THE COURT:  All right.

6            Go ahead.

7    BY MR. WADE-SCOTT:

8    Q.  Ms. Anice responds to you at the bottom of page 165-2.

9    She says, "Thank you, Keith.  So sorry if I'm asking this

10   several times, but honestly, I am worrying about news Boeing's

11   bailout.  But if I know the fund is already in GK account,

12   I'll be more calm."

13           Did I read that right?

14   A.  Yes.

15   Q.  Do you recall receiving this e-mail?

16   A.  Yes.

17   Q.  You do confirm to her on Friday, April 3rd, that the funds

18   had been received into the firm trust account, right?

19   A.  Yes.

20   Q.  But you say, "I will let you know as soon as funds are

21   scheduled for wire," right?

22   A.  Yes.

23   Q.  You didn't know at this point when the money was going to

24   be paid?

25   A.  I did not know.

**Griffin - Direct by Wade-Scott**

1    Q.  You had asked Mr. Kamon and Mr. Girardi to send the money.

2    Is that your position?

3    A.  Yes, I had.

4    Q.  I'm going to move away from Exhibit 165 for just a minute.

5    We'll return to it.

6             Showing you what's been marked as Exhibit 130.

7    Exhibit 130 is an e-mail you received from George Hatcher,

8    right?

9    A.  It appears to be.

10   Q.  Do you have any reason to believe you didn't receive this

11   e-mail?

12   A.  I do not have any reason to believe that.

13   Q.  This was on April 15th of 2020?

14   A.  Yes.

15   Q.  Mr. Hatcher sends it to an e-mail address

16   tgirardi@girardikeese.com.  Whose e-mail is that?

17   A.  That's Mr. Girardi's e-mail.

18   Q.  Did Mr. Girardi use e-mail?

19   A.  E-mails were printed out for him by his secretary.

20   Q.  Did you ever make sure that Mr. Girardi had seen an e-mail

21   because he went through this process of having them printed

22   out?

23   A.  I was not involved in that.

24           THE COURT:  Have you communicated with him by e-mail

25   in the past where it's clear he got it because he responded to

Griffin - Direct by Wade-Scott

1   your e-mail even if it was through some other form of

2   communication?

3            THE WITNESS:  No, I never communicated with him by

4   e-mail ever.

5            THE COURT:  You just talked to him?

6            THE WITNESS:  Yes.

7            THE COURT:  Okay.  All right.

8            THE WITNESS:  Or sent him a memo.

9            THE COURT:  Not an e-mail but a hard copy memo?

10           THE WITNESS:  Yes.

11           THE COURT:  Okay.

12           Go ahead.

13  BY MR. WADE-SCOTT:

14  Q.   There's a person copied on this e-mail named Shirleen

15  Fujimoto.

16           Do you see that?

17  A.   I do.

18  Q.   Who is Ms. Fujimoto?

19  A.   That was Mr. Girardi's secretary.

20  Q.   And Kim Cory, who is that?

21  A.   Also Mr. Girardi's secretary.

22  Q.   And you and Mr. Lira are copied?

23  A.   Yes.

24  Q.   Mr. Hatcher says, "Dear Tom, I tried calling you this

25  morning to bring you up to date on four of the Lion Air

**Griffin - Direct by Wade-Scott**

1   families that Mohamed and I signed for GK: Septiana, Bias,

2   Anice, and Dian," right?

3   A.   Yes.

4   Q.   Essentially the e-mail is asking for an update for these

5   families on their money, right?

6   A.   Yes.

7           THE COURT:  Is Mohamed the referring attorney?

8           THE WITNESS:  Yes, sir.

9           THE COURT:  All right.  And then Mr. Hatcher is

10  somewhere in between helping out you deal -- your firm deal

11  with the referring attorneys and apparently dealing with some

12  of the clients, too?

13          THE WITNESS:  Yes.

14          THE COURT:  All right.

15          Go ahead.

16  BY MR. WADE-SCOTT:

17  Q.   Do you know if anyone updates the clients at this point on

18  the status of their payments?

19  A.   I don't recall.  I don't know.

20          MR. WADE-SCOTT:  This next exhibit is going to

21  contain confidential information.

22          THE COURT:  Okay.

23  BY MR. WADE-SCOTT:

24  Q.   Showing you what's been marked as Exhibit 133.  Is this a

25  memo that you sent to Mr. Girardi?

Griffin - Direct by Wade-Scott

1    A.   Yes, it is.

2    Q.   Mr. Lira and Mr. Kamon are copied?

3    A.   Yes.

4    Q.   It says "lots of messages from Boeing clients over the

5    weekend," right?

6    A.   Yes.

7    Q.   Did that refer to Ms. Anice, Mr. Bias, Ms. Dian, and

8    Ms. Septiana?

9    A.   Yes, I imagine that I had gotten e-mails from them in the

10   days preceding this memo, and so that's why I wrote it.

11   Q.   You say, "Client funds need to be wired," right?

12   A.   Yes.

13          MR. WADE-SCOTT:  This next exhibit also contains

14   confidential information.

15   BY MR. WADE-SCOTT:

16   Q.   I'm going to show you what's been marked as Exhibit 164.

17          Exhibit 164 is an e-mail that you sent to Chris Kamon

18   and Mr. Lira, right?

19   A.   Yes.

20   Q.   On May 6, 2020?

21   A.   Yes.

22   Q.   After these inquiries from the clients had come in, right?

23   A.   Yes.

24   Q.   The numbers here are next to people's names.  I want to

25   make sure I understand which are connected to which.

**Griffin - Direct by Wade-Scott**

1         Sutanto refers to Ms. Anice, right?

2    A.  Yes, sir.

3    Q.  Huzaifah refers to Ms. Dian?

4    A.  Yes.

5    Q.  Nawazar refers to Mr. Bias?

6    A.  Yes.

7    Q.  Fitrasyah refers to Ms. Septiana?

8    A.  Yes.

9    Q.  You say in this e-mail, "Chris, Tom told me that we should

10   wire 50 percent of the client funds for the four cases in

11   trust and advise clients that the remaining 50 percent would

12   be wired in 14 days."

13        Did I read that right?

14   A.  Yes.

15   Q.  It's your position that Mr. Girardi told you that Girardi

16   Keese should wire half the money?

17   A.  Well, he did.  That's not my position.  He told me to have

18   Chris wire 50 percent of the funds and that he would wire the

19   remaining 50 percent of the funds in two weeks.

20   Q.  But you were the one that told Mr. Kamon to wire half the

21   money?

22   A.  Yes.

23   Q.  And at that time you were aware the Court's order required

24   that 100 percent of the client's funds should be wired?

25   A.  Yes.

**Griffin - Direct by Wade-Scott**

1  Q.  There's no agreement with any of these clients to pay them

2  half of their money?

3  A.  Yes, that's correct.

4  Q.  Why were you sending them half?

5          MR. SABA:  Objection.  Misstates his testimony.

6          MR. WADE-SCOTT:  Why were you conveying --

7          THE COURT:  Go ahead.

8  BY MR. WADE-SCOTT:

9  Q.  Why were you conveying to Mr. Kamon that Tom had said that

10  half the money should be wired?

11  A.  That was the directive that I was given from Mr. Girardi

12  who the order applied to.  He was the one that told me to tell

13  accounting that 50 percent should be wired and that he would

14  wire the second 50 percent in two weeks.

15  Q.  But why --

16  A.  And I -- I told him.  I told him that that -- there was no

17  provision in the court order for that.

18          THE COURT:  Let's lay a foundation for that.  This is

19  a May 6th e-mail to Kamon.  When did you have the conversation

20  with Girardi?

21          THE WITNESS:  On the same day.

22          THE COURT:  Same day.  This is at 10:04 a.m., so

23  before --

24          THE WITNESS:  That would have been in the morning,

25  most likely the morning of May 6th.

**Griffin - Direct by Wade-Scott**

1    THE COURT:  All right.  Who was present for the

2  conversation?

3    THE WITNESS:  I believe it would have just been me

4  and Girardi.

5    THE COURT:  Where was it?  In his office?

6    THE WITNESS:  I believe it was in his office.

7    THE COURT:  All right.  But it was face to face, not

8  over the phone?

9    THE WITNESS:  As far as I can recall, yes, sir.

10    THE COURT:  All right.  Give me your best

11  recollection of the entire conversation.

12    THE WITNESS:  My recollection was that I, once again,

13  was telling him that the clients had been calling about their

14  money and you need to send them their money.  And he said,

15  "Okay, tell accounting to send them half, half now and half in

16  two weeks."  I reminded him that there was a court order that

17  required disbursement of all the funds.  He told me that he

18  understood that.  I asked if he wanted to see a copy of the

19  court order, and he progressively got more and more upset with

20  me.  He told me it was above my pay grade and that he would

21  handle it.  And my best recollection is he walked away.

22    THE COURT:  All right.  Did you call anybody and

23  complain about this?  Did you call another attorney?  Did you

24  talk to Mr. Lira?  Did you go to anyone to complain about what

25  you viewed correctly as improper conduct by Mr. Girardi to

**Griffin - Direct by Wade-Scott**

1    hold back half the money?

2              THE WITNESS:  No, sir.  I wrote this e-mail.

3              THE COURT:  All right.  Did you ever contemplate

4    notifying the Court?

5              THE WITNESS:  Your Honor, no, I did not ever

6    contemplate that.  I thought that it was -- it was

7    Mr. Girardi's order and his obligation.  And I thought that he

8    was the one that would ultimately be responsible and should do

9    that.  But no, I did not think about calling the Court.

10             THE COURT:  How about a --  another lawyer, someone

11   whose advice you trusted, someone who can give you advice,

12   which is often what lawyers are told when they're confronted

13   with an ethical dilemma within their own firm, to call someone

14   outside the firm who they would trust and ask for advice, did

15   you think of doing that?

16             THE WITNESS:  I didn't think of doing that at this

17   time, Your Honor.  I did do so several months later.

18             THE COURT:  How -- okay.

19             Go ahead.  I interrupted.  Finish off.

20             You did something -- you did that several months

21   later?

22             THE WITNESS:  Yes, I did.

23             THE COURT:  We'll get to that I'm sure.

24             Is that part of your outline?

25             MR. WADE-SCOTT:  Yes, Your Honor.

**Griffin - Direct by Wade-Scott**

1    THE COURT:  Let me ask you this:  How long have you

2  been an attorney at this point in May of 2020?

3    THE WITNESS:  About 20 years, Your Honor.

4    THE COURT:  All right.

5    Proceed.

6  BY MR. WADE-SCOTT:

7  Q.  Did you ask Mr. Girardi why you were sending half?

8  A.  I didn't ask him why.  I just told him that the order said

9  to send the full amount.  But I don't have recollection of

10  asking -- asking him why or saying why.

11    THE COURT:  Did you suspect it was because he didn't

12  have the money, the money was not in the trust account, had

13  been used to pay other things?

14    THE WITNESS:  I did not.

15    THE COURT:  Did you believe there was any inability

16  to fulfill the order to pay the entire amount as of that date?

17    THE WITNESS:  I did not.

18    THE COURT:  Which I think is why the questions were

19  asked about other cases.  Had you ever been aware of other

20  cases where the Girardi Keese firm could not pay their

21  obligations under court orders or standard operating

22  procedures for personal injury firms when they get money to

23  pay it to the client immediately?

24    THE WITNESS:  Right.  To the best of my knowledge at

25  this -- at this point in time, Your Honor, I do not recall

1  being aware of any cases that I had worked on where, you know,

2  a client was complaining that they hadn't been paid or

3  something like that.

4        THE COURT:  How about cases at Girardi Keese, even if

5  you didn't work on it, you were aware as a lawyer for the firm

6  that clients not been paid in a timely way when funds were

7  provided by a defendant to the Girardi Keese firm to be paid

8  to the client?

9        THE WITNESS:  You know, I believe I certainly became

10 aware of that later in the year in 2020 as it progressed on.

11       THE COURT:  About other incidents?

12       THE WITNESS:  Yes.

13       THE COURT:  All right.  Well, you could get to that.

14 I don't want to -- Mr. Scott, I'll let you continue your

15 questioning, but I'm going to interrupt as I always do in

16 hearings.  But go ahead with your questioning.  You can get to

17 that issue, awareness by Mr. Griffin of other incidents

18 involving Girardi Keese where they weren't paying in a timely

19 way, which I view as potentially relevant to the issue of the

20 believability of Mr. -- of any witness thinking that

21 Mr. Girardi was actually going to pay the money.

22       Go ahead.

23 BY MR. WADE-SCOTT:

24 Q.  Was any other client of yours at Girardi Keese ever paid

25 in installments?

**Griffin - Direct by Wade-Scott**

94

1  A.  I did have one client that, by an agreement with

2  Mr. Girardi, that was paid in installments.

3  Q.  There was an agreement in that case, without disclosing

4  anything else?

5  A.  Correct.

6          THE COURT:  The agreement with the client?

7          THE WITNESS:  Yes.

8          THE COURT:  Okay.  All right.

9          Go ahead.

10  BY MR. WADE-SCOTT:

11  Q.  Exhibit 164, there's a note next to the Huzaifah line

12  which actually refers to Ms. Dian.  It says, "You recently

13  sent him 40K."

14  A.  Yes.

15  Q.  Was that true that Ms. Dian had received $40,000?

16  A.  I believe so.  I believe -- I believe there was an advance

17  or some payment of 40,000 prior to May 6th.

18  Q.  Before May 6th do you recall receiving an e-mail from

19  Ms. Dian asking about the status of her payment?

20  A.  I don't specifically, but it's certainly possible.

21  Q.  Do you think this payment was made to Ms. Dian so that she

22  would stop e-mailing about the status of her payment?

23  A.  I think it was a specific request from Ms. Dian for

24  40,000.  I don't think it was an arbitrary number.

25  Q.  Did you explain to these clients at this point why half of

**Griffin - Direct by Wade-Scott**

1    their settlement money was going out?

2    A.  No, I did not.

3            THE COURT:  Did the clients know the actual amount

4    they were due?  Any doubt in your mind that each client knew

5    how much money they were supposed to get?  I realize there was

6    a gross settlement amount and then there's amounts taken off

7    for attorneys' fees; but were the clients all aware of the

8    dollar amount they were supposed to receive?

9            THE WITNESS:  Yes.

10           THE COURT:  Okay.  And you know that from personal

11   knowledge because you either relayed it to them or sent them

12   something to tell them that?

13           THE WITNESS:  Well, there were what we call consent

14   agreements or closeout statements that they each signed

15   indicating their final net amount.

16           THE COURT:  And that happened with all four of these?

17           THE WITNESS:  Yes.

18           THE COURT:  Okay.

19   BY MR. WADE-SCOTT:

20   Q.  Turning back to Exhibit 165.  On page 165-2, we had talked

21   earlier about your e-mail to Ms. Anice a month earlier

22   confirming that the money was in the Girardi Keese account,

23   right?

24           THE COURT:  We can go back to the public display on

25   this one?

1       MR. WADE-SCOTT:  Yes, we can.

2   BY MR. WADE-SCOTT:

3   Q.  Before April 3rd, had you told Ms. Anice that money had

4   come into the account for her settlement?

5   A.  I don't recall.

6   Q.  Above your response, there's an e-mail that's split across

7   two pages.  It's the bottom of 165-1 and the top of 165-2.

8   This is another e-mail you received from Ms. Anice, right?

9   A.  The one that starts "Dear Tom Girardi"?

10  Q.  Yes, the header information which is on the bottom of

11  165-1.

12  A.  Okay.  I see that.

13  Q.  That's an e-mail you received from Ms. Anice?

14  A.  It appears to be, yeah.

15  Q.  She copies Mr. Girardi and Mr. Lira.

16      Do you see that?

17  A.  Yes.

18  Q.  As well as Mr. Hatcher and others, including some of the

19  other clients at issue here, right?

20  A.  Yes.

21  Q.  This e-mail is longer so I won't read the whole thing, but

22  do you understand the point of it was that she wanted a status

23  on her settlement payment?

24  A.  Yes.

25  Q.  This is dated May 7, 2020, right?

**Griffin - Direct by Wade-Scott**

1    A.   Correct.

2    Q.   Mr. Lira responds via a forward on May 7th to you and

3    Mr. Kamon, right?

4    A.   Yes.

5    Q.   He asks, "Did we send half out?"

6    A.   Yes.

7    Q.   Did you talk to Mr. Lira at this time about sending half

8    of the money from Girardi Keese to these clients?

9    A.   No, I don't believe so.

10   Q.   Mr. Lira is copied on the e-mail that we were looking at a

11   moment ago regarding wiring half the money?

12   A.   Yes.

13           THE COURT:  Who is Norena Rouillard?

14           THE WITNESS:  She worked in the accounting

15   department.

16           THE COURT:  So she worked for Mr. Kamon?

17           THE WITNESS:  Correct.

18           THE COURT:  Okay.

19   BY MR. WADE-SCOTT:

20   Q.   You respond to Mr. Lira, right, on May 11th?

21   A.   Yes.

22   Q.   You say, "Tom just said he was sending the wire out today.

23   Not sure if Chris can confirm."

24           Right?

25   A.   Correct.

1   Q.   Mr. Kamon writes back and copies Norena Rouillard, right?

2   A.   Yes.

3   Q.   He says, "Norena is working on the wires."  And then he

4   says, "Once she enters, can I send to you guys to double-check

5   and confirm?"

6            Right?

7   A.   Yes.

8   Q.   What did it mean to you to confirm a wire?

9   A.   She wanted us to confirm the banking information because

10  it was somewhat complicated I believe as far as the foreign

11  banks and make sure they had the account numbers correct.

12  Q.   You respond and agree to confirm the wires, right?

13  A.   Yes.

14  Q.   And then she responds and says, "Keith, please review and

15  confirm ASAP," right?

16  A.   Right.

17  Q.   And that's what all the wire information at the bottom of

18  Exhibit 165 is?

19  A.   I believe so.

20  Q.   Those documents are attached to the e-mail that Norena

21  sends you, right?

22  A.   Right.

23  Q.   These half payments to the clients, in fact, were wired

24  out on May 11th, right?

25  A.   Yes, I believe so.

**Griffin - Direct by Wade-Scott**

1   Q.  Were there other e-mails between you and Mr. Lira about

2   paying these half payments that we haven't looked at?

3   A.  Not that I know of.

4   Q.  Did you discuss the justification for sending out the half

5   payments?

6   A.  I don't believe so.

7   Q.  Between the two of you, neither of you wanted to discuss

8   this method for paying the clients?

9            MR. SABA:  Lacks foundation.

10           MR. WADE-SCOTT:  I'll withdraw it.

11  BY MR. WADE-SCOTT:

12  Q.  It's your position today you did not discuss this reality,

13  that you were paying half of the money to the clients, with

14  Mr. Lira around this date?

15  A.  Well, I remembered that there were subsequent e-mails, you

16  know, that Girardi was sending letters out that Mr. Lira was

17  commenting on.  I don't sit here -- as I sit here today, I

18  don't recall a conversation with David about these half

19  payments.

20           THE COURT:  Had you ever confronted this before?  I

21  may have asked this question in another form, but have you

22  ever confronted this before where a client is not getting

23  their full payment?

24           THE WITNESS:  No, just on the one matter I referred

25  to earlier.

**Griffin - Direct by Wade-Scott**

1    THE COURT:  Right.  That was by agreement with the

2  client?

3    THE WITNESS:  Right.

4    THE COURT:  I have questioned you about whether you

5  went and talked to an ethics advisor, some other lawyer,

6  contacted the Court, contacted anyone.  But you never talked

7  about this with Mr. Lira, how odd this seemed?

8    THE WITNESS:  I think it was all captured by e-mail.

9  I just don't recall having any other one-on-one conversations

10  with him about it.

11    THE COURT:  You didn't pick up the phone -- maybe

12  you've answered this, but you didn't pick up the phone and

13  say, "David, this is nuts, this is trouble, this is a problem,

14  this is illegal, what we're doing is wrong," any conversation

15  between you and Mr. Lira about -- of any sort along those

16  topics?

17    THE WITNESS:  I just don't recall that sitting here

18  today, Your Honor.

19    THE COURT:  And would you recall it if you had such a

20  conversation?  I assume it would be unusual enough given the

21  circumstances of this since it's only happened once before and

22  that was by client agreement, that you would remember such a

23  conversation if you had one?

24    THE WITNESS:  Yes, I would imagine so.

25    THE COURT:  All right.

Griffin - Direct by Wade-Scott

1      Continue.  We're at 12:22.  We'll go until about

2   12:30.  We'll break at 12:30 for lunch and then go on from

3   there.

4      Go ahead.

5   BY MR. WADE-SCOTT:

6   Q.  Did you tell these clients before the half payment was

7   sent to expect a half payment?

8   A.  No, I don't believe so.

9   Q.  Did the clients follow up with you after receiving the

10  half payments?

11  A.  Yes, I believe they did.

12      MR. WADE-SCOTT:  In an excess of caution, Your Honor,

13  this next exhibit might need to be confidential.  Is it all

14  right if I --

15      THE COURT:  All right.  Take it off the public

16  screen.

17  BY MR. WADE-SCOTT:

18  Q.  Showing you what's been marked as Exhibit 172.  On page

19  172-1, between the lines from Dian Daniaty and ending "with

20  regards, Dian," there's an e-mail there, right?

21  A.  Yes.

22  Q.  Is that an e-mail that you received from Ms. Dian?

23  A.  Yes, it appears that I'm on the e-mail.

24  Q.  Around May 12, 2020?

25  A.  Yes.

**Griffin - Direct by Wade-Scott**

1   Q.  Ms. Dian says, "Dear Tom Girardi, how are you doing?  I

2   hope you're doing well.  First, I'd like to say thank you.  I

3   just found out that a portion of the settlement money was

4   wired to my Indonesian Rupier (IDR) account.  My questions are

5   when will the wiring of the second half be executed and can

6   the money be wired to my dollar account?"

7        Did I read that right?

8   A.  Yes.

9   Q.  Did you answer Ms. Dian's question about why -- when the

10   wiring of the second half will be executed?

11   A.  No, I did not.  I mean, this was addressed to Mr. Girardi.

12   Q.  Ms. Dian was your client, right?

13   A.  Well, she was the firm's client, but, yes, she was my

14   client.  She was Girardi's client.  She was David's client.

15   Q.  Do you contest in any way that Ms. Dian was your client?

16   A.  No, sir.

17   Q.  Do you recall getting questions from the other clients

18   about why they had received a half payment?

19   A.  I don't -- I don't recall specifically, but I know there

20   were other e-mails.

21   Q.  I'm showing you what's been marked as Exhibit 131.

22        THE COURT:  Back on the public screen?

23        MR. WADE-SCOTT:  Yes, we can go back on the public

24   screen.

25        THE COURT:  All right.

**Griffin - Direct by Wade-Scott**

1   BY MR. WADE-SCOTT:

2   Q.   At the top of 131-5, this is an e-mail that you received

3   from Ms. Septiana?

4        MR. SABA:  Objection.  Misstates the e-mail.

5        THE COURT:  You have to speak into the mic.  I

6   couldn't hear you.

7        MR. SABA:  Misstates the e-mail.

8        MR. WADE-SCOTT:  I can lay some more foundation,

9   Your Honor.

10       THE COURT:  Why don't you just ask about the e-mail.

11  No reason to misstate it.  If it's there on the screen, it is

12  what it is.

13       MR. WADE-SCOTT:  Okay.

14       THE COURT:  So go ahead and ask questions about it.

15       MR. SABA:  I'm sorry.  I was looking at a different

16  e-mail.  I thought he said Exhibit 131.

17       THE COURT:  I thought he did, too.

18       MR. SABA:  Now, apparently, we're -- are we looking

19  at a certain page on 131?

20       THE COURT:  Yeah, it looks like 131-5; is that

21  correct?

22       MR. WADE-SCOTT:  131-5.

23       THE COURT:  Okay.  Go ahead.

24       MR. SABA:  Go ahead.

25  BY MR. WADE-SCOTT:

1  Q.  So this is an e-mail that you received, Mr. Griffin, at

2  the top of 131-5?

3  A.  Yes, I believe so.

4  Q.  Ms. Septiana says, "Dearest Mr. Tom Girardi and all GK

5  staff," and then "Dear David, thank you very much for the

6  confirmation regarding the money transfer.  However, I noticed

7  that we received only half of the money that we should.

8  Please advise us regarding the transfer of the second half by

9  GK.  Please complete its wiring immediately."

10         Did I read that right?

11 A.  Yes.

12         MR. WADE-SCOTT:  I'm showing you what's been marked

13 as Exhibit 166 which can be on the public screen.

14         THE COURT:  Okay.

15 BY MR. WADE-SCOTT:

16 Q.  Exhibit 166 is an e-mail that you sent to Ms. Cory and

17 Mr. Lira, right?

18 A.  Yes.

19 Q.  Does this reflect a forwarded e-mail that Ms. Cory had

20 sent to just you?

21 A.  Yes.

22 Q.  This was on May 13, 2020?

23 A.  Correct.

24 Q.  You say, "Kimi, hang on before sending."

25         "David, take a look."

Griffin - Direct by Wade-Scott

1    A.  Yes.

2    Q.  I read that right?

3    A.  Yes.

4    Q.  You're referring to Mr. Lira there?

5    A.  Yes.

6    Q.  Attached to that e-mail was this document, 166-2, right?

7    A.  Yes.

8    Q.  This is a draft letter that Mr. Girardi had prepared to

9    Mr. Bias?

10   A.  It appears to be.

11   Q.  I think he dictated it somehow?

12   A.  I have no idea.

13   Q.  It says, "Dear Bias, I got enough of the problem taken

14   care of so we were able to release 50 percent of the

15   settlement."

16          Did I read that right?

17   A.  Yes.

18   Q.  That was a lie, right?

19   A.  Absolutely.

20   Q.  There was no problem?

21   A.  Correct.

22   Q.  He also says, "There are tax issues, et cetera."

23          That's also a lie, right?

24   A.  That's correct.

25   Q.  There were no tax issues with the settlement that you were

1  aware of that was delaying payments?

2  A.  That's correct.

3  Q.  At this point you had received this from Ms. Cory, right?

4  A.  Yes.

5  Q.  And you forwarded it to Mr. Lira?

6  A.  Yes.

7  Q.  How did you get it?

8  A.  I'm sorry?

9  Q.  How did you come into possession of this draft?

10  A.  Well, I think it was e-mailed to me from Ms. Cory.

11  Q.  Was she e-mailing it to you for approval?

12  A.  I think she was mailing it to me to make sure it was okay

13  to send out.

14  Q.  Did she typically do that when Mr. Girardi was

15  communicating with your clients?

16  A.  Sometimes.

17  Q.  Did she do that when she was worried that Mr. Girardi was

18  lying to your clients?

19          MR. SABA:  Objection.  Lacks foundation.

20          THE COURT:  Overruled.

21          If you know.

22  BY THE WITNESS:

23  A.  No, I don't know if she did it as a matter of practice

24  when she thought that Mr. Girardi was lying.

25  BY MR. WADE-SCOTT:

### Griffin - Direct by Wade-Scott

1   Q.  Is this the first draft correspondence you have ever --

2   you had ever received from Mr. Girardi that contained lies to

3   clients?

4   A.  As far as I can recall.

5   Q.  When you said "Hang on before sending," did you mean that

6   you wanted Ms. Cory to hold off before sending the letter out?

