```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   WELLY CHANDRA, et al.,            )
                                       )
 4                  Plaintiffs,        )
                                       )
 5   -vs-                              )
                                       )  Case No. 18 C 7686
 6   THE BOEING INTERNATIONAL SALES    )
     CORPORATION, a Washington         )  Chicago, Illinois
 7   State Profit Corporation, et      )  December 9, 2021
     al.,                              )  9:00 a.m.
 8                                     )
                    Defendants.        )
 9

10          TRANSCRIPT OF PROCEEDINGS - Volume 2
         BEFORE THE HONORABLE THOMAS M. DURKIN
11
     APPEARANCES:
12
     For Edelson PC:      MR. ALEXANDER G. TIEVSKY
13                        MR. JAY EDELSON
                          MR. J. ELI WADE-SCOTT
14                        MS. AMY B. HAUSMANN
                          Edelson PC
15                        350 North LaSalle Street, 14th Floor,
                          Chicago, Illinois  60654
16
     For Keith Griffin:   MR. RYAN D. SABA
17                        Rosen Saba, LLP
                          9350 Wilshire Boulevard, Suite 250
18                        Beverly Hills, California  90212

19
     For David Lira:      MS. EDITH R. MATTHAI
20                        MS. LEIGH ROBIE
                          Robie & Matthai
21                        350 South Grand Avenue, Suite 3950
                          Los Angeles, California  90071
22
     Court Reporter:      KELLY M. FITZGERALD, CSR, RMR, CRR
23                        Official Court Reporter
                          United States District Court
24                        219 South Dearborn Street, Room 1420
                          Chicago, Illinois  60604
25                        Telephone:  (312) 818-6626
                          kmftranscripts@gmail.com
```

1         (Proceedings heard in open court:)

2              THE COURT:  We're on the record.

3              Exhibit 322, amended, was presented to me.  It's

4    the -- an affidavit from Mr. Griffin about his current

5    financial state, assets, liabilities, income, expenses.  And

6    it's going to be filed under seal if it hasn't been already.

7              Mr. Lira is going to file something similarly on

8    Monday at the request of his attorney, something -- in effect

9    an affidavit setting forth his assets, liabilities, income and

10   expenses, not in any granular detail.  I don't need to know

11   gas bills and electric bills, but something that talks about

12   the big ticket assets, big ticket liabilities, and similar

13   income and expenses.

14             Apparently, he presented as -- in discovery in

15   response to the Edelson firm's subpoena, I assume it was a

16   subpoena.

17             MR. TIEVSKY:  Sorry, Your Honor.  It was just that

18   they submitted them voluntarily.

19             THE COURT:  Oh, they did.  Okay.

20             MR. TIEVSKY:  We didn't ask for any discovery from

21   them, never received any.

22             THE COURT:  Well, there were submitted some W-2s, I

23   think simply to show that -- I'm assuming part of it is to

24   show Mr. Lira was not an equity partner in the firm and, in

25   fact, was a W-2 employee or at least had some relationship

1    that is not -- couldn't be characterized as an equity partner

2    because Mr. Girardi apparently was 100 percent partner of his

3    firm.  And that certainly is a way to put that evidence in and

4    further that argument.

5         But I asked Mr. Griffin what he made, what his salary

6    was at the Girardi firm.  I thought that was relevant for a

7    variety of reasons.  And Mr. Griffin answered the question.

8         Mr. Lira is going to have to answer the same

9    question.  I don't view that as something that is subject to

10   any confidentiality order.  His current financial situation,

11   though, can certainly be filed under seal.  And if you want to

12   supplement the -- with your filing under seal the W-2s which

13   have the numbers attached to it, that's fine.  It may have

14   Social Security numbers or other things like that, so that

15   shouldn't be of the public record.

16        But I'm going to ask him.  I'll let the Girardi firm

17   ask it because they have him on the stand -- or the Edelson

18   firm ask it.  But I'm going to ask it otherwise what his

19   salary is, so there's no ambiguity about that.  And that's

20   salary at Girardi, not salary where he's working now.

21        Okay.  Anything else we need to discuss before we

22   continue the examination of Mr. Lira?

23        MR. TIEVSKY:  Yes, Your Honor, our time zones.

24        MS. MATTHAI:  Oh, yes.

25        THE COURT:  Yes.

1          MR. TIEVSKY:  So the time in Indonesia, it depends on

2    when there's daylight savings time or not, but it is I believe

3    typically nine hours ahead of California.  So right now it is

4    about 10:00 p.m. on Thursday today in Indonesia.  So that just

5    means for some of the documents, the ones that came from the

6    clients' computers or where the timestamp came from the

7    client's computer, it might be nine hours different.

8          And so I looked through the documents the other day

9    and I don't think there are any for which that difference

10   matters, but it could change the date.  So I guess if there's

11   any question about it or if there's any, you know, concern

12   about a time when one day could make a difference or nine

13   hours could make a difference, then we just want the Court to

14   know that, you know, that there could be -- that there could

15   be a time gap.

16         THE COURT:  All right.  That's fine.  Thank you for

17   pointing that out, Ms. Matthai, yesterday, and thank you both

18   for the clarification on that.

19         You agree with what counsel just said?

20         MS. MATTHAI:  I agree that if it came off the

21   computer of someone in Indonesia, it's going to have an

22   Indonesian timestamp which may not only change the time as to

23   when the recipient got it but also the day, depending upon the

24   time involved.  So the date -- it's not just a time issue.

25   It's potentially a date issue.

1          Then there's also the situation that the difference

2     between California and Central Time as to potential

3     communications between Los Angeles and the Edelson office here

4     in Chicago.  It just depends on whose computer it comes off

5     of.  I don't think that -- there are a couple of documents

6     where this does make a difference and other situations it

7     really doesn't.

8          THE COURT:  All right.  Well, we were at Exhibit 129

9     when this issue came up.  If it becomes relevant and the

10    questioning of either me or the Edelson firm makes it clear

11    there may be a misunderstanding as to the timing, raise your

12    objection at that time and we'll see if we can get an

13    agreement by everyone as to what time this was in real-time

14    and not the time in Indonesia which may be the marking on

15    this.

16         MR. TIEVSKY:  And I didn't want to testify yesterday,

17    Your Honor, but I can answer your question about 129 and what

18    it is if that is helpful.

19         THE COURT:  Go ahead.

20         MR. TIEVSKY:  So those are screenshots of e-mails

21    from Ms. Anice's and she took them on her phone.

22         THE COURT:  All right.

23         MR. TIEVSKY:  That's why they look like this.

24         THE COURT:  Understood.

25         MR. TIEVSKY:  As opposed to forwarding them, she took

1   screenshots and sent them to Mr. Wisner who sent them to us.

2          THE COURT:  I see.  Okay.  And the date that would be

3   on them and time would be --

4          MR. TIEVSKY:  You see the little date next to the

5   person's name.  That's going to be the date it was in

6   Indonesia.

7          THE COURT:  Got it.  All right.  That's helpful.

8   That clarifies things.  Okay.

9          MR. SABA:  Your Honor, I'm sorry.  Could I just weigh

10  in on one thing on this?

11         THE COURT:  Yeah.

12         MR. SABA:  The parties had submitted to this Court as

13  a guide a timeline of events.

14         THE COURT:  Yes.

15         MR. SABA:  In light of this, some of those dates may

16  be wrong.  So we -- you know, my suggestion would be that the

17  Court only use it as a guide and not as a stipulation of fact

18  or evidence in this matter.

19         THE COURT:  Well, what I would ask is you submit a

20  revised one if there are some dates here that need to be

21  changed.  I don't think there's many.  We only -- I'm sure

22  we're only talking about a couple of entries.  You put a lot

23  of work into this.  I am relying upon this because it's the

24  only rational way to go through this, comparing it to exhibits

25  and this timeline.  Everything so far that's been in the

**Lira - Direct by Tievsky**

1  timeline is consistent with the exhibits that I've seen.

2          MR. SABA:  There are a couple of minor typographical

3  errors that I discovered after it was submitted, so I'll meet

4  and confer with all counsel and see if we can get a revised

5  one to the Court.

6          THE COURT:  Send me a revised one and also send me a

7  red line version so I can see the difference so that I'm not

8  doing a side-by-side and wasting an hour trying to figure out

9  the difference when it may be insignificant.

10          Okay.  Mr. Lira, you may retake the stand.

11          All right.  Mr. Lira, you can have a seat.  You're

12  still under oath.

13          THE WITNESS:  Yes.

14          THE COURT:  You may continue your questioning.

15          MR. TIEVSKY:  All right.  I will need the exhibit

16  monitor once again here.

17          THE COURT:  And this is a public document?

18          MR. TIEVSKY:  This is a public document.

19          THE COURT:  All right.

20          DAVID RICHARD LIRA, WITNESS, PREVIOUSLY SWORN,

21                  DIRECT EXAMINATION (Resumed)

22  BY MR. TIEVSKY:

23  Q.  Mr. Lira, let's continue back with Exhibit 129 which we

24  were discussing yesterday.  You sent this e-mail to Ms. Anice,

25  correct?

**Lira - Direct by Tievsky**

1   A.  Yes.

2   Q.  You get a response from Ms. Anice?

3   A.  I don't recall.

4   Q.  Okay.  Looking at page 129-007.  Looking at the top half

5   of this page.  This is the response that Ms. Anice sent you,

6   correct?

7   A.  Yes.

8   Q.  It says, "Dear David, thank you for your e-mail.  It made

9   me more relieved.  However, after I checked it, it turns out

10  there's only a portion of the specified amount is there.  I

11  don't think that this is in accordance with the results of the

12  Court's order.  If I may know, how are the calculations and

13  when will the rest be sent?"

14          Did I read that correctly, Mr. Lira?

15  A.  Yes, you did.

16  Q.  Did you respond to this e-mail?

17  A.  I don't recall.

18  Q.  Did you do anything when you saw this e-mail?

19  A.  Yes.

20  Q.  What did you do?

21  A.  I asked if that was true, whether only one-half of the

22  settlement proceeds had been wired, and then that's when I

23  began my conversations with Mr. Girardi.

24  Q.  Who did you ask?

25  A.  I asked Keith.

Lira - Direct by Tievsky

```
1   Q.  You asked Mr. Griffin?

2   A.  Yeah, I'm sorry, Mr. Griffin.

3   Q.  On what date?

4   A.  Around this time.

5   Q.  Was it in the office?

6   A.  I don't recall whether it was a cell phone call or face to

7   face.

8   Q.  What specifically did you ask him?

9   A.  Did Tom only wire out one half of the proceeds.

10  Q.  And what did Mr. Griffin say?

11  A.  He confirmed that was true.

12  Q.  What else did you ask?

13  A.  We got to do something about it.

14  Q.  Okay.  And what did Mr. Griffin say?

15  A.  He agreed.

16  Q.  Okay.  And did you decide what you were going to do about

17  it?

18  A.  Not at that moment, no.

19  Q.  Did you say anything else in that conversation?

20  A.  Not that I recall.

21  Q.  Did you respond to this e-mail from Ms. Anice?

22  A.  I don't recall.

23  Q.  Looking now at 129-8.  This is an e-mail you received from

24  Ms. Anice on or about May 20, 2020, correct?

25  A.  I presume so, yes.
```

Lira - Direct by Tievsky

1    Q.  It is, correct?

2    A.  I'm copied on this e-mail, correct.

3    Q.  You don't recall receiving it?

4    A.  I'm not denying I received it.  As I sit here, I don't

5    know -- I don't have a specific memory of this.

6    Q.  The e-mail says, "Dear Tom Girardi, David and Keith,

7    Girardi Keese law firm."

8             David is you, right?

9    A.  Yes.

10   Q.  "I hope you are all doing well and safe.  I'd like to

11   appreciate the half of the payment you wired about a week ago.

12   I am grateful for that, but I'd also like to remind you that

13   it has been more than 30 days since I signed the

14   settlement/release.  I expect you to complete the rest of the

15   payment so I can close this case, and we, my daughters and I,

16   can move on with our lives."

17            That's what it says?

18   A.  Yes.

19   Q.  "Please ease our anxiety by explaining the reasons for the

20   separated wiring and tell us when will the second half be

21   wired."

22            That's what it says?

23   A.  Yes.

24   Q.  Did you respond to this e-mail?

25   A.  Not that I recall.

**Lira - Direct by Tievsky**

1    Q.   What did you do when you received this e-mail?

2    A.   My mission at this point was to get the clients paid fully

3    by confronting Mr. Girardi.

4    Q.   I didn't ask what your mission was, Mr. Lira.  I asked

5    what specifically you did when you received this e-mail.

6    A.   I spoke to Mr. Girardi.

7    Q.   What day did you speak to Mr. Girardi?

8    A.   Pardon me?

9    Q.   What day did you speak to Mr. Girardi?

10   A.   It would have been around the 13th or 14th of May.

11   Q.   Okay.  Well, this e-mail says it came on the 20th of May.

12   So what did you do after you received this e-mail in response

13   to it?

14   A.   I continued to press Mr. Girardi to make the payments.

15   Q.   When specifically did you do that?

16   A.   I don't have specific dates of my conversations with

17   Mr. Girardi, but it was after the 13th of May until the day I

18   resigned from the firm.

19   Q.   How often would you say you had these conversations?

20   A.   My best recollection was five to seven times face to face.

21   Q.   Were they all in person?

22   A.   Yes.

23   Q.   Do you remember what you said specifically during any of

24   these conversations?

25   A.   I do have general recollections of what I said.

1  Q.  I'm going to ask you, do you remember what you said

2  specifically during any of these conversations?

3  A.  Portions, yes.

4  Q.  What do you remember?

5  A.  I told him that he was risking 50 years of legal work,

6  that this was wrong.  It wasn't his money and it had to be

7  paid.

8      I then continued the conversations, and I

9  specifically remembered telling him that his family name is on

10  the Advocacy Center at Loyola Law School and at Loyola High

11  School that he attended and everything he's worked for in

12  terms of his reputation and skill is now being jeopardized by

13  these acts.

14  Q.  And what did he say?

15  A.  He listened to me and he nodded in acknowledgment and told

16  me he would take care of it.

17  Q.  Okay.  And now you mentioned that -- you said his

18  reputation and skill is now being jeopardized by these acts.

19  What acts are you talking about?

20  A.  Not paying the clients their full share of the settlement

21  proceeds.

22  Q.  Did you know what he had done with the rest of the

23  settlement proceeds?

24  A.  I did not know.

25  Q.  Did you ask him what he had done with the rest of the

Lira - Direct by Tievsky

1    settlement proceeds?

2    A.   I said, "Where is the money?"

3    Q.   What did he say?

4    A.   "I'll take care of it."

5    Q.   He didn't give you an answer?

6    A.   No, he did not.

7    Q.   What did you do to find out where the money was?

8    A.   I asked Mr. Kamon if I could see the financial records

9    pertaining to this settlement.

10   Q.   What specific day did you ask Mr. Kamon that question?

11   A.   It would have been shortly after the letters that we

12   viewed yesterday.

13   Q.   What date?

14   A.   I don't have a specific date in mind.

15   Q.   Did Mr. Kamon respond to you?

16   A.   Not for a long time; and then finally he said, "Tom's

17   dealing with it."

18   Q.   What's a long time?

19   A.   A few days.

20   Q.   So when did Mr. Kamon respond to you?

21   A.   A few days after I made the initial inquiry.

22   Q.   Was it before or after you received this e-mail from

23   Ms. Anice on or around May 20th?

24   A.   No, this was closer to the time when I learned that only

25   half the proceeds had gone out and Tom was drafting letters to

Lira - Direct by Tievsky

1    the client.

2    Q.  And Mr. Kamon you said didn't show you any financial

3    records?

4    A.  Oh, no.

5    Q.  Okay.  So what did you do to find out the information

6    about where the money had gone?

7    A.  Well, once I was denied access to this trust information,

8    I continued to speak with Mr. Girardi.

9    Q.  Okay.  Were you a signer on this trust account?

10   A.  I am.

11   Q.  Do you know if in California attorneys are allowed to

12   delegate responsibility for client trust accounts to another

13   person?

14          MS. MATTHAI:  I'm going to object, Your Honor, on

15   relevancy grounds.

16          THE COURT:  Overruled.

17          THE WITNESS:  I don't understand the question.

18   BY MR. TIEVSKY:

19   Q.  My question is do you know if under the California Rules

20   of Professional Conduct attorneys are permitted to delegate

21   responsibility for a client trust account to another

22   individual?

23   A.  I assume -- it depends on who that other individual is.

24   Q.  Okay.  What does it depend on?

25   A.  I think people who are authorized on the trust account and

**Lira - Direct by Tievsky**

1    accounting people who are executing the checks.

2    Q.  So it's your belief that it was okay for you to delegate

3    responsibility for the trust account to Mr. Kamon?

4    A.  I didn't delegate anything to Mr. Kamon.

5    Q.  That's not a question I asked.  The question I asked is

6    it's your belief that it was okay to delegate responsibility

7    for the trust account to Mr. Kamon?

8    A.  Yes.

9    Q.  But that's not what you did?

10   A.  Pardon me?

11   Q.  But that's not what you did?  You didn't delegate

12   responsibility for the trust account to Mr. Kamon?

13   A.  No.

14   Q.  Okay.  But when Mr. Kamon refused to provide you with

15   records of the trust account, then what did you do?

16   A.  I continued my conversations with Mr. Girardi.

17   Q.  You didn't tell Mr. Kamon he had to provide you with those

18   records?

19   A.  I did not make that demand, no.

20   Q.  Could you have?

21   A.  I assume.

22   Q.  But you didn't?

23   A.  I did not.

24        THE COURT:  Those conversations with Mr. Girardi that

25   you spoke of, the half dozen or so, was anyone else present

**Lira - Direct by Tievsky**

1   for them?

2   THE WITNESS:  Not that I believe, except for one.  On

3   June 13th when I resigned and we had a heated discussion, our

4   voices were heard in the firm, and a lawyer in the firm

5   confirmed that he had listened to that conversation in part.

6   THE COURT:  Who is that?

7   THE WITNESS:  Mr. Chris Aumais, A-u-m-a-i-s.

8   THE COURT:  And he confirmed it after you left the

9   meeting with Mr. -- I guess we're going to get there.  I'll

10  let the lawyer continue his examination.

11  But other than that, these conversations where you

12  told -- you know, you had these conversations with Mr. Girardi

13  about the family name being jeopardized and 50 years of legal

14  work down the drain, et cetera, no one else was present for

15  that?

16  THE WITNESS:  Not that I know of.

17  THE COURT:  Okay.  Could you have accessed those

18  client trust accounts at the bank?

19  THE WITNESS:  No.

20  THE COURT:  The records for them?

21  THE WITNESS:  No.

22  THE COURT:  You couldn't walk into the bank and say

23  "I want to see it"?  And why couldn't you?

24  THE WITNESS:  I assume I could have walked into the

25  bank and identified myself.

Lira - Direct by Tievsky

291

1          THE COURT:  You're the signator on that account,

2   aren't you?

3          THE WITNESS:  Yes.

4          THE COURT:  And why didn't you?

5          THE WITNESS:  I took a different course of action.

6          THE COURT:  All right.  But you admit that at least

7   was one course of action you could have taken to investigate

8   where the money went, to look at that client trust account,

9   see the money coming in from Boeing and seeing if it was

10  segregated, seeing if monies taken out of it were going to any

11  other purpose, correct?

12         THE WITNESS:  Yes.

13         THE COURT:  Okay.

14         Go ahead.

15  BY MR. TIEVSKY:

16  Q.  So looking again at 129-8 for a moment.  You said you did

17  not respond to this e-mail?

18  A.  Correct.

19         MR. TIEVSKY:  The next exhibit contains confidential

20  information.

21         THE COURT:  What exhibit is that?

22         MR. TIEVSKY:  That's Exhibit 164.

23         THE COURT:  Okay.  We won't put it on the public

24  feed.

25  BY MR. TIEVSKY:

**Lira - Direct by Tievsky**

1    Q.   Mr. Lira, this is an e-mail you received from Keith

2    Griffin, correct?

3    A.   I assume so, yes.

4    Q.   And this Exhibit 164, this is an e-mail you received on

5    May 6, 2020, about 10:00 a.m., right?

6    A.   Yes.

7    Q.   The e-mail says, "Chris, Tom told me we should wire

8    50 percent of the client funds for the four cases in trust and

9    advise clients that the remaining 50 percent would be wired in

10   14 days."

11        Yes?

12   A.   Yes.

13   Q.   Did you know before this e-mail that Mr. Girardi had said

14   to wire only half of the money to the clients?

15   A.   I did not.

16   Q.   So this was the first time you learned that?

17   A.   Yes.

18   Q.   So that wire didn't go out that day, right, May 6th?

19   A.   No.

20   Q.   No.  Between the time when you received this e-mail and

21   when the wires went out, did you discuss the reasons for

22   sending only half the money with Keith Griffin?

23   A.   I remember making -- I asked.  I said, "Is this true?  Is

24   this how it's going to be played out?"

25   Q.   Okay.  But did you ask why?

1    A.   No, I did not ask why.

2    Q.   Did you discuss the reasons for sending only half the

3    money with Chris Kamon?

4    A.   After the wires went out.

5    Q.   What date was that?

6    A.   It would have been shortly after May 12.

7    Q.   And what did Mr. Kamon say?

8    A.   That's when I asked for the books and asked him what's

9    going on.  And he said that was a directive from Mr. Girardi

10   to only send half.

11   Q.   So you didn't -- your testimony is you did ask him why,

12   though?

13   A.   Yes.

14   Q.   And he didn't give you an answer?

15   A.   He just said that's what Mr. Girardi stated.

16   Q.   Okay.  And during this time frame after you received this

17   e-mail but before the wires went out, did you discuss the

18   reasons for only sending half the money with Tom Girardi?

19   A.   No, I did not.

20        MR. TIEVSKY:  Turning now to Exhibit 165.  The

21   portion of this that I will be showing is not confidential.

22        THE COURT:  Okay.

23   BY MR. TIEVSKY:

24   Q.   You see on 165-1, towards the bottom of the page, it

25   starts from David Lira, sent Thursday, May 7, 2020, 5:07 p.m.,

**Lira - Direct by Tievsky**

1    right?

2    A.   Yes.

3    Q.   Now, this is an e-mail in which you have forwarded a

4    variety of client communications on the pages below, correct?

5    A.   Can I see the pages below?

6    Q.   Absolutely.

7    A.   I believe that may be a string of e-mails, yes.

8    Q.   A string of e-mails involving the Lion Air clients?

9    A.   Yes.

10   Q.   You weren't on all of these communications originally, but

11   you were added in this last one, May 7th, 3:00 p.m., from

12   Ms. Anice, right?

13   A.   I'm on that string, yes.

14   Q.   So you saw this whole string even if you weren't

15   originally on all of the e-mails?

16   A.   I may have, yes.

17   Q.   And your comment on page 165-001, question, rather, is,

18   "Did we send half out?"

19   A.   Yes.

20   Q.   You didn't ask whether all of the money was being sent

21   out?

22   A.   No.  This is in response to the May 6th memo from

23   Mr. Griffin to Mr. Kamon.

24   Q.   And why did you ask the question "Did we send half out?"

25   A.   I was inquiring whether or not that actually happened on

**Lira - Direct by Tievsky**

1  that day.

2  Q.  Mr. Griffin responded to you right above there on 165-1,

3  Monday, May 11, 2020, "Tom just said he was sending out the

4  wire today."  That's what he said?

5  A.  That's what's written.

6  Q.  "I'm not sure if Chris can confirm."

7          Did anything about this response make you think that

8  all of the money was going out?

9  A.  That's what I was waiting to verify.

10 Q.  Okay.  And did you have any conversations with anyone

11 between May 7th and May 11th with regard to the half wire?

12 A.  Other than the conversation with Keith after his memo of

13 May 6th.

14 Q.  So that's a no?

15 A.  So you're saying May 7th.  I'm sorry.

16 Q.  Yes, I'm saying between May 7, 2020, when you sent that

17 question, "Did you send half out," and May 11th when you got

18 the response from Keith Griffin, I would like to know if you

19 had any conversations with anyone about the half wire?

20 A.  Not that I recall.

21 Q.  At any time did any of those four Lion Air clients ask you

22 to wire only half of the money to them?

23 A.  No.

24 Q.  At any time did any of them ask you to wire any less than

25 the full amount owed?

**Lira - Direct by Tievsky**

296

1  A.  No.

2  Q.  Turning now to Exhibit 166.  Looking here on page 1, you

3  received this e-mail from Keith Griffin, right?

4  A.  Yes.

5  Q.  You received it on May 13, 2020?

6  A.  That's what it says.

7  Q.  And it asks you to take a look at an attachment, right?

8  A.  Yes.

9  Q.  The attachment is the letter that I'm showing you at

10  166-2, correct?

11  A.  I assume so, yes.

12  Q.  It is, yes?

13  A.  Pardon me?

14  Q.  This letter is the attachment you received on May 13,

15  2020?

16  A.  I assume so.  I'm not disputing it.

17  Q.  Okay.  You're not sure?

18  A.  Well, there were so many iterations of these letters.  I

19  assume this was sent to me.

20  Q.  You're having trouble remembering which letter containing

21  lies this one is?

22  A.  Which e-mail attached which letter, yes.

23  Q.  Okay.  At the time you received this document, you

24  understood it to be a draft of a letter from Mr. Girardi to

25  Mr. Bias, right?

**Lira - Direct by Tievsky**

1   A.  Yes.

2   Q.  The first sentence of this letter says, "I got enough of

3   the problem taken care of so we were able to release

4   50 percent of the settlement," right?

5   A.  Yes.

6   Q.  What's the problem?

7   A.  It's not true.

8   Q.  So there's no problem?

9   A.  Right.  I wasn't aware of any problems that prohibited the

10   full release of the settlement monies.

11   Q.  The third sentence there says, "There are tax issues, et

12   cetera."

13        Right?

14   A.  Yes.

15   Q.  What were the tax issues?

16   A.  As I indicated in an e-mail in response, there were none.

17        THE COURT:  Counsel, on all these letters, it's clear

18   Mr. Girardi is making this stuff up.  I'm -- excuse me.  I'm

19   convinced these are all lies Mr. Girardi is putting in the

20   letters to basically lull the folks who were supposed to get

21   this money into thinking there was some real reason the money

22   was delayed when, in fact, there was no real reason it was

23   delayed other than Mr. Girardi had spent it or dissipated it

24   in some way.  We don't really know that at this moment.

25        So you can go through these, but I don't think it's

1    necessary.  I'm convinced that Mr. Griffin and Mr. Lira knew

2    these letters were outrageously false.  No rational person --

3    I should restate it.  No person who would read that who had

4    any knowledge about how settlements are supposed to work would

5    buy it.  He was trying to sell a bill of goods to the

6    plaintiffs off in Indonesia.  It was callous.  It was pretty

7    outrageous.  And I think both Mr. Griffin and Mr. Lira

8    recognize that in their responses saying no one is going to

9    buy it.

10          If you want to focus on other aspects of this, that's

11   fine, but I'm convinced based on these letters that's the

12   conclusion I draw.

13          MR. TIEVSKY:  Understood, though I will skip then

14   Exhibit 167, but I do have some questions about Exhibit 168.

15          THE COURT:  Go ahead.  I just wanted to tell you what

16   conclusions I've drawn at this point, and I don't think

17   there's anything that's going to shake my conclusions on that.

18   We're not going to hear from Mr. Girardi, so we're not going

19   to hear any explanation for the inexplicable.

20          MR. TIEVSKY:  I think that is perhaps up in the air

21   and that is why I would like to ask about Exhibit 168.

22          THE COURT:  Go ahead.

23   BY MR. TIEVSKY:

24   Q.  Showing you what's been marked Exhibit 168.  This is an

25   e-mail you sent, correct, Mr. Lira?

**Lira - Direct by Tievsky**

1   A.  Yes.

2   Q.  This e-mail was in response to the letters, draft letters,

3   you received that Mr. Girardi had written that contained lies?

4   A.  Yes.

5   Q.  At the time you wrote this e-mail, you knew that the

6   letters contained lies?

7   A.  Yes.

8   Q.  The e-mail reads:  "These are smart people.  There are no

9   tax issues."

10        Did I read that correctly?

11   A.  Yes.

12   Q.  Can you explain what the intelligence of the clients has

13   to do with there are no tax issues?

14   A.  Certain of these families lost a loved one who were

15   judges.  All of these clients, except for a small segment,

16   were college educated and smart.  And so that's why I made

17   that statement, that they would see through this and determine

18   on their own that this is a lie.

19   Q.  In other words, they would figure out that Mr. Girardi was

20   lying?

21   A.  Absolutely.

22   Q.  Why would they need to figure it out on their own?

23   A.  I don't know the answer to that.  That's why I endeavored

24   to intercept these letters before they went out.

25   Q.  But couldn't you have told them that Mr. Girardi was

**Lira - Direct by Tievsky**

1   lying?

2          MS. MATTHAI:  Your Honor, I'm going to object.  It

3   lacks foundation.  The question lacks foundation in assuming

4   that all the clients got these letters.

5          THE COURT:  Well, it's clear a couple of them did.

6          MS. MATTHAI:  I believe that we're -- I don't want to

7   testify, but I think a couple got away.

8          THE COURT:  Yes, they did.  That's clear from the

9   e-mails, that several of these letters got out before -- and

10  the secretary said, whoops, a couple of them went out.  I'll

11  hold the other one.

12         MS. MATTHAI:  Yeah.

13         THE COURT:  So that's the record as I understand it.

14         MS. MATTHAI:  I agree.  I think two went out.

15         THE COURT:  Right.  So re-ask your question.  I'll

16  hear it.  If there's still an objection, I'll rule on it.

17  BY MR. TIEVSKY:

18  Q.  So the question is, couldn't you have told them if these

19  letters had gone out, the draft ones with the tax issues,

20  couldn't you have told them that Mr. Girardi was lying?

21  A.  I assume so, yes.

22  Q.  So what relevance is the fact that they would have figured

23  it out on their own?

24  A.  I'm just responding to your question, Counsel.  You asked

25  it.

**Lira - Direct by Tievsky**

1   Q.  You wrote this e-mail.  So -- and you said that -- you

2   said that they were smart people and some of them, family

3   members were judges, college educated, they would have figured

4   it out.  So my question is what relevance is that with respect

5   to these letters?

6   A.  I am telling Ms. Cory and Keith Griffin that these letters

7   can't go out.

8   Q.  Because the clients will figure out that they're not true?

9   A.  Certainly.

10  Q.  Okay.  Not because it's wrong to lie to a client but

11  because the clients will figure it out?

12  A.  No, primarily what Mr. Girardi was doing was despicable

13  and absolutely wrong.

14  Q.  But the e-mail you wrote was, "These are smart people.

15  There are no tax issues."

16  A.  Yeah, this is an internal memorandum amongst the firm.

17  Q.  Not something you would say to the clients?

18  A.  I did not say anything to the clients.

19  Q.  You didn't say anything at all to the clients?

20  A.  That's correct.

21  Q.  Even after the letters with lies went out?

22  A.  That's correct.

23  Q.  Turning back now to an e-mail we looked at yesterday.

24  This is Exhibit 169-4.  All right.  I'm now looking at the end

25  of the string here.  You see here about halfway down the page,

1    Mr. Hatcher sends you an e-mail that says, "Bias reads this

2    and Tom won't know how to put the fire out."

3            I read that right?

4    A.  Yes.

5    Q.  When you say "this," you're referring to the draft letter

6    to Mr. Bias?

7    A.  Yes.

8    Q.  And that's the draft letter here at 169-2?

9    A.  Again, I don't know which one actually went out.

10   Q.  But this is the one you forwarded to Mr. Hatcher, right?

11   A.  Yes.  And --

12           MS. MATTHAI:  Your Honor, I'm going to belatedly

13   object.  I believe the question was that Mr. Lira wrote it and

14   this is an e-mail from Mr. Hatcher, I believe.

15           THE COURT:  All right.  Rephrase your question.

16           MR. TIEVSKY:  I'm sorry.

17   BY MR. TIEVSKY:

18   Q.  So I'm asking what Mr. Hatcher is referring to as "this,"

19   and I think you don't disagree that it is this letter here,

20   correct?

21   A.  I assume so.

22   Q.  And you sent this letter, 169-2, you sent that to

23   Mr. Hatcher?

24   A.  I did send a letter to Mr. Hatcher.

25   Q.  You sent this letter here at 169-2 to Mr. Hatcher?

**Lira - Direct by Tievsky**

1   A.  I assume so, yes.

2   Q.  Did you understand Mr. Hatcher's response to mean that he

3   was going to show the e-mail to Mr. Bias?

4   A.  I really don't know what he was conveying.  I think he was

5   conveying more that this would be a major, major event.  I

6   didn't know what his intentions were about communicating with

7   Bias.

8   Q.  You didn't know one way or the other whether he was going

9   to show it to Mr. Bias?

10  A.  I think he's stating when Mr. Bias reads this, there's

11  going to be a problem.

12  Q.  Did you regularly communicate with Mr. Bias through

13  Mr. Hatcher?

14  A.  Rarely.

15  Q.  Was it your intention that he should share that letter

16  with Mr. Bias when you sent it to Mr. Hatcher?

17  A.  No.

18  Q.  Did you tell Mr. Bias that you had to, quote, intercept --

19  you've written intercepted -- a letter containing lies that

20  Mr. Girardi was about to send him?

21  A.  No.

22  Q.  Why not?

23  A.  I was trying to, as I said, to get Tom to knock off this

24  nonsense and send the remainder of the money.

25  Q.  What do you mean by "nonsense"?

1    A.   These letters.

2    Q.   You don't think the fact that Mr. Girardi was attempting

3    to lie to Mr. Bias was a relevant fact to your representation

4    of Mr. Bias?

5    A.   Oh, absolutely.

6             MS. MATTHAI:  Argumentative and ambiguous.

7             THE COURT:  Overruled.

8    BY THE WITNESS:

9    A.   Yes.

10   BY MR. TIEVSKY:

11   Q.   Do you have a responsibility to share relevant facts about

12   your representation of clients with those clients?

13   A.   My intention at this time frame was to get them paid, and

14   I was going to try everything I could to persuade Mr. Girardi

15   to do that.

16   Q.   Okay.  Mr. Lira, but that wasn't my question.  My question

17   was do you have a responsibility to share relevant facts about

18   your representation of clients with those clients?

19   A.   Yes.

20   Q.   Did you share the fact that Mr. Girardi was attempting to

21   lie to Mr. Bias with Mr. Bias?

22   A.   As I indicated previously, no.

23   Q.   Not once ever?

24   A.   Not that I recall.

25   Q.   I'm turning now to Exhibit 1 --

**Lira - Direct by Tievsky**

1      THE COURT:  Well, stay there.

2      MR. TIEVSKY:  Okay.

3      THE COURT:  Do you know what Mr. Hatcher meant in

4  that second line, "Reminds me of the letter in the Blythe

5  case"?

6      THE WITNESS:  Yes.  Yesterday I indicated the case of

7  Mr. Cesar Castillo.

8      THE COURT:  Yes.

9      THE WITNESS:  He was one client that the firm

10  represented that was injured in a bus rollover.  And we had a

11  number of those clients, and there was a global settlement.

12  It went through the typical allocation process, not wire, but

13  check instructions.  And he complained that he didn't get his

14  check fast enough.

15      THE COURT:  Well, what does -- if you know, what is

16  Hatcher referring to about the letter in the Blythe case?  Was

17  there a letter that contained falsehoods that was sent to

18  Cesar -- what's his last name?

19      THE WITNESS:  Castillo.

20      No, I'm not aware of such a letter.

21      THE COURT:  Do you know what Hatcher is talking about

22  then, what letter he's talking about in the Blythe case?

23      THE WITNESS:  I do not.

24      THE COURT:  He -- all right.  And Blythe case is

25  another word for that rollover crash case you were talking

1   about?

2          THE WITNESS:  The bus rollover occurred in Blythe,

3   California.

4          THE COURT:  I see.

5          All right.  Go ahead.

6   BY MR. TIEVSKY:

7   Q.  You had two other -- you had two other clients in that

8   Blythe bus crash case?

9   A.  I was the lead liaison counsel, so technically I

10   represented everyone.  I don't recall the exact number of

11   passengers that retained Girardi & Keese.

12   Q.  You represented Pedro Caldera Ariano (phonetic)?

13   A.  That sounds vaguely familiar.

14   Q.  Do you know if Mr. Ariano received his settlement funds in

15   full and on time?

16   A.  I assume so because I never received word.

17   Q.  You represented Jose Luis Marquez in that matter also?

18   A.  That sounds vaguely familiar.

19   Q.  Did Mr. Marquez receive all of his settlement funds on

20   time?

21   A.  I assume so, yes.

22   Q.  But you don't know specifically?

23   A.  I never received a complaint from them.

24   Q.  Did you do anything to verify to make sure that they had

25   gotten their funds?

**Lira - Direct by Tievsky**

1  A.  I sent the closing statements, and the procedure is once

2  those are submitted and the settlement proceeds are received

3  that the procedure was to cut the checks as indicated on the

4  closing statements.  And I never heard anything so I assumed

5  everything went according to the procedure.

6  Q.  You assumed that in March 2020 also?

7  A.  Yes.

8  Q.  In March 2020 did you have any reason to think that money

9  wasn't being paid out on time?

10  A.  On that case, no.

11  Q.  On any case?

12  A.  No.

13  Q.  How about in May 2020?  May 2020 you knew that money

14  wasn't being paid out on cases on time?

15  A.  Yes, in this Lion Air case.

16  Q.  You didn't check to see whether there were problems with

17  any of your other clients?

18  A.  I had no problems with my other clients.

19  Q.  But you just said you didn't know if Mr. Ariano had gotten

20  paid.

21  A.  Right.  I didn't receive word one way or the other.

22  Q.  But once you found out there was a problem in Lion Air,

23  you didn't -- you didn't check with respect to any of your

24  other recent settlements?

25  A.  No, because there was no indication of nonpayment.  I was

1    focusing on Lion Air.

2    Q.   Remind me, when the Lion Air clients' money came in from

3    Perkins Coie to Girardi Keese, did you immediately inform the

4    clients that they had received their money?

5    A.   I don't -- I don't -- I don't believe so, but I'm not

6    certain.

7    Q.   And how about with the Blythe bus crash case, when the

8    money came in from that case, did you immediately notify those

9    clients that their money had been received by Girardi Keese?

10   A.   I believe so.

11   Q.   You don't know?

12   A.   I just remember there was an allocation procedure through

13   a judge, and once those awards were issued, I sent them to the

14   clients.

15   Q.   That's the awards from the judge?

16   A.   Right.

17   Q.   That's not the receipt of the funds by Girardi Keese?

18   A.   I don't recall if I called each one and told them the

19   funds were in.

20   Q.   Is it possible that they never learned that information?

21   A.   I would be speculating.

22   Q.   You don't know if they ever found out that Girardi Keese

23   had received their money?

24   A.   Well, they got their checks.

25   Q.   How do you know?

**Lira - Direct by Tievsky**

 1   A.  Because like I said, if there was an issue of nonpayment,

 2   I certainly would have been called by the clients.

 3   Q.  What reason would they have to call you if they never

 4   found out the money came in?

 5   A.  "Hey, we haven't received our check."

 6   Q.  Okay.

 7         THE COURT:  Where is Mr. Hatcher located?

 8         THE WITNESS:  In Pasadena, California -- or in

 9   L.A. County.

10         THE COURT:  All right.  Okay.

11         Go ahead.

12   BY MR. TIEVSKY:

13   Q.  Turning now to Exhibit No. 171.  The first six pages of

14   this exhibit I'm going to scroll through, and I would just

15   like you to confirm that these are e-mails that you received

16   with attachments from Kim Cory on May 14, 2020.

17   A.  Yes.

18   Q.  And that's 171 at 1 through 6, all of those?

19   A.  Yes.

20   Q.  And then looking at 171-7, this is your response to

21   Ms. Cory, correct?

22   A.  Yes.

23   Q.  You sent this response May 14, 2020, about 3:26 in the

24   afternoon?

25   A.  Five minutes later after she sent them to me.

**Lira - Direct by Tievsky**

1   Q.  And it says, "Kim, I wouldn't send any of these letters.

2   They are lies and can come back to haunt Tom.  David."

3          Yes?

4   A.  Yeah, that's what it reads.

5   Q.  When you said "They could come back to haunt Tom," what

6   did you mean?

7   A.  Everything that's happened since this OSC.  He would get

8   in trouble with the state bar, trouble with the tribunal here,

9   and face possible criminal charges.

10   Q.  But these clients that these letters were going out to,

11   they're your clients, too, right, or they were?

12   A.  Yes.

13   Q.  But it was Tom that these actions were to come back to

14   haunt?

15   A.  Yeah, I never lied to these clients and I wanted them

16   paid.

17   Q.  You didn't lie but did you tell them the truth either?

18          MS. MATTHAI:  Objection.  Vague and ambiguous.

19          THE COURT:  Overruled.

20          MR. TIEVSKY:  I'm sorry.  I'll re- --

21   BY MR. TIEVSKY:

22   Q.  Go ahead.

23   A.  Could you rephrase the question, please, restate it?  I'm

24   sorry.

25   Q.  I can restate it.

**Lira - Direct by Tievsky**

1       You didn't lie but you didn't tell them the whole

2  truth either, did you, Mr. Lira?

3  A.  I was always truthful in my communications with them.

4  Q.  So the answer is no, you didn't tell them the whole truth?

5  A.  No, I disagree.  I was always truthful when I communicated

6  with them.

7  Q.  But you didn't tell them that letters had been drafted

8  that contained lies?

9  A.  No, I didn't inform them of these letters that I didn't

10  know went out or did.

11       THE COURT:  Well, two of them went out --

12       THE WITNESS:  Yes.

13       THE COURT:  -- correct?

14       Did you do any -- if they didn't go out, it's a

15  nonissue for the clients that didn't get them.  But the two

16  that did go out, they were your clients, weren't they?

17       THE WITNESS:  Yes.

18       THE COURT:  Did you contact them to tell them the

19  letters that Mr. Girardi sent them were false?

20       THE WITNESS:  I did not have that communication with

21  them.

22       THE COURT:  Why not?

23       THE WITNESS:  I was focusing on getting them paid.  I

24  was doing everything I could to get Tom to wire the rest of

25  the money, and I thought that would take care of the issues.

**Lira - Direct by Tievsky**

1    THE COURT:  It's kind of a giant Rubicon you cross,

2    though, when clients get a letter from your partner, your

3    clients and his clients get a letter from the partner that

4    contain materially false statements, whoppers really, not even

5    close to being true, and you don't call those clients and tell

6    them the letters you got from my partner, Mr. Girardi, were

7    false.  Didn't you view that as an almost critical point in

8    your representation of your clients?

9    THE WITNESS:  I thought it was awful, and I wanted to

10   find a solution.

11   THE COURT:  All right.  And one solution obviously

12   you tried and you're saying this is to get Mr. Girardi to pay

13   the money.  But did you feel that having clients sit there

14   with these knowing misrepresentations from Mr. Girardi, not

15   just his clients but your clients, was a -- you had an

16   obligation to correct those falsehoods?

17   THE WITNESS:  I didn't think along those lines.  I

18   was just trying to get them paid fully.

19   THE COURT:  All right.

20   Continue your questions.

21   BY MR. TIEVSKY:

22   Q.  Moving on to page 171-8.  You received this response from

23   Ms. Cory just a few minutes later: "Oh, no.  I sent the first

24   two already to Dian and Bias.  I will keep Septiana letter."

25   Yes, that's what it says?

1    A.  Yes, it does.

2    Q.  What did you understand this e-mail to mean when you got

3    it?

4    A.  I'm sorry.  What?

5    Q.  When you received this e-mail, what did you understand it

6    to mean?

7    A.  That two letters had gone out, one to Dian and one to

8    Bias.

9    Q.  So at the time you received this letter, you believed that

10   two of the letters previously in the chain, those to Ms. Dian

11   and those to Mr. Bias, had actually been sent to those

12   clients?

13   A.  That's what she's representing in her e-mail to me, yes.

14   Q.  And did you believe her?

15   A.  Yes.

16   Q.  No reason to disbelieve her?

17   A.  I assumed she was being honest with me.

18   Q.  Looking at page 171-9, you responded just a few minutes

19   later.  Your response was, "Tom will have to be ready for an

20   onslaught on inquiries.  They all talk and all other victims

21   have received their compensation."

22          Did I read that correctly?

23   A.  Yes.

24   Q.  What did you mean by "Tom will have to be ready for an

25   onslaught on inquiries"?

**Lira - Direct by Tievsky**

1  A.  That the two individuals that received these letters would

2  either get in contact with Mr. Hatcher or with Keith and I and

3  Tom and everyone else in the firm that had been on those

4  e-mails.

5  Q.  It says "Tom will have to be ready," right?

6  A.  Yes.

7  Q.  Not any of those other people you mentioned?

8  A.  I'm sorry.

9  Q.  You just mentioned Mr. Hatcher, Keith, you, everyone else

10  in the firm.  But you didn't mention those people in this

11  e-mail?

12  A.  No.  I just assumed the people who received the letters

13  will be making inquiries and they would copy everybody on the

14  e-mails that we have seen previous.

15  Q.  And what would Mr. Girardi do to get ready for such an

16  onslaught?

17  A.  It's just a statement I made.

18  Q.  You said he'll have to be ready, right?

19  A.  Right.

20  Q.  Okay.  So what --

21  A.  He's going to have to explain himself if he got a direct

22  inquiry.

23  Q.  Only if he got a direct inquiry?

24  A.  Well, he had to deal with me, too.

25  Q.  What did you mean by "they all talk"?

**Lira - Direct by Tievsky**

1  A.   I think it's common knowledge in the aviation field that

2  even though you have different lawyers representing differing

3  groups of families, there's no secrets.  One plaintiff who

4  received an award will talk to other families.  I'm not saying

5  all of them did this, but they would communicate what

6  settlements.  And then jealousy would go.

7       And then there were times, and this was referenced

8  somewhere in the file, that lawyers were always trying to get

9  other lawyers' cases.  That happened in two of the cases that

10  were referred to me from Mr. Koushan.

11       So every time there was a settlement or there was a

12  bid to outdo the other lawyer, it spread like wildfire among

13  the families of this disaster.

14  Q.   Let's talk about this more specifically, though.  You knew

15  that when you wrote this e-mail that Mr. Bias and Ms. Dian

16  were in communication with Ms. Septiana and with Ms. Anice,

17  correct?

18  A.   I think there were previous e-mails where they're copied

19  on certain --

20  Q.   I'm not --

21  A.   I can't testify as to how often they communicated and by

22  what means.

23  Q.   But you e-mailed them all together at the same time

24  unprompted, correct?

25  A.   Could you show me the e-mail?

1  Q.  I can.  We're looking at Exhibit 131-1 on the right side

2  of your screen there.

3  A.  Yes, that's my e-mail of April 18th.

4  Q.  This isn't in response, direct reply to any previous

5  e-mail?

6          MS. MATTHAI:  Lacks foundation.

7          MR. TIEVSKY:  Just asking.

8          THE COURT:  Over -- well, that happens in every

9  question, you're asking.

10         Overruled, but I -- I'm not sure this inquiry

11  furthers what I need as the factfinder to know about.  The

12  letters and the e-mails are plainly evident what's going on in

13  my mind.

14         MR. TIEVSKY:  Sure.  The question is whether Mr. Lira

15  understood that not only Ms. Dian and Mr. Bias would have

16  received those lies but also Ms. Septiana and Ms. Anice.

17         THE COURT:  Would you agree with that?

18         THE WITNESS:  I wouldn't know.

19         THE COURT:  You wouldn't know, but would it be likely

20  that given the communications between these folks being common

21  on some e-mails that a couple of letters that go out would

22  likely find their way into the hands of the two that didn't

23  get letters?

24         THE WITNESS:  There was that possibility, yes.

25         THE COURT:  All right.  That's enough.  That's fine.

Lira - Direct by Tievsky

1    That's a logical inference that can be drawn by anyone.

2         MR. TIEVSKY:  Thank you.

3    BY MR. TIEVSKY:

4    Q.   Moving now to Exhibit 135, this is an e-mail that you

5    received from George Hatcher on May 19, 2020?

6    A.   Yes, I'm cc'd on this.

7    Q.   So you received it?

8    A.   I assume so.

9    Q.   It says, "Dear Tom, Client Bias and Dian received letters

10   from you, a sort of reply regarding their questions sent to

11   you of why they received only half the money from GK."

12        I'm reading that right?

13   A.   That's what it says.

14   Q.   GK is Girardi Keese?

15   A.   Yes.

16   Q.   Do you understand the letters that Mr. Hatcher is

17   referring to here to be the ones containing lies from

18   Mr. Girardi?

19   A.   One form or another.  The exact letter, I don't know.

20   Q.   The ones that Ms. Cory had told you went out?

21   A.   Well, there were different letters, and the ones that

22   actually went to Bias and Dian I don't know as I sit here.

23   Q.   But do you know that those were letters in some form or

24   another that contained lies?

25   A.   Yes.

**Lira - Direct by Tievsky**

1    Q.  And did you know at the time you received this e-mail from

2    Mr. Hatcher that that is what he was referring to?

3    A.  I'll be speculating, but I assume so.

4    Q.  Did you respond to Mr. Hatcher?

5    A.  I don't recall.

6    Q.  Did you respond to Ms. Dian who is making an inquiry

7    through Mr. Hatcher?

8    A.  It was addressed to Tom, and this is what I warned would

9    happen.  And so I was going to let Tom respond.

10    Q.  So that's a no?

11    A.  I did not talk to Ms. Dian.

12    Q.  Same for Mr. Bias?

13    A.  I believe so.

14    Q.  You didn't never tell any attorney at Edelson PC that

15    Girardi Keese has sent Ms. Dian or Mr. Bias e-mails containing

16    lies, did you?

17    A.  Not that I recall.

18    Q.  Not even after you left Girardi Keese?

19    A.  Not that I recall.

20    Q.  You didn't never tell the California bar that Girardi

21    Keese had sent Ms. Dian or Mr. Bias letters containing lies,

22    did you?

23    A.  That's correct.

24    Q.  Not even after you left Girardi Keese?

25    A.  I did not.

1   Q.  All right.  Are you aware of any other occasion besides

2   the letters we've seen where Mr. Girardi lied to a client?

3           MS. MATTHAI:  Vague, ambiguous, and overly broad.

4           THE COURT:  Yeah, let's keep it specific -- well,

5   actually, he can answer that question, if you know.  Let's

6   start first with yes or no.

7           THE WITNESS:  No.

8           THE COURT:  All right.  Then we can move on.

9   BY MR. TIEVSKY:

10  Q.  So you didn't tell Mr. Bias and Ms. Dian that Mr. Girardi

11  was lying to them, but you did start making sure that other

12  clients' money didn't go to Girardi Keese, right?

13  A.  What do you mean?  I'm sorry.  I don't understand.

14  Q.  We can clarify.

15          So Mr. Dani Andrian, he signed his settlement on

16  May 15, 2020, right?

17  A.  Yes.

18  Q.  And that's the day after these e-mails from Mr. Girardi?

19  A.  Approximately, yes.

20  Q.  Mr. Andrian, he's one of the clients that was referred

21  directly to you?

22  A.  That's correct.

23  Q.  And you knew on May 15, 2020 that his settlement agreement

24  didn't provide for money to be wired to Girardi Keese?

25  A.  Yeah, that was determined back in March before all these

**Lira - Direct by Tievsky**

1    events.

2    Q.   How was it determined?

3    A.   I wanted to make sure that -- I was leaving the firm, and

4    I shared that with Mr. Koushan.  And I didn't know whether or

5    not I could tie up all those cases he referred to me by the

6    time I resigned.  So I said I want to make sure you get your

7    attorney fees because Tom has signed away one half of the

8    attorney fees to California Lending.  And he said certainly

9    because he had obligations to a referring lawyer.

10            And so it was agreed back in March that the cases

11   that were referred to me directly would be handled by

12   Mr. Koushan's office, and that was actually executed.

13   Q.   So you said to Mr. Koushan that I want to make sure you

14   get half your attorneys' fees -- or I'm sorry -- I want to

15   make sure you get your attorneys' fees.  Did you have some

16   reason to believe if the money was sent to Girardi Keese that

17   Mr. Koushan wouldn't get his attorneys' fees?

18   A.   That crossed my mind because of the assignment to

19   California Attorney Lending.

20   Q.   What did that have to do with it?

21   A.   Well, in March -- in November of 2019, Tom pledged one

22   half of the attorney fees from all the Lion Air cases to

23   California Attorney Lending.  My agreement with Mr. Koushan

24   was that he was to receive 50 percent of the attorney fees

25   from the cases referred to me directly.

Lira - Direct by Tievsky

1        That was the situation I was dealing with in March,

2   and he asked me, that's how he wanted to proceed in order to

3   make sure he received his fees and that of the referring

4   lawyer to him.

5   Q.   Mr. Girardi had pledged half of the fees to California

6   Attorney Lending.  The other half was already committed to

7   Mr. Koushan?

8   A.   Yes.

9   Q.   What reason did you have to believe that if the money were

10  sent to Girardi Keese, Girardi Keese would not simply pay

11  Mr. Koushan what was owed?

12  A.   Because I learned sometime in 2020 that Mr. Girardi had

13  promised your firm, and the letter is very vague, depending on

14  the amount of work your firm did, 50 percent.  And now there

15  was this other lawyer, Mohamed Eltaher, and I think I learned

16  from Mr. Griffin that he was promised by Mr. Girardi to

17  receive 50 percent of the attorney fees from the cases Mohamed

18  referred to Tom Girardi.

19        THE COURT:  This is all adding up to more than

20  100 percent.

21        THE WITNESS:  Yes.

22        THE COURT:  The reason you could cut such a deal

23  where the money would not go to Girardi Keese is because there

24  wasn't a court order entered by me requiring the money to be

25  put into a trust account; is that correct?

**Lira - Direct by Tievsky**

1          THE WITNESS:  Yes.

2          THE COURT:  Okay.  That was -- however Boeing paid

3     the money, there was an agreement between Boeing to pay it to

4     someplace, but there was no court order in place requiring it

5     to go a trust account because there's no minors involved in

6     those, correct?  Is that how it worked?

7          THE WITNESS:  Yes.  Mr. Koushan was to handle all six

8     of the cases that were referred to me directly.

9          THE COURT:  All right.  Well, maybe there were minors

10    involved.  Maybe there weren't.  I don't recall if I entered

11    an order on these.

12         These were all paid off in full.  Does everyone

13    agree?

14         MR. TIEVSKY:  Yes.  Those settlements as far as we

15    know, the ones that were wired to Mr. Koushan instead of to

16    Girardi Keese, those clients got their money.

17         THE COURT:  All right.  If there's some relevance to

18    it, it goes maybe perhaps to the witness's knowledge that the

19    ship was sinking.  But get to that point because otherwise

20    we're talking about an area that really isn't the focus of

21    this inquiry.  These people all got paid.

22         I still want to hear about Mr. Multi.

23         MR. TIEVSKY:  Yes.

24         THE COURT:  And if you're going to get to that,

25    please do soon.

1  BY MR. TIEVSKY:

2  Q.  The only question I can ask, the ultimate question, the

3  only thing I'm trying to understand is is the reason that you

4  sent these funds to Mr. Koushan because you were concerned

5  that if the money went to Girardi Keese, the clients wouldn't

6  get paid?

7  A.  Not back in March of 2020.

8  Q.  You were just worried that Mr. Koushan might not get paid?

9  A.  Yes.

10 Q.  Okay.  After June 13, 2020, did you ever act on behalf of

11 Girardi Keese?

12 A.  I'm unclear.  What do you mean by that?

13 Q.  I mean, did you act on behalf of the firm Girardi Keese in

14 any manner after June 13, 2020?

15         MS. MATTHAI:  That's vague and ambiguous.

16         THE COURT:  Well, the witness can ask for

17 clarification if he doesn't understand.

18         What was your date of resignation?

19         THE WITNESS:  June 13, 2020.

20         THE COURT:  All right.  So did you represent yourself

21 to be -- did you take any actions on behalf of clients of

22 Girardi Keese after June 13, 2020?

23         THE WITNESS:  After June 13, 2020, I signed some

24 trust checks out of the San Bernardino office as I was the

25 only signatory to that trust account.

**Lira - Direct by Tievsky**

1          THE COURT:  Okay.

2          THE WITNESS:  And after I resigned, I got a call

3   saying the settlement checks need to go out out of San

4   Bernardino.  You're the only signatory.  And so they gave me

5   the breakdown of these modest settlements in order to get them

6   paid, and I asked them to take me off that account as I had

7   resigned.

8          THE COURT:  So that's a separate matter that you

9   signed those settlement checks on?

10         THE WITNESS:  Oh, yes, yes, this related only to the

11  San Bernardino office.

12         THE COURT:  And who called you on that?

13         THE WITNESS:  Jack Girardi.

14         THE COURT:  The brother of Thomas Girardi?

15         THE WITNESS:  Yes.

16         THE COURT:  And were you, in fact, taken off of that

17  account?

18         THE WITNESS:  You know, I don't know.

19         THE COURT:  That was the last time you were asked to

20  sign anything from that account?

21         THE WITNESS:  Yeah.  And in a few months, I can't

22  remember the number of checks that I signed and over what

23  period, but it was always "hey, get me off the account," and

24  they were closing down that branch.

25         THE COURT:  All right.

Lira - Direct by Tievsky

1          Is that where you're going?

2          MR. TIEVSKY:  Yes.

3          THE COURT:  Okay.  Do you need further explanation on

4    that?

5          MR. TIEVSKY:  A little bit, yes.

6          THE COURT:  Make it little.  Go ahead.

7    BY MR. TIEVSKY:

8    Q.  Mr. Lira, did you sign any checks from that account after

9    the motion for rule to show cause was filed in this case?

10   A.  For what?

11   Q.  Did you sign any checks out of that account after the

12   motion for rule to show cause was filed in this case?

13   A.  Not that I believe.

14         MR. TIEVSKY:  I am showing a confidential exhibit.

15         THE COURT:  All right.  What number?

16         MR. TIEVSKY:  159-145.

17   BY MR. TIEVSKY:

18   Q.  This is a check you signed from that San Bernardino trust

19   account, correct, Mr. Lira?

20   A.  Yes.

21   Q.  This check is dated -- I will Zoom in so you can see it --

22   December 11, 2020, correct?

23   A.  Yes.

24   Q.  This is your signature on the check, correct?

25   A.  Yes.

**Lira - Direct by Tievsky**

1   Q.   You signed this check on or about December 11, 2020?

2   A.   I don't recall the exact date when I signed it.

3   Q.   Do you ever predate checks?

4   A.   No.

5   Q.   Postdate?

6   A.   They're present -- I don't prepare checks.  They're

7   presented to me and I sign.

8   Q.   That's not your handwriting on the check?

9   A.   No, just a signature.

10  Q.   Whose handwriting is it?

11  A.   It's the office manager of the San Bernardino office.

12  Q.   And did that office manager as a general matter present

13  you with such checks the same day that the office manager

14  wrote the checks?

15  A.   No, they would be mailed to where I was in L.A.  This is

16  going back while I was an employee of Girardi & Keese.  They

17  would FedEx the checks or mail them.  I would sign them, and

18  then they would be FedEx'ed back to the San Bernardino office

19  for delivery.

20  Q.   It's possible you signed this check after December 11,

21  2020?

22  A.   I don't recall.

23  Q.   Is it possible you signed this check after December 11,

24  2020?

25  A.   Anything is possible, I assume, but I don't have an

1   independent recollection of when I signed it.

2   Q.  Are you aware that this Court froze the assets of Tom

3   Girardi and Girardi Keese?

4   A.  At some point, yes.

5   Q.  Did you sign this check after the Court froze the assets

6   of Tom Girardi and Girardi Keese?

7           MS. MATTHAI:  Objection.  Relevancy.  There's no

8   evidence that this is an asset of Girardi Keese.

9           THE COURT:  Well, it's -- overruled.  What was the

10  date of the hearing that -- where I found Mr. Girardi in

11  contempt?

12          THE WITNESS:  You're asking me?  December 14th.

13          THE COURT:  December 14th?

14          THE WITNESS:  Yes.

15          THE COURT:  And you were on that call, correct?

16          THE WITNESS:  Yes, I was.

17          THE COURT:  All right.  After I -- and I froze the

18  assets of Girardi Keese and Mr. Girardi on that date on the

19  spot, and you heard that.  Did you sign any checks relating to

20  any Girardi Keese trust accounts or other accounts relating to

21  Girardi Keese after I froze the assets on a -- on a court

22  hearing you were present on?

23          THE WITNESS:  No.

24          THE COURT:  All right.  And this -- we don't know the

25  date this was issued, but it says 12/11/20 which was a few

**Lira - Direct by Tievsky**

1    days before that hearing.

2            Go ahead.

3    BY MR. TIEVSKY:

4    Q.  All right.  Turning now to the time you left before

5    Girardi Keese, we discussed the other day, yesterday, that you

6    were also a signer on the client trust account at Torrey Pines

7    Bank, right?

8    A.  Yes.

9    Q.  But you say you had no access to transaction information

10   for that account?

11   A.  The only transactional information I would receive would

12   be a spreadsheet showing what was due to the clients to verify

13   the checks, and they would be delivered to me hundreds at a

14   time because of the mass tort litigation we were doing.

15   Q.  How did you know you weren't passing a bad check?

16   A.  I assumed good faith, that everybody was following the

17   instructions regarding the closing statements and/or orders of

18   the Court or a qualified settlement fund.

19   Q.  But you were aware of some at least irregularities

20   involving that specific client trust account as far back as

21   2019, weren't you, Mr. Lira?

22   A.  No.  What do you mean by "irregularities"?

23   Q.  You did understand that the California Rules of

24   Professional Conduct don't permit lawyers to mix their own

25   money with money in an IOLTA account, right?

**Lira - Direct by Tievsky**

1    A.   That's correct.

2    Q.   But you were aware of at least one occasion on which Tom

3    Girardi appears to have done so, right?

4    A.   I don't know what you're referring to.

5    Q.   Sure.  Let's have a look.

6         I'm showing you Exhibit 128 which is confidential.

7    So you'll see that the first five pages of this exhibit here

8    are the summary portion of an account statement for the month

9    ending in June 30, 2019, right?

10   A.   I assume so.

11   Q.   So looking at the bottom of page 128-4, I'm going to zoom

12   in on a wire transfer here.  You see the line at the bottom

13   there where it says 6/7 for June 7th?

14   A.   I think you have to scroll up.

15   Q.   It's right here.

16   A.   June 7th?

17   Q.   6/7 wire credit.

18   A.   And your question?  I see that.

19   Q.   And it says, "Incoming wire ORG MSL FBO Thomas V.

20   Girardi," right?

21   A.   That's what's written.

22   Q.   And it's for the amount that's written here, right?

23   A.   I assume so.  I've never seen this document before.

24   Q.   Do you know where this wire came from?

25   A.   I do not.

**Lira - Direct by Tievsky**

330

1 Q.   Now, looking at page 128-6, the bottom right of the page,

2 do you see check 124265?

3 A.   I do.

4 Q.   This check has your signature on it?

5 A.   It looks like my signature, but I'm not certain.

6 Q.   You're not certain?

7 A.   No.

8 Q.   Do you have any reason to believe it's not your signature?

9 A.   Yes, because I've learned that my name had been forged

10 once I received evidence from the banks.

11 Q.   Look for a moment at Exhibit  --

12          THE COURT:  Let's go back a minute.

13          MR. TIEVSKY:  Oh.

14          THE COURT:  This is a check to Girardi Keese in the

15 amount of $11,800,000, correct?

16          THE WITNESS:  Yes.

17          THE COURT:  And it's either your signature or -- does

18 it look like your signature?

19          THE WITNESS:  You know, there's been so many

20 forgeries of my signature that I've seen.  It's close.

21          THE COURT:  Do you have a recollection of a check for

22 $11.8 million being written out of a client trust account?

23          THE WITNESS:  I do not, Your Honor.

24          THE COURT:  All right.  Is that amount unusual, so

25 unusual you would have remembered it if you actually signed a

                          Lira - Direct by Tievsky
                                                                      331

 1    check in that amount?

 2              THE WITNESS:  There were so many checks over the

 3    years of different amounts, Your Honor.

 4              THE COURT:  So it wouldn't be unusual?

 5              THE WITNESS:  No.

 6              THE COURT:  Okay.  What would be the reason -- I just

 7    want to make sure I understand how this account works if you

 8    can help me on this.

 9              Client trust money, or client money that comes from a

10    defendant to pay a settlement goes to this client trust

11    account, correct?

12              THE WITNESS:  Yes.

13              THE COURT:  And then -- in total, and then Girardi

14    Keese takes out portions of it to represent their attorneys'

15    fees, correct?

16              THE WITNESS:  Yes.

17              THE COURT:  And then clients also have their checks

18    cut from this for payments of the settlements?

19              THE WITNESS:  Yes.

20              THE COURT:  Is there a single account or are these

21    somehow segregated into different client matters?

22              THE WITNESS:  They are not segregated accounts.  It's

23    all one general trust account.  That's my understanding.  All

24    money goes into one account.

25              THE COURT:  Is that -- in your experience as an

**Lira - Direct by Tievsky**

1    attorney, is that unusual?

2            THE WITNESS:  No.

3            THE COURT:  So it's just one big pot of money that

4    all defendants pay into?

5            THE WITNESS:  Yeah.  My understanding is the escrow

6    accounts aren't required for every case and every settlement.

7            THE COURT:  Okay.  Well, this is not a -- this is

8    more for education of me on this.

9            All right.  So what purpose would $11,800,000 coming

10   out of that account in -- what is it? -- June of 2019, what

11   would you believe that purpose to be?

12           THE WITNESS:  I have -- I have no knowledge,

13   Your Honor.

14           THE COURT:  All right.

15           Okay.  Go ahead.

16   BY MR. TIEVSKY:

17   Q.  You may have had some knowledge, though.  Looking at the

18   memo line here, it says "TVG loan proceeds," correct,

19   Mr. Lira?

20   A.  That's what's written there.

21   Q.  And TVG are Tom Girardi's initials?

22   A.  Yes.

23   Q.  So what would $11.8 million of Mr. Girardi's loan proceeds

24   be doing in a client trust account?

25   A.  As I indicated, I have no knowledge.

Lira - Direct by Tievsky

1  Q.  You didn't ask anybody?

2  A.  I did not.

3  Q.  Before you signed a check for $11.8 million?

4  A.  I believed everybody was acting in good faith.

5  Q.  Can you think of any possible legitimate reason that

6  $11.8 million of TVG loan proceeds would be in a client

7  account?

8  A.  I don't remember this check or this amount, so any answer

9  would be speculation.

10           THE COURT:  So the way you keep track of this in

11  these accounts is with the memo line?  It seems like an

12  impossible task to keep track of all this money going into a

13  single account and then attorneys' fees coming out of it,

14  client payments coming out of it.  It looks like here some

15  type of loan proceeds for this memo.

16           Who keeps track of all this?  Mr. Kamon?

17           THE WITNESS:  Yes.

18           THE COURT:  All right.

19           Go ahead.

20  BY MR. TIEVSKY:

21  Q.  Oh, sorry.  I did want to ask you, Mr. Lira, looking at

22  Exhibit 154 on the right here, this is the declaration you

23  submitted in connection with this case?

24  A.  Could you scroll down, please?

25  Q.  Exhibit 154.

1    THE COURT:  This can go up on the screen, I believe.

2    MR. TIEVSKY:  I still got the check with the account

3  numbers here.

4    THE COURT:  I don't have a 154 in my hard copy.

5    MR. TIEVSKY:  It is in the other binder because it --

6    THE COURT:  That's the large exhibit.  Thank you.

7    MR. TIEVSKY:  I don't need the exhibits now,

8  Your Honor.  I'm just looking at 154-006.

9    THE WITNESS:  I believe that's the declaration I

10  filed under seal.

11  BY MR. TIEVSKY:

12  Q.  Is that your true and legitimate signature that you made

13  with your hand?

14  A.  Yes.

15    THE COURT:  By the way, were you aware of forgeries

16  or someone signing your name before December of 2020?

17    THE WITNESS:  No.

18  BY MR. TIEVSKY:

19  Q.  Looking now at Exhibit 152, this is the statement for that

20  same client trust account ending March 31, 2020, right?

21  A.  I assume so.  I've never seen this document before.

22  Q.  Now, because this is the client trust account, any money

23  in this account would be held for specific clients, right?

24  A.  That's the purpose.

25    MS. MATTHAI:  Objection.  That misstates the record.

**Lira - Direct by Tievsky**

1        THE COURT:  Well --

2        MS. MATTHAI:  That misstates --

3        THE COURT:  -- the witness can correct the improper

4    assumption if there is one in the question.

5        THE WITNESS:  Well, you have to remember, monies are

6    sent by the defendant, that part of the monies will have to be

7    allocated between attorneys' fees, costs related, and then at

8    some point there's a net, where all the money is representing

9    all those line items would be deposited into the trust

10   account.

11   BY MR. TIEVSKY:

12   Q.   Right.  The money comes in and then you, pursuant to

13   client authorization or the firm pursuant to client

14   authorization, withdraws the money they are entitled to?

15   A.   Yes.  That is what is called the consent to distribute or

16   the closing statements that are in evidence in this case.

17   Q.   So when the money shows up, it's all the client's money?

18   A.   No.

19   Q.   No.

20   A.   The checks are written from the closing statements from

21   each case that is submitted to the accounting which has a line

22   item for gross settlement, attorney fees, costs, and then

23   there's a net.  So it would be multiple checks written from

24   that one settlement amount.

25   Q.   But the client is paying you from their settlement, right?

Lira - Direct by Tievsky

1   A.  Pursuant to a contract, yes.

2   Q.  So the money is wired from the defendant to the client

3   trust account?

4   A.  Not always wired.  They come in different forms.  There's

5   checks.  I would say the super majority, until recent, were

6   just certified checks or checks in other forms.

7   Q.  So the money in some form comes from the defendant and you

8   put it all in the client trust account, right?

9   A.  That's my understanding.

10  Q.  And that's because, until the client pays you, that's all

11  the client's money, right?

12  A.  Not true.

13  Q.  No?  Some of that money belongs to you immediately?

14  A.  Yes.

15  Q.  You're commingling funds in the trust account?

16  A.  No.  Once --

17         MS. MATTHAI:  Ob- --

18         THE COURT:  Go ahead.  Complete your answer.

19         THE WITNESS:  Yeah.  The checks are distributed

20  according to the authorized consent of the clients.

21  BY MR. TIEVSKY:

22  Q.  All right.  Turning to page 151-2.  Do you see the section

23  here marked credits?

24         THE COURT:  151-2 or 152?

25         MR. TIEVSKY:  I'm sorry.  152-2.  I misspoke.

1          THE WITNESS:  I see that.

2    BY MR. TIEVSKY:

3    Q.   You see money coming in on March the 4th, correct?

4    A.   That's what it says.

5    Q.   From Perkins Coie?

6    A.   That's what it says.

7    Q.   And that's the wire transfer for Ms. Anice, right?

8    A.   I assume so.

9    Q.   March 11th --

10          THE COURT:  Was this on the public display or not,

11   Emily?

12          THE CLERK:  It's not.

13          THE COURT:  It's not.  It shouldn't be.  Go ahead.

14   It shows amounts of settlement.

15   BY MR. TIEVSKY:

16   Q.   On March 11th we see another wire from Perkins Coie,

17   right?

18   A.   That's what it says.

19   Q.   And that's Ms. Dian's settlement?

20   A.   I don't have -- I know the dates but not the names

21   specific.  But that's correct.  There were wires on the 4th,

22   11th, 27th, and 31st.

23   Q.   Okay.

24   A.   Of March.

25   Q.   And those you understand correspond with Mr. Griffin's

Lira - Direct by Tievsky

1   memos on those dates, right?

2   A.  Yes.

3   Q.  Okay.  So let's focus on this first one, March 4th, which

4   is -- which is Ms. Anice's.  That was the first Lion Air

5   settlement that got wired to Girardi Keese at all, right?

6   A.  I assume so, yes.

7   Q.  So from the time that Ms. Anice's settlement came in on

8   March the 4th and when the next one came in on the 11th, the

9   only Lion Air money in this account was from Ms. Anice's

10  settlement, right?

11  A.  I assume so, yes.

12  Q.  Let's see.  So I'm looking now at 152-9.  In the middle of

13  the right-hand column here, you see check 125017, right?

14  A.  Yes.

15  Q.  And that's your signature there on the top line?

16  A.  It looks like it, yes.

17  Q.  Okay.  And you signed it on March the 10th, 2020?

18  A.  I don't remember when I signed this.  The check is dated

19  that date.  I'm not disputing the date of the check.  But I

20  don't recall when I actually signed it.

21  Q.  You see below on the back of the check that same date,

22  March the 10th, 2020, is printed, right?

23  A.  Yeah, there's a deposit stamp.

24  Q.  So that indicates it was also deposited on that date?

25  A.  I assume so.

**Lira - Direct by Tievsky**

1  Q.  So likely that you signed it on that day?

2  A.  I'm not disputing I didn't.  I just don't have an

3  independent recollection.

4  Q.  There's no chance you signed it after March the 10th,

5  2020?

6  A.  I don't know.  It says what it says.  I assume I signed it

7  around that time.  I just don't have an independent

8  recollection specific to the date.

9  Q.  Now, it's got a memo line here.  It says Case Number

10  2018-251.  Is that the case number internal at Girardi Keese

11  for Lion Air?

12  A.  I'm assuming, and I could explain why.  You have this

13  awful event in terms of Lion Air dropping in the sea occurred

14  in October of 2018.  That first four digits on the case number

15  represents the year the file was opened.  And then this would

16  be the 251st case that the firm signed up in the year 2018.

17  That's my recollection of that number.

18  Q.  I'm going to show you very briefly what's been marked

19  Exhibit 101.  I'm not suggesting at all that you received this

20  e-mail.  I just want you to look at the subject line here.  It

21  says "Fwd: Correspondence, Lion Air Flight JT610B," and then

22  it's got that same number, right?

23  A.  It has the same number.

24  Q.  Right.  And so if -- in your experience, if someone at

25  Girardi Keese sent an e-mail containing such a number in the

**Lira - Direct by Tievsky**

340

1  format you just described, then it would be the internal case

2  number, right?

3  A.  Well, I don't know why anyone would include an internal

4  file number.  I never would.  It's not relevant to anything.

5  Q.  But strongly suggests at least that the internal case

6  number for Girardi Keese was, in fact, 2018-251?

7  A.  Yeah, I'm not disputing that.

8  Q.  The amount of this check is for half a million dollars,

9  right?

10  A.  That's what it says, yes.

11  Q.  So let's have a look at Mr. Griffin's memo about

12  Ms. Anice's case which is Exhibit 109.  Now, I'm not going to

13  get -- I'm not going to say too many of the numbers here, but

14  you see that there's an amount that was wired to California

15  Attorney Lending, correct?

16  A.  Yes.

17  Q.  And then there's an amount to be wired to the client?

18  A.  Yes.

19  Q.  And then on 129-1, there's three amounts below that could

20  potentially belong to Girardi Keese, right?

21  A.  That's what it says.

22  Q.  Those amounts added up, do they add up to more or to less

23  than the amount of the check?

24  A.  I think what happened here, this would cover both the

25  first two cases.  But that's my presumption.  I'm not

**Lira - Direct by Tievsky**

1    disputing the closing statements.

2    Q.   So if you could answer the question.

3    A.   Those numbers do not add up to 500,000 as to Girardi &

4    Keese, that's correct.

5    Q.   Less?

6    A.   Yes.

7    Q.   Okay.  And so your testimony is it could have covered two

8    cases?

9    A.   Yeah, because total fees on the first two cases was

10   $1.6 million.  So that would be a fraction of the attorney

11   fees owed.

12   Q.   Why not the whole amount?

13   A.   I don't know.

14   Q.   And why would you -- strike that.

15           Did you have any reason to believe that any

16   settlement other than Ms. Anice's had come in to the Girardi

17   Keese client trust account on March 10, 2020?

18   A.   I have no knowledge.

19   Q.   Okay.  Have a look for a moment at Exhibit 110 here.  This

20   is that next settlement that you're talking about?

21   A.   In the order, yes.

22   Q.   Now, the money, looking at the bottom of the page again,

23   there's an amount for remaining attorneys' fees and an amount

24   to Girardi Edelson for costs.  Does that amount add up to the

25   amount of the check?

**Lira - Direct by Tievsky**

1    A.   No, it adds up to 470,000.

2    Q.   And if you were to add the 470,000 you just said to the

3    amount owed from Ms. Anice's settlement, does that end up to

4    half -- exactly half a million dollars?

5    A.   No, it's way above that amount.

6    Q.   It's way above.  Why only half a million dollars?

7    A.   I have no idea.

8    Q.   You just signed the check?

9    A.   I signed that check, yes.

10   Q.   Okay.  Without having any idea why that amount was being

11   sent to Girardi Keese?

12   A.   What amount?  It represents attorney -- a partial attorney

13   fees.

14   Q.   Why would only partial attorney fees be paid?

15   A.   As I said, I don't know.

16   Q.   In your experience had that ever happened before at

17   Girardi Keese?

18   A.   I would be speculating.  I only could focus on my cases.

19   Q.   Okay.  To your knowledge, have you ever signed a check

20   from Girardi Keese's client trust account for only part of the

21   attorneys' fees that Girardi Keese was owed?

22   A.   As I sit here, I don't recall.  There are hundreds of

23   checks.

24   Q.   You don't recall any occasion on which that ever happened?

25   A.   Not that I can recall.

**Lira - Direct by Tievsky**

1    Q.  Did you personally receive any of this $500,000, Mr. Lira?

2    A.  No.

3            THE COURT:  Well, that starts into the questions I

4    had yesterday for Mr. Griffin.

5            What was your salary at Girardi Keese?

6            THE WITNESS:  Back in 2020, I had a base salary of

7    550,000.

8            THE COURT:  All right.  What -- did you have the

9    potential to earn -- did you earn more than that in 2020?

10           THE WITNESS:  I never received a W-2 or is it W --

11   yeah, W-2, because of the bankruptcy.  So I can't give you an

12   exact number.

13           THE COURT:  All right.  You kept getting paid until

14   you resigned, though; is that correct?

15           THE WITNESS:  That's correct.

16           THE COURT:  All right.  And did you receive any

17   monies after you resigned?

18           THE WITNESS:  No.

19           THE COURT:  Did you have any type of agreement where

20   you received a percentage of any cases you brought --

21   recoveries of any cases you brought in?

22           THE WITNESS:  Well, there was an oral agreement, and

23   that was at the discretion of Mr. Girardi.

24           THE COURT:  And what was that agreement?

25           THE WITNESS:  That he would give me a share of the

**Lira - Direct by Tievsky**

1   attorney fees when a case came in successfully.

2            THE COURT:  All right.  And what was that share?

3            THE WITNESS:  It was case-to-case determinative.

4            THE COURT:  All right.  And what -- so what was

5   your -- in 2020, did you receive a share of any of the -- for

6   any case that was litigated through Girardi Keese?

7            THE WITNESS:  I did not.

8            THE COURT:  How about 2019?

9            THE WITNESS:  All I could say, Your Honor, I don't

10  recall.  I think the last significant share I received was

11  like six years ago when I received a check based on a verdict

12  that I obtained.

13           THE COURT:  All right.  And what was that amount?

14           THE WITNESS:  I think it was 250,000.

15           THE COURT:  In addition to the base salary of 550?

16           THE WITNESS:  Yes.

17           THE COURT:  Okay.

18           Go ahead.

19  BY MR. TIEVSKY:

20  Q.  Mr. Lira, I'm showing you what's been marked as Exhibit

21  160.  You recognize this as the same check we saw a moment

22  ago, right?

23  A.  Yes.

24  Q.  The $500,000 check from the client trust account?

25  A.  That's what it looks like, yes.

**Lira - Direct by Tievsky**

1    Q.  On the top there, you see that Nano Banc, right?

2    A.  Yes.

3    Q.  Okay.  I'm showing you now what's been marked as

4    Exhibit 161.  You see this is a Nano Banc bank statement,

5    correct?

6    A.  This is the first time I'm seeing these documents.

7    Q.  That's fine.  You see that that's what this is, though,

8    right?

9    A.  It says Nano Banc.

10   Q.  And you see in the upper right corner here, there's an

11   account number, yes, on Exhibit 161?

12   A.  There is an account number stated.

13   Q.  And do you see that that account number -- I can flip the

14   page if you'd like.  I can try -- is the same account number

15   that's written on the bottom of 160-1, right?

16   A.  Appears so.

17   Q.  So let's have a look at the bottom here of 161-4.  You see

18   where it says "daily balance summary"?

19   A.  Yes.

20   Q.  You see at the beginning of March here, this statement

21   indicates that the account is overdrawn, correct?

22   A.  Like I said, I've never seen this before, but it's a

23   negative number.

24   Q.  Indicating that the account is overdrawn?

25   A.  I assume so.

**Lira - Direct by Tievsky**

1   Q.  Did you know that Girardi Keese was overdrawing any of its

2   bank accounts as of March 2020?

3   A.  I did not.

4   Q.  Did you have any reason to believe that Girardi Keese was

5   running out of money in March 2020?

6   A.  No.

7   Q.  Looking at March 23rd, the account is overdrawn again,

8   right?

9   A.  That's what this document seems to indicate.

10  Q.  And again on March 24th?

11  A.  Same answer.

12  Q.  And again on March 26th?

13  A.  Same answer.

14  Q.  All right.  Looking at 161-15 here.  At the bottom of the

15  left-hand column, you see this is a check dated March 11,

16  2020?

17  A.  I've never seen this check before.

18  Q.  March 11, 2020 is the day after that check we were looking

19  at was dated, right?

20  A.  Yes.

21  Q.  Did you know that Girardi Keese -- did Girardi Keese have

22  a Lamborghini?

23  A.  No.

24  Q.  Did you ever see Mr. Girardi driving or riding in a

25  Lamborghini?

Lira - Direct by Tievsky

347

 1   A.   No.

 2   Q.   Do you know why Girardi Keese was making payments to

 3   Lamborghini Payment Center?

 4   A.   I have no idea.

 5              THE COURT:   What page -- what exhibit?   161 dash

 6   what?

 7              MR. TIEVSKY:   161-15 in the bottom left-hand corner,

 8   Your Honor.

 9              THE COURT:   Okay.   Thank you.

10   BY MR. TIEVSKY:

11   Q.   You have a company car at Girardi Keese?

12   A.   I did.   It was turned in on my resignation.

13   Q.   What kind of car was it?

14   A.   It was a Land Rover.

15   Q.   A Land Rover?

16   A.   Yeah.

17   Q.   And the firm paid for that car?

18   A.   Yes, they paid the car bills.

19   Q.   Turning now to 161-16, in the middle of the left-hand

20   column, you see check 10509?

21   A.   I see it.

22   Q.   You see the check is dated 3/12/2020?

23   A.   I see that.

24   Q.   And you see the check is to the Girardi Keese payroll

25   account?

**Lira - Direct by Tievsky**

1   A.   That's what it says.

2   Q.   And this is dated after the date on the $500,000 check we

3   looked at a moment ago, correct?

4   A.   That's what this check says.

5   Q.   Let's go back to the client trust account on which you

6   were a signer.  I'm looking at 152-3.  We're going to have a

7   look at the daily balances here.  Do you see that?

8   A.   Yes.

9   Q.   So you see here that on March 3rd the amount in the

10  account is $85,118.57, correct?

11  A.   I don't know.  That's what the document says, but I have

12  no direct knowledge of that.

13  Q.   The bank is reporting that that's the balance in the

14  account as of that date?

15  A.   I assume that's their intention.

16  Q.   Right.  And so scrolling back up to page 152-2, we see a

17  deposit come in on the 4th.  That's Ms. Anice's settlement,

18  right?

19  A.   Yes.

20  Q.   We see a small deposit on the 11th, with deposit

21  undescribed?

22  A.   That's what the document reads.

23  Q.   And then the document also reflects on the 11th another

24  wire from Perkins Coie for Ms. Dian's settlement?

25  A.   That's what it indicates.

**Lira - Direct by Tievsky**

1  Q.  So this would seem to indicate that on March 11th, the

2  only -- the most money that could possibly be in this account

3  that doesn't come from either Ms. Anice's or Ms. Dian's

4  settlements is this $184.86 plus this $85,118.57, right?

5  A.  That's what the document says.

6  Q.  That amount would be $85,303.13, right?

7  A.  I can accept your addition.

8  Q.  With the Court's permission, and if you would like, we do

9  have a calculator for you.

10 A.  No, you don't need to do the dramatics.  I'll accept your

11 representation.

12 Q.  Absolutely.

13      So I would like to bring us back then to a document

14 we looked at yesterday, 152-10 in the lower left-hand corner.

15 This is the check to your client from the Blythe bus crash

16 case, correct?

17 A.  Yeah, you showed me that yesterday.

18 Q.  Is this check more for $85,303.13?

19 A.  Using your question, obviously.

20 Q.  So where did the money that you sent to Mr. Castillo come

21 from?

22 A.  I have no idea.

23      THE COURT:  All right.  Where are you going on all

24 this?  Let me tell you what I think is going on and you can

25 tell me if you have questions that go differently.

1          This client trust account is a mess.  The money comes

2     in from Perkins Coie for the Lion Air plaintiffs, and there's

3     money coming out of that account for other plaintiffs.

4     They're not segregated, and so it's clear that money, one way

5     or the other, money that went in from Perkins Coie wasn't held

6     in trust separately to pay off attorneys' fees and plaintiffs

7     in the Lion Air cases.  It was used for who knows what

8     reasons, certainly among them, payment of other plaintiffs

9     unrelated to the Lion Air case.  One is this individual,

10    Mr. Cesar Castillo, but likely others, too.  The money had to

11    go out.

12          Are there -- do you have evidence -- I haven't gone

13    through all these checks.  Is there evidence that funds went

14    out for anything other than what appears to be attorneys' fees

15    and payments to plaintiffs?

16          MR. TIEVSKY:  Yes.  There is evidence of that,

17    although there is not evidence that either of the two

18    individuals here today knew about it.

19          THE COURT:  All right.  Well --

20          MR. TIEVSKY:  But what -- if I haven't --

21          THE COURT:  If Tom Girardi was sitting up here right

22    now, I would say go through every page of this.

23          MR. TIEVSKY:  And --

24          THE COURT:  I would give you weeks to do it.  I would

25    give you as much time as you wanted.  I would give you every

1    day I possibly had in my schedule to allow you to do that.

2    He's not here.  He exercised his Fifth Amendment privilege,

3    which is wise given this evidence.

4            But let's focus on what this person knew so we can

5    move on with it.  But my conclusion is this money was put into

6    a trust account and wasn't held in trust.  It was used for all

7    kinds of expenses including taking of attorneys' fees that may

8    have been due but certainly shouldn't have been due before the

9    clients got paid.  That's how I view it.

10           If there's a different conclusion you want me to draw

11   based on your questions, ask those questions.

12           MR. TIEVSKY:  Sure.

13           THE COURT:  But that's what I've drawn.  Ms. Matthai

14   is free to come in and have questions of her client otherwise

15   if there's a conclusion I've drawn that you think is

16   incorrect.  So please tell me where you're going.

17           MR. TIEVSKY:  Sure.  So I will say it is relatively

18   common with this type of client trust account, if the money is

19   only going to be held for a very short time, you can have a

20   group account like this.  The interest goes to the state bar

21   and you just have to keep at the law firm meticulous track of

22   it.  We think that didn't happen here.

23           On top of that, what this is is we think a check

24   from -- that Mr. Lira has signed sending the Lion Air clients'

25   money to somebody else.  I don't know if he knew specifically

**Lira - Direct by Tievsky**

1    that he was doing that, and I would like to know that, but

2    that's -- that is the point of this question.

3              THE COURT:  All right.  Ask him that.

4    BY MR. TIEVSKY:

5    Q.  Did you know that this check -- did you know that when you

6    signed this check, you were sending the Lion Air clients'

7    money to Mr. Castillo?

8    A.  My -- could you repeat that?  I'm looking at the

9    signature; and I know yesterday I said it looks familiar, but

10   upon reflection, that does not look like my signature, for

11   starters.  So could I have your question again?  I'm sorry.

12   Q.  Yesterday you testified you signed the check.

13   A.  Yeah, but then upon reflecting and looking at it, I had

14   some suspicion it may not be my signature when you look at the

15   one to the right.  See the one to the right, flat, that's my

16   signature.

17   Q.  Did you know when you signed this check, as you testified

18   yesterday, that you were sending Lion Air clients' money to

19   Mr. Castillo?

20   A.  No.

21   Q.  I'm looking now at Exhibit 155.  I would just like to turn

22   your attention to 155-3.  The first line there under debit,

23   you see it says "Outgoing wire, BNF Dian Daniaty," correct?

24   A.  Yes.

25   Q.  And the wire is in the amount of $40,000.  Yes?

1    A.   Yes.

2    Q.   Now, this is nearly a month after Ms. Dian's settlement

3    was wired to Girardi Keese, right?

4    A.   I think it's less than a month.  I think Anice was funded

5    on 3/4.  I don't know when Ms. Daniaty's was funded.

6    Q.   According to Exhibit 110, it was funded on March 11th,

7    right?

8    A.   I think that's a different plaintiff.

9    Q.   No.  110, you see in the regarding line, it says Dian

10   here?

11   A.   Yes.

12   Q.   And then on 4/6, it also says Dian.  It's the same person,

13   right?

14   A.   I assume so.  I'm not certain.

15   Q.   Why was $40,000 sent to Ms. Dian on April the 6th?

16   A.   I have no knowledge why.

17   Q.   Did you know at the time that $40,000 had been wired to

18   Ms. Dian?

19   A.   I did not.

20   Q.   All right.

21        MR. TIEVSKY:  Your Honor, I can go through these or

22   not.  Effectively without Mr. Lira's testimony, we can

23   demonstrate that there wasn't enough money in the trust

24   account very shortly after March to pay all of the clients.

25   So I can go through and demonstrate that now or I can just ask

**Lira - Direct by Tievsky**

1    him if he knew and at what point he knew.

2            THE COURT:  Let's do the latter.

3            MR. TIEVSKY:  That's what I thought.

4    BY MR. TIEVSKY:

5    Q.  Mr. Lira, do you know on what date or if at all the

6    balance in the Torrey Pines IOLTA account became too low to

7    pay what was due to the Lion Air clients?

8    A.  I have no knowledge.

9    Q.  No knowledge of that whatsoever?

10   A.  That's correct.

11           THE COURT:  Who would know that?  Mr. Kamon?

12           THE WITNESS:  And Mr. Girardi.

13           THE COURT:  All right.  Which is likely why they both

14   exercised their Fifth Amendment privilege.

15           Go ahead.

16           MR. TIEVSKY:  And I would add that the Court knows

17   also, we could present the calculations, but all of the -- all

18   of the information needed to figure that out is now in the

19   record.

20           THE COURT:  I don't question the conclusion.

21   BY MR. TIEVSKY:

22   Q.  So you testified that you left Girardi Keese on June 13,

23   2020?

24   A.  Correct.

25   Q.  When did you decide to leave Girardi Keese?

1   A.   A year prior.

2   Q.   A full year?

3   A.   Approximately.

4   Q.   And when did you decide what specifically you would do

5   after Girardi Keese?

6   A.   Those conversations started in earnest at the end of 2019,

7   and I think we had a deal in place in January of 2020.

8   Q.   So during the entire period of time after the Lion Air

9   money was wired to Girardi Keese, you knew that you were going

10   to be leaving?

11   A.   That's correct.

12   Q.   And did you know the exact date you would be leaving by

13   that point?

14   A.   The goal originally was by April 15th.  It got pushed back

15   to May 15th and then pushed back again because I was closing

16   my cases.  And I had a trial commitment in New Mexico that

17   went for five weeks.

18   Q.   Gotcha.  So when you left, you left to join a firm called

19   Johnston & Hutchinson?

20   A.   That's correct.

21   Q.   And after you joined, what was it called?

22   A.   Johnston Hutchinson & Lira.  They asked me if I wanted my

23   name first.  I don't have that kind of ego, and I said leave

24   it as is.  Just add my name to the back.

25   Q.   Is the firm called that anymore?

1  A.  No.  They kicked me out of the partnership as soon as your

2  motion was filed.

3  Q.  Did you have any discussions with them about this motion?

4  A.  Yes.

5  Q.  What did you tell them?

6  A.  I told them that I didn't take any money.  I endeavored to

7  get them paid.  But the allegations were so salacious and they

8  didn't want to take the heat, and so they kicked me out of the

9  partnership on December 21, 2020.

10  Q.  Is that everything you told them about the circumstances

11  of the --

12  A.  Well, yes, that apparently Tom didn't pay all the clients

13  and I'm named in this lawsuit.  And I think you named my new

14  firm as a defendant.

15  Q.  Did you discuss any more specific facts and circumstances

16  with respect to this case before you left that firm?

17  A.  No, because their mind was made up.

18  Q.  So you said you had confrontations with Mr. Girardi in May

19  and June of 2020.

20  A.  Yes.

21  Q.  Were all of those confrontations about paying the clients

22  in this case?

23  A.  Yes.

24  Q.  You didn't have any fights about anything else?

25  A.  This was it.

**Lira - Direct by Tievsky**

1  Q.  All right.  Did you accuse Mr. Girardi of lying to the

2  clients during any of these conversations?

3  A.  Yes.

4  Q.  What did he say?

5  A.  He wouldn't respond to specific allegations I was making.

6  And then I remembered the day we had our last confrontation

7  and my resignation.  He begged me to stay and he promised he

8  would pay the rest of the money on Monday.

9  Q.  Gotcha.  And so there were no other cases at that time

10  that you were concerned about with respect to payment?

11  A.  No, I had settled two major paralysis cases that year, and

12  one was delayed in funding because of a Medicare Set-Aside

13  calculation that's required.  I don't know if you know

14  anything about MSAs.

15  Q.  That was Mr. Castillo?

16  A.  No.

17  Q.  No?

18  A.  No, no, no.  That was Mr. Biglari (phonetic).  It's a pool

19  diving accident which he was rendered quadriplegic.  I had to

20  jump through the Medi-Cal protocols which takes a minimum four

21  months and Medicare Set-Aside which is the federal program.

22  So I was urgently trying to get that final case wrapped up

23  which I did within days of resignation.

24          The other case was a major case involving Honda and a

25  paralysis case that settled in March of 2020.  I can't go into

Lira - Direct by Tievsky

1   the details because it's confidential unless the Court compels

2   me.  And I was wrapping up those cases, including the New

3   Mexico case that I just tried that went on for 20 years.  And

4   I was trying to tie up that case and who was going to take it

5   over upon my departure.  So I was dealing with 80 cases at

6   that time.  And then also transitioning my book of business to

7   my new firm.

8   Q.  So there were no other cases other than the Lion Air and

9   the two you just mentioned where you were concerned about

10  delays in payment?

11  A.  Yes.  When I -- I left on June 13th, all my book of

12  business, all my case lists were resolved in one way or the

13  other, fully paid, dismissed.  And then the ones that were

14  pending, I took the supermajority to my new firm.

15  Q.  How about the Ruigomez case, did you --

16  A.  I had no involvement with that.

17  Q.  Never received any communications from the client in that

18  case?

19  A.  I did in the first quarter of 2019.

20  Q.  What communication did you receive?

21  A.  E-mails.

22  Q.  And what were the gist of those e-mails?

23  A.  Some interest payments were due to the plaintiffs.

24  Q.  So a demand for payment?

25  A.  Well, they wanted an accounting of interest.

**Lira - Direct by Tievsky**

1    Q.  Did they say that they hadn't been paid the money that

2    they were owed?

3    A.  No.  Initially when I got the e-mail -- and I wasn't

4    familiar with that case or worked on it.  That was a

5    Bob Finnerty case.  And it was curious because he was copied

6    and they're asking me about a case I had no knowledge of other

7    than it settled ten years prior.  And they said we would like

8    an accounting on the case.

9    Q.  That's the same Bob Finnerty that Mr. Griffin referred --

10   says he referred the Lion Air clients to?

11   A.  Apparently.

12   Q.  So he was still somehow involved with cases at Girardi

13   Keese?

14   A.  No.  I think when this first communication came in, I

15   think Mr. Finnerty was still part of the firm and he was the

16   lead lawyer on the Ruigomez case.  So I found it curious why

17   am I being asked information about that specific case.

18   Q.  If you were seeing demands for an accounting of something,

19   you didn't think to go look at the bank statements?

20   A.  I had no idea.  I pulled the file and I passed on all

21   these inquiries to Mr. Girardi because I had no knowledge of

22   the case.  I didn't even know how much it settled for at that

23   point.

24   Q.  But you knew that the clients were asking for an

25   accounting?

Lira - Direct by Tievsky

1    A.   Yes.

2    Q.   Did that happen often?

3    A.   No.

4    Q.   So it was unusual?

5    A.   Yes.

6    Q.   Did you do any further inquiry after you --

7    A.   Yes.   There were a couple of more e-mails from the

8    Ruigomez family which I was cc'd on.   And so I would send

9    those to Tom, Shirleen, Finnerty back and Kamon, please

10   address because I have no information on this case.

11   Q.   When was this?

12   A.   This was the first quarter of 2019 I believe.

13   Q.   A full year before the Lion Air money came in?

14   A.   No, short -- the same -- yeah about.

15   Q.   And did you get answers to your questions?

16   A.   No, that it would be handled.

17   Q.   The same answer you got in the Lion Air case?

18   A.   More or less, yes.

19   Q.   Did you ever follow up to see if it was handled?

20   A.   No.

21   Q.   Was it handled, to your knowledge?

22   A.   I heard there was a resolution later.

23   Q.   Do you know if anyone involved in that case also was

24   involved in Girardi Keese bankruptcy petitions?

25   A.   And the documentaries, yes, I saw that.

1   Q.   Yeah.

2          THE COURT:   I think the video feed is cut off.   We're

3   trying to reestablish it for those people who are watching

4   this on video.   How much more do you have?

5          MR. TIEVSKY:   Only a little bit, Your Honor.

6          THE COURT:   I'm thinking more in terms of time as

7   opposed to questions.

8          MR. TIEVSKY:   It should only take I think less than

9   15 minutes.

10          THE COURT:   All right.   Why don't we break so we can

11   reestablish the video feed.   We'll take a ten-minute break.

12          Mr. Wisner, I have not allowed you to ask questions

13   or I haven't prohibited you from asking it.   You're an

14   attorney for -- for Mr. Multi, correct?

15          MR. WISNER:   I am, Your Honor.

16          THE COURT:   Are you also the attorney now for the

17   other four that haven't gotten their money?

18          MR. WISNER:   I am, Your Honor.

19          THE COURT:   All right.   You're free to ask questions

20   at some point when the other lawyers are done.   And because I

21   didn't give you the opportunity yesterday, if you want to

22   recall Mr. Griffin to ask him questions, you're free to do so.

23   I'm not requiring you to.   Certainly the witnesses have been

24   examined extensively so far and I expect more questions.   But

25   you have that right.   Just raise your hand if there's a point

**Lira - Direct by Tievsky**

1    when the other questioning is done you want to question the

2    witness.

3            MR. WISNER:  Thanks very much, Your Honor.  I'm not

4    shy.  I would have spoken up.

5            THE COURT:  I assume you would, but I want to make

6    sure you knew that's my position.

7            MR. WISNER:  Thanks very much.

8            THE COURT:  Okay.  We'll break for ten minutes so we

9    can reestablish the video feed and then finish up the

10   questioning by the Edelson firm of this witness and allow

11   Ms. Matthai to ask her client any questions.

12     (Recess.)

13           THE COURT:  Mr. Wisner, do you know if your clients

14   are actually listening in to this?

15           MR. WISNER:  You know, Your Honor, I think some of

16   them are.  I'm not exactly sure, though.

17           THE COURT:  Okay.

18           MR. WISNER:  There's a big time difference, so

19   they'll probably go to bed at some point.

20           THE COURT:  This is an open courtroom.  People are

21   free to sit here.  We made the video feed available as an

22   accommodation to them, but it's not a requirement.  We're not

23   going to delay the proceedings while we try and get this

24   fixed.  It's more important we push this ahead.

25           Anybody who wants to observe this can do so by

**Lira - Direct by Tievsky**

1   sitting in this courtroom or sitting in the overflow

2   courtroom.  We can proceed, and if your clients ask what

3   happened, you can e-mail and tell them what happened.  We're

4   working on it, but we do need to move forward.

5            MR. WISNER:  That's no problem at all, Judge.

6            THE COURT:  Thank you.

7            All right.  Continue your questioning.

8            MR. TIEVSKY:  I do have one more exhibit to show.  It

9   is confidential.

10           THE COURT:  Okay.

11  BY MR. TIEVSKY:

12  Q.  I would like to discuss Mr. Multi Rizki.  Was Mr. Multi

13  referred -- was one of the clients referred to you or referred

14  to Tom?

15  A.  To Mr. Girardi through Mr. Mohamed Eltaher.

16  Q.  So he was part of that first group?

17  A.  That's correct.

18  Q.  But his case settled later than the others?

19  A.  I think he signed the settlement agreement in May of 2020.

20  Q.  Do you know why?

21  A.  He was part of the second mediation.  The second mediation

22  only involved those plaintiffs that had executed a Lion Air

23  release.  And the Lion Air release provided a sum of money,

24  and it was Boeing's position that the release applied to them.

25  And that was one of my concerns throughout the pendency of

1   this matter.  The Lion Air release stated that any disputes

2   regarding the enforceability of the release would have to be

3   litigated in Indonesian courts.

4   Q.  So were any of the clients referred to you part of that

5   second mediation?

6   A.  All but the Warti matter, yes, six.

7   Q.  So there was a mix in that second mediation between the

8   clients referred to Mr. Girardi and the clients referred to

9   you?

10  A.  Yeah, one involved Mr. Girardi, Mr. Rizki.  And then the

11  other six were the cases directly referred to me.

12  Q.  So Mr. Multi's claim did settle?

13  A.  Yes.

14  Q.  His family signed a release?

15  A.  Mr. Girardi and Mr. Rizki signed the releases.

16  Q.  And then the money was wired to the Girardi Keese client

17  trust account on June 9, 2020?

18  A.  That's my understanding, yes.

19  Q.  I'm showing you what's Exhibit -- marked Exhibit 105-5.

20  This is our stipulation.

21  A.  Sure.

22  Q.  And so you were the one who confirmed receipt of those

23  funds?

24  A.  I probably received an e-mail saying the funds were being

25  wired, yes.

**Lira - Direct by Tievsky**

1  Q.  Now, at this point, June 9, 2020, you knew that other

2  Lion Air clients weren't getting paid?

3  A.  That's correct.

4  Q.  You knew that Mr. Girardi wouldn't answer your questions

5  about why those other clients weren't getting paid?

6  A.  Yes.

7  Q.  You were, in fact, having shouting matches with

8  Mr. Girardi about it?

9  A.  Yes.

10  Q.  But you still let Perkins Coie wire Mr. Multi Rizki's

11  money to Girardi Keese?

12  A.  That, I had no involvement with that release.  That was

13  signed by Mr. Girardi, and this slipped through the cracks.  I

14  hate to say that.  I'm not being smug about it, but you're

15  right.  That came in the same time all the other monies came

16  in on the cases.

17  Q.  Did you warn Mr. Multi Rizki before the money got wired

18  that you had concerns?

19  A.  I did not have such communications with him, no.

20  Q.  Did you warn Mr. Multi Rizki after the funds got wired?

21  A.  No.

22  Q.  This was your client, though?

23  A.  Yes.

24  Q.  Did you ever tell Mr. Multi Rizki at any point that you

25  had concerns about Mr. Girardi's handling of client funds?

1    A.  I don't have that recollection, no.

2    Q.  And instead, less than a week later, you walked out the

3    door at Girardi Keese?

4    A.  I went on to my new venture.  That's correct.

5         MR. TIEVSKY:  I don't have any more questions,

6    Your Honor.

7         THE COURT:  Okay.

8         Ms. Matthai, any questions?

9         MS. MATTHAI:  Yes.  Thank you, Your Honor.

10                    CROSS-EXAMINATION

11   BY MS. MATTHAI:

12   Q.  So you started working at Girardi Keese when, Mr. Lira?

13   A.  In January of 1999.

14   Q.  And over the years that you worked at Girardi Keese, did

15   your role change in terms of the cases that you were handling

16   there?

17   A.  Slowly.  If I could explain.

18         When I first joined Girardi & Keese, I had moved from

19   San Francisco to Los Angeles.  I didn't have a caseload.  But

20   over time, it got to a point where all cases, or at least the

21   supermajority of the cases I brought in and considered my own

22   book of business.

23   Q.  Okay.  And if we take the period 2018 to 2019, was the

24   majority of your time spent on cases which you considered to

25   be your own book of business even though you were a lawyer

1  with Girardi Keese?

2  A.  All my cases, approximately 80 or so, were directs to me

3  referrals or -- except for one, and that was the Acosta case

4  tried in New Mexico.

5  Q.  And during the period 2018 to 2019, during that period of

6  time, you did, however, work from time to time on cases that

7  had come in to Girardi Keese, correct?

8  A.  Yes, I would be asked to appear on occasion and/or take

9  depositions.

10  Q.  Okay.  And one of the cases that you worked on that had

11  been referred to Girardi Keese was the Lion Air matter,

12  correct?

13  A.  Yes.

14  Q.  Okay.  And did you do some work on the Lion Air matter

15  before the clients were referred to you by Mr. Koushan?

16  A.  Not that I recall.

17  Q.  Once Mr. Koushan had sent the clients to you, you did work

18  on the Lion Air matter, correct?

19  A.  Yes.

20  Q.  Okay.  As to Girardi Keese, did you ever have an ownership

21  interest in that firm?

22  A.  No.

23  Q.  Did you ever share in the profits of that firm?

24  A.  No.

25  Q.  Did you share in the expenses of that firm?

1  A.  No.

2  Q.  Were you a partner in the firm?

3  A.  No.

4  Q.  Were you an employee of the firm?

5  A.  Yes.

6  Q.  Now, Girardi Keese law firm, can you describe the offices

7  in terms of the organization of the files.

8  A.  The firm was old school.  And what I mean by that is we

9  were at least a decade behind when it came to technologies.

10  When it came to processing internal documents, my secretaries

11  that I had did everything by shorthand.  I dictated to them.

12  So I'm part of that old school.  And the -- we used forms that

13  were the same over decades, such as the closing statements

14  that had to be submitted to accounting.

15  Q.  I would ask you to turn to Exhibit 260-4.

16         THE COURT:  And is there a binder of the -- your

17  exhibits?  Oh, right over to my left.  Sorry about that.

18         Okay.  Off the record.

19    (Off the record.)

20         THE COURT:  Back on the record.

21         Go ahead.

22  BY MS. MATTHAI:

23  Q.  Exhibit 260 is a status report that was filed by Alyssa

24  Miller --

25         MR. TIEVSKY:  Objection, Your Honor.

1    THE COURT:  What's the objection?

2    MR. TIEVSKY:  This exhibit is hearsay.

3    THE COURT:  Overruled.

4    Go ahead.

5  BY MS. MATTHAI:

6  Q.  It was filed by Ms. Miller in the Girardi Keese

7  bankruptcy.  Do you see that, Mr. Lira?

8  A.  Yes.

9  Q.  Okay.  Page 4, Ms. Miller states that she regularly visits

10  the office, correct?

11  A.  Yes.

12  Q.  She describes it as "difficult to navigate, disorganized,

13  and holding a large volume of current and old physical files,

14  physical case files, including physical exhibits."

15    Is that an accurate statement based on your knowledge

16  as of when you left in June of 2020?

17  A.  I would say it's an understatement.  She was kind with her

18  words.

19  Q.  It says, "There are numerous antiquated computers,

20  computer accessories, printers, telephones, and other office

21  equipment."

22    Is that an accurate statement based on the time you

23  left?

24  A.  Yes.

25  Q.  "The debtor occupies two contiguous and conjoined low rise

1  buildings on Wilshire Boulevard just west of downtown"; is

2  that right?

3  A.  Yes.

4  Q.  "The lower floor of each building has large packed to the

5  gills file rooms with case files, including personal

6  identifying information."

7       Is that an accurate statement based as of the time

8  you left?

9  A.  Yes.

10 Q.  And those files, in fact, to your knowledge when you left

11 date back decades?

12 A.  Yes.

13 Q.  It says, "The file rooms have calendars, phone messages,

14 personal correspondence for attorneys long gone from the firm,

15 cancelled checks for the debtor and for Mr. Tom Girardi

16 personally dating back to the 1990s and in some cases

17 earlier."

18      Do you know whether that's an accurate statement?

19 A.  That's an accurate statement.

20 Q.  "Also in the file rooms are boxes of copies of voluminous

21 publications that mention the debtor or Tom Girardi."

22      Is that an accurate statement based on the time you

23 left?

24 A.  Absolutely.

25 Q.  There's a footnote for that one.  And it says, "It

1    appeared that if a publication featured Tom Girardi or the

2    debtor on the cover or the debtor in the article, the debtor

3    ordered cases of the publication."

4            Was that an accurate statement?

5    A.   Yes.

6    Q.   Ms. Miller also describes -- can you describe for me the

7    office of Mr. Kamon?

8    A.   You would -- the accounting department had their own

9    little office, and Norena Rouillard and Chris Kamon and two

10   other entry clerks worked there.  And you would go into the

11   offices and you would see bills piled like a mountain on their

12   desk, medical bills, subpoena bills.  It was a mess.  It

13   wasn't organized in any way.

14   Q.   Okay.

15   A.   And this bill is stacked and stacked in no order on each

16   of their desks.

17   Q.   Okay.  During the time that you -- let's say the last five

18   years that you were with Girardi Keese, was there -- were

19   there an enormous volume of cases that were coming through

20   that office?

21   A.   Hundreds if not thousands.  One case alone had 12,000

22   plaintiffs.

23   Q.   And were there a multitude of those cases that were mass

24   tort cases with many, many plaintiffs?

25   A.   Absolutely, yes.

Lira - Cross by Matthai

1  Q.   Okay.  And were there other significant injury cases

2  during those last five years?

3  A.   Yes.

4  Q.   Were you ever -- did Mr. Girardi ever make statements to

5  you with regard to the amount of revenue that was coming

6  through the office in the later years --

7  A.   He did.

8  Q.   -- when you were there?

9       What did he tell you?

10      MR. TIEVSKY:  Objection.  Foundation.

11      THE COURT:  A date.

12      MS. MATTHAI:  In the last five years.

13      THE COURT:  Any time in the last five years?

14      MS. MATTHAI:  Yeah.  What -- let me rephrase my

15  question.

16      THE COURT:  Let's start generally and then narrow it

17  down.

18      Go ahead.

19  BY MS. MATTHAI:

20  Q.   Did you -- did Mr. Girardi tell you -- let's take the last

21  three years that you were there.  Did Mr. Girardi make

22  statements to you with regard to the amount of money that was

23  coming into the firm on settlements?

24  A.   Yes.

25  Q.   And what did Mr. Girardi tell you?

**Lira - Cross by Matthai**

1   A.   My best recollection is that every year we were hitting

2   above 35 million in fees alone.  And then he would give his

3   opinions as to certain cases that were in the hopper and

4   mediation and gave us the evaluation.

5        One was the Porter Ranch case that settled recently

6   for over a billion dollars in which we had the biggest group

7   of plaintiffs.

8   Q.   Okay.  And was it your expectation that because Girardi's

9   office had the majority of the plaintiffs in the Porter Ranch

10  litigation that there would be significant fees coming from

11  that litigation?

12  A.   Substantial amount.

13  Q.   Okay.  And just in a two-second version, can you tell the

14  Court what the Porter Ranch litigation is?

15  A.   Yes.  That was a methane gas leak up in the hills, Susana

16  Hills above the City of Northridge.  And they built large

17  tracts of homes around that pipeline.  There is a documented

18  release of methane which devalued the properties in those

19  neighborhoods, and the allegations were personal injuries or

20  requests for medical monitoring.

21       There's a total of 25,000 of those cases.

22  Mr. Girardi and our firm had approximately 12,000.  So we had

23  the biggest group of plaintiffs and, therefore, had the

24  expectation we would receive the Lion Air of the settlement.

25  Q.   And has the Porter Ranch case now settled to your

1    knowledge?

2    A.   It has.

3    Q.   And have you received an estimate of how much will come in

4    fees to the Girardi firm -- to the bankruptcy estate of the

5    Girardi firm as a result of that settlement?

6              MR. TIEVSKY:  Objection.  Hearsay.

7              THE COURT:  Overruled.

8    BY THE WITNESS:

9    A.   The range I heard is 40 to 60 million.

10   BY MS. MATTHAI:

11   Q.   Okay.  Were there other large cases in the office that

12   were anticipated to generate significant fees in the year

13   before you left?

14   A.   Yes.

15   Q.   Can you give us some examples of the cases that were

16   expected to generate significant fees?

17   A.   Yes.  There was one case that Mr. Griffin actually worked

18   on that I was aware of because we spoke about it at times.  It

19   was a double amputation case against the City of L.A., and

20   that concluded I believe in October of 2020.

21   Q.   Okay.  Any others that you can think of that were

22   anticipated to generate significant fees?

23   A.   Yeah, focusing -- I know we still had mass tort

24   litigations across the country going on.  And then we had the

25   catastrophic injury cases.  I had a number of bus rollover

Lira - Cross by Matthai

1  incidents with multiple victims.

2          So it was a vast array of cases, all high volume, all

3  high case value worth.  And focusing on my case, I brought in

4  anywhere from 20 to 30 million in revenue to the firm.  And in

5  the time I was at Girardi & Keese, I brought in settlements in

6  excess of 500 million.  But remember, these are individual

7  cases.  They're not mass torts thrown in there.  So these are

8  personal injury type cases with a product liability component.

9  Q.  Okay.  So you're saying during the time that you were with

10  Girardi & Keese over that entire time on cases that had been

11  referred to you that you worked on, you generated how much in

12  fee revenue?

13  A.  Half a billion in total settlements which means we would

14  receive a third or 40 percent.

15  Q.  Okay.  And the fees on that would go to Girardi Keese, not

16  to you, correct?

17  A.  That's correct.

18  Q.  Okay.  And in the last two years that you were at the

19  Girardi Keese firm, do you recall the volume of settlement

20  money you -- that came into the firm based on the work you

21  were doing on your cases?

22  A.  It was pretty steady until the pandemic.

23  Q.  Okay.  And when you say "pretty steady," on a yearly

24  basis, what are we looking at?

25  A.  I brought in, again, settlements in the range of 20 to 30

Lira - Cross by Matthai

1    million a year.

2    Q.   Did Mr. Girardi make statements to you with regard to his

3    own wealth in the last two years that you were with the firm?

4    A.   All the time.

5    Q.   And what did Mr. Girardi tell you with regard to his own

6    personal wealth in those last two years?

7    A.   I know he had a large stake in a casino chain in Las

8    Vegas.  He was part owner of the Orleans Casino and others.  I

9    think he was cashed out recently -- well, a few years ago with

10   a minor investment per share and the return on it was

11   astronomical.

12            He would tell me his stockholdings.  And one

13   stockholding payout in 2018 or so resulted in a payment of

14   60 million to Mr. Girardi.

15            He always bragged about his wealth and how well he

16   was doing.

17   Q.   Okay.  When you left the firm in June of 2019, did you

18   have any reason to believe that Mr. Girardi was broke?

19            MR. TIEVSKY:  Objection.  Misstates testimony.

20            THE COURT:  You may have misstated the date.

21            MS. MATTHAI:  I did misstate the date.  I apologize.

22            THE COURT:  Why don't you rephrase your question.

23            MS. MATTHAI:  Yes, of course.

24   BY MS. MATTHAI:

25   Q.   When you left the firm in June of 2020, did you have any

1    reason to believe that Mr. Girardi was broke?

2    A.   No, not based on the assets that he owned.

3    Q.   And when you left the firm in June of 2020, did you have

4    reason to believe that the firm itself was broke?

5    A.   No.

6    Q.   Now, you did know that Mr. Girardi had taken out

7    litigation funding from time to time, correct?

8    A.   Yes.

9    Q.   Did the fact that there was litigation funding or the

10   borrowing by Mr. Girardi cause you to believe that the firm

11   had financial difficulties?

12   A.   No.

13   Q.   Why not?

14   A.   You know, we were floating so much in costs on these

15   cases, being on steering committees and the financial

16   commitments that go with those.  It was kind of a regular part

17   of business of getting these loans from these lenders,

18   especially after 2008 when all lines, traditional lines of

19   credit dried up.  And so the only source of financing on a

20   temporary basis would be these lenders.

21   Q.   Okay.  Now, you are regularly described as Mr. Girardi's

22   son-in-law, correct?

23   A.   That's correct.

24   Q.   And you are, in fact, married to Mr. Girardi's daughter by

25   his first wife, correct?

**Lira - Cross by Matthai**

1    A.   That's correct.

2    Q.   Is there a friendly relationship between Mr. Girardi and

3    his first wife?

4    A.   No.

5    Q.   Okay.  In fact, has she brought litigation against him?

6    A.   Currently pending in the bankruptcy proceeding, yes.

7    Q.   Okay.  And can you tell me as the son-in-law of

8    Mr. Girardi what social or other contact did you have with him

9    on a family basis in, let's say, the last three years before

10   you left Girardi Keese?

11   A.   The number of visits by Mr. Girardi to my home in the last

12   three years I could count on one hand, five or less.

13   Q.   Okay.  You have children?

14   A.   Yes, I do.

15   Q.   And how old are your children now?

16   A.   Michael is 23.  Catherine is 21.  And my daughters who are

17   seniors in high school are 18 years of age.

18   Q.   Those are twin daughters?

19   A.   Yes.

20   Q.   Okay.  They are Mr. Girardi's grandchildren?

21   A.   Yes.

22   Q.   Please describe Mr. Girardi's relationship with his

23   grandchildren.

24   A.   Zero.

25   Q.   Did he ever come visit his grandchildren?

Lira - Cross by Matthai

1  A.  No.

2  Q.  Did he ever take his grandchildren on outings or trips?

3  A.  I only remember once he took them to see Hamilton.

4  Q.  Okay.  Did -- were there -- he didn't come to see them.

5  Did they go to see him?

6  A.  No.

7  Q.  Okay.  Did your wife see Mr. Girardi more often than you

8  did in the context of a family relationship?

9  A.  No.

10  Q.  Okay.  Mr. -- do you know whether Mr. Girardi was

11  estranged from other family members?

12  A.  Yes, he was.

13  Q.  And what can you tell us about that?

14  A.  His son, Matt Girardi, who is a lawyer in Los Angeles,

15  their relationship is zero, no contact at all.  And he hadn't

16  spoken to his youngest daughter, Jennifer, in a decade.

17  Q.  What was Mr. Girardi doing with his time instead of

18  spending any of it with his family members?

19  A.  Well, you know, hobnobbing with politicians, other

20  lawyers.  He was out every night, and he was a constant figure

21  at Morton's and other establishments in the city.

22  Q.  Okay.  And in the last three years before you left Girardi

23  Keese, can you describe the legal aspects of Mr. Girardi's

24  practice?

25  A.  Yeah.  I would say on a given day, he would devote maybe

1   10 percent to the practice of law.  His only real activity was

2   going to mediations.  He'd like popping in on every mediation

3   that was taking place in the firm.

4   Q.   Okay.  Did Mr. Girardi, besides hobnobbing at Morton's,

5   did he have a practice of contact with and relationships with

6   other people in the Los Angeles community who had some

7   influence or power?

8   A.   Absolutely.

9   Q.   Can you describe that for us, please?

10  A.   Yes.  He had a lot of friends within the government, Gavin

11  Newsom, Jerry Brown.  He knew celebrities, if you will,

12  big-time business individuals.  You name it.  He was always

13  out and about with the influential within Los Angeles.

14  Q.   You said that he was the first one into the office in the

15  morning and the last one to leave in one of your answers.

16  What was he doing?

17  A.   He would be sitting there writing one-line letters to

18  folks, friends, judges, politicians, and would be overseeing

19  his calendar which was a big deal to him.

20  Q.   Okay.  And when you say "overseeing his calendar," was

21  that of his appearances in court?

22  A.   No.  It's more social.  In the 20 years I was with

23  Girardi & Keese, Mr. Girardi only took one deposition.  And so

24  he was not involved in the day-to-day execution of these

25  cases.

Lira - Cross by Matthai

1    Q.   Okay.  I would like you to look at Exhibit 272.

2              THE COURT:  It's on the screen, too.

3              THE WITNESS:  Oh.

4    BY MS. MATTHAI:

5    Q.   Okay.  What is in this picture?

6    A.   That's Mr. Girardi in his office.

7              THE COURT:  This can be on the public feed.

8              Emily, is it on?

9              THE CLERK:  Just double-checking.  Yes, it is.

10             THE COURT:  Thank you.

11             Go ahead.

12   BY MS. MATTHAI:

13   Q.   This is Mr. Girardi behind his desk?

14   A.   Yes.

15   Q.   And he's got all of these crystal awards actually sitting

16   on his desk?

17   A.   That's correct.

18   Q.   Okay.  And there's sort of a bunch of stacked up stuff to

19   the left of his desk?

20   A.   Yeah.  Those would be the articles you mentioned

21   previously where he appeared or the firm was referenced, and

22   he would hand those out to the visitors to his office,

23   potential clients and others.

24   Q.   Okay.  And in addition to these crystal gawdies on his

25   desk, he also had various awards and plaques and stuff spread

Lira - Cross by Matthai

1    throughout the office, correct?

2    A.  It was unbelievable, yes.  The one I won't forget is the

3    full-length portrait of Mr. Girardi in our conference room,

4    and every time I took a deposition, I didn't want to be facing

5    that.  So I always took the position on the other side of the

6    table.  Yeah, it was -- it was a temple to Tom Girardi, in

7    truthfulness.

8    Q.  Okay.  And one of the things he did was promote himself

9    through this IACTP group?

10   A.  Yes.

11   Q.  So if we turn to Exhibit 273.  Can you tell us what that

12   is and if you know how it came about?

13   A.  Yeah.  I and others in the firm began to investigate this

14   organization.  And they gave Mr. Girardi at least ten awards;

15   lawyer of the decade, consumer lawyer of the year, citizen of

16   the year, and what have you.  And I think you had to pay to be

17   recognized.  And part of the marketing is that he would appear

18   at Times Square in this 273.

19   Q.  Going back for just a second on 272.  Did Mr. Girardi use

20   a computer?

21   A.  No.

22   Q.  So there's no computer on this desk?

23   A.  There never was.

24   Q.  Okay.  Did Mr. Girardi use an iPad?

25   A.  He did not.

Lira - Cross by Matthai

1   Q.   Did Mr. Girardi use an iPhone?

2   A.   No.

3   Q.   What did he use for a phone if he did?

4   A.   He just had one of those flip phones.

5   Q.   Did Mr. Girardi receive e-mail on his flip phone to your

6   knowledge?

7   A.   I think only text messages, but I'm not certain.

8   Q.   Okay.  Would you ever e-mail Mr. Girardi?

9   A.   If I e-mailed Mr. Girardi, I always copied Kimi Cory and

10  Shirleen Fujimoto.

11  Q.   And why was that?

12  A.   Because he didn't have access to his own e-mail account.

13  I had to rely on Shirleen and Kimi to make sure that he would

14  receive the e-mails.  And that was the instruction throughout

15  the firm.

16  Q.   Okay.  And his -- Shirleen, Ms. Fujimoto?

17  A.   Yes.

18  Q.   And Ms. Cory would print out e-mails that were directed to

19  Mr. Girardi and give them to Mr. Girardi?

20  A.   Yeah, there would be a stack on his desk waiting for him,

21  and it would be all the e-mails printed out.

22  Q.   Okay.  Which -- after you left Girardi & Keese in June of

23  2020, since that time, have you spoken to Mr. Girardi?

24  A.   I have not.

25  Q.   Since you left the firm in June of 2020, to your

Lira - Cross by Matthai

384

1    knowledge, has your wife spoken to Mr. Girardi?

2    A.   She has not.

3    Q.   Have you made any -- have you -- putting aside any

4    communication -- let me rephrase that.

5         Are you aware of any communication other than what's

6    been marked as an exhibit here with the Girardi Keese firm

7    after June of 2020 in which you were a participant?

8    A.   I did not have any, no.

9    Q.   Okay.  Now, you were -- we talked briefly about the San

10   Bernardino trust account.  Did that San Bernardino trust

11   account have anything whatsoever to do with the Lion Air case?

12   A.   Zero.  Nothing.

13   Q.   Okay.  And what -- you continued to sign checks on that

14   trust account after you left the firm, correct?

15   A.   Yes.

16   Q.   And what information would you have when you signed a

17   check from that account after you left the firm?

18   A.   I would have the breakdown as to what case the checks

19   applied to.  So there would be a check to the client and to

20   Girardi & Keese, any lienholders, such as Medi-Cal and other

21   lienholders in terms of medical services.

22   Q.   Okay.  So it would be one of the file disbursement sheets

23   that would happen at the close of the file?

24   A.   That's correct.

25   Q.   And it would include the amount of the fees and the amount

Lira - Cross by Matthai

1  that was to be directed to the file?

2  A.  That's correct.

3  Q.  And would you match the checks that you had been sent to

4  that disbursement sheet to make certain that the numbers

5  matched?

6  A.  Yes.

7  Q.  Did you ever hear anything to suggest that there was any

8  problem with that particular trust account?

9  A.  No.

10  Q.  Now, the trust account that was used when the Lion Air

11  money came in was the Torrey Pines trust account ending in

12  5859?

13  A.  That's correct.

14  Q.  Do you know whether the Girardi firm had other bank

15  accounts?

16  A.  I heard in excess of 159 bank accounts.

17  Q.  Okay.  Do you know why there were in excess of 159 bank

18  accounts?

19  A.  I have no idea.

20       THE COURT:  Maybe you could explain this because I'm

21  not -- I was not a personal injury lawyer.  I don't know how

22  they handle accounting, and I know you're familiar, both you

23  and co-counsel are familiar with California rules relating to

24  this.

25       How are trust accounts handled in California?  You

**Lira - Cross by Matthai**

1    put it all in one big account or do you have to segregate it

2    by case?

3            MS. MATTHAI:  It's a little more complicated.  I

4    won't give you a full trust account because it's too much.

5            THE COURT:  It can be blanket.

6            MS. MATTHAI:  But this part is pretty consistent.

7            Under both Illinois law and under California law,

8    there can be a single trust account, and all monies that are

9    owed to clients go into those -- can go into those trust

10   accounts.  The exception is when you have -- and what goes

11   into the trust account appropriately.  It's not commingling

12   funds.  When the money from the defense comes in, it goes into

13   the trust account and then the money can be disbursed out of

14   the trust account for the fees and costs owed to the lawyer or

15   any other money legitimately owed to the lawyer and then for

16   the amount that is to go to the client.  And there are

17   obligations to keep accounting of that.

18           If there is money that is to be held for a long

19   period of time, which can legitimately happen, then that is to

20   be held in a separate account that's interest-bearing.  So if

21   there -- if the Court's order instead of saying disburse the

22   funds immediately for some reason had said disburse the funds

23   after two years have passed, then that money would have had to

24   have been put in a separate account so that the interest on

25   that sum would go to the client.

1          The setup and the sort of philosophy behind the

2    single account for all of the monies to flow through is

3    because the state -- it's called an IOLTA account because the

4    interest on the account gets swept automatically by the bank

5    to the state bar of California for a fund that's designed to

6    compensate clients if monies have been lost.  So the rules

7    have the money go into that independent account.

8          Now, there are some other exceptions.  For instance,

9    if you have a minor's trust account, that has to be separate.

10   If -- there's some certain kinds of accounts that would also

11   be separate; but the large bulk of everything coming into the

12   firm is going to go through that single account.

13         THE COURT:  Mr. Wisner, you made a claim on that fund

14   in California for your clients?

15         MR. WISNER:  I'm in the process of doing that, Judge,

16   absolutely.

17         THE COURT:  Okay.  Thank you for the explanation.

18         Proceed.

19   BY MS. MATTHAI:

20   Q.  Now, as to any of the bank accounts, did you review the

21   bank account statements?

22   A.  No.

23   Q.  Did you ever see a bank account -- excuse me.

24         While you were at Girardi Keese and before this

25   matter, did you ever see a bank account statement for the

1   Torrey Pines bank account?

2   A.  No.

3   Q.  Before this litigation did you ever see a bank account

4   statement for the Nano Banc operating account of Girardi

5   Keese?

6   A.  No.

7   Q.  Were you aware that there was an operating account at

8   Girardi Keese?

9   A.  I knew there were general accounts.

10  Q.  Okay.  Were you privy to any information about the general

11  accounts of Girardi Keese?

12  A.  No.

13  Q.  Did you ever ask to see the general information regard --

14  as bank statements or cancelled checks or any other

15  information with regard to the general operating accounts of

16  Girardi Keese?

17  A.  No.

18  Q.  Did you ever ask to see the bank statements for the trust

19  account?

20  A.  As I indicated earlier, yes, when the Lion Air issue came

21  up.

22  Q.  All right.  And what were you told when you were asked

23  to -- when you said to see the information with regard to the

24  Torrey Pines bank account?

25  A.  It wasn't a quick response, but this is Tom Girardi's

1  issue and only he could authorize review.

2  Q.  And who --

3              MR. TIEVSKY:  Objection.  Foundation.

4              THE COURT:  Yeah.  Lay a foundation for that

5  conversation, please.

6              MS. MATTHAI:  Sure.

7  BY MS. MATTHAI:

8  Q.  When did that conversation occur?

9  A.  Shortly after May 14th or 12th.

10  Q.  And who was the conversation with?

11  A.  Mr. Kamon.

12  Q.  Did you ever have a conversation asking for those records

13  with Mr. Girardi?

14  A.  Yeah, I had.  Not related to this case.  It was just

15  general information on one of my cases.  I don't remember the

16  issue.  I think it was still pending and we're going to close

17  it.  And he said, no, I can't review any of the bank

18  statements or records of Girardi & Keese.

19  Q.  Okay.  And other than asking Mr. Kamon or Mr. Girardi, did

20  you ever take any other steps to access the bank account

21  information for any account of Girardi Keese?

22  A.  No.

23  Q.  Okay.  Now, we've seen your signature on checks for that

24  Torrey Pines bank account, correct?

25  A.  Yes.

Lira - Cross by Matthai

1   Q.  You were a signatory on that account, correct?

2   A.  Yes.

3   Q.  During the time -- let's just take the last five years

4   that you were at Girardi Keese.  Was it your understanding

5   that you could be the only signatory on a check?

6   A.  No.

7   Q.  What was your understanding?

8   A.  That the checks had two signature lines and it required

9   two signatures.

10  Q.  Okay.  Now, you since, during this litigation as a result

11  of a subpoena, you've seen a 10-year-old, roughly 10- or

12  11-year-old account opening statement that you signed,

13  correct?

14  A.  Yes.

15  Q.  And that account opening statement has the box checked

16  that it only takes one signature, correct?

17  A.  Yes.

18  Q.  During the entire time that you signed checks on that

19  account, was it your belief that two signatures were required?

20  A.  Yes, after doing it hundreds of times.

21  Q.  Okay.  And in your experience, were the checks regularly

22  signed by two people?

23  A.  All the ones I seen, yes.

24  Q.  Okay.  During the time that you were at Girardi Keese, did

25  you understand whether or not you were authorized to make a

1  wire transfer out of the Torrey Pines trust account?

2  A.  I did not have that authority from the firm.

3  Q.  Okay.  And did you ever on your own, without Mr. Girardi's

4  approval, authorize a wire transfer from the Torrey Pines bank

5  account?

6  A.  Never.

7  Q.  And when you did sign checks from the Torrey Pines bank

8  account checks, was -- did you have the same process of having

9  the disbursement sheet and matching the checks against that

10 disbursement sheet?

11 A.  Yes.

12 Q.  Okay.  And until this matter came up as to checks you

13 signed on that account, had you -- did you have any knowledge

14 of any complaint?

15 A.  No.

16        MS. MATTHAI:  I would like to look at a couple of

17 checks.  This is Exhibit 246.  Now, is it correct --

18        MS. ROBIE:  Which page?

19 BY MS. MATTHAI:

20 Q.  Is it correct that the first time you saw this collection

21 of checks was in connection with this matter?

22 A.  Yes.

23 Q.  Let's look at 246, page 2.

24        THE CLERK:  Taken off?

25        THE COURT:  This should probably be taken off the

Lira - Cross by Matthai

1    public record.

2              MS. MATTHAI:  Yes.

3              THE COURT:  There are client names throughout this.

4    BY MS. MATTHAI:

5    Q.  And if we look at these four checks that are displayed on

6    this particular page, do you see signatures that appear to be

7    your signature?

8    A.  Yes.

9    Q.  And on each of those checks -- well, the checks themselves

10   have two lines, correct?

11   A.  Yes.

12   Q.  And the -- but if we look at the lower right-hand check,

13   we see what appears to be Mr. Girardi's signature twice?

14             MR. TIEVSKY:  Objection.  Assumes facts not in

15   evidence.

16             THE COURT:  Well, the witness can correct the

17   conclusions from the statement if he can.

18   BY THE WITNESS:

19   A.  Yes, that looks like Mr. Girardi's signature, having seen

20   it many times.

21   BY MS. MATTHAI:

22   Q.  Okay.  On the other hand, despite the fact that you've

23   seen Mr. Girardi's signature many times, you are now aware,

24   having reviewed these checks, that your name was forged,

25   correct?

Lira - Cross by Matthai

1   A.   That's correct.

2   Q.   And Mr. Girardi's signature consisted of what I will

3   describe as a wiggly line; is that correct?

4   A.   Yes.

5   Q.   Relatively vertical.  So is there any way for you to tell

6   one way or the other whether Mr. Girardi was holding the pen

7   that signed this check twice?

8   A.   I cannot.

9   Q.   Let's look at 246-6.  If we look at the lower left-hand

10  check on that page, that's a check written to Girardi Keese,

11  correct?

12  A.   Yes.

13  Q.   And that has a wiggly line on it, correct?

14  A.   Yes.

15  Q.   It only has one wiggly line, correct?

16  A.   Yes.

17  Q.   So the second line is not signed at all?

18  A.   Correct.

19  Q.   And do you have any way of knowing whether the person

20  holding the pen when the wiggly line was put on the top line

21  was Mr. Girardi or someone else?

22  A.   I do not know.

23  Q.   And if we look at the check immediately to the right --

24  well, let's start at the top of the right page.  We have

25  another one written to Girardi Keese.  It has only one

Lira - Cross by Matthai

394

1  signature, correct?

2  A.   Yes.

3  Q.   And like the one on the lower left-hand side of this page,

4  your signature is not there, is it?

5  A.   That's correct.

6  Q.   And this has a wiggly line on one line of the check,

7  correct?

8  A.   Yes.

9  Q.   Do you have any way of knowing who was holding the pen

10 that wrote that wiggly line?

11 A.   No.

12 Q.   Would the same be true as to the single wiggly line on the

13 lower right-hand page?

14 A.   True.

15 Q.   If we turn to the next page which is 246-7.  There's a

16 top -- a check at the top left.  Do you see that?

17 A.   Yes.

18 Q.   And it has a squiggly line on the top line, correct?

19 A.   Yes.

20 Q.   And it has some circles on the bottom line.  Do you see

21 that?

22 A.   Yes.

23 Q.   Do you believe that that is your signature on the bottom

24 line of that check?

25 A.   No.

1    Q.   Okay.   Do you know who was holding the pen that made those

2    circles on that check?

3    A.   I have no idea.

4    Q.   Okay.   If we go to 246-8.   Upper right-hand corner,

5    there's a check to it looks like Cesar.   I won't say the rest

6    of the name for client confidentiality.   That check has a

7    wiggly line on the top line and some circles on the bottom

8    line.   Is that your signature on that check?

9    A.   No.

10    Q.   Do you know who was holding the pen when either of those

11    signatures were made on that check?

12    A.   No.

13           THE COURT:   I think you can do a summary question for

14    all these now.

15           MS. MATTHAI:   Well, there's a variety of different

16    ones --

17           THE COURT:   Well, what I've seen here are a bank

18    honoring checks that have a single signature when there's

19    supposed to be two.   I've had some where it appears that

20    somebody has forged Mr. Lira's name because the signature that

21    is the co-signature is clearly not him.   And there's a mark

22    that apparently Mr. Girardi makes that the witness has

23    identified as Mr. Girardi's but he can't be certain.

24           Those are the conclusions I've drawn.   If there's

25    some particular checks that deal with Lion Air, go ahead.   But

1    I take the point that the bank in this case was honoring

2    checks that may not have been signed appropriately under the

3    rule of two signatures by the people who were supposed to be

4    signing for the account.

5            MS. MATTHAI:  And just so the record is clear, the

6    actual -- the actual account opening document says one

7    signature.

8            THE COURT:  It does.  All right.

9            MS. MATTHAI:  But the -- and if you wish Mr. Lira to

10   reconfirm this, the practice at the firm throughout the time

11   that he had anything to do with this account was that there

12   always were two signatures, and it was his understanding that

13   two signatures were required.

14           THE COURT:  Okay.  Why don't you ask a summary

15   question then unless there's a check in particular that deals

16   with Lion Air that you want to focus on which, of course, you

17   can.

18           MS. MATTHAI:  Well, there are some in the relative

19   time periods, but what we can do is I would assume that on

20   some of these issues, the Court would like to have a brief --

21   briefing summarizing some of this, and we can certainly

22   identify any additional ones that are particularly

23   significant.

24           THE COURT:  That's fine.

25           MS. MATTHAI:  I think I've made the point of what was

Lira - Cross by Matthai

1    happening here.

2              THE COURT:  Yes, you have.

3              MS. MATTHAI:  Thank you.

4    BY MS. MATTHAI:

5    Q.  And just for the record, was my statement correct,

6    Mr. Lira, that it was always your belief that two signatures

7    were required?

8    A.  Yes.

9    Q.  And was it always your belief that you had no authority on

10   your own to have a wire transfer made out of that account?

11   A.  That's correct.

12             THE COURT:  What was the basis of your belief that

13   there were two signatures required?

14             THE WITNESS:  The practice of the firm for a decade.

15   It was always the checks were passed around usually between

16   myself and Mr. O'Callahan who passed away recently, and then

17   when he passed, no additional signatory was put on the card.

18   And so it was just Mr. Girardi and I.

19             THE COURT:  All right.

20             I'll ask this question.  Maybe you'll get to it,

21   Ms. Matthai, but I'll ask it.

22             What is it about the complete inattention Mr. Girardi

23   was paying to the law side of the business that gave you

24   comfort that he would follow through on his promises that he

25   would pay these clients?

1    THE WITNESS:  It was based on his representations of

2    the settlements coming in, the value of our book of business

3    at the firm, and the constant influx of cases of all sorts, of

4    all different values.  So it wasn't like business was drying

5    up, business has slowed.  We were just on auto cruise when it

6    came to these big exposure cases.

7         THE COURT:  I thought it dried up during the

8    pandemic?

9         THE WITNESS:  Well, it slowed, yeah because --

10        THE COURT:  Slowed.

11        THE WITNESS:  -- no one was prosecuting cases

12   anymore.  All the courts were closed.  There were no

13   mediations until months later.  It was on a standstill for at

14   least four months following the mandate.

15        THE COURT:  Okay.

16        Proceed.

17   BY MS. MATTHAI:

18   Q.  Did Mr. Girardi over and above the statements that he was

19   making to you with regard to the cases that were coming in and

20   the potential fees from that, did he tell you that there were

21   other sources for funds that he had?

22   A.  Yes.

23   Q.  What did he tell you?

24   A.  About his various real estate holdings, about his stock

25   portfolio, his ownership of Las Vegas casinos, and eventually

1   becoming a board member of Bally which is one of the largest

2   casino owners in the country.  So he had multiple activities

3   and sources of income, as he explained to me, and I saw proof

4   of it actually.

5   Q.  Okay.  Let's move to the Lion Air matter.  Now, we've

6   already heard and this Court is well aware that there were --

7           MS. MATTHAI:  Actually before I go to that,

8   Your Honor, I apologize.  I do need to go back to 246.

9           THE COURT:  Go ahead.

10          MS. MATTHAI:  There is a check we should discuss.

11  Let's start with 303 and 304.

12          THE COURT:  Exhibit 303?

13          MS. MATTHAI:  Yes, and these should be off the public

14  screen.  I think we're still off.  These may be duplicates

15  under another number, but I would just like to have them -- I

16  happen to have them in my notes under these numbers.

17          THE COURT:  All right.

18  BY MS. MATTHAI:

19  Q.  Can you tell me what 303 is?

20  A.  Yeah.  This is a memo from Keith to Mr. Girardi and the cc

21  to Chris Kamon and myself.

22  Q.  Okay.  And that has the -- it's the breakdown sheet that

23  we saw earlier, correct?

24  A.  That's one form of it, yes.

25  Q.  Okay.  And as of the time of this memorandum -- by the

1   way, if we go to the second page, actually the second and

2   third page, could you tell us what the second and third page

3   of this exhibit is?

4   A.   Yeah, this is the internal closing statement process I

5   described.  This is what would be submitted to accounting for

6   payment of the monies on this breakdown per case.

7   Q.   Okay.  And you see on the third page that's Exhibit 303-3

8   that the -- this disbursement statement or closing statement

9   is signed by the client?

10  A.   That's correct.

11  Q.   And was that the practice of the firm, that these closing

12  statements were signed by the client reflecting the authority

13  to make the disbursements that are specified?

14  A.   Always.

15  Q.   And if we look at 304, that's the same set of documents

16  with regard to another one of the cases, correct?

17  A.   That's correct.

18  Q.   And this one also has the order attached to it, correct?

19  A.   It does.

20          THE COURT:  Was it typical to have the cover memo?

21  It seems it's duplicative of what's on the closing statement.

22  Was it typical to have a cover memo?

23          THE WITNESS:  No, no.  Actually this is the first

24  time I've seen a cover memo.

25          THE COURT:  All right.  And do you know why a cover

Lira - Cross by Matthai

1   memo was prepared for these when you have the same information

2   in the closing statement that follows?

3           THE WITNESS:  I do not.  That was not my practice.

4           THE COURT:  Okay.

5           MR. SABA:  Your Honor, I would make a representation,

6   that was Mr. Griffin's personal practice when he settled his

7   cases to make those memos.

8           THE COURT:  All right.  Does anyone disagree?

9           MR. TIEVSKY:  I have no idea.  I will say that it's

10  not the exact same information.  The information about the

11  litigation funding doesn't appear on the closing statements.

12          THE COURT:  You're right.  You're right.  It isn't

13  identical.  Okay.  Mr. Griffin is going to have to be recalled

14  anyway, and if you want to ask a question about that, you're

15  free to do so.

16          Okay.  Go ahead.

17  BY MS. MATTHAI:

18  Q.  Just so it's clear and clear up any confusion about this,

19  the money for the litigation funding portion went directly

20  from Boeing to California Attorney Lending, correct?

21  A.  Yes, pursuant to the release settlement agreement.

22  Q.  Okay.  So -- and what was that money that went to

23  California Attorney Lending?

24  A.  Oh, 50 percent of the attorneys' fees from each case.

25  Q.  So half of the attorneys' fees on each case went directly

Lira - Cross by Matthai

1   from Boeing to California Attorney Lending, correct?

2   A.   That's correct.

3   Q.   And then the other half of the attorneys' fees went to the

4   Girardi Keese trust account, correct?

5   A.   Correct.

6   Q.   And so that's why if you look at the incoming wire in the

7   Girardi Keese trust account, it doesn't include one half of

8   the attorneys' fees because that has been separately wired to

9   California Attorney Lending, correct?

10  A.   That's correct.

11  Q.   And we'll look quickly after a bit, but the client signed

12  releases that specified that that portion of the money was to

13  go to California Attorney Lending, correct?

14  A.   That's correct.

15  Q.   And Boeing relied on the statements in the releases to

16  determine how they would wire the money, correct?

17  A.   That's correct.

18        MR. TIEVSKY:  Objection.  Speculation.

19        THE COURT:  Overruled.

20  BY MS. MATTHAI:

21  Q.   Did you have any understanding as to whether Boeing had

22  any willingness to deviate from the release itself in the

23  wires that Boeing would make?

24  A.   There were no deviations.

25  Q.   Okay.  Then we saw earlier the $500,000 fee check that you

1  signed from the Torrey Pines bank account, correct?

2  A.  Yes.

3  Q.  And it's dated March the 10th, correct?

4  A.  Yes.

5  Q.  When you signed that check, did you believe that that

6  money was part of the attorneys' fees that was owed to Girardi

7  Keese?

8  A.  Yes.

9  Q.  Did -- when you signed that check, did you have any

10  inkling that Girardi Keese was not at the same time wiring

11  monies to the client?

12  A.  That was my expectation.

13  Q.  Okay.  And why did you have the expectation that when you

14  signed the attorney fee check that the firm would also be

15  wiring the money to the clients?

16  A.  Because all the proper documentation and orders have been

17  submitted and that was the practice, that once the closing

18  statements and the settlements were funded, then the

19  accounting office would execute the distributions.

20  Q.  Okay.  And was it over a month later that you learned that

21  the monies had not been wired to the client at the same time?

22  A.  That's correct.

23  Q.  And that's when you -- what did you do when you learned

24  that?

25  A.  No. 1, I made inquiries to Keith, Mr. Griffin, and Kamon.

**Lira - Cross by Matthai**

404

1    They had not -- they gave me -- not Mr. Griffin but Mr. Kamon

2    gave me the expectation -- the explanation that they were

3    waiting for Tom's approval on the wires.

4    Q.  Okay.  And did you make any inquiry of Mr. Girardi at that

5    time?

6    A.  I don't recall making an inquiry of Mr. Girardi in

7    mid-April.

8    Q.  Okay.  Let's look at Exhibit 238, please.

9           THE COURT:  Can this be on the public feed?

10          MS. MATTHAI:  I believe so, but may I check just to

11   make sure I'm not forgetting something?

12          THE COURT:  Sure.

13          MS. MATTHAI:  Yes, it can.

14   BY MS. MATTHAI:

15   Q.  Have you seen this letter before, Mr. Lira?

16   A.  As part of this litigation, yes.

17   Q.  Okay.  What is your understanding of what this letter is?

18   A.  This is the fee agreement between Girardi & Keese and the

19   Edelson firm.

20   Q.  Okay.  And what cases did this letter cover?

21   A.  This letter only covered --

22          MR. TIEVSKY:  Objection.  Lack of personal knowledge.

23          THE WITNESS:  I have personal knowledge.

24          MR. TIEVSKY:  He just testified he had never seen

25   this before the litigation.

1      THE COURT:  Overruled.  You can state the basis of

2  your knowledge of this agreement.

3      THE WITNESS:  Sure.  There's a separate agreement to

4  the cases referred to me directly.  So this letter,

5  Exhibit 238, pertains to an alleged agreement between

6  Girardi & Keese and the Edelson firm of the five cases that

7  are the subject of this hearing.

8  BY MS. MATTHAI:

9  Q.  Okay.  And then if we look at Exhibit 239, can you tell us

10  what that is?

11  A.  Yes.  When I was referred the cases from Mr. Koushan, this

12  was the agreement between Girardi & Keese and the Edelson firm

13  as to the second group of cases.

14  Q.  And was the arrangement different with the Edelson firm

15  with regard to the cases that had been referred to you by

16  Mr. Koushan than it was with the cases that had been referred

17  directly to Girardi Keese?

18  A.  If I understand your question, yeah, there was a

19  difference in the fee split.

20  Q.  Why was there a difference in the fee split?

21  A.  Because the agreement with Mr. Koushan's office is that he

22  would share 50 percent of any attorney fees in the cases

23  referred to me known as group two less the Rizki case.

24  Q.  Okay.  And so you negotiated with the Edelson firm a

25  lower percentage fee for them on those cases, correct?

1    A.    Based on my agreement with Mr. Koushan, that's correct.

2    Q.    Okay.  Are you aware of any other writings that relate to

3    those agreements?

4    A.    None.

5    Q.    Now quickly, because it is covered in the timeline, there

6    was an initial group of cases -- let me rephrase that.

7              The entirety of the cases that had been referred to

8    Girardi Keese and to you through Mr. Koushan were originally

9    settled when?

10   A.    That would be after the mediation on October 30, 2019.

11   Q.    And then some of -- that was a group settlement, correct?

12   A.    That -- that pertained to all 11 clients at that time.

13   Q.    And is it correct that after that point in time, the issue

14   arose with regard to the settlement that had been signed by

15   some of those clients with Lion Air?

16   A.    Actually that issue arose with Mr. Edelson present when we

17   were shaking hands on the global settlement.  That's when

18   Boeing presented that provision as a condition precedent.  We

19   had a warrant -- or make a warranty that none of our clients

20   sign the Lion Air release.

21   Q.    Okay.  And what was Mr. Edelson's reaction when at the

22   handshake point that issue came up?

23   A.    Well, we -- we both had the same attitude.  That was bull.

24   Why are they talking about this proposition or provision after

25   we had a deal in place in terms of the amount?  Usually that's

1   something you discuss early on in the negotiations.

2   Q.   Okay.  Did Boeing back down from that position?

3   A.   No.

4   Q.   Okay.

5           THE COURT:  All right.  Let me -- so I understand

6   this, Judge O'Connell negotiated a settlement between Boeing

7   and all of the Girardi Keese clients which were how many then?

8   Nine?

9           THE WITNESS:  Eleven.

10          THE COURT:  Eleven.

11          THE WITNESS:  There was one wobbler.

12          THE COURT:  Pardon me?

13          THE WITNESS:  There was one wobbler.  That was the

14  Nixi -- one case that went between my office and the Podhurst

15  firm.  She was a client of ours at one point, left us, came

16  back.  But I think the original global settlement was to 11.

17          THE COURT:  Okay.  And then once Boeing had agreed

18  upon a number for all 11, you employed a different judge, not

19  Judge O'Connell, but a different judge as I read some of these

20  documents to negotiate settlements for the individuals within

21  that group settlement?

22          THE WITNESS:  You mean allocate them?

23          THE COURT:  Allocate, yes, I misspoke.  Allocate.

24          THE WITNESS:  Yes.

25          THE COURT:  Okay.  So Judge O'Connell was not

Lira - Cross by Matthai

1  involved in negotiating the individual allocations for the --

2  all these different plaintiffs?

3        THE WITNESS:  It was always a global approach.  And I

4  couldn't allocate.  That would be a conflict.  So we used a

5  retired judge out of Los Angeles, California.

6        THE COURT:  Okay.  Thank you for explaining that.

7        And then -- well, go ahead with your questions then.

8        MS. MATTHAI:  Sure.

9  BY MS. MATTHAI:

10  Q.  And once Boeing took the position and did not back off

11  with regard to the Lion Air release, what happened next in

12  terms of settling these cases?

13  A.  Well, I had to verify whether or not any of my clients

14  signed that Lion Air release.  And that took days with the

15  communication, the language barrier, the time --

16        THE COURT:  Why don't you explain the Lion Air

17  release again to me.  What exactly was this holdup?

18        THE WITNESS:  Yes.  Very early on, within days of

19  this tragedy, Lion Air met with all the families and presented

20  this, if I remember correctly, eight-page release which also

21  provided a sum of money which I don't think I can state.  But

22  it's in the releases signed through Boeing.  They reflect all

23  the payments made to the plaintiffs from other sources,

24  including the Boeing assistance fund.  And so --

25        THE COURT:  That's the fund that Mr. Feinberg was

1    involved with?

2              THE WITNESS:  Exactly.  Exactly.

3              THE COURT:  Go ahead.

4              THE WITNESS:  And so I eventually got a copy of the

5    Lion Air release, but it came with a warning that the clients

6    were not to share the release.  And, in fact, they took the

7    original as soon as they were signed at the airport.  Well,

8    one of the clients, who was a lawyer, photographed it.  And

9    that's the copy I received.

10             THE COURT:  Lion Air was signing -- getting releases

11   from people who just lost loved ones in the crash at the

12   airport while they're waiting to see if their family arrives?

13             THE WITNESS:  Within days, yes, that's correct.  And

14   the release was so broad, and what concerned me is it named

15   every Boeing entity ever incorporated throughout the world.

16   And then the choice of law provision which said any dispute

17   regarding enforceability of this release would have to be

18   adjudicated in Indonesia.

19             So this was alarming, and I had to ask my clients who

20   didn't have a copy of it but did you sign it.  And I asked

21   Boeing, do you have the list of the passenger or the families

22   that had signed the Lion Air release?  Initially they said no,

23   but then later verified during negotiation of the second

24   group.

25             THE COURT:  Okay.  All right.

1   BY MS. MATTHAI:

2   Q.  So once it was determined that -- well, first of all, had

3   the clients who had been referred to you by Mr. Koushan all

4   signed the Lion Air release?

5   A.  They had.

6   Q.  And had the Rizki family or the Multi family signed the

7   Lion Air release as well?

8   A.  Yes.

9   Q.  As a result, did those people, families, get removed from

10   that original group settlement?

11   A.  Yes.

12   Q.  But was there still a settlement as to the clients that

13   had not signed the Lion Air release?

14   A.  Yes.  The great mediator, Judge O'Connell, and I had

15   numerous phone calls during the month of November.  What was

16   the plan going forward?  And he in our discussions, and I

17   recommended, could we at least settle out those families that

18   had not executed a Lion Air release?  And that was the plan

19   and that's how we resolved the four that are at issue in this

20   hearing.

21   Q.  Okay.

22   A.  The Edelson firm had no involvement in any negotiations

23   after meeting with Judge O'Connell on October 30, 2019.

24   Q.  So you negotiated those four settlements, correct?

25   A.  I did.

1    Q.   And when -- and when was that negotiation finalized?

2    A.   I want to say in late November 2019 or early December 2019

3    because the Edelson firm and my firm were sent draft releases

4    for those four.

5    Q.   Okay.  And the Edelson firm was aware that those four

6    settlements had been reached?

7    A.   Yes.

8    Q.   And was that also a group settlement --

9    A.   Yes.

10   Q.   -- for those cases?

11        Was there also an allocation process that had to take

12   place?

13   A.   Yes.

14   Q.   After a settlement was reached in the Lion Air case for

15   the plaintiffs, in addition to the allocation process, were

16   there other -- other things that had to be taken care of

17   before you could actually get the release put together by

18   Boeing?

19   A.   Yes.  And this is what took the most time.  Between the

20   agreement to settle and a global amount and the delivery of

21   the key documents, and that was to get certified government

22   documents verifying the rightful heirs to the decedent.  And

23   that had to be obtained and adjudicated at times through

24   Indonesian courts.

25   Q.   And did you -- well, first of all, we've heard about

1    Mr. Hatcher?

2    A.   Yes.

3    Q.   And did Mr. Hatcher serve as an intermediary between the

4    Girardi Keese firm and the clients that had been referred to

5    Girardi Keese?

6    A.   Yes.

7    Q.   Did Mr. Hatcher serve as an intermediary between the

8    clients that had been referred to you and the Girardi Keese

9    firm or you?

10   A.   No.

11   Q.   Was there someone who served as an intermediary between

12   you and the Girardi Keese firm and the clients that had been

13   referred to you?

14   A.   Yes.

15   Q.   Who was that?

16   A.   Rachel Manning.

17   Q.   Okay.  Did you ever communicate with the clients that had

18   been referred to you through Mr. Hatcher?

19   A.   Never.

20   Q.   So there were essentially two lines of communication

21   coming out of the Girardi firm, one to the Girardi firm

22   clients and one to the firm clients that had been referred to

23   you, correct?

24   A.   Yes.

25   Q.   And did you refer to those cases that had been referred to

Lira - Cross by Matthai

413

1    you colloquially as your cases?

2    A.  Yes.

3    Q.  Did they actually, quote-unquote, belong to the Girardi

4    Keese firm?

5    A.  No, those were the cases referred to me specifically.

6    Q.  Okay.  But did you have -- they were Girardi Keese cases

7    in the sense that the firm was the attorney of record for

8    those cases, correct?

9    A.  That's correct.

10   Q.  I would like you to --

11          MS. MATTHAI:  This should not be on the public

12   record, Your Honor.

13          THE COURT:  All right.

14   BY MS. MATTHAI:

15   Q.  If we could look at Exhibit 203.  Can you tell me what

16   Exhibit 203 is, please?

17   A.  Yes, this is the certified, stamped, notarized,

18   confidential settlement agreement and full release of all

19   claims pertaining to the decedent -- should I say the name?

20   Is that okay?

21          THE COURT:  Yes.

22          THE WITNESS:  Eko, E-k-o, last name Sutanto,

23   S-u-t-a-n-t-o.  The spouse is Anice Kasim.

24   BY MS. MATTHAI:

25   Q.  Okay.  And who actually wrote this release?

Lira - Cross by Matthai

414

1    A.   Boeing.

2    Q.   Okay.  Who translated it into the -- I'm not certain what

3    the language is in Indonesia, but you understood that the

4    language that is used here is the appropriate language for

5    Indonesia?

6    A.   That's correct because I had to verify that was an

7    accurate, literal translation.

8    Q.   You actually had that verified?

9    A.   Yes.

10   Q.   Now, this -- was one of the -- would Boeing write this

11   release before they got the certification from Indonesia as to

12   who the proper heirs were?

13   A.   Yes, a master or a first draft of this agreement, like I

14   said, was delivered to the Edelson firm and my firm on

15   December 18, 2019.  So we had all the language really except

16   for the names of each of the heirs, dates of birth.  A lot of

17   demographic information had to be provided in the release with

18   also the certified government or religious document

19   identifying the heirs.

20   Q.   Okay.  And if we go to 203-26, do you see that the client,

21   Anice Kasim, indeed signed this?

22   A.   On February 12, 2020, yes.

23   Q.   And did Boeing require that the -- that the signatures on

24   these releases be certified by the appropriate notary person

25   in Indonesia?

1  A.  Yes.  And that became an issue later on some of these

2  cases.

3  Q.  To your knowledge, as to the cases that Boeing issued

4  funding on, all of the releases were, in fact, signed by

5  certified signatures of the client?

6  A.  That's correct.

7  Q.  If we look at page 203-9.  We see that the release

8  specifies the amount that is to be paid, correct?

9  A.  Within 30 days, yes.

10  Q.  Okay.  And did each of the releases specify the amount to

11  be paid and state that the amount was to be paid in 30 days?

12  A.  That was common language through all the releases.

13  Q.  Okay.  And the release also, the first statement with

14  regard to where the money would be sent shows an amount to

15  California Attorney Lending, correct?

16  A.  Yes.

17  Q.  And was that in -- to the extent that California Attorney

18  Lending received funds directly from Boeing, was that in the

19  release that had been signed by the client?

20  A.  Yes.

21  Q.  And then finally, it reflected the amount to be sent to

22  the Girardi Keese client trust account, right?

23  A.  Yes.

24          THE COURT:  So Boeing had 30 days to pay it after the

25  signing of this?

Lira - Cross by Matthai

416

1          THE WITNESS:  Yes.

2          THE COURT:  And we're almost at our break, but I'm

3    still struck by something you said.  So Lion Air was signing

4    people up and getting releases from them, the widows and

5    orphans, at the airport while they're out there collecting the

6    plane and the bodies?

7          THE WITNESS:  In a room by themselves with Lion Air

8    officials.  That's how it was explained to me.

9          THE COURT:  I'm floored.

10          All right.  Go ahead.  Keep asking questions.

11   BY MS. MATTHAI:

12   Q.  Did they have a chance to get lawyers?

13   A.  I was told by my clients they did not have that option.

14          THE COURT:  Of course not.

15          Go ahead.

16   BY MS. MATTHAI:

17   Q.  Just quickly, for the record, if we turn to Exhibit 208,

18   is that the release for Ms. Septiana?

19   A.  Yes.

20   Q.  And if we turn to 2 -- same provisions?

21   A.  Identical other than the demographic information.

22   Q.  And particularly -- potentially the total amount?

23   A.  Yes, that's true.

24   Q.  Okay.  And then 213, that's for Ms. Dian?

25   A.  Yes.

**Lira - Cross by Matthai**

1    Q.   Same identity of the language in the release?

2    A.   Yes.

3    Q.   And if we go to 218.

4    A.   That's for Bias that we've been discussing, yes.

5    Q.   Right.  And, again, same language in the release itself;

6    is that correct?

7    A.   That's correct.

8    Q.   Okay.

9         MS. MATTHAI:  Is this a good time to break before I

10   move to something else, or you wish to go on?

11        THE COURT:  We can break now.  Let's come back in

12   about an hour, at 1:25.

13        This will be off the record.  It's on scheduling.

14   (Lunch recess had from 12:27 p.m. to 1:29 p.m.)

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3   WELLY CHANDRA, et al.,            )
                                       )
 4                   Plaintiffs,       )
                                       )
 5   -vs-                              )
                                       )   Case No. 18 C 7686
 6   THE BOEING INTERNATIONAL SALES    )
     CORPORATION, a Washington         )   Chicago, Illinois
 7   State Profit Corporation, et      )   December 9, 2021
     al.,                              )   1:29 p.m.
 8                                     )
                     Defendants.       )
 9

10               TRANSCRIPT OF PROCEEDINGS - Volume 2
             BEFORE THE HONORABLE THOMAS M. DURKIN
11
     APPEARANCES:
12
     For Edelson PC:        MR. ALEXANDER G. TIEVSKY
13                          MR. JAY EDELSON
                            MR. J. ELI WADE-SCOTT
14                          MS. AMY B. HAUSMANN
                            Edelson PC
15                          350 North LaSalle Street, 14th Floor,
                            Chicago, Illinois  60654
16
     For Keith Griffin:     MR. RYAN D. SABA
17                          Rosen Saba, LLP
                            9350 Wilshire Boulevard, Suite 250
18                          Beverly Hills, California  90212

19
     For David Lira:        MS. EDITH R. MATTHAI
20                          MS. LEIGH ROBIE
                            Robie & Matthai
21                          350 South Grand Avenue, Suite 3950
                            Los Angeles, California  90071
22
     Court Reporter:        KELLY M. FITZGERALD, CSR, RMR, CRR
23                          Official Court Reporter
                            United States District Court
24                          219 South Dearborn Street, Room 1420
                            Chicago, Illinois  60604
25                          Telephone:  (312) 818-6626
                            kmftranscripts@gmail.com
</pre>

Lira - Cross by Matthai

419

1          (Proceedings heard in open court:)

2               THE COURT:  Sir, you can retake the stand.  Thank

3     you.

4               All right.  You may begin.

5          DAVID RICHARD LIRA, WITNESS, PREVIOUSLY SWORN,

6               CROSS-EXAMINATION (Resumed)

7     BY MS. MATTHAI:

8     Q.   I think when we left off, we were at the place in which

9     the group of claimants' families who had signed the Lion Air

10    release had been removed from the settlement, you

11    negotiated -- renegotiated that first settlement to keep a

12    settlement for the four who had not, correct?

13    A.   Yes.

14    Q.   And then that left those families who had signed the

15    Lion Air plaintiff.  And other than Mr. Rizki, those had all

16    been referred to you, correct?

17    A.   Correct.

18    Q.   And were there further settlement discussions as to those

19    parties?

20    A.   Yes.  It culminated in a mediation on March 12, 2020,

21    again, in front of Judge O'Connell.

22    Q.   Were you able to be present for that mediation?

23    A.   I was not.

24    Q.   Why not?

25    A.   I was in trial in Lovington, New Mexico, against Shell Oil

Lira - Cross by Matthai

420

1  from February 1, 2020, through March 4th of 2020.

2  Q.  Okay.  Do you know who did attend that mediation?

3  A.  I know Mr. Griffin did because he reported the results to

4  me.  And I believe Mr. Scharg.

5  Q.  From the Edelson firm?

6  A.  Yes.

7  Q.  Okay.  So is it your understanding that Edelson was

8  completely aware of the fact that there were two different

9  sets of settlements made at two different times?

10  A.  No doubt.

11  Q.  Okay.  Following that second set of -- well, let me ask

12  you this.  Did -- to your knowledge, did the Edelson firm have

13  direct communications with Boeing's counsel with regard to the

14  statuses of releases?

15  A.  Yes.

16  Q.  I'd ask you to turn to Exhibit 263.

17          MS. MATTHAI:  This should not be public.

18          THE CLERK:  It's not public.

19          MS. MATTHAI:  Okay.

20          THE COURT:  Not public?

21          MS. MATTHAI:  Not public.

22          THE COURT:  All right.

23  BY MS. MATTHAI:

24  Q.  There are a couple of e-mails in this exhibit.  Could you

25  just briefly tell us what this is?

1  A.   This is an e-mail from Grant Silvernale from Perkins Coie

2  to Mr. Griffin, Scharg, myself, and it's cc'd to a number of

3  lawyers at Perkins Coie enclosing draft Girardi releases for

4  the four claimants.

5  Q.   And this one is dated December 18, 2019?

6  A.   That's correct.

7  Q.   And if we look at Exhibit 264.  Is that once again a set

8  of e-mail communications in which yourself, Mr. Scharg, and

9  Mr. Griffin are included with regard to the releases to be

10 signed in the Lion Air cases?

11 A.   Yeah.  And this is January 22, 2020 now.

12 Q.   Okay.  And to your knowledge, in addition to these two

13 e-mails, were there communications directly between the

14 Edelson firm and the counsel for Boeing with regard to these

15 cases?

16 A.   Yes.

17 Q.   Did you ever tell anyone from the Edelson firm that they

18 could not communicate with Boeing's lawyers?

19 A.   No.

20 Q.   Now, you've talked to us a little bit after -- about the

21 confrontations that you had with Mr. Girardi starting in April

22 or May and then continuing up until the day that you left the

23 firm, correct?

24 A.   Yes.

25 Q.   Was the -- which of those conversations was the longest?

Lira - Cross by Matthai

1    A.   The day I left the firm, June 13, 2020.

2    Q.   Which of those conversations was the loudest?

3    A.   That same one.

4    Q.   Had there been other ones in which voices had been raised?

5    A.   Yes, in the form of pleas to him.

6    Q.   Okay.

7    A.   To pay the clients.  And I'm almost ashamed to say this,

8    but I referenced not only his professional reputation but I

9    mentioned his grandkids.

10   Q.   Okay.  After -- on the day that you left the firm, you had

11   a shouting match with Mr. Girardi, correct?

12   A.   Yes.

13   Q.   And that shouting match was loud enough that it was

14   overheard by another lawyer who was in the office?

15   A.   Yes.

16   Q.   Was that Saturday -- was June 13th a Saturday?

17   A.   Yes, it was.

18   Q.   Okay.  And did -- can you tell us what was said in that

19   conversation?  Well, first, let me just ask you this: Were

20   there expletives?

21   A.   Yes.

22   Q.   Okay.  Leaving out the expletives, unless the Court would

23   like to hear them, can you tell us what was said in that

24   conversation, everything that you can remember you're saying

25   and everything that you can remember Mr. Girardi saying.

Lira - Cross by Matthai

1   A.   When I first approached Mr. Girardi in his office, I had a

2   packet with me and -- containing the keys to the car, the

3   passes to the office, a check.  And I first said, "I'm

4   resigning the firm."  And he said, "No, no, no, you can't do

5   this to me."  And I started to say that he has committed

6   professional suicide by the handling of the four plaintiffs,

7   that it wasn't his money to even delay on or play with.

8         And that was so disconcerting that everything that he

9   had worked for was in jeopardy and also the firm and the 90

10   employees at Girardi & Keese.  He was jeopardizing not only

11   the victims of the Lion Air crash but everybody that served

12   him faithfully for decades.

13         And I said, "You're going to be disbarred.  You're

14   going to be criminally indicted.  There is no excuse for

15   what's happened.  I've asked you time and time again to pay

16   these people.  And if it was a situation where you didn't have

17   the money, you know so many rich people that I know would help

18   you out or leverage other cases to get this done."

19         So I summarized what happened, and I go, "It's an

20   embarrassment."  And it's going to have long-term effects if

21   it turns out -- I didn't know it was going to turn out this

22   way -- on everybody associated with Mr. Girardi and including

23   myself.  It's been so damaging to my reputation and

24   financially.

25         And it was very heated.  I was doing most of the

1  talking.  He kept begging me.  Then he made me one last

2  promise.  "Think about it.  Don't do it.  I'll get everything

3  taken on Monday, the 15th."

4       That discussion -- then the rest of the day he left

5  me ten phone messages, begging me to come back, everything

6  will be fine, that he would right the ship.

7  Q.  Okay.  Did you take -- when he said he would right the

8  ship or everything would be fine, did you understand him to be

9  saying to you that he was going to pay the clients on Monday?

10 A.  Because that was the focus of the conversation, the

11 Lion Air victims.

12 Q.  At this point did you believe that he would do that?

13 A.  I still held out some faith, like here is his son-in-law

14 who served him faithfully.  His daughter would be a direct

15 victim of these actions, and I held out hope that he would do

16 that by any means possible.

17 Q.  At that point did you think that he didn't have the money?

18 A.  That did cross my mind, absolutely.

19 Q.  Okay.

20 A.  I didn't know definitively, but that's an easy conclusion

21 to make.

22 Q.  When you said to him that he would be committing

23 professional suicide, what did you mean by that?

24 A.  Everything that he stood for, that he represented to the

25 community will now go down the drain.  I quoted him something.

Lira - Cross by Matthai

425

1   I said, "You could live a stellar life for 50 years, but

2   you're only going to be remembered for your last act.  And

3   your last act now has begun to look like that you are going to

4   be disbarred from the one thing that is most sacred to you,

5   and that's your reputation within the bar."

6   Q.  Why did you say that was the one thing that was the most

7   sacred to him?

8   A.  It's clear, and I'm sorry I have to say this.  My wife is

9   listening.  But Tom put his reputation among -- above family

10  and friends.  And that is clearly played out now.  And why

11  would he sacrifice the most sacred thing to him in his life by

12  cheating these people given the wealth that he held?

13  Q.  And did you believe that that would be the incentive that

14  would make him finally honor the obligation to pay these

15  people?

16  A.  I thought that would be the most effective power play in

17  terms of persuasion, yes.

18  Q.  And have you spoken to Mr. Girardi since you left the

19  firm?

20  A.  I have not.

21  Q.  Did you know -- when was it that you found out that he

22  didn't honor that promise to you to make the payment to these

23  people on Monday?

24  A.  In my conversations later that month with the Edelson firm

25  and Mr. Griffin.

1    Q.   Did -- when you left the firm -- by the way, in that last

2    conversation, did you call him a thief?

3    A.   Yes.

4    Q.   What was his reaction to that?

5    A.   I think he was shocked initially by my statements and the

6    fact that I was leaving.  And then that's when he got into the

7    mode of telling me "I'll take care of it, I'll take care of

8    it.  You can't leave me.  I swear to you and everyone I will

9    take care of this issue right away."

10   Q.   Okay.  Other than the promises that he made to you in that

11   conversation, do you remember anything else that he said?

12   A.   No.  It was at the end and I was very angered.  He told

13   me, you know, I didn't have to yell at him.  He understood my

14   concerns.  And then it was just basically him asking me to

15   stay and reconsider, and he wouldn't accept the package that I

16   handed him.

17   Q.   Okay.  I may have asked you this earlier.  I apologize if

18   it's a repeat.  But after you left the Girardi firm, were your

19   e-mails forwarded to you by the firm?

20   A.   They were not.

21   Q.   So if somebody sent you an e-mail to the Girardi Keese

22   e-mail address that you had had previously, did you get those

23   e-mails?

24   A.   I did not.

25   Q.   I would like you to go to Exhibit 1- --

 1        MS. MATTHAI:  Actually, may I have a minute,

 2   Your Honor?

 3        THE COURT:  You may.  Is it one of the exhibits

 4   already shown by the Edelson firm?

 5        MS. MATTHAI:  I've got it.

 6        THE COURT:  You've got it.  Okay.

 7        MS. MATTHAI:  Too many binders.

 8        THE COURT:  Yeah.

 9        MS. MATTHAI:  I'm going to go to Exhibit 117 --

10   excuse me -- 116.

11   BY MS. MATTHAI:

12   Q.  If you can look at 116.

13        MS. MATTHAI:  This should not be shown to the public.

14        THE COURT:  Okay.

15   BY MS. MATTHAI:

16   Q.  Is this a letter that you wrote on July 6, 2020?

17   A.  Yes.

18   Q.  Okay.  And that's to Mr. Scharg and Mr. Balabanian?

19   A.  Yes.

20   Q.  And it refers to a follow-up to the telephone conference

21   on June 16th, correct?

22   A.  Yes.

23   Q.  Okay.  Now I am going to go to Exhibit 117.  We may come

24   back to 116 again.

25        Exhibit 117 is a letter from the Edelson firm.  I

1  believe it's signed by Mr. Scharg, but let me verify that.  I

2  could be wrong.  It could be Mr. Balabanian.  It's signed by

3  Mr. Balabanian.  And this is from -- signed by Mr. Balabanian

4  to Mr. Girardi and to you, correct?

5  A.  Yes.

6  Q.  And you got this letter at your new firm, correct?

7  A.  That's correct.

8  Q.  And in the first paragraph, it starts out saying that this

9  letter follows up my conversations with David and Keith

10  Griffin, correct?

11  A.  Yes.

12  Q.  And it also responds in part to David's letter of July 6,

13  2020, correct?

14  A.  Yes.

15  Q.  And it says that the July 6, 2020 letter is attached,

16  correct?

17  A.  Yes.

18  Q.  And if we flip to -- you can't lick your thumb to turn

19  pages when you have a mask on.

20          MR. TIEVSKY:  We'll stipulate to the attachment,

21  Ms. Matthai.

22          MS. MATTHAI:  05.  243-5.

23  BY MS. MATTHAI:

24  Q.  So this is, in fact, your July 6th letter that we looked

25  at, correct?

Lira - Cross by Matthai

429

1    A.   Yes.

2    Q.   And it was now attached to this letter of July the 10th,

3    correct?

4    A.   Yes.

5    Q.   And in the second paragraph after saying that it's a

6    follow-up to the telephone conference, in the second

7    paragraph, it reads, "All of the releases in Keith's cases."

8    I'm going to stop there right now.

9         Did you have any reason to believe that the Edelson

10   firm didn't understand what you were referring to when you

11   said Keith's cases?

12   A.   I can't imagine how they would confuse it.

13   Q.   Okay.  And all of the releases have been delivered to

14   Boeing and have funded, correct?

15   A.   Yes.

16   Q.   And then you referred to your cases, and you gave the

17   status of your cases, correct?

18   A.   That's correct.

19   Q.   And you told them -- you told Mr. Scharg that six had

20   funded due to the delivery of releases and those families that

21   have not signed releases are the families of, and then they

22   are listed, correct?

23   A.   Yes.

24   Q.   So did you understand that the Edelson firm would fully

25   understand at this point if there had been any possible

Lira - Cross by Matthai

1  confusion in the past that settlements were being funded

2  whether or not all the clients had actually signed the

3  releases?

4  A.  That's correct because I'm trying to make payment on the

5  20 percent fee they were due under my cases.

6  Q.  Okay.  And then --

7        THE COURT:  Where is Mr. Multi among these cases?

8  There's a reference to three and then to six.  Where is he in

9  that group?

10        THE WITNESS:  I'm only speaking -- this addresses

11 only the cases that were referred to me directly.

12        MS. MATTHAI:  In that part of the letter.  The

13 first -- Mr. Multi would be in the Keith's cases that have

14 been delivered and have funded.

15        THE COURT:  Right.  Where it says five of these cases

16 were referred to Keith Griffin?

17        THE WITNESS:  Yes.

18        THE COURT:  And that's the four we've been speaking

19 about and then Mr. Multi?

20        THE WITNESS:  Yes.

21        THE COURT:  Okay.  All right.

22 BY MS. MATTHAI:

23 Q.  Okay.  And then you also -- in fact, there was one of the

24 client's -- when the settlement was made for the group of

25 people who had signed the Lion Air releases, we had one

Lira - Cross by Matthai

1    Mr. Rizki who was a Keith case, correct?

2    A.  Yes.

3    Q.  And then there were others that were your cases, correct?

4    A.  Yes.

5    Q.  What happened with those?

6    A.  Three funded on June 9th of 2020, and those are the three

7    mentioned, Ningrum, Inajatullah, and Harwinoko.  They funded

8    on June 9th and they were wired their money two days later on

9    June 10th, the same day I asked for the call with Mr. Scharg.

10   They were funded.

11        The other three which are referenced, Ravi Andrian,

12   Jorry Saroinsong, and Darwin Harianto, I had not received the

13   executed releases from those three families.

14        As it would turn out, two of those cases went with

15   another firm even though there was an agreement on their

16   settlements.

17        And then Mr. Saroinsong, who lost his son in this

18   incident, is a lawyer, and he had his own opinions about

19   releases, inheritance documents.  And so I eventually was able

20   to have Mr. Saroinsong sign a release, and his monies were

21   funded and paid out in October.

22        Mr. Johan Saroinsong, of all the victims and clients,

23   him and I had, I would call, a relationship of constant

24   communication.  I liked him.  And he called upon on me to

25   close out the case.

1   Q.   Okay.  So you closed out that one case after you had left

2   Girardi Keese?

3   A.   Yes.

4   Q.   Did you receive any money or compensation for having done

5   that?

6   A.   No.

7   Q.   Did you receive any money or compensation from the

8   Lion Air monies before you left Girardi Keese?

9   A.   No.

10  Q.   Have you ever received any money from the Lion Air

11  settlements?

12  A.   No.

13  Q.   Now, the -- going back to Exhibit 117.

14        MS. MATTHAI:  I'm trying to see if there are any

15  numbers in that, Your Honor, before I say whether it can be

16  public.  I believe there are no numbers in it.

17        THE COURT:  As long as you do not go to the

18  attachment to it, 117-05.  But 117-1 through 4 have no

19  problems.

20        MS. MATTHAI:  That's what I believe and I wasn't

21  intending to go past that at this point.

22        THE COURT:  Okay.  Then this can be on the public

23  display.

24  BY MS. MATTHAI:

25  Q.   So now in this response, in this letter by Mr. Balabanian,

1   it speaks about the conversation and also refers to your

2   letter of July 6th that we just looked at, correct?

3   A.  Yes.

4   Q.  And he asserts that it -- his firm now has concerns?

5   A.  Yes.

6   Q.  Okay.  And toward the bottom of the second paragraph, it

7   says, "Keith said that Boeing would not fund any of the

8   settlements, including in the dismissed cases until the

9   releases had been signed by all of our clients in all 11

10  cases."

11          Did you ever say any such thing to anyone at the

12  Edelson office?

13  A.  No, that would be absurd.

14  Q.  If we go to 243-2.  Now, the representation is made in

15  this letter that you had reiterated what Keith had said

16  previously, that we still hadn't received all of the executed

17  releases from the clients that Boeing would fund if and when

18  they were all received.  Do you see that?

19  A.  Yes.

20  Q.  Did you ever say that?

21  A.  Never.

22  Q.  Is that directly contrary to what was said in the July 6th

23  letter before this July 10th letter?

24  A.  Both in the letter and in reality.

25          THE COURT:  I think you called it 243-2.  You mean

Lira - Cross by Matthai

1   117-2, correct?

2          MS. MATTHAI:  I'm sorry.  I'm using the duplicate.

3          THE COURT:  Okay.

4          MS. MATTHAI:  It's 117-2.  I apologize.

5          THE COURT:  All right.

6   BY MS. MATTHAI:

7   Q.  And then this refers down at the bottom of the page, it

8   says that you provided a more detailed explanation of where

9   things stood on specific releases and why it was taking long

10  for them to be translated and executed by the clients.

11         Had that occurred months before?

12  A.  Yes.

13  Q.  And what had you told the Edelson firm about why it was

14  taking time to get the releases finalized?

15  A.  Some of these clients had issues in providing the required

16  documentation regarding the heirs.  And also there was

17  demographic information that was missing in regards to a

18  government -- government identification numbers.  Everybody

19  has a number in Jakarta.  And getting all the required

20  documents from different sources took time.  And that would

21  stall the finalization of the releases.

22         And then once they were approved by the Boeing

23  lawyers, both in America and in Indonesia, they would be

24  translated.  I offered to have them translated, but Boeing

25  would not agree to that, to speed things up.  And then they

Lira - Cross by Matthai

435

1    would go to my client and they would have to be read to them

2    so they understood.

3    Q.   Okay.

4    A.   So it wasn't simply just signing a release.  It was

5    meeting all the conditions precedent required under the

6    release.

7    Q.   If we go down the next paragraph to this letter from

8    Mr. Balabanian, it says, "On June 11th, we got an e-mail from

9    David asking to set up a call to discuss the status of the

10   cases."

11           Do you see that?

12   A.   Yes.

13   Q.   And June 11th was before your resignation, right?

14   A.   That's correct.

15   Q.   Why did you ask to have a call set up in order to discuss

16   the cases with the Edelson firm?

17   A.   One, I wanted to tell them I've departed Girardi & Keese

18   to start my own firm, to tell them that all the cases that

19   were referred to me and in which the client signed the

20   releases had been funded and delivered to the clients.  So to

21   remove off the slate of business would be all the cases I was

22   handling at that juncture, and to give them an update about

23   the other four and where we were at at that time.

24   Q.   Okay.  And it says on that call -- well, did you want to

25   make sure that the Edelson firm who was going to continue to

1  represent these remaining plaintiffs -- or the plaintiffs that

2  had not been paid more accurately?

3  A.  The cases were still open, and I know Keith was remaining

4  at Girardi & Keese.

5  Q.  Okay.

6  A.  And so the more pressure, the better.

7  Q.  Okay.  Well, why -- why did you think that you could leave

8  Girardi Keese on June 13th and not have further discussions

9  directly with the clients or be directly involved in this

10  issue yourself?

11  A.  The way I looked at it, my day-to-day activities were the

12  group that I was referred to.  I was involved in the Girardi

13  cases certainly, but I didn't have the relationship, involved

14  Mr. Hatcher; but, more importantly, I didn't think it was my

15  place at that time.  I was no longer at Girardi & Keese and

16  acting as the attorney of record.

17  Q.  Did the clients have attorneys of record at that point?

18  A.  Yes, the Girardi firm and Edelson firm.

19  Q.  And the Edelson firm had, in fact, appeared as attorney of

20  record?

21  A.  Yes.

22  Q.  And was one of the reasons to have this call set up that

23  you asked to set up two days before you actually resigned was

24  to make sure they understood the status of the case?

25  A.  Yes.

1    Q.   Okay.  And --

2              THE COURT:  Did you ever withdraw from any of these

3    cases once you left the Girardi firm?

4              THE WITNESS:  I did not file formal withdrawal papers

5    as required in federal court.  There's no such requirement in

6    state court.  Well, at least I'm talking about California

7    anyway.

8              MS. MATTHAI:  The record is that Mr. Lira signed the

9    complaints on his cases which are not the ones that are

10   unpaid.

11             THE COURT:  Right.

12             MS. MATTHAI:  Did not do so and was not involved at

13   the beginning when the first group of plaintiffs had filed.

14   And we've looked at the docket and we don't see any indication

15   that Mr. Lira ever made a formal appearance with the court on

16   any of the cases.  The court appearances on Mr. Lira's cases

17   were made by the Edelson firm, and while there may have been

18   an intention at some point for Mr. Lira to become *pro hac*

19   *vice*, we have not found anything that confirms that that was

20   ever done.

21             MR. TIEVSKY:  I am going to object to counsel's

22   testimony about this.

23             THE COURT:  Well, is it untrue or inaccurate?

24             MR. TIEVSKY:  I don't know that he made an

25   appearance.  I don't know why.  I also know that he's a member

**Lira - Cross by Matthai**

1  of the bar of this Court, so *pro hac vice* doesn't make any

2  sense.

3           THE WITNESS:  If I could explain, Your Honor?

4           THE COURT:  You can.

5           THE WITNESS:  This is a very interesting case.  It

6  went right into mediation mode.  And I never appeared before

7  Your Honor.  I never filed an appearance in this Court.  I was

8  just focusing on the mediation effort as one of the architects

9  of the settlements.

10          THE COURT:  Oh, I understand that.  My question is

11 you have a -- do you recall either having an appearance on

12 file or authorizing Edelson, the Edelson firm to file an

13 appearance for you?

14          THE WITNESS:  I don't have any knowledge or memory of

15 that ever happening.

16          THE COURT:  I could look at the docket as well as

17 anyone else, but have you looked at it from the Edelson firm?

18 Is there any record of Mr. Lira being on the docket in the

19 cases involving the four plaintiff -- well, five, really,

20 people that were at issue, but the four that I approved the

21 settlements on?

22          MR. TIEVSKY:  I don't believe that he filed formal

23 notices of appearance; but because these cases were

24 consolidated, I have not checked every single docket of the

25 cases that were closed up and then consolidated.

 1          THE COURT:  All right.

 2          MS. MATTHAI:  Okay.

 3          THE COURT:  But the four that relate to the

 4  plaintiffs that we're talking about, you found nothing on

 5  those?

 6          MR. TIEVSKY:  I don't -- I don't believe so.  You

 7  know, I don't believe that he filed notices of appearance.

 8  I'm not sure if that really makes any difference, you know, in

 9  terms of whether he represented the clients in connection with

10  the case before this Court, but I don't know that he followed

11  the local requirements.

12          THE COURT:  That's a different question.  Is he

13  formally on the docket?

14          MR. TIEVSKY:  I don't believe he is.

15          THE COURT:  Ms. Matthai?

16          MR. SABA:  Your Honor, I don't mean to interrupt, but

17  as long as we're talking about this -- as long as we're

18  talking about this, Your Honor, the same is true for

19  Mr. Griffin.

20          THE COURT:  Okay.

21          And, Ms. Matthai, you wanted to add something?

22          MS. MATTHAI:  I was just going to say we looked at

23  the docket.  We did not find Mr. Lira on the docket.  The

24  docket is -- we actually marked it as Exhibit 1.  I don't know

25  which is easier for the Court, the exhibit or your own docket

1   which is, by the way, not -- as I'm sure you're well aware, is

2   a long slog through.  But we did not find Mr. Lira's name on

3   that document.  And if I may ask Mr. Lira one other

4   question --

5            THE COURT:  Go ahead.

6            MS. MATTHAI:  -- it may also clarify that.

7   BY MS. MATTHAI:

8   Q.  Did you receive ECF notices on the Lion Air case?

9   A.  Never.

10           THE COURT:  All right.  You knew of the order that --

11  you heard Mr. Griffin testify that he was aware of -- right at

12  the start of his testimony, he was aware of the order

13  requiring the monies to be sent to the plaintiffs promptly.

14           THE WITNESS:  Yes.

15           THE COURT:  Were you aware of that order?

16           THE WITNESS:  Yes.

17           THE COURT:  Okay.

18           Go ahead.

19           MS. MATTHAI:  Okay.

20  BY MS. MATTHAI:

21  Q.  So we're now back to Exhibit 117.  And the paragraph --

22  the second paragraph on page 2, Mr. Balabanian writes about a

23  call which occurred on June 16th, correct?

24  A.  Yes.

25  Q.  And "David, who had just resigned from GK, explained that

Lira - Cross by Matthai

1   the settlements had, in fact, been funded," correct?

2   A.  Yes.

3   Q.  Was it your understanding that the -- that the Edelson

4   firm had been aware of that prior to this time?

5   A.  That was my assumption, yes.

6   Q.  But certainly as of that telephone conversation of

7   June 16th, there could be no doubt that the Edelson firm was

8   aware that the -- that the settlements had funded with the

9   exception of Mr. Saroinsong?

10  A.  That's correct.

11          MR. TIEVSKY:  Objection.  Lack of personal knowledge.

12          THE COURT:  Well, if the answer is yes, explain why

13  you know.

14          MR. TIEVSKY:  There's a difference between being told

15  something and knowing something.  He has no idea what the

16  Edelson firm knew or did not know.

17          THE COURT:  Well, that objection is overruled.

18          You can explain if you knew and then you can explain

19  why you knew.  Did you know if the Edelson firm knew that

20  these settlements, at least the four that are at issue, had

21  been funded, and if the answer is yes, how is it you knew?

22          THE WITNESS:  Yes.

23          THE COURT:  Then you can explore on further

24  questioning if you would like.

25          THE WITNESS:  I'm sorry, Your Honor.  The answer is

Lira - Cross by Matthai

442

1    yes.

2          THE COURT:  And how do you know?

3          THE WITNESS:  They were copied with the releases.  In

4    particular I think it's paragraph 1(e) which stated that the

5    settlement would be funded within 30 days of delivery of the

6    releases.  They had obtained a court approval of the four and

7    got the cases dismissed.  So I'm assuming on this information,

8    as lawyers, they should have had that conclusion early on.

9    BY MS. MATTHAI:

10   Q.  And that was also discussed in this telephone conversation

11   referenced in this letter as having occurred on June 16th,

12   correct?

13   A.  That's correct.

14         MR. TIEVSKY:  I will renew my objection because the

15   fact that something is written in a contract does not mean

16   that it actually happened.  So lack of personal knowledge.

17         THE COURT:  All right.  Objection overruled.

18         MS. MATTHAI:  Okay.

19   BY MS. MATTHAI:

20   Q.  And did you say, confirm in that telephone conversation of

21   June 16th that those settlements had funded?

22   A.  Yes.

23   Q.  As of June 16th, did you know whether Mr. Girardi had

24   honored his promise to you made on June 13th to pay those

25   settlement funds?

Lira - Cross by Matthai

443

1    A.   Not at that time, no.

2    Q.   Okay.  If you go to the last full paragraph of this,

3    Mr. Balabanian speaks of calls with Keith Griffin on June 18th

4    and also on June 30th, correct?

5    A.   Yes.

6    Q.   And the Edelson firm says that they're concerned at that

7    time that the settlements have funded but the clients have not

8    yet been paid, correct?

9    A.   Yes.

10   Q.   And they state that Mr. Griffin's response is that he did

11   not know for certain since Tom handles the finances of GK,

12   correct?

13   A.   Yes.

14   Q.   To your knowledge, did Mr. Griffin have access to any of

15   the books and records and finances of Girardi Keese?

16   A.   He did not.

17   Q.   Did Tom Girardi, to your knowledge, with the exception of

18   Mr. Kamon and perhaps Ms. Fukimoto -- is it --

19   A.   Fujimoto.

20   Q.   -- Fujimoto, provide the people in the firm with

21   information about the firm's finances?

22   A.   No.

23   Q.   Was he closed mouth about that?

24   A.   Very secretive.

25   Q.   Was he secretive about the documents that would reflect

Lira - Cross by Matthai

444

1    that?

2    A.  Yes.

3    Q.  Okay.  And then this goes on to say that Keith had said

4    that he believed that, to date, the clients had been paid

5    about half of what they were owed, correct?

6    A.  That's what it says.

7    Q.  And then Mr. Balabanian says the same thing that you had

8    said in the past, on the top of page 3, that the clients must

9    be paid what they were owed immediately, correct?

10   A.  Yes.

11   Q.  They also go on later on at the bottom toward the center

12   of the page there, they say that they're demanding a full

13   accounting of all the settlement funds, correct?

14   A.  Yes.

15   Q.  They also demand in this letter a response from

16   Mr. Girardi and from you, correct?

17   A.  Yes.

18   Q.  And do you know one way or the other whether Mr. Girardi

19   ever responded to this letter?

20   A.  I have no knowledge of that.

21   Q.  Okay.  You responded to the letter, however, correct?

22   A.  That's correct.

23   Q.  And if we turn to Exhibit 118.

24           MS. MATTHAI:  I believe this does not have numbers on

25   it.

1          THE COURT:  Okay.  This can be on the public feed.

2     BY MS. MATTHAI:

3     Q.  Is this your response to the letter?

4     A.  Yes.

5     Q.  The July 10 letter.  Okay.

6          And if we go to the second paragraph, it says, "I

7     have never stated or represented that the entirety of the

8     cases would not fund until Boeing received all 11 of the

9     executed releases."

10         Was that a true statement?

11    A.  Absolutely true.

12    Q.  Okay.  Then we go to the bottom of that response.  And you

13    state, "The three cases from your referring source in which a

14    fully executed release had been received are fully funded and

15    the clients have received their settlement monies," correct?

16    A.  Yes.

17    Q.  And then you also dispute one of the other statements in

18    the July 10th letter.  On the second page of Exhibit 118, it

19    says, "Fourth, I have never represented or stated that my new

20    firm would be responsible for attorneys' fees due to your

21    firm."

22         Why did you write that?

23    A.  Because it was true.

24    Q.  Okay.  Well, had the July 10th letter from Mr. Balabanian

25    suggested that you had said such a thing?

1   A.   Yes.

2   Q.   Okay.  Did you ever say that there would be fees coming

3   from your new firm to anyone on these Lion Air cases?

4   A.   As I stated, I said that would be insanity since I'm not

5   receiving any compensation.

6   Q.   Okay.  Did Johnston Hutchinson & Lira ever receive a dime

7   from the Lion Air monies?

8   A.   Not one penny.

9   Q.   Then it goes -- further down, there's a paragraph that

10  starts "lastly."

11          Do you see that?

12  A.   Yes.

13  Q.   "As to the current status of payment to the four clients

14  settled in late 2019 and referred to Keith and Tom, I do not

15  know the current status.  I resigned from Girardi Keese

16  effective June 13, 2020, and I do not have access to such

17  information."

18          Was that a true statement?

19  A.   Yes.

20  Q.   Did you know one way or the other as of July 13th whether

21  Mr. Girardi had met his promises to complete the payment to

22  the plaintiffs?

23  A.   I had no such information.

24  Q.   Did you consider reporting Tom to the bar?

25  A.   I did.

Lira - Cross by Matthai

1  Q.  Did you do it?

2  A.  I did not.

3  Q.  Why not?

4  A.  I looked -- on my own, I did some -- the professions and

5  business code in California, and California is a nonreporting

6  state.  I just hoped and prayed one way or the other that he

7  would fulfill his obligation.

8  Q.  Did you think that if there was outside intervention from

9  the bar -- well, let me ask -- before I ask that, did you

10  consider inviting -- advising this Court that the money had

11  not been paid?

12  A.  I did not.

13  Q.  You didn't consider that one way or the other?

14  A.  No.

15  Q.  Okay.  Did you -- when you were considering whether or not

16  to report him to the bar and you confirmed that California is

17  indeed a nonreporting state, did you believe that intervention

18  from the bar would make any difference in getting these

19  clients paid?

20  A.  I had some doubts.  His reputation, the timing involved.

21  If it was true in June what was true in December, I suppose

22  the same outcome would have occurred, which is the blowup of

23  his firm.

24  Q.  Did you ever get any -- you got paid your salary, correct?

25  A.  Yes.

Lira - Cross by Matthai

1   Q.  You've been paid your salary every two weeks from the time

2   you started there, correct?

3   A.  Yes.

4   Q.  Did that come from an automatic pay through a payroll

5   service?

6   A.  Yes.

7   Q.  Other than the fact that you continued to get your salary,

8   did you get one thin dime of money from the Lion Air

9   settlement, and not suggesting your salary -- let me rephrase

10  that because I don't like my phraseology of my question.

11         By the way, did you learn that Girardi Keese had

12  taken out a PPP loan?

13  A.  I learned that.

14  Q.  You were paid your salary, correct?

15  A.  Yes, and benefits.

16  Q.  Did you take one thin dime of money that you understood

17  came from any Lion Air settlement?

18  A.  No.

19  Q.  Did you ever intend to violate any order of this Court?

20  A.  No.

21  Q.  Did you ever intend to assist Mr. Girardi in stealing

22  these clients' money?

23  A.  Absolutely not.

24  Q.  Did you ever intend to try to cover up the fact that

25  Mr. Girardi had not paid these clients?

Lira - Cross by Matthai

449

1   A.  No.

2   Q.  Did you demand that Mr. Girardi pay the money that was due

3   to these clients?

4   A.  Yes, multiple times.

5   Q.  Did you want the clients to get paid?

6   A.  Absolutely.

7   Q.  Was that the goal?

8   A.  Yes.

9   Q.  That's all the questions that I have.

10          THE COURT:  All right.  Mr. Saba, do you have any

11  questions?

12          MR. SABA:  I do not, Your Honor.

13          THE COURT:  Any questions by the Edelson firm?

14          MR. TIEVSKY:  Yes, Your Honor.

15          THE COURT:  Go ahead.

16                   REDIRECT EXAMINATION

17  BY MR. TIEVSKY:

18  Q.  You testified you had a call with Edelson attorneys on

19  June 16th?

20  A.  Yes.

21  Q.  You testified that that call was to make sure they

22  understood the status of the case?

23  A.  Yes.

24  Q.  This was three days after you had had a fight with

25  Mr. Girardi --

1   A.   Yes.

2   Q.   -- in which you literally called him a thief?

3   A.   Yes.

4   Q.   So let's be clear.  The status of the case at that time

5   was, as to your belief, was that Mr. Girardi had stolen the

6   clients' money?

7   A.   I didn't conclude that, but there was a huge discrepancy,

8   whether they were gone or misplaced, yeah, that was an issue.

9   Q.   Sorry.  If you didn't conclude that, then why did you call

10  him a thief?

11  A.   Because I was trying to influence him to make the payment.

12  I would have called him anything under the sun if I knew it

13  would work.

14  Q.   You didn't believe he was a thief when you called him

15  that?

16  A.   Well, if he had, in fact, taken the money, he is a thief.

17  Q.   Did you believe he was a thief when you called him a

18  thief?

19  A.   I still had doubts, and I was still hoping the money would

20  be delivered.

21  Q.   Had you forgotten by June 16th that you had just called

22  Mr. Girardi a thief?

23  A.   No.

24  Q.   Did you mention it on the call with the Edelson attorneys?

25  A.   No, that was private between Mr. Girardi and I.

**Lira - Redirect by Tievsky**

451

1    Q.  It doesn't relate to anybody else?

2    A.  No.  That was a conversation between Mr. Girardi and I

3    that I wasn't willing to share.  I didn't know your firm.  I

4    didn't know who you guys were really other than serving as

5    co-counsel.

6    Q.  Whose money did you think Mr. Girardi had stolen?

7    A.  Well, there was a question regarding Lion Air monies.

8    Q.  Whose money?

9    A.  The four that are missing money.

10   Q.  But that was private between you and Mr. Girardi?

11   A.  I'm not suggesting that.  The conversation was.

12   Q.  You didn't mention it at all.

13   A.  I mentioned it to my wife but not to the Edelson lawyers.

14   You're correct.

15           MR. TIEVSKY:  I got one more exhibit, Your Honor.

16           THE COURT:  Go ahead.

17   BY MR. TIEVSKY:

18   Q.  Turning back to 118-2.  This is the letter you wrote on

19   July 13th.

20   A.  Yes.

21   Q.  A month after you had the conversation in which you called

22   your father-in-law a thief?

23   A.  Yes.

24   Q.  In the paragraph that Ms. Matthai read a moment ago that

25   starts "lastly," you do not mention any of your suspicions

**Lira - Redirect by Tievsky**

1   that Mr. Girardi had been stealing the money of the clients?

2   A.  I did not use those words, no.

3   Q.  Did you mention those suspicions at any time to any

4   Edelson attorney at all?

5   A.  That he was a thief, no.

6   Q.  That you suspected he was a thief?

7   A.  That's right.

8   Q.  Not once?

9   A.  Not once.

10          MR. TIEVSKY:  I've got no further questions,

11  Your Honor.

12          THE COURT:  All right.  As to Mr. Rizki, there's a

13  stipulation that the funds were sent to Girardi Keese on

14  June 9th, correct?  If you don't know --

15          THE WITNESS:  Yes.

16          THE COURT:  Okay.  All right.  And you left on

17  June 13th.

18          THE WITNESS:  Yes.

19          THE COURT:  As you sit here now, do you know what

20  happened to that money?

21          THE WITNESS:  I do not, Your Honor.

22          THE COURT:  Have you ever spoken to Mr. Rizki?

23          THE WITNESS:  No.

24          THE COURT:  Who was the contact with him?

25          THE WITNESS:  I believe that would be Keith Griffin

**Lira - Redirect by Tievsky**

1     and Mr. Hatcher.

2              THE COURT:  All right.  As far as you know, did he

3     get any of his funds?

4              THE WITNESS:  I don't know as I sit here, but it

5     sounds like he did not.

6              THE COURT:  Okay.  All right.  Let's see if I have

7     any other questions.  Turn to 120 -- never mind.  I heard

8     testimony on that.

9              I have no further questions.  You're excused, sir.

10    Thank you.

11             THE WITNESS:  Thank you.

12             THE COURT:  All right.  Ms. Hausmann, were you going

13    to put on Mr. Balabanian?

14             MS. HAUSMANN:  I'm happy to, Your Honor, unless you

15    prefer to ask Mr. Griffin questions.

16             THE COURT:  Oh, you're right.

17             Let's hear from Mr. Griffin first.  I want to focus

18    it on the Mr. Rizki issue, if I'm pronouncing it correctly.  I

19    have no other questions for him other than that issue, and

20    I'll ask a few questions on that and I'll let the attorneys

21    ask additional questions if they would like.

22             Mr. Griffin, you're still under oath.

23             THE WITNESS:  Yes, Your Honor.

24             KEITH GRIFFIN, WITNESS, PREVIOUSLY SWORN

25                          EXAMINATION

**Griffin - Exam by the Court**

1    BY THE COURT:

2    Q.   Okay.  It appears from a stipulation with Boeing and that

3    all the parties have agreed that Mr. Rizki's claim was settled

4    for X amount of dollars.  And the monies were sent by Perkins

5    Coie to Girardi Keese, the Girardi Keese account, and also it

6    looks like the CAL account.  That's the litigation funding

7    account?

8    A.   I would think so.

9    Q.   But, anyway, it was sent on June 9, 2020.  So it was

10   funded as of June 9, 2020, correct?

11   A.   Yes, although I didn't know it at the time, but yes.

12   Q.   All right.  What involvement did you have with that

13   client?

14   A.   Once I learned that the funds had been received, because

15   this was part of the second settlement and Mr. Lira had

16   handled the funding arrangements on that, I didn't know that

17   these funds were coming initially to Girardi Keese, but I was

18   notified.  I think I asked accounting at some point later

19   whether or not the funds had, in fact, been received.  I think

20   that was in response to a question from Mr. Rizki himself, an

21   e-mail to me.

22        And so I -- I got confirmation that the funds were in

23   our trust account and I confirmed the same to Mr. Rizki, that

24   the funds were in trust.  I told Mr. Kamon to immediately pay

25   the funds.  And my recollection is he did not.

1       And then I wrote similar memos as I had before on the

2  first four cases to Mr. Girardi, I believe including my

3  parting memo, that Mr. Rizki was still due his funds.

4  Q.  How many communications have you had with Mr. Rizki about

5  this?

6  A.  I would say three or four e-mails.

7  Q.  For somebody to learn that his settlement was funded in

8  June and not get paid any of it through December, did -- what

9  were the nature -- are any of these communications with Rizki

10  in these binders, these many binders?

11  A.  No, Your Honor.  We didn't receive any -- the Wisner firm

12  who sent us communications between the clients and the Girardi

13  Keese firm, and I guess Mr. Multi didn't provide them with

14  any, so we haven't see any.

15  Q.  All right.

16       THE COURT:  And are any in the binders for

17  Mr. Griffin or Mr. Lira?

18       MR. SABA:  No.  All the binders are joint documents.

19  None of the binders have Rizki documents other than the Boeing

20  stipulation mentions that.

21       THE COURT:  Okay.

22       MR. TIEVSKY:  Maybe I can add some clarity.  Our only

23  source for this type of communication was directly from the

24  clients through the Wisner firm or a handful of documents that

25  we received from the trustee last week, and those are -- those

**Griffin - Exam by the Court**

1   are the internal Girardi Keese ones.

2          THE COURT:  Were there any internal Girardi Keese

3   ones on Mr. Rizki, on this -- Mr. Multi Rizki?

4          MR. TIEVSKY:  No, Your Honor, but we only asked --

5   because the files are such a mess and because we were trying

6   to reduce the burden on the trustee, we only asked for a small

7   portion basically within a couple of weeks.  We said can you

8   please, please look at this for us to determine if Mr. Griffin

9   or Mr. Lira had seen those lie letters, and then they too are

10  surprised, produced 20 or 30 e-mails that we've been

11  discussing for the last two days.

12         THE COURT:  Okay.  All right.

13  BY THE COURT:

14  Q.  Well, describe the nature of the e-mail communication you

15  had with Mr. Rizki.  I assume it was e-mail and not by phone?

16  A.  It was e-mail.

17  Q.  All right.  And you estimate approximately four of those

18  between the time his settlement was funded and the time you

19  left the firm?

20  A.  Yes, I believe that's correct, four or five e-mails.

21  Generally he asked if the funds had been received.  I checked

22  with accounting.  This was after the middle of June at this

23  point and received confirmation that the funds had been

24  received.  I told that to Mr. Rizki.  And he asked when they

25  would be funded.  And I said as soon as Mr. Girardi

**Griffin - Exam by the Court**

1  approves --

2  Q.  By funding, you mean when he would get the money, when

3  they would be funded?

4  A.  Yes.  And I would then continue to -- you know, as I

5  talked to him, I would send a memo to Mr. Girardi or Mr. Kamon

6  and advise that Mr. Multi has called again asking for an

7  update on when his funds would be wired.

8        I believe I also had one e-mail with him where I

9  asked if he wanted to speak with Mr. Girardi, and I think he

10 declined.  But that was the nature of the e-mail conversation.

11 Q.  All right.  So if the -- if documents were pulled, we

12 would find a series of e-mails from Multi Rizki to you asking

13 where's the money, responses from you saying that the money

14 has been funded by Boeing.

15 A.  Yes.

16 Q.  It resided with Girardi Keese.

17 A.  Yes.

18 Q.  And that the -- what did you tell him?  That you've told

19 Girardi to send him the money?

20 A.  Yes.

21 Q.  And obviously of course he didn't get it.

22        Did he at any point -- and he apparently declined to

23 talk to Tom Girardi?

24 A.  He did decline to speak with Tom Girardi, and I don't

25 recall if he threatened to, you know, report Mr. Girardi to

**Griffin - Exam by the Court**

1   the DA's office.  I can't recall if that was him or another

2   client.  But he was obviously extremely upset.

3   Q.  Well, there's another client in documents we've seen that

4   did say they were going to report him to the DA's office.

5       Were any of your answers lulling in the sense you

6   told him "Don't worry, it's on the way"?

7   A.  No.  No.  I was direct with him.  He asked if the money

8   had come in.  I told him it did.  He asked when it would be

9   wired, and I told him as soon as Girardi approved it, and I

10  did not lull him.

11  Q.  All right.  Did you prepare a cover memo, as you did for

12  the other four, breaking out the settlement amount, the amount

13  for fees and, in bold, the part that says we should wire X

14  amount of money to Multi Rizki?

15  A.  I don't know if I did that initially because I didn't know

16  the funds were coming in.  I mean, normally, you know, I would

17  get an e-mail when they were coming in.  So because these were

18  coming from Mr. Lira's settlement, I didn't know they were

19  coming to Girardi Keese.  So I don't recall if I prepared one

20  of those -- those memos that I would typically prepare.

21  Q.  All right.  And that's something you did typically for

22  every settlement you were involved in?

23  A.  Yes.  A cover page memo?

24  Q.  Right.

25  A.  Yes.

1    Q.  And you would typically bold the part that talks about

2    what's supposed to be sent to the client?

3    A.  Yes.

4    Q.  All right.  And on this one, you don't recall if you did

5    or you don't think you did?  What is it?

6    A.  I just don't recall whether I did or not.

7              THE COURT:  Okay.  Any additional questions by the

8    attorneys from Edelson?

9                        REDIRECT EXAMINATION

10   BY MR. WADE-SCOTT:

11   Q.  There were a number of memos that you produced or filed

12   with the Court in this case, right?

13   A.  Yes.

14   Q.  How are those still in your possession as of the date you

15   produced them?

16   A.  I took them -- I had copies printed before I left the

17   firm.

18   Q.  So the memos that have been either produced to us as a

19   trial exhibit or filed were things that you took as you were

20   kind of walking out the door from Girardi Keese?

21   A.  Correct.

22   Q.  Were there any memos concerning Mr. Multi that you didn't

23   take?  There's just a completeness question that I have.

24   There's certain memos that you produced, right?

25   A.  Yes.

**Griffin - Redirect by Wade-Scott**

1  Q.  Do you recall any other memos about Mr. Multi that you did

2  not take with you when you left?

3  A.  I do not know whether I have in my possession any memos on

4  Mr. Rizki or not.

5  Q.  I'll note in the -- I'll show you one exhibit which is

6  confidential.  This is Exhibit 320.  This one does mention

7  Mr. Multi's money?

8  A.  Yes.

9          MR. WADE-SCOTT:  That's all I have, Your Honor.

10          MR. SABA:  I just have one question, Your Honor.

11          THE COURT:  All right.  Just one second.  I just want

12  to make a note.

13          MR. SABA:  Sure.

14          THE COURT:  Could you put that back up?  It's not for

15  public, but can you put it back up, please?

16          MR. WADE-SCOTT:  Yes, Your Honor.

17          THE COURT:  How did you know -- sir, this is a memo

18  from you, correct?

19          THE WITNESS:  Yes.

20          THE COURT:  How did you know the amount that was due

21  to Multi?

22          THE WITNESS:  I must have -- well, let's see.  When

23  we got -- when I got notification that the funds were in, I

24  must have received either from Mr. Lira or from Mr. Hatcher a

25  consent agreement, a closing statement.  That's how I would

1    have known.

2              THE COURT:  All right.  And the closing statement is

3    not something you took with you when you left the firm?

4              THE WITNESS:  I don't believe so.

5              THE COURT:  And the closing statement is not

6    something the parties received in their discovery from the

7    trustee, correct?

8              MR. WADE-SCOTT:  We do not have it to my knowledge,

9    Your Honor, speaking for Edelson.

10             THE COURT:  And did Edelson have a fee arrangement on

11   this individual?

12             MR. TIEVSKY:  On Mr. Multi?

13             THE COURT:  Yeah.  Was he part of the -- did you have

14   a fee-sharing agreement with Girardi Keese?

15             MR. TIEVSKY:  It's part of the ones that fall under

16   the fee agreement that Mr. Griffin signed.

17             THE COURT:  Right.  But have there been -- was there

18   follow-up on this individual?  He's just absent from -- it's

19   almost as if people forgot about him.  He's just absent from

20   any of the letters back and forth between Edelson and Griffin

21   and all the e-mails of Edelson and Lira.

22             Can anyone explain the absence of -- it's

23   inexplicable to me that there wouldn't be an outcry about

24   someone who didn't get a penny as opposed to the people here

25   who got -- didn't get it all, just got half or a little more

Griffin -

1  than half in the end, but then here's a person who didn't get

2  anything.

3        Was there any documents that anyone found expressing

4  outcry over this other than apparently unfound e-mails for the

5  person who settled for a significant amount of money, didn't

6  get a penny of it?

7        MR. TIEVSKY:  I don't believe any distinction was

8  made when Mr. Griffin had said the clients were paid half.  I

9  don't think any distinction was made at that time between

10  Mr. Multi and the rest of the clients.  And then

11  Mr. Balabanian I think can explain further the assurances he

12  got from Tom, or from Mr. Girardi that basically made things

13  not a concern.

14        THE COURT:  All right.  Well, I'm just commenting on

15  the fact there's nothing in the record, and this person has

16  probably a -- just probably a larger objection, well-founded

17  objection to the way he was treated than the other four.  And

18  I would have thought there would be papers somewhere, and

19  maybe they're buried in the files of Girardi Keese and the

20  trustee didn't pull them because she wasn't asked for them,

21  and I understand that.

22        MR. TIEVSKY:  I will say, Your Honor, we did hear

23  objections from the other side with respect to asking

24  questions or bringing up or seeking discovery about Mr. Multi

25  because there was no order with respect to him.

1          THE COURT:  I understand that.  It's possible you

2     could interpret it as being beyond the scope of what I'm

3     examining, but it's not.  It was a filed case in front of me,

4     so it's within my jurisdiction.

5          Okay.  Any additional questions, Mr. Saba?  Do you

6     have --

7          MR. SABA:  Actually you asked the question I was

8     going to ask.

9          THE COURT:  Okay.  Well, I asked a lot of them so

10    somewhere in there was my question.  Good enough.

11         MR. SABA:  Correct.

12         THE COURT:  Ms. Matthai, any questions?

13         MS. MATTHAI:  No, Your Honor.

14         THE COURT:  Sir, you're excused.  Thank you.

15         THE WITNESS:  Thank you, Your Honor.

16         THE COURT:  All right.  Then you want to call --

17    well, you should call Mr. Balabanian.

18         MS. HAUSMANN:  Yes, Your Honor.  He's in the other

19    room, I believe.

20         THE COURT:  All right.  Why don't you have him come

21    in and then -- you can get him, please.  And then, please, you

22    can restrict your questioning a little bit, but the key

23    question in my mind is when did representatives of the Edelson

24    firm know these people weren't getting all their money, they

25    were getting paid in installments.

**Balabanian - Direct by Hausmann**

1          Right up here, sir.

2          THE WITNESS:  Yes, Your Honor.

3          THE COURT:  There's a lot of binders up here.  Are

4  you going to be using just your binders, Ms. Hausmann?

5          MS. HAUSMANN:  Yes, Your Honor.

6          THE COURT:  Why don't we have the other two binders

7  at least put on the floor so we don't have an accident up

8  here.

9    (Witness sworn.)

10          THE COURT:  All right.  You may proceed.

11          RAFEY S. BALABANIAN, WITNESS, DULY SWORN,

12                  DIRECT EXAMINATION

13  BY MS. HAUSMANN:

14  Q.  Could you please state your name for the record.

15  A.  Rafey Sarkis Balabanian.

16  Q.  What is your current occupation?

17  A.  I'm an attorney.

18  Q.  Where do you work?

19  A.  Edelson PC.

20  Q.  How long have you worked there?

21  A.  Since July 2008.

22  Q.  When did you personally first get involved in the Lion Air

23  cases?

24  A.  I think it was sometime at the end of April of 2020, April

25  or May.

**Balabanian - Direct by Hausmann**

1  Q.  Why did you get involved at that point?

2  A.  We believed there was an issue with respect to a delay in

3  paying us our attorneys' fees in the case.  I'm general

4  counsel at the firm.  It is common for me to get involved in

5  cases where we're collecting fees and there's a question as to

6  whether we're going to be able to do so.

7  Q.  I'm going to pull up Exhibit 107.

8       Have you seen this document before, Mr. Balabanian?

9  A.  Yes.

10       THE COURT:  And this could be on the public display,

11  correct?

12       MS. HAUSMANN:  Yes, I believe so.

13       THE COURT:  Okay.  Go ahead.  Thank you.

14  BY MS. HAUSMANN:

15  Q.  Are these e-mails you received in May of 2020?

16  A.  Yes.

17  Q.  I would like to direct your attention to the e-mail at the

18  bottom of page 107-1.  Is this an e-mail you received from

19  David Lira on May 12th of 2020?

20  A.  Yes.

21  Q.  Do you see where it says "Boeing's lawyers will release

22  the money once they are in receipt of executed releases"?

23  A.  Yes.

24  Q.  What did you understand that to mean at the time?

25  A.  Well, there were several plaintiffs involved in this

1    tragedy, of course.  I understood that Boeing was somehow

2    taking the position that they would not release any of the

3    settlement monies due any of the plaintiffs unless and until

4    these signed settlement agreements from each of those

5    plaintiffs had been received by Boeing.

6              THE WITNESS:  Excuse me, Your Honor.  May I take a

7    sip of water, please?

8              THE COURT:  Go ahead.  You can pull the mask down and

9    take a sip.

10             THE WITNESS:  Thank you.

11   BY MS. HAUSMANN:

12   Q.  I would like to look now at the e-mail on page 107-1 that

13   you sent on May 15th at 7:28 a.m.

14             Do you see that?

15   A.  Yes.

16   Q.  You ask if you can reach out to Boeing's lawyers, right?

17   A.  Yes.

18   Q.  Why did you want to do that?

19   A.  It seemed certainly not efficient to us that Boeing would

20   be refusing to release any of the settlement monies until it

21   received all of the signed settlement agreements from the

22   clients.

23             Our understanding was that the clients were

24   differently situated in terms of their ability to communicate

25   with the attorneys from Girardi Keese.  We were told that some

**Balabanian - Direct by Hausmann**

1   of those clients were in extremely remote areas, remote

2   islands, didn't have access to phone or Internet.  So it

3   seemed like it could take potentially a long, long time to get

4   all of the executed releases from the clients, and we didn't

5   understand why some of the clients who had signed their

6   releases and were awaiting payment had to wait.

7   Q.  Did you receive this e-mail above from Mr. Lira on

8   May 15th at 7:51 a.m.?

9   A.  Yes.

10   Q.  You see where he writes, "Rafey, we are good"?

11   A.  Yes.

12   Q.  What did you understand that to mean?

13   A.  I took it to mean that he didn't want us to reach out to

14   Boeing, essentially was telling me to stand down and that the

15   releases were coming in.  And so there was no need for us to

16   get involved I suppose.

17   Q.  After these e-mails, did you end up reaching out to any of

18   Boeing's lawyers?

19   A.  No.

20   Q.  Why not?

21   A.  Well, I was told not to essentially from Mr. Lira.  I also

22   didn't have a relationship with any of those lawyers.  But the

23   main reason was that Mr. Lira basically told us to stand down.

24         THE COURT:  You interpret this as him telling you to

25   stand down?

1    THE WITNESS:  I do, Your Honor.  I thought -- well --

2    THE COURT:  Well, that's how you interpreted it, that

3  you were prohibited from calling Boeing?

4    THE WITNESS:  Not that we were prohibited,

5  Your Honor, but that it was discouraged by the Girardi Keese

6  attorneys.  And it felt as though it would be strange for us

7  to sort of leapfrog them since we were in the capacity as

8  local counsel.  We didn't also want to send some kind of a

9  message that we weren't -- or that there was some kind of

10  fracture in the relationship.  But that was how we interpreted

11  it.

12    THE COURT:  By "we," you mean you?

13    THE WITNESS:  It was to several attorneys at the

14  firm, Your Honor.  I think we all had the same interpretation.

15    THE COURT:  Did you all talk about it?

16    THE WITNESS:  We did.

17    THE COURT:  Okay.  Go ahead.

18  BY MS. HAUSMANN:

19  Q.  As of May 15th, were you aware of any wire transmissions

20  from Boeing to Girardi Keese?

21  A.  No.

22  Q.  Had Mr. Griffin ever mentioned anything about that to you

23  at this point?

24  A.  No, I don't believe I had spoken to him at that point.

25  Q.  And what about Mr. Lira?

**Balabanian - Direct by Hausmann**

1  A.  No.  I think just these e-mails was our only

2  communications up to that point.

3          THE COURT:  You were not involved in the negotiation

4  of the settlements, correct?

5          THE WITNESS:  I was not, Your Honor.

6          THE COURT:  All right.  Was someone in your firm

7  involved in it?

8          THE WITNESS:  Yes, Your Honor.

9          THE COURT:  And who was that?

10          THE WITNESS:  Mr. Edelson and Mr. Scharg.

11          THE COURT:  Okay.  So you're coming in at this point

12  basically to see what's going on with the collection of the

13  attorneys' fees?

14          THE WITNESS:  That was my sole role in coming into

15  the case, Your Honor.

16          THE COURT:  Were you aware of any of the settlement

17  documents which mandated that the payments by Boeing be sent

18  in 30 days after the signing of the settlement agreement?

19          THE WITNESS:  I did not independently review the

20  settlement agreements, Your Honor.  I relied on the attorneys

21  at my firm who were working up the case to so apprise me.

22          THE COURT:  Did you discuss with the attorney --

23  other attorneys from Edelson, did any of them tell you that

24  the settlement agreements required Boeing to fund these

25  settlements and necessarily would have had -- would have had

**Balabanian - Direct by Hausmann**

1   to -- had to have done so by some time -- some dates in March,

2   certain dates in March given the fact that settlement

3   agreements were signed in February?  Did they tell you that?

4           THE WITNESS:  We discussed it many times, Your Honor.

5   There was a lack of clarity on our end as to whether somehow

6   the delay in the receipt of the signed settlement agreements

7   would delay that requirement.

8           THE COURT:  Well, it looks like you were talking, and

9   maybe based on your coming into this at the time you did, on

10   some confusion.  There was, as you probably know by now, four

11   separate fundings of settlements with money being sent from

12   Boeing to Girardi Keese in March of 2020.  You're aware of

13   that now?

14           THE WITNESS:  I'm aware of that now, Your Honor.

15           THE COURT:  Did you know it then?

16           THE WITNESS:  I did not know it then.

17           THE COURT:  Did Mr. Scharg or Mr. Edelson say

18   anything about that?

19           THE WITNESS:  I do not believe they were aware of it.

20           THE COURT:  Well --

21           THE WITNESS:  I'm certain they weren't aware of it.

22           THE COURT:  Why?

23           THE WITNESS:  Because we spoke about it and we

24   didn't -- we believed that the money hadn't arrived.  And as

25   to the terms of the settlement agreement, Your Honor, I can't

**Balabanian - Direct by Hausmann**

1   say with certainty that, you know, we sat down and went

2   through every line of it, but we discussed it extensively, and

3   I recall that there was confusion on our end as to whether the

4   requirement had been triggered to fund the settlements.

5          THE COURT:  Well, I get it, there may have been some

6   confusion as to the second set of settlements, the Lira

7   clients, so-called Lira clients where those were delayed.  But

8   these four were funded in March, and Mr. Scharg certainly was

9   communicating with people at Perkins Coie, wasn't he?

10          THE WITNESS:  Yes.

11          THE COURT:  Did he ever say why don't I just call up

12   Perkins and find out if the money went there?

13          THE WITNESS:  We discussed doing so, Your Honor, and

14   we decided against it.

15          THE COURT:  Why?

16          THE WITNESS:  Because we felt as though it would have

17   been usurping Girardi Keese's role as the lead counsel in the

18   case.

19          THE COURT:  Well, that courtesy seems -- well, I'll

20   withdraw the question.  I -- go ahead.  Go ahead.

21   BY MS. HAUSMANN:

22   Q.  After these e-mails with Mr. Lira, did you have additional

23   communications with him?

24   A.  Yes.

25   Q.  Did you ever talk to him on the phone?

**Balabanian - Direct by Hausmann**

1  A.  Yes.

2  Q.  Do you remember talking to him on the phone in June at any

3  point?

4  A.  Yes.

5  Q.  Do you know what date?

6  A.  I think it was mid-June.

7  Q.  Did you talk to him on June 16th?

8  A.  Sounds right.

9  Q.  Who was on that call?

10  A.  Me and Ari Scharg and Mr. Lira, I believe.

11  Q.  What did you talk about?

12  A.  The main topic of conversation was Mr. Lira's resignation

13  from Girardi Keese.  He gave us certain updates on I believe

14  the six clients that were referred directly to him and the

15  status of obtaining the releases from those individuals.

16       And at the very end of the call, I recall in somewhat

17  of a -- I would say it was in passing, Mr. Lira said that with

18  respect to the funds that were to be wired to Girardi Keese

19  relative to the five clients that referred to Mr. Griffin,

20  that those monies had been received by Girardi Keese and were

21  being held there so that -- and, finally, if I wanted further

22  information about that, those monies, that I would need to

23  follow up with the lawyers there.

24  Q.  Before this call on June 16th, were you aware that Boeing

25  had wired the money for any of these four clients to Girardi

**Balabanian - Direct by Hausmann**

473

1  Keese?

2  A.  No.

3  Q.  On this call --

4        THE COURT:  And on that same point -- sorry to

5  interrupt -- had Mr. Scharg or Mr. Edelson told you that the

6  money had been wired to Girardi Keese?

7        THE WITNESS:  No, I don't believe they knew that.

8        THE COURT:  So it's your position no one at Edelson

9  knew before July -- before June 16th that Boeing had funded

10  the money for the four people who were the subject of this

11  contempt proceeding, and then that fifth person, Mr. Multi?

12        THE WITNESS:  That is correct, Your Honor.

13        THE COURT:  Okay.

14        Go ahead.

15  BY MS. HAUSMANN:

16  Q.  On this call with Mr. Lira on June 16th, did he mention

17  anything about a partial payment going out to any of these

18  clients?

19  A.  No.

20  Q.  Did he mention anything about clients being dissatisfied

21  regarding their settlement payments?

22  A.  No.

23  Q.  Did he mention anything about Tom Girardi lying to the

24  clients?

25  A.  No.

**Balabanian - Direct by Hausmann**

1  Q.  Did he mention any suspicions that Mr. Girardi was

2  stealing from the clients?

3  A.  No.

4  Q.  Did Mr. Lira say why he had resigned from Girardi Keese?

5  A.  I think he had said that he had grown tired of his time at

6  the firm and that things had run their course.  I don't recall

7  if he actually said that things with Tom were contentious,

8  Mr. Girardi.  I think he did.  That was basically the gist of

9  it.

10 Q.  You mentioned that Mr. Lira told you to reach out to

11 Mr. Griffin.  Did you end up speaking with Mr. Griffin after

12 this?

13 A.  I did, many times.

14 Q.  Did you have a call with him at the end of June?

15 A.  Yes.  I believe so, yes.

16 Q.  Who was on that call?

17 A.  Just myself and Mr. Griffin.

18 Q.  What did you talk about?

19 A.  I relayed the fact that Mr. Lira had told us that the

20 settlement monies relative to the five clients that were

21 referred to Mr. Griffith -- Griffin, excuse me -- had been

22 received by Girardi Keese.  And I asked him, if that was the

23 case, then what the delay was with respect to paying the

24 attorneys' fees.  He didn't have a substantive answer to that.

25          I then proceeded to ask him sort of in a -- how do I

1    put it?  Somewhat as a shot in the dark, almost as a shot

2    across the bow, whether the clients had been paid.  And I was

3    surprised to hear him say that he wasn't sure, but he thought

4    they had been paid about half of what they were owed.

5    Q.   Before this call with Mr. Griffin, did you have any

6    awareness of partial payments going to the clients?

7    A.   No.

8    Q.   Did Mr. Griffin on this call mention anything to you about

9    Tom Girardi lying to the clients?

10   A.   No.

11   Q.   I would now like to look at Exhibit 116 which should be

12   confidential.

13        Do you recognize this document, Mr. Balabanian?

14   A.   Yes.

15   Q.   Is this a letter you received from Mr. Lira on July 6th of

16   2020?

17   A.   I'm not sure if I reviewed it on July the 6th.  I don't

18   believe I physically had it on July the 6th because it was

19   sent to, it looks like, the Chicago office.  I reviewed it

20   around -- I mean, I got the letter right around that time, I

21   believe.

22   Q.   And looking at page 116-2, what is this?

23   A.   It was a check that accompanied the letter.

24   Q.   What did you understand it to be a check for?

25   A.   Partial payment of our attorneys' fees in the Lion Air

**Balabanian - Direct by Hausmann**

1   cases.

2   Q.   Did Edelson ever cash this check?

3   A.   No.

4   Q.   Why not?

5   A.   Well, we -- so I'm not -- part of the confusion about the

6   dates on it, again, was when I actually got the check in hand,

7   but by the time we had the check in hand, I know that we had

8   questions about -- well, certainly continuing questions based

9   upon my discussion with Mr. Griffin as to whether the clients

10  had received full payment of the monies that were due them.

11  And in the absence of answers to those questions or

12  confirmation that that had taken place, we were not

13  comfortable cashing that check.

14  Q.   Did you understand how the amount on the check was

15  calculated?

16  A.   No.   I understood what our portion of fees was supposed to

17  be relative to the six cases that Mr. -- that were referred to

18  Mr. Lira, but I -- I didn't really follow the calculation.   I

19  wasn't aware also of -- I don't believe I was aware of other

20  referring attorneys being involved.

21  Q.   Did you ever have any contact with Tom Girardi directly?

22  A.   Yes.

23  Q.   How did you have contact with him?

24  A.   It was always by -- well, it was by phone.   I think I sent

25  him a text message at some point telling him that he needed to

**Balabanian - Direct by Hausmann**

1    call me.  But it was always by phone other than that.

2    Q.  Do you remember when the first time you spoke to

3    Mr. Girardi on the phone was?

4    A.  I don't.  I believe it was sometime in early -- excuse

5    me -- late June or July.  And I'm having a hard time in my

6    mind figuring out whether I had -- whether it was part of the

7    same conversation or not.  But I did speak with him I believe

8    in early July after Mr. Griffin had said that I needed to

9    speak to him about the details of what was taking place with

10    respect to the settlement monies.

11         I recall that the call was fairly short.  I had only

12    spoken with Mr. Girardi I think twice before that in my life.

13    I had met him once in person -- excuse me -- twice in person.

14    He always had kind of a strange way of saying things.  He kind

15    of opened by -- I think he called me "babe" or something like

16    that, and he said -- he said basically the same thing that had

17    been told to us, that it was taking time to obtain the

18    releases from the clients and that that was part of the

19    holdup.

20         He also mentioned a tax issue that he had been

21    dealing with with the IRS with respect to aviation cases.  He

22    said that his lawyers had just gotten back I believe from D.C.

23    and just got a favorable decision I think from the IRS and

24    that it was finally figured out.

25         I don't recall whether he had told me on that call

1  that he was also sick.  He had told me certainly on later

2  calls that he was suffering from cancer and undergoing cancer

3  treatment.  But I don't recall if he said it on that call.  I

4  don't think he did.

5  Q.  But at some point he told you on the phone that he was

6  sick and undergoing treatment for cancer?

7  A.  I believe it was on the next call that we had, yes.

8  Q.  So after this initial call or -- with Mr. Girardi in July,

9  what did you understand the status of the settlement payments

10  to be?

11  A.  I understood that they were -- well, he said he would

12  figure it out and get back to me.  So I didn't know what the

13  status of the settlement payments were at that point.  He

14  didn't -- he certainly didn't say we owe the plaintiffs half

15  or something like that.  He just said, you know, it took

16  forever to get the releases.  This IRS issue has been dragging

17  on forever, but I finally got it resolved.  So I'll look into

18  things and take care of it.

19  Q.  Did he give any kind of explanation for sending the

20  clients less than the full amount?

21  A.  We didn't discuss that at all, no.

22          THE COURT:  Did you discuss it internally at the

23  firm?  What kind of law do you practice?

24          THE WITNESS:  Class actions and mass torts,

25  Your Honor.

**Balabanian - Direct by Hausmann**

1    THE COURT:  So you're familiar with attorneys' fees

2  that plaintiff lawyers collect, correct?

3    THE WITNESS:  Very familiar.

4    THE COURT:  All right.  You understand when

5  settlements are funded, partial payments to clients are not

6  what's required; it's the full payment because it's not your

7  money, it's the money of the client, correct?

8    THE WITNESS:  Absolutely.

9    THE COURT:  And you do that at your firm, I assume?

10    THE WITNESS:  Yes.

11    THE COURT:  So when you heard from Keith Griffin that

12  he thought a half of the settlement amounts had been paid,

13  did you raise alarm bells with your partners?

14    THE WITNESS:  Yes.

15    THE COURT:  And what was the response, by name?

16    THE WITNESS:  The response by?

17    THE COURT:  By name.  Who in your firm responded to

18  that alarm bell?

19    THE WITNESS:  Well, I spoke to Mr. Edelson and

20  Mr. Scharg collectively.  Other attorneys were also involved.

21  I don't recall specifically who.  And we were alarmed, but our

22  view was that sometimes -- well, I don't necessarily agree

23  that partial payments are always improper.  Sometimes there is

24  a reason for partial payments.  But we didn't feel as though

25  we had definitive answers at that point in time that partial

**Balabanian - Direct by Hausmann**

1   payments really had been sent out.  Mr. Griffin said he

2   thought but wasn't sure, that he didn't have access to any of

3   that information, didn't have access to the accounts.

4         It certainly concerned us, but we didn't feel as

5   though it was something that required us to intervene and file

6   papers with the Court at that point in time.

7         THE COURT:  Did you say you were the firm general

8   counsel or there is a firm general counsel?

9         THE WITNESS:  I'm the firm general counsel.

10         THE COURT:  You're the firm general counsel?

11         THE WITNESS:  Yes, Your Honor.

12         THE COURT:  So you basically are the person

13   responsible for refereeing ethical conflicts or any type of

14   problems that relate to the obligations of the firm to meet

15   its requirements with both the Court and with clients,

16   correct?

17         THE WITNESS:  Yes, Your Honor.

18         THE COURT:  All right.  Did it occur to you at that

19   point when you heard -- well, let me back up.

20         Did you view these explanations by Mr. Griffin -- by

21   Mr. Girardi that he had sent lawyers to the IRS in Washington

22   to get tax advice, did you view that as ludicrous?

23         THE WITNESS:  I did not, Your Honor.  It was

24   surprising to hear because it wasn't part of the initial

25   explanations that we had received.  But I -- I didn't think

**Balabanian - Direct by Hausmann**

1  that.

2         What I thought during this time and for several

3  months thereafter was that this was all pretextual as a way to

4  avoid paying our fees.  That was my -- that was the firm's

5  collective view.

6         THE COURT:  Well, it certainly was pretextual.  I'll

7  agree with you on that.  But did you think it was pretextual

8  as a basis to avoid paying the clients their fees?

9         THE WITNESS:  I'm sorry, Your Honor?

10        THE COURT:  Let me rephrase it.

11        I'll agree with you it was pretextual.  It was all

12 just lies and, in many cases, bad lies but -- from

13 Mr. Girardi.  And you believe it was just an effort by him to

14 hold back on paying you your fees, correct?

15        THE WITNESS:  Correct.

16        THE COURT:  All right.  Did it occur to you that this

17 was also a way for him to avoid telling you or at least avoid

18 the issue of paying the clients their monies?

19        THE WITNESS:  No, because, Your Honor, it seemed

20 inconceivable that Mr. Girardi wouldn't pay the clients the

21 monies that were due to them especially when you're talking

22 about this amount.

23        THE COURT:  Well, you already heard Griffin tell you,

24 he thought only half had been paid, correct?

25        THE WITNESS:  Correct.

**Balabanian - Direct by Hausmann**

1    THE COURT: So did you confront Girardi about that,

2  tell him, Griffin said you only paid half the clients?

3    THE WITNESS: I did.

4    THE COURT: And what did he say?

5    THE WITNESS: He didn't really answer it, Your Honor.

6  He said, "I don't know what's going on. I'll figure it out."

7    THE COURT: And that didn't raise alarm bells with

8  you as a general counsel of a firm that that's just not how

9  anybody in this business operates if they're acting legally

10  and ethically?

11    THE WITNESS: It raised concerns, Your Honor, but he

12  had committed to investigating the issue and figuring it out.

13  I didn't believe Mr. Girardi was on the ground in terms of

14  prosecuting those cases. So, I mean, my view of him at that

15  point in time was that he was somewhat of a figurehead at the

16  firm. So I definitely had concerns, Your Honor, but I

17  didn't -- I didn't imagine that what was taking place was

18  theft of client money.

19    THE COURT: All right.

20    THE WITNESS: I did not.

21    THE COURT: At what point did you realize with

22  certainty that only half of the monies that were due to the

23  clients were paid?

24    THE WITNESS: I believe it was in the beginning of

25  September, Your Honor, when they had indicated that they had

**Balabanian - Direct by Hausmann**

1  paid the clients more money.

2  THE COURT:  All right.  Well, I'm sure we'll have

3  some e-mails about that.  I think it was earlier.  But by

4  early September, you're saying the Edelson firm, as a firm,

5  knew with certainty or at least with enough clarity that the

6  clients had only received half of the money that you know had

7  been funded months and months before?

8  THE WITNESS:  Yes, Your Honor, for two reasons.

9  Mr. Girardi, I had a previous conversation with -- a

10 couple of previous conversations with Mr. Girardi where he had

11 said, "This was a mistake.  I don't know how this happened.

12 You got to believe me.  This has never happened before and I

13 will fix it."

14 I forget what I -- what my other point was.

15 THE COURT:  Why you knew that --

16 THE WITNESS:  And the partial payment.

17 THE COURT:  All right.

18 THE WITNESS:  And the partial payment.  And the fact

19 that he was saying it was a mistake, Your Honor, and he was

20 saying that he had cancer, was in the hospital, undergoing

21 cancer treatment, was out of the office, not on top of these

22 types of issues, I didn't think that was completely

23 unreasonable.

24 I also had discussions with Mr. Griffin who convinced

25 me also that Mr. Girardi was both very -- was elderly, had

**Balabanian - Direct by Hausmann**

1   lost a step, Your Honor, certainly.  I don't think he meant

2   necessarily in his mental capacity, but he meant in terms of

3   his day-to-day ability to continue on at the firm.

4           He told me that Mr. Girardi was suffering from

5   cancer, was about to undergo surgery, and it was just very

6   difficult for him to function normally.  And I believed all

7   those things.

8           THE COURT:  Yeah.  You're not asking Tom Girardi to

9   give an opening statement in front of a jury.  You're asking

10  him to authorize the release of money that was sent to his

11  firm.  This isn't hard.

12          Cancer, elderly or not, he's still -- it's still a

13  functioning law firm with people in the financial department,

14  attorneys like Mr. Griffin working for him.

15          Let me ask -- that's a statement more than a

16  question, so let me be fair to you and ask a question.

17          Assuming it is September that the Edelson firm

18  becomes aware that there is -- the clients aren't getting paid

19  and it's money that was already sent by Boeing, and the

20  records make clear it was sent in March, but assuming by

21  September the Edelson firm knew of this, why is it the first I

22  heard of this is a motion you filed in December?  And who

23  knows what happened at that firm money wise and what was

24  available in September, if you had come to me, as opposed to

25  December when it's clear they were bankrupt?

1    THE WITNESS:  Because Mr. Girardi said it was a

2    mistake, Your Honor, and that it was not something that had

3    ever happened before, that I had to believe him, that -- and

4    that coupled with my view of Mr. Girardi, Your Honor.  I felt

5    as though this was not a situation where he was stealing

6    money.  And the fact that they then paid the clients money in

7    September I think strung me along further.

8    THE COURT:  Well, everybody is buying his lies.  But

9    in October, did you continue to buy his explanations?

10    THE WITNESS:  I did because he said he had paid the

11    clients by October the rest of the money.

12    THE COURT:  All right.

13    Well, we'll get to that.  I'm sure it's in your

14    outline.  So I'll let you continue.  I'm sorry.  I'm trying to

15    jump to the points that are important to me, but continue.

16    MS. HAUSMANN:  Thank you, Your Honor.

17    BY MS. HAUSMANN:

18    Q.  Mr. Balabanian, I would like to jump to the call you had

19    with Mr. Girardi in September.  Did you -- do you recall

20    speaking to him on September 30th of 2020?

21    A.  Yes.

22    Q.  Could you describe that phone call, please?

23    A.  It was different than the prior two in the sense that he

24    seemed much more with it.  His voice wasn't as faint.  He

25    started the call by saying something to the effect of "Please

1    don't yell at me anymore, you know, I'm a good guy."  And I

2    said, "Tom, I'm not looking to yell at you.  I hope you can

3    understand why I've been the way I've been with you all over

4    the past several months.  I've told you from the start of this

5    that this was never about our attorneys' fees and to the

6    extent you all need more time to pay these fees, that's fine.

7    We've always just maintained from the start that we didn't

8    want to be part of any type of craziness or anything like that

9    and I'm not accusing you of that, but I hope you can

10   understand why I've been so all over you to get this -- you

11   know, to get this done."

12          He said, you know, "No," something like "I hear you,"

13   and, you know, "You could have been a little more easy on me,

14   but in any event, you know, it's done.  I got them paid.  It's

15   over."  And then he said, you know, "With respect to your fee,

16   are you still okay with us taking a little more time to pay

17   that?"  And I said, "Yeah.  As I said from the start of this,

18   this was not about collecting our fees.  We told you, we told

19   Keith that if this is about you all not wanting to pay us fees

20   or you think, you know, we're getting too much or whatever,

21   we're happy to have that conversation and we're happy to wait

22   on that.  But obviously we needed to feel comfort that the

23   clients were paid."

24          He then said that he was going to -- he said

25   something like at the end of all this, I'm going to make

1    sure -- like make sure you've -- like you've never been

2    happier or you've never been treated so well, something like

3    that, which I took to mean that he was somehow going to maybe

4    pay us more in attorneys' fees or something like that.  I

5    said, "Tom, I've never asked for anything like that.  I don't

6    want anything like that.  It's all good."  I said, you know,

7    "Here's what you can do for me at some point in time.  When

8    I'm down in L.A., you can take me to one of your ten country

9    clubs for a round of golf and act like I'm your best friend."

10   Q.  After this call on September 30th, was it your impression

11   that the clients had received all of the money that was owed

12   to them?

13   A.  Yes.

14          THE COURT:  Did you do a memo to file this

15   conversation?

16          THE WITNESS:  No, Your Honor.

17          THE COURT:  All right.  Did you tell anybody about

18   it?

19          THE WITNESS:  Yes, Mr. Edelson, Mr. Scharg, the firm.

20          THE COURT:  How soon after the call did you tell

21   them?  Immediately?

22          THE WITNESS:  Immediately, Your Honor.

23          THE COURT:  All right.  And did you ask for any type

24   of confirmation the clients had been paid?

25          THE WITNESS:  I did not.

**Balabanian - Direct by Hausmann**

1          THE COURT:  Okay.

2          THE WITNESS:  No, Your Honor.  I had asked for that

3   previously at the beginning of September from Mr. Griffin, and

4   he said he could provide me with the wire confirmation.  And

5   then I didn't require him to provide it because I felt as

6   though if he was offering it that it was truthful and I wanted

7   some semblance of trust to remain between us, or at least the

8   appearance of trust.

9          THE COURT:  All right.  So I can summarize.  At some

10  point the Edelson firm, collectively, you on behalf of

11  Edelson, learned that there was funding provided to Girardi

12  Keese.  You knew at some point, and that was sometime after

13  March, possibly in June, at some point you realize there was

14  funding.

15         At some point you realize half of the monies were

16  paid to the plaintiffs, not all of it.  You had been

17  pressuring Mr. Girardi to tell you when they were going to be

18  paid.  And then on September 30, 2020, he told you

19  unequivocally the clients had been paid.

20         THE WITNESS:  Yes, Your Honor.

21         THE COURT:  And that was all five of them?  Or,

22  collectively, you believed them to be all five?

23         THE WITNESS:  That's what I believed, Your Honor.  I

24  thought Mr. Multi -- I never differentiated because I don't

25  think I was super -- it's my fault.  I wasn't very familiar

**Balabanian - Direct by Hausmann**

1　with the Court's orders.  I didn't study them as I should

2　have, but I wasn't clear that this was only with respect to

3　the minors.  So I thought Mr. Multi's money was included.

4　　　　THE COURT:  At any point before September 30th, had

5　you contemplated coming to the Court to tell us there may be

6　problems or there were problems with clients -- with the court

7　orders being followed about the clients being paid shortly

8　after the funding occurred?

9　　　　THE WITNESS:  Yes, Your Honor.

10　　　　THE COURT:  You did think of that?

11　　　　THE WITNESS:  Yes, we thought of that.

12　　　　THE COURT:  During the summer of 2020?

13　　　　THE WITNESS:  Absolutely.  We had many conversations

14　about that.

15　　　　THE COURT:  And why didn't you come to the Court?

16　　　　THE WITNESS:  Because we ultimately felt as though

17　the explanations were reasonable in terms of Mr. Girardi's

18　ailments, in terms of it being the result of a mistake.

19　And --

20　　　　THE COURT:  Isn't that really for me to decide,

21　though?  Isn't it ultimately you bring that to my attention

22　and then if there are mistakes or claims of illness or claims

23　of elderliness or disorganization or anything else, isn't it

24　ultimately my decision when I get that explanation from

25　Girardi Keese on whether or not those explanations are

**Balabanian - Direct by Hausmann**

1    reasonable?

2           Because, clearly, if you knew half got paid, then you

3    knew -- and if you didn't, Mr. Scharg did, because he knew

4    what the settlement agreement said -- you had to have known as

5    a firm that there had been a violation of the order.  And

6    you're not -- well, you're in San Francisco, but your firm is

7    down the block.

8           And if you're having discussions about that, did it

9    ever occur to you that let's report it and if there's nothing

10   to it, Girardi can explain it to the judge?

11          THE WITNESS:  Yes, we should have.

12          THE COURT:  I know you should have.

13          THE WITNESS:  Yes.

14          THE COURT:  Believe me, you should have.  The

15   question is did you ever discuss that and decide that it was

16   the judge who should decide whether these explanations were

17   reasonable and not you because there's third parties here that

18   are getting injured?

19          THE WITNESS:  Of course it's not our role, Your

20   Honor.  It's the Court's role.  Absolutely.  We discussed it,

21   Your Honor.

22          THE COURT:  Yeah.

23          THE WITNESS:  We contemplated it.  We ultimately

24   decided that we should exercise some level of restraint and

25   compassion for Girardi given what he had been telling us and

**Balabanian - Direct by Hausmann**

1     given what we had been told by his partners.  And so we

2     decided against that.

3              THE COURT:  All right.  That's fine.  I mean, the

4     compassion is for me to decide.  I think you understand that.

5              THE WITNESS:  Yes, of course.

6              THE COURT:  And this is all Monday-morning

7     quarterbacking, but you're the closest to this case at least

8     in front of me.  And I'm curious why a firm of -- you know,

9     well-respected firm.  I don't know the Girardi Keese firm.  I

10    didn't know they even existed before this case.  But I've

11    heard of your firm.  It's well-respected.  You're the general

12    counsel of it.  I'm surprised and don't really understand why

13    I had to learn of this in December.

14             THE WITNESS:  I understand, Your Honor.

15             THE COURT:  All right.

16             Well, go ahead.  Continue asking your questions, but

17    that's where my head is at right now.

18    BY MS. HAUSMANN:

19    Q.  I would like to look at Exhibit 119, page 119-28.  Are

20    these text messages that you exchanged with Mr. Griffin?

21    A.  Yes.

22    Q.  Looking at the message you received from him on

23    November 17th starting "Hey, man," do you see that?

24    A.  Yes.

25    Q.  He says that he's trying to set up a call between

**Balabanian - Direct by Hausmann**

1    Mr. Girardi and the Boeing clients?

2    A.  Yes.

3    Q.  Is that right?

4    A.  Yes.

5    Q.  And then you respond, "I'm not following?  Which clients

6    and what for?"

7    A.  Yes.

8    Q.  Do you see that?

9    A.  Yes.

10   Q.  And the message -- the next message you sent states, "Oh,

11   okay.  I thought he had finally paid them and only owed us

12   fees."

13           Do you see that?

14   A.  Yes.

15   Q.  Was that true at the time that you sent it?

16   A.  Yes.

17   Q.  Did you speak on the phone to Mr. Griffin at any point at

18   the end of November?

19           THE COURT:  Could you give me the page number again

20   on that last e-mail?  I'm flipping through the earlier ones.

21           MS. HAUSMANN:  Yes, Your Honor.  I'm looking at page

22   119-27 and -28.

23           THE COURT:  Got it.  Thank you.

24   BY MS. HAUSMANN:

25   Q.  Mr. Balabanian, did you speak on the phone to Mr. Griffin

**Balabanian - Direct by Hausmann**

1    at the end of November?

2    A.   Yes.

3    Q.   Who was on that call?

4    A.   Myself, Jay Edelson, and Mr. Griffin, I believe.

5    Q.   And what did you talk about?

6    A.   We talked about the fact that while Mr. Griffin said that

7    the Lion Air clients hadn't been paid what was owed to them,

8    despite what Mr. Girardi had told us, that he didn't believe

9    the firm had the funds to pay them, that he didn't believe the

10   firm had the funds to pay our attorneys' fees.  He then

11   suggested that we speak to an attorney named Bob Finnerty

12   who -- it was a bit convoluted.  He said that he was somehow

13   bringing like malpractice claims against Girardi Keese on

14   behalf of people like us and our clients.

15         But then as the conversation went on a little

16   further, I think I said, "I don't understand anything you're

17   saying.  What are you talking about, like a receiver or

18   something like that?"  And he said, "Yeah, like a receiver."

19         And then -- but I did not lead the conversation.

20   Jay Edelson of my firm was the main voice from our end.  It

21   was a contentious call.  So I recall Jay saying to Keith that

22   he had been lying to us for months.  Keith said he didn't lie

23   to us.  I think I jumped in and starting yelling and Jay shut

24   me down.  And then I think Jay remarked that we were preparing

25   a lawsuit and that he would enjoy reading it or something like

**Balabanian - Direct by Hausmann**

494

1  that.

2  Q.  Did you end up speaking to Mr. Finnerty?

3  A.  Yes.

4  Q.  When did you talk to him?

5  A.  I believe it was that same day.

6  Q.  And who was on that call?

7  A.  Jay Edelson, myself, and Robert Finnerty, I believe.

8  Q.  Could you describe what you talked about?

9  A.  It was the same dynamic in terms of Jay leading the call.

10  Mr. Finnerty represented that he was representing a client, a

11  former client of Girardi Keese who was owed settlement money

12  that had been misappropriated by the firm and that he was

13  pursuing that.

14        He told us to not file any kind of lawsuit against

15  Mr. Girardi, that it would do no good for anyone, not least of

16  which our clients.  I didn't understand that statement.  He

17  said that it would just bring -- it would be a cloud over the

18  plaintiff's bar.  It would just be another story about a

19  plaintiff's attorney stealing money from their clients.  And

20  that it would not add to -- it would not add any facts that

21  people were unaware of.  Mr. Finnerty said that everyone knew

22  that Girardi had been stealing from clients for years.

23        THE COURT:  Did you know that?

24        THE WITNESS:  I did not, Your Honor.

25        MR. SABA:  Objection.  Hearsay.  Motion to strike

  1    that, Your Honor.  Mr. Finnerty is not a witness in this case.

  2              MS. MATTHAI:  I would join in that objection.

  3              THE COURT:  State of mind.  Overruled.

  4              Go ahead.

  5    BY MS. HAUSMANN:

  6    Q.  Did you end up working with Mr. Finnerty any further after

  7    this call?

  8    A.  No.

  9    Q.  At any point prior to this call at the end of November,

 10    had Mr. Griffin ever told you that clients were reaching out

 11    to ask about their settlement payments?

 12    A.  No.

 13    Q.  Had Mr. Lira?

 14    A.  No.

 15    Q.  Had you -- had they ever forwarded you any e-mails from

 16    clients?

 17    A.  No.

 18    Q.  At any point did Mr. Griffin ever tell you that

 19    Mr. Girardi was lying to the clients?

 20    A.  No.

 21    Q.  Did Mr. Lira tell you that?

 22    A.  No.

 23              MS. HAUSMANN:  I don't have any further questions,

 24    Your Honor.

 25              THE COURT:  I do.

**Balabanian - Examination by the Court**

496

BY THE COURT:

Q.   Please go to Exhibit 119 again.  You have a binder up
there, I think.  It's probably easiest if you just pull the
binder out.

A.   The 154 binder?

Q.   119.  Exhibit 119.  I think it's the thicker binder.

A.   Yes.

Q.   All right.  You can put it up on the screen, too, if you
want.  Tell me when you're there.

A.   I'm sorry.  I'm here, Your Honor.

Q.   All right.  On Exhibit 119, this is a series of text
messages between you and Keith Griffin, correct?

A.   Yes, Your Honor.

Q.   All right.  You've looked at these before?

A.   Yes.

Q.   Okay.  Looking at 119-8.

A.   Yes, Your Honor.

Q.   The August 3rd, 5:32 p.m. text where you said, "If I don't
hear from him today, I have no choice but to move forward in
court."

A.   Yes.

Q.   What court were you referring to?

A.   This Court, Your Honor.

Q.   Then go to 119-10.

A.   Yes, Your Honor.

1   Q.  This is August 24th at 6:17 p.m.

2   A.  Yes.

3   Q.  The bottom of this said, "If he doesn't get it done, I am

4   going to have to file something with the Court."

5           Is that again referring to this Court?

6   A.  This Court, Your Honor.

7   Q.  And September 3, 2020, at 119-12.

8   A.  Yes.

9   Q.  Mr. Griffin says, "He sent a wire out this morning,"

10  referring to Mr. Girardi, "for about half their collective

11  balance.  I think the clients are fine for now.  He's trying

12  to get the rest out by next week."

13          Is that the first you knew definitively the clients

14  had been paid half, or did you know it earlier?

15          MR. SABA:  Objection, Your Honor.

16          THE WITNESS:  That's when I --

17          THE COURT:  What's the -- you can object to my

18  questions, but usually I --

19          MR. SABA:  I think you're misreading the e-mail, the

20  text message.

21          THE COURT:  No, that's fine.  I appreciate that.

22  BY THE COURT:

23  Q.  The text says, "He sent a wire out this morning to them

24  for about half their collective balance.  I think the clients

25  are fine for now.  He's trying to get the rest out by next

**Balabanian - Examination by the Court**

 1  week."

 2          What did you understand Mr. Griffin to mean by that?

 3  A.  I understood that they had wired half of the half that the

 4  clients were owed.

 5  Q.  I see.

 6  A.  So at that point in time, I started to actually believe --

 7  and I'm not saying I disbelieved it, but I certainly had

 8  questions both ways that the clients had not been paid the

 9  full amount of money.

10  Q.  This is a quarter they're getting paid at this point that

11  you understood?  They had already gotten the half earlier?

12  A.  This was a quarter of the half that was --

13  Q.  It was half of the remaining half?

14  A.  Yes.  I don't -- I'm a lawyer.

15          THE COURT:  Mr. Saba, thank you for raising that

16  objection.  I sustained your objection.

17  BY THE COURT:

18  Q.  All right.  Then finally, your answer to this, which

19  follows on 119-13, you say, "He's leaving me no" -- at the

20  bottom -- "leaving me no choice but to file a motion for an

21  accounting.  You should tell him that."

22          Was that again a reference to filing something with

23  this Court?

24  A.  That was, Your Honor.

25  Q.  All right.

1  A.  I'm not sure why I styled it a motion for an accounting.

2  Q.  Okay.

3  A.  Or referenced it like that.

4          THE COURT:  Okay.  I'll let the attorneys for

5  Mr. Griffin and Mr. Lira, in whatever order you prefer, to go

6  next.

7          MR. SABA:  Thank you, Your Honor.  I would like to

8  start with Exhibit 107.

9          THE COURT:  All right.  This I think can go on the

10  public feed.

11          MR. SABA:  Yes, it can, Your Honor.

12          THE COURT:  All right.

13                    CROSS-EXAMINATION

14  BY MR. SABA:

15  Q.  Mr. Balabanian, I believe it was your testimony earlier

16  that you interpreted the e-mails from David Lira to stand down

17  and you were prohibited from speaking or communicating with

18  Boeing.  Did I get that correct?

19  A.  I wouldn't say prohibited.  My interpretation was that

20  they were asking us not to get involved in contacting Boeing

21  directly.

22  Q.  Mr. Scharg was handling the day-to-day responsibilities of

23  the litigation on behalf of Edelson for the Lion Air cases,

24  correct?

25  A.  I would say he was handling it in his capacity as local

**Balabanian - Cross by Saba**

1   counsel.

2   Q.   He was handling it on behalf of Edelson, correct?

3   A.   I don't know what you mean by that question.

4   Q.   Mr. Scharg is an employee of Edelson?

5   A.   Yes.

6   Q.   Acting as an attorney in the Lion Air cases, correct?

7   A.   Yes.

8   Q.   Okay.  And as general counsel, did you interview

9   Mr. Scharg about whether or not he was communicating with

10  Boeing?

11  A.   I had several discussions with Mr. Scharg about that.

12  Q.   And did Mr. Scharg tell you that he exchanged e-mails with

13  Boeing in December of 2019, January of 2020, February of 2020,

14  March of 2020, and April of 2020?

15  A.   He didn't need to tell me.  I was aware of it.

16  Q.   So you knew Mr. Scharg was communicating with Boeing on a

17  regular basis?

18  A.   Yes, he was acting as local counsel and his interactions

19  were ministerial in nature.

20  Q.   Did you ever ask Mr. Scharg to send an e-mail to Boeing

21  regarding the settlements of the cases?

22  A.   No.  Regarding the funding of the settlements?

23  Q.   Regarding anything related to the settlements?

24  A.   I don't know if I understand your question, but I don't

25  think -- the answer is no, I don't think so.

**Balabanian - Cross by Saba**

1   Q.  Mr. Balabanian, by May of 2020, you were actually starting

2   to be copied on e-mails with Mr. Scharg and Boeing as well,

3   correct?

4   A.  If my name appears in the copy line, yes.

5         MR. SABA:  Your Honor, I'm going to have to add a new

6   exhibit.  We'll call this Exhibit 323.  I've got hard copies

7   for the Court and counsel.

8         THE COURT:  Okay.  Can it be publicly displayed?

9         MR. SABA:  It can be publicly displayed, yes.

10        THE COURT:  All right.  Is it on the computer?

11        MR. SABA:  Yes, we will put it up on the computer.

12        THE COURT:  All right.  So the witness can see it.

13        MR. SABA:  And I'll bring a copy to the witness.

14        THE COURT:  Okay.  Make sure counsel has it.

15        THE WITNESS:  Thank you.

16        MR. SABA:  Sure.

17  BY MR. SABA:

18  Q.  Okay.  We're looking at Exhibit 107.  The date of the

19  e-mail exchange was Friday, May 15th.  And that e-mail

20  exchange you said interpreted by you was to stand down and not

21  communicate with Boeing.

22        What we've just handed you is Exhibit 323.  If you

23  look at the bottom, this is an e-mail from Ari Scharg dated

24  May 18th, Monday, the next business day, correct?

25  A.  Yes.

1    Q.  And you are copied on this e-mail.

2          Do you see that?

3    A.  Yes.

4    Q.  And that e-mail is sent to Mack Shultz at Perkins Coie and

5    other Perkins Coie attorneys.

6          Do you see that?

7    A.  Yes.

8    Q.  And you understood Perkins Coie's attorneys were

9    representing Boeing, correct?

10   A.  Yes.

11   Q.  And this is an e-mail communication that went back and

12   forth, three e-mails, on May 18th and May 19th with Boeing,

13   yes?

14   A.  Yes.

15   Q.  Did anybody tell you you could not have asked in e-mail to

16   Boeing at this time about any questions you had regarding the

17   settlements?

18   A.  I don't understand -- what?

19   Q.  Did Mr. Griffin ever tell you do not communicate with

20   Boeing?

21   A.  No.  And these communications were, again, ministerial in

22   nature.  I think the topic of discussion was whether we could

23   communicate with them as to the disposition of the settlement

24   funds that we were wondering about.

25   Q.  Mr. Balabanian, you had the capability to communicate with

**Balabanian - Cross by Saba**

1   Boeing's counsel, yes?

2   A.  Yes.

3   Q.  And your e-mail box was being populated with e-mails back

4   and forth with Boeing's counsel, yes?

5   A.  Yes.

6   Q.  And that was true not just on May 18th and 19th, but I've

7   got a stack of e-mails here.  You'll agree with me that that

8   continued on for many months, that you were copied on e-mails

9   with Boeing's counsel?

10  A.  I -- okay.  Sure.  I don't have any reason to dispute

11  that.

12  Q.  Okay.  So when you said you interpreted Exhibit 107 to

13  mean you were to stand down and not to communicate with

14  Boeing, there's no reason as general counsel of Edelson that

15  you couldn't have asked Boeing a direct question about whether

16  or not the settlements were funded?

17  A.  That's true.  That's true.  We just thought it would be

18  inappropriate to go against what Mr. Lira had suggested in his

19  e-mail, and so we decided not to do that.

20  Q.  Regardless, though, by the time June came around, you were

21  fully aware that the settlements had been funded for the first

22  four cases, correct?

23  A.  No.  I think the first time that that was suggested was on

24  my call with Keith Griffin around -- I think it was June the

25  30th, and even on that call, he said that he wasn't certain

1    but that he thought the clients had received about half of

2    what they were owed; but then said that I would need to follow

3    up with Tom Girardi to understand what the actual numbers were

4    or whatever.

5    Q.   Okay.  You understand that the clients wouldn't have

6    received half if the settlement hadn't been funded at all,

7    right?

8    A.   Yes.

9    Q.   Okay.  Girardi & Keese wasn't going to pay the plaintiffs

10   any money until Girardi & Keese received at least the money

11   from Boeing.  You agree with that?

12   A.   Yes.

13   Q.   Okay.  So if Keith Griffin told you that he believed half

14   had been paid to the clients, there's no doubt in your mind

15   that Boeing had paid Girardi & Keese, correct?

16   A.   No, because he didn't -- he didn't suggest that he knew

17   for certain.  But I -- but I believed -- I think I

18   contacted -- excuse me.  No.  I spoke to Mr. Lira first.

19   Mr. Lira had said that the settlements had been funded and

20   that they were being held at Girardi Keese.

21   Q.   Okay.  Mr. Lira -- I'm sorry.  Go ahead.

22   A.   So -- so yes, that was the first indication I had that the

23   settlements had actually been funded.

24        In terms of whether the clients had been paid or what

25   amount that they had been paid, the first discussion about

1  that, the first time that any suggestion about paying half was

2  made was on my call with Mr. Griffin who said that he wasn't

3  sure but had thought that that's what the case was.

4  Q.  Okay.  Well, let's just focus on this telephone call that

5  you had with Mr. Lira on June 16th, okay?

6  A.  Yes.

7  Q.  During that call, Mr. Lira told you that the four -- first

8  four settlements had been funded, correct?

9  A.  He identified them as the -- with respect to the cases

10  that were referred to Keith, those settlements had been

11  funded.

12  Q.  So there was no doubt in your mind that those cases were

13  funded by June 13th, correct?

14  A.  Well, I don't know if I believed Mr. Lira completely, but

15  certainly that -- yes, I mean, that was news to me and a

16  surprise to hear for sure.

17  Q.  Why don't we take a look at Exhibit 116.

18       MR. SABA:  I'm sorry.  That's confidential.

19       THE COURT:  Okay.  I'll take it off the public feed.

20  BY MR. SABA:

21  Q.  The first line of the second paragraph reads, "All of the

22  releases in Keith's cases have been delivered to Boeing and

23  have been funded."

24       Do you see that?

25  A.  Yes.

**Balabanian - Cross by Saba**

1    Q.   Okay.  And that was consistent with what Mr. Lira told you

2    during his telephone call on June 16, 2020?

3    A.   Yes.

4    Q.   Correct?

5    A.   Yes.

6    Q.   Let's turn to Exhibit 117.  Now, during your telephone

7    call with Keith Griffin on June 13th --

8             THE COURT:  This letter can be on the public feed?

9             MR. SABA:  Yes.

10   BY MR. SABA:

11   Q.   During your telephone communication with Keith Griffin on

12   June 30th, he told you half of the money had been paid,

13   correct?

14   A.   I think he said he thought that half had been paid but

15   wasn't certain.

16   Q.   As general counsel of the firm, did you ask Mr. Scharg on

17   what date the firm obtained the minors' compromise orders from

18   this Court?

19   A.   I know we discussed those things, yes.

20   Q.   And Mr. Scharg was the attorney responsible on behalf of

21   the plaintiffs to prepare the motions for the minor

22   settlements and file them with this Court, correct?

23   A.   Yes, I believe that's true.

24   Q.   And Mr. Scharg was the attorney responsible for the

25   plaintiffs to obtain the court orders from this Court?

1  A.  Yes, I believe that's true.

2  Q.  And Mr. Scharg was the attorney who delivered those court

3  orders to Keith Griffin and David Lira, correct?

4  A.  I don't know for certain, but I don't believe I have a

5  reason to dispute that.  I'm not sure if they got it by the

6  docket or -- I don't know if I understand exactly the process

7  you're referring to.

8  Q.  The four court orders were obtained in March of 2020.  Do

9  you agree with me on that?

10  A.  I don't have an independent recollection, but I think in

11  that range, March to April is what I recall.

12  Q.  Okay.  Let's just say they were obtained in March of 2020.

13  Okay.

14        Now, your conversation with Keith Griffin where he

15  says, according to you, maybe half the money has been paid to

16  half the clients indicated to you, at a minimum, Mr. Griffin

17  wasn't sure whether or not the clients had been paid, correct?

18  A.  Yes.

19  Q.  Okay.  And from the court orders, you understood that the

20  money was to be paid immediately, correct?

21  A.  I -- no, that's not correct.

22  Q.  Okay.  Money had to be paid as soon as practicable,

23  correct?

24  A.  Yes.

25  Q.  And if the court orders happened in March, would you agree

**Balabanian - Cross by Saba**

1    or disagree that a -- the money should have been paid by the

2    end of June?

3    A.   Yes.

4    Q.   There's no doubt in your mind that June would have been

5    too late to make the payments, correct?

6    A.   I don't know that I was familiar with the timing of when

7    the payments were required to be made, but if the court order

8    said that they were required to be made within 30 days of

9    their entry, absolutely.

10   Q.   Is it the practice of your law firm that when wires come

11   in to pay plaintiffs, the money goes into a client trust

12   account?

13   A.   Yes.

14   Q.   And when wires come into the Edelson client trust account,

15   is there a policy within your firm of how long it takes before

16   the plaintiffs are paid?

17   A.   It's immediate.

18   Q.   Immediate.  Immediate means within a business day or two?

19   A.   Yes, if it's feasible.

20   Q.   So if you learned that Boeing had funded the settlements,

21   you would have expected Girardi & Keese, because it's the

22   policy of your firm, to immediately pay the money to the

23   plaintiffs, correct?

24   A.   I think that that is the only appropriate practice, yes.

25   Q.   So when you had this conversation with Keith Griffin where

1  he advised you that maybe half of the money had been paid,

2  that should have alarmed you, correct?

3  A.  It definitely raised concerns.

4  Q.  Okay.  And you said that what you did with those concerns

5  is you had meetings internally at Edelson?

6  A.  We did.

7  Q.  Okay.  And did you ever seek outside counsel on whether or

8  not there had been an ethical violation on behalf of Girardi &

9  Keese for not immediately paying the money?

10  A.  No, I don't believe we did.

11  Q.  Okay.  Now, Mr. Balabanian, just so we're clear, let me

12  get a little background from you.  You are a licensed Illinois

13  lawyer; is that correct?

14  A.  Yes.

15  Q.  And you are also a licensed California lawyer; is that

16  correct?

17  A.  Yes.

18  Q.  Which means you've taken both the California bar and the

19  Illinois bar and passed both bar exams?

20  A.  I took the Illinois bar.  I took the California attorney

21  exam which, if you've been a licensed attorney in another

22  jurisdiction for four years, or at least this was what the

23  case was when I took it, you didn't have to take the

24  multistate.  You'd only have to take the other parts of it.

25  So I had a two-day exam instead of three days.

**Balabanian - Cross by Saba**

1   Q.   But you had to take the California professional ethics

2   portion of the exam, correct?

3   A.   I didn't have -- you mean the separate ethic -- no.   I

4   mean, I took -- I don't understand your question.   The

5   separate ethics exam that you have to take as part of being an

6   attorney?   The NPRE you mean?

7   Q.   Yes.

8   A.   No.   My NPRE transferred over from my original score that

9   I got in relation to the Illinois license.

10   Q.   As an Illinois lawyer, are you aware of the Illinois Rules

11   of Professional Conduct?

12   A.   Yes.

13   Q.   And are you aware of the guidance the courts have given

14   related to *Himmel* responsibilities for Illinois lawyers?

15   A.   Yes.

16   Q.   And you're aware that the Illinois Rules of Professional

17   Conduct are modeled after the ABA rules; is that right?

18   A.   Yes, I think I'm aware of that.

19   Q.   Now, as a California lawyer, you're aware that California

20   has its own Rules of Professional Conduct, right?

21   A.   Yes.

22   Q.   And you're aware that California does not have the same

23   *Himmel* type of requirements that Illinois does; is that right?

24   A.   I'm not sure I agree with that.

25   Q.   What do you understand the *Himmel* requirements to be?

**Balabanian - Cross by Saba**

1  A.  That if a lawyer learns of wrongdoing on the part of

2  another attorney that they have an obligation to report that.

3  I think the wrongdoing has to do with fraud or deceit.

4          THE COURT:  No matter what state you're in?  No

5  matter what state you're licensed in?

6          THE WITNESS:  Yes.

7          THE COURT:  Okay.

8          MS. MATTHAI:  I'm going to object, Your Honor, as

9  lack of foundation.  Speculation of this witness.

10          MR. SABA:  Let me lay a better foundation.

11          THE COURT:  All right.

12  BY MR. SABA:

13  Q.  As a California lawyer, are you aware that California does

14  not follow that same rule?

15  A.  I do not believe California has a mirror rule.  I think

16  other aspects of the California ethical rules require

17  reporting.

18  Q.  Do you know or are you guessing?

19  A.  I can't recall any provision off the top of my head, any

20  subsection of the rules.  But as a general matter, where you

21  learn of wrongdoing, you have an obligation to report it.

22  Q.  That's the rule in Illinois, correct?

23  A.  Yes.

24  Q.  That's not the rule in California, correct?

25  A.  No, I don't think I agree with that.

1  Q.  In fact, California does not follow the ABA rules.  You're

2  familiar with that, right?

3  A.  Yes.

4  Q.  Either way, you knew that Illinois followed *Himmel*

5  reporting requirements as of July of 2020?

6  A.  Yes.

7  Q.  At any time, at any time, did you ever discuss or text

8  with Keith Griffin that Illinois has a requirement that if

9  there is any fraud, I believe you used, that they must -- the

10 attorneys must report another attorney to the appropriate

11 persons or court?

12 A.  No.  I told Mr. Griffin that if we didn't get to the

13 bottom of all this that I would have to file something with

14 this Court that requires them to explain themselves.

15 Q.  But you never told Mr. Griffin there was a mandatory

16 reporting requirement, correct?

17 A.  No.

18         MS. MATTHAI:  Your Honor, for the record, I think we

19 have a double negative.

20 BY MR. SABA:

21 Q.  Did you ever tell Mr. --

22         THE COURT:  Rephrase.  Go ahead.

23 BY MR. SABA:

24 Q.  Did you ever tell Mr. Griffin that he had -- that there

25 was a mandatory requirement to report in the state of

**Balabanian - Cross by Saba**

1  Illinois?

2  A.  No.

3  Q.  Did you ever mention the word *Himmel* to Keith Griffin?

4  A.  No.

5  Q.  At any time did the Edelson firm ever seek outside ethics

6  guidance or counsel related to the Lion Air payment to the

7  plaintiffs?

8  A.  I'm not sure if we sought outside counsel after we

9  determined that we had been lied to.  Prior to that, no.

10  Q.  If anybody at the law firm would have communicated with

11  outside counsel seeking an ethics opinion, would it have been

12  you?

13  A.  It would have been me or potentially Mr. Tievsky I think.

14  Q.  So did you ever contact outside ethics counsel to get

15  guidance on how to deal with the nonpayment of money to the

16  plaintiffs?

17  A.  No, I don't believe so.

18  Q.  By July 10th when you wrote the letter to Tom Girardi and

19  David Lira identifying that half of the money may have been

20  paid to the clients, did Jay Edelson know that there was a

21  potential that only half of the money was paid to the

22  plaintiffs?

23  A.  Yes.

24  Q.  Did Ari Scharg know as of July 10, 2020 that there was a

25  potential that only half the money was paid?

**Balabanian - Cross by Saba**

1   A.   Yes.

2   Q.   Who else in the law firm knew that there was a potential

3   that only half of the money was paid to the plaintiffs as of

4   July 10th?

5   A.   I think that was it.  I'm not certain.

6   Q.   You understood that this was a serious issue if the

7   plaintiffs had only been paid half the money, correct?

8   A.   Yes.

9   Q.   In fact, if we look at Exhibit 119.  On page 2 -- excuse

10  me.  Sorry.  Let's call it page 3.  There's a July 14th text

11  message from you.  It says, "I'm really trying to manage

12  things on my end."  That means you had some upset people at

13  your firm?

14  A.   Every -- there were people who were concerned about what

15  was taking place.

16  Q.   Well, concerned is not manage things.  Manage things means

17  you're trying to calm people down, correct?

18  A.   I wasn't trying to calm people down.  People were

19  concerned and so I was trying to -- yeah, I mean, Mr. Edelson

20  was certainly perturbed by all of this, and we had many

21  discussions about whether we should just file something with

22  the Court.  And so we were -- when I say manage things, I was

23  talking about, you know, refraining from doing that for the

24  time being.

25  Q.   So by "manage things," you mean you were trying to control

**Balabanian - Cross by Saba**

1    your own people from, what, filing something from this

2    Court -- with this Court?

3              MS. HAUSMANN:  Objection.  Misstates his testimony.

4              THE COURT:  Witness can correct it if it's wrong.  Go

5    ahead.

6              THE WITNESS:  I wasn't trying to control them.  I'm

7    saying I was trying to calm nerves and the concerns that were

8    being raised and that I had as well.

9    BY MR. SABA:

10   Q.  You wrote then "Tom's got to take this seriously."

11              So even though David Lira had already responded to

12   your letter on July 14th, you still -- excuse me -- on

13   July 13th, you still wanted to hear from Tom Girardi, correct?

14   A.  Well, yes, because Mr. Lira didn't have answers with

15   respect to the five clients that we had been inquiring about.

16   Q.  So you ultimately had a telephone conversation with

17   Tom Girardi, correct?

18   A.  Yes.

19   Q.  And according to you, you testified that Mr. Girardi --

20   when you asked were the plaintiffs paid, I believe if I wrote

21   this down correctly, you said, "Tom Girardi stated, 'I don't

22   know what's going on and I'll figure it out.'"

23              Is that what Mr. Girardi said to you in response to

24   the question of "Did you pay the four plaintiffs"?

25   A.  I believe something to that effect, yes.

1          MR. SABA:  Your Honor, I would like to look at the

2    original motion for rule to show cause which is Docket 842.

3    We will display it here.

4          THE COURT:  All right.

5          MR. SABA:  If we could first go to the signature

6    page.

7          THE COURT:  This can be public.

8          MR. SABA:  Yeah, it's already a publicly filed

9    document.

10          THE COURT:  Right.

11          MR. SABA:  The signature page on the document is on

12    page 10 and 11.

13    BY MR. SABA:

14    Q.   On page 10, Mr. Balabanian, you were the one that put your

15    ECF electronic signature on the motion for rule to show cause;

16    is that correct?

17    A.   Yes.

18    Q.   And you understand when you file something with a federal

19    court and you put your signature on it that that means you are

20    filing something that you believe to be true and correct and

21    candid with this Court, correct?

22    A.   Yes, I understand that.

23    Q.   I would like you to take a look at paragraph 15.

24    Paragraph 15 says, "Balabanian ultimately got an opportunity

25    to speak with Girardi in late July."  And this call we've been

**Balabanian - Cross by Saba**

1    talking about is on July 20th.  That's correct?

2    A.   No.  I don't think --

3    Q.   Okay.

4    A.   -- no.

5    Q.   Let's go back to Exhibit 119, page 4.  Page 4 under the

6    July 20th date is a text from you, correct?

7    A.   Yes.

8    Q.   "Tom called.  He sounded not great.  I hope he gets

9    better.  He promised to figure it out and said he would follow

10   back up with me later this week which is fine with us.  I'll

11   follow back up with you soon."

12           That's a text message you wrote, correct?

13   A.   Yes.

14   Q.   Was your conversation with Tom Girardi on July 20, 2020?

15   A.   I had a conversation with him on July 20th, certainly.

16   But I believe I had a conversation with him prior to that as

17   well.

18   Q.   I'm sorry.  I didn't hear that last part.

19   A.   I believe I had a conversation with him prior to that as

20   well.

21   Q.   Okay.

22   A.   I will say that, as I testified earlier, I'm not entirely

23   clear as to whether that initial conversation happened or

24   whether it was part of this conversation, but I believe that

25   the initial conversation didn't cover his illness in a real

**Balabanian - Cross by Saba**

1   way.  It was related to the releases and the tax issue that he

2   said that they were dealing with.

3   Q.  When you wrote, "I hope he gets better," that means the

4   conversation -- during the conversation with Mr. Girardi, he

5   discussed his illness with you?

6   A.  Yes.

7   Q.  So Mr. Girardi discussed his illness with you on July 20,

8   2020?

9   A.  Yes.

10  Q.  Okay.  Let's go back to the verified motion for rule to

11  show cause at paragraph 15.  It starts, "Balabanian ultimately

12  got an opportunity to speak with Girardi in late July.

13  Girardi's explanation regarding the status of the settlement

14  proceeds was extremely convoluted and meandering, and he

15  couched everything in terms of him recovering from the illness

16  for which he was being treated."

17          So you understand that when you're discussing in

18  paragraph 15 the July 20, 2020 call, correct?

19  A.  Yeah, I think so.  Yes.

20  Q.  If you go on later in the paragraph 15, it says, "Girardi

21  claimed that his illness, which caused him to be away from his

22  firm for several weeks, is ultimately what" -- "what

23  ultimately caused the, in his words, mistake of not getting

24  certain clients paid in full."

25          Do you see that?

**Balabanian - Cross by Saba**

1    A.   Yes.

2    Q.   There was no doubt in your mind on July 20, 2020, that the

3    clients had not been paid in full, correct?

4    A.   I still think I had doubts because --

5    Q.   Mr. Girardi -- sorry.

6    A.   -- because of the way the call went and the fact that he

7    wasn't clear about who was paid what or when.  So no, I'm not

8    certain that I had formulated that belief in my mind at that

9    point in time.

10   Q.   You testified in court that what Mr. Girardi told you was,

11   "I don't know what is going on and I'll figure it out."  That

12   quote is not in paragraph 15 in your motion for order to show

13   cause, is it?

14   A.   No.

15   Q.   In fact, what you told this Court which started the

16   contempt proceedings is that Mr. Girardi told you that he had

17   not paid the clients in full.  That's what you told the Court.

18          So did Mr. Girardi tell you he had not paid the

19   clients in full on July 20, 2020?

20   A.   I don't recall exactly when he said that.  But it could

21   have been on that date, certainly.

22   Q.   And did Mr. Girardi promise that he was going to send the

23   remaining amount that was owed within a couple of days?

24   A.   Yes.  Yes.  He said, "Give me a few days and I'll figure

25   it out and I'll make sure it's taken care of," something to

**Balabanian - Cross by Saba**

1    that effect.

2    Q.   Now, you've handled personal injury cases in your career?

3    A.   A few, yes.

4    Q.   What does a few mean?

5    A.   Well, it depends on what you mean by personal injury

6    cases.  We have mass torts that I have -- that we handle, but

7    I wouldn't characterize that as kind of a personal injury

8    case, like a hit-and-run type of thing.  I've represented my

9    mother before in a slip-and-fall accident.  That's really the

10   extent of those, you know, kind of one-off personal injury

11   cases.

12   Q.   All right.  I'll get right to the point.  Are you aware --

13   strike that.  Let me rephrase.

14        In July of 2020, were you aware that personal injury

15   settlements are not taxable by the United States Government?

16   A.   No.

17   Q.   You were not aware of that?

18   A.   No, I don't think I had a view one way or another.

19   Q.   As general counsel at Edelson -- does Edelson handle

20   personal injury cases at all?

21   A.   Not really.  We do class actions and mass torts.  Most of

22   the class actions are in the privacy and technology space.  We

23   do have a number of class actions against the NCAA for

24   concussion-related issues, so you could call those personal

25   injury cases.  But no, not as a matter of practice, we don't

**Balabanian - Cross by Saba**

1   really handle personal injury cases.

2   Q.   In July of 20 -- 2020, did you believe that the Lion Air

3   settlements were subject to any tax treatment considering the

4   plaintiffs lived in Indonesia?

5   A.   I didn't have a clear view of that at that point in time.

6   Q.   So if I understand this correctly, in July of 2020, you

7   didn't know that personal injury settlements were exempt from

8   taxes and Indonesian residents do not have to pay United

9   States taxes?  Is that your testimony?

10  A.   Yes, I don't think I had a view on either of those issues

11  at that point in time.

12  Q.   Did you ever contact a tax lawyer in July of 2020 or

13  thereafter to ask those types of questions?

14  A.   No.

15  Q.   So you did nothing to verify the veracity of the

16  statements Mr. Girardi was telling you about him having to go

17  to the IRS; is that correct?

18  A.   Correct.

19  Q.   Six days later -- if we could go back to Exhibit 119,

20  page 6.  Six days later you text Mr. Griffin, "Tom's putting

21  us in an untenable position and I can't hold things off any

22  longer."

23        Were you referring to your *Himmel* obligations at that

24  point of having to come to report to the Court?

25  A.   I was talking about filing something with this Court.

**Balabanian - Cross by Saba**

1  Q.  Complying with your *Himmel* obligations by reporting to

2  this Court that there has been some sort of misconduct related

3  to the settlement?

4  A.  I was not thinking about it in terms of *Himmel*.  I was

5  thinking about it in terms of just having them answer to the

6  Court at that point in time.

7  Q.  Okay.  So by July 26th, you felt at least a need to send a

8  text to Mr. Griffin that the firm was in an untenable position

9  and you can't hold things off any longer, correct?

10  A.  Yes.

11  Q.  Okay.  So at that point in time, you were consciously

12  aware that there was a problem and potential fraud and the

13  plaintiffs had not been paid, correct?

14  A.  I don't believe that I thought that there was necessarily

15  a fraud.  I definitely thought that there was a problem and

16  that the explanations were somewhat all over the place but

17  believable at various times.  But at some point, without

18  getting clarity as we had been requesting, our view was that

19  we would have to file something with the Court.

20  Q.  Mr. Girardi called you on July 27th; is that correct?

21  A.  I believe we spoke in late July, yes.

22  Q.  Okay.  If you look at the next page, on page 7 under the

23  label of July 27th, it says -- Mr. Griffin writes, "Has he

24  called?"  And you wrote, "Yes, I spoke with him."

25          That refers to Tom Girardi, correct?

**Balabanian - Cross by Saba**

1  A.  Yes.

2  Q.  Okay.  So you had a conversation with Mr. Girardi on

3  July 27th where he said that he would call me next Monday and

4  we should have the clients paid or ready to be paid by then.

5  Do you see that?

6  A.  Yes.

7  Q.  So you knew with no doubt in your mind by July 27th that

8  the clients had not been paid, correct?

9  A.  I knew that that was what we were being told.  I don't --

10  I'm telling you I did not have a concrete view that that was

11  the case.  What was in the back of my mind constantly was that

12  this all may have just been pretext to avoid paying our fees.

13  Q.  So Mr. Girardi of Girardi & Keese admitted to you in a

14  phone call that the clients had not been paid and that was not

15  good enough for you?

16  A.  He said, "I will take care of this.  This is a big

17  mistake.  I don't know how this happened.  I've been out of

18  the office sick."  He made one remark about how maybe this was

19  Griffin's fault, but that regardless, he was going to take

20  care of it and that he understands why we've been frustrated

21  with the delays but that, you know, we got to believe him.  He

22  didn't -- this had never happened before.  He didn't know how

23  this happened.  But that he would rectify the issue.

24          THE COURT:  You mentioned as part of your role as

25  general counsel for the Edelson firm that you get involved in

**Balabanian - Cross by Saba**

1  conversations with other attorneys about the fees they may owe

2  your firm.

3          THE WITNESS:  Yes, Your Honor.

4          THE COURT:  Have you ever had a firm before tell you

5  as an excuse for not paying your fee that they hadn't actually

6  paid the clients?

7          THE WITNESS:  I don't recall anything like that

8  before, Your Honor.

9          THE COURT:  And -- okay.  I suspected you hadn't.

10         THE WITNESS:  No.

11         THE COURT:  All right.

12         Go ahead.

13  BY MR. SABA:

14  Q.  Your July 27 text ends, "That's fine as long as he keeps

15  his promise."  And the promise you're referring to was that

16  Mr. Girardi would pay the money by Monday, correct?

17  A.  Yes.

18  Q.  So that means you're giving Mr. Girardi until Monday, and

19  if Monday didn't happen, you needed to report to this Court?

20  A.  Yes.

21  Q.  On July 31st, you wrote an e-mail that says, "It's Friday,

22  and I haven't heard anything further from Tom," correct?

23  A.  Yes.

24  Q.  "He said" -- You typed, "He said the clients will be paid

25  by Monday, August 2nd."

1      Do you see that?

2  A.  Yes.

3  Q.  Okay.  "Can you stay on him and maybe we can touch base

4  Sunday?"

5      Do you see that?

6  A.  Yes.

7  Q.  Mr. Griffin agreed with you?

8  A.  Yes.

9  Q.  Okay.  And then comes August 3rd, you wrote, "It's

10  Monday."

11      Do you see that?

12  A.  Yes.

13  Q.  And on Monday, you couldn't get ahold of him, right?

14  A.  Right.

15  Q.  And then Mr. Griffin wrote, "Give him a couple of more

16  days, Rafey.  I know he's working on this," right?

17  A.  Yes.

18  Q.  But in your mind, you say, "If I don't hear from him,"

19  meaning Tom Girardi, "today, I have no choice but to move

20  forward with the Court."

21      Do you see that?

22  A.  Yes.

23  Q.  Did you hear from Tom Girardi on August 3rd?

24  A.  No.

25  Q.  Did you go forward with this Court after you did not hear

1   from Tom Girardi on August 3rd?

2   A.  No, I spoke to Mr. Griffin.  And as I testified earlier, I

3   believe that was a conversation where he was telling me to

4   calm down and that it wasn't the situation where Girardi was

5   just trying to avoid me, that he was very old, that he had

6   lost a step, that he was truly sick, and that he was working

7   on it.

8   Q.  Well, as a law firm that pays wires immediately, you

9   certainly couldn't have believed that, right?  I mean --

10  A.  I believed him.

11  Q.  -- it takes 15 minutes to go to a bank and issue a wire.

12  You understood that, right?

13  A.  I didn't think Mr. Girardi was actually physically sending

14  wires.

15  Q.  Well, it takes less time to instruct someone to send a

16  wire.

17  A.  Yes, of course.  It does not take a long time to send a

18  wire.  It is not an involved process, certainly.

19  Q.  So you knew or should have known that there was a problem

20  by, if you didn't already know, by early August, right?

21  A.  I definitely had concerns that there was a problem.  I was

22  told that there was a mistake for sure, yes.

23  Q.  Well, what kind of mistake could you possibly believe that

24  happened by that time?

25  A.  I had no idea.  I thought -- I have no idea how they run

1    their law firm.  I have no idea that if Girardi was out

2    whether or not somehow an accounting error had taken place

3    such that the clients didn't get their money.  I didn't know

4    that.

5              I also remember speaking to Mr. Griffin about Girardi

6    dealing with litigation funders.  The Court asked me whether I

7    was aware of prior litigation against Mr. Girardi on behalf of

8    former clients.  I was not.  I was aware that Mr. Girardi had

9    some litigation pending with litigation funders.  So in my

10   mind also, I had questions about whether something with

11   respect to his funders prevented him from moving quickly to

12   pay the clients, whether there was some kind of account

13   control agreement in place or something of that sort.

14             THE COURT:  Well, you've had -- have you had

15   litigation funders on cases you've had, your firm?

16             THE WITNESS:  Yes, Your Honor.

17             THE COURT:  All right.  And you know that the -- is

18   the standard practice that the -- is it standard the

19   litigation funder is paid by the defendant, or does it go --

20   the money that goes to the -- as it happened here, the

21   litigation funder was paid directly by Boeing.

22             THE WITNESS:  Correct.

23             THE COURT:  In your firm's experience -- I don't want

24   to know about clients or anything -- but in your firm's

25   experience, has litigation funders been paid directly by the

1  defendants for the funding, or has the money gone into the

2  client escrow account and then you send the money to the

3  litigation funder?

4     THE WITNESS:  No, it goes directly into the client

5  trust account and then the firm sends the money.

6     THE COURT:  Just like you'd pay the money to a

7  referring attorney, same way?

8     THE WITNESS:  Correct.  But what I was referring to,

9  Your Honor, was whether or not there was some restrictions in

10  place that wouldn't allow Girardi to move money without

11  approval from the funder.

12     THE COURT:  You ever experience that before at any

13  other -- at --

14     THE WITNESS:  Yes.

15     THE COURT:  You've had that occur with other cases

16  where litigation funders --

17     THE WITNESS:  I'm aware -- excuse me, Your Honor.

18     THE COURT:  Let me finish -- where litigation funders

19  have prevented a law firm from sending money from their escrow

20  account to the clients who were due the money?

21     THE WITNESS:  I'm aware that litigation funders have

22  required in certain cases account control agreements.  I think

23  it would be strange for that to be placed over an IOLTA

24  account or a trust account, admittedly, of course, but I have

25  familiarity with that type of arrangement.

**Balabanian - Cross by Saba**

1    THE COURT:  Well, there's no arrangement that would

2  allow a litigation funder to put a lien on anything other than

3  fees for the law firm because they have no lien over proceeds

4  that are supposed to go to the client.

5    THE WITNESS:  No legitimate arrangement, certainly.

6    THE COURT:  Okay.  All right.

7    Go ahead.  How much more do you have?

8    MR. SABA:  Just a few more minutes.

9    THE COURT:  Okay.  Go ahead.

10  BY MR. SABA:

11  Q.  Mr. Balabanian, you ultimately had a call with Mr. Girardi

12  on August 24, 2020, correct?

13  A.  Yes.

14  Q.  And that's on page 10 of Exhibit 119.

15  A.  Yes.

16  Q.  This call was contentious, wasn't it?

17  A.  Yes.

18  Q.  And did Mr. Girardi tell you during this phone call that

19  he didn't need to explain himself to you when it came to the

20  clients of Girardi & Keese?

21  A.  Yes.

22  Q.  And at that time, did he tell you that the plaintiffs had

23  still not been paid?

24  A.  Yes.

25  Q.  In fact, your text message to Mr. Griffin says, "If he

**Balabanian - Cross by Saba**

1    doesn't get it done, I'm going to have to file something with

2    the Court."  That's referring to paying the individual

3    plaintiffs, correct?

4    A.  Correct.

5    Q.  You then say that Mr. Girardi gave you a helping heap --

6    sorry -- heaping helping of righteous indignation.  Do you see

7    that?

8    A.  Yes.

9    Q.  And what did you mean by that?

10   A.  I meant that he -- I mean, our conversation got quickly

11   contentious.  He -- some of these conversations felt like I

12   was watching the movie *Groundhog Day* where our previous

13   conversations almost never happened.  So it was like he was

14   almost surprised that I was badgering him again.

15          So he said, you know, "I'm really trying to take care

16   of this.  It's -- I've been sick, as you know.  I've been out.

17   And I don't know how this got screwed up.  But you know I'm

18   going to figure it out."  And I said, "You've been saying that

19   for a long time, Tom."  And he said, "Yeah, I know, but I'm

20   going to figure it out."  I said, "But you keep saying that,

21   so when are you going to figure it out?  I can't just continue

22   to accept you saying that but then not figuring it out."  And

23   he said, "Look, I don't need you yelling at me about this."  I

24   think he said like, "Do you know I am?"  I said, "Yeah, I know

25   who you are and I don't care and I'm not yelling at you.

**Balabanian - Cross by Saba**

1    You've got to understand where I'm coming from."  And he said

2    something like, "We wouldn't even be here if it wasn't for

3    me."  And I said, "Where are we?  What are you talking about?"

4    And I think he hung up either right at that point or right

5    after.

6              THE COURT:  Did you notice any sign of mental

7    incompetency during any of these calls?

8              THE WITNESS:  There were calls, Your Honor, where I

9    had concerns about whether -- no, I don't believe I witnessed

10   mental incompetency, but he certainly sounded ill and out of

11   sorts at various points.

12             THE COURT:  And you state that in one of your text

13   messages.  But I meant mental acuity, mental competency, you

14   had no reason to doubt that he was mentally competent to --

15   certainly you didn't express anything in your e-mails or your

16   texts about it, correct?

17             THE WITNESS:  No, Your Honor.

18             THE COURT:  So you had no reason to doubt his mental

19   competency during these conversations?

20             THE WITNESS:  I did not think he was struggling in

21   that respect.

22             THE COURT:  All right.  Very good.

23   BY MR. SABA:

24   Q.  Whatever was said by Mr. Girardi to you during that

25   August 24, 2020 call, you were satisfied enough, though, not

**Balabanian - Cross by Saba**

1   to bring this issue to the Court, correct?

2   A.  Yes.

3   Q.  Have you ever tried a case or taken a deposition?

4   A.  Yes.

5   Q.  You consider yourself a litigation attorney?

6   A.  Yes.

7   Q.  Part of your job is to evaluate the veracity of witnesses

8   that you depose or put on the stand.  Would you agree with

9   that?

10  A.  Yes.

11  Q.  Okay.  When you were talking to Mr. Girardi in August of

12  2020, did you believe him, that he was going to get the

13  plaintiffs paid?

14  A.  Yes.  I did.

15  Q.  Would you agree with me, sir, that Mr. Girardi fooled you?

16  A.  Yes.  Absolutely.  Not only Mr. Girardi, though.

17  Q.  Well, my question was, sir, whatever Mr. Girardi said to

18  you, it was enough not to convince you to come to this Court

19  and that you believed that he would pay the clients, right?

20  A.  Not exactly.  I mean, yes, in a way, but then shortly

21  thereafter I got further communications that said that he had

22  got the money to pay the clients from Mr. Griffin.

23          So I don't know if -- I don't believe we moved

24  forward with filing paper -- with preparing papers at that

25  point in time.  We may have.  We may have started.  I don't

**Balabanian - Cross by Saba**

1   know for certain.  But shortly thereafter and I think in

2   communications with -- phone calls with Keith, I understood

3   that Girardi had the money together and was sending it.

4   Q.   Well, on September 3rd, Mr. Griffin told you that the

5   plaintiffs had not been paid in full, correct?

6   A.   He told me that they sent out a wire for half of the

7   collective balance that was owed to them at that time.

8   Q.   That is not all the money.  That is a portion of what is

9   owed, correct?

10  A.   That's right.

11  Q.   There's no doubt in your mind that the plaintiffs still

12  had not been paid all of their money by September 3rd?

13  A.   Yes, and I recall being mystified by that fact because I

14  was expecting them to pay it all.  And so the fact that he

15  said they paid half was very disappointing.

16  Q.   At that point when Keith Griffin told you that they -- the

17  plaintiffs had not been paid all of their money, why didn't

18  you say to Mr. Griffin, "Hey, man, we jointly need to go to

19  the Court.  We need to go to the Court right now together

20  because this is now a violation of a court order nearly six

21  months later"?

22  A.   Mr. Griffin had convinced me to hold off and that

23  Mr. Girardi was working hard to rectify the issue and that --

24  but I think, you know, he certainly said at various points I

25  understand if you need to do what you have to do.

**Balabanian - Cross by Saba**

1  Q.  Mr. Griffin said that to you?

2  A.  He said that I think -- yes, I mean, he said that at

3  various times.

4  Q.  Did you ever have a conversation with Mr. Griffin where

5  you would say to Mr. Griffin, "Hey, we need to do this

6  together.  Mr. Girardi is screwing both of us by not paying

7  the plaintiffs"?

8  A.  I had many conversations with Mr. Griffin where I said I

9  do not understand how it is so hard to get information out of

10 you all and that this was not a place that anybody wanted to

11 be, that if any type of craziness or whatnot was going on --

12 and what I meant by that was like misappropriation of client

13 funds, that that was insanity, and I think I had said at

14 various points that Girardi could go to jail.

15 Q.  Say that again.

16 A.  I think I said at various times that Girardi could be

17 facing criminal liability.

18 Q.  So you recognized enough that Mr. Girardi was committing a

19 crime, correct?

20 A.  I said that -- no, I didn't think he was committing a

21 crime, but I thought that if he -- if they weren't being

22 truthful and that was going on that, yes, obviously that was

23 extremely serious.

24 Q.  I would like you to look at September 22nd, the e-mail

25 that's on page 16.  Sorry.  It's a text message on page

**Balabanian - Cross by Saba**

1    119-016.  Thank you.

2      (Counsel conferring.)

3    BY MR. SABA:

4    Q.  So you wrote a text that says, "I just spoke to Jay, and

5    he flipped out at me, that this isn't done."  When you wrote

6    "that this isn't done," you mean the plaintiffs had not been

7    paid, correct?

8    A.  Correct.

9    Q.  You had a conversation with Jay Edelson and you told him

10   at some point prior to September 22nd that Tom Girardi still

11   had not paid the individual plaintiffs, correct?

12   A.  I think I told him they had paid half and that -- were

13   planning to pay the rest at some point in that time frame.

14   Q.  And when you write Mr. Edelson flipped out, he yelled at

15   you?

16   A.  I don't think he yelled at me, but he -- yes, he flipped

17   out.  He got very upset.

18   Q.  And did Mr. Edelson tell you that you need to go to the

19   Court as general counsel and tell this Court that there's a

20   problem?

21   A.  We discussed it, yes.

22   Q.  Okay.  And did you convince Mr. Edelson not to go to the

23   Court?

24   A.  I think so.

25   Q.  And Mr. Edelson agreed with you that he shouldn't go to

**Balabanian - Cross by Saba**

1  the Court?

2  A.  He agreed that we could hold off a little longer to see

3  whether or not Girardi would make good on the remaining money

4  due.

5  Q.  In fact, you calmed Mr. Edelson down, correct?

6  A.  Yes, I think you could say that.

7          THE COURT:  But of course no one did come to the

8  Court until September.  Why didn't you come earlier?

9          THE WITNESS:  We didn't -- I'm sorry.  We didn't come

10  to the Court in September.  Why didn't we come earlier?

11          THE COURT:  No, you didn't come until December.  So

12  why didn't you come earlier?

13          THE WITNESS:  Because we thought that in the end,

14  Your Honor, as I had said, that this was not the result of

15  intentional misconduct but that it was the result of some type

16  of mistake that had been made and, for whatever reason, that

17  it took time to get the plaintiffs paid in full.

18          THE COURT:  And you thought they were paid in full by

19  the end of September?

20          THE WITNESS:  Yes, Your Honor.

21          THE COURT:  All right.  Did you seek any verification

22  of that?

23          THE WITNESS:  I did not, Your Honor.

24          THE COURT:  In light of all the -- your expression of

25  not believing Girardi, of having trouble understanding all

1　this, this whole string of text messages, and having the

2　managing partner of the firm saying he wanted to run to court

3　that week, did anyone in your firm think that the assurances

4　of Tom Girardi that the clients had been paid, an oral

5　assurance over the phone, for which there's no memo to file,

6　was enough to feel comfortable you had no obligation to go to

7　the Court?

8　　　　　THE WITNESS:  We didn't certainly require anything in

9　writing or anything like that, Your Honor.  I did have

10　subsequent discussions with Mr. Griffin where the tenor of the

11　discussion was that the clients had been paid and the issue

12　had been put behind us, but no.

13　　　　　THE COURT:  Well, did Mr. Griffin tell you the

14　clients had been paid?

15　　　　　THE WITNESS:  No.  He did not make an affirmative

16　statement like that.  I don't believe he did, Your Honor.

17　　　　　THE COURT:  He couldn't have because it would have

18　been a lie.

19　　　　　THE WITNESS:  I do not believe that he made any

20　affirmative statement, but the tenor of our discussion moved

21　to the fees, Your Honor.

22　　　　　THE COURT:  Okay.  All right.

23　　　　　Finish up, please.

24　　　　　MR. SABA:  I'm done, Your Honor.  I have no more

25　questions.  Thank you.

Balabanian -

538

1      THE COURT:  Ms. Matthai, do you have any questions or

2 any or many?

3      MS. MATTHAI:  I just have one question.  And we've

4 been looking at 119 on the screen, which I think was an

5 original 119 and then there was a substitute that was put in

6 at a later by the Edelson firm with a couple of redactions on

7 it because of a reference to other -- to another matter.

8      THE COURT:  Right.

9      MS. MATTHAI:  And I don't know which -- which one the

10 Court is looking at in the hard copy, whether it's the one

11 that looks like the one on the screen.

12      THE COURT:  What page has the redactions on your

13 version?

14      MS. HAUSMANN:  The Court has the updated screenshots

15 from a phone.

16      THE COURT:  Okay.  And this has some redactions as to

17 an unrelated case?

18      MS. HAUSMANN:  Yes, that's correct.

19      THE COURT:  That fine.  I don't need to see that.

20 Unless you think there's something relevant to the unrelated

21 case, I don't need to see that.

22      Ms. Matthai, are you suggesting I need to --

23      MS. MATTHAI:  I just wanted to refer to a text

24 message and I just had a terrible time trying to find it

25 because of the different ways this has been put out.

**Balabanian - Cross by Matthai**

 1          THE COURT:  The redactions I have are on page -- it

 2   looks like pages 119-20, 119-21, actually 119-19 also.

 3          MS. MATTHAI:  Okay.

 4          THE COURT:  Three pages -- it looks like three pages

 5   of redactions which -- unless -- I'll accept the

 6   representation it deals with another case unless there's

 7   reason for me to doubt that.

 8          MS. MATTHAI:  Sure.  Okay.  Then I think we're all

 9   together on Exhibit 119, page 20.

10          THE COURT:  All right.

11                      CROSS-EXAMINATION

12   BY MS. MATTHAI:

13   Q.  And we're now at September the 30th, 2020.

14          Do you see that?

15   A.  Yes.

16   Q.  And the inquiry from Mr. Griffin is "Did Tom call today?"

17   Correct?

18   A.  Yes.

19   Q.  And you texted back on September 30th, "Yes, we spoke.  I

20   didn't want to give him shit so we had a nice conversation and

21   he sent me a funny letter afterwards which I'll forward.

22   Hoping he gets it done, and I've gotten Jay to chill a bit."

23          Does that mean that you worked to calm Mr. Edelson

24   down so that nothing would be filed with the Court?

25   A.  Yes.

1          MS. MATTHAI:  Thank you.

2          THE COURT:  All right.

3          Anything else, any redirect?

4          MS. HAUSMANN:  No, Your Honor.

5          THE COURT:  Okay.  Sir, you're excused.  Thank you.

6          THE WITNESS:  Thank you, Your Honor.

7          THE COURT:  All right.

8          How do you want to proceed?  I do want to hear

9    Mr. Scharg and Mr. Edelson.  I don't necessarily know I want

10   to hear from them today.  It's been a long couple of days and

11   I need to digest some of this because of -- do the parties

12   have questions they are prepared to ask each of them?  Have

13   you prepared a direct of those two witnesses from the Edelson

14   table?

15         MR. WADE-SCOTT:  Your Honor, we -- we have questions

16   we could ask.  I think that we would need to similarly modify

17   things in light of having gone through a lot of the content

18   with Mr. Balabanian.

19         THE COURT:  Right.  Okay.

20         And I take it you would also have questions of those

21   two witnesses similar to the ones you've had with

22   Mr. Balabanian?

23         MR. SABA:  Well, Your Honor, I think since we have a

24   little bit of time, perhaps we can talk about this in a

25   different way.

1          It is my belief that the failure of any of the

2    parties to notify this Court of an ethical breach is not

3    actually something that they can be held in contempt of.  To

4    be held in contempt, you have to have violated the court order

5    or -- and in this --

6          THE COURT:  Or assisted someone else in violating it.

7          MR. SABA:  Well, not just that.  You have to have

8    knowledge that they are committing a crime in order -- the

9    standard to aid and abet, Your Honor, under the United States

10   Supreme Court and under the Seventh Circuit is that it's an

11   overt act and knowledge of -- in fact, I'll read it right to

12   you, Your Honor.  Give me a second.  I didn't know we were

13   going to get to this right now.

14         THE COURT:  No, I don't think we need to.  Where are

15   you going?

16         MR. SABA:  My point is is that we are going down a

17   line of questioning of who knew what and when.

18         THE COURT:  Correct.

19         MR. SABA:  And I'm not so sure it's actually relevant

20   to the issue of whether or not someone should be held in

21   contempt.  And that's -- and I see us going down this rabbit

22   hole and calling more witnesses, and I think that we should

23   maybe reset and discuss what the standard is because I don't

24   think the testimony is necessarily helpful to the standard

25   because if the true issue is you should have come to me

1    earlier, then Edelson is just in the same boat as the Girardi

2    people.

3            But I don't think that's the standard.  In fact, I

4    want to rephrase.  It is not the standard.  And so I think

5    that maybe we could spend some time arguing about the legal

6    standard, and then if this Court makes a determination of what

7    the legal standard is, then we could call a few more witnesses

8    if necessary.

9            But in my opinion, this is not the correct standard.

10   Even under Edelson's definition, two-prong definition of

11   either aiding and abetting or privity, which I disagree with,

12   I don't think that there's been any evidence in this case that

13   either Mr. Griffin or Mr. Lira assisted Mr. Girardi in the

14   sense that they knew he was committing a crime and wanted to

15   assist him in committing that crime.

16           I think the evidence has been crystal clear that they

17   both were trying to get him to pay.  And they were not helping

18   him in furtherance of the crime in the sense that they were

19   cooperating with him to commit the crime.

20           THE COURT:  Well, you keep saying crime.  It's a

21   court order that's being violated.  That's not necessarily a

22   crime.  That's a civil matter.  So your reference to criminal

23   standards and criminal aiding and abetting may not be entirely

24   on point, but I understand your position.

25           The Edelson firm, you're the ones that brought this

1    motion.  I'm glad you did certainly as to Mr. Girardi, but you

2    continued it as to these two lawyers.  What's your position?

3         MR. TIEVSKY:  Yes, Your Honor.  Before last week, we

4    thought that this was going to be an aiding and abetting case

5    and it was going to be about Mr. Griffin and Mr. Lira throwing

6    attorneys, the Edelson firm, sort of off the scent; and then

7    last week, we got the letters that we've spent most of the

8    last two days talking about.  And it's clear to us now that

9    this isn't really an aiding and abetting case anymore.  This

10   is a direct violation of a court order case.

11        THE COURT:  By who?

12        MR. TIEVSKY:  By both Mr. Griffin and Mr. Lira.

13        THE COURT:  What about by you?  Not you individually

14   but your firm.

15        MR. TIEVSKY:  I don't believe so, no, because I -- I

16   haven't heard evidence that we knew the things that they knew

17   that would allow us to help someone violate a court order or

18   directly violate a court order ourselves.

19        I'll also add that the court order was directed at

20   Girardi Keese, specifically, and not at Edelson PC.

21        THE COURT:  Well, if it's directed to Girardi Keese

22   as opposed to Lira and Griffin, then it's -- but you think

23   Lira and Griffin were in violation of an order, it certainly

24   would, under that analogy, also apply to Edelson.  You had an

25   appearance on file in this case.  You had knowledge of the

1   court order.  You had knowledge of the directive of the court

2   order, which all three parties have had said.  Your firm has

3   said you knew.  Both these two attorneys said they knew.  So

4   knowledge of the order, knowledge the order was not being

5   followed for months and months and months.

6           Now, whether you had plausible deniability up to a

7   certain period of time, there's no question, given the facts

8   I've heard, that at some point before December, well before

9   December, you knew there had been funding.  Frankly, I think

10  your firm knew there was funding right away and you knew that

11  the clients hadn't been paid.

12          Now, maybe it's mixed up a little with a belief that

13  attorneys' fees were -- what were -- that Girardi was playing

14  fox on this because he was trying to hold off on giving you

15  attorneys' fees; but, unquestionably, you knew -- you, your

16  firm, not you of course, none of the three attorneys here --

17  but the firm knew at some point that the clients had only been

18  paid half.

19          Everybody knows paying the clients half is wrong

20  because it's not an installment plan.  You pay them

21  everything.  It's not Girardi's money.  It's the money of the

22  clients.

23          And the question is if the order is not directed

24  specifically at Lira and Griffin, it's not directed

25  specifically at you, but you're all attorneys on the case.

1   And, you know, beyond ethical issues, which is not really

2   my -- appropriately my focus, it may be, but at this point it

3   really isn't, it's a question of whether people allow -- as

4   you say, they aided and abetted, a direct case of aiding and

5   abetting Tom Girardi in violating that order.

6           You may be in the soup, too, over that.  Not quite as

7   early but at some point definitely.  Because this motion

8   didn't come to me in September which -- or in August.  It came

9   December 2nd.  And maybe it was a deference to Tom Girardi,

10  this so-called titan of the plaintiff's bar that how could he

11  ever lie, how could he ever do anything like this.  That's

12  really my call.

13          As I told Mr. Balabanian, you know, if this complete

14  ethical and legal abuse committed by Tom Girardi was something

15  that might be excused because of his age or because of an

16  illness or because of being mixed up or because of playing coy

17  with you on attorneys' fees, these poor folks in Indonesia,

18  they don't care.  They didn't get the money.  The e-mails they

19  sent to Mr. Griffin were heartbreaking.  We need the money.

20  We're not going to survive the pandemic without the money.  Me

21  and my kids can't survive it.

22          This is ridiculous.  You know, we send -- the ABA

23  sends lawyer over to Eastern Europe to teach them about the

24  American legal system.  These poor folks in Indonesia expect

25  integrity.  It's an embarrassment to the whole legal community

1   that people in Indonesia are being ripped off by someone who

2   is acting like a two-bit crook.  And that's how they're

3   acting.  That's how Mr. Girardi acted.  I'm not going to

4   restrain myself on this.  That's exactly how he acted.

5       This is an embarrassment, to let people who are

6   unsophisticated -- and that actually doesn't give them credit.

7   They're very sophisticated.  As soon as they didn't get their

8   checks, they're saying, "Where are they?"  And as soon as the

9   check came with half, they said, "What is going on?"  I give

10  credit to the plaintiffs.  They were all over Mr. Griffin and

11  Mr. Lira, I believe, but wherever the e-mails went to.  I

12  would have to go back at some of this.  But they were all over

13  people about where the money is.

14      They were respectful, "Sorry to bother you but

15  where's my money," as if it's a favor to get their money.

16      So that's what I've concluded from two days of

17  hearings.  And I don't think -- I'm going to want to hear from

18  Mr. Edelson and Mr. Scharg.  Not today.  I've had enough.  And

19  they're both local.  I won't require the parties, they're from

20  California, to come back in, unless they want to.  I'll allow

21  you to do questioning by some type of video hookup.  I'm going

22  to want Mr. Edelson and Mr. Scharg in my courtroom.  They're

23  down the block.  And all of you are free, of course, to come

24  to the courtroom, but I won't require you and your clients to

25  come back for that.  You can participate by asking questions

1    by video.  We all have the same set of exhibits.  So I don't

2    think there will be any problem at all with all of us working

3    off the same page.

4          So I'm going to have you contact my courtroom deputy

5    maybe as you leave; if not, by e-mail in the next day or two.

6    I don't want anybody to miss planes to arrange for this.  I

7    would like to do it before Christmas, get this over with while

8    my mind is still fresh at least to complete the factual record

9    on this.

10          I don't need to hear from Mr. Clinton at this point.

11    If I do at some point or you want to offer him, you're free

12    to.  But I repeat that this is a factual inquiry, and I would

13    like to hear from the two other people who I think were

14    involved to a lesser extent than the three witnesses I've

15    heard, but they were still involved.  So I think, in fairness,

16    I should hear from them.

17          Any questions first by the Edelson firm?

18          MR. TIEVSKY:  I should make one disclosure.

19          THE COURT:  Go ahead.

20          MR. TIEVSKY:  Because of what you said and I want to

21    make sure I correct it.

22          In July I was asked because I represent the firm in

23    various litigation, Mr. Edelson asked me in July to look at it

24    and give him my thoughts which I did in privileged form.

25          THE COURT:  All right.

1    MR. TIEVSKY:  And so I looked at it then and I did

2 not get brought back into it again until December when we

3 filed.  So I did not consider myself a potential witness.  I

4 think all the communications I had were privileged, but I

5 wanted to make sure that I identified that for the Court --

6    THE COURT:  All right.

7    MR. TIEVSKY:  -- immediately just so --

8    THE COURT:  Thanks for that disclosure.  It doesn't

9 change my -- I don't need you as a witness.

10    MR. TIEVSKY:  Thank you.

11    THE COURT:  Anything you would say would be

12 repetitive of what the other witnesses who have yet to speak

13 would say.  And I'm not delving into privileged communications

14 at this point.

15    MR. TIEVSKY:  Thank you.

16    THE COURT:  Nor could I possibly, but I'm certainly

17 not.  So thank you for the disclosure, but that doesn't change

18 who I think I need to hear from.

19    Anything else from the Edelson firm?

20    MR. WADE-SCOTT:  No, Your Honor.

21    THE COURT:  Anything else from Mr. Lira?

22    MS. MATTHAI:  No, Your Honor.

23    THE COURT:  Mr. Griffin?

24    MR. SABA:  The only thing I wanted to mention,

25 Your Honor, is I was looking for those U.S. Supreme Court and

1  Seventh Circuit cites --

2          THE COURT:  Yes.

3          MR. SABA:  -- to aiding and abetting.  If you

4  wouldn't mind, I would just like to tell them to you real

5  quick.

6          THE COURT:  Sure.  These are not in your briefs that

7  you filed?  I had a lot of cases you cited from the

8  Seventh Circuit and the Supreme Court in your briefs.

9          MR. SABA:  They may be.

10         MS. MATTHAI:  I think so.

11         MR. SABA:  Okay.  How about I tell them to you?  It

12 will take me two seconds.

13         THE COURT:  Go ahead.

14         MR. SABA:  The U.S. Supreme Court case is *Rosemond v.*

15 *United States.*  It's 572 U.S. 65 at the jump cite 71.  That's

16 a 2014 case.

17         And the Seventh Circuit case is *U.S. v. Irwin*, and

18 that's 149 F.3d 565, the jump cite of 571, and that's 1998.

19         And it's -- I -- I wanted to clarify what I said

20 earlier.  I do believe that the standard is that there needs

21 to be a desire or an intent by Mr. Lira or Mr. Griffin to make

22 Mr. Girardi's violation of the court order succeed.

23         THE COURT:  Okay.

24         MR. SABA:  I just don't need -- like I said, I don't

25 think there was ever a desire or intent by Mr. Griffin or

1   Mr. Lira to have Mr. Girardi succeed in violating a court

2   order.

3            THE COURT:  What if that was the practical effect of

4   their actions?

5            MR. SABA:  Well, but that's -- well, maybe, maybe

6   not, but I think the law says they have to have the desire or

7   intent to want him to succeed in violating the court order.

8   And I think that the evidence is undisputed that that's not

9   what their desire and intent was.  It was exactly the

10  opposite.

11           THE COURT:  Okay.  Well, I'll hear oral argument.

12  This is important for everyone's professional career.  I'm not

13  minimizing the effect this could have, my findings on the

14  ability of people to practice law.  So I'm not making light of

15  any of this.

16           So I'll give you an opportunity to make argument at

17  some point in the future before I make a decision.  I won't

18  make it -- I'm giving you my impressions now having heard the

19  facts, but I'm not making any conclusions about the --

20  ultimately about the conduct of the Edelson firm or the two

21  attorneys that are subject of their motion.  Okay?  That

22  should be clear.  I'll give you an opportunity to make

23  argument and for me to re-read these cases that I've read

24  already and read the ones you've pointed out unless I've read

25  them already.

1    Okay.  With that then, I would ask we'll recess.

2  I'll take my copy of these exhibits with me.  And I would ask

3  the parties to talk to my courtroom deputy either now or, you

4  know, in the next couple of days to arrange for the

5  continuation of this hearing.

6          Thank you all.

7          MR. SABA:  Very well.

8          MS. MATTHAI:  Thank you, Your Honor.

9    (Which were all the proceedings heard.)

10

11                    CERTIFICATE

12    I certify that the foregoing is a correct transcript from

13  the record of proceedings in the above-entitled matter.

14  */s/Kelly M. Fitzgerald*                    *December 12, 2021*

15  _____        _____

16  Kelly M. Fitzgerald                        Date
    Official Court Reporter

17

18

19

20

21

22

23

24

25