7   A.  Yeah, I wanted David to review the letter so that he could

8   handle the situation.

9   Q.  Why was it up to Mr. Lira to handle the situation?

10  A.  Well, I mean, he was -- I thought that David was in a

11  better position to handle it with -- with Tom.  You know, I

12  didn't -- I didn't have the same, I guess, ability, in my

13  mind, to change Tom's mind as David might.

14  Q.  Why was Mr. Lira better able to change Mr. Girardi's mind?

15  A.  Well, he was certainly more senior, and I just felt like

16  he was the one that should address it with Mr. Girardi.

17  Q.  Mr. Lira was also representing these four clients we've

18  been discussing today?

19  A.  Yes.

20  Q.  Showing you what's been marked as Exhibit 167.

21          THE COURT:  Before we get there, we're at 12:30.

22          Did this letter ever go out, to your knowledge?

23          THE WITNESS:  I do not know.

24          THE COURT:  All right.  Does anyone know?

25          MR. WADE-SCOTT:  We do.  There's -- there's a series

**Griffin - Direct by Wade-Scott**

1  of e-mails here discussing draft letters that are all kind of
2  part of the same day-long sequence.

3         THE COURT:  Yeah.  I know that 168 is another letter.
4  Did the letter -- do you know if the letters actually went
5  out?  Do you have either -- any e-mails from clients or other
6  people that they got the letter and there's more conversations
7  where it's clear the letter went out?

8         MR. WADE-SCOTT:  I can show a different exhibit that
9  will show a slightly modified version of these letters went
10  out to at least two of the clients.

11         THE COURT:  We'll get to that after lunch.

12         All right.  Let's break.  It's 12:30.

13         Sir, you're on the stand, but you can talk to your
14  lawyer during the break.  I won't prohibit that.  Even though
15  you're on cross-examination, you're free to talk to your
16  lawyer.

17         Normally I only break for 45 minutes.  If you want an
18  hour to -- I'll give you an hour today until 1:30.

19         Tomorrow morning, we are going to start at 10:00.  I
20  have two short matters over the phone.  We'll start at 9:00
21  tomorrow morning.  I can see this taking the full amount of
22  two days and I don't want people from California having to
23  travel in twice if we can't complete it, so I want to do our
24  best to complete this in two days.  So tomorrow morning, I
25  know it's early for California, it will be 7:00 for you, but

Griffin - Direct by Wade-Scott

1   we will start at 9:00 Chicago time.  I'll dispose of the other

2   two matters on the phone in your presence but very briefly and

3   then we'll launch right back into this.

4          We'll go to 5:00 today, a little bit longer if we

5   need to complete a witness, but we'll go to 5:00 today and

6   we'll have one 15-minute break this afternoon.

7          So 1:30, please be back.  Thank you.

8          MR. WADE-SCOTT:  Thank you, Your Honor.

9     (Lunch recess was had from 12:33 p.m. to 1:30 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3  WELLY CHANDRA, et al.,              )
                                       )
4                  Plaintiffs,         )
                                       )
5  -vs-                                )
                                       ) Case No. 18 C 7686
6  THE BOEING INTERNATIONAL SALES      )
   CORPORATION, a Washington           ) Chicago, Illinois
7  State Profit Corporation, et        ) December 8, 2021
   al.,                                ) 1:28 p.m.
8                                      )
                   Defendants.         )
9

10           TRANSCRIPT OF PROCEEDINGS - Volume 1
          BEFORE THE HONORABLE THOMAS M. DURKIN
11

   APPEARANCES:
12

   For Edelson PC:     MR. ALEXANDER G. TIEVSKY
13                     MR. JAY EDELSON
                       MR. J. ELI WADE-SCOTT
14                     MS. AMY B. HAUSMANN
                       Edelson PC
15                     350 North LaSalle Street, 14th Floor,
                       Chicago, Illinois  60654
16
   For Keith Griffin:  MR. RYAN D. SABA
17                     Rosen Saba, LLP
                       9350 Wilshire Boulevard, Suite 250
18                     Beverly Hills, California  90212

19
   For David Lira:     MS. EDITH R. MATTHAI
20                     MS. LEIGH ROBIE
                       Robie & Matthai
21                     350 South Grand Avenue, Suite 3950
                       Los Angeles, California  90071
22
   Court Reporter:     KELLY M. FITZGERALD, CSR, RMR, CRR
23                     Official Court Reporter
                       United States District Court
24                     219 South Dearborn Street, Room 1420
                       Chicago, Illinois  60604
25                     Telephone:  (312) 818-6626
                       kmftranscripts@gmail.com

1    (Proceedings heard in open court:)

2         THE COURT:  Okay.  Before Mr. Griffin retakes the

3    stand, I did get an e-mail from my courtroom deputy which was

4    a forwarded e-mail, I believe, from one of the attorneys, I

5    believe possibly from someone from the Edelson firm saying

6    Mr. Kamon is going to be taking the Fifth Amendment,

7    exercising his Fifth Amendment privilege, and attached to the

8    e-mail was a letter signed by Mr. Kamon saying that on the

9    advice of his counsel, he's exercising his Fifth Amendment

10   privilege.  So his appearance is excused.  I'm not going to

11   drag him into Chicago just to do that.

12        All right.  Mr. Griffin, you may retake the stand,

13   please.

14        THE WITNESS:  Yes, Your Honor.

15        I have a new mask so hopefully it will --

16        THE COURT:  Pardon me?

17        THE WITNESS:  I have a new mask.

18        THE COURT:  Good.  That's fine.  I appreciate it.

19   It's a little hard to concentrate on answering the questions

20   and keep your mask on.  We're all in a new world, so we're all

21   concentrating on different things.

22        You may continue your questioning, Mr. Scott.

23        MR. WADE-SCOTT:  Thank you, Your Honor.

24        Before we broke for lunch, I was putting Exhibit 167

25   on the screen.

**Griffin - Direct by Wade-Scott**

1          KEITH GRIFFIN, WITNESS, PREVIOUSLY SWORN

2              DIRECT EXAMINATION (RESUMED)

3    BY MR. WADE-SCOTT:

4    Q.  Mr. Griffin, Exhibit 167 is another e-mail that you

5    received from Ms. Cory, right?

6    A.  Yes.

7    Q.  This e-mail is about half an hour after the first forward

8    to Mr. Lira about this on Exhibit 166, right?

9    A.  Yes.

10   Q.  Do you remember talking to Mr. Lira during that half hour

11   after receiving the letter on Exhibit 166?

12   A.  I do not.

13   Q.  Were you all in the office at this point?

14   A.  I believe I would have been in the office.

15   Q.  Do you believe Mr. Lira was in the office?

16   A.  I don't know.

17   Q.  Turning back to Exhibit 167, the subject line here is

18   "FYI, Tom's letter to Dian Daniaty, re, Lion Air," right?

19   A.  Yes.

20   Q.  And attached to that is more draft correspondence from

21   Mr. Girardi, right?

22   A.  Yes.

23   Q.  This letter says, "Dear Dian, we made an agreement with

24   Boeing that all of the cases would be resolved.  They gave us

25   special authorization to distribute 50 percent."

**Griffin - Direct by Wade-Scott**

1    The sentence "They gave us special authorization to

2    distribute 50 percent," that's a lie, right?

3    A.   Correct.

4    Q.   You did not need authorization from Boeing to pay these

5    clients?

6    A.   That is correct.

7    Q.   He says, "I feel fairly confident the balance will be done

8    within 30 days.  There was also a tax issue that came up that

9    I am trying to resolve."

10        We established earlier this is also a lie about

11   taxes, right?

12   A.   Yes.

13   Q.   Do you remember how you got this draft letter?  Did you

14   speak -- let me withdraw that.

15        Did you speak to Ms. Cory in that half hour between

16   about 11:15 and when you got this about any more draft letters

17   from Mr. Girardi?

18   A.   No, I believe my -- my only e-mail to her was hang on and

19   forwarding it to David to handle.

20   Q.   What did handling constitute at that point in your mind?

21   A.   Well, I guess it was talking to Mr. Girardi and making

22   sure that the letters didn't go out.

23   Q.   Showing you what's been marked as Exhibit 168.

24        Exhibit 168 is an e-mail that you received from

25   Mr. Lira, right?

**Griffin - Direct by Wade-Scott**

114

1   A.  Yes.

2   Q.  That e-mail is responding to the e-mail from Kim Cory to

3   you and Mr. Lira from a few minutes before?

4   A.  Correct.

5   Q.  The e-mail a few minutes before is Exhibit 167, right?

6   A.  I believe so.  I'm not sure.

7   Q.  I'll scroll up here.

8        You see on Exhibit 167 --

9   A.  Yes.

10   Q.  -- the header information?

11   A.  Yes.

12   Q.  Do you understand Mr. Lira's e-mail in 168 to be a reply

13   to Exhibit 167?

14   A.  Yes, it appears so.

15   Q.  Mr. Lira says, "These are smart people.  There are no tax

16   issues."

17        Right?

18   A.  Yes.

19   Q.  What did you understand this to mean?

20   A.  Well, that the letter that Girardi had drafted about tax

21   issues was false.

22   Q.  And that the clients would figure out that it was false,

23   right?

24   A.  Well, I mean, he was just identifying them as smart

25   people, which they are.

1   Q.  Does Mr. Lira say that you should not send the letters at

2   this point?

3           MR. SABA:  Objection.  The document speaks for

4   itself.

5           THE COURT:  Overruled.

6           Go ahead.

7   BY THE WITNESS:

8   A.  That's not written here.

9           THE COURT:  Was Lira in -- Mr. Lira in the office

10  that day, do you recall?

11          THE WITNESS:  I do not recall if he was -- if he was

12  in the office.  Sometimes if you are out of the office and

13  we're responding remotely, it would say sent by your iPhone or

14  BlackBerry.  I don't see that here, so it leads me to believe

15  he was in the office, but I'm not 100 percent sure.

16          THE COURT:  Where was his office compared to your

17  office compared to Girardi's office in the overall Girardi

18  Keese offices?

19          THE WITNESS:  My office was on the main floor of the

20  building.  Girardi's office was next to mine on the main floor

21  of the main building; and Mr. Lira's office was on the third

22  floor -- or one floor above my office.

23          THE COURT:  And where were his secretaries, the one

24  that was -- Ms. Cory sending you the -- sending you these

25  from -- is she right outside Mr. Girardi's office?

Griffin - Direct by Wade-Scott

1    THE WITNESS:  No, Ms. Cory's work space was upstairs

2  on the third floor.

3    THE COURT:  Same as Mr. Lira?

4    THE WITNESS:  Yes.

5    THE COURT:  All right.  Okay.

6    Go ahead.

7  BY MR. WADE-SCOTT:

8  Q.  Did you speak to Mr. Lira after he sent you this e-mail?

9  A.  I don't recall having a conversation with him.

10 Q.  He sent Exhibit 168 at 11:50 a.m. that day?

11 A.  I'm sorry.  What was your question?

12 Q.  Mr. Lira sent the e-mail that is Exhibit 168 at 11:50 a.m.

13 on May 13th?

14 A.  Yes, that's what it says.

15 Q.  I'm showing you what's been marked as Exhibit 170.

16 Exhibit 170 is an e-mail that you received from Ms. Cory later

17 that same day, right?

18 A.  Yes, it looks like about 4:00.

19 Q.  Mr. Lira is copied again?

20 A.  Yes.

21 Q.  The subject line this time is "Draft - Tom's letter to

22 Septiana re Lion Air," right?

23 A.  Yes.

24 Q.  Turning your attention to 170-2.  This draft

25 correspondence was attached to that e-mail, right?

1    A.  I assume so.

2    Q.  This correspondence says, "There are many confidential

3    issues that I'm solving," right?

4    A.  That's what it says.

5    Q.  Did you understand that to be a lie at the time?

6    A.  Quite honestly, I don't even recall opening this

7    attachment or reading this, but no, there were no confidential

8    issues that were present as of May 13, 2020, that I knew of.

9    Q.  You don't remember opening this e-mail at the time you

10   received it?

11   A.  I honestly do not have a recollection of opening it.

12   After I sent the first one to Mr. Lira, I don't recall opening

13   any of these.

14   Q.  Do you recall opening what we looked at as Exhibit 167?

15   I'll put that back up.

16          Do you recall seeing this draft correspondence that's

17   at 167-2?

18   A.  I don't have an independent recollection of opening it.  I

19   mean, I've seen it since, but at the time I do not remember

20   whether or not, in fact, I opened it.

21   Q.  It didn't make such an impression on you at the time that

22   you remember opening this e-mail?

23   A.  No, because I had sent the initial one to Mr. Lira and

24   felt confident that he was handling it.

25          THE COURT:  And by handling, you mean don't send out

**Griffin - Direct by Wade-Scott**

1    a letter that has boldfaced lies on it, correct?

2              THE WITNESS:  Correct.

3              THE COURT:  Go ahead.

4    BY MR. WADE-SCOTT:

5    Q.  Was it your testimony earlier that this was the first time

6    you had seen draft correspondence from Mr. Girardi that

7    contained lies going to clients?

8    A.  To the best of my recollection.

9    Q.  And you don't remember opening e-mails later that day that

10   contained more such letters?

11   A.  There may -- there may have been other e-mails sent that

12   day.  At the time in May, I don't know if I remembered.

13             THE COURT:  What was your state of mind when you saw

14   that first letter and whether you opened these letters or not

15   after it which contained all these ludicrous, pretty

16   outrageous statements, the one about talking to the head

17   person from the IRS and some of these other -- maybe you

18   didn't see that.  But even the one you saw, what was your

19   reaction at that point?  Did you believe -- did you really

20   believe Mr. Girardi at that point, that he said he would pay

21   off the rest of the money in the future?

22             THE WITNESS:  I did -- I honestly believed that he

23   would pay the money.  Certainly I didn't believe --

24             THE COURT:  Go ahead.  Finish.

25             THE WITNESS:  Certainly I didn't -- these letters

1  that he was sending were false.  But I -- I did not believe

2  that there was any way in the world that he would defy a court

3  order and not pay these clients.

4          THE COURT:  Well, what would -- what did you think

5  was going on?  A cash flow problem?  A -- I mean, this had to

6  have raised alarm bells with you that a seemingly successful

7  law firm with a titan of the plaintiff's bar, all kinds of

8  clients -- even in bankruptcy they have all kinds of

9  clients -- that why on earth would -- what were you thinking

10 when he said this delay?  Were you thinking the money wasn't

11 there?  Were you thinking that -- you couldn't have believed

12 that he was trying to work -- that the lie about Boeing

13 holding off on it was credible.  What do you think -- I guess

14 I'm -- I'm commenting more than questioning and I shouldn't do

15 that.  I'll question.

16          What was in your mind when you saw the first letter

17 and possibly the other two --

18          THE WITNESS:  Sure.

19          THE COURT:  -- when you see Girardi making outrageous

20 lies?

21          THE WITNESS:  Yeah.  I mean, I was certainly

22 confused, but I never thought that he was broke.  I mean, he

23 always flouted how much money he had and, you know, the planes

24 and the cars, and I just -- it did not cross my mind that he

25 did not have the money to pay these plaintiffs.

1       THE COURT:  Then why -- what were you thinking when

2  he wasn't -- if you thought he had the money to pay them, why

3  do you think he wasn't?

4       THE WITNESS:  You know, I don't remember considering

5  that and why he was doing it the way he was doing it.  He told

6  me it was above my pay grade and got upset with me and I kind

7  of left it at that.  I obviously, in hindsight, wish that I

8  had been more aware.  I do.

9       THE COURT:  All right.  You had been an attorney for

10  20 years at that point, correct?

11       THE WITNESS:  Yes.

12       THE COURT:  How old were you then?  A year younger

13  from now.  How old are you?

14       THE WITNESS:  I'm 49 now.  So I would have been 48.

15       THE COURT:  All right.

16       Continue your questioning.

17  BY MR. WADE-SCOTT:

18  Q.  This letter at 170-2 is more draft correspondence, right?

19  A.  Yes.

20  Q.  The Court just referenced this letter, I believe.  It

21  says, "I am dealing with the head of the IRS to make sure this

22  does not harm us."

23       That was a lie, right?

24  A.  Yes.

25  Q.  I'm showing you page 170-3.  Before preparing for the

1  hearing, had you seen these e-mails between Mr. Lira and

2  Ms. Cory?

3  A.  No.

4          THE COURT:  Were you evidencing any mental defect by

5  Mr. Girardi at this time?

6          THE WITNESS:  By May?

7          THE COURT:  Or mental disability.  Mental defect is

8  an improper way of characterizing it.  I'm not suggesting

9  there was.  These appear to be rational acts of a -- rational

10 acts of a person acting irrationally to the extent that makes

11 any sense.  He's making these outrageous lies and wanting to

12 put off the inevitable for his clients.

13          But were you on a day-to-day basis noticing anything

14 about Mr. Girardi, about his mental state?

15          THE WITNESS:  Nothing significant at this point.  You

16 know, some days he would forget things.  But I would say that

17 was sporadic.  And I didn't observe anything that I would

18 characterize as a disability at that time.

19          THE COURT:  Was he still generating new business?

20 Were clients still coming into the firm?

21          THE WITNESS:  As far as I know, yes.  I mean, he was

22 still the first one in the office and the last one to leave.

23          THE COURT:  All right.  And as far as you know, were

24 clients still being signed up for cases?

25          THE WITNESS:  As far as I know.

Griffin - Direct by Wade-Scott

1          THE COURT:  Okay.  All right.

2          Go ahead.

3     BY MR. WADE-SCOTT:

4     Q.  I'm showing you what's been marked as Exhibit 171.  This

5     is an e-mail you received again from Ms. Cory on May 14th,

6     right?

7     A.  Yes, it appears so.

8     Q.  You testified a moment ago -- I'm going to take 171 off

9     the screen for a minute.

10          You testified a moment ago that you had not seen this

11    e-mail from Mr. Lira to Ms. Cory on the morning of May 14th

12    that's at 173?

13          MR. SABA:  I'm sorry.  I'm confused.  What is this

14    e-mail you're referring to?

15          MR. WADE-SCOTT:  I'll clarify.

16    BY MR. WADE-SCOTT:

17    Q.  There's an e-mail on 170-3 from David Lira to Kim Cory

18    that starts -- well, where my cursor is.  There's text that

19    says from David Lira, and the text of the e-mail is, "Did

20    these go out?"

21          Do you see that, Mr. Griffin?

22    A.  I see the text that you're referring to, "Did these go

23    out?"

24    Q.  I'm on 170-3.

25          THE COURT:  Oh, I'm sorry.  You were saying 173.

1   That where I was getting confused.

2              MR. WADE-SCOTT:  I'm sorry, Your Honor.

3              THE COURT:  170-3.  That clears it up.  Go ahead.

4   BY MR. WADE-SCOTT:

5   Q.  That's the morning of May 14th, right, Mr. Griffin?

6   A.  Yes, 10:43.

7   Q.  Going back to 171, 171 the exhibit.  Ms. Cory sends you an

8   e-mail the afternoon of May 14th, right?

9              THE COURT:  I think it's sent to Mr. Lira.  It's

10  copied to --

11             MR. WADE-SCOTT:  Copied to Mr. Lira.

12             THE COURT:  -- copied to both but the body says

13  David.

14             MR. WADE-SCOTT:  That's right.

15             THE COURT:  Go ahead.

16  BY MR. WADE-SCOTT:

17  Q.  Ms. Cory asks if this is okay and there's another letter

18  attached, right?

19  A.  Appears to be.

20  Q.  This draft letter says, "They gave us special

21  authorization to distribute 50 percent," right?

22  A.  Yes.

23  Q.  This was still a lie?

24  A.  Correct.

25  Q.  But in this draft, nothing about tax issues?

1    A.  I don't see anything about tax issues.

2    Q.  Do you know if Mr. Lira spoke to Ms. Cory about the

3    content of these drafts on either May 14th or May 13th?

4    A.  I do not, other than the e-mail in 168.

5    Q.  On page 171-3, there's another essentially identical

6    e-mail from Ms. Cory, "David, is this okay?"

7    A.  Yes.

8    Q.  And another attachment, this time to Mr. Bias, "I got

9    enough of the problem taken care of so we were able to release

10   50 percent of the settlement."

11          This is also essentially a lie, right?

12   A.  Yes.

13   Q.  There's no problem that you're aware of that required

14   50 percent of the payment to go out?

15   A.  That's correct.

16   Q.  Nothing about tax issues in this one?

17   A.  Correct.

18   Q.  Another identical e-mail from Ms. Cory at 171-5, this time

19   attaching draft correspondence to Ms. Septiana, right?

20   A.  Yes, appears to be.

21   Q.  Mr. Girardi references some issue about other plaintiffs'

22   lawyers.  Is any of that sentence there true?

23   A.  I don't know what he's referring to when he says "I agree

24   with two of the plaintiff lawyers."

25   Q.  That would not have required Girardi Keese to hold back

1   any of the clients' money, whatever it is he's talking about,

2   right?

3   A.   Correct.

4   Q.   Again, no tax issues in this one?

5   A.   Correct.

6   Q.   Mr. Lira responds a few minutes later on May 14th, right?

7   A.   Yes.

8   Q.   He says, "Kim, I wouldn't send any of these letters.  They

9   are lies and can come back to haunt Tom."

10          Right?

11  A.   Yes.

12  Q.   Did you talk to Mr. Lira about this?

13  A.   No, not that I recall.

14  Q.   Do you recall receiving an e-mail saying that Mr. Girardi

15  was lying to the clients?

16  A.   Well, other than the ones that we've looked at, like 168.

17  Q.   When you got the e-mail back in May of 2020, do you

18  remember receiving this e-mail the moment that you got it?  Do

19  you remember that?

20  A.   This particular one, 171?

21  Q.   171-7 where Tom -- where Mr. Lira says that Tom Girardi is

22  lying to your clients.  Do you remember when you got it, the

23  moment that you opened this e-mail?

24  A.   I do not.

25          THE COURT:  Have you ever received an e-mail before

1 from one of the firm lawyers saying the head of the firm was

2 lying about anything?

3          THE WITNESS:  Not that I recall.

4          THE COURT:  And this didn't jump out at you as an

5 unusual e-mail such that you would remember it?

6          THE WITNESS:  I mean, these were certainly an unusual

7 sequence of e-mails.  All of these were.  But I don't recall

8 having any personal phone conversations or face-to-face

9 conversations with anyone about them.

10          THE COURT:  You would routinely read all your

11 e-mails, though, wouldn't you?

12          THE WITNESS:  Well --

13          THE COURT:  I mean, e-mails of -- that dealt with the

14 case and were from David Lira with Mr. Girardi's secretary

15 copied on it?

16          THE WITNESS:  Yes.  Yes, I would.

17          THE COURT:  Okay.  All right.

18          Go ahead.

19 BY MR. WADE-SCOTT:

20 Q.  On page 171-8, there's a reply from Ms. Cory just to

21 Mr. Lira that says.  "I sent the first two already to Dian and

22 Bias."

23          Are you aware of Ms. Dian receiving the draft

24 correspondence that we looked at in Exhibit 171?

25 A.  I believe -- I'm not sure who received what

1  correspondence, but I believe there's a later e-mail that is a

2  response to having received one of these letters, but I'm not

3  sure which one it is.

4  Q.  Do you know if Mr. Bias actually received one of these

5  letters?

6  A.  I do not.

7  Q.  You have reason to think that Mr. Bias did receive the

8  letter at 171-4?

9  A.  Like I said, I know that one of the four clients I believe

10 responded to a letter with an e-mail.  I do not recall whether

11 it was Bias or not.

12 Q.  And sitting here, you don't know if Ms. Dian actually got

13 the letter at 171-2?

14 A.  I do not.

15 Q.  You submitted a declaration in this case, right, opposing

16 the show cause motion?

17 A.  Yes.

18 Q.  Did you mention these days in May in that declaration?

19 A.  I don't recall specifically addressing any of these --

20 these letters, although I do believe that there was a

21 reference in part of the declaration to Mr. Girardi sending

22 letters to the client, to the clients.

23 Q.  Did you say in that declaration that I'm aware that

24 Mr. Girardi was lying to the clients about why they hadn't

25 been paid?

1   A.  No, I don't -- I don't recall saying that.

2   Q.  Did you go to Mr. Girardi at this point and say that the

3   clients had to be paid the rest of their money?

4   A.  Absolutely.

5   Q.  What was his response?

6   A.  His response to me was consistently that he was handling

7   it and this was his firm and generally it was above my pay

8   grade.

9   Q.  Did you confront him about lying to the clients?

10  A.  I -- I left that to Mr. Lira.  I mean, I don't think I had

11  that same kind of relationship in that I probably had a little

12  more fear of Mr. Girardi than Mr. Lira might have.  So no, I

13  don't -- I don't recall accusing him of being a liar.

14  Q.  Did you tell Mr. Girardi at this point that you were going

15  to go to the Court?

16  A.  No, I did not threaten him with -- with going to the

17  Court.

18  Q.  We heard earlier some about Mr. Girardi being concerned

19  about his image in the public; is that fair?

20  A.  Yes.

21  Q.  Do you agree with that?

22  A.  I do.

23  Q.  Mr. Girardi was very interested in appearing wealthy to

24  the public?

25  A.  I would agree.

**Griffin - Direct by Wade-Scott**

1  Q.  Don't you think it would have been effective to say to him

2  that you were going to make this public that he wasn't paying

3  clients?

4  A.  I do not.  I think that he would have been very spiteful

5  if I had made a comment like that.  He would -- he would not

6  tolerate a statement like that from me.

7  Q.  You said earlier that Mr. Lira occupied a more senior

8  position within the Girardi Keese firm than you.  Can you

9  explain that a little more?

10  A.  Well, I mean, he had just been a lawyer longer than I had.

11  Q.  Are you aware that Mr. Lira is Mr. Girardi's son-in-law?

12  A.  Yes.

13  Q.  Are you aware that Mr. Lira was designated as the

14  successor for some portion of the firm's cases?

15        MS. MATTHAI:  Objection.  Lacks foundation.

16  Misstates the evidence.

17        THE COURT:  Well, let's see what the witness says.

18        Overruled.

19  BY MR. WADE-SCOTT:

20  Q.  Are you aware of anything like that?

21  A.  I only became aware of that document in the course of this

22  litigation.

23  Q.  I'm showing you what's been marked as Exhibit 135.  This

24  is an e-mail you received from George Hatcher?

25  A.  It looks like it's sent to Mr. Girardi and I'm copied

1   along with Mr. Lira and Shirleen and Kim Cory.

2   Q.   Mr. Hatcher said, "Client Bias and Dian received letters

3   from you, a sort of reply, regarding their question sent to

4   you of why they only received half the money from GK."

5        Do you think that's true, that Mr. Bias and Ms. Dian

6   received the letters?

7   A.   I wouldn't have any reason to dispute it.

8   Q.   In the middle of Exhibit 135, there's some messages

9   between Mr. Hatcher and the clients in a screenshot.

10       Do you see that?

11  A.   Yes.

12  Q.   Do you know what this screenshot is of?

13  A.   It looks like a screenshot of a text message.

14  Q.   Are you familiar with the text message program WhatsApp?

15  A.   I don't believe so.

16  Q.   Did you ever communicate directly with the clients via

17  text message?

18  A.   I don't -- not that I recall.

19  Q.   Did you ever have WhatsApp as an application on your work

20  phone?

21  A.   I'm not sure.  I don't recall.

22  Q.   How about your personal cell phone, did you ever have

23  WhatsApp on it?

24  A.   Well, I just have the one phone, so ...

25  Q.   And you don't recall ever communicating with the clients

**Griffin - Direct by Wade-Scott**

1   via WhatsApp on your phone?

2   A.  I don't recall.

3           THE COURT:  How about phone conversations?  Did you

4   ever talk to the clients on the phone about the missing money?

5           THE WITNESS:  I don't think that I ever did speak on

6   the phone with the clients.  It was -- it was always by

7   e-mail.

8           THE COURT:  All right.

9   BY MR. WADE-SCOTT:

10  Q.  At this point did you suspect that Mr. Girardi had

11  misappropriated client money out of the client trust account?

12  A.  No, sir.

13  Q.  Are there any other e-mails or documents through May of

14  2020 that we haven't seen that would show that you knew that

15  fact?

16          THE COURT:  Sustained.

17          MR. SABA:  Thank you.

18          THE COURT:  I think that was an objection.

19          Sustained.

20          Go ahead.

21  BY MR. WADE-SCOTT:

22  Q.  Did you tell the clients at this time that Mr. Girardi was

23  lying to them about why their money had not been paid?

24  A.  No, I don't recall ever saying that.

25  Q.  Did you ever tell the clients that Mr. Girardi had lied to

1    them about why their money was not paid?

2    A.  No, I don't recall ever doing that.

3           THE COURT:  You never talked to them on the phone at

4    all, but you had the ability to communicate with them by

5    e-mail, correct?

6           THE WITNESS:  Yes.

7           THE COURT:  Okay.

8           Go ahead.

9    BY MR. WADE-SCOTT:

10   Q.  Did you report Mr. Girardi to any disciplinary

11   authority -- disciplinary authority at this point?

12   A.  No.

13   Q.  And Mr. Girardi did not explain to you why the clients

14   have been paid half?

15   A.  He did not give me an explanation.

16   Q.  Did you forward any of these e-mails to any Edelson

17   attorney?

18   A.  I don't believe so.

19   Q.  Did you tell any Edelson attorney that Mr. Girardi was

20   lying to the clients?

21   A.  No, I don't believe I -- I told any Edelson attorney that.

22   Q.  Did you forward any of the e-mails from the clients that

23   we've looked at so far to any Edelson attorney?

24   A.  I don't believe so.

25   Q.  Not the ones asking about the status of their payments,

1   right?

2   A.  Correct.

3   Q.  Not this e-mail from Mr. Hatcher saying that the

4   clients -- not this e-mail from Mr. Hatcher at Exhibit 135,

5   you did not forward that to any Edelson attorney?

6   A.  I do not believe so.

7   Q.  Showing you what's been marked Exhibit 148.  Have you seen

8   Exhibit 148 before?

9   A.  I know I've seen it in this litigation.  I don't recall

10  whether I saw it at the time in June of 2020.

11  Q.  Do you understand this to be a letter that was sent by

12  Mr. Girardi to Ms. Anice?

13  A.  Appears to be, yes.

14  Q.  Mr. Girardi says, "There are some serious issues.  I have

15  been back east four times to get everything resolved."

16          Was any of that true?

17  A.  No.

18  Q.  That was another lie to the clients?

19  A.  Yes.

20  Q.  There's a time gap here.  We were looking at exhibits in

21  May.  This is now June.  Had you spoken to Ms. Cory at this

22  point about any more communications from Mr. Girardi?

23  A.  No, I don't recall having spoken with her about that at

24  all.

25  Q.  Did she forward you a draft of this letter?

1  A.  I don't recall.

2  Q.  Did you tell her, "I need to see anything that Mr. Girardi

3  is sending to these clients"?

4  A.  No.

5  Q.  I want to talk about Mr. Lira's leaving Girardi Keese.

6          Did Mr. Lira ever leave employment at Girardi Keese,

7  to your knowledge?

8  A.  Could you repeat your question?

9  Q.  Did Mr. Lira ever leave employment at Girardi Keese, to

10  your knowledge?

11  A.  Yes.

12  Q.  When was that?

13  A.  I believe it was around the 13th of June.

14  Q.  Did he ever come back into the office after that date?

15  A.  Not that I recall.

16  Q.  Did Mr. Lira continue to work on the cases for Ms. Anice,

17  Ms. Dian, Mr. Bias, or Ms. Septiana?

18  A.  I think at that point he was working on the -- the second

19  settlement cases.

20  Q.  Did you have any conversations with Mr. Lira after June

21  about getting these clients paid?

22  A.  I think probably sporadically we may have spoken on the

23  phone and he just asked for an update on what was going on

24  with them, whether they had been paid.

25  Q.  Do you know if Mr. Lira was talking to Mr. Girardi after

1    June 2020 about these clients being paid?

2    A.   I don't -- I don't believe that they spoke again after he

3    left.

4    Q.   So after June 2020, it's just you and Mr. Girardi on these

5    cases?

6    A.   At Girardi Keese.  I mean, obviously your firm was

7    involved.

8    Q.   But Mr. Lira had left who was more senior, right?

9    A.   Yes.

10   Q.   Was there anyone left more senior than you at Girardi

11   Keese?

12   A.   Yes.

13   Q.   Who?

14   A.   Jack Girardi was still there.  I can't recall anyone else.

15   Q.   Did you talk to him about these cases at all?

16   A.   It certainly came up later in the year.

17   Q.   Did you tell him these clients had not been paid?

18   A.   Yeah.  At some point later in 2020, yes, that was

19   disclosed to him.

20   Q.   When was that?

21   A.   I don't recall specifically.

22   Q.   Did you tell him that Tom had lied to the clients?

23   A.   I don't recall saying that.

24   Q.   Turning back to Mr. Lira's leaving the firm.  Did he say

25   anything to you about why he was leaving Girardi Keese?

1   A.  No.  In fact, I don't think he -- he didn't tell me that

2   he was leaving when he left.  I believe he may have called me

3   over the weekend or something like that to let me know.  But

4   no, he didn't -- I mean, he didn't tell me other than that he

5   wanted to start his new firm.

6   Q.  How long had you worked with Mr. Lira at Girardi Keese?

7   A.  Probably 20 years.

8   Q.  And he didn't mention to you until the weekend before that

9   he was leaving the firm?

10         MS. MATTHAI:  Objection.  Misstates the testimony.

11   BY MR. WADE-SCOTT:

12   Q.  I'm sorry.  When did he tell you he was leaving the firm?

13   A.  He told me after he had left.

14   Q.  And he did not explain to you any of the reasons that he

15   was leaving?

16   A.  Not that I recall other than he was just starting his new

17   firm and had wanted to do so.  You know, he may have mentioned

18   that he was tired of dealing with Tom and, you know, just

19   couldn't take it anymore.

20   Q.  Couldn't take what anymore?

21   A.  I guess dealing with arguments with Tom.

22   Q.  Arguments about whether or not clients had been paid?

23   A.  That was certainly one of them, yeah.

24   Q.  When you and Mr. Lira were talking about this, was it just

25   in the context of these clients not being paid or were there

1   any other clients at issue?

2   A.  As far as I recall, it was just the Boeing cases.

3   Q.  Are you aware of a call that Mr. Lira had with Edelson

4   attorneys around June 16th of 2020?

5   A.  Not specifically.

6   Q.  Did you discuss talking to attorneys from Edelson with

7   Mr. Lira at all in advance of that call?

8   A.  I don't believe so.

9   Q.  You two did not discuss any kind of strategy for what to

10  say to Edelson?

11  A.  No.

12  Q.  I'm showing you what's been marked Exhibit 137.  This is a

13  memo that you sent to Tom Girardi on June 24, 2020?

14  A.  Yes.

15  Q.  Were there more e-mails from the clients around this time

16  asking for updates on their payments?

17  A.  There may have been.  I'm sure there were, but I don't

18  recall specifically like in June which clients were e-mailing.

19  Q.  Had you informed any of the clients at this point that

20  Mr. Girardi had lied to them about why they weren't being

21  paid?

22  A.  No, I never said that Mr. Girardi was lying to the

23  clients.

24          THE COURT:  You never told the clients that Girardi

25  was lying to them, correct?

Griffin - Direct by Wade-Scott

138

1          THE WITNESS:  That's correct, Your Honor.

2          THE COURT:  Did you ever tell anybody at Edelson that

3     Girardi was lying to the clients?

4          THE WITNESS:  No, I do not recall doing that.

5          THE COURT:  Okay.

6     BY MR. WADE-SCOTT:

7     Q.  Are you aware that more partial payments were made to

8     these clients after June of 2020?

9     A.  Yes.

10          MR. WADE-SCOTT:  The next exhibit contains some

11     confidential information.

12          THE COURT:  Okay.  What exhibit is that?

13          MR. WADE-SCOTT:  This will be Exhibit 116.

14          THE COURT:  Okay.  We'll take it off the public feed.

15     BY MR. WADE-SCOTT:

16     Q.  I'm showing you what's been marked Exhibit 116.

17          Have you seen this document before?

18     A.  I think I've only seen it in connection with this

19     litigation.

20     Q.  Were you aware in July of 2020 that Mr. Lira was going to

21     send Edelson a letter?

22     A.  No.

23     Q.  Showing you what's been marked as Exhibit 117.

24          THE COURT:  There's nothing confidential in this, is

25     there?

1      MR. WADE-SCOTT:  I was just making sure.

2      No.

3      THE COURT:  All right.  It can be displayed.

4      MR. WADE-SCOTT:  There may be parts, but I will not

5  scroll to them.

6      THE COURT:  All right.

7  BY MR. WADE-SCOTT:

8  Q.  This is a letter that Mr. Balabanian sent Mr. Girardi and

9  Mr. Lira, right?

10 A.  Yes, appears to be.

11 Q.  You were copied on this letter?

12 A.  I think I was copied by -- by e-mail.

13 Q.  After you received this letter, did you discuss it with

14 Mr. Girardi?

15 A.  I don't recall specifically discussing the letter with him

16 other than, you know, continually reminding him that he had

17 balances to pay the clients.

18 Q.  Did you discuss this letter with Mr. Lira after you

19 received it?

20 A.  No, I don't -- I don't recall doing so.

21 Q.  At this point, you didn't forward any of the e-mails from

22 the clients to Mr. Balabanian, did you?

23 A.  No, sir.

24 Q.  You did not tell anybody at the Edelson firm about the

25 communications between Girardi Keese and the clients up to

1   this point?

2   A.  If you mean Mr. Girardi's letters, correct.

3   Q.  Showing you what's been marked as --

4           THE COURT:  Let's stay on that exhibit.  Let's go to

5   117-02, please, pull it up.

6           MR. WADE-SCOTT:  Sure, Your Honor.

7           THE COURT:  And Mr. Griffin, I'll focus you on the

8   lower -- is it up on the screen?

9           MR. WADE-SCOTT:  I'm getting it there.

10          THE COURT:  117-002.

11          I'll focus you on the part below the issue of whether

12  our clients have been paid.  Are you there?

13          THE WITNESS:  Yes.

14          THE COURT:  All right.  It says, "After the call with

15  David, both Ari and I immediately reached out to Keith to gain

16  more clarity on the situation.  Ari spoke with Keith on

17  June 18th and I spoke to him on June 30th."  "I," apparently

18  the author, which is Mr. Balabanian.  "Unfortunately those

19  conversations only raised more questions and heightened our

20  concerns that the settlements have been funded but our clients

21  may not yet have been paid.  In my conversation with Keith, I

22  asked point blank, 'Has Boeing funded the settlements and have

23  our clients been paid?'  Keith's response was he didn't know

24  for certain since Tom handles the finances of Girardi Keese

25  but that he believed that, to date, the clients had been paid

### Griffin - Direct by Wade-Scott

1   about half of what they are owed."

2         Did you have such a conversation with, it looks like,

3   Mr. Balabanian and Mr. Ari's last name is pronounced what,

4   Scharg, did you have such a conversation with them?

5         THE WITNESS:  I do believe I had a conversation with

6   Mr. Balabanian.  I don't recall if I had one with Mr. Scharg.

7   And I do recall telling him that half the balances had been

8   authorized and paid by Mr. Girardi.

9         THE COURT:  Did you tell him that the full amount of

10   the settlements had been paid by Boeing?

11         THE WITNESS:  No, I told him that half had been paid.

12         THE COURT:  Well, that's a lie, isn't it?

13         MR. SABA:  Objection.  He misunderstood your

14   question, Your Honor.

15         He's answering a different question.

16         THE COURT:  In fairness, I will -- the question is

17   not how much has been paid.  Did you tell the Edelson lawyers

18   whether or not the Boeing -- that Boeing had fully funded the

19   settlements?

20         THE WITNESS:  I do not believe that was even part of

21   the conversation.

22         THE COURT:  Well, the letter indicates it is, but you

23   don't recall that being part of the conversation?

24         THE WITNESS:  I do not.

25         THE COURT:  Did the Edelson firm know, did they have

1  access to the records to know that Boeing had fully funded the

2  settlements as of this date and really as of the time when

3  Boeing paid the money?

4       THE WITNESS:  Well, they certainly had access to the

5  Boeing attorneys.  I mean, they had a relationship with the

6  Boeing attorneys.  But as far as like the wires coming in, I

7  do not believe that they were copied on the wire e-mails from

8  Perkins Coie to Girardi Keese.

9       THE COURT:  All right.  So this letter, it says, "Has

10  Boeing funded the settlements and have our clients been paid?"

11  You don't believe the discussion of funding was even the

12  issue, it was just a matter of how much the clients had been

13  paid?

14       THE WITNESS:  Correct.

15       THE COURT:  All right.  Then you misunderstood my

16  question.

17       THE WITNESS:  I'm sorry.

18       THE COURT:  No, I -- I probably phrased it poorly.

19       All right.  So that's your recollection of the

20  conversation being related in this letter?

21       THE WITNESS:  Yes.

22       THE COURT:  Okay.

23  BY MR. WADE-SCOTT:

24  Q.  At this point, Mr. Griffin, you knew that the Boeing money

25  for the four clients at issue here had come into the account?

1  A.  Yes.

2  Q.  And that half had been paid?

3  A.  Correct.

4  Q.  There were a number of questions posed in this letter at

5  the top of 117-3, the first full paragraph there.  The first

6  question asked both Mr. Girardi and Mr. Lira to confirm in

7  writing whether Boeing has funded the settlements in their

8  entirety, and if not, to identify the amount funded and the

9  amount unfunded.

10      You knew the answer to that question as to at least

11  Ms. Anice, Ms. Dian, Mr. Bias, and Ms. Septiana, right?

12  A.  Yes.

13  Q.  The second question is to the extent the settlements have

14  been funded in whole or in part, where the settlement funds

15  are or were being housed.

16      Did you know the answer to that question?

17  A.  Yes.

18  Q.  You knew that half had been paid to the clients at that

19  point?

20  A.  Correct.

21  Q.  Did you know where the other half was?

22  A.  Well, I mean, I assumed it was in the trust account.

23  Q.  Question 3 asks:  "What amount is still owed to the

24  clients?"

25      You knew the answer to that question?

1    A.   I'm sorry.  Which number are you on?

2    Q.   No. 3.  "To the extent the settlements have been funded in

3    whole or in part, whether our collective clients have been

4    paid the entirety of the amounts owed to them under the

5    settlements, and if not, the amounts paid to them and the

6    amounts still owed."

7           You knew the answer to that question?

8    A.   Yes.

9    Q.   No. 4 is the basis for withholding settlement, any funds,

10   excluding attorneys' fees, from our clients, to the extent

11   they are being withheld.

12          It's your position that you were not aware of any

13   legitimate reason to withhold them, right?

14   A.   Correct.

15   Q.   Were you aware in any way of why they were being withheld

16   at this point?

17   A.   No.

18   Q.   Did you answer this letter at all?

19   A.   No, I did not.  It was addressed to Girardi and Lira.

20   Q.   But you knew most of the answers, right?

21   A.   Yes.

22   Q.   Why not provide them to the Edelson firm?

23   A.   I just didn't see it as my position to respond when it was

24   addressed to Tom and David.

25          THE COURT:  Let me direct you to the top of page 2,

1    117-002.  And it says, "On April 14, David and Ari had another

2    conversation about where things stood on the settlements and

3    David just reiterated what Keith had said previously, that we

4    still hadn't received all the executed releases from the

5    clients and that Boeing would fund -- and that Boeing would

6    fund if, and when, they were all received."

7              Did you tell them -- did you ever tell anyone at the

8    Edelson firm that Boeing had not funded the money when, in

9    fact, you knew they had funded it?

10             THE WITNESS:  No.

11             THE COURT:  All right.  All right.  And that takes us

12   to page 1 which really goes back to this bottom of the second

13   paragraph.  The second from the last sentence -- the third --

14   "Ari reached out to Keith and asked when he expected Boeing to

15   fund the four settlements.  Keith said that Boeing would not

16   fund any of the settlements, including in the dismissed cases,

17   until releases had been signed by our clients in all eleven

18   cases.  He further stated we are still waiting on several

19   releases to be executed and returned."

20             That's a point of confusion for me.  I didn't know

21   that there was -- was there some arrangement with Boeing where

22   they wouldn't fund all -- any of these settlements unless all

23   11 had been released?

24             THE WITNESS:  Absolutely not, and that's -- that's

25   the critical misrepresentation that has been made here.  I

**Griffin - Direct by Wade-Scott**

146

1    never told Ari Scharg that Boeing would not fund the first

2    four settled cases that had been -- had executed settlement

3    agreements, approved court order minor compromises.  I mean,

4    those had directives in the agreements that they were to be

5    paid within 30 days.  I mean, it would make no sense for --

6    that I would have somehow the power to convince Boeing to go

7    against a court order that said these have to -- these can't

8    be paid until all the releases were paid.

9            The discussion that's being referred to here,

10   Your Honor, is about the second settlement, the second seven

11   cases that were mediated in February of 2020.  Had nothing to

12   do with the first four settled cases.

13           THE COURT:  All right.  So this statement here, which

14   you didn't make, it was written by an attorney from the

15   Edelson firm, was not -- is not accurate as far as you're

16   concerned?

17           THE WITNESS:  It is not.

18           THE COURT:  All right.

19           Go ahead.

20   BY MR. WADE-SCOTT:

21   Q.  I'm going to show you another exhibit, the first page of

22   which contains some confidential information and then we can

23   put it back up.

24           THE COURT:  Okay.  What exhibit?

25           MR. WADE-SCOTT:  Exhibit 104.

**Griffin - Direct by Wade-Scott**

1      THE COURT:  Okay.

2   BY MR. WADE-SCOTT:

3   Q.  Do you recognize Exhibit 104, Mr. Griffin?

4   A.  Yes.

5   Q.  These are texts you had with Ari Scharg from the Edelson

6   firm?

7   A.  Yes.

8   Q.  Mr. Scharg is asking about one of the client families that

9   Edelson and Girardi Keese jointly represented, right, at the

10  time?

11  A.  Yes, this is about two weeks after we had had the

12  settlement conference on the second set of cases, and we had

13  learned that one of the cases from our global settlement was

14  falling out.

15      THE COURT:  What's confidential about this?

16      MR. WADE-SCOTT:  We no longer -- well, we no longer

17  represent the clients.  The problem is the -- whether or not

18  the client referenced on the first page was, in fact, backing

19  out.  I didn't feel -- I felt it was potentially privileged,

20  and we don't have a privilege waiver from that client.  I'm --

21  yeah.  We did not -- we actually redacted the client's name in

22  the version that we included and then one of the other parties

23  filed it unredacted, and so we just used the unredacted

24  version.

25      THE COURT:  Use the unredacted version in open court.

1   That's not -- there's nothing about a dollar amount here,

2   nothing about a billing or a wiring number.  There's nothing

3   confidential in this.

4           Go ahead.  We'll put it on the public screen.

5           Go ahead.

6   BY MR. WADE-SCOTT:

7   Q.  So you and Mr. Scharg were having a conversation about

8   whether or not one of the clients was essentially backing out?

9   A.  Correct.

10  Q.  At the top, you say -- sorry.  Mr. Scharg asks if the

11  client is going to sign the settlement agreement, right?

12  A.  Correct.

13  Q.  You say, "No, she's not.  Trying to get Perkins to give us

14  individual offers," right?

15  A.  Correct, because Boeing was not going to fund this global

16  settlement for these seven cases without participation from

17  all seven clients.

18          THE COURT:  Unrelated to the four that are the

19  subject of this hearing?

20          THE WITNESS:  Correct.

21          THE COURT:  All right.  Go ahead.

22  BY MR. WADE-SCOTT:

23  Q.  So it's your view that it was clear that you were just

24  talking about this second set of clients here?

25  A.  That's all we had been talking about; this entire text

1    string with Mr. Scharg was the second set of cases, and this

2    was two weeks after the settlement conference on that second

3    set of cases.

4    Q.   On page 104-2, Mr. Scharg asks you, "And Perkins is not

5    going to release any of the money until all of the settlement

6    agreements are signed?"  Right?

7    A.   Right.

8    Q.   And you say "correct"?

9    A.   Right, meaning that Perkins was not going to go ahead and

10   fund a global settlement for all seven cases without

11   participation from all seven clients.

12            THE COURT:  And 104-003 actually has a dollar amount

13   in it, so don't put that up.

14            MR. WADE-SCOTT:  Yeah, I pulled it down just to

15   figure out how to navigate around that, Judge.

16            THE COURT:  All right.

17   BY MR. WADE-SCOTT:

18   Q.   You have Exhibit 104 still in front of you, Mr. Griffin?

19   No?

20   A.   I do not.

21   Q.   I'm going to put Exhibit 104 back up on the screen

22   skipping that page.  We can go back if you want to look at it.

23            On April 27th, Mr. Scharg texts you for an update on

24   Boeing, right?

25   A.   Yes, again, on the second set of cases.

**Griffin - Direct by Wade-Scott**

1   Q.  Mr. Scharg never says anything explicitly about this being

2   the second set of cases, does he?

3   A.  No, but he had already filed the settlement motions and

4   minors' compromises for the first four cases.  So he knew

5   those cases were not still hanging out there.

6           THE COURT:  And in fairness -- you can't put it up on

7   the screen, but on page 104-003 in the middle of the --

8   March 17, 2020, 12:56 p.m., we have the four cases signed and

9   done.  You have those.

10          I don't know where you're going on this, but that

11   would seem to indicate that at least the subject in the mind

12   of this witness, he thought those are four cases on one side,

13   we got the other seven on the other side.  If you have

14   documents that are going to say otherwise or witnesses are

15   going to say otherwise, so be it.  But I think his statement

16   here indicates at least he's separating out for this

17   conversation those -- those two sets of cases.

18   BY MR. WADE-SCOTT:

19   Q.  Looking at the last page of Exhibit 104, 104-7.

20   A.  Okay.

21   Q.  Mr. Scharg texts you on June 16th, right?

22   A.  Yes.

23   Q.  That's around the day that you understand Mr. Lira spoke

24   with Edelson attorneys?

25   A.  Yeah, about three days after Mr. Lira had left the office.

Griffin - Direct by Wade-Scott

1  Q.  And Mr. Scharg asks if the Boeing money had come in?

2  A.  Correct, again, referring to the money on the seven cases.

3       THE COURT:  Well, who knows what he was referring to,

4  but you thought he meant the Boeing?

5       THE WITNESS:  Absolutely.

6       THE COURT:  It may be the basis of some of the

7  misunderstanding on this part, but you're saying where you

8  don't know was as to the seven settlements, the seven

9  individuals, not for the four where the money had come in

10  three months earlier.

11       THE WITNESS:  That's correct.  And that's why I said

12  I didn't know because my understanding was that Mr. Lira had

13  taken those seven cases and I was not included on how they

14  were being funded.

15       THE COURT:  All right.

16  BY MR. WADE-SCOTT:

17  Q.  Had you informed Mr. Scharg at this point that any of the

18  money from Boeing had come in for the first four cases also?

19  A.  No, I don't know.  Either way I don't think he asked and I

20  don't think I told him.

21  Q.  Edelson was not copied on the e-mails from Boeing

22  notifying you that the wires were done for the first four

23  cases?

24  A.  I don't recall specifically, but I don't think so.

25       THE COURT:  Mr. Scott, how much more do you have?

Griffin - Direct by Wade-Scott

1    We're only up to June and we've got a lot of witnesses to

2    cover.

3                   MR. WADE-SCOTT:  Yes, Your Honor.  I'm trying to

4    figure out how to move through the rest of it very quickly.

5                   THE COURT:  All right.  Do you want to take a few

6    minutes to revise your outline?

7                   MR. WADE-SCOTT:  That would be perfect.

8                   THE COURT:  Let's take five.

9                   MR. WADE-SCOTT:  Thank you, Your Honor.

10                  THE COURT:  All right.

11     (Recess.)

12                  THE COURT:  All right.  Are you ready to proceed?

13                  MR. WADE-SCOTT:  Yes, Your Honor.

14                  THE COURT:  Okay.  Mr. Griffin, please retake the

15   stand.

16                  THE WITNESS:  Yes, Your Honor.

17                  THE COURT:  Okay.

18   BY MR. WADE-SCOTT:

19   Q.   Showing you what's previously been marked Exhibit 140.

20                  Do you recognize Exhibit 140 as e-mails that you

21   exchanged with Mr. Bias?

22   A.   Well, I'm just looking for my name.

23   Q.   I'll start at the bottom.  On August 31, 2020, Mr. Bias

24   e-mails you, Mr. Girardi and Mr. Kamon and others on the cc

25   line?

**Griffin - Direct by Wade-Scott**

1   A.  Yes, I see that.

2   Q.  Mr. Bias asks for a response for when you will send the

3   rest of that money, right?

4   A.  Well, he's addressing this to Mr. Girardi, but says "Good

5   day, Tom."

6   Q.  You respond to this e-mail, right, on September 3rd?

7   A.  Well, that's -- that's certainly an e-mail from me.  I

8   can't tell if it's in response to the last e-mail, but ...

9   Q.  You don't know if your September 3rd e-mail is responding

10  to Mr. Bias's e-mail?

11  A.  What are the dates?  I'm sorry.  This was August 31st.

12  Q.  August 31 and then September 3.

13  A.  I don't know if my e-mail here is a response to his or

14  not, but it looks like an e-mail I'm sending to Bias.

15  Q.  Did you receive this e-mail from Mr. Bias on August 31?

16  A.  Well, I assume I did.  My name is on the "to" line.

17  Q.  And you sent this e-mail to Mr. Bias, regardless of

18  whether or not it's a response, you sent that to Mr. Bias?

19  A.  Yes, it appears I did.

20  Q.  You say, "I know that you addressed this to Mr. Girardi

21  and I am confident that he will respond officially once he is

22  able," right?

23  A.  Yes.

24  Q.  It says, "I did just get notice from Mr. Girardi that he

25  was able to release a large wire of funds today on your

**Griffin - Direct by Wade-Scott**

1   cases."

2         Did you speak to Mr. Girardi about wiring more of the

3   client money in early September?

4   A.   Yes.

5   Q.   What did he say at that time?

6   A.   Well, we had received some attorney fees on a case that

7   had settled, and he approved sending out 1.5 million at that

8   time.

9   Q.   It was your understanding that attorneys' fees were being

10   used to pay what was owed to the clients?

11   A.   Yes.

12         THE COURT:   What matter was it?

13         MR. SABA:   Well, Your Honor, I don't know the answer

14   to this, but that may invade on an attorney-client privilege.

15         THE COURT:   Was it on a filed case?

16         THE WITNESS:   It was on a filed case.

17         THE COURT:   All right.   There's no privilege relating

18   to the name of the case.   Go ahead.

19         THE WITNESS:   To be honest, Your Honor, I'm not sure

20   of the name of the case.

21         THE COURT:   All right.

22         THE WITNESS:   It was an employment -- it was an

23   employment case that I --

24         THE COURT:   Well, my question is -- and that was

25   preliminary.   My real question is do you know if the money

Griffin - Direct by Wade-Scott

1    that was being used to fund this next tranche of payments to

2    the Indonesian clients came from attorneys' fees on another

3    case or from settlement funds on another case that belonged to

4    the clients in that case?

5              THE WITNESS:  It came from attorney fees.

6              THE COURT:  How do you know that?

7              THE WITNESS:  Because it was a case that I worked on.

8              THE COURT:  All right.

9              All right.  Go ahead.

10   BY MR. WADE-SCOTT:

11   Q.  Are you aware of the prohibition on fee sharing with

12   clients?

13             MR. SABA:  Objection.  Irrelevant.

14             THE COURT:  We're long past that.  I mean that in all

15   seriousness.

16             MR. WADE-SCOTT:  That's fine, Your Honor.  I won't

17   ask any more questions about it.

18             THE COURT:  Go ahead.

19   BY MR. WADE-SCOTT:

20   Q.  It was your understanding as of this day that the clients

21   were being paid with attorneys' fees that had come in from a

22   different case?

23   A.  Correct.

24   Q.  You spoke about that with Mr. Girardi explicitly?

25   A.  Yes.

1  Q.  Did you tell that to Mr. Bias?

2  A.  No.

3  Q.  You did not tell him that we're paying you with different

4  money?

5  A.  No, I did not say that.

6  Q.  Did you ever explain that fact to any Edelson attorney?

7  A.  No, I don't believe so.

8          THE COURT:  Did you ever talk to Mr. Lira?

9          THE WITNESS:  I don't recall discussing it with

10  Mr. Lira at that point in time.  He had already left.

11          THE COURT:  Did you intend to imply to Mr. Bias in

12  that second line, "I did just get notice from Mr. Girardi that

13  he was able to release a large wire of funds today on your

14  cases," did you intend to convey to Mr. Bias that the money

15  going to him was Boeing money?

16          THE WITNESS:  No, I was not intending it either way,

17  just that money was coming to him.

18          THE COURT:  Well, it seems to be carefully written,

19  and that's why I asked if you were intentionally trying to be

20  silent on the issue of where this money came from.

21          THE WITNESS:  No, I don't recall trying to be silent

22  or sly about that, Your Honor.

23          THE COURT:  But you didn't get notice from

24  Mr. Girardi on that, did you?  This was money that you -- fees

25  that you had earned, correct?

**Griffin - Direct by Wade-Scott**

1    THE WITNESS:  Well, fees that the firm had earned on

2  a case that I had worked on.

3    THE COURT:  Right.  Did you have an actual

4  conversation with Girardi where you and he discussed how fees

5  you had earned would then be used to fund some of the

6  settlement proceeds for the Boeing clients?

7    THE WITNESS:  Well, I do recall a conversation where

8  I told him that this money had come in and he said send a

9  million five on -- to the Boeing clients.

10    THE COURT:  All right.  And how much were those fees?

11  How much -- beyond the million five sent to the clients, what

12  else did you have fee wise that would have been available to

13  pay them if you chose to give the entirety of the fees to

14  them?

15    THE WITNESS:  I believe the total fees were about

16  2.4.

17    THE COURT:  All right.  So there's another $900,000

18  available if -- to pay the -- at least some of the deficiency

19  that was owed to these Boeing clients, correct?

20    THE WITNESS:  Well, he had also approved a -- a

21  $400,000 wire to another client on a case that I had worked

22  on, the one that I mentioned earlier that had got -- received

23  periodic payments so that his account could be closed out.

24    THE COURT:  So that came out of the attorneys' fees

25  from this employment case also?

1          THE WITNESS:  Correct.

2          THE COURT:  And how did -- how was the decision made

3    to give preference to fully funding the remainder of the

4    settlement for the other client on an unrelated case versus

5    these five -- or the four Boeing clients?

6          THE WITNESS:  Well, it was -- it was my suggestion

7    that the 400 be paid to close out that account just because

8    that was another one of the cases that I had been working on.

9          THE COURT:  Did it occur to you at this point when

10   you had to use funds from attorneys' fees that just came in

11   the door apparently -- they had just come in the door; is that

12   correct?

13         THE WITNESS:  They had come in the door, yeah, at or

14   about that time.

15         THE COURT:  Did it occur to you at that time, which

16   is early September 2020, that the money may not even be there?

17         THE WITNESS:  Certainly at this point in time, yes, I

18   was definitely concerned that there were problems with the

19   trust account.

20         THE COURT:  Did you ever see the bank statement

21   that -- was a trust account a single bank account?  If you

22   know?

23         THE WITNESS:  I don't know.

24         THE COURT:  All right.  Do you know anything about if

25   it was divided up in multiple accounts or a single trust

**Griffin - Direct by Wade-Scott**

1    account with multiple divisions so the money could be escrowed

2    for particular clients?

3              THE WITNESS:  I don't know.

4              THE COURT:  Who would know that?

5              THE WITNESS:  Well, I know that we have exhibits here

6    that have checks and bank statements and stuff like that,

7    but -- well, certainly Mr. Kamon would know.

8              THE COURT:  All right.  Well, I guess we'll get into

9    that if the exhibits are in here.  I haven't reviewed them

10   all.

11             Go ahead with your questions.

12   BY MR. WADE-SCOTT:

13   Q.  Mr. Bias responds to you and again asks why he hasn't

14   received the full amount, right?

15   A.  Could you direct me to where you're looking?

16   Q.  On the bottom of 140-1, there's an e-mail from Bias

17   Ramadhan to Keith Griffin on September 4th?

18   A.  Yes.

19   Q.  At the bottom of the e-mail, he says, "It seems the amount

20   of money wired to us, not full amount.  The ladies is

21   questioning why.  It's not like what Mr. Tom promises to the

22   ladies."

23   A.  I see that.

24   Q.  Do you explain to Mr. Bias at this time why he didn't get

25   the full amount?

1    A.  I don't know if I sent an e-mail in response to this or

2    not, but I most likely left that to Mr. Girardi.

3    Q.  You did not inform Mr. Bias that he had been partially

4    paid with attorneys' fees from a different case?

5    A.  No, sir.

6    Q.  Even though you knew that Mr. Girardi had lied to Mr. Bias

7    in May?

8    A.  Correct, I did not inform him of that.

9    Q.  But you left it to Mr. Girardi to communicate with

10    Mr. Bias in September about why he hadn't been paid?

11    A.  I did.  I mean, it was his firm.

12         MR. WADE-SCOTT:  I have just a couple of more

13    exhibits, Your Honor.

14         THE COURT:  Go ahead.

15         MR. WADE-SCOTT:  This will be Exhibit 143.

16    BY MR. WADE-SCOTT:

17    Q.  This is an e-mail thread, at the bottom of 143-1, do you

18    see there's an e-mail here that begins from Rare Movie to

19    Keith Griffin, Tom Girardi, George Hatcher, and others?

20    A.  Yes, I see it.

21    Q.  And there's an e-mail string beneath that.  Did you

22    receive these e-mails on 143-2?

23    A.  Well, I can only comment on the ones where I see my name.

24    Q.  Is it your understanding that when you receive an e-mail

25    in this format where there's -- at the bottom of 143-1, it's

**Griffin - Direct by Wade-Scott**

1    from Rare Movie to Keith Griffin.  Do you understand the text

2    of these other e-mails would have been included when you

3    received that?

4            MR. SABA:  Lack of foundation.

5            THE COURT:  Overruled.

6    BY THE WITNESS:

7    A.  I don't know one way or the other.

8    BY MR. WADE-SCOTT:

9    Q.  But you did at least receive this top e-mail where

10    Mr. Bias says he hasn't received an answer to his previous

11    e-mail, right?

12    A.  I see that.

13    Q.  Mr. Bias says, "One more thing.  We want to know where is

14    our settlement money all this time.  We need an explanation."

15    That's at the top of 143-2.  You see that, right?

16    A.  Yes.

17    Q.  He says, "I know you read my e-mail, Mr. Keith and

18    Mr. Girardi.  I expect an answer ASAP," right?

19    A.  Yes.

20    Q.  You respond to him on November 18, 2020, right?

21    A.  Yes.

22    Q.  You say, "I understand your concern in wanting

23    clarification and details.  Mr. Girardi is the sole owner of

24    the firm and is the person with whom you need to speak."

25           And then you offer to set up a phone call, right?

**Griffin - Direct by Wade-Scott**

1   A.   Yes.

2   Q.   You don't tell Mr. Bias at this point that his settlement,

3   to the extent he's received it, was funded in part with

4   different attorneys' fees?

5   A.   No, sir.

6   Q.   You don't tell him that Mr. Girardi has been lying to him?

7   A.   No, sir.

8   Q.   You just try to set up a call between him and Mr. Girardi?

9   A.   Yes.  That was the advice I had been given after reaching

10  out for an ethics opinion.

11  Q.   How did you reach out for an ethics opinion?

12  A.   I called a former member of the state bar that I knew was

13  working with an ethics office.

14  Q.   That person was no longer a member of the state bar?

15  A.   No.

16  Q.   So this was not an official opinion of the state bar; it

17  was another attorney's opinion?

18  A.   An ethics attorney's opinion, correct.

19          THE COURT:  And when did you reach out to this

20  person?

21          THE WITNESS:  Well, it would have -- I believe it was

22  the day before -- or could have been this exact day because

23  the instruction I was given was you should try to set up a

24  phone call between the clients and Mr. Girardi.

25          THE COURT:  All right.  And was it true, Mr. Girardi

1    had surgery?

2              THE WITNESS:  He did.

3              THE COURT:  So that is a truthful statement, he had

4    surgery last week and is currently at home recovering?

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.  And this person you consulted

7    with, this is someone -- it's an attorney you spoke to?

8              THE WITNESS:  Yes.

9              THE COURT:  All right.  What's his name?

10             THE WITNESS:  His name is Murray Greenberg.

11             THE COURT:  And how do you know him?

12             THE WITNESS:  I know him just from events through

13   Girardi Keese.

14             THE COURT:  How long have you known him?

15             THE WITNESS:  Probably ten years.

16             THE COURT:  Why didn't you call him in early April

17   when this whole saga started?

18             THE WITNESS:  I don't know.  I really thought that

19   Girardi was going to deliver and pay the clients and I guess I

20   was overly hopeful at that point in time.

21             THE COURT:  You understand calling Mr. Greenberg

22   wouldn't -- wouldn't out you if you called him in a

23   confidential way where he would go back and call Mr. Girardi

24   and say your employee is saying bad things about you; you

25   didn't expect Mr. Greenberg to violate any confidences you

1   gave him?

2          THE WITNESS:  No, I didn't, but he was certainly

3   friendly with Mr. Girardi as well.

4          THE COURT:  Well, it didn't stop you in November from

5   calling him apparently.

6          THE WITNESS:  No, but in November, I was certainly

7   feeling like things were -- were getting very bad.

8          THE COURT:  Well, things were very bad in April.

9   When did you reach the point -- there's lies by Girardi, you

10  know, just fantastic lies in letters he's sending out.

11  There's misrepresentations about the money being funded.  You

12  knew when the -- when that last tranche of money was sent out,

13  it was not being funded with Boeing money, it was being funded

14  with attorneys' fees from an employment case.

15         Didn't you know at that point it was time -- if you

16  couldn't confront Girardi, for whatever reason, that it was

17  time to get some help by reaching out to someone and getting

18  an opinion about the untenable position you were in and the

19  fact that you were being forced to say things to clients,

20  other people -- take that last part back.

21         Didn't you realize at that point when the last

22  tranche of money was sent out that you needed to consult with

23  somebody about your exposure?

24         THE WITNESS:  Your Honor, at that point I think I was

25  just more focused on trying to make sure that more money kept

1  going out to the clients, and I guess I wasn't as concerned

2  about where the money was coming from as long as it was

3  getting to the clients.

4          THE COURT:  What was your salary at Girardi Keese?

5  Did you have a salary or is it all a percentage of income you

6  brought in?

7          THE WITNESS:  I had a salary.

8          THE COURT:  And did you also get a piece of any cases

9  that you settled that you brought in or that you worked on?

10          THE WITNESS:  Only on rare occasions.

11          THE COURT:  All right.  What was your salary?

12          THE WITNESS:  It was 450,000 a year.

13          THE COURT:  And in addition, on rare occasions, you

14  would get a bonus or some other part of any case you may have

15  brought in where you got a percentage of any settlement or

16  verdict?

17          THE WITNESS:  That was often promised, but I don't

18  think I had received one in many years.

19          THE COURT:  And that salary, did you get bonuses or

20  was that the extent of your salary?

21          THE WITNESS:  That was the extent of my salary.

22          THE COURT:  Okay.  And you were still getting paid

23  throughout his whole period even though -- well, it was

24  obvious some people weren't getting paid, the Boeing people.

25  You were still getting your draws or your monthly -- however

1    you're paid, monthly --

2            THE WITNESS:  Twice a month.

3            THE COURT:  Twice a month.  You were still getting

4    paid up until December of 2020; is that correct?

5            THE WITNESS:  Up until the end of November.

6            THE COURT:  All right.  Okay.

7            Continue.

8    BY MR. WADE-SCOTT:

9    Q.  Did you actually set up a call between Mr. Girardi and the

10   Boeing clients?

11   A.  No, I believe they declined the call, to have the call.

12   Q.  So you don't know if they spoke with him in November or

13   you think they did not?

14   A.  I believe that they spoke -- Mr. Girardi spoke with

15   Mr. Hatcher at or about that time, but I don't believe that he

16   spoke with the clients.

17   Q.  And you said you referred the clients at some point to a

18   malpractice attorney?

19   A.  Yes, I referred them to a lawyer.  I referred Mohamed

20   Eltaher who was the referring lawyer to a firm to file a claim

21   against Girardi Keese.

22   Q.  Who was the lawyer you referred Mohamed to?

23   A.  To -- the firm is Abir Cohen Treyzon, and I referred them

24   specifically to Robert Finnerty.

25   Q.  Has Robert Finnerty ever worked at Girardi Keese?

Griffin - Direct by Wade-Scott

1    A.  Yes.

2    Q.  When did he leave Girardi Keese?

3    A.  I don't know if he left in 2018 or 2019.

4    Q.  So at least within the last two years of November 2020

5    Mr. Finnerty was a Girardi Keese lawyer?

6    A.  Yes.

7         MR. WADE-SCOTT:  One last confidential exhibit,

8    Your Honor.

9         THE COURT:  Before we get there.

10        MR. WADE-SCOTT:  Yes.

11        THE COURT:  This referring attorney Mohamed, did he

12   know anything about this shortfall?  Did you have discussions

13   with him about any of this?

14        THE WITNESS:  No.  I believe -- I believe the only

15   conversation I had with Mohamed was on or around November 29th

16   when I told him about -- that the clients should sue Girardi.

17   But I believe he was being copied on all of the client

18   correspondence that was going on throughout the whole year.

19        THE COURT:  I didn't see that, but if it's -- well,

20   it's either on there or not.  No point going through that

21   again.  I'll look at these exhibits.

22        But did you have conversations with Mohamed, I guess

23   is the point, other than -- if he's copied on e-mails, did he

24   ever call you up and say what on earth is going on or anything

25   like that?

1        THE WITNESS:  No.

2        THE COURT:  All right.  And did you ever confide in

3   him and say we've got a real problem here?

4        THE WITNESS:  No.

5        THE COURT:  Okay.

6        Go ahead.

7   BY MR. WADE-SCOTT:

8   Q.  During the fall, you were speaking with Mr. Balabanian

9   occasionally about these cases, right?

10  A.  Yes.

11  Q.  You understand that he's talking directly to Mr. Girardi

12  at various points?

13  A.  Yes, he was.

14  Q.  But you didn't forward any of these client contacts to any

15  Edelson attorney at any point, right?

16  A.  The client e-mails?

17  Q.  That's correct.

18  A.  I don't believe so.

19  Q.  Or the correspondence from Tom to the clients, you didn't

20  forward that to Edelson attorneys?

21  A.  No, I don't believe so.

22  Q.  You didn't tell any Edelson attorney that client

23  settlements were being funded with Girardi Keese's attorneys'

24  fees?

25  A.  No, sir.

1    MR. WADE-SCOTT:  I'm going to show that confidential

2  exhibit now.

3    THE COURT:  All right.  What number?

4    MR. WADE-SCOTT:  This will be Exhibit 320.

5    THE COURT:  I don't have a 320.

6    MR. WADE-SCOTT:  This is in Mr. Griffin's production.

7    THE COURT:  All right.

8    MR. WADE-SCOTT:  We filed our exhibits under seal

9  last night.  I don't know if Mr. Griffin's counsel or

10  Mr. Lira's counsel did that.

11    MR. SABA:  I thought you gave the Judge binders.

12    THE COURT:  He gave binders of their exhibits.  Do

13  you have binders also?

14    MR. SABA:  Oh, no.  I was under the impression they

15  were bringing binders for everybody.  I'm sorry.

16    THE COURT:  That's okay.  We'll put it on the screen

17  and we'll work this out in a while.  Go ahead and put this

18  exhibit up on the screen.

19    MR. WADE-SCOTT:  I'm sorry to jump, Your Honor.

20  There's confidential information on the exhibit.

21    THE COURT:  Yeah.  It won't be shown to the public

22  feed.

23    MR. WADE-SCOTT:  Okay.

24    THE COURT:  And it's Exhibit 320?

25    MR. WADE-SCOTT:  320.  It's marked at the bottom

**Griffin - Direct by Wade-Scott**

1    320-1.

2              THE COURT:  Is it -- we haven't been calling these

3    Edelson, Griffin, Lira exhibits, but it's just by number?

4              MR. WADE-SCOTT:  Yes, we worked with everyone to

5    number each exhibit so that each has a distinct number.

6              THE COURT:  All right.  Okay.  So Exhibit 320.

7    BY MR. WADE-SCOTT:

8    Q.  Exhibit 320 is a memo that you say you sent to

9    Mr. Girardi, right, Mr. Griffin?

10   A.  Yes, sir.

11   Q.  That was on December 2, 2020?

12   A.  Correct.

13   Q.  Was that before or after you became aware that Edelson had

14   filed a motion in this case to hold the firm in contempt?

15   A.  I don't recall.  I don't know if it was before or after.

16   I mean, I had made my decision that I was leaving Girardi

17   Keese if he didn't follow through with his November 30th

18   promise.  So this was a memo I prepared as I was getting ready

19   to leave on Friday.

20   Q.  And that accurately reflects the amount presently owed to

21   the clients as of December 2, 2020?

22   A.  I believe it does.

23   Q.  There's nothing else in this memo about the last couple of

24   months, right?

25   A.  I'm sorry?

**Griffin - Direct by Wade-Scott**

1  Q.  You don't have anything in here about things that you've

2  told Mr. Girardi in the last few months?

3  A.  No, I had sent separate documents on that.

4  Q.  You sent Mr. Girardi other memos essentially saying pay

5  the clients; is that right?

6  A.  Many, many memos.

7         MR. WADE-SCOTT:  Last exhibit, Your Honor.  This will

8  be Exhibit 147.

9  BY MR. WADE-SCOTT:

10  Q.  This is the transcript of the proceeding on December 14th

11  in this Court.  Have you seen this before, Mr. Griffin?

12  A.  I don't believe so.

13  Q.  On 147-15 at line 9, the Court asks you what your position

14  is on the receipt and distribution of these funds, right?

15  A.  I see that.

16  Q.  On line 16 to 17, you defer to Mr. Girardi's counsel on

17  the receipt of those funds, right?

18  A.  Yes.

19  Q.  But you knew that they had been received at that point,

20  right?

21  A.  Well, it was receipt and distribution of the funds.

22  Q.  And you knew quite a bit about the distribution of the

23  funds at this point, right?

24         MR. SABA:  Objection.  Relevance, Your Honor.

25         THE COURT:  Sustained.

**Griffin - Direct by Wade-Scott**

1    This is -- he had counsel at that time.  There's

2  nothing on the face of this that is, given the inquiry I had,

3  that's false which would be relevant if it were.  There's

4  nothing on the face of it.  He said I never had access,

5  possession or control of any of the settlement funds in the

6  Lion Air settlement.  That's consistent with his testimony

7  today, unless I heard something different, but that's been his

8  position.  It's his attorney's position in opening statement

9  and multiple times in briefs.  So I don't view anything here

10  as relevant to that inquiry.

11    I do have a question, though, sir.  You said you

12  resigned after Girardi failed to keep his promise on November

13  30th.  What are you talking about there?

14    THE WITNESS:  He had -- he had made a promise through

15  Mr. Hatcher and to the clients I believe that he sent in the

16  letter in early November that he would have the funds, all

17  their funds to them by November 30th.

18    THE COURT:  Which exhibit was that?  We may have gone

19  through that, and I may have just --

20    MR. WADE-SCOTT:  I picked up the pace quite a bit,

21  Your Honor.  I can find an exhibit that evidences --

22    THE COURT:  That's fine.  Your understanding is there

23  was something that Girardi sent to Hatcher and the client

24  saying I'll have you paid by November 30th?

25    THE WITNESS:  Correct.

**Griffin - Direct by Wade-Scott**

1          THE COURT:  And, of course, he didn't, and that's

2     when you resigned?

3          THE WITNESS:  That's when I had made my mind up to

4     resign.  That's when I was going to go and I started packing

5     up my office and I was out by that Friday.

6          THE COURT:  All right.  That's fine.

7          And, Mr. Scott, not a criticism.  I'm sure you would

8     have gotten to that exhibit if you hadn't cut things down, but

9     we needed to move it along.

10          MR. WADE-SCOTT:  That's the end of my questions right

11     now, Your Honor.

12          THE COURT:  Mr. Griffin's attorney, Mr. Saba, do you

13     have some questions?

14          MR. SABA:  Yes, Your Honor.  I do need to go through

15     some of these memos and stuff, so please bear with me.

16          THE COURT:  Pardon me?

17          MR. SABA:  We have to get the memos into evidence so

18     I'm going to have to go through them.

19          THE COURT:  Go ahead.  You can do it from a seated

20     position or you can go up to the podium, whatever you're

21     comfortable doing.

22          MR. SABA:  Before we do that, I would like to put up

23     Exhibit 104-67 that was previously shown to Mr. Griffin.

24          THE COURT:  Okay.  Can this be shown to the public?

25          MR. SABA:  Yes, I think it can.

**Griffin - Cross by Saba**

1     THE COURT:  I would assume every one of these can be

2    unless you tell me up front that it can't.

3     MR. SABA:  I would also like Mr. Griffin to refer to

4    Exhibit 311-17, and if we can put both of them up side by

5    side, that would be great.

6     THE COURT:  Does he have the 300 exhibits?

7     MR. SABA:  We'll put it up.  I was under the

8    impression that the full binders were up there.

9     MS. ROBIE:  Ms. Wall, I'm the one on media 1.

10     THE CLERK:  I think I got it.

11     THE COURT:  It looks like we have -- on the left side

12    is what?

13     MR. SABA:  On the left side is Exhibit 104-007 which

14    was shown by the Edelson firm to Mr. Griffin during his

15    cross-examination.

16     THE COURT:  Okay.

17                    CROSS-EXAMINATION

18    BY MR. SABA:

19    Q.  And Exhibit 311-17, do you recognize that as the same text

20    chain but complete, Mr. Griffin?

21    A.  Yes.

22    Q.  Okay.  And that text chain actually contains an additional

23    series of text messages that are not shown in the exhibit that

24    was identified by the Edelson firm; is that correct?

25    A.  That's correct.

1  Q.  Okay.  And this was the chain where Mr. Scharg asked you,

2  "Hey, Keith, did the Boeing money come in," and we were

3  talking about the second set of settlements, and you wrote,

4  "Ari, I actually don't know.  I will find out."  And

5  Mr. Scharg wrote back, "David Lira just brought me up to speed

6  on his situation.  Yikes.  Anyways, he said those cases have

7  been funded so please let me know.  Thank you."

8          Do you see that?

9  A.  Yes.

10 Q.  That wasn't shown to you by the Edelson firm in their

11 presentation, was it?

12 A.  It was not.

13 Q.  Okay.

14         THE COURT:  What does this refer to?  Why don't we

15 explain -- what did you understand Mr. Scharg to mean when he

16 said "David Lira just brought me up to speed on his situation.

17 Yikes"?

18         THE WITNESS:  Well, that Mr. Lira had explained to

19 him that only half the money had gone out to the first four

20 cases.  And I assumed that's what the "yikes" meant.

21         THE COURT:  All right.

22 BY MR. SABA:

23 Q.  Okay.  When you first started working for Girardi & Keese,

24 what was your impression of Tom Girardi?

25 A.  I mean, he was larger than life.  He was -- he was the

1  trial lawyer in California, if not the country.  I mean,

2  everyone knew him.  He was kind of a legal celebrity I guess.

3  Q.  Was your office always near Mr. Girardi's office?

4  A.  Not always, no.

5  Q.  At the beginning where were you housed in the firm?

6  A.  Well, I worked on the other side of the building closer to

7  Mr. O'Callahan.

8  Q.  Were you scared of Tom Girardi?

9  A.  Oh, I -- I remember being very scared of Tom Girardi.  I

10  would -- I would try and find ways to avoid walking in front

11  of his office so as not to get questioned about something I

12  might not know the answer to.

13  Q.  What would happen if you were questioned and didn't know

14  the answer to it?

15  A.  Well, he had a temper.  I mean, he would, you know, cut

16  you up or, you know, wait until you left and made fun of you.

17  He -- I mean, he was outwardly very generous and kind and

18  charismatic, but internally, he could be very vindictive.

19  Q.  What do you mean by that?

20  A.  Well, very few lawyers left the firm, and the reason was

21  that if you left the firm, he would generally attack you as

22  having, you know, been worthless and good riddance and, you

23  know, good thing we got rid of so-and-so because they didn't

24  contribute anyways.

25        He was -- I mean, at one point, we had a federal

1    judge that had retired and come to work for us and left, and

2    he cut him up, you know, saying he was the laziest lawyer he

3    had ever come across and he wasn't pulling his weight.  He was

4    just very spiteful.

5    Q.  Tell me what the office of Girardi & Keese looked like.

6    A.  Oh, it was basically a shrine to Tom Girardi.  I mean,

7    there was plaques from every organization on every inch of

8    every wall in the office.  I mean, the conference room had a

9    giant portrait of him.  His desk was filled with trophies and

10   different accolades and pictures with politicians and

11   celebrities and you name it from L.A., who's who, he had a

12   picture with them.

13   Q.  Did Mr. Girardi ever host political events at the firm or

14   at restaurants?

15   A.  Yes, he did.  He did.  He would host events either at the

16   firm or one of the restaurants.  He would go to Morton's.  He

17   would host events for presidents, vice presidents.

18   Q.  What political -- what political figures did he introduce

19   you to?

20   A.  I mean, Joe Biden, Kamala Harris, Bill Clinton.

21   Q.  Senators, congressmen?

22   A.  Senator Harry Reid, various congressmen, local California

23   congressmen and senators.

24          THE COURT:  I appreciate the questions, and I know

25   you just started.  A coercion defense isn't persuasive to me.

1    I don't care who Tom Girardi was.  This witness was an adult.

2    He had been an attorney for 20 years.  I'm not going to be

3    considering as credible any claim that a person was afraid of

4    another human being, a member of the bar, that person being a

5    person who supposedly was afraid or cowed a member of the bar,

6    a person in his late forties who had been an attorney for 20

7    years.  Maybe that's a reason, but it's not an excuse.  So

8    keep that in mind.

9              MR. SABA:  Yes, Your Honor.  And I just want to have

10   the Court be aware of what the environment was like because

11   the environment is the reason why the communications are the

12   way that they were made to Mr. Girardi.

13             THE COURT:  Fair enough.  Conduct it as you wish, but

14   just understand where I'm coming from because, ultimately, I'm

15   the factfinder.

16             MR. SABA:  That's fair.

17   BY MR. SABA:

18   Q.  Mr. Girardi hosted large, lavish parties?

19   A.  Yes, he did.

20   Q.  And celebrities, musicians, politicians would show up to

21   these parties?

22   A.  Yes.

23   Q.  You understood that Tom Girardi's firm had settled lots of

24   large cases before?

25   A.  Yes, very large cases.

1      MR. SABA:  Can we show Exhibit 321, please?

2   BY MR. SABA:

3   Q.  Is 321 the website biography of Girardi & Keese for Thomas

4   Girardi?

5   A.  It appears to be.

6   Q.  If you could scroll down, please, to the representative

7   settlements.  It says here that the firm settled a

8   $4.85 billion settlement with pharmaceutical giant Merck?

9   A.  Yes.

10  Q.  Turn to the next page.  The firm settled a $1.9 billion

11  settlement with California consumers who were defrauded by a

12  manipulation of natural gas prices?

13  A.  Yes.

14  Q.  1.7 billion for California consumers who were defrauded by

15  a manipulation of natural gas prices?

16  A.  Yes.

17  Q.  A 333 million and a $300 million settlement for residents

18  of Hinkley which was made famous by the film of Erin

19  Brockovich?

20  A.  That's true.

21  Q.  A $200 million settlement with bad faith?

22  A.  Yes.

23  Q.  At any time prior to this Boeing situation, did you ever

24  have any doubt that Tom Girardi was having an inability to pay

25  a $2 million amount of money to anybody?

1   A.   No.

2   Q.   Did Tom Girardi portray lavish wealth to you and the rest

3   of the firm members?

4   A.   He did.

5   Q.   And I heard you say earlier there was planes.  Describe

6   the planes that Mr. Girardi had.

7   A.   He had two planes, a Gulf Stream jet and a smaller King

8   Air.

9   Q.   Prior to this Boeing situation, did you have any reason to

10  doubt that Tom Girardi would not make payments to a client?

11  A.   No, I thought he was going to pay them.

12  Q.   At the height, how many lawyers did the firm have?

13  A.   Probably 30, 35.

14  Q.   At any time that you worked at Girardi & Keese, did you

15  ever have conversations with Tom Girardi about the firm's

16  finances?

17  A.   No.

18  Q.   Was that something Tom Girardi would ever talk to you

19  about at all?

20  A.   He would not talk to me about that.

21  Q.   And we talked about -- we know we have the Boeing -- I'm

22  sorry.  We know we have the stipulation with Edelson about the

23  trust account.  I won't go through that with you.  But did you

24  have access to any of the firm's bank account statements?

25  A.   I did not.

1    Q.  Did you have access to any mobile applications or website

2    applications that would allow you to review the finances of

3    the firm?

4    A.  I did not.

5    Q.  Did you even know how many bank accounts the firm had?

6    A.  I did not.

7    Q.  The judge asked you how much money you were making at

8    Girardi & Keese.  When was the last time you received a raise

9    prior to your resignation?

10   A.  Oh, it had been at least ten years, if not more.

11   Q.  So for ten years you made the same amount of money, no

12   raises, and sporadic, if any, bonuses; is that correct?

13   A.  Correct.

14   Q.  So why did you stay at Girardi & Keese so long if you

15   didn't get a raise for ten years?

16   A.  Well, you know, before the last year, it was -- it was a

17   good firm to be at.  I had been able to try a lot of cases,

18   win some, do some good for people.  I had gotten a lot of

19   experience.  I liked the people that I was working with.  And,

20   you know, I enjoyed being there.

21   Q.  Now, let's focus in on the specific four plaintiffs,

22   Ms. Anice, Ms. Septiana, Ms. Dian, and Mr. Bias.  Do you know

23   how they became clients of the firm?

24   A.  They were brought from George Hatcher to Tom Girardi.

25   Q.  And --

1  A.  I should say George Hatcher and Mohamed Eltaher to Tom

2  Girardi.

3  Q.  And how did you get the assignment to work on the Lion Air

4  cases?

5  A.  You know, I'm not exactly sure, but he probably maybe sent

6  me one of the retainers or a memo or something that asked me

7  to work on it.

8  Q.  So I know we had a timeline that the Court has the benefit

9  of, so we won't overkill it, but just quickly, in July of

10  2019, there was a general meeting of counsel for the parties

11  with a Judge Don O'Connell.  Do you recall that?

12  A.  Yes, I was there.

13  Q.  And that was the first time that there was a beginning of

14  sort of a meet-and-greet to start discussing settlement with

15  Boeing?

16  A.  Yes.

17  Q.  And then there was a formal mediation on August 29, 2019.

18  Did you attend that mediation?

19  A.  I did.

20  Q.  Okay.  And that mediation was where?

21  A.  In Chicago.

22  Q.  And did it result in a settlement at that time?

23  A.  No.

24  Q.  There was another mediation on October 30, 2019.  What

25  happened at that mediation?

1   A.   I was not there for that mediation.

2   Q.   Did you get an understanding as to what happened at that

3   mediation from other lawyers assigned on this case?

4   A.   Well, I was getting text messages from Mr. Scharg that the

5   case had resolved globally for a certain amount.

6   Q.   Okay.  And after there was ultimately a settlement, did

7   it -- somehow there were some issues with that settlement?

8   A.   Yes.

9   Q.   Did those issues get ironed out by December of 2019?

10  A.   Yes.

11  Q.   And after there was an ironing out of the settlement

12  monies, what was the next step in the process?

13  A.   The settlement agreements were drafted and --

14  Q.   Well, first, was there an allocation that needed to be

15  made?

16  A.   Yes, I'm sorry.  Because they were global settlements, we

17  had retained the services of retired judge Jaime Corral to

18  allocate the global amount as between the plaintiffs.

19  Q.   And then after there was an individualized assessment or

20  allocation for each of the individual clients, what was the

21  next step?

22  A.   I believe at that point the settlements were drafted, the

23  settlement agreements.

24  Q.   And first did there need to be closing statements that had

25  to be prepared and signed?

**Griffin - Cross by Saba**

1    A.  Yeah, that's correct.  In order to ensure that we would

2    have, you know, participation from all of the clients so that

3    we would have a deal on a global settlement, once the

4    allocations were done, accounting statements were prepared for

5    the clients to sign, that laid out how much money they were

6    going to get.

7    Q.  Okay.  Could you please turn to Exhibit 109-002?  It needs

8    to be a confidential exhibit.

9    A.  I have it in front of me.

10         MR. SABA:  Is that okay, Your Honor?

11         THE COURT:  Yeah.

12    BY MR. SABA:

13    Q.  Is this an example of a closing statement from Ms. Anice?

14    A.  Yes, it is.

15    Q.  And who prepared these closing statements?

16    A.  I believe that Mr. Hatcher's office prepared them.

17    Q.  And the closing statements then required Ms. Anice to sign

18    them, yes?

19    A.  Yes.

20    Q.  And there was wire instructions on page 003 as well and

21    where to deliver the money?

22    A.  Correct.

23    Q.  Okay.  And then after the closing statements were

24    prepared, then the full settlement agreements needed to be

25    prepared, correct?

Griffin - Cross by Saba

1   A.   Correct.

2   Q.   And those settlement agreements required the money to be

3   delivered to Girardi & Keese and then wired to the plaintiffs,

4   yes?

5   A.   The -- yes.

6   Q.   Okay.  And then after the settlement agreements were

7   signed, that's when Mr. Scharg prepared the motions for the

8   Court's approval for the minors, correct?

9   A.   Yes.

10  Q.   Okay.  Now, the reason why I went through all that is

11  because you were shown some e-mails from George Hatcher dated

12  March 11th which I believe were Exhibit 120 to start.  Nope

13  not 120.  Sorry.  126.  Excuse me.

14          And 126 has numbers in it as well?

15  A.   Yes.

16  Q.   Okay.  So on March 11th --

17          THE COURT:  This one is not on the public feed,

18  correct?

19          THE CLERK:  No, it's not.

20          THE COURT:  Okay.  Very good.

21          Go ahead.

22  BY MR. SABA:

23  Q.   On March 11th, Mr. Hatcher sent a series of e-mails which

24  we saw earlier which -- in which he effectively said on some

25  of them please immediately inform Boeing to deduct the

1    attorneys' fees and costs and wire them directly to, in this

2    particular case, Ms. Dian.

3              Do you see that?

4    A.   Yes.

5    Q.   Okay.  And by the time on March 11, 2020 that George

6    Hatcher had written these e-mails, wasn't it true that the

7    individual plaintiffs had signed their settlement statements?

8    A.   Yes.

9    Q.   And the settlement agreements had been drafted and already

10   signed?

11   A.   Yes.

12   Q.   And the motions for approval were filed, some of them,

13   most of them were filed with the Court?

14   A.   Yes.

15   Q.   And the Court had issued orders, for example, to Ms. Dian

16   by March 4th?

17   A.   Correct.

18   Q.   And according to our timeline chart and our stipulation

19   with Boeing, Boeing actually delivered the money for Ms. Dian

20   on March 11th, yes?

21   A.   Right.

22   Q.   So it was impossible at this point for you to comply with

23   Mr. Hatcher's belated requests, correct?

24   A.   I believe so.

25   Q.   And that goes true as well for Mr. Bias's money, which was

1   on Exhibit 127, and Ms. Septiana's money, which was also

2   Exhibit 127-003?

3   A.  Correct.

4   Q.  Turning your attention to April of 2020, specifically

5   Exhibit 130-1.  This was an e-mail that was sent by George

6   Hatcher to Girardi & Keese personnel dated April 15.  You see

7   that?

8   A.  Yes.

9   Q.  Okay.  When this e-mail came in on April 15 to Tom

10  Girardi, did you go speak with Tom Girardi?

11  A.  Let me just refresh my recollection by reading it.

12  Q.  Take your time.

13  A.  I would have either spoken to him or sent him a memo,

14  again, you know, reminding him that the money had come in.  I

15  had already sent the first four memos, but I likely would have

16  addressed it with him again.

17  Q.  And do you recall what Mr. Girardi said to you in response

18  on or around April 15th?

19  A.  I mean, every time that I brought up paying the clients

20  with Tom Girardi, he shut me down; and it grew worse and worse

21  to the point where he would -- he would say, you know, "I'm

22  handling this.  This is not Girardi and Keith."  He would

23  storm off and walk away from me.  That's generally what

24  happened.

25  Q.  Would you speak with Tom Girardi on a weekly basis about

1    paying the Boeing clients from April through November?

2    A.  I would say so.

3    Q.  Let's look at Exhibit 133 again.  These have numbers in

4    it.  This is how much --

5           MR. SABA:  So we'll not put this up in the public

6    view.

7    BY MR. SABA:

8    Q.  In addition to preparing the memo of May 4th -- well,

9    first of all, you delivered this memo to Tom Girardi?

10   A.  Yes, I did.

11   Q.  Okay.  And in addition to preparing this memo, did you go

12   speak with Tom Girardi about this?

13   A.  Yeah, I would have, a similar conversation as to what I

14   just described.

15   Q.  And was it then that Mr. Girardi ultimately told you,

16   okay, we're going to pay half of the money?

17   A.  Well, he told me that I think two days later, but

18   obviously I had somehow gotten through to him.

19   Q.  Now, I know you described and this Court asked you what

20   happened during that conversation on May 6th with Tom Girardi

21   where he told you he was only going to pay half, but I wanted

22   to focus on very specifically, when you told him that there

23   was a court order that he required to pay 100 percent, what

24   did Tom Girardi say to you and in what tone of voice?

25   A.  He said, "I got it, I understand, I'll handle it."  That's

1    what he said.

2    Q.   And when he told you it was above your pay grade, what did

3    that mean to you?

4    A.   He was telling me to butt out, that this was his firm, it

5    wasn't mine, and he was handling it.

6    Q.   Now, in your mindset on May 6, 2020, did you believe that

7    Tom Girardi was going to handle it?

8    A.   I did.

9    Q.   And he told you he was going to pay the plaintiffs two

10   weeks later, right?

11   A.   He did.

12           MR. WADE-SCOTT:  Objection.  I'm trying not to object

13   to leading to avoid slowing things down, but that was I think

14   objectionable, Your Honor.

15           THE COURT:  Well, try and avoid the leading questions

16   if you can, but I have not heard anything here that suggests

17   an answer other than the last one.  So rephrase the last

18   question.

19           MR. SABA:  Sure.

20   BY MR. SABA:

21   Q.   Well, we know from the e-mail that you sent to Chris Kamon

22   which was exhibit  -- excuse me.  Excuse me.  I lost my

23   exhibit.

24           MR. SABA:  The exhibit to Chris Kamon, the e-mail to

25   Chris Kamon on May 6th was?

**Griffin - Cross by Saba**

1          MS. ROBIE:  164.

2          MR. SABA:  164.  Good timing.  Thank you.

3   BY MR. SABA:

4   Q.  In Exhibit 164, it says 50 percent would be wired in 14

5   days.

6          Do you see that, Mr. Griffin?

7   A.  Yes.

8   Q.  Mr. Girardi told you that?

9   A.  He told me that.

10  Q.  So even though you knew it was wrong that Mr. Girardi was

11  violating a court order, you believed he was going to pay in

12  two weeks, yes?

13  A.  I did.

14  Q.  And is that why you didn't go see -- seek ethics counsel?

15  A.  Well, yes.  I believed that this money was going to get

16  paid, and I didn't even think about seeking an ethics opinion

17  at that point.

18  Q.  And you knew it was wrong that Mr. Girardi was violating a

19  court order, but you didn't come to this Court and say

20  Mr. Girardi is violating a court order even though he's

21  promising to pay in two weeks.  Why not?

22  A.  Well, I thought he was going to take care of it.  I mean,

23  that's what he was telling me.  And I believed him.

24  Q.  On page 135-001, this was the e-mail that was shown to you

25  about George Hatcher  -- from George Hatcher, rather, on

**Griffin - Cross by Saba**

1    May 19th.

2    A.  Yes.

3    Q.  Did you go speak to Tom Girardi after receiving this

4    particular e-mail?

5    A.  I don't have a specific recollection at this point on

6    May 19th.  I believe at this point, you know, I thought that

7    Mr. Lira was handling the situation with Mr. Girardi.

8    Q.  And the situation you're referring to are the letters that

9    were sent out by Kim Cory, yes?

10    A.  Correct.

11    Q.  And let's look at Exhibit 170-003.

12          Mr. Lira had asked, "Did these letters go out?"

13          Do you see that?

14    A.  Yes.

15    Q.  Okay.  And then Exhibit 171-005 -- sorry -- 007, excuse

16    me -- 007 is an e-mail from David Lira dated May 14th that you

17    were copied on, right?

18    A.  Yes.

19    Q.  And it says, "Kim, I wouldn't send any of these letters.

20    They are lies and can come back to haunt Tom.  David."

21          Did you ever authorize Kim Cory to send false letters

22    or any letters to the four clients?

23    A.  No.

24    Q.  Did you ever tell Ms. Cory it's okay to go ahead and do

25    that?

**Griffin - Cross by Saba**

1    A.   No.

2    Q.   In your experience -- well, strike that.

3         How long had Ms. Cory worked at Girardi & Keese?

4    A.   Over 30 years.

5    Q.   And she was Tom Girardi's personal secretary?

6    A.   Yes.

7    Q.   In your experience -- well, how about this:  In your

8    opinion, if Mr. Lira had given an order to Ms. Cory not to

9    send the letters but Tom Girardi told her to do it anyway,

10   would Ms. Cory have complied with Tom Girardi's direction?

11        MR. WADE-SCOTT:  Objection, Your Honor.

12        THE COURT:  Overruled.

13   BY THE WITNESS:

14   A.   I would think that she would follow Girardi's advice.

15        THE COURT:  The witness is in a position to make a

16   lay opinion about a matter where he's been there that many

17   years and is aware of the relationship between Mr. Lira and

18   his longtime secretary.  So for that reason, the objection is

19   overruled.

20   BY MR. SABA:

21   Q.   Okay.  By June of 2020, Mr. Balabanian appeared on the

22   scene, as they may say, correct?

23   A.   Yes, I believe that's the first time that I started

24   speaking or texting with Mr. Balabanian about the case.

25   Q.   Mr. Balabanian was not really involved with the litigation

1    up until then or any of the settlements or any of the issues,

2    correct?

3    A.   That's correct.

4    Q.   If you could please turn to Exhibit 302.

5            302 is what?

6            THE COURT:  He doesn't have a binder of the hard copy

7    exhibits, so you have to put it on the screen, which is fine,

8    and I'll do the same.  I'll look at it on the screen.

9            MR. SABA:  Actually, Your Honor, I have an extra

10   version right here.

11           THE COURT:  I got it on the screen.  Is that a binder

12   with your exhibits?

13           MR. SABA:  It is.

14           THE COURT:  How many binders do you have?

15           MR. SABA:  Well, I have this one and I have mine.

16   I'll bring you one tomorrow.

17           THE COURT:  That's fine, or you can ask the Edelson

18   firm.  They're local.  They can draw a binder up of these.

19           MR. SABA:  That would be appreciated.

20           THE COURT:  Why don't you give one to the witness and

21   I'll look at it on the screen.

22           MR. SABA:  Very well.

23           THE CLERK:  Switch it back to public?

24           THE COURT:  This one can go up on the public feed.  I

25   don't see anything in it that's confidential.

**Griffin - Cross by Saba**

1    BY MR. SABA:

2    Q.   Do you have Exhibit 302 in front of you?

3    A.   I do.

4    Q.   Okay.  So the first text is an introductory text from

5    Mr. Balabanian, yes?

6    A.   Yes.

7    Q.   And to the best of your knowledge, is that the first text

8    you ever received from Rafey Balabanian?

9    A.   I believe so.

10   Q.   Okay.  So I did all that and then I have to go to 117.

11   Sorry.  Let's go to 117, please.

12             117 is the letter of July 10th that you were copied

13   on that was directed to David Lira and Tom Girardi, right?

14   A.   Okay.

15   Q.   And in this letter there were the questions asked that we

16   had already discussed, right?

17   A.   Yes.

18   Q.   Now, this letter came in on July 17 -- sorry -- July 10.

19   And if you turn to page 118 -- sorry, excuse me --

20   Exhibit 118, there's a letter from David Lira to Rafey

21   Balabanian.

22             Do you see that?

23   A.   I do.

24   Q.   And Mr. Lira writes, "First and foremost, I have never

25   stated or represented that the entirety" --

1        THE COURT:  Slow down.  Go ahead.

2  BY MR. SABA:

3  Q.  -- "the entirety of the cases would not fund until Boeing

4  received all 11 executed releases."

5        Do you see that?

6  A.  Yes.

7  Q.  "As you know, four cases were settled in late 2019.  Seven

8  cases settled later on February 12th at a mediation I did not

9  attend."

10       Do you see that?

11 A.  Yes.

12 Q.  "We would not as a matter of practice allow a case to be

13 dismissed without cases being fully funded."

14       Do you see that?

15 A.  Yes.

16 Q.  So now when you were communicating with Rafey

17 Balabanian -- and we'll go through some of these texts -- he

18 was asking questions about settlements he knew full well that

19 the first four cases had been funded, yes?

20       MR. WADE-SCOTT:  Objection.

21       THE COURT:  Sustained.

22 BY MR. SABA:

23 Q.  Did Rafey Balabanian express to you that he knew the first

24 four cases had been funded?

25 A.  Yes.  He certainly told me at some point in June it was

1   clear that the cases had funded and only half of the proceeds

2   had gone out to the clients.

3           MR. WADE-SCOTT:  Objection.

4           THE COURT:  What's the objection?

5           MR. WADE-SCOTT:  Hearsay and foundation.

6           THE COURT:  Hearsay is a little tricky in this case

7   since there's really -- I don't know who the party-opponent

8   is, but Mr. Balabanian is going to be testifying, so it's fair

9   game to have this witness testify to what he conveyed to

10  Mr. Balabanian and what Mr. Balabanian conveyed to him.

11          Go ahead.

12  BY MR. SABA:

13  Q.  If you could please turn to Exhibit 119, page 2.

14          Mr. Balabanian sent you a text message that says,

15  "Hey, man, is Girardi going to respond?  Want to jump on the

16  phone today?"

17  A.  Okay.

18  Q.  That was one day after the letter that Mr. Lira had

19  written and four days after the letter that Mr. Balabanian had

20  written to Mr. Girardi.

21          What did you interpret Mr. Balabanian's text message

22  to mean?

23  A.  Well, I assume that he was referring to the letter

24  exchange.

25  Q.  And what did you respond?

**Griffin - Cross by Saba**

1  A.  I think, "I don't know if he has read it yet.  I can do a

2  call later today if that works."

3  Q.  If you could turn to Exhibit 318.

4       MR. SABA:  Does that got a number in it?  It needs to

5  be confidential, Your Honor.

6       THE COURT:  Okay.

7  BY MR. SABA:

8  Q.  318, is this a memorandum that you prepared on July 14,

9  2020?

10  A.  Yes.

11  Q.  And did you deliver this to Tom Girardi?

12  A.  Yes.

13  Q.  Why?

14  A.  Well, I assume that it was in response to Rafey

15  Balabanian's request to speak with Girardi.  And, again, it

16  was, you know, just reinforcing what the status was on these

17  payments.

18  Q.  So you also write, "The Edelson firm, local counsel in

19  Chicago, has asked for an update on disbursements to the

20  clients and their associate counsel fees."

21  A.  Yes.

22  Q.  Okay.  And that was -- came from the letter?

23  A.  Yeah, that would have been from either the letter or the

24  text from Rafey Balabanian.

25  Q.  Did you actually go speak to Tom Girardi in or around

1  July 14 or 15th?

2  A.  I most likely would have if I had delivered this letter to

3  him.  I don't recall if I delivered it to him personally or

4  dropped it in his -- his mailbox.  I don't recall as I sit

5  here right now whether I talked to him personally.

6  Q.  If you could turn to Exhibit 319, please.

7          This is another memorandum that you prepared to Tom

8  Girardi dated July 17, 2020?

9  A.  Yes.

10  Q.  And you advised Mr. Girardi that "the Edelson firm signed

11  declarations on the minors' compromises and settlement

12  approval motions in federal court.  They need to hear back

13  from you on completing the payments to the clients.  This is

14  urgent."

15  A.  Yes.

16  Q.  And if you look on the following pages, did you attach

17  anything to your memorandum?

18  A.  It looks like I attached the July 10 letter that was

19  addressed to Mr. Girardi.

20  Q.  So you were trying to get Mr. Girardi's attention to speak

21  to Mr. Balabanian?

22  A.  I was, yeah.  And Mr. Balabanian had indicated that he

23  wanted to speak with him, so I was trying to put the two of

24  them together.

25  Q.  And if you look -- go back to Exhibit 119 and to page 4.

1  At the top of the page on July 17th, you wrote to

2  Mr. Balabanian, "He said he was going to call you."

3  A.  Yes.

4  Q.  Did Mr. Girardi tell you that?

5  A.  He would have -- if I wrote that, then he would have told

6  me face to face that he was going to call Rafey.

7  Q.  And if you continue down the page to July 20, it says,

8  "Tom called."

9        Do you see that?

10 A.  Yes.

11 Q.  Were you on that call?

12 A.  I was not.

13 Q.  Did you participate in that call in any way?

14 A.  No.

15 Q.  Were you invited to participate in that call?

16 A.  No.

17 Q.  After the call, Mr. Balabanian sent apparently this text,

18 yes?

19 A.  Yes.

20 Q.  Mr. Balabanian wrote, "He sounded not great.  I hope he

21 gets better.  He promised to figure it out and said he would

22 follow up with me later this week which is fine with us.  I'll

23 follow back up with you soon."

24        Do you see that?

25 A.  Yes.

1   Q.  Did Mr. Balabanian ever tell you that you needed to go see

2   ethics counsel because Tom Girardi didn't pay the money?

3   A.  No, he never said that.

4   Q.  Mr. Balabanian knew at this point for sure and certainly

5   as early as June, and maybe July, that Mr. Girardi had failed

6   to follow a court order?

7           MR. WADE-SCOTT:  Objection.

8           THE COURT:  Well, let's see first if he knows the

9   answer, and then you'd have to explain why he would know that.

10          Do you know that?

11          THE WITNESS:  Well, he would have known certainly by

12  this time that only half the funds had been sent to the

13  clients.

14          THE COURT:  And why is that?  Why would he have known

15  that?  What's your basis for making that statement?

16          THE WITNESS:  I believe there was the letter from

17  Mr. Lira prior to this, prior to this date advising of such.

18          THE COURT:  All right.

19  BY MR. SABA:

20  Q.  And it was your understanding --

21          MR. WADE-SCOTT:  Objection.

22          THE COURT:  What's the objection?

23          MR. WADE-SCOTT:  I don't know what letter is being

24  referred to.

25          THE COURT:  All right.

1      MR. WADE-SCOTT:  It's hard to accept that.  I can

2  show the letters he's referring to or Mr. Saba can.

3      THE COURT:  What letter are you referring to, sir?

4      THE WITNESS:  I believe there was a letter from

5  Mr. Lira that we looked at.

6      THE COURT:  All right.  Pull it up, please.

7      MR. SABA:  Yeah.  I believe it's Exhibit 116.

8      That's not it.  Sorry.

9      MS. ROBIE:  We got numbers on 116.

10   (Counsel conferring.)

11      MR. SABA:  I know.  We can't show 116.  It got

12  numbers.

13      MS. MATTHAI:  This letter appears a couple of times

14  in the exhibit, so I think we're referring to a July 6 letter

15  that is marked as 243.

16      MS. ROBIE:  It's also 116.  We just can't publish it.

17      THE COURT:  116 won't be put on the public view, but

18  you can put it on the screen otherwise.

19      MS. MATTHAI:  It's got numbers.

20      MR. SABA:  Hang on.

21      THE COURT:  That's all right.  It's not on the public

22  feed.

23      MR. SABA:  We're losing focus.  I can reset this,

24  Your Honor.

25      THE COURT:  Go ahead.

1   BY MR. SABA:

2   Q.  What did you understand the purpose of why Rafey

3   Balabanian wanted to speak with Tom Girardi in July of 2020?

4   A.  To discuss the situation with the half payment of funds

5   for the clients and his firm's attorneys' fees.

6              THE COURT:  And the question is how is it you believe

7   Mr. Balabanian didn't know -- or knew, rather, that only half

8   of the fees -- half of the proceeds had been paid to the

9   clients.  You made reference to a letter.  I don't see

10  anything about that in this July 6 letter, Exhibit 116.

11             THE WITNESS:  I may have been mistaken that it was

12  from the letter.

13             MS. MATTHAI:  Wait.

14             THE COURT:  If there is such a letter, let's put it

15  up.

16             MR. SABA:  I think it's -- so, Your Honor, I believe

17  it's Exhibit 117 which is Edelson's letter asking questions

18  about have the clients been paid.  You discussed that with

19  Mr. Griffin already earlier?

20             THE COURT:  I did.  And where is it here -- it's a

21  long letter so you can point me to the --

22             MR. WADE-SCOTT:  It's discussed at the bottom of 117.

23             MR. SABA:  It's on page 002.

24             THE COURT:  Okay.

25             MR. SABA:  And it says here, "Keith Griffin, I asked

1   point blank, had Boeing funded the settlements and have our

2   clients been paid?  Keith's response was" --

3            THE COURT:  Where are you at on this page?

4            MR. SABA:  The paragraph under the words "the issue

5   of whether our clients had been paid."

6            THE COURT:  Okay.

7            MR. SABA:  "Keith's response was that he didn't know

8   for certain since Tom handles the finances of Girardi & Keese

9   but that he believed to date the clients had been paid about

10  half of what they are owed."

11           THE COURT:  All right.  And this is a letter --

12           MR. SABA:  From Edelson.

13           THE COURT:  -- from Mr. Balabanian to Tom Girardi and

14  David Lira.

15           MR. SABA:  Correct.

16           THE COURT:  And it is this letter that you believe

17  shows that at least as of July 10, 2020, Mr. Balabanian had

18  been told that Boeing had funded the settlements and clients

19  had only received half the funds?

20           MR. SABA:  Well, I can even do this more

21  specifically.

22           THE COURT:  Go ahead.

23  BY MR. SABA:

24  Q.  Mr. Griffin, did you speak with Rafey Balabanian on or

25  about June 30th?

**Griffin - Cross by Saba**

1    A.   Yes, I believe so.

2    Q.   And during that conversation did you tell him --

3         THE COURT:   No, don't lead him on that one.   Ask him

4    what was said.

5    BY MR. SABA:

6    Q.   What did you tell Mr. Balabanian?

7    A.   I had told him that the funds had come in and Girardi had

8    made an initial distribution of half the funds.

9         THE COURT:   What was Mr. Balabanian's response?

10        THE WITNESS:   That he wanted to talk with Tom

11    Girardi.

12        THE COURT:   Did he express shock, surprise,

13    bewilderment or just said he wanted to talk to Tom Girardi?

14        THE WITNESS:   Oh, I think he was certainly shocked.

15    I don't recall what words he would have used though.

16        THE COURT:   Well, given the text messages between

17    you, did he swear?   Did he get upset?

18        THE WITNESS:   Yeah, I would imagine that he did.

19        THE COURT:   Well, that's not my question.   Not

20    imagining.   What do you recall?   If you don't recall, you

21    don't.   But what do you recall him saying in response to you

22    telling him that the funds had been paid by Boeing and only

23    half had gone to the clients?

24        THE WITNESS:   I don't -- I don't recall the words

25    that he used, Your Honor.

1          THE COURT:  Okay.  All right.

2          Continue your questioning.

3          MR. SABA:  Okay.

4    BY MR. SABA:

5    Q.  So back on Exhibit 119-4, when Rafey Balabanian wrote the

6    text to you, "He said he promised to figure it out and said he

7    would follow back up with me later this week which is fine

8    with us," what did you understand that to mean?

9    A.  That Mr. Balabanian had spoken with Mr. Girardi, that

10   Mr. Girardi had assured him that everything was being taken

11   care of and that Girardi would follow back up with him later

12   in the week.

13   Q.  Whatever Mr. Balabanian was told by Mr. Girardi, it was

14   your impression, though, that Mr. Balabanian was willing to

15   wait some period of time?

16          MR. WADE-SCOTT:  Objection.

17          THE COURT:  Well, that's -- you're asking his

18   interpretation of what this text means.

19          Go ahead.

20   BY THE WITNESS:

21   A.  That seemed to be the case, that he said that he was okay

22   with waiting to have Girardi follow back up with him later in

23   the week.

24   BY MR. SABA:

25   Q.  So if you turn to the next page, please.  There is a text

1     after, "okay, good, thanks, man," Mr. Balabanian writes to you

2     on July 24th.

3              Do you see that?

4     A.  Yes.

5     Q.  And what did you understand Mr. Balabanian was

6     communicating to you at this point?

7     A.  Are you referring to the "hey, man" text?

8     Q.  Yes.

9     A.  It said that he had not heard back from Girardi yet.

10    Q.  And how did you respond to Mr. Balabanian?

11    A.  That I had handed him a note to call, to call you, to call

12    Rafey.

13    Q.  And was that true?  Did you give Mr. Girardi another note?

14    A.  Yes.

15    Q.  On July 26, Mr. Balabanian wrote you a text that says, "We

16    have to figure this out."

17             Do you see that?

18    A.  Yes.

19    Q.  And what did you do in response to the text by

20    Mr. Balabanian?

21    A.  I had another conversation with Girardi, explained the

22    severity of the situation, and Girardi told me that he would

23    be calling Rafey the following day.

24    Q.  And the next day you sent a text message to

25    Mr. Balabanian.  What did you communicate?

1  A.  I asked Mr. Balabanian if Girardi had called.

2  Q.  And if you turn to the next text message page.  I believe

3  it's page 119-7.  Did Mr. Balabanian advise you that he had

4  spoke with Tom Girardi?

5  A.  He did.  He indicated that he had spoke with him.  They

6  were going to speak again next Monday and that he thought he

7  should have the clients paid or ready to be paid by then.

8  Q.  And that's what Mr. Balabanian communicated to you on

9  July 27th?

10  A.  Yes.

11          MR. WADE-SCOTT:  Objection.

12  BY MR. SABA:

13  Q.  Were you not part of that telephone call?

14  A.  I was not.

15  Q.  You wrote back to Mr. Balabanian and told him, "I will

16  monitor."  What were you trying to convey to Mr. Balabanian at

17  that point?

18  A.  That I would keep Mr. Balabanian apprised as to whether or

19  not the clients had been paid.

20  Q.  At this point in time, were you acting as a go-between

21  effectively between Mr. Balabanian and Mr. Girardi?

22          MR. WADE-SCOTT:  Objection.

23          THE COURT:  What's the objection?

24          MR. WADE-SCOTT:  It's leading, Your Honor.

25          THE COURT:  It's technically leading but not

1    problematic, if that's a ruling.  So overruled.  I can

2    recognize leading -- answers that are responsive to leading

3    questions and those that are not.  I don't think this is

4    critical.

5            Go ahead.

6    BY THE WITNESS:

7    A.  Yes, I was.

8    BY MR. SABA:

9    Q.  On July 31, 2020, Mr. Balabanian sent you a text message.

10           Do you see that?

11   A.  Yes.

12   Q.  And you wrote, "It's Friday.  I haven't heard anything

13   further from Tom.  He said the clients will be paid by Monday,

14   August 2nd."

15           Do you see that?

16   A.  Yes.

17   Q.  Okay.  And was that consistent with what Mr. Girardi was

18   also telling you, that the clients were going to be paid at

19   some point?

20   A.  Yes, it was.

21   Q.  And Mr. Balabanian writes, "Can you stay on him and maybe

22   we can touch base Sunday?"  And you responded, "Sounds good."

23           Yes?

24   A.  Yes.

25   Q.  Turn to the next page, please.  We're at Exhibit 119-08.

1          Mr. Balabanian writes to you on August 3rd, "It's

2   Monday."

3          What did you understand that text to mean?

4   A.   That he was checking in because Girardi had promised him

5   that the clients were going to be paid.

6   Q.   And you wrote, "I handed him a note with your number

7   again."

8          Do you see that?

9   A.   Yes.

10  Q.   If you could turn to Exhibit 139-1.

11         Is this the note that you handed to Tom Girardi?

12  A.   Yes, it is.

13  Q.   It says, "Just got a message from Rafey at Edelson.  He

14  said you told him the clients would be paid in full today.  He

15  said he needs to speak with you right away."

16         See that?

17  A.   Yes.

18  Q.   Did you actually speak with Mr. Girardi about this or what

19  happened at that moment?

20  A.   No, I believe I left him this message.

21  Q.   What does that mean?

22  A.   That I delivered this memorandum to him.  I don't recall

23  whether I actually spoke to him face to face.

24  Q.   Okay.  You wrote on 119-08, "He is here at the office,"

25  and then you gave a phone number.  Was that the law firm's

1   phone number?

2   A.   Yes.

3   Q.   And why were you telling Mr. Balabanian he is here at the

4   office?

5   A.   So that he could call him.

6   Q.   You were educating Mr. Balabanian as to Mr. Girardi's

7   location?

8   A.   Yeah.  I was telling him he was at the office.  He was --

9   there's the phone number.  You can call him and speak with

10  him.

11  Q.   Mr. Balabanian says, "So I tried him twice and just got

12  transferred to Shirleen and she sends me to her voicemail.

13  This is absurd and has run its course.  If I don't hear from

14  him today, I'll have no choice but to move forward in court."

15          Do you see that?

16  A.   Yes.

17  Q.   And then you wrote, "Give him a couple of more days,

18  Rafey.  I know he is working on this."

19          What did you know at that time when you wrote that

20  text?

21  A.   Well, Girardi was telling me that he was going to have the

22  funds to pay the clients.

23  Q.   And did Mr. Girardi at that time in August tell you where

24  the funds were coming from or what was going on?

25  A.   He did not.

1    Q.  Mr. Balabanian writes, "This has been going on for eight

2    months."

3           Now, by August, it really hadn't been eight months at

4    that point, correct?

5    A.  No, it hadn't been going on for eight months, but...

6    Q.  Been going on for roughly four months, yes?  April, May,

7    June, July?

8    A.  Yes.

9           THE COURT:  Four and a half.

10          MR. SABA:  Okay.

11   BY MR. SABA:

12   Q.  If you could turn to the next page, which I believe is

13   119-09.

14          Mr. Balabanian on August  --

15          THE COURT:  Let me interrupt for a minute.

16          When he said -- when Mr. Balabanian said, "I have no

17   choice but to move forward in court," what did you understand

18   him to mean?

19          THE WITNESS:  I understood him to mean that he was

20   going to sue Tom Girardi.

21          THE COURT:  You didn't understand him to mean he was

22   going to come to the federal court that approved this

23   settlement to enforce the order that the monies be paid?

24          THE WITNESS:  I don't think I understood that at the

25   time.  At that point, I thought I understood him to mean that

1    he was -- he was going to take some legal action against Tom

2    Girardi.

3                THE COURT:  All right.

4                Go ahead.

5    BY MR. SABA:

6    Q.  In Exhibit 119-09, Mr. Balabanian wrote, "Can I get an

7    update" on August 12th.

8                Do you see that?

9    A.  Yes.

10   Q.  And then he asks you for Tom's cell number, and you

11   provided it to him, correct?

12   A.  Yes.

13   Q.  That is an accurate number?

14   A.  Yes.

15   Q.  You didn't stall or delay or give excuses; you gave

16   Mr. Girardi's cell phone number when requested?

17   A.  Yes.  Yes, I did.

18   Q.  Mr. Balabanian says, "Called him twice and left him a

19   voicemail.  What am I supposed to do at this point?"

20               Do you see that?

21   A.  Yes.

22   Q.  What did you write back?

23   A.  I told Mr. Balabanian that I asked Girardi two times to

24   call him.

25   Q.  And is that true?

1   A.  Yes.

2   Q.  And when you asked Mr. Girardi twice to call

3   Mr. Balabanian, what did Mr. Girardi tell you?

4   A.  That he would call him.

5   Q.  On August 13th, Mr. Balabanian writes, "He left a

6   voicemail.  You and I should talk today."  And you responded,

7   "Okay, I'll give you a call."

8          Do you see that?

9   A.  Yes.

10  Q.  Do you believe you had a conversation with Mr. Balabanian

11  on August 13th?

12  A.  It's possible.  I don't have a specific recollection of

13  it.

14  Q.  Mr. Balabanian writes to you on August 24th.  That would

15  be the next page on 119-10.

16  A.  Yes.

17  Q.  Says, "Yo, spoke to Tom."

18         Do you see that?

19  A.  Yes.

20  Q.  But this time Mr. Balabanian writes something different.

21  He writes, "More of the same except he gave me a heaping

22  helping of righteous indignation for me supposedly yelling at

23  him about this."

24         What did you understand that to mean?

25  A.  Well, it seemed like that he had talked to Girardi about

1  the funding and the clients being paid.  And Girardi yelled at

2  him in probably the same way that he had been yelling at me.

3  Q.  Mr. Balabanian says, "I didn't do anything of the sort.

4  He's sick of me calling him and frankly I'm sick of it myself.

5  He said he would have everything wrapped up this week,

6  including payment of our portion of fees.  I'm going to send

7  him and you an e-mail confirming.  If he doesn't get it done,

8  I'm going to have to file something with the Court."

9       First, did you ever get an e-mail from Rafey

10  Balabanian confirming the conversation?

11  A.  Did I get an e-mail from him?

12  Q.  Yes.  I believe he says, "I'm going to send you and him an

13  e-mail confirming."  Did you ever get an e-mail?

14  A.  I don't recall that.

15  Q.  Now, Mr. Balabanian writes, "If he doesn't get it done,

16  I'm going to have to file something with the Court."

17       At this point, did you have an interpretation that it

18  meant something other than what you previously testified?

19  A.  Yeah.  This, to me, sounds more like he's going to raise

20  the issue with this Court.

21  Q.  And how did you respond to Mr. Balabanian on August 24th?

22  A.  I thanked him for the update and apologized to him for

23  being in this position.

24  Q.  And what does that mean to you?

25  A.  Well, I guess I felt like he was kind of in the same

1  position that I was as far as having to deal with Girardi and

2  continually ask him to make the payments.

3  Q.  Would you say at this point in time that you and

4  Mr. Balabanian were working together to try and get

5  Mr. Girardi to pay the money?

6  A.  I would say so, definitely.

7  Q.  Do you feel like you and Mr. Balabanian were both trying

8  to find a way to get Mr. Girardi to pay the money?

9  A.  Yes.

10  Q.  You completely understood at that moment in time that not

11  paying clients is a bad thing?

12  A.  Absolutely.

13  Q.  It is something everybody knows is a disbarrable event,

14  yes?

15  A.  Yes, absolutely.

16  Q.  And you were working with Mr. Balabanian to make sure that

17  the clients got paid?

18  A.  Yes, I was.

19          THE COURT:  Well, his suggestion you file

20  something -- that he would have to file something in court,

21  did that prompt you to consider coming to the Court and saying

22  that the instructions of giving the money to the clients had

23  not been fulfilled?

24          THE WITNESS:  No, Your Honor, it didn't cause me to

25  think about coming to court.  Certainly, in hindsight, you

1  know, I wish I had made different decisions; but, at that

2  point in time, I didn't and I thought that this was Girardi's

3  issue to handle.

4          THE COURT:  Well, I know you said that earlier and

5  testified to that earlier, and I recall that testimony.  But

6  now that you have a prompting or at least a suggestion from

7  co-counsel that he might have to go to court, it didn't prompt

8  you to believe that that's something you should do if he

9  didn't do it?

10         THE WITNESS:  No.  I mean, I guess I would have

11  relied on, you know, his being local counsel and knowing what

12  the appropriate route to take would have been.  And if that's

13  what it was, then I'm sure that's -- that's what it was.

14         THE COURT:  All right.

15         Go ahead.

16  BY MR. SABA:

17  Q.  Okay.  If you could please turn to 119-12.

18         On September 3rd, you advised Mr. Balabanian, "he," I

19  assume you mean Mr. Girardi, yes?

20  A.  I'm sorry.  Where are you at?

21  Q.  119-12.

22  A.  Yes, sir.

23  Q.  Okay.  You wrote, "He sent a wire out this morning to them

24  for about half of their collective balance."

25  A.  Yes.

1   Q.   When you made that statement, did you mean Mr. Girardi had

2   paid the clients that other half settlement money that we

3   talked about earlier on September 3rd?

4   A.   Yes.

5   Q.   Okay.  You wrote, "I think the clients are fine for now."

6           Why did you write that?

7   A.   I believe that was based on some communication either by

8   phone or e-mail from George Hatcher.

9   Q.   What do you recall about that telephone conversation?

10  A.   I don't -- I don't recall much other than him indicating

11  that he thought the clients were fine for now, so I just

12  reported the exact same thing.

13  Q.   On September 3rd, did you have a telephone conversation

14  with Rafey Balabanian or just this text message?

15  A.   I believe just this text.

16  Q.   If we turn to the next page, that would be 119-13, this is

17  Mr. Balabanian's response.

18          Do you see that?

19  A.   Yes.

20  Q.   And he writes, "Yeah, and is he going to send proof of

21  that?  I mean, come on, Keith.  He's been giving me the

22  runaround every time I talk to him.  He hangs up on me" -- "he

23  hangs up on me the last time we talked and I'm supposed to be

24  satisfied that he paid the clients half of the balance due?

25  He owed them the money eight months ago.  And what about my

1  firm's fees?  He said those were getting paid alongside the

2  clients.  What assurance do we have that we're getting the

3  approximate $2.4 million we're owed?  You have to understand

4  why I'm done with this at this point.  He's leaving no choice

5  but to file a motion for an accounting.  You should tell him

6  that."

7       What did you understand a motion for accounting is?

8  A.  And I think that's why I said earlier that it was a civil

9  suit rather than what they ultimately ended up finding because

10 I remembered him asking for a motion for an accounting.

11 That's why I said that.

12 Q.  Did you speak with Mr. Girardi after receiving this text

13 message from Mr. Balabanian?

14 A.  I'm sure I did, but I don't specifically recall.

15 Q.  Mr. Balabanian sends a text message to you on

16 September 16th, says, "Hi, Keith, hope you're well.  Any

17 updates?"

18       If you turn to the next page on 119-014 -- I'm

19 missing a text.  Sorry.  119-14, "Hey, Rafey, same to you.

20 I'll check in with him tomorrow."

21       Do you see that?

22 A.  Yes.

23 Q.  Okay.  So Mr. Balabanian was wishing you well, yes?

24 A.  Yes.

25 Q.  And you wished him well back?

1    A.  Yes.

2    Q.  When you told Mr. Balabanian "I'll check in with him

3    tomorrow," what were you trying to convey?

4    A.  That I would check in with Girardi the next day and report

5    back to Mr. Balabanian.

6    Q.  And the next day you wrote a text to Mr. Balabanian and

7    said, "I'm on it.  He wasn't well today so he didn't get back

8    to me."

9          What did you mean that Mr. Girardi wasn't well today?

10    A.  Well, at some point during the year, he had had some eye

11    surgery, and it could have been around this time that he had

12    had that surgery.  I'm not exactly sure.

13    Q.  You then wrote, "He told our client liaison guy something

14    about Monday wire to the clients."

15          What did you know about that?

16    A.  I believe that would have been something that George

17    Hatcher would have told me, that Hatcher had communicated with

18    Tom and indicated that there was going to be a Monday wire.

19    Q.  So in addition to you and Mr. Balabanian trying to get

20    Mr. Girardi to pay, was it your understanding that Mr. Hatcher

21    was also trying to get Mr. Girardi to pay?

22    A.  Yes, he was.

23    Q.  Mr. Balabanian then writes back, "Were you able to speak

24    with him" on September 21st.

25          Do you see that?

1 A.  Yes, I see that.

2 Q.  Okay.  And if we turn the page to 119-15.  Whoops.  Sorry.

3 Let's go to the next page.  119-16.

4      Mr. Balabanian writes, "Hey, man, I'm sorry to say

5 this, but we're out of time.  I just spoke to Jay and he

6 flipped out at me that this isn't done.  He wants to file

7 something with the Court this week.  We should talk today or

8 tomorrow.  Hopefully you can connect with Tom before then."

9 And also -- excuse me.  "Also obviously getting the clients

10 paid has been our focus, but we've got to have something in

11 place guaranteeing our fees by a date certain.  Let me know

12 if/when you want to talk."

13      And you responded, "Okay, I will let him know."

14 A.  Yes.

15 Q.  Did you communicate this message from Mr. Balabanian to

16 Tom Girardi?

17 A.  I did.

18 Q.  And what did Tom Girardi say in response?

19 A.  I don't remember exactly, but it was most likely the same

20 story that he had told me before, that he was handling this,

21 he was taking care of it, he was the one speaking with Rafey

22 at this point.  That would be my best recollection.

23      THE COURT:  Did you ever tell Mr. Girardi that

24 Rafey -- or Mr. Balabanian had threatened at least in three

25 different texts to go to court, whether it was go to this

1  Court, whether it was go to some other court, but did you tell

2  him each time you had been told by Mr. Balabanian that there

3  was a threat that he may have to go to court?

4         THE WITNESS:  I did.

5         THE COURT:  Each time?

6         THE WITNESS:  Well, I know I referred to it in at

7  least one of the memos that I wrote.  I don't know if I did

8  each time.

9         THE COURT:  Did you get any reaction from

10 Mr. Girardi?

11        THE WITNESS:  None that I recall other than just

12 being frustrated with me.

13        THE COURT:  All right.

14        Go ahead.

15 BY MR. SABA:

16 Q.  What do you mean by being frustrated with you?

17 A.  Well, he was tired of me hassling him about paying the

18 funds and paying the money.  He basically told me to butt out

19 and he was handling it.

20 Q.  Was he cavalier about the situation?

21 A.  I don't recall him being overly concerned.

22 Q.  Let's turn to the next page, 119-17.

23        You wrote to Mr. Balabanian, "I'll touch base with

24 you today.  Nothing major new but just wanted to keep you up

25 to date."

**Griffin - Cross by Saba**

1    Were you being -- were you doing your best to keep

2  Mr. Balabanian up to date on all progress of communications

3  with Tom Girardi?

4  A.  Yes, I was.

5  Q.  If you look down to the bottom on September 28th, you

6  wrote, "Tom said he was calling to update you today.  Let me

7  know if he does."

8    Do you see that?

9  A.  Yes, I see that.

10 Q.  And then there's some exchanges about "Haven't heard from

11 him," and then you wrote to Mr. Balabanian, "Just asked him

12 again."

13    Did you speak with Mr. Girardi and tell him to call

14 Mr. Balabanian?

15 A.  It's not up on the screen, but if I had -- if I had

16 written that to Rafey Balabanian, then yes, I would have

17 spoken to him.

18 Q.  It looks like -- and we'll turn to the next page.  It will

19 be 119-20.  You wrote to Mr. Balabanian, "Did Tom call today?"

20    Do you see that?

21 A.  Yes.

22 Q.  And Mr. Balabanian responded -- there was a portion that's

23 blacked out, and that's because you and Mr. Balabanian were

24 talking about another case that you're working on together,

25 yes?

1   A.  Correct.

2   Q.  Okay.

3       MR. SABA:  And so those portions have been blacked

4   out because the parties have agreed that they are not relevant

5   to this proceeding, just so the Court knows.

6   BY MR. SABA:

7   Q.  Mr. Balabanian says, "Yes, we spoke.  I didn't want to

8   give him shit, so we had a nice conversation and he sent me a

9   funny letter afterward."

10      What did you understand a "nice conversation" to

11  mean?

12  A.  Well, I guess just not one where there was any yelling,

13  hanging up or storming off, that they had had a pleasant

14  conversation.

15  Q.  And then Tom Girardi sent a funny letter afterward.

16  You've seen this letter?

17  A.  I believe I have.

18  Q.  It's Exhibit 271-1.  You could blow that up a little,

19  please.

20      This is a letter dated September 30th to Rafey

21  Balabanian?

22  A.  Yes.

23  Q.  It says, "It was great talking to you.  This will confirm

24  that I will be better than Miracle on 34th Street."

25      What does that mean to you?

1    A.   Well, I think he was telling Mr. Balabanian that he was

2    going to be better than Santa Claus or something like that.

3    Q.   Let's go back to Exhibit 119-20.  Mr. Balabanian says, "He

4    sent me a funny letter afterwards which I'll forward.  Hoping

5    he gets it done, and I've gotten Jay to chill a bit."

6            What did you understand when Mr. Balabanian was

7    telling you, "I've gotten Jay to chill a bit"?

8                MR. WADE-SCOTT:  Objection.  Relevance.

9                THE COURT:  Overruled.

10               Go ahead.

11   BY THE WITNESS:

12   A.   It seems to suggest that Mr. Edelson, who had earlier been

13   upset, was now less upset.

14   BY MR. SABA:

15   Q.   And it didn't seem like the Edelson firm was going to run

16   to the Court any time soon?

17   A.   That's my understanding.

18   Q.   At any time did Rafey Balabanian suggest that there should

19   be a joint filing between you and him to this Court to tell

20   this Court that Mr. Girardi had not paid the fees?

21   A.   No.

22   Q.   At any time did Mr. Balabanian ever suggest to you that

23   you need to speak to ethics counsel or get counsel for your

24   own personal well-being?

25   A.   No.

1   Q.  To the best of your understanding, was Mr. Balabanian's

2   anger and frustration directed at Mr. Girardi, not at you?

3   A.  Yes.

4   Q.  Mr. Balabanian then writes, "The only thing I would ask is

5   that in the next week or so could you send me an e-mail or

6   letter just confirming the amount of fees that we stand to get

7   on the cases?"

8         Do you see that?

9   A.  Yes.

10   Q.  Was that -- what did you interpret that to mean?

11   A.  I don't know if it's on this page here, but I recall

12   getting that text and sending Mr. Balabanian a breakdown of

13   the fees.

14   Q.  They wanted to know how much money they were going to earn

15   from the Boeing Lion Air cases?

16   A.  Yes.

17   Q.  Okay.  If you turn to the next page, 119-21,

18   Mr. Balabanian sends another text on October 2nd that says,

19   "Can you work on getting me a statement of how much we're owed

20   on Boeing?"

21         Do you see that?

22   A.  Yes.

23   Q.  Mr. Balabanian wasn't asking about the payment to the

24   Boeing clients at this point, correct?

25   A.  That's correct.

1  Q.  And you responded, "Yes, I'll work on it over the

2  weekend."

3  A.  Yes.

4  Q.  And he said "Great," correct?

5  A.  Correct.

6  Q.  All right.  Let's go to the next page.  Sorry.  Not the

7  next page.  It's actually 119.  On October 6 -- I'm sorry.

8  There's a communication -- let's go to October 12th.

9        Now, at this point, by October 12th, you were

10  speaking with Mr. Balabanian about his firm's fees?  If you

11  look at the top of the page, it says, "Got the fee memo."

12  A.  Yes, I see that.

13  Q.  Okay.  And Mr. Balabanian asked, "One thing I'm sort of

14  confused about is how Lira's cases fit in."

15        Do you see that?

16  A.  Yes.

17  Q.  And then you responded, "Short story is that Lira took

18  those cases with him to his new firm."

19  A.  Right.

20  Q.  Do you see that?

21  A.  Yes.

22  Q.  "But he committed to paying Girardi Keese its fees and

23  Edelson its fees as the cases settled."

24        Do you see that?

25  A.  Yes.

1    Q.   So you and Mr. Balabanian in October, mid-October, are now

2    talking about the fees that are owed to his firm, not about

3    the plaintiffs, correct?

4    A.   That's correct.

5    Q.   On Election Day of 2020, did Erika Girardi file for

6    divorce against Tom Girardi?

7    A.   I believe that's true.

8    Q.   I would like you to take a look at the next page which is

9    119-26.  Mr. Balabanian writes to you, "Hey, man, any update

10   on Lion Air?  This divorce stuff is a little unsettling.  I

11   also spoke to Lira the other day about the four cases he

12   settled.  He says that he'd send half of what's owed to us on

13   those since you guys are getting and will owe the other half."

14          Did you understand what Mr. Lira was sending to

15   Edelson was the referral fee?

16   A.   Yes.

17   Q.   Or the split of attorneys' fees?

18   A.   Correct.

19   Q.   Okay.  That's not client money, correct?

20   A.   Correct.

21   Q.   You wrote back, "Hey, bud, let me get you a status on

22   Friday.  Some positive developments, but Girardi was having

23   eye surgery today, so need a couple of days to talk to him."

24          Do you see that?

25   A.   Yes.

**Griffin - Cross by Saba**

1   Q.  Let's turn to the next page which is 119-27.  And on

2   October -- I'm sorry -- looking at November 17th.  You say,

3   "Hey, man, just an update.  He's still at home.  Haven't been

4   able to speak to him."

5           So you're updating Mr. Balabanian, correct?

6   A.  Yes.

7   Q.  Now, this is the time period on November 17th where you

8   said that you have now consulted an ethics attorney, yes?

9   A.  That's correct.  Yes.

10  Q.  Now, you didn't tell Mr. Balabanian you consulted an

11  ethics attorney, correct?

12  A.  That's correct.

13  Q.  Why?

14  A.  Well, I guess I thought it was private.

15  Q.  You had told Mr. Balabanian that there were positive

16  developments, though?

17  A.  Yeah, the positive developments that I think I was

18  referring to was that Girardi was having a meeting with

19  Hatcher and was setting like a date certain to make a payment.

20  Q.  Okay.  So if you look on 119-29, November 20, 2020, you

21  wrote, "Waiting for a report from a meeting Tom had this

22  morning with the client representative."

23          Were you a part of this meeting?

24  A.  No.

25  Q.  Were you invited to the meeting?

1   A.   No.

2   Q.   Did Tom tell you what happened after this meeting --

3   excuse me -- did Mr. Girardi tell you what happened after this

4   meeting?

5   A.   No.

6   Q.   Did you communicate with Mr. Hatcher about what happened

7   at this meeting?

8   A.   Yes.

9   Q.   And what did Mr. Hatcher tell you?

10  A.   He told me that Tom had committed to paying the balance by

11  November 30th.

12  Q.   Now, by November 20th, you had now heard multiple

13  deadlines come and go, correct?

14  A.   Yes.

15  Q.   So what did you tell yourself?

16  A.   That if he did not make the payment that I was going to

17  resign from the firm.

18  Q.   I would like you to turn to Exhibit 310.

19       This is a memorandum that you prepared to Tom

20  Girardi?

21  A.   Yes.

22       MR. SABA:  Oh, this has got money in it.  Sorry.  Can

23  we put it on private?

24       THE COURT:  All right.  Put it on private.

25       MS. ROBIE:  Ryan, it's not up.

1        MR. SABA:  Sorry.

2   BY MR. SABA:

3   Q.  Do you see that?

4        MR. SABA:  It's confidential.

5        THE COURT:  Yeah, it's off the public screen; is that

6   correct, Emily?

7        THE CLERK:  Yes.

8        THE COURT:  The witness should be able to see it.

9        THE WITNESS:  I do see it.

10  BY MR. SABA:

11  Q.  This is a memorandum that you wrote to Tom Girardi?

12  A.  Yes.

13  Q.  And you advised Tom Girardi how much money they were owed?

14  A.  Yes.

15  Q.  And you also told him that he needed to pay interest?

16  A.  Yes.

17  Q.  And that the clients were demanding interest?

18  A.  Yes.

19  Q.  And how did you calculate that interest?

20  A.  Oh, I think I calculated 10 percent interest on -- on the

21  balance over how long it had been.

22  Q.  You then wrote, "If they do not receive their funds by

23  November 30th, they have indicated they are all filing bar

24  complaints and a criminal complaint with the DA's office.

25  This could not be more serious."

1   What were you trying to convey to Tom Girardi at this

2   point?

3   A.   That he had to pay the money, that it had been months now

4   that he had been promising to do it, and this was it.   You

5   know, he had to do it.

6            THE COURT:   Could you have sent this letter in April

7   when the first -- after the money had been settled -- sent

8   over by Boeing and these people weren't getting paid?

9   Anything that prevented you from sending a note like this to

10  Mr. Girardi?   This was as serious then as it was in November.

11  The only difference was six months or whatever number of

12  months of excuses from Girardi.   Was there anything preventing

13  you from telling him this was serious, couldn't have been any

14  more serious?

15           THE WITNESS:   No, there was nothing preventing me

16  from doing that, and I believe I did -- I had sent some memos

17  to him earlier on --

18           THE COURT:   You had.

19           THE WITNESS:   -- that said it was very serious.

20           THE COURT:   All right.

21           Go ahead.

22  BY MR. SABA:

23  Q.   Well, when you had oral discussions with Tom Girardi, did

24  you tell him how serious this situation was by not paying

25  clients and by violating a court order?

1    A.  I said that from day one when he said he was going to only

2    pay them half.

3    Q.  On -- I'm going to have you turn to the next page on

4    Exhibit 119.  I believe it's 30.

5          On November 29th -- now, this is the Sunday in which

6    you testified earlier that you spoke with Mohamed about

7    referring the clients to a legal malpractice attorney.  Okay?

8    A.  Yes.

9    Q.  You send a text message to Mr. Balabanian that says, "Hope

10   you had a good Thanksgiving.  I'll call you tomorrow with an

11   update on Boeing case," correct?

12   A.  Yes.

13   Q.  Did you have a conversation with Rafey Balabanian and

14   Jay Edelson on November 30, 2020?

15   A.  Yes.

16   Q.  What did you tell them?

17   A.  Well, I remember first Rafey called me and then patched in

18   Jay.  And I told them both that I did not think, and it was

19   already November 30th, that Girardi was going to live up to

20   his promise.  And so I had the day before spoken with Mohamed

21   Eltaher, or even that morning -- I don't recall if it was the

22   night before or earlier that morning -- about referring the

23   clients to a firm that could help them make claims and file a

24   lawsuit against Girardi Keese.

25   Q.  And how did Mr. Edelson respond?

**Griffin - Cross by Saba**

1   A.  Well, I also indicated that, you know, I could -- was

2   happy to put Mr. Edelson in touch with Mr. Finnerty at the

3   firm with respect to his attorney fees.  And he, you know, was

4   insulted somewhat that I had suggested that he needed help

5   collecting his fees and, you know, he was angry and shouting

6   at me, calling me a liar and, you know, told me there was a

7   nice portion in the lawsuit about me.

8           And then I said, "Listen, Jay, I'm not trying to have

9   a problem with you here.  Why don't you at least speak with

10  Finnerty."  And then I believe I sent him Finnerty's phone

11  number.

12  Q.  Why did you select Mr. Finnerty as the lawyer to refer the

13  clients to?

14  A.  Because he and his firm were representing another Girardi

15  client that hadn't been paid in suing Girardi Keese.

16  Q.  And that was an issue that had come up in 2020?

17  A.  Yes.

18  Q.  And do you have an opinion as to whether Mr. Finnerty was

19  friendly with Tom Girardi at this time?

20  A.  I do not believe they were friendly.  Mr. Finnerty did not

21  leave on good terms.

22  Q.  So Mr. Finnerty, in your opinion, had no problem suing Tom

23  Girardi?

24  A.  Correct.

25  Q.  And on November 30th, you wrote an e-mail to

1  Mr. Balabanian that says, "Just FYI, Finnerty said he called

2  you but it went to voicemail."

3          Did Mr. Finnerty communicate that to you?

4  A.  Yes.

5          THE COURT:  What did you know about the lawsuit that

6  Finnerty brought against Girardi Keese for a client not

7  getting paid?

8          THE WITNESS:  I learned late in the year that -- late

9  in 2020 that Finnerty's firm, the Abir Cohen firm, was

10 representing a client that had a dispute with Girardi about

11 funds.  I believe it was an issue with an investment issue

12 that Girardi had and underpaying on an investment.  I'm not

13 familiar with the facts of that case.

14         THE COURT:  You didn't learn of that until late 2020?

15         THE WITNESS:  Correct.

16         THE COURT:  You had no idea there was a lawsuit

17 brought by a client against Girardi Keese relating to some

18 dispute about not getting paid?

19         THE WITNESS:  I don't believe I knew about that until

20 the fall of 2020.

21         THE COURT:  All right.

22         Go ahead.

23         MR. SABA:  Okay, Your Honor.  I'm almost done.  I

24 have some cleanup questions to do.

25         THE COURT:  You want five minutes?

1    MR. SABA:  No.

2    THE COURT:  Go ahead.

3    MR. SABA:  I would rather go.

4    THE COURT:  Ask your questions.

5    MR. SABA:  Okay.

6  BY MR. SABA:

7  Q.   In the December 14, 2020, hearing, Jay Edelson said to

8  this Court that the Edelson firm did not have the authority to

9  reach out and communicate with Boeing about the settlements.

10         Did you ever tell anyone at the Edelson firm that

11  they could not communicate with Boeing?

12  A.   No.

13  Q.   Is that accurate at all, that Edelson did not have

14  authority to communicate with Boeing about the settlements?

15  A.   That is not accurate.

16  Q.   Did Ari Scharg ever communicate with Boeing to the best of

17  your knowledge?

18  A.   He did so regularly.

19  Q.   And what was Ari Scharg communicating with Boeing about?

20  A.   He was communicating with them about the settlements, the

21  releases, the minors' compromises, that kind of thing.

22  Q.   Switching to a different topic, did you ever prevent

23  Mr. Girardi from making -- issuing the wires to the clients?

24  A.   No.

25  Q.   Did you ever tell anybody at -- like Mr. Kamon, don't send

1    wires to these plaintiffs?

2    A.   No.  I did the opposite.

3    Q.   On December 2, 2020, did the Edelson firm file a lawsuit

4    against you personally?

5    A.   Yes, they did.

6    Q.   And the Edelson lawsuit that is in Judge Kennelly's

7    courtroom in this building, that alleges that you are to pay

8    the Edelson firm attorneys' fees for the Lion Air cases; is

9    that correct?

10   A.   Yes.

11   Q.   And then we talked about your job earlier, but just so

12   we're clear on the record, were you ever an equity partner at

13   Girardi & Keese?

14   A.   No.

15   Q.   Were you ever listed on the website as a partner?

16   A.   No.

17   Q.   Did you ever attend any partnership meetings?

18   A.   No.

19   Q.   Did you ever have any control over the day-to-day finances

20   of the firm?

21   A.   No.

22   Q.   Did your business card ever identify you as a partner?

23   A.   No.

24   Q.   I would like you to turn to Exhibit 315, please.

25            315 is labeled Partnership Agreement, and the last

1    sentence of the first paragraph says, "The partners in this

2    agreement are as follows:  Tom Girardi, solely, 100 percent.

3    And the partnership will be known as Girardi Keese."

4           Was it your understanding the entire time you worked

5    at Girardi & Keese that Tom Girardi owned 100 percent of

6    Girardi & Keese?

7    A.  Yes.

8    Q.  At any time did you ever have the knowledge that Tom

9    Girardi had the intent to steal the Lion Air money?

10   A.  No.

11          MR. SABA:  Your Honor, at this time, I would request

12   that we have an *in camera* or off the public view conversation

13   with Mr. Griffin.  His part of the affirmative defense of

14   impossibility is the present inability to pay, and I would

15   like to present evidence to this Court of Mr. Griffin's net

16   worth.

17          THE COURT:  He can present a -- something in writing

18   and put it under seal.

19          MR. SABA:  Okay.

20          THE COURT:  That's just as easy and I think probably

21   allows him to be more complete with it and allows you to

22   review it before it's filed, but I'm -- I would be satisfied

23   with that, under seal, but accessible by attorneys from all

24   three sides.

25          MR. SABA:  Very good.  I just want to make sure it

Griffin - Cross by Saba

1    gets into the record for your consideration.

2              THE COURT:  No, I was going to ask him myself, and I

3    realized the more efficient way to do it is have him prepare

4    something that is in writing or you submit something that he

5    affirms.

6              Okay.  Any other questions?

7              MR. SABA:  Last question.

8              THE COURT:  Go ahead.

9    BY MR. SABA:

10   Q.  Mr. Griffin, if you could say anything to the plaintiffs

11   of the clients of the ex-Girardi law firm, what would you say

12   to them now?

13   A.  Well, I'm obviously angry, distraught, and disappointed

14   not only that they've had to endure the tragedy that they did

15   but to have it magnified by the way their case was handled.

16   I'm very sorry to them.  And I'm, quite frankly, angry that

17   Mr. Girardi is not here to answer these questions and answer

18   for what he has done.  That's what I would say.

19             MR. SABA:  Thank you, Your Honor.

20             No further questions at this time.

21             THE COURT:  Ms. Matthai, any questions?

22             MS. MATTHAI:  I do not have any.

23             THE COURT:  Any redirect?

24             MR. WADE-SCOTT:  No, Your Honor.

25             THE COURT:  Sir, you're excused.  Thank you.

Lira - Direct by Tievsky

239

1          THE WITNESS:  Thank you, Your Honor.

2          THE COURT:  Okay.  I would like to use time -- who

3     are you calling next?

4          MR. WADE-SCOTT:  We'll call David Lira next.

5          THE COURT:  Let's get started.  I would like to use

6     the time efficiently.  You came from California.  So let's go

7     off the record.

8        (Off the record.)

9          THE COURT:  Sir, please raise your right hand.

10       (Witness sworn.)

11            DAVID RICHARD LIRA, WITNESS, DULY SWORN,

12                      DIRECT EXAMINATION

13    BY MR. TIEVSKY:

14    Q.  If you could state your name for the record, sir.

15    A.  Yes, David Richard Lira.

16    Q.  You've been licensed to practice law in California since

17    June 1988?

18    A.  That's correct.

19    Q.  Have you worked -- did you work at Girardi Keese starting

20    in June 1988?

21    A.  No.

22    Q.  When did you start working at Girardi Keese?

23    A.  January 1999.

24    Q.  And were there any gaps in your employment at Girardi

25    Keese between then and when you left in June 2020?

Lira - Direct by Tievsky

240

1    A.   No.

2    Q.   When you left in June 2020, what was your position at

3    Girardi Keese?

4    A.   I was an employee, trial lawyer.

5    Q.   Did you have a title?

6    A.   No.

7    Q.   Were you a partner?

8    A.   No.

9    Q.   Have you ever represented to anyone that you were a

10   partner at Girardi Keese?

11   A.   I have not.

12   Q.   Have you ever represented to a bank that you are a partner

13   at Girardi Keese?

14   A.   I remember signing a signature card with one of the banks

15   and it said a general partnership.

16   Q.   I'm showing you what's been marked as Exhibit 150.

17        Do you recognize this document, Mr. Lira?

18   A.   Yes, I do.

19   Q.   And in the lower right-hand corner on 150-1, is that your

20   signature?

21   A.   It is.

22   Q.   Scrolling to the next page here --

23        MR. TIEVSKY:  Sorry.  This should be confidential if

24   it's not.  I'm sorry.  I thought the cameras were off.

25        THE COURT:  We won't put this on the public feed

**Lira - Direct by Tievsky**

 1   because it looks like personal information on there.

 2            MR. TIEVSKY:  There it is.

 3            THE COURT:  All right.

 4   BY MR. TIEVSKY:

 5   Q.  In the upper left-hand corner there, that's your name,

 6   correct?

 7   A.  Yes.

 8   Q.  And below that, the word "partner" is written; is that

 9   correct?

10   A.  That's correct.

11   Q.  You saw this before you signed on the previous page?

12   A.  I don't recall.

13   Q.  Moving to page 150-4, you'll see a line there that says C.

14   That is your name, David R. Lira, followed by the word

15   "partner", correct?

16   A.  Correct.

17   Q.  And next to that is your signature, correct?

18   A.  Correct.

19   Q.  At the bottom of the page, you see your name, David R.

20   Lira, correct?

21   A.  That's correct.

22   Q.  And at the bottom of that page, there's your signature

23   again, correct?

24   A.  Yes.

25   Q.  You were also designated to take over at least part of the

1  firm's portfolio if Mr. Girardi couldn't run it anymore,

2  right?

3  A.  If I could take over it?  I'm sorry?

4  Q.  At least part of the firm's portfolio of cases if

5  Mr. Girardi was unable to, correct?

6  A.  Yeah, the cases that were secured as collateral by a

7  lender in the event Mr. Girardi didn't show up for work on

8  Monday, I was the person they were to contact to handle the

9  cases.

10  Q.  So would you say that you were second in command at the

11  firm?

12  A.  No, not at all.

13  Q.  But you were the one lawyer designated to take everything

14  over at least as far as those case -- those secured cases were

15  concerned?

16  A.  That's correct.

17  Q.  Let's see.  Turning now to the Lion Air cases we've been

18  discussing.  You're a member of the bar of this court also,

19  correct, Mr. Lira?

20  A.  I really don't know that.  I got to be honest with you.

21  Q.  You don't remember if you swore an oath as an attorney and

22  counselor of the bar of the United States District Court for

23  the Northern District of Illinois?

24  A.  I know you showed a document to Mr. Griffin, and I have no

25  recollection of signing that document.

1  Q.  That's not the document I'm talking about, Mr. Lira.

2  That's a state court document.  I'm talking about whether

3  you're a member of the general bar of this court.

4  A.  I think so.

5  Q.  You think so, but you're not sure?

6  A.  No.

7  Q.  You don't remember joining the bar of this court in

8  October of 2019?

9  A.  I'm not disputing that.  I just don't have the document in

10  mind.

11  Q.  You represented victims of the Lion Air Flight 610 crash,

12  correct?

13  A.  That's correct.

14  Q.  And you represented them in connection with their cases

15  before this Court, right?

16  A.  That's correct.

17  Q.  So you represented Ms. Anice Kasim?

18  A.  True.

19  Q.  Ms. Dian Daniaty?

20  A.  Absolutely.

21  Q.  Bias Ramadhan?

22  A.  Yes.

23  Q.  And Septiana Damayanti?

24  A.  Yes, and others.

25  Q.  And others, but focusing on those four for now.

1   A.   Sure.

2   Q.   You represented all four of those at the time they settled

3   their cases with Boeing, right?

4   A.   Yes.

5   Q.   So let's discuss the process of finalizing the

6   settlements.  The settlement families, they had to sign

7   releases?

8   A.   Among other things.

9   Q.   And after those releases were signed, motions to approve

10  the settlement and dismiss the cases were filed here in this

11  Court, right?

12  A.   That was part of a multifactor process, correct.

13  Q.   But you understood for those four cases that orders needed

14  to be entered to approve the settlements, right?

15  A.   Because minors were involved, yes.

16  Q.   And you were aware of each of those orders around the time

17  it was entered?

18  A.   I remember receiving notification from Mr. Scharg that

19  they had been approved, yes.

20  Q.   Do you remember when?

21  A.   My best recollection would have been around February, late

22  February of 2020.

23  Q.   So by late February 2020, you were aware that the Court

24  had entered orders with respect to the distribution of the

25  settlement funds in those four cases?

**Lira - Direct by Tievsky**

1   A.   That's correct.

2          THE COURT:  And not to interrupt, but I am about to,

3   I didn't ask Mr. Griffin about Multi Rizki, Mr. Multi, nor did

4   I ask -- nor has it been asked here of this witness.  I may

5   recall Mr. Griffin on that subject, but cover it in your

6   questions, or Ms. Matthai, in yours.  If these attorneys had

7   no involvement in that, so be it.  If they did, I would like

8   to know what the involvement is, and that can come up either

9   by the cross-examination or your direct examination when you

10  get to it likely tomorrow.

11         Similarly, with Mr. Griffin, if there's no

12  involvement, you could put him on and you can ask questions

13  about that.  But no fault of anyone, but it didn't come up and

14  I do want to have it covered.

15         Go ahead.

16  BY MR. TIEVSKY:

17  Q.   I will ask, you represented Mr. Multi also?

18  A.   Yes.

19  Q.   I'm showing you, once again, confidential Exhibit 109.

20         You see the bold amount there written on that page?

21  A.   Yes.

22  Q.   To your knowledge, at the time that you left Girardi

23  Keese, had this full amount been wired to Ms. Anice?

24  A.   No.

25  Q.   How did you know?

1   A.   Through the various e-mails that I were copied on from

2   Mr. Griffin, Mr. Hatcher, it was apparent they had only been

3   wired half their money on or about May 12, 2020.

4   Q.   And you knew that, the same thing for -- for Ms. Dian,

5   Ms. Septiana, and Mr. Bias, correct?

6   A.   All four, that's correct.

7   Q.   All four.  You also knew that those four cases had been

8   fully funded by the end of March 2020, right?

9   A.   No doubt.

10  Q.   So in April 2020, you communicated directly with all four

11  of those clients, right?

12  A.   I remember I was suddenly on a string of e-mails from the

13  clients in April, and then when I would get an inquiry

14  directly, I would respond.

15  Q.   I'm showing you here Exhibit 131.  This is an e-mail you

16  sent to Mr. Bias, Ms. Septiana, Ms. Dian, and Ms. Anice,

17  correct?

18  A.   That's correct.

19  Q.   What prompted you to send this e-mail?

20       THE COURT:  This could be on the public feed.

21  BY THE WITNESS:

22  A.   What prompted me?  There was an inquiry from the client

23  that they hadn't received any of their monies, and I was

24  trying to answer their question.

25  BY MR. TIEVSKY:

1    Q.  So reading this e-mail now, are there any statements in it

2    that aren't true?

3    A.  No, it's correct.

4    Q.  Sorry?

5    A.  It's correct.  You asked me if it's untrue?

6    Q.  I'm asking you if there are any statements in this letter

7    that are not true?

8         THE COURT:  By "letter," you're talking about the

9    April 18 --

10        MR. TIEVSKY:  This e-mail, 131-1.

11        THE COURT:  Okay.

12   BY THE WITNESS:

13   A.  No, there's nothing in it that's not true.

14   Q.  It's missing some information, though, isn't it?

15   A.  What do you mean?

16   Q.  Well, at the time you sent this e-mail, you knew that the

17   clients' funds had been sent from Boeing to Girardi Keese or

18   from Perkins Coie to Girardi Keese, right?

19   A.  Yes, through the end of March.

20   Q.  But you didn't mention that?

21   A.  I didn't feel I needed to.

22   Q.  Did you tell them at any point that Girardi Keese had

23   received their funds?

24   A.  They had signed closing statements.  They -- I -- they had

25   signed the release which required the funding of the

**Lira - Direct by Tievsky**

1    settlements within 30 days of delivery of those releases.

2    Q.   Sure.  But did you tell them it actually happened?

3    A.   No.  Did I say, "Hey, we actually have your money"?  No.

4    But I'm implying that through that -- that note.

5    Q.   Neither of these clients are native English speakers,

6    right?

7    A.   No, that's why I had an interpreter liaison to communicate

8    for me.

9    Q.   But this e-mail is in English?

10   A.   Yeah, that's what's interesting.  I think this is a

11   WhatsApp.  A lot of them did speak English and didn't have a

12   problem.  There were certain of the plaintiffs that lived in

13   remote islands that could not communicate in English or had

14   the technology.  So that's when I used a liaison to

15   communicate with those individuals.

16   Q.   Did you communicate with any of these four clients via

17   WhatsApp?

18   A.   No.

19   Q.   This is an e-mail, right?

20   A.   It looks like it.

21   Q.   When you sent this e-mail, you intended for the clients to

22   believe that their funds had not yet wired because of

23   pandemic-related delays, right?

24   A.   Well, I made inquiries when I first received notice of an

25   inquiry, which was April 13th from Ms. Anice, and then that's

1    when I would communicate with Mr. Kamon, "Are the wires out

2    yet?"  And I would get a response maybe a few days later after

3    an inquiry.

4    Q.   When you say you made inquiries, what does that mean?

5    A.   "Hey, has the wires been made?"

6    Q.   Okay.  But you didn't ask why they hadn't been when you

7    were told no presumably?

8    A.   No, I asked them, "Have the wires gone out?"  And no,

9    they're working on it.

10   Q.   What is there to work on?

11   A.   Well, I don't know.  I made the inquiry, and that was the

12   response that I received.

13   Q.   Moving down here to page 131-007.  You see that this is an

14   e-mail starting at the top of what's visible right now,

15   starting with from Septiana on April 20, this is 1:09 a.m.,

16   this is an e-mail you received from Ms. Septiana, right?

17   A.   Yes.

18   Q.   You responded to this e-mail, right?

19   A.   I think that's my response below.  Oh.

20   Q.   Right here above in the blue text is your response, right?

21   A.   Yes.

22   Q.   Your response says, "We are still under the government

23   mandate to stay at home.  The governor has hinted at reopening

24   the economy by May 15th.  We will endeavor to wire funds by

25   early May, if not sooner.  I hope you and your families are

Lira - Direct by Tievsky

1  well.  David."

2  A.  Yes.

3  Q.  What was your basis for saying, "We will endeavor to wire

4  funds by early May, if not sooner"?

5  A.  That's what I was told by Mr. Kamon and confirmed by

6  Mr. Girardi.

7  Q.  Did either of them offer a reason why early May would be

8  the time to wire the funds?

9  A.  They did not.

10  Q.  Do you know if other Girardi Keese clients were getting

11  paid at this time?

12  A.  Yea, I believe so.

13  Q.  So if other Girardi Keese clients were getting paid, why

14  would these monies be delayed?

15  A.  I don't know the answer to that.

16         THE COURT:  Were you getting paid by wire transfer?

17         THE WITNESS:  Yes, a payroll service.

18         THE COURT:  All right.  And you understood that even

19  under a stay-at-home order, businesses were operating

20  electronically; is that correct?

21         THE WITNESS:  Absolutely.

22         THE COURT:  And were you working from home?

23         THE WITNESS:  Yes, for the most part.  I would go to

24  the office quite often for a couple of hours, grab things, and

25  go home.

1          THE COURT:  All right.  When did Mr. Kamon tell you

2    in response to -- as I understand the sequence, you got a

3    call -- you got an e-mail from a client asking where is the

4    money, in essence.

5          THE WITNESS:  Yes.

6          THE COURT:  And you answered that the -- about the

7    stay-at-home order, the pandemic, we'll wire funds in early

8    May, if not sooner.  And that statement you say is based on

9    what Mr. Kamon and Mr. Girardi told you?

10          THE WITNESS:  Yes.

11          THE COURT:  All right.  Were these face to face or

12    e-mail or phone?

13          THE WITNESS:  It would be face to face with

14    Mr. Girardi, and I think with Mr. Kamon I would leave a

15    message and say "Call me."  I don't remember him being at the

16    office at all --

17          THE COURT:  Okay.

18          THE WITNESS:  -- during the bulk of that time.  And

19    then he would call me on his cell phone.

20          THE COURT:  And what did Mr. Kamon tell you -- well,

21    give me the sequence of who talked to who and when.

22          THE WITNESS:  Yeah.  Sure.  When I would -- started

23    to get these inquiries in late April, I would talk to Tom and

24    then I would call Chris.  And the way it was always handled

25    was Chris would say, "The wires are ready to go.  I'm just

1  waiting for Tom to give me the okay."  And then I would say,

2  "When is that going to happen?"  And then there's usually I

3  would have to follow up with Tom.

4       At some point I got the answer that they were going

5  to initiate these wires in early May.  And that's what I

6  communicated to the clients.

7       THE COURT:  Was that an answer given to you by

8  Mr. Girardi or by Mr. Kamon?

9       THE WITNESS:  Mr. Kamon.

10      THE COURT:  All right.  What did Girardi tell you

11 when you told him clients are asking for their money?

12      THE WITNESS:  He said, "I'm going to take care of

13 it."

14      THE COURT:  All right.  Did you find it odd that as

15 of -- the funds would be wired in early May when Boeing gave

16 you the funds when?  When did you understand Boeing gave you

17 the funds?

18      THE WITNESS:  March 4, 11, 27, and 30.

19      THE COURT:  All right.  So you've got a month and a

20 half between the time Boeing gave you the money and the time

21 that Girardi promised there would be payments to them.

22      You've been practicing how many years?  30?

23      THE WITNESS:  32 years.

24      THE COURT:  All right.  You understand that money

25 given to you by a defendant in a personal injury case needs to

**Lira - Direct by Tievsky**

1   be put in an escrow account.

2          THE WITNESS:  In a trust account.

3          THE COURT:  In a trust account or escrow account.

4          Did it seem odd to you there would be a delay in

5   paying money that was slotted to be paid to the plaintiffs in

6   this case?

7          THE WITNESS:  Yeah, I didn't think there was a reason

8   to delay paying them, and the pandemic certainly was.  That's

9   why I raised that with them.

10          THE COURT:  Well, but by raising it, did you push

11   back on the response?  The pandemic didn't have anything to do

12   with money being delayed a month and a half.  Do you agree

13   with that?

14          THE WITNESS:  Yeah, absolutely.

15          THE COURT:  All right  did you tell that to Girardi

16   and say, "What's up?"

17          THE WITNESS:  Yeah, get them paid.  It's funded.  And

18   there's more cases and settlements coming in.

19          THE COURT:  And when did he tell you that?

20          THE WITNESS:  This would have been before my response

21   on April 23.

22          THE COURT:  All right.  Were you alarmed that there

23   had been a month-and-a-half lag between funding and even a

24   promise to pay?

25          THE WITNESS:  I wouldn't use the word "alarmed."

**Lira - Direct by Tievsky**

1   There was a delay, but I was confident they would get the

2   wires out, and they told me they would.

3           THE COURT:  Had this occurred in the past in your

4   experience at Girardi Keese where there had been delays

5   between the funding of a settlement or verdict and the payout

6   to the clients?

7           THE WITNESS:  The only -- the only case I remember

8   where there was a delay, it was because there was an MSA

9   issue, a Medicare set-aside issue, and multiple Medi-Cal, and

10  the client wasn't happy enough with the speed of the delivery

11  of the settlement.  That's the one case I remember out of

12  thousands.

13          THE COURT:  So out of thousands, this is the only one

14  as far as you know where you had a delay of -- at this stage

15  of a month and a half?

16          THE WITNESS:  As far as I'm aware, that's correct.

17          THE COURT:  All right.  And that didn't -- you heard

18  Mr. Griffin viewed you as someone at least as a more

19  experienced attorney.

20          THE WITNESS:  Yes.

21          THE COURT:  This was your father-in-law, correct?

22          THE WITNESS:  Yes.

23          THE COURT:  Did you push back and say "that's

24  ridiculous"?

25          THE WITNESS:  I did push back.  And as time went on,

1   it got very contentious.

2        THE COURT:  Well, pushing back now before it's

3   contentious, for the first month and a half, did you push

4   back?

5        THE WITNESS:  Yeah, I said they had to be paid and

6   all the wires are completed, the instructions, the

7   allocations.  There was nothing to do other than authorize the

8   wire, and that's what I was waiting for.

9        THE COURT:  All right.  How frequently did you tell

10  him he needed to authorize the wire?  Mr. Kamon apparently

11  said it's ready to go as soon as Tom Girardi says it can go.

12       THE WITNESS:  I spoke with Tom directly at least five

13  to seven times.

14       THE COURT:  By "directly," is that face to face or

15  over the phone?

16       THE WITNESS:  Absolutely.

17       THE COURT:  Face to face?

18       THE WITNESS:  Yes.

19       THE COURT:  And the response?

20       THE WITNESS:  It depended on the conversation.  The

21  first conversation I remember with Mr. Girardi, but I want to

22  put it into the proper context.  This is when I received

23  notice they had been wired only half.  I went down -- and also

24  when I learned that they were only wired half, then I saw the

25  letters where Tom is saying that there's a tax issue, where

1    I'm talking --

2            THE COURT:  We'll get to those.  I'm looking at your

3    answer to Septiana and on April 23rd saying you're under a

4    government mandate to stay home.  We will endeavor to wire

5    funds by early May if not sooner.

6            What were your conversations with Girardi before that

7    e-mail was sent out?

8            THE WITNESS:  I said Tom, the wires are ready to go.

9    Chris has acknowledged the wire instructions.  Let's get them

10   out and finish these cases.

11           THE COURT:  All right.

12           Continue with your questioning.  Sorry to hijack it.

13           MR. TIEVSKY:  No, that's fine, Your Honor.  I'd like

14   to ask a question about one of the answers that Mr. Lira gave.

15           THE COURT:  Go ahead.

16   BY MR. TIEVSKY:

17   Q.  Mr. Lira, you mentioned that you were aware of one case in

18   which payment had been delayed.  Which case was that?

19   A.  That was -- and it's referenced in the e-mail from

20   Mr. Hatcher.  It's the Blythe case.

21   Q.  Yeah.  Let's jump to that for a moment.  I'm looking at

22   169-004 on the middle of the page here.  Mr. Hatcher says,

23   "Reminds me of the letter in the Blythe case," right?

24   A.  Yes.

25   Q.  Now, the letter that he's saying -- he's reminded of, we

**Lira - Direct by Tievsky**

1  haven't seen yet, but the letter you've attached to the e-mail

2  is one that contains lies, right?

3  A.  I don't remember seeing a letter that he's referencing.

4  Q.  But you respond "Indeed."

5  A.  No, I'm responding to, quote, "Bias reads this and Tom

6  won't know how to put out the fire."  And I said "Indeed."

7  Q.  So you have no idea what letter Mr. Hatcher is talking

8  about?

9  A.  That's correct.

10  Q.  You sent Mr. Hatcher a letter in which Tom Girardi tells

11  lies, right, a draft of a letter?

12  A.  Yes.

13  Q.  And you receive a communication back from Mr. Hatcher that

14  says it reminds him of a letter in another case, right?

15  A.  Apparently.

16  Q.  And you have never heard of the letter that he's referring

17  to?

18  A.  That's correct.  In that Blythe case, I was a

19  court-appointed lead attorney representing 55 passengers.  Our

20  firm had about 12 of them.  And I cannot remember or I don't

21  recall ever seeing a letter as referenced by Mr. Hatcher.

22  Q.  One of your clients in that case was Cesar Castillo,

23  right?

24  A.  Yes.

25  Q.  When did Mr. Castillo get paid his settlement money?

**Lira - Direct by Tievsky**

1  A.  I don't recall.  I don't recall the year of the case.

2  Q.  You don't recall the year of the case?

3  A.  No, I don't.

4  Q.  Would it surprise you if the settlement funds came in in

5  October 2019?

6  A.  It was an allocation.  It was a global settlement, and it

7  had to go through an allocation process.  So I believe you if

8  you're representing the date of the settlement.

9       MR. TIEVSKY:  So I'm about to show a document that it

10  does contain confidential information.

11       THE COURT:  Okay.

12  BY MR. TIEVSKY:

13  Q.  Showing you what's been marked as Exhibit 152.  This is a

14  Torrey Pines Bank statement ending March 31, 2020, right?  Is

15  that what that is?

16  A.  Yes, it's a bank statement.

17  Q.  And you know that Torrey Pines Bank is where Girardi Keese

18  had its client trust account?

19  A.  At one time, yes.

20  Q.  It's an IOLTA account?

21  A.  Yes.

22  Q.  And what's an IOLTA account?

23  A.  Interest only lawyer trust account.

24  Q.  And we'll get into the specifics of this account a little

25  bit later, but you were a signer on this account, right?

**Lira - Direct by Tievsky**

1  A.  Yes, I was.

2  Q.  Directing your attention to 152-010.  We're going to look

3  at the bottom of the page here.  You see check 125035 in the

4  bottom left?

5  A.  Yes, I do.

6  Q.  That's a check to Cesar Castillo from the Blythe bus crash

7  case, correct?

8  A.  That's correct.

9  Q.  The date on this check is 3/11/2020, right?

10  A.  Yes.

11  Q.  Did you sign this check?

12  A.  Yes, I did.

13  Q.  And so at the time you signed this check, did you know

14  when the money for the Blythe bus crash case had come in?

15  A.  I don't recall as I sit here.

16  Q.  But you said the delay in that case was fully justified?

17  A.  No, I'm not suggesting that.  There was a process because

18  of Medi-Cal liens and other issues pertaining to Mr. Castillo

19  that had to be dealt with.

20  Q.  Did this check come from Mr. Castillo's own money?

21  A.  Pardon me?

22  Q.  Did this check come from -- as in the money that you sent

23  to Mr. Castillo, did it belong to Mr. Castillo?

24  A.  I believe so, yes.

25  Q.  We'll get back to that.

Lira - Direct by Tievsky

1    THE COURT:  I think your question is was that money

2    from the actual payment by the defendants to the --

3    THE WITNESS:  I assume so, yes.

4    THE COURT:  All right.

5    BY MR. TIEVSKY:

6    Q.  So turning back now to -- back now to Exhibit 1 -- let me

7    close the -- turning back now to Exhibit 131 which -- which

8    can be public.

9    The next two e-mails above your response in blue are

10   both from Septiana, right?

11   A.  That's correct.

12   Q.  Did you respond to either of these e-mails?

13   A.  I don't recall.

14   Q.  The next e-mail above that is also an e-mail from

15   Ms. Septiana, correct?

16   A.  Yes.

17   Q.  Do you recall receiving any -- this e-mail I'm showing

18   from Ms. Septiana here from May 8th at 131-005 to 006, are

19   either of two e-mails below that on 131-006?

20   A.  And what's your question?  I'm sorry.

21   Q.  Do you recall receiving any of these three e-mails?

22   A.  I'm not disputing I did not.  I just don't recall them at

23   this time.

24   Q.  You don't recall receiving this poem from Ms. Septiana?

25   A.  I remember the poem.

1  Q.  You remember the poem?

2  A.  Yeah.

3  Q.  Did you respond to the poem?

4  A.  No.

5  Q.  Moving up, there's another e-mail from Ms. Septiana dated

6  May 11, 2020, correct?

7  A.  Yes.

8  Q.  This e-mail says, "As like David said, the wire funds will

9  endeavor by early May and now in the second week of May, we

10  hope the funds can transfer no later than May 15th as like

11  mail from David."

12         Do you see that?

13  A.  Yes.

14  Q.  Did you respond to this e-mail?

15  A.  Yes, I believe I told her or the other plaintiffs that the

16  wires have been made.

17         THE COURT:  Where is that e-mail?

18         THE WITNESS:  I think I saw it earlier today and in

19  my review from --

20         THE COURT:  Oh, I see.  This is -- you told her that

21  the wires had been made and that's when she notices it's half.

22         THE WITNESS:  That's correct.

23         THE COURT:  All right.  When you sent the e-mail -- I

24  don't know if we have it in front of me.  When you sent it

25  telling her the wires had been made, did you tell her she's

Lira - Direct by Tievsky

1   getting half?

2           THE WITNESS:  No, I thought she was getting the full

3   amount.

4           THE COURT:  Okay.

5   BY MR. TIEVSKY:

6   Q.  Your testimony is that you thought she was getting the

7   full amount?

8   A.  Absolutely.

9   Q.  And you thought that on May 11, 2020?

10  A.  Yes.

11  Q.  Okay.  I'm turning your attention to Exhibit 164.  This is

12  an e-mail that you received from Keith Griffin on May 6, 2020,

13  correct?

14  A.  That's correct.

15  Q.  This e-mail says --

16          MR. WADE-SCOTT:  This one should not be public.

17          MR. TIEVSKY:  Excuse me.  This one should not be

18  public.

19          Thank you, Eli.

20  BY MR. TIEVSKY:

21  Q.  This e-mail said, "Tom told me we should wire 50 percent

22  of the client funds for the four cases in trust and advise

23  clients that the remaining 50 percent would be wired in 14

24  days."

25          You received this e-mail on May 6, 2020?

Lira - Direct by Tievsky

1   A.  Yes.

2   Q.  You read this e-mail?

3   A.  I did.

4   Q.  What basis did you have to believe that the full amount of

5   the funds would be sent to the clients?

6   A.  I made an inquiry.  I said, "You're only sending half?"

7   And then I left a message for Mr. Kamon, and the next response

8   I get was the client e-mailed that we only received half of

9   the monies.

10  Q.  Let's step back to your inquiry.  What do you mean when

11  you said you made an inquiry?

12  A.  I said, "Chris, call me."

13  Q.  Okay.  So you called Chris.  What day was that?

14  A.  When I got this e-mail on May 6th, or when I responded.  I

15  don't know when -- I made the inquiry and there was no

16  response to my inquiry, so that's when I placed the call.

17  Q.  And when did Mr. Kamon call you back?

18  A.  I don't remember.

19  Q.  Okay.

20  A.  I don't know if he did, but I remember receiving the

21  e-mail from a client around May 12th that they only received

22  one-half.

23  Q.  Okay.  So I'll ask you, you don't remember if Mr. Kamon

24  called you back?

25  A.  Not as I sit here.

1   Q.  So what basis did you have to believe that somehow the

2   plan had changed from half the money to all the money?

3   A.  Well, I didn't know, and that's why I was making the

4   inquiry.  "Please respond.  Why are you only sending half

5   out?"

6   Q.  But you testified a moment ago that you believed the full

7   amount was going out?

8   A.  That was my belief and hope, yes.

9   Q.  Hope is different than belief, Mr. Lira.  I'm asking you

10   what basis did you have to believe, not hope, that all of the

11   money was getting wired on that day?

12   A.  Because all the wire information was provided in the

13   closing statements.  The monies had been funded.  So it was my

14   expectation that they would be wired the full amount.

15   Q.  I'm showing you what's been marked Exhibit 165.  I am

16   going to show the confidential portions of this document.

17          You received this e-mail, correct?

18   A.  Yes.

19   Q.  On May 11, 2020?

20   A.  I assume so.  I don't recall it.

21   Q.  And you received these attachments?

22   A.  I -- I do not recall having received these attachments.

23   Q.  Do you have any reason to believe you didn't receive this

24   e-mail?

25   A.  I'm not disputing I was sent the e-mail.  I just don't

1   recall ever reviewing these wire confirmations.

2   Q.  But at this time you knew that there was some question as

3   to whether the clients would be paid the full amount?

4   A.  Based on Keith Griffin's e-mail of May 6th, yes.

5   Q.  And then you received an e-mail with a subject line

6   Lion Air Eko Sutanto/Anice, right?

7   A.  Yeah, she's asking Keith to review and confirm.

8   Q.  But even though the subject line was Lion Air and even

9   though you knew that there was some question as to whether the

10  clients would be paid their full funds, you didn't look at the

11  e-mail?

12  A.  I don't recall seeing the wire confirmation information.

13  Q.  Was it your general practice to open e-mails from

14  Ms. Rouillard relating to cases when you got them?

15  A.  Yes.

16  Q.  And generally would you also look at the attachments?

17  A.  Oh, yes.

18  Q.  Okay.  So looking at the attachments to Ms. Rouillard's

19  e-mail, you see in the middle of the page here next to amount,

20  there's an amount of money, correct?

21  A.  Right.  It's half of what was due.

22  Q.  Right.  And there's a recipient name, Anice Kasim?

23          THE COURT:  What page number is this?

24          MR. TIEVSKY:  I'm sorry.  I'm looking at 165-004.

25          THE COURT:  Okay.

Lira - Direct by Tievsky

266

1  BY MR. TIEVSKY:

2  Q.  That amount is half of what is due?

3  A.  Yes.

4  Q.  And you knew at the time you received that e-mail that

5  that was half?

6  A.  No.  Like I said, I don't remember receiving the wire

7  confirmation pages.

8  Q.  I'm just asking if you knew at the time you received that

9  e-mail that looking at that amount that's written on that

10  page, that that amount is half of the money that was owed to

11  Ms. Anice?

12  A.  Yes, I already said that.

13          THE COURT:  Can you focus on that page again,

14  165-004?

15          MR. TIEVSKY:  Of course.

16          THE COURT:  Mr. Lira, what does it mean above the

17  amount that's sent on May 11th?  There's a balance checking as

18  of May 11th?  What do you understand that to mean?

19          THE WITNESS:  That must be the balance as of that

20  time.

21          THE COURT:  In the trust account?

22          THE WITNESS:  Yes, the one identified.

23          THE COURT:  For Lion Air?

24          THE WITNESS:  You know, I don't know the answer to

25  that, Your Honor.

1        THE COURT:  Is that -- it was a trust account.  It

2 wasn't a merger of all different settlements you had.  Was it

3 segregated by cases?

4        THE WITNESS:  I don't know the answer to that.

5        THE COURT:  Okay.  Well, we'll get into it or maybe

6 we'll get an answer tomorrow, but that's a much -- well, that

7 amount isn't confidential.  It's $4.4 million in that account,

8 it looks like, and yet the client is only getting a half

9 payment of -- half payment.

10        Okay.  Go ahead.

11 BY MR. TIEVSKY:

12 Q.  Moving on to 165-006.  At the time that you received this

13 e-mail, you also knew that the number printed next to the word

14 "amount" on this page was half of the amount owed to Mr. Bias?

15 A.  That amount of money is half of what was due.

16 Q.  Looking at page 165-008.  At the time you received this

17 e-mail, you knew that the e-mail printed next to the word

18 "amount" was half the money owed to Ms. Dian?

19 A.  Well, let me be clear.  I'm on the e-mail.  I don't recall

20 reviewing the wire confirmation sheets.  But I agree that that

21 amount is one-half that is due to the client.

22 Q.  And you also agree that generally speaking you reviewed

23 similar e-mails from Ms. Rouillard as they came to you?

24 A.  No.  Wire -- wires were very rare and rarely happened on

25 my cases.

**Lira - Direct by Tievsky**

1  Q.  And then looking at 165-10, same thing.  At the time you

2  received this e-mail and whether or not you read it, you would

3  have known that this amount is half of what was owed to

4  Ms. Septiana?

5  A.  Yes.

6  Q.  Let's see.  Now, turning to Exhibit 129.

7          THE COURT:  Will this be public?

8          MR. TIEVSKY:  This exhibit can be public.

9          THE COURT:  All right.

10  BY MR. TIEVSKY:

11  Q.  This is an e-mail that you sent to Ms. Anice on May 12,

12  2020, correct?

13  A.  Yes.  That's what I was referring to when I say "your

14  money was wired."

15          THE COURT:  Is this an e-mail or a text or some kind

16  of WeChat?  What is this?  It doesn't look like an e-mail.

17          THE WITNESS:  I don't know.  I think it's an e-mail

18  but a picture of an e-mail.  I don't know.

19          THE COURT:  All right.

20          THE WITNESS:  It says "Mama."  Actually I wrote

21  "ma'am" and it didn't autocorrect.

22  BY MR. TIEVSKY:

23  Q.  Understood.  Setting aside that typo, the following text

24  is "Money was wired to your account today," correct?

25  A.  Yes.

Lira - Direct by Tievsky

1  Q.  It does not say "the money," does it?

2  A.  The what money?

3  Q.  It does not say, "The money was wired to the account

4  today"?

5  A.  No, it says, "Money was wired to your account today."

6  Q.  And at this time you had already received an e-mail

7  evidencing that half of the money had been wired?

8  A.  That was Mr. -- the May 6 memo of which I did not get my

9  answer.

10         THE COURT:  When you sent this, did you know only

11  half had been spent?

12         THE WITNESS:  No, I was just told wires went out

13  today and I wanted to get an answer to her right away.

14         THE COURT:  So your testimony is that when this was

15  sent out on May 12, 2020 to one of the clients, you believed

16  that the entirety of the settlement had been wired to her?

17         THE WITNESS:  Yes.

18         MS. MATTHAI:  Your Honor, may I interject for a

19  moment?

20         THE COURT:  Yes.

21         MS. MATTHAI:  I believe that these are screenshots

22  that somebody has taken with a phone of their e-mails.

23         THE COURT:  Okay.

24         MS. MATTHAI:  And the important thing about that is

25  that I'm not certain about the date in the sense that it has

1    been my experience -- I'm not an expert, but it has been my

2    experience that the date shown on an e-mail is the date on the

3    computer of the person who is printing or taking a picture of

4    it.  And if you've got a time zone issue, then you can have --

5    in other words, if it's May 12th and this is actually taken

6    from a computer in Indonesia, then I believe it may be

7    May 11th here in the United States.  I'm not certain, but I

8    think we need to watch for time zone issues on e-mails here

9    because you can have a different time and, in this case, a

10   different date because of the question of which computer is it

11   taken off of.

12        THE COURT:  All right.  Well, with that, we're going

13   to call it a night, and what I'm going to suggest is that

14   counsel for Edelson and counsel for Mr. Lira talk about this

15   subject and hopefully you can come back with an agreement on

16   what this is and what times are correct.

17        MR. TIEVSKY:  Ms. Matthai is correct.  There may be a

18   time zone issue.

19        THE COURT:  Why don't you talk that over and we'll

20   pick up here tomorrow where you left off.

21        MR. TIEVSKY:  I have -- it's not a question for

22   Mr. Lira.  I have one more thing I need to say on the record

23   before we close today.

24        THE COURT:  Go ahead.

25        MR. TIEVSKY:  I wanted to let the Court know that

1    Mr. Griffin is also a member of the Illinois bar.  And given

2    the statements we said today, I do think I have a -- sorry,

3    not the Illinois bar, excuse me -- a member of the bar of this

4    court, and I do think that I have an obligation as a member of

5    the Illinois bar to report him.  Can I consider this to be my

6    report?

7              THE COURT:  No.

8              MR. TIEVSKY:  Okay.  Then I think I need to --

9              THE COURT:  Because I'm not going to take on any

10   responsibility --

11             MR. TIEVSKY:  Understood.

12             THE COURT:  -- for reporting it to a bar association.

13   Talk to --

14             MR. TIEVSKY:  I'm sorry.  It's the bar of the United

15   States District Court for the Northern District of Illinois.

16             THE COURT:  Oh, I see.  I see.  I thought you meant

17   the Illinois bar.

18             MR. TIEVSKY:  I'm sorry.  I misspoke.  That's on me.

19             THE COURT:  Raise it with me tomorrow.

20             MR. TIEVSKY:  Okay.

21             THE COURT:  We'll deal with it tomorrow.  And talk to

22   his lawyer because I think there's some question about his

23   membership of the bar of this court.

24             MR. SABA:  Your Honor, that brings up a good point

25   because --

1      THE COURT:  Stand in front of the mic, please.

2      MR. SABA:  As you know, Your Honor, we have hired an

3  expert witness on the issue of professional responsibility,

4  and I did that out of an abundance of caution because I don't

5  know if this Court wants us to bring evidence and testimony

6  about who has *Himmel* obligations and who doesn't.

7      As this Court knows, the local rules of this Court

8  say that out-of-state attorneys only have to follow the laws

9  of the state in which the lawyer's principal office is

10  located.

11      And so what we have are competing Rules of

12  Professional Conduct.  Mr. Griffin is in California and

13  Edelson is Illinois.  And I don't know if this is an area you

14  even want to go down because I don't know exactly what the

15  standard is, and this is one of my issues.  If you think this

16  is an issue you want to have evidence on, I would need to

17  bring my expert tomorrow.  If not, I can not bring an expert.

18      THE COURT:  Is this Mr. Clinton?

19      MR. SABA:  Yes.

20      THE COURT:  I actually know him.  He was at

21  Mayer Brown for a period of time when I was there.  We're not

22  friends or personal friends.  I just know of him because I

23  think he was at Mayer Brown for a short period at least when I

24  was there.

25      I don't view the -- I'm not sure we need to deal with

1    that tomorrow.

2           MR. SABA:  Okay.

3           THE COURT:  If we have to, maybe we can do it by Zoom

4    or some other mechanism to do it where I've now heard the key

5    witnesses -- or will have heard once I hear the rest of

6    Mr. Lira's testimony and hear from the folks from the Edelson

7    firm.  I'll have heard all the witnesses that are important

8    for me.

9           If Mr. Clinton has something that you think ought to

10    be put on the record, we possibly can do it by Zoom if we

11    don't have time tomorrow.  But I don't think you need to bring

12    him in tomorrow.  That deals with reporting obligation if they

13    become -- if a lawyer becomes aware of misconduct.

14           I've read your -- I know Ms. Matthai does a lot of

15    that work in California.  I think you do, too.  But it's not

16    something I think we need to deal with necessarily tomorrow.

17    If you're going to ask questions about it, so be it, but I'm

18    not going to need to hear from Mr. Clinton tomorrow.

19           MR. SABA:  Very well.

20           THE COURT:  I don't think we have time for him, quite

21    frankly.

22           MR. TIEVSKY:  And I'm not -- I just wanted to make

23    sure I didn't hear tomorrow that I had not fulfilled my

24    obligation.

25           THE COURT:  No, you're fine.  Remind me by the close

1    of business tomorrow --

2              MR. TIEVSKY:  I will do that.

3              THE COURT:  -- of that issue.

4              I would appreciate a binder of the two defense

5    witnesses -- hard copy of defense witness exhibits.  If you

6    need an extra copy made, ask the Edelson firm to help you.

7    They'll bill you, but they're local, and you shouldn't be

8    going off to a -- some type of fast copy service overnight.

9    They're a full service firm here, and they can do that and

10   they'll simply bill you for it.

11             MR. SABA:  Thank you.

12             THE COURT:  All right.  Anything else we need to put

13   on the record tonight, first from the Edelson firm?

14             MR. TIEVSKY:  Nothing from us, Your Honor.

15             THE COURT:  On behalf of Mr. Griffin?

16             MR. SABA:  Not tonight, Your Honor.

17             THE COURT:  And Mr. Lira?

18             MS. MATTHAI:  No, Your Honor.

19             THE COURT:  Thank you.  We are off the record.  We

20   can cut any feed on this.

21      (Proceedings adjourned until 9:00 a.m., 12/9/21.)

22

23                        CERTIFICATE
        I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.
24   /s/Kelly M. Fitzgerald                December 11, 2021
     _____       _____
25   Kelly M. Fitzgerald                       Date
     Official Court Reporter