552

```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   WELLY CHANDRA, et al.,                )
                                           )
 4                     Plaintiffs,         )
                                           )
 5   -vs-                                  )
                                           )  Case No. 18 C 7686
 6   THE BOEING INTERNATIONAL SALES        )
     CORPORATION, a Washington             )  Chicago, Illinois
 7   State Profit Corporation, et          )  December 14, 2021
     al.,                                  )  10:03 a.m.
 8                                         )
                       Defendants.         )
 9

10                TRANSCRIPT OF PROCEEDINGS - Volume 3
              BEFORE THE HONORABLE THOMAS M. DURKIN
11
     APPEARANCES:
12
     For Edelson PC:        MR. ALEXANDER G. TIEVSKY
13                          MR. JAY EDELSON
                            MR. J. ELI WADE-SCOTT
14                          Edelson PC
                            350 North LaSalle Street, 14th Floor,
15                          Chicago, Illinois  60654

16   For Keith Griffin:     MR. RYAN D. SABA
                            Rosen Saba, LLP
17                          9350 Wilshire Boulevard, Suite 250
                            Beverly Hills, California  90212
18

19   For David Lira:        MS. EDITH R. MATTHAI
                            Robie & Matthai
20                          350 South Grand Avenue, Suite 3950
                            Los Angeles, California  90071
21

22
     Court Reporter:        KELLY M. FITZGERALD, CSR, RMR, CRR
23                          Official Court Reporter
                            United States District Court
24                          219 South Dearborn Street, Room 1420
                            Chicago, Illinois  60604
25                          Telephone:  (312) 818-6626
                            kmftranscripts@gmail.com
```

1       (Proceedings heard in open court:)

2          THE CLERK:  All right.  This is case number 18 CV

3  7686, In Re Lion Air Flight 610 Crash.

4          Could I please have the attorneys state their names

5  for the record one at a time.

6          MR. WADE-SCOTT:  Good morning, Your Honor.  J. Eli

7  Wade-Scott for Edelson.

8          MR. TIEVSKY:  Good morning, Your Honor.  Alexander

9  Tievsky for Edelson.

10         MR. SABA:  Good morning, Your Honor.  Ryan Saba for

11  Keith Griffin.

12         MS. MATTHAI:  Good morning, Your Honor.  Edith

13  Matthai, Robie & Matthai, for Mr. Lira.

14         MR. LIRA:  Good morning, Your Honor.  David Lira.

15         MR. GRIFFIN:  Good morning, Your Honor.  Keith

16  Griffin.

17         THE COURT:  Good morning.  And I left one thing back

18  in chambers.  I'll be right back.

19         And, Emily, you're getting the sound set up?

20         THE CLERK:  Yes.

21         THE COURT:  Okay.  Great.  I'll be right back.

22         Okay.  Please be seated.

23         All right.  How do you want to proceed?

24         MR. WADE-SCOTT:  Good morning, Your Honor.  Edelson

25  will call Jay Edelson to the stand.  Before we start, we have

1    just a handful of additional exhibits to add to the binders.

2    I believe the Court has two total copies so these can just

3    slot into the back of the binders the Court currently has.

4              THE COURT:  Okay.  Terrific.  And the other side has

5    those copies?

6              MR. WADE-SCOTT:  The other side has these copies.  I

7    can tender both copies to the bench.

8              THE COURT:  Why don't you give one to my law clerk.

9              MR. WADE-SCOTT:  Yes.

10             THE COURT:  And I'll take the other one.  You can

11   give it to my courtroom deputy.

12             MR. WADE-SCOTT:  Thank you.

13             MS. MATTHAI:  And, Your Honor, if I may, there are a

14   couple of preliminary things.

15             THE COURT:  Okay.  We'll talk about those in a

16   second.

17             Okay.  Go ahead.

18             MS. MATTHAI:  The first thing is when we agreed to

19   this Tuesday and we Federal Expressed all our hard copy

20   exhibits and other materials on Friday, it didn't occur to us

21   that they would arrive at our office at the same time I was on

22   an airplane coming to Chicago.

23             THE COURT:  Ah.

24             MS. MATTHAI:  So we do not have hard copies of our

25   exhibits available for the Court today.  I think there are

1   copies of most of them that are left over from last week, but

2   I just wanted to let the Court know that there's that

3   logistical issue.

4           THE COURT:  Well, I have the binders from both Lira

5   and Griffin.  I have a hard copy binder here.  Do you have

6   what you need if you need to put anything on the screen on

7   your computer?

8           MS. MATTHAI:  I believe I have it on the computer.

9   We don't have one for the witness, except by seeing it on the

10  screen.

11          THE COURT:  Okay.  And do you have the Lira and

12  Griffin exhibits on your computer?

13          MR. WADE-SCOTT:  On our computers, yes, Your Honor.

14          THE COURT:  Okay.  I may ask you to assist them if

15  they ask for a document to be put up, you know, just as a

16  courtesy to put that up if there's questioning of a witness

17  where they can't access the document but you have it, if you

18  can just put it up.  Great.

19          MS. MATTHAI:  Then there -- if I may, there's one

20  other issue that we need to correct in the record.

21          Mr. Lira misremembered his compensation when he was

22  asked it by the Court.  And he went back and looked at the

23  W-2s, which we will be submitting, we can -- if the Court will

24  indulge us in some logistical problem, we'll set a date and

25  time for that, but we will be submitting unredacted W-2s.  For

1    2019, that compensation was 704,656; for 2018, it was 710,683.

2         That resulted from some payments on cases that had

3    been referred to Mr. Lira he had settled and he did get that

4    amount -- or he did get the differential over his base salary

5    for those cases in those years.

6         As to 2020, we will -- Mr. Lira did not receive a W-2

7    for 2020 because of the bankruptcy proceedings and the chaos

8    that they were dealing with bankruptcy.  So no employee for

9    Girardi Keese, to Mr. Lira's knowledge, got a W-2 for the year

10   2020.

11        However, Mr. Lira had his income reconstructed by an

12   accountant, because he obviously had to file taxes even though

13   he did not receive a W-2.  In light of the misrecollection and

14   the chance that he -- and since he has not actually seen that

15   document, since we realize this occurred, we will provide the

16   tax information to the Court, sealed as we have done with

17   other financial information, so that we're sure you have the

18   accurate information on that.

19        THE COURT:  All right.  That's fine.  Thank you.

20        Anything else before we start from either the Griffin

21   or Lira attorneys?

22        MR. SABA:  Not from me, Your Honor.  Thank you.

23        THE COURT:  Okay.

24        And, Ms. Matthai, anything else?

25        MS. MATTHAI:  No, Your Honor.

**Edelson - Direct by Wade-Scott**

557

1          THE COURT:  Okay.  Then with the additional exhibits

2   you gave me, are you ready to call Mr. Edelson?

3          MR. WADE-SCOTT:  Yes, Your Honor.

4          THE COURT:  All right.

5          Come on up, sir.

6          Please raise your right hand.

7     (Witness sworn.)

8          THE COURT:  Have a seat.

9          And you may begin.

10              JAY EDELSON, WITNESS, DULY SWORN

11                   DIRECT EXAMINATION

12   BY MR. WADE-SCOTT:

13   Q.  Please state your name for the Court.

14   A.  Jay Edelson.

15   Q.  Where do you work, Mr. Edelson?

16   A.  At my firm, Edelson PC.

17   Q.  What is your job at Edelson PC?

18   A.  I'm the founder and CEO.  That's a title, but it's my

19   firm.  I run the firm.

20   Q.  What kind of work does Edelson PC do?

21   A.  We're a plaintiff's firm.  We do plaintiff's class action

22   work.  We represent governments, so regulators; and then we do

23   mass torts as well.  Those are -- that's like 98 percent of

24   what we do.

25   Q.  How long have you been practicing law?

**Edelson - Direct by Wade-Scott**

1    A.   I graduated in 1997.  So just under 25 years.

2    Q.   How long have you worked for your own firm?

3    A.   Since 2000.  It was called Blim & Edelson back then,

4    but -- so over 20 years.

5    Q.   I'd like to talk now about Girardi Keese.

6         When did you first meet anyone from Girardi Keese?

7    A.   I -- I don't remember the exact date.  The -- we were

8    co-pitching a client in -- a regulator in Los Angeles, and so

9    it was our firm and Tom's firm.  And that was the first time I

10   flew to L.A.  That was the first time I believe that I ever

11   met David or Keith, and it's the first time I met Tom as well.

12   Q.   David is David Lira?

13   A.   I'm sorry, yes.  Mr. Lira and Mr. Griffin, and Tom is

14   Mr. Girardi.

15   Q.   Did you go to the Girardi Keese offices at that time?

16   A.   Yes, I went to -- I went to their offices, correct.

17   Q.   What was your impression of the offices at the time?

18   A.   It's -- it's like being in a time machine.  They -- they

19   seemed like a firm that was operating from maybe even like the

20   1970s or '80s.

21        So I heard testimony that Mr. Girardi didn't use a

22   computer and had two secretaries.  That was something -- that

23   was very consistent with my view.  They did not seem to be

24   kind of a modern office.

25   Q.   What was your impression at the time of their legal work?

**Edelson - Direct by Wade-Scott**

1  A.  I'm sorry.  I didn't hear you.

2  Q.  What was your impression at the time of their legal work?

3  A.  My understanding of them was that they were really good

4  trial lawyers.  They had -- there were really like three firms

5  in the country that kind of had their reputation in terms of

6  personal injury work, and they -- they were one of those three

7  that kind of did the top work.  And I base that knowing not

8  just the cases they had but the results they got.  They were

9  willing to take cases to trial, and their settlements were --

10  were really good in my estimation.  So that was my sense of

11  kind of -- of their -- their legal abilities.

12  Q.  Last on this, what were your impressions of Tom Girardi

13  specifically at the time?

14  A.  I did not like the man.

15  Q.  Why was that?

16  A.  He -- I mean, he was someone who was very familiar to me

17  in terms of -- of lawyers I had worked with.  I started at --

18  in big law and I knew some lawyers who were just kind of --

19  they -- they weren't in modern times.

20        The way he spoke at that meeting was not something

21  that was appropriate in my mind.  I thought he was -- he

22  was -- he was just very crude, and I did not -- I didn't like

23  him personally.  He -- he was -- everything was about kind of

24  his ego and narcissism.  And, you know, we went to Morton's

25  and he had his name on the menu.  It just was not the type of

**Edelson - Direct by Wade-Scott**

1   person who -- who I would associate myself with personally.

2   Q.  If that's true, why did the Edelson firm get involved in

3   Lion Air?

4   A.  Well, my understanding of their firm was that Tom -- Tom

5   added a lot of value in terms of his name, but I did not

6   understand him to be a working lawyer in the sense that he was

7   going to court or was going to be involved in the Lion Air

8   cases.

9           So David and Keith -- my -- my sense of the firm was

10  that it was -- it was those people, the David and Keiths who

11  were really running the firm.  They were doing all the work.

12  And I was very comfortable working with them.  If -- if they

13  had told me that Tom was going to be at a mediation, for

14  example, I -- I would not have wanted to work with them on the

15  case.  But I did understand that the name of his firm added

16  value to the clients.  So I was okay with that -- with that

17  kind of bargain.

18  Q.  At the time you were first meeting with the firm, were you

19  concerned about Mr. Girardi's ethics in any way?

20  A.  No.  No.  He was just someone who wasn't my type of

21  person, but I didn't have any issue -- I had no reason to

22  think that -- that he had any ethical issues.

23  Q.  And did you get the impression at this point that

24  something bad would happen to the Edelson firm if you angered

25  Mr. Girardi in some way?

**Edelson - Direct by Wade-Scott**

1    A.   If -- if I angered Tom?

2    Q.   Yes.

3    A.   I was not concerned about that.  I was not -- I -- there

4    was never a moment in my life that I was scared of anyone like

5    Tom Girardi.

6    Q.   At the outset of the Edelson firm's involvement in

7    Lion Air, what was your role?

8    A.   So our firm was local counsel.  Ari Scharg, who -- who I

9    believe will testify later, was -- was kind of the point

10   person for our firm.

11          My role at the firm often is to be available, to add

12   value when I come on cases.  So there's certain cases which

13   that is my case and I'm assigned to it and, you know, I'm

14   involved in every aspect of it.

15          There are other cases where -- kind of any case in

16   the firm, if there's any sort of issue or someone thinks I can

17   add value in a certain way -- show up to a mediation, help

18   with a complicated legal issue -- I will do that.  That was

19   kind of more my role with Ari where I was definitely tracking

20   the cases from the beginning.  I was very interested in -- in

21   it because I thought it was very important to the clients.  We

22   hadn't handled an aviation case before.

23          And so I also thought, you know, this was -- this was

24   something I should have more insight into.  And so my role

25   ended up being -- before everything just, you know, went

**Edelson - Direct by Wade-Scott**

1  sideways, my role was to help with a couple of the trickier

2  legal issues, and then I was at the first two mediations.

3  Q.  What were some of the tricky legal issues you were

4  involved in?

5  A.  There was the issue of the Lion Air release, which I think

6  the Court's heard testimony about.

7      And then the other issue, which was kind of the key

8  issue to me in the case, was choice of forum, choice of law.

9  The clients would -- their -- their claims, in my mind, were

10 worth significantly less if the case were decided under

11 Indonesian law.

12 Q.  Did you attend any of the mediations in the case?

13 A.  Yes.  As I testified, I -- I was at the first two.

14 Q.  What happened at the first mediation?

15 A.  It was an interesting scene.  They started with -- Boeing

16 basically gave a presentation to all the plaintiffs' counsel.

17 So it wasn't just the Girardi firm and our firm there.  It was

18 a lot of other plaintiffs' firms there as well.  I can't tell

19 you if it was every plaintiffs' firm involved, but it was a

20 whole group and they wanted to make a presentation.  And their

21 general counsel clearly felt she had a silver bullet, and her

22 silver bullet was that Lion Air had gotten people to sign

23 releases.  And that was her presentation.

24 Q.  Did you speak to that issue at all at the first mediation?

25 A.  I spoke in that -- in that common area.  I waited for a

**Edelson - Direct by Wade-Scott**

1   second to see if anyone else was going to speak, and when

2   nobody did, I spoke up and I explained that that was a very

3   dangerous issue for Boeing to push because beyond that it was

4   disgusting, it raised a lot of questions about Boeing

5   specifically.

6           So I asked a number of pointed questions.  I wanted

7   to know was Boeing involved in this?  Did Boeing understand

8   that some of the people were represented by counsel?  I think

9   out of the three or four questions, they responded by shutting

10  down that part of -- they said, "We're not answering any more

11  questions.  Let's just move to separate rooms and try and

12  negotiate separately."  So I felt like I had been effective on

13  that issue.

14  Q.  Once the mediation moved into separate rooms, what

15  happened next?

16  A.  They -- they made what -- what I viewed as a very lowball

17  offer.  I want to be clear.  When I say "I," I don't want to

18  make it seem like -- like I had a different view than anybody

19  else.  I'm giving my thoughts, but the room -- we were all

20  totally side by side in terms of our view.  David, Keith, Ari,

21  and I all viewed it -- what -- what seemed clear what was

22  happening was they were trying to offer small amounts of money

23  to pick off the low-hanging fruit.

24          There -- there are people in the plaintiffs' bar who

25  are incentivized to take or recommend very bad deals at the

**Edelson - Direct by Wade-Scott**

564

1   beginning so they can sign up more clients.  So they go and

2   they say, Mr. Person in Indonesia, we just settled for X

3   amount, your attorneys can't get you anything, come to our

4   firm.

5           And in our room we kind of were -- understood that --

6   that Boeing might be trying to take advantage of that.  Nobody

7   in our room had any interest in that.  We didn't even make a

8   counter.  The idea was they're not here to settle for a real

9   number yet.  They'll get there, but they want to pick off the

10  other people first.  So if -- if I'm remembering correctly, we

11  didn't even make a counter.  We -- we just said, you know,

12  you -- you need to bring back more money.

13  Q.  Was there pressure from Mr. Lira and Mr. Griffin at that

14  time to take what you've characterized as a low offer?

15  A.  No.  They -- there was nothing at all.  There was no angst

16  from them in the room.  There was no pushback.  We were all on

17  the same page.  We all saw it the same way.  In my -- and that

18  was my understanding.  I can't tell you what was in their

19  heads, but that's how I took it.

20  Q.  Did you attend any subsequent mediations in the Lion Air

21  case?

22  A.  Yes.  There was a -- I went to the second mediation.

23  Q.  What happened at the second mediation?

24  A.  The second mediation, it was somewhat similar in that they

25  were giving what I thought -- what I think we all thought were

1    very lowball offers.

2         One thing that was different was they were really

3    insistent on doing what's called -- what -- this is an awful

4    term for it, but the term of art is an "inventory settlement."

5         An inventory settlement is a case where a defendant

6    settles with the -- with all the cases that are being

7    represented by a plaintiffs' attorney or a group of

8    plaintiffs' attorneys.  So Boeing was very insistent.  They

9    wanted to settle all like that.

10        I -- I don't like inventory settlements.  I don't

11   think that they're unethical, but I think that they -- they

12   create a lot of problems, and I -- I think they're unfair

13   because if you make a rule of law for -- it's -- it's hard

14   with individual plaintiffs, you might have different risk

15   tolerances or different views.  A plaintiff might say, "Money

16   isn't the most important thing; I want justice."

17        So I believe, if I'm remembering correctly, Ari and I

18   actually spoke separately with the Boeing attorneys to try to

19   urge them that we've got to -- we've got to negotiate on -- on

20   a per family or per person basis, that we should not be

21   negotiating on -- on a global or inventory basis.

22   Q.  Did the clients who were represented by the Edelson firm

23   and the Girardi Keese firm eventually resolve the cases at any

24   of these mediations?

25   A.  Yes.  So --

Edelson - Direct by Wade-Scott

1    Q.  How did that --

2    A.  Well, twice actually.  So at the third -- so I did not go

3    to the third mediation, but I was still paying attention to

4    it.  I was still getting reports.

5         So at the third mediation, we reached an inventory

6    deal.  So they agreed to pay X amount of money.  And -- and

7    the idea was then -- and this was really in -- in the

8    Girardi's bailiwick, but they were going to have it allocated

9    with a private -- with a former judge who would help allocate

10   it within the families.  That was the third mediation.

11   Q.  And then what happened?

12   A.  Then -- then I found out that -- that Boeing had re-raised

13   the -- the Lion Air releases and said, hold on, some of

14   your -- some of your clients have signed these Lion Air

15   releases and we want to renegotiate those on behalf of -- I

16   think it was -- I think it was seven families that they

17   thought were implicated with the Lion Air releases.

18        Our position was we've already settled this.  Their

19   position was, no, that's not true.  It was all contingent on

20   there not being these Lion Air releases, and so they wanted to

21   renegotiate on that basis.

22   Q.  Did you view the ultimate settlement as an inventory

23   settlement?

24   A.  Yes, it was, in -- kind of with -- with a hiccup.  We --

25   we then did settle with the other seven cases.  And so, yes,

**Edelson - Direct by Wade-Scott**

1   the whole thing settled.  There -- there was one -- one client

2   who was poached, but the settlement was an inventory

3   settlement in my mind.

4   Q.   There were a number of steps required to finalize these

5   settlements; is that right?

6   A.   Yes.

7   Q.   Were you aware that individual family releases had to be

8   drafted and executed?

9   A.   That individual -- yeah.  So individual -- the individual

10   settlements had to be drafted, translated into Indonesian, had

11   to be signed for the minors, had to be approved by the Court.

12   I may be missing steps, but that -- that's what comes to mind.

13   Q.   After the inventory settlement had been reached, did the

14   finalizing process for the individual families happen quickly

15   enough in your view?

16   A.   No.

17   Q.   What were the obstacles, in your understanding?

18   A.   The technological obstacles, based on the Girardi firm,

19   seemed to -- seemed to be what was delaying things.

20   Q.   When you say "technological obstacles," what do you mean?

21   A.   So I -- I want to be careful because I don't want to make

22   it seem like I'm insulting anybody here because -- because I

23   do believe that their firm -- they're -- they're good lawyers,

24   you know, kind of in a narrower sense.  I'm putting aside

25   everything we know now.

**Edelson - Direct by Wade-Scott**

568

1          They -- they were not a modern firm, so what we --

2     what we found out, the -- kind of the most jarring thing, Ari

3     was sent an e-mail from I believe David -- and I hope you'll

4     correct me if I'm wrong.  I believe it was David saying, "We

5     got a settlement agreement from" -- "from Boeing's attorneys,

6     and we want to redline it.  What is the program we need to" --

7     "to download in order do redline on Word?"

8          That is something which it -- that was fairly

9     shocking to me, that they -- and -- and anyone who understands

10    kind of word processors in general, let alone Microsoft Word,

11    which is what most people use, knows that redline is just --

12    it's built into the system, and they seemed not to understand

13    that.

14         But that was kind of -- that wasn't -- that wasn't

15    inconsistent with my view of their firm in general.  It was --

16    it was -- I definitely understood that -- that they

17    wouldn't -- that Tom wouldn't know that.  I was a little

18    surprised that David and Keith wouldn't know that, or at least

19    David.

20         And then the other thing was it seemed like they --

21    they weren't aware of Google either because if you really

22    didn't know how to -- how to redline a Word document, you

23    would type that into Google and figure that out.

24         MR. SABA:  Objection.  Speculation, Your Honor, and

25    lack of foundation.

1      THE COURT:  Overruled.  You know, I'll consider it

2  for its worth.

3      Go ahead.

4  BY MR. WADE-SCOTT:

5  Q.  Very quickly I'm going to show you Exhibit 175.

6      THE COURT:  What exhibit was it again?

7      MR. WADE-SCOTT:  This is Exhibit 175, Your Honor.

8  This is one of the things we added to the binder.

9      THE COURT:  Okay.

10  BY MR. WADE-SCOTT:

11  Q.  Mr. Edelson, is Exhibit 175 the e-mail you were referring

12  to a minute ago?

13  A.  Yes.  And it was -- it was David that Keith cc'd, correct.

14  Q.  Other than these kind of technological competency issues,

15  were there any other issues that were raising eyebrows for you

16  at the time that the firms were trying to finalize these

17  settlements?

18  A.  I didn't know if there was about to be an objection.  I'm

19  sorry.

20      THE COURT:  No.  Go ahead and answer.

21  BY THE WITNESS:

22  A.  You'd have to -- you have to give me some time frame.  As

23  we know, there were a ton of issues.  So there -- we were

24  hearing from them that -- that there were issues getting the

25  documents translated.  That was, I think, the first thing that

**Edelson - Direct by Wade-Scott**

1   we heard.

2   BY MR. WADE-SCOTT:

3   Q.  At the time you were trying to finalize these settlements,

4   were there any ethical issues that were concerning you at the

5   time?

6   A.  Yeah.

7           MR. SABA:  Vague as to time.

8           MR. WADE-SCOTT:  Sure.

9   BY MR. WADE-SCOTT:

10  Q.  In the -- in the period between, let's say, January and

11  April, were there any ethical issues that were concerning you

12  at the time of 2020?

13  A.  No.  The -- no.  The things I disagreed with them about I

14  didn't view as ethical issues.  I thought we should have had

15  more time urgency, but, no, I -- I didn't see any ethical

16  issues.

17  Q.  You're aware that the coronavirus pandemic started in

18  force in the United States in early 2020?

19  A.  The -- yeah, I think in -- in March is when everything

20  started shutting down.  That's when -- if I'm remembering the

21  dates right, that's when we shut our two offices down, right

22  before the cities directed everybody to do so.

23  Q.  You said that the Edelson offices were shut down.

24          How else was that affecting -- how else was the

25  coronavirus pandemic affecting Edelson's operations in March

Edelson - Direct by Wade-Scott

1    of 2020?

2    A.   When we're -- so we kind of made our bones doing

3    technology work initially.  So we consider ourselves to be on

4    the cutting edge.  So it was not an issue to us.  And we -- so

5    we were remote at that point.  Nobody was in the office.

6    Maybe there was someone coming every so often to pick up mail,

7    but we did not have any issue communicating through Zoom or

8    Google Hangouts or any of the different ways, FaceTime, phone

9    calls, even e-mails.  That was not an issue for us.

10        And more generally, we're obviously very concerned

11   about -- about the people in our firm and also the people I

12   worked with.  It was a scary time.  I -- I got -- I got the

13   coronavirus in March, and it was -- it was not pleasant at

14   all.  So virtually all of our conversations at that point

15   started with, "Are you okay?  Is your family okay?"

16   Q.   Did you have any visibility into how the pandemic was

17   affecting Girardi Keese's ability to operate?

18   A.   So my -- my sense of them was that, again, they were like

19   stuck in the '70s and that this -- there were a number of

20   firms which I just didn't understand how they were going to

21   fully function, and they -- they were in that group.

22        So my sense was that they were going to need some --

23   some extra help with kind of basic competency things.

24        And I don't mean that in terms of like lawyer

25   competency.  I just mean in terms of like how to use the

**Edelson - Direct by Wade-Scott**

1  Internet and how to get things translated and how to -- how to

2  get things signed.  I always pictured them as they would do

3  best if they were huddled in an office together with lots of

4  stacks of paper.  And if that -- if that wasn't there,

5  you know, my sense was that was going to make it harder for

6  them.

7  Q.  Back in March of 2020, how was the pandemic affecting

8  pending cases that Edelson had?

9       MR. SABA:  Relevance, Your Honor.

10      THE COURT:  Overruled.

11      Go ahead.

12  BY THE WITNESS:

13  A.  The -- so state courts were fairly shut down.  Federal

14  courts were generally more active.  But -- but there -- there

15  was kind of a COVID defense brought -- brought into anything

16  we filed.  We filed a privacy class action against a hospital,

17  and their first defense was, "We can't even begin thinking

18  about privacy issues, we're saving lives, COVID."

19      Defense attorneys -- and I'm not attacking them for

20  that -- generally were saying we need more time because

21  there's a sickness in our -- in our family or in our firm or

22  our operations aren't as modern.

23      So that was something that we were dealing with

24  and -- and thought those were -- I didn't think the hospital

25  argument was appropriate, but the day-to-day arguments by --

**Edelson - Direct by Wade-Scott**

1  by lawyers of, you know, trying to deal with a sick parent was

2  obviously very relevant to us.

3  Q.  Last question on this.

4       Did the pandemic and its effect on the courts make

5  you feel like you couldn't file something with the Court in

6  the spring of 2020?

7  A.  Something like along these lines, of like what we filed?

8  Q.  Sure.

9  A.  Absolutely not.  It would have -- there would have been --

10  we would have avoided kind of more routine filings or

11  something; but something of this importance, that wouldn't

12  have been any concern to us at all, COVID or no COVID.  We

13  knew the Court would hear that.

14  Q.  Returning to finalizing the settlements in the spring of

15  2020.  Were you initially involved in the process for

16  translating the releases?  For instance, in getting them

17  executed by the clients?

18  A.  When you say "you," do you mean me personally or my firm?

19  Q.  You, Jay Edelson.

20  A.  No, that's not something that I would add a lot of value

21  to.

22  Q.  Was the firm involved?

23  A.  The firm -- this was -- this was the Girardi's part of the

24  case.  So what our -- what we did was we tried to make

25  ourselves available to help out.  So we felt like there could

**Edelson - Direct by Wade-Scott**

1    be a gap here.  And the message I had to Ari was, look,

2    anything we can do, we're happy to take over because this

3    virtual world we're living in or this remote world is not

4    scary to us.  So let's -- let's offer to do as much as

5    possible.  Again, my understanding is Ari did make those

6    offers.

7    Q.  Did you ever get personally involved with Girardi Keese

8    trying to finalize the settlements?

9    A.  I sent -- I sent an e-mail at one point to I believe

10   David.  It probably was David and Keith.  This had to do with

11   what we were being told was that Boeing was not -- was not

12   funding the settlements until all of them were signed.  And I

13   thought that I could add particular value in speaking to

14   Boeing about that.

15   Q.  I'm going to show you what's been marked as Exhibit 107.

16        MR. WADE-SCOTT:  There's one number in here that's

17   arguably confidential, but I will scroll to the

18   nonconfidential part first.

19        THE COURT:  Okay.  So we can put this up on the

20   screen?

21        MR. WADE-SCOTT:  It can go up on the screen.

22        THE COURT:  All right.

23        MR. WADE-SCOTT:  That was a long explanation,

24   Your Honor.

25   BY MR. WADE-SCOTT:

**Edelson - Direct by Wade-Scott**

1  Q.  At the bottom of 107-3, do you see there's an e-mail from

2  you to a number of people?

3  A.  Oh, yeah.  I didn't realize Jake was on that, too, yes, to

4  Jake who is another partner at the firm and David and Keith.

5  Q.  And Mr. Balabanian, Mr. Scharg, and Mr. Richman are

6  copied?

7  A.  They were copied, correct.

8  Q.  Is this the e-mail you were referring to a minute ago?

9  A.  Yes.

10  Q.  At this point, was it your understanding that Boeing had

11  funded any of the settlements for the clients represented by

12  the Girardi Keese and the Edelson firm?

13  A.  No, my understanding was that they were not funding any

14  settlements with regard to our collective cases.

15  Q.  What was the purpose of this e-mail that you sent at the

16  bottom of 107-3?

17  A.  Well, I was getting very anxious because this was all

18  taking so long.  There were kind of rumors that Boeing might

19  be -- might be forced into bankruptcy.

20      Also, just part of my view is when you settle a case,

21  you close it out.  You never know what's going to change.  You

22  never know if the Court is going to issue some sort of order

23  transferring all these cases to Indonesia and then Boeing

24  says, aha, we don't like this deal anymore.  Plus we're

25  talking about families that really needed their money.

**Edelson - Direct by Wade-Scott**

1    So I was feeling very anxious.  And my take, although

2  it was clearly wrong, was that the delays were more in terms

3  of competency issues at the -- at the Girardi Keese firm.  So

4  in the e-mail, we say, yes, we've been pestering you.  Here's

5  the reason that we're anxious.  Whatever we can do to help

6  logistically we will take on, and can I please talk to Boeing

7  about -- about their refusal to fund the settlements because

8  that position is not proper.

9    THE COURT:  So as of May 12th, this e-mail indicates

10  you were not aware that there had been funding already?

11    THE WITNESS:  No, Your Honor.

12    THE COURT:  Because the timeline indicates, and I'm

13  sure you've seen it, that funding at least for four of these

14  had taken place in -- toward the end of March -- well, one

15  March 11th, one March 27th, one March 30th, and one April 2nd.

16    You were not aware of that?

17    THE WITNESS:  No, they were telling us the opposite,

18  Your Honor.

19    THE COURT:  All right.  Was one of your partners

20  telling you this?

21    THE WITNESS:  Yes.  Yes.  I should be more precise.

22  I was not speaking to them on the phone.  So I was getting

23  updates from Ari at the time, and Ari was saying that they

24  weren't -- that what he was hearing from David and Keith was

25  Boeing wasn't going to fund anything until everything was

**Edelson - Direct by Wade-Scott**

577

1    signed.

2              THE COURT:  Okay.

3              Go ahead.

4    BY MR. WADE-SCOTT:

5    Q.  Are you aware of any communications to anyone at the firm

6    before May 12th notifying the firm, Edelson, that the

7    settlements had funded?

8    A.  No.

9    Q.  Why was it believable -- I mean, you testified you

10   believed the sums had not been funded.  Why was it believable

11   that was true?

12   A.  So the -- this is why I don't like inventory settlements

13   in general, where if a defendant is saying we are settling

14   this block of cases, then often they take a position of we

15   want to make sure that everyone is signed off before we pay

16   any of the money.

17             That's what I wanted to talk to Boeing about or

18   Boeing's lawyers.  I definitely -- I didn't view Boeing as

19   kind of a paradigm of virtue.  I heard their arguments about

20   the Lion Air releases and I saw the positions they were

21   taking.  I did and I still believe Perkins Coie to be an

22   honorable firm.  And I wanted to explain to them that even if

23   in their mind it was an inventory settlement, there were

24   specific settlements that were signed and they had to -- they

25   had to pay on them.

**Edelson - Direct by Wade-Scott**

1    And I also wanted to explain to them that there was

2    nothing untoward going on.  Sometimes defendants think that

3    you're playing games where you grant an inventory settlement

4    and then pull a couple of people out, try to like hit home

5    runs or something.  This isn't anything we would do.  But I

6    felt like I had credibility with Perkins Coie and I could

7    explain to them that we weren't playing any games, that our

8    goal was to get everyone signed, and I thought that that would

9    solve the issues.

10   Q.  Did you have any visibility into who was driving the

11   inventory or global component of this settlement?

12   A.  Yes.  And I was -- thank you for saying that because I was

13   actually a little unfair to Boeing which I can't believe I'm

14   saying publicly.  But it was their insurance company.  That's

15   what was explained to us during the mediations.  The insurance

16   company was saying it's got to be an inventory settlement.

17   So, right, my -- that's a good clarification.  Thank you.

18   Q.  Has it ever happened in your practice before that a

19   defendant or a defendant's insurer would delay settlement

20   payments?

21   A.  Yes.  That happens unfortunately all the time.

22   Q.  Are there any specific examples that you can think of?

23   A.  The -- sure.  We represented -- it relates to this mess.

24   After -- after we filed the rule to show cause and the Girardi

25   firm was imploding, we were helping some clients out on a

1    *pro bono* basis.  There was a man, Mr. Abikzer, who had a

2    $20 million settlement with the City of L.A.  He's paraplegic.

3    And --

4            MS. MATTHAI:  Your Honor, I'm going to object to

5    this.  I think this is not relevant and it exceeds the scope.

6            THE COURT:  Yeah, I don't understand the relevance of

7    this.  If you can explain it, please do; but, otherwise, let's

8    stick to the issues in the case.

9            MR. WADE-SCOTT:  Sure.  I can move on.  We were just

10   discussing this because I think the Court maybe had a question

11   about why we believed this.

12           THE COURT:  Why you what?

13           MR. WADE-SCOTT:  Why the Edelson firm believed that

14   the settlements had not been funded.  I can move on from here,

15   but that --

16           THE COURT:  Well, I think Mr. Edelson has testified,

17   in the past, defendants and insurers have delayed payment.

18   That's sufficient.  I don't need examples unless a challenge

19   is made to that on cross and then examples can be set forth at

20   that time.

21           MR. WADE-SCOTT:  I'll move on, Your Honor.

22           THE COURT:  All right.

23   BY MR. WADE-SCOTT:

24   Q.  Getting back to this e-mail at the bottom of 107-3, what

25   were you trying to accomplish with this May 12th e-mail?

**Edelson - Direct by Wade-Scott**

1    A.  I apologize.  I feel like I've testified to that.  The --

2    not giving you a hard time, Eli.

3            We were saying -- we were trying to accomplish, you

4    know, getting across that we are a resource where we can be

5    helpful.  So, you know, you need us to grab water bottles for

6    you to help get these things finalized, we're here.  Tell us

7    what we can do.  And then I thought I could add some value in

8    speaking to Boeing directly, as I testified to.

9            MR. WADE-SCOTT:  I think we're going to hit the

10   confidential number so if we can go off the public feed for

11   just a moment.

12           THE COURT:  All right.

13   BY MR. WADE-SCOTT:

14   Q.  Do you see Mr. Griffin's --

15           MR. WADE-SCOTT:  Actually we did not hit it.  I

16   sorry.  Just to flag what's going to happen in this thread,

17   there's a discussion about a poached -- a phrase that's going

18   to be used here, "a poached client," and as you can see,

19   someone asked, "How much more does she want?"  And that number

20   comes up.  We don't represent that person any more, so I'm

21   inclined to show that number to everyone.

22           THE COURT:  All right.  That's fine.

23           MR. WADE-SCOTT:  So I will leave this as public for

24   right now.

25   BY MR. WADE-SCOTT:

**Edelson - Direct by Wade-Scott**

1  Q.  Do you see Mr. Lira's response also on May 12th starting

2  at the bottom 107-2?

3  A.  Yes, I do.  I apologize.  Yes, he responded to my e-mail.

4  Q.  What did you make of that response?

5  A.  I felt it was reassuring.  It sounded like they -- that

6  they were on top of it.  They had -- they gave us six things.

7  Five of the six made perfect sense to me.  And what I took was

8  that they were saying, we got this.  We don't need your help.

9  We're in control here and we are not struggling.  We're not

10  incompetent.  I mean, they weren't saying that because I

11  wasn't accusing them of being incompetent, but that was in my

12  head.  You know, we're good.

13  Q.  You said five of the six things were believable.  Which

14  one didn't make sense?

15  A.  This -- when he -- about -- No. 6, if Boeing filed BK,

16  which won't happen, the settlement funds are all insurance

17  monies.  That, to me, wasn't terribly convincing because if a

18  company goes bankrupt, even if there's insurance, there could

19  be big fights.  Insurance is not unlimited.

20          But it didn't matter because under 5 they said the

21  Boeing lawyers have the settlement funds in their trust

22  account.  So that was more reassuring than this idea that they

23  would know what would happen if Boeing went bankrupt.

24          THE COURT:  So you understood that to mean that

25  Perkins had the money?

Edelson - Direct by Wade-Scott

1        THE WITNESS:  Yes.

2        THE COURT:  Okay.

3        THE WITNESS:  Correct.

4        MR. WADE-SCOTT:  If we can go off the public feed for

5  just a minute so I can scroll past the number.

6        THE COURT:  All right.

7  BY MR. WADE-SCOTT:

8  Q.  There's a few more e-mails back and forth concerning the

9  client that did not want to sign her individual release,

10  right?

11        I'll scroll up.  Sorry.  You can't see that.

12        On May 12th at 10:43, and then Mr. Lira responds

13  again on May 12th at 12:47.  Do you see that?

14  A.  Yes.

15  Q.  And then you follow up again on May 12th.

16        MR. WADE-SCOTT:  And I've scrolled past the

17  confidential number so we can go back on.

18        THE COURT:  All right.

19        THE WITNESS:  Yes.

20  BY MR. WADE-SCOTT:

21  Q.  What were you trying to accomplish with this e-mail that's

22  at the bottom of 107-1 and continues on to 107-2?

23  A.  So this, again, goes back to why I don't like inventory

24  settlements.

25        So my understanding from David, I believe it was

**Edelson - Direct by Wade-Scott**

1   David, you went quickly, but I believe it was David who said

2   we've got a client who's poached.  And my sense was, okay, you

3   know, this is going to make things harder to get Boeing to

4   release all of the money.

5          And so I asked, again, can I speak to Boeing and let

6   them know -- this might sound strange, but I wanted -- I

7   wanted them to understand that our firm and the Girardi firm

8   wasn't involved in this kind of -- in some sort of fake

9   poaching, like that we were, again, taking someone out of the

10  settlement to try to hit a home run.  And I thought that

11  voice-to-voice conversation, that they would understand that

12  we were doing everything the way we should and that they --

13  they could not take this position because we had individual

14  settlements that were signed.  And I thought that that would

15  actually be a fairly easy call with the Perkins lawyers based

16  upon our relationship with them.

17  Q.   What was Mr. Lira's response to that?

18  A.   He -- we've got it here.  He says -- I can read it to you.

19  Q.   What did you understand the point of Mr. Lira's e-mail to

20  be at the bottom of 107-1?

21  A.   He's saying he's got this, that, you know, it's -- what I

22  understood was that practically there was a quicker solution

23  than trying to convince Boeing or Boeing's insurer to do the

24  right thing, which was everything's coming in.  And, again, I

25  got this.  We don't -- we don't need your help.

**Edelson - Direct by Wade-Scott**

1   Q.  You testified earlier that you believed that the

2   settlements for the clients had not yet been funded, right?

3   A.  Yes.  Correct.

4   Q.  Anything about Mr. Lira's e-mail correct that

5   misconception?

6   A.  No.

7   Q.  And then Mr. Balabanian sends an e-mail on May 15th.

8   That's also on 107-1.  Do you see that?

9   A.  Yes.

10  Q.  Why was Mr. Balabanian involved at this point?

11  A.  What's the date here?

12  Q.  That's May 15th.

13  A.  So -- so first -- do you mind if I back up a second?  I

14  apologize.  Let me answer your question.  I don't want to be a

15  lawyer and a witness.  So take that back.  The question was

16  why was -- why was Rafey involved?

17  Q.  Yes.

18  A.  This was -- so this was hitting my radar a lot more.  I

19  was getting nervous, you know, because of the potential

20  bankruptcy and stuff we talked about.

21          Rafey is -- he's the global managing partner of the

22  firm.  He is kind of my lieutenant.  And if there is something

23  going on, I like to bring him involved especially when it's,

24  you know, trying to get answers from people.  He is often

25  better at that than I am.  People often just shut down when I

**Edelson - Direct by Wade-Scott**

585

1  start asking pointed questions.

2  Q.  Were you speaking with Mr. Balabanian about these

3  settlements in mid-May?

4  A.  Yes.  Yes.  This was very much on the radar of our firm

5  of, you know, we got to get these people their money.

6  Q.  Do you see Mr. Balabanian's response on May 15th?

7  A.  Yep.

8  Q.  What was your impression of his response?

9         MS. MATTHAI:  Objection.  Lack of foundation.

10  Relevance.  I'm sorry.  Lacks foundation and relevancy.  His

11  impression of an e-mail.

12         THE COURT:  Overruled.

13         You can cross on it if you think there's no

14  foundation for it.

15  BY THE WITNESS:

16  A.  Yeah.  It's the same thing, that he's saying -- the way I

17  read it is, can we get them to release the money for the

18  people who have signed releases.  We can't have this one

19  holdout and then they say we're not really seeing any money.

20  So he was trying, yet again, can we please speak to Boeing.

21         And then the reference to the name, I believe that

22  was the client who was poached; is that correct?  I'm sorry.

23  I shouldn't --

24  BY MR. WADE-SCOTT:

25  Q.  I can't tell you.

**Edelson - Direct by Wade-Scott**

1    A.   Sorry.

2              THE WITNESS:  I apologize, Your Honor.

3              THE COURT:  So I'm clear, on May 15th, you didn't

4    believe the settlements had been funded, correct?

5              THE WITNESS:  Correct.

6              THE COURT:  And this is for the -- how many clients?

7              THE WITNESS:  For all of them.

8              THE COURT:  Number wise.

9              THE WITNESS:  Oh.  11.

10             THE COURT:  All right.  And you didn't differentiate

11   anyone there between the ones that were for minor settlements

12   versus non minor settlements.  It's all 11 of the clients that

13   you jointly had with Girardi Keese you believed, as of May 15th,

14   there had been no funding of any settlements?

15             THE WITNESS:  Correct.

16             THE COURT:  When did you believe there had been an

17   allocation, in other words, the settlement's arrived at even

18   if Boeing hadn't settled -- hadn't funded them?

19             THE WITNESS:  So I don't have the date off the top of

20   my head.  Ari would know that better than I did.  But the

21   allocation would have been before this.

22             THE COURT:  Sure.  But how far in advance?  Do you

23   have any idea?

24             THE WITNESS:  I would be guessing and I don't know.

25             THE COURT:  Okay.

**Edelson - Direct by Wade-Scott**

587

1          THE WITNESS:  And I believe there were kind of two

2   allocations because -- because they -- Boeing renegotiated

3   seven based on this Lion Air release.

4          THE COURT:  All right.

5          THE WITNESS:  But I'm kind of guessing as to what I

6   know.

7          THE COURT:  All right.  But if there were two

8   allocations, did you believe that what you're talking about

9   here in this e-mail was the second allocation or the entirety

10  of any allocation?

11         THE WITNESS:  The entirety.  We viewed this as all

12  one inventory settlement that was done with this little

13  kink --

14         THE COURT:  All right.

15         THE WITNESS:  -- were there to be a readjustment.

16         THE COURT:  All right.

17         Go ahead.

18  BY MR. WADE-SCOTT:

19  Q.  Mr. Lira responds, "Rafey, we are good.  Executed releases

20  are coming in.  David."

21         Did you take that to mean you should call Boeing?

22  A.  No.  I took that as he's saying, again, I've got this.

23  You guys are being annoying.  You guys are local counsel.  We

24  got this.  We don't need your help.  Everything's fine.

25         THE COURT:  Did you have any reason -- let me

                    **Edelson - Direct by Wade-Scott**

1    rephrase.

2            Did you feel you couldn't call Boeing if you wanted

3    to?

4            THE WITNESS:  The -- I mean, practically, of course

5    we could call Boeing.  You know, I knew their numbers.  I knew

6    who they were.

7            One of my big views is that when you're working with

8    other firms on cases, which we do a lot, is the people have to

9    speak with one voice.

10           So we generally are not in the subservient position

11   of cases.  We're generally the lead.  And our view is lead

12   counsel speaks unless they delegate it to somebody else.  And

13   there's a lot of reasons for that which is that we may not

14   know everything, and having some sort of jumbled communication

15   or sending the message that there's a fracture within the

16   group is not a good idea.

17           So no, we weren't -- there was nothing legally

18   prohibiting us from doing that, and obviously I wish that we

19   had.  But practically our view was we're not going to -- we're

20   not going to step on toes and do something that could have

21   negative consequences.

22           I'm not defending -- you know, I wish I had spoken to

23   them.  I'm just telling you what was in my mind at the time.

24   BY MR. WADE-SCOTT:

25   Q.  At this point in mid-May, were you concerned that there

**Edelson - Direct by Wade-Scott**

 1   was anything inappropriate happening with the Boeing

 2   settlement funds?

 3   A.   Not by Girardi Keese.   I thought that the way that their

 4   insurance company was handling things was not appropriate, but

 5   no.

 6   Q.   Did you know at this point in mid-May that Mr. Girardi had

 7   lied to the clients about their payments?

 8   A.   No.

 9   Q.   Would that have changed things?

10   A.   Yes.

11   Q.   What would you have done differently?

12           MR. SABA:   Objection.   Speculation.   Lack of

13   foundation.

14           THE COURT:   Overruled.

15           Go ahead.

16   BY THE WITNESS:

17   A.   If -- so if we had seen the stuff that we saw like ten

18   days ago, I assume you're talking about, so the communications

19   with David and Keith and Tom where it was just clear he was

20   lying, I think we would have gone to the FBI right away.   We

21   would have gone -- I don't know.   I mean, that would have

22   been -- it's nothing I've experienced before.   We would

23   have -- we would have moved very quickly probably at a number

24   of fronts.   I would hope that we would have gone to the FBI

25   and the Court as soon as possible.

**Edelson - Direct by Wade-Scott**

1    BY MR. WADE-SCOTT:

2    Q.   Did you eventually hear that settlements for at least the

3    four plaintiff families had funded?

4    A.   So we heard -- first -- Keith had kind of a hint of that

5    where he said, "I'm not sure.  Tom knows.  But I think maybe

6    there had been partial payments."

7            MR. SABA:  Your Honor, objection.  Could we ask some

8    foundation of whether this witness was on the phone call?

9            THE COURT:  Sure.

10           Lay a foundation for the conversation if it's a

11   conversation with Mr. Griffin.

12           MR. WADE-SCOTT:  Sure.  If I could -- I'll lay a

13   foundation for --

14           THE COURT:  Or e-mail, whatever it was.

15           MR. WADE-SCOTT:  Yeah.  I'm going to lay a foundation

16   for maybe two calls.

17   BY MR. WADE-SCOTT:

18   Q.   Specifically when did you first learn that the settlements

19   had funded into the Girardi Keese client trust account, or at

20   least you were being told that?

21   A.   So -- so the -- Keith -- what I heard -- and just to be

22   clear, I was not on the phone with Keith or David at all

23   during these conversations.  So everything I knew was through

24   Ari and Rafey, Ari Scharg and Rafey Balabanian, or e-mails

25   that I was a part of.

**Edelson - Direct by Wade-Scott**

1        So first what I heard was that Keith was --

2        MS. MATTHAI:  Your Honor, I'm going to object on a

3   hearsay ground.  I understand that there may be a state of

4   mind issue, but I object for having this come in for the truth

5   of the matter stated.

6        THE COURT:  Well, again, as I said last time, it's a

7   little difficult to know who the adverse party is.  I'm going

8   to allow it in.  This is not a hearing before a jury.  It's

9   the nature of a rule to show cause hearing.  And I'm going to

10  allow it.  The weight I will give it will be made clear when I

11  make a decision.

12       So objection is noted, but it's overruled.

13  BY MR. WADE-SCOTT:

14  Q.  So you understand there was a call with Keith Griffin and

15  who else from the Edelson firm?

16  A.  That -- if I'm remembering correctly, that would have been

17  Rafey, but I'm not 100 percent sure of that as I sit here.

18  But I believe it was Rafey.

19  Q.  Are you aware of any other calls in June with either

20  Mr. Lira or Mr. Griffin where the settlement funds were

21  discussed?

22  A.  Oh, in June?  So I don't know.  You would have to refresh

23  my recollection.  I'm sorry.

24       THE COURT:  You had no conversations directly with

25  Mr. Lira or Mr. Griffin, correct?

**Edelson - Direct by Wade-Scott**

1    THE WITNESS:  At that time, I didn't.

2    THE COURT:  We're in the May/June time period?

3    THE WITNESS:  I only had one conversation with them,

4  and that was at the -- right before we filed.  And that was

5  with only Keith.

6    THE COURT:  This entire period, your only phone

7  conversation with either Mr. Lira or Mr. Griffin was right

8  before you -- right before December of 2020?

9    THE WITNESS:  Correct.

10    THE COURT:  All right.  And we'll get to that.

11    Any conversations with Tom Girardi from the time of

12  the settlement, three settlement conferences through today,

13  any conversations with Tom Girardi?

14    THE WITNESS:  Through today, yes.

15    THE COURT:  All right.  When did you have

16  conversations with Tom Girardi?

17    THE WITNESS:  After we filed the motion for rule to

18  show cause, not before.

19    THE COURT:  All right.

20    You intend to get to that in your outline?  Is that

21  in your --

22    MR. WADE-SCOTT:  I will get to it now, Your Honor.

23    THE COURT:  Either way.  I'd rather we do it in an

24  orderly fashion, but I'm just trying to siphon this a little

25  to -- or silo it a little.  We can get to that in the December

**Edelson - Direct by Wade-Scott**

1    time period since there's conversations with both Mr. Girardi

2    and Mr. Griffin.

3              Anything you heard about this then was through -- not

4    through Griffin or Lira, in the May/June/July period, it was

5    conversations with one of your partners or e-mails you were

6    copied on?

7              THE WITNESS:  The answer to that is correct.  I would

8    just say it a little differently which is I was getting

9    e-mails directly with David and Keith; but correct, orally

10   anything that was being said was being said to Ari or Rafey

11   and then communicated to me by Ari or Rafey or both.

12             THE COURT:  All right.  Well, I'll let you go through

13   the e-mails.  If you don't, I'm confident the attorneys for

14   Mr. Lira and Mr. Griffin are going to go through those

15   e-mails.  You can do it in an orderly fashion.  I don't want

16   to interrupt this.  But I just wanted to get the boundaries so

17   I know how the communications would take place in light of the

18   objection Ms. Matthai made.

19             So go ahead.

20             MR. WADE-SCOTT:  Understood, Your Honor.

21   BY MR. WADE-SCOTT:

22   Q.  I'm going to show you what's been marked as Exhibit 117.

23             Do you recognize Exhibit 117?

24   A.  Yes, I do.

25   Q.  This is a letter that Mr. Balabanian sent in July to

**Edelson - Direct by Wade-Scott**

1    certain people from Girardi Keese?

2    A.   Yeah.  This is a letter that I worked on with

3    Mr. Balabanian.  So it bears his signature, but it was

4    partially written by me as well.

5    Q.   Scrolling down to page 117-2, the paragraph here, "Several

6    more weeks passed with Ari."

7    A.   Yes.  Oh, yes.  Okay, I remember now.

8    Q.   Does this refresh your recollection about how the firm

9    learned that the settlements had perhaps been funded into the

10   Girardi Keese client trust account?

11   A.   Yeah.  So the two data points we got, one was Keith saying

12   "I think maybe, I'm not sure, I got to speak to Tom," and then

13   David leaving the firm.  And I had just forgotten the dates of

14   that.  But if I saw correctly, it was in the middle of June

15   where David said he was leaving the firm to join this other

16   firm and then kind of slipped in "The money has been funded.

17   The client money has been funded."

18   Q.   And then the call with Mr. Griffin, we established earlier

19   you were not on it, correct?

20   A.   Correct.

21   Q.   What did you understand happened on that call, if

22   anything?

23   A.   This is -- this is -- what did I understand happened on

24   that call?

25   Q.   I can ask it differently.  There's a description of that

Edelson - Direct by Wade-Scott

1    call at the bottom of 117-2.  Do you have any reason to think

2    that description is inaccurate?

3    A.  No, that's -- no.  That was my understanding.  That's why

4    we wrote that.

5    Q.  At this point, what was your role in following up on these

6    cases as compared to Mr. Balabanian's?

7    A.  So -- okay.  Mr. Balabanian has been described as the

8    general counsel of the firm.  That's accurate.  But the big

9    decisions of the firm, I'm involved in and I direct.  At this

10   point, this was something close to DEFCON 5 for us.  So this

11   was not something where I was deferring to Mr. Balabanian and

12   said, oh, you're general counsel, you figure it out.  My view

13   was what is going on and I took hold of that.

14          So the fact that we had Mr. Balabanian send a letter

15   instead of from me shouldn't -- shouldn't confuse anyone in

16   terms of kind of what my level of involvement or concern was.

17   Q.  Stepping back for a moment, on June 30th, there's the call

18   with Mr. Griffin.  What did the firm decide to do as a next

19   step after the call with Mr. Griffin?

20   A.  So we -- as I said, it was DEFCON 5.  Our thought was is

21   it actually possible that the money has been funded and the

22   clients haven't been paid.  So we started working on a motion

23   for rule to show cause, and that was kind of our next step.

24   Q.  What happened next?

25   A.  When -- in the process of that, when we were -- I use

**Edelson - Direct by Wade-Scott**

1    this -- I don't mean this in the technical sense, but as we

2    were re-interviewing people, specifically Rafey and Ari, and

3    trying to figure out what are the actionable statements that

4    were made that lead us to believe this, it was all mush.

5         So the motion that we were preparing, it was like --

6    I viewed it as a jello motion, that just nothing was sticky

7    there, that we didn't have the goods.

8         And then there was one other thing which was the big

9    issue for me, the missing piece of the puzzle which is that it

10   didn't make any sense to me.  My understanding of the firm was

11   that they had made hundreds of millions of dollars that -- and

12   more importantly -- so I'm not used to people who make that

13   amount of money and then spend it.  That's just not the world

14   I live in.

15        But more importantly, they also I knew had cases

16   where they were going to get hundreds of millions of dollars

17   of money in the future, specifically the Porter Ranch cases

18   and then the Las Vegas shooting cases.  And I don't remember

19   exactly where those cases were time-wise with this, but that

20   was in my mind.

21        The way plaintiffs work is these days if you have --

22   if you have cases like that, it's very easy to get litigation

23   funding.  So if the idea that they -- that they would steal a

24   couple of million dollars, which it's a large amount of money,

25   you know, without context, but for their firm, it just made

Edelson - Direct by Wade-Scott

597

1   absolutely no sense at all.

2           So that was the other thing that was -- that was

3   holding me back which it's just the story doesn't fit.

4   Q.  What did you decide to do instead?

5   A.  We decided -- so our firm is an investigation firm.  We

6   feel like we're different than a lot of other firms on the

7   plaintiff's side in that we develop our own cases.  We have

8   our own internal investigation team.

9           And so we got into investigation mode which is if

10  we're going to do this, if we're going to say that this firm

11  is stealing money from clients, we've got to have the goods.

12  And so that was our focus.  How do we nail this down so first

13  we're not wrong?  Because we didn't want to be wrong.  This is

14  going to sound crazy now, but we actually feel we have some

15  sort of moral duty to potential defendants that, when we file

16  something, we know it's going to have an impact on them.  And

17  I don't want to file something that's incorrect because it

18  does a lot of damage.

19          And then we wanted to make sure we had -- we had all

20  of the evidence or had enough evidence and could explain this

21  missing piece too.  So that was our focus which is let's nail

22  this down.

23  Q.  You testified earlier you were involved in sending the

24  July 10th letter, right?

25  A.  Yes.

**Edelson - Direct by Wade-Scott**

1    Q.  Was this one of the next steps the firm took in the

2    process you were just describing of trying to nail things

3    down?

4    A.  Yes.  Yes.  So we memorialized it.  We asked a number of

5    pointed questions.

6              THE COURT:  At any point during this investigation,

7    did you contemplate calling Boeing?  They would have told you

8    the funding had happened months earlier.  At any point between

9    July when you're conducting an investigation, as you

10   testified, and December, did you ever ask to get the

11   settlement documents which showed the funding had occurred in

12   March?  Did you look at the Court docket where it showed that

13   I had approved these settlements in March and April?

14             THE WITNESS:  Well, we knew that you approved the

15   settlements.  Under the order, there wasn't a requirement by

16   Boeing to pay by a certain amount of time if I'm remembering

17   the orders correctly.

18             THE COURT:  I think it was 30 days.

19             THE WITNESS:  30 days on the settlement agreement,

20   Your Honor.

21             THE COURT:  Right.

22             THE WITNESS:  But the order itself.  So I'm not

23   quibbling with Your Honor.  I was just trying to be precise.

24             So the -- so, first, we absolutely should have called

25   Boeing.  No question about that, and I own that.

**Edelson - Direct by Wade-Scott**

1    The thing that we thought was most likely happening

2  was that Girardi Keese was not interested in paying our fees

3  on time.  That was the most likely -- I'm a believer in

4  Occam's Razor which is the simplest answer is usually the

5  right one, and it did not make any sense to me that they were

6  stealing money from clients.  It did make sense that they

7  might want to delay paying us.  That happens in our business

8  all the time, and I'm sure that you've seen texts and e-mails

9  where Rafey is saying, if it's just about our fees, we're

10  fine, relax, you can just pay us later.

11    But yes, we should have -- we should have reached out

12  to Boeing.  There's 50 things we should have done.

13    THE COURT:  All right.

14    Go ahead.

15  BY MR. WADE-SCOTT:

16  Q.  You mentioned some questions in this letter.  Those are at

17  the top of 117-3, right?

18  A.  Yes.

19  Q.  Did the firm get any explanations -- the firm meaning

20  Edelson -- for why there were issues with getting money out to

21  the clients?

22  A.  Yes.

23  Q.  What were those explanations?

24    MR. SABA:  Vague as to time.

25    THE WITNESS:  Yeah, thank you actually.

Edelson - Direct by Wade-Scott

1  BY MR. WADE-SCOTT:

2  Q.  Sure.

3       After you sent the July letter.

4  A.  I'm not sure I'm totally tracking your question.  So

5  the -- so what I was told was that Rafey was then speaking

6  directly to -- to Tom Girardi.  And what was reported back to

7  me was that Tom had a brain tumor which was cancer related

8  behind his eye, was in the hospital, and that he was trying to

9  figure out kind of the logistics of where money was, but -- I

10  really thought -- I don't know what to believe anymore, but I

11  think that he wasn't lying about that.

12       But my picture was that he was kind of fighting for

13  his life.  At that time being in the hospital during COVID,

14  being, you know, an 80-plus-year-old man fighting cancer, that

15  that was very scary.

16  Q.  Did Mr. Girardi, as far as you're aware, explain to

17  Mr. Balabanian why the money hadn't been paid?

18  A.  What I was told by Mr. Balabanian was that he didn't know,

19  that he had to figure out the -- he had to figure out the

20  accounting and what kind of -- in my mind, it was people were

21  going to have to go and there were going to be boxes all

22  around and they were going to have to, like, sift out this

23  client, how much money, and where did it go.

24       So that was what I understood, that he needed to be

25  kind of physically present or have people physically present

**Edelson - Direct by Wade-Scott**

1    and sort it out.  But he was saying that to the extent there

2    was an issue, it was a clerical issue.

3    Q.  Was that explanation plausible to you at the time you

4    heard it based on what you knew about the firm?

5    A.  I mean, yeah.  It wouldn't be plausible -- if it was

6    Jenner & Block saying that, it wouldn't have been plausible at

7    all.  But for that firm, a firm that didn't know how to use,

8    you know, Word, Microsoft Word, that seemed very plausible.

9    Q.  And just to close the loop on this, did COVID impact your

10   thinking about this at the time?

11   A.  I'm sorry?

12   Q.  Did the existence of the coronavirus pandemic impact your

13   thinking about how plausible it was that Mr. Girardi was

14   trying to sort out some kind of error?

15   A.  Yes.  I mean, the time that he was in the hospital --

16   which, again, I hope is true.  I hope he wasn't lying about

17   that -- people couldn't even visit the hospital.  So if we --

18   I always try to think, if I was in their position, if we were

19   a nonpaperless office, so we had physical documents and files

20   we had to look at, that would be very hard to sort anything

21   out.

22           And I do have to say, I think that I was correct

23   about that impression.  When we've tried to get documents from

24   the trustee, they -- they made it clear that their -- all of

25   their docket filing systems, it was a total mess, just

**Edelson - Direct by Wade-Scott**

1  impossible to figure out what was going on.  So I don't think

2  that my -- that general sense was necessarily off.

3  Q.  Did you hear anything via Mr. Balabanian about a tax issue

4  during this time?

5  A.  Yes.

6  Q.  Was that in any way plausible to you?

7  A.  It was.

8  Q.  If you could describe briefly why that was plausible.

9  A.  Yeah.  So I've actually been kind of confused about kind

10 of the lack of plausibility here.  I can tell you how I

11 understood it.  And I've got to make it really clear, I am not

12 a tax expert.  This is not anything that I'm particularly

13 skilled in.

14        The issue of taxes, though, comes up a lot in

15 personal injury cases.  The general rule under U.S. law, my

16 understanding at least, is that if there's a settlement for a

17 personal injury -- for a personal injury case, it's not

18 taxable unless there are emotional distress damages or

19 punitive damages.

20        Here, there was kind of an interesting question.

21 Under Illinois, there's the Illinois Wrongful Death Act which

22 basically says you can't get punitive damages.  So if this

23 were an Illinois citizen and it was clear Illinois law

24 applied, then there wouldn't be any tax issues.

25        There was the issue of the choice of law analysis

1   which is if we're actually suing under Indonesian law, then

2   the amount that we got would have -- would have definitely

3   included punitive damages because the amount you get in

4   compensatory damages would be so much lower under Indonesian

5   law.

6           But the bigger issue was that -- and this is why I'm

7   kind of -- was confused by this testimony.  I don't understand

8   why U.S. law would be that relevant.  And I'm saying this,

9   again, not as a tax attorney, but these are people in

10  Indonesia who have to figure out the tax code in Indonesia.

11  And the idea that there might be complexities when you're

12  talking about an international thing and money going from the

13  U.S. to Indonesia didn't seem crazy to me.

14  Q.  Did it become clear to the firm at some point based on

15  your understandings of what Mr. Balabanian or anyone else was

16  being told that the clients had received some kind of partial

17  payment?

18  A.  I didn't hear the beginning of your question.  I'm sorry.

19  Q.  Sure.

20          Did it become clear to the firm at some point that

21  the clients had received some kind of partial payment based on

22  what the firm was hearing from Girardi Keese attorneys?

23  A.  Yeah, I believe that we were fairly certain of that.

24  You're going to have to refresh my recollection on that.  I

25  apologize.

**Edelson - Direct by Wade-Scott**

604

1  Q.  In the July 10th letter, there's a mention that

2  Mr. Griffin had at least said that there had been some partial

3  payments to the clients, correct?

4  A.  Correct.

5  Q.  And then the firm got the explanations for that that you

6  were just talking about, right?

7  A.  They didn't give those -- they just said tax issues.  They

8  didn't go into all the analysis.  They just said tax issues.

9  Q.  But the other issues we were talking about as well, there

10  had been some kind of clerical error?

11  A.  Oh, yes.  Yeah.  Yeah.  Correct.

12  Q.  At some point later in the fall --

13       THE COURT:  Well, hang on.

14       MR. WADE-SCOTT:  Yes, Your Honor.

15       THE COURT:  What's the basis -- you're saying that

16  the -- you received information from somebody at Girardi Keese

17  or your firm did that there were clerical errors?

18       THE WITNESS:  Yes.

19       THE COURT:  Give me the foundation for how you know

20  that.  Who told you that, that information?

21       THE WITNESS:  Rafey Balabanian told me that he had

22  spoke with Tom personally, and Tom said, you know, I'm trying

23  to figure this out, really sick, but, you know, maybe there

24  was some clerical issue.

25  BY MR. WADE-SCOTT:

**Edelson - Direct by Wade-Scott**

1   Q.  Did you understand that to be the message that

2   Mr. Balabanian was receiving in July and August?

3   A.  Yes.  Yeah, along with sickness.  There were a number of

4   things that they were saying, but that -- that was -- that was

5   kind of the most prominent one.

6          THE COURT:  And the issue about a tax -- the

7   statement about a tax issue, was that something you learned

8   from Mr. Balabanian that he learned from Girardi?

9          THE WITNESS:  I would have learned it from -- from

10   Rafey.  Who he learned it from I could not testify to.

11          THE COURT:  All right.  But you believe it was

12   plausible there would be a tax issue or implausible?

13          THE WITNESS:  Plausible.

14          THE COURT:  A tax issue for the clients?

15          THE WITNESS:  Yes.

16          THE COURT:  Well, you just said a moment ago, that's

17   an Indonesian tax issue, not a U.S. tax issue.

18          THE WITNESS:  Correct.

19          THE COURT:  Was that ever discussed in any of the

20   settlement conferences, how these payments would be

21   structured, if they'd be broken out between compensatory and

22   punitive damages to address supposed tax issues in Indonesia?

23          THE WITNESS:  Not during the two -- the two issue --

24   the two mediations I was at, no.

25          THE COURT:  All right.

**Edelson - Direct by Wade-Scott**

606

1          Go ahead.

2     BY MR. WADE-SCOTT:

3     Q.   At some point did the firm have some confidence that the

4     clients had been paid?

5     A.   Yes.

6     Q.   Do you recall when that was?

7     A.   I mean, it was false confidence, but I believe it was in

8     September where Tom said, "I'm back.  I figured out the

9     clerical stuff.  Everyone's been paid.  Great."  Again, he

10    said that to Rafey who then relayed that to me.

11    Q.   Did the firm get proof of that as far as you know?

12    A.   No.

13    Q.   Why didn't the firm ask for proof of it at the time?

14    A.   Well, first, we should have.

15          Second, I'm not -- it kind of made sense to me, you

16    know, that just based on my understanding of their firm.  It

17    was something that we accepted.

18    Q.   Have we heard -- let me clarify.

19          Had anyone, to your knowledge, at Edelson PC heard

20    any communications from the clients at this point about not

21    being paid?

22    A.   No.  Now, to be clear, though, we wouldn't -- we wouldn't

23    have heard from them.  We didn't have a direct relationship

24    with them.  The kind of -- I always think in terms of data

25    points.  And as we were kind of thinking, is it possible that

**Edelson - Direct by Wade-Scott**

607

1    they stole money, one of the data points was that we weren't

2    hearing any rumblings from the -- the Indonesian community,

3    you know, these victims, the community there, which is -- and

4    I still don't quite know why this happened.

5          The plaintiff's bar was very active in Indonesia, and

6    as we've seen with one of the cases here, were trying to poach

7    cases.  And they were doing it in a number of ways.  So kind

8    of in the back of my mind, I would have -- I would have

9    thought -- and I still don't know why this didn't happen -- if

10    clients hadn't been paid and they weren't getting proper

11    assurances from their lawyer why they wouldn't be easy targets

12    to be poached by another firm who would say we're having no

13    trouble getting money from Boeing, you know, come with us.

14          So that -- it was just a data point.  That wasn't

15    something that convinced me to kind of my skepticism that

16    really this was a criminal enterprise by the Girardi firm.

17    Q.  Did you believe at this point -- at the point that the

18    firm heard the clients had been paid, did you believe at this

19    point the clients had been paid with anything but their own

20    settlement money?

21    A.  No.  Absolutely not.

22    Q.  Did you -- at the point in late September when the firm

23    got these assurances, did you think that the Girardi Keese

24    firm had run out of money in any respect?

25    A.  When are we talking?

**Edelson - Direct by Wade-Scott**

1   Q.  In late September.

2   A.  No, absolutely not.

3   Q.  Did you begin to think that the Girardi Keese had run out

4   of money at any point in the fall of 2020?

5   A.  I don't know your definition of "fall," but in November,

6   that's when -- when I first thought maybe they're out of

7   money.

8   Q.  At that time in November, did you still think the clients

9   had been paid?

10  A.  Yes.  In November I thought the clients had been paid,

11  then heard some news which made me think that the firm might

12  actually be out of money, but I thought that meant we were out

13  of luck with our attorneys' fees.

14  Q.  What was the news that made you think that?

15  A.  Erika Girardi, Tom's wife, announced publicly that she was

16  getting divorced from him.

17  Q.  In your prior answer when I asked you in November of 2020

18  whether you thought the clients had been paid, I just want to

19  clarify because it wasn't totally clear here.  Was it your

20  understanding in November that the clients had or had not been

21  paid?

22  A.  That they had.  What we were told in September was -- by

23  Tom was a clerical error, everything's fine now, everyone's

24  been paid.  And that's when we didn't do some things which we

25  should have, like, say could you please show us.

**Edelson - Direct by Wade-Scott**

609

1      THE COURT:  Was there any thought when you learned --
2  when you believed they were paid in September that a delay in
3  payment to the clients was something that was reportable?
4      THE WITNESS:  So when I think about reporting,
5  there's kind of our legal duty and then kind of our moral
6  duty.  Legally, no, we do not have any duty to report if it
7  was a mistake.  So we have a duty to report if it were a
8  fraud.  That doesn't end it for us.  If there was some sort of
9  mistake and it hurt the clients, that was something that we
10  would have followed up on at some point.
11      THE COURT:  Well, your time frame is March/April, you
12  were not aware that there had been funding, correct?
13      THE WITNESS:  Correct.
14      THE COURT:  In June or at least July, there's a
15  reference to a June conversation where you were told by
16  Mr. Griffin -- or by Lira that the settlements had been
17  funded, correct, as of June 16th?  That's what's in the letter
18  you wrote.
19      THE WITNESS:  Yeah, I wasn't sure if it was partial
20  or full, but yes, Your Honor.
21      THE COURT:  That the bulk of the funds were received
22  by and housed at Girardi Keese.
23      THE WITNESS:  Yes.
24      THE COURT:  If not all of it, at least the bulk of
25  it.

**Edelson - Direct by Wade-Scott**

610

1        THE WITNESS:  Correct.

2        THE COURT:  And then it was not -- and then you

3   learned, at least according to this letter, Mr. Balabanian

4   said he spoke with Keith Griffin on June 30th and that he

5   believed clients -- Mr. Griffin believed clients had been paid

6   half of what they were owed.

7        And then it wasn't until September when

8   Mr. Balabanian had a conversation directly with Mr. Girardi

9   where Girardi said we paid them all off.

10       THE WITNESS:  Yes.

11       THE COURT:  Is that -- do I got my time frame correct

12  from your perspective?

13       THE WITNESS:  Yeah.  There are a number of calls

14  between Rafey and Tom before that September date.  We weren't

15  just sitting on our hands, but correct, Your Honor.

16       THE COURT:  All right.  But if it's funded as of --

17  at least as of June 16th, was there anything in your mind that

18  would have obligated you, even from June to September,

19  accepting these dates, to have raised some alarm -- is it

20  routine for personal injury firms when they receive money from

21  a defendant -- you just said earlier, as soon as a settlement

22  happens, you get it done and get payments made --

23       THE WITNESS:  Correct.

24       THE COURT:  -- because things can change.  That makes

25  sense.  Settlements are an agreement at a moment in time.

1   People may have buyer's remorse or seller's remorse.  You want

2   to get it done.  There was a meeting of the minds for at least

3   a moment and you get it settled.

4          So if there was a payment, at least a funding in late

5   June, partial or total, and half payment made, and Girardi is

6   giving excuses, Mr. Girardi is giving excuses throughout the

7   rest of the period until some time in September, that didn't

8   cause any alarm about maybe there was something fishy or

9   something that you should report either to this Court or to a

10  bar association or going to Boeing during that period of time?

11         THE WITNESS:  Absolutely.  When we wrote that letter,

12  as I testified to, it was DEFCON 5.

13         So I think -- I think we -- I don't mean to speak for

14  Your Honor, but I understood Keith's statement a little bit

15  different than how I heard Your Honor say it, which is I heard

16  him say, "I think maybe half of the money has been paid but

17  Tom knows."  So I didn't take that as particularly sticky.

18         But, yes, when we wrote that letter, our view was

19  this looks really, really bad, and we started working on a

20  contempt motion, rule to show cause, and as I said, it was

21  jello.  We didn't have enough sticky stuff.

22         THE COURT:  There was actually a draft of a rule to

23  show cause in July of 2020 in your firm's web site or your

24  firm's servers, rather?

25         THE WITNESS:  May I answer that?

**Edelson - Direct by Wade-Scott**

1        MR. WADE-SCOTT:  Your Honor, we would assert

2   privilege over the content of the letter.

3        THE WITNESS:  Yes.

4        THE COURT:  I'm not asking for the content of the

5   letter.  I'm just saying was there actual physical efforts

6   made in late June or sometime around this letter, July 10th,

7   to prepare a court filing that would have been filed in front

8   of me as to these settlement funds?

9        THE WITNESS:  Correct, Your Honor.

10       THE COURT:  All right.

11       THE WITNESS:  And when -- in looking at it, it

12   wasn't -- we didn't feel we had it.

13       THE COURT:  All right.  No, you testified to that.  I

14   just want to know if there was actual physical -- if this was

15   a thought or something that actually --

16       THE WITNESS:  It was not a thought.  This was high

17   alert at our firm where we were talking about it all the time,

18   and it was very, very concerning to us.

19       THE COURT:  And in those discussions, this DEFCON 5,

20   in those discussions, was the fact that partial payment was

21   made to the clients something that took this over the edge?

22   Because, as you know, installment payments to clients on

23   settlements are not the norm unless the client agrees.  And

24   I'm sure you've had many settlements where the clients want

25   their full amount of money as soon as you get it or within a

 1  few days anyway so they can get the benefit of the settlement

 2  they bargained for.

 3          THE WITNESS:  So actually, in my world, that's not --

 4          THE COURT:  All right.  Let's go back to normal

 5  personal injury world then.

 6          THE WITNESS:  No, that's what I'm responding to.

 7          THE COURT:  Go ahead.  Go ahead.

 8          THE WITNESS:  The -- so it actually -- the -- and

 9  David and Keith will know this much better than I do, but in

10  my experience over the last five years especially, there's

11  been a big movement to have installments paid through

12  qualified settlement funds where basically the money goes to a

13  separate account and then you got all these pre-tax savings

14  and people get paid over time.

15          And in most of our personal -- in our mass tort

16  cases, we don't really do one-off personal injury cases --

17  that's an issue we talk about with the client whether they

18  want to do that.

19          So the idea that they might be doing some sort of

20  kind of tax planning and there may be partial payments was

21  not -- it was not something that was unusual.  It would have

22  been a technical violation of the Court order and -- but if

23  the clients had consented, you know, my view is -- my view at

24  the time and my view now is that that's something which would

25  have to be brought to the Court's attention at some point, can

Edelson - Direct by Wade-Scott

614

1   you modify the order, this is what we're doing.

2          But no, I didn't think that meant fraud was

3   happening.

4          THE COURT:  Other than apparently David Lira telling

5   your partner that half of the fees had been paid, you have --

6   well, let me back up.  I'll strike my own question.

7          Did you have any knowledge that the clients had

8   actually consented to receiving installment payments?

9          THE WITNESS:  No.

10         THE COURT:  All right.

11         Go ahead.

12  BY MR. WADE-SCOTT:

13  Q.  Just to clarify, during this time, the July to September

14  period, was the firm getting other explanations, all of which

15  you've already talked about, but was the firm getting other

16  explanations besides tax issues for why the payments had been

17  delayed?

18  A.  Tom -- we talked about this.  Are you talking about the

19  clerical stuff and Tom being in the hospital?

20  Q.  Yeah.  I'll move on.

21         So going back to November, it's your testimony that

22  the firm thought the clients had been paid at that point.

23  A.  Yes.

24  Q.  But that news about Erika Girardi made you think that

25  something was going on with money at the firm?

Edelson - Direct by Wade-Scott

615

1    A.   Yes.

2    Q.   Could you explain that further?

3    A.   I'm sorry.  Could I explain it further?

4    Q.   Could you explain that further?

5    A.   Why I thought that?  The -- it sounds very cynical, and I

6    apologize for this, but my understanding of Tom and Erika's

7    relationship, he was -- that it was fairly transactional in

8    nature and that when the money was gone, she likely would be

9    gone, too.

10            MS. MATTHAI:  I move to strike.  Lacks foundation.

11   Calls for speculation.

12            THE COURT:  No, this is the witness's perception of

13   why the alarm bells about not getting paid fees may be

14   appropriate given the fact that there was a change in Tom

15   Girardi's life circumstance.  So I understand it for that

16   reason.  I'm not sure -- well, it's this witness's perception,

17   and I'm going to allow it to stand and he can be subject to

18   cross on it if you want to ask him how he arrived at that

19   conclusion.

20            Go ahead.

21   BY MR. WADE-SCOTT:

22   Q.   After that news broke in November, did you come to learn

23   that there were still issues with payments to the clients at

24   some point?

25   A.   The -- yes.  Then -- then -- so after that, I believe that

**Edelson - Direct by Wade-Scott**

1   Rafey sent a text to perhaps Keith, if I'm remembering

2   correctly, and said, like, you know, something about the

3   divorce.  And then we got some weird texts in response -- "we"

4   meaning Rafey, but then given to the firm.  It was, you know,

5   things along the lines of, you know, "good news" which we

6   thought that meant our fees were coming, and then it was all

7   very cryptic.

8           And then it came out where -- where Keith said, you

9   know, the clients now it looks like are about to be paid.  So

10  totally reversing everything that we understood.

11  Q.   What did you do -- what did the firm do after receiving

12  those messages from Mr. Griffin?

13  A.   Can you remind me of the dates?

14  Q.   Sure.  I'm going to put Exhibit 119 up on the screen.  It

15  can be public.  I'm showing you page 119-26.  Have you seen

16  Exhibit 119 before?

17  A.   Yes.

18  Q.   Does this refresh your recollection about the time period

19  of these discussions with Mr. Griffin?

20  A.   Yeah.  November 17th was when -- was when he says, "Trying

21  to set up a call with him and the Boeing clients."

22  Q.   As far as you're aware, is this the first time the firm

23  then learned, again, that the clients had not been paid?

24  A.   Yes.

25          THE COURT:  November 17th?  If you're looking at

**Edelson - Direct by Wade-Scott**

1   119-26, that's a November 11th --

2              THE WITNESS:  27.

3              MR. WADE-SCOTT:  I'm sorry, Your Honor.  I scrolled

4   down on the screen.  It's 119-28.  I'm having Mr. Edelson look

5   at some November 17th messages.

6              THE WITNESS:  It's actually 27, Eli.

7              MR. WADE-SCOTT:  Sorry.

8              THE COURT:  So 119-27?

9   BY MR. WADE-SCOTT:

10  Q.  You testified earlier that Mr. Griffin had texted

11  something like "good news."  Does this refresh your

12  recollection about what Mr. Griffin actually said?

13  A.  Yes.

14  Q.  That's at 119-26.  There's a mention of positive

15  developments?

16  A.  Yep.  Some positive developments.  Girardi is still having

17  health issues but good stuff coming.

18  Q.  And then on 119-28, this is the message you were referring

19  to about the meeting with the Boeing clients?

20  A.  You've got to go up.  I apologize.  It's -- yes, it's that

21  one where he says, "Hey man" -- this is Keith -- "Hey, man,

22  just an update.  He's still at home.  Haven't been able to

23  speak with him.  Trying to set up a call with him and the

24  Boeing clients."

25              And then we responded or Rafey responded saying, what

1    are you talking about, why would they need talk?

2         And then he says, he drops the bomb, "The Boeing

3    Lion Air clients want to speak with him about the balance of

4    their funds that he needs to pay them."

5    Q.   What did the firm do after Mr. Balabanian received this

6    message?

7    A.   Our view was we are now going to the Court.  So we drafted

8    what we then filed was the contempt motion.  I wanted to speak

9    to someone at Girardi's firm before filing because I still

10   understood that what we were filing was going to be so

11   explosive and I wanted to -- I wanted to hear if there was

12   something that we were missing.

13        At that point, I was -- it seemed -- it seemed clear

14   to me what was happening, but I wanted to speak to them one

15   time, you know, me and either Keith or Tom or David.

16   Q.   Did you personally wind up speaking with any of those

17   three people?

18   A.   Yes.  Rafey and I spoke with Keith at the end of November.

19   Q.   What happened on the call with Mr. Griffin?

20   A.   He said -- he sounded defeated.  He was very squishy, like

21   he always was in my mind.  He told me that -- that he -- there

22   was someone who was going to be acting as like a *de facto*

23   trustee who would help everyone get paid and that I should

24   speak to him, and he gave me the name of Bob Finnerty.

25        I told Keith I thought he was a liar and made it

**Edelson - Direct by Wade-Scott**

619

1    clear what we were going to do.  I then -- I then did call

2    Mr. Finnerty.

3    Q.  What happened on the call with Mr. Finnerty?

4    A.  He told me that it was a mistake to file suit against --

5    you know, or file some public court document against --

6    against Tom or his firm.  He said that it would come back and

7    bite me.  He also said that it would shine a spotlight on the

8    plaintiff's bar which none of us needed.  He told me that

9    the -- that the best solution, the one that he had done was

10   getting Tom to agree to judgments on behalf of the clients or

11   us, and he made it seem like Tom would sign whatever paper we

12   wanted and then we'd be first in line.

13        He then said that -- when I pushed back and said,

14   this is all so disgusting, he said, what are you talking

15   about?  Everyone has known that Tom has been stealing money

16   for years.

17        And that was stunning to me.  I got off the phone

18   with him.  I then decided to look him up to have a better

19   sense of who he was, found out that he used to be a partner at

20   Girardi's firm, and I -- I needed to take like 15 showers

21   after that.  It was all just so disgusting to me.

22   Q.  Did you send any letters or e-mails memorializing your

23   call with Mr. Finnerty?

24   A.  Yes, I memorialized my call to Mr. Finnerty.

25   Q.  Showing you what's been marked as Exhibit 176.

**Edelson - Direct by Wade-Scott**

620

1          Do you recognize Exhibit 176?

2    A.   Yes.   The -- whoa, you're going quickly.

3    Q.   Sorry.

4    A.   Yes.

5    Q.   Is this an e-mail thread that you exchanged with

6    Mr. Finnerty?

7    A.   Correct.

8    Q.   The e-mail here at 176-2 -- at 176-2, is this the e-mail

9    you were referring to earlier memorializing the conversation?

10   A.   Yes.

11   Q.   Was this accurate at the time you wrote it?

12   A.   What do you mean "accurate"?

13   Q.   Accurate of your state of mind and of the call at the time

14   you wrote it?

15   A.   Yes.   I was memorializing the call as I understood it.

16   Correct.

17   Q.   What happened after you spoke to Mr. Finnerty?

18   A.   What do you -- after the e-mail or after I spoke to him?

19   What do you mean?

20   Q.   After the interaction with Mr. Finnerty, did the firm do

21   anything else with respect to Girardi Keese?

22   A.   We filed the motion for rule to show cause and then filed

23   a separate lawsuit in federal court on behalf of our firm.

24   Q.   Do you recall the hearing where Girardi Keese retained

25   counsel and came to court?

**Edelson - Direct by Wade-Scott**

1    A.   I -- yes, of course.

2    Q.   Do you recall what they said about the firm's finances at

3    that point?

4    A.   Yes.

5    Q.   What did they say?

6              MR. SABA:  Objection.  This is in the record,

7    Your Honor.

8              MR. WADE-SCOTT:  For the impact on the witness, I

9    want to make sure I'm telling a consistent --

10             THE COURT:  Go ahead.

11             MR. WADE-SCOTT:  It's a foundational story here.

12   BY THE WITNESS:

13   A.   What I heard them say was, the money's gone.

14   BY MR. WADE-SCOTT:

15   Q.   Were you surprised by that when Girardi Keese's counsel

16   said that after we'd filed?

17   A.   I was shocked by everything that happened at that hearing

18   as I had been shocked since.

19   Q.   Did you think there was a possibility at the time we filed

20   that there was going to be some explanation that we had

21   missed?

22   A.   Yes.  I actually did.  I mean, the whole thing -- I've

23   been practicing 25 years.  I've seen a lot of stuff in my

24   career.  I've never seen a plaintiff's attorney steal money

25   from a client.  That's not something which I've even heard of.

**Edelson - Direct by Wade-Scott**

1    I mean, I've heard like Michael Avenatti apparently did

2    something similar to what Tom's accused of.

3           But yeah, it just -- I've seen a lot of attorneys try

4    to put their interests ahead of clients but not -- not steal

5    money from clients.  So yeah, it was all unimaginable even

6    though at that point we thought that was the only -- the only

7    explanation.  But yes, when -- when Tom took the Fifth, then

8    they admitted the money didn't go to the clients, they didn't

9    have any money, that was one of the most shocking days I've

10   had in my life.

11   Q.  We've heard some testimony during the proceedings here

12   that Mr. Lira and Mr. Griffin are sorry to the victims of the

13   fraud.  Has the Edelson firm done anything concretely to try

14   to help the victims?

15   A.  Yes.

16           MR. SABA:  Objection.  Relevance, Your Honor.

17           MS. MATTHAI:  Join.

18           THE COURT:  Well, I'm going to ask the same question.

19   How do these people get paid back?  So I'll let this question

20   be answered because it's a question we ought to be asking.

21   How do these people get paid back the money that was paid by

22   Boeing to a lawyer, represented by multiple lawyers, these

23   clients, and they're still out the money?

24           So if that's where your question is going, go ahead.

25   BY MR. WADE-SCOTT:

**Edelson - Direct by Wade-Scott**

623

1   Q.  Go ahead, Mr. Edelson.

2   A.  Yeah.  So, I mean, we perhaps have even a little bit of a

3   broader view which is, you know, for us, my career has been

4   fighting to raise the integrity of the plaintiff's bar.

5   The -- this -- what happened here didn't just impact the

6   Lion Air -- our clients in this crash; it also impacted a lot

7   of other clients he stole money from.  And, to me, it's the

8   worst fraud I've seen by a plaintiff's lawyer.

9           So our focus was how could we help in a lot of

10  different ways.  And we have done that.  It's all been *pro*

11  *bono*.  We represented, I mentioned before, Mr. Abikzer and got

12  him $20 million back.

13          We've been incredibly active in the bankruptcy

14  proceeding to find other sources of money to go to the

15  clients.  The suit that we have against Mr. Griffin and

16  Mr. Lira also, that money would go to the clients.  We've made

17  that clear from the beginning.

18          We have been calling publicly on the California bar

19  to finally wake up and do something even though, you know,

20  that's not totally in our self-interest because we've become a

21  target.

22          We've pushed for legislation in Illinois which has

23  been introduced to make it easy for plaintiffs to get an

24  accounting and to penalize attorneys who even think about

25  misappropriating funds.

**Edelson - Direct by Wade-Scott**

1        And to us, this is -- this is the middle of the ball

2  game.  We do believe that we're going to be able to help get

3  the clients their money back.  We think that there -- this is

4  all just the tip of the iceberg.  The number of people we

5  think that were involved and could potentially be held

6  accountable is a much longer list than the people in this

7  courtroom.

8        THE COURT:  By "accountable," you're talking about

9  other cases, not this one?

10        THE WITNESS:  No, this case, 100 percent this case.

11        THE COURT:  Well, I'll be very direct.  Have you

12  considered paying back these clients yourself from your firm

13  funds and then pursuing other less liquid parties that may be

14  accountable?  In other words, you pay and then get

15  reimbursement from the parties that are responsible that may

16  not have the funds at this time?

17        THE WITNESS:  The -- our firm -- our firm is out, you

18  know, two and a half million dollars, and I'm not asking for

19  sympathy for that.  Paying them would have a big impact on our

20  firm, and they haven't asked us to do that.

21        THE COURT:  Meaning the people in Indonesia have not

22  asked you to do it?

23        THE WITNESS:  Yeah.  I mean, there's certain stuff I

24  would be happy to tell you about our conversations.  I don't

25  know if I'm allowed to.

**Edelson - Direct by Wade-Scott**

1    THE COURT:  I could -- well, and I understand that,

2  but they don't need to ask.  I mean, they -- I would think to

3  someone in Indonesia, this is one black box of a group of

4  attorneys.  Tom Girardi, the main culprit, of course, but a

5  group of attorneys, and somehow this money got paid by Boeing

6  and didn't get to them.  I don't know they have to ask for you

7  to know they'd want it.  I would be shocked if Mr. Wisner

8  hasn't -- if he hasn't yet, he will ask, and that's just the

9  four, the 2 million.  There's the fifth guy, individual, who

10  hasn't received any of his money.

11    I'm not arguing you have a legal obligation to do it.

12  But I'm just asking have you considered that?

13    THE WITNESS:  I can't see a possibility where I go

14  through my career and they haven't been paid.  So I don't know

15  if that fully answers your question.  I -- I think that the --

16  you may disagree with me.  I do not believe that we were

17  involved in any of this.  We didn't -- we weren't involved in

18  stealing the money, of course, or anything.

19    But I do believe in overall justice; and, at the end

20  of the day, our firm can take the hit better than the widows

21  and orphans.  We're aware of that.  And so if it comes to it

22  at the end of the day, that's something that obviously would

23  be on the table.

24    But that's not -- we're not in a position where it

25  would be easy for us to write a two and a half million

**Edelson - Direct by Wade-Scott**

1    dollar -- I'm sorry.  I don't know that I should say the exact

2    amount.

3           THE COURT:  Two million plus the whatever the --

4    which is public record, 2 million for the four that are out

5    the money, and then another sum for the fifth person.

6           THE WITNESS:  Yes.

7           THE COURT:  Well, I asked.  I'm not suggesting, short

8    of an order from me, which we're not there yet, that there is

9    such an obligation, but I wondered in light of the question,

10   which was tell us everything you're doing to make this right,

11   whether that had been part of a consideration and something

12   that crossed your mind.

13          THE WITNESS:  It absolutely -- we have thought of

14   many different avenues including from our own pocket how to

15   make this right.

16          THE COURT:  Okay.

17          THE WITNESS:  100 percent, Your Honor.

18          THE COURT:  Go ahead.

19          Well, as long as we're there in that time frame, you

20   said you had a conversation with Tom Girardi.

21          THE WITNESS:  Yes.

22          THE COURT:  Why don't you relay that, when it was,

23   who was on the call and what the nature of the conversation

24   was and what was said.

25          THE WITNESS:  So this was after we filed the motion

**Edelson - Direct by Wade-Scott**

1  for rule to show cause.  Tom started calling me.  He left --

2  he left voicemails and then also spoke to me directly.  And he

3  was trying to explain to me that if we simply dropped it,

4  that -- that he was going to make me a ton of money because of

5  his connection with -- with the judges in California.

6         I said to him, "Tom, do you know how much money

7  you've taken?"  And he said "500."  And I said, "Total?"  I

8  just wanted to understand how much he knew.  And he said,

9  "Well, there were four of them."  He was talking about the

10  minors.  And I said, "Okay, so 2 million total?"  And he said

11  "Yes."  And I said, "Tom, this is going to be very, very bad

12  for you."  Then he said, "Well, I think I should get off the

13  phone."

14         That was it.  But he left -- that was the tenor of

15  the conversations.  A lot of -- I don't know if you've

16  listened to the voicemails, a lot of "I'm a nice guy."  "The

17  only reason we have any of this is because of me."  It was all

18  just beyond unseemly.

19         THE COURT:  He said he could make you a ton of money

20  because of his connection with the judges in California?

21         THE WITNESS:  Yes, Your Honor, he did.

22         THE COURT:  Did he sound lucid?

23         THE WITNESS:  Yes, he sounded very lucid.  The reason

24  I believe he sounded lucid was because he knew the amount that

25  he had stolen and that he was smart enough.  When it was clear

**Edelson - Direct by Wade-Scott**

1   that I didn't care at all about his, you know, absurd attempts

2   to entice us to make this go away, he got off the phone

3   quickly, which was the right thing to do.  He understood I

4   wasn't interested, and he said, well, this doesn't seem like

5   there's a point in continuing to speak, and then he got off

6   the phone.

7          THE COURT:  Okay.  All right.

8          Continue.

9          MR. WADE-SCOTT:  I think that's all I have for right

10   now, Your Honor.

11          THE COURT:  All right.

12          What time is it?  11 -- it's almost noon.  We can

13   take a lunch break now or take a short break and allow

14   cross-examination and then we'll do lunch a later.

15          What's your preference on the side of the other

16   attorneys?

17          MS. MATTHAI:  I can begin as long as --

18          THE COURT:  Pardon me?

19          MS. MATTHAI:  If we take a short break, then we can

20   begin and use some of the time.

21          THE COURT:  Yes, let's do that.  Why don't we break

22   for about ten minutes and come back on the stand at that time.

23   Thank you.

24          MR. WADE-SCOTT:  Your Honor?

25          THE COURT:  Yes.

Edelson - Cross by Matthai

629

1      MR. WADE-SCOTT:  When Mr. Griffin and Mr. Lira were

2  on the stand, the Court made an order about consultations with

3  the witnesses and whether or not the witnesses be subject to

4  cross on it.  I just want to know before we step into the

5  hall.  I'm sure I'll want to speak to Mr. Edelson not for any

6  improper purpose, but I'm probably going to talk to him.

7      THE COURT:  As I recall, I allowed you to talk to

8  your clients even when they're on cross, and the same goes for

9  Mr. Edelson.  He can talk to you.

10      MR. WADE-SCOTT:  Thank you, Your Honor.

11      THE COURT:  All right.  I think that's -- remind me.

12  I believe that's what I said.

13      MS. MATTHAI:  I believe that's correct.

14      THE COURT:  Fair is fair.  Same for both sides.

15      All right.  Very good.  Ten minutes.

16      MR. WADE-SCOTT:  Thank you.

17    (Recess.)

18      THE COURT:  Mr. Edelson, please retake the stand.

19      And Ms. Matthai, you may begin questioning.

20      MS. MATTHAI:  Thank you, Your Honor.

21                  CROSS-EXAMINATION

22  BY MS. MATTHAI:

23  Q.  I guess I should say good afternoon instead of good

24  morning, Mr. Edelson.

25  A.  Good afternoon.

**Edelson - Cross by Matthai**

1    Q.  Your firm was first contacted by Girardi Keese with the

2    possibility of serving as local counsel, correct?

3    A.  That's right.

4    Q.  And at that point in time when you were first contacted,

5    Mr. Lira was not involved in the cases, correct?

6    A.  That's a question you had -- I don't have any reason to

7    disbelieve what you're saying, but I wasn't involved in the

8    initial outreach.

9    Q.  All right.  You were aware, were you not, that the Edelson

10   firm had a fee-sharing arrangement with Girardi Keese?

11   A.  That's right.

12   Q.  And if we'll look at Exhibit 238.

13        You've seen this letter before, have you not?

14   A.  I'm sorry, ma'am.  I don't see anything on my screen.

15        THE CLERK:  Sorry.

16        THE COURT:  We'll get there.

17        MS. MATTHAI:  Am I not hooked up correctly?

18        THE CLERK:  I'm not sure.  It's not wanting to

19   display anything.

20        THE COURT:  If you've got a hard copy, you can put it

21   on the ELMO.

22        MS. MATTHAI:  How is that?  Does that work?  There we

23   are.

24        THE CLERK:  There we go.

25        MS. MATTHAI:  Okay.

Edelson - Cross by Matthai

631

```
 1              THE COURT:  Go ahead.

 2              THE WITNESS:  Yes, I've seen that before.

 3              MS. MATTHAI:  Mr. Saba offered to help and I may take

 4    him up on it shortly.  We're going to try this and see how it

 5    works.

 6    BY MS. MATTHAI:

 7    Q.  You've seen this letter before, have you not?

 8    A.  Yes, I have.

 9    Q.  Now, this is April 3, 2019, correct?

10    A.  I'm sorry, just -- sorry about that.

11              This was April 3rd, correct.

12    Q.  And this was from Mr. Griffin at the Girardi firm,

13    correct?

14    A.  Yes, to Ari Scharg.

15    Q.  Yes.  And this confirms that the fee split will be 50/50

16    on the Boeing cases that you have filed with us, correct?

17    A.  I didn't hear the last word.

18    Q.  This confirms that the fee agreement, fee split will be

19    50/50 on the Boeing cases you have filed with us in Chicago

20    concerning the Lion Air crash, correct?

21    A.  You read it correctly, yes.

22    Q.  And there was a first group of cases that were filed with

23    just Mr. Griffin and the Girardi Keese firm involved, correct?

24    A.  As opposed to who?

25    Q.  As opposed to Mr. Lira.
```

**Edelson - Cross by Matthai**

632

1    A.  I -- I don't have any reason to doubt that.

2    Q.  And this agreement, it says -- well, it says 50/50.  It

3    says, if it turns out that one of our two firms performs

4    significantly more work than expected or less if the case

5    settles fairly quickly, we will adjust the fee split as would

6    be reasonable to both firms, correct?

7    A.  That's what it says, correct.

8    Q.  All right.  And are you aware of any other writing that

9    confirms this agreement?

10   A.  Yes.

11   Q.  What writing are you aware of that confirms this agreement

12   other than this letter?

13   A.  I'm sorry.  Can you be more specific?  Writing between

14   who?

15   Q.  Well, are you aware of any writing between Girardi Keese

16   and the Edelson firm?

17            MR. WADE-SCOTT:  Objection.  Relevance.

18            THE COURT:  Overruled.

19   BY THE WITNESS:

20   A.  I don't know.

21   BY MS. MATTHAI:

22   Q.  Are you aware of any writing with any of the Lion Air

23   clients with regard to this fee split letter?

24   A.  Yes.

25   Q.  What are you aware of?

**Edelson - Cross by Matthai**

1   A.  That they've confirmed that in writing.

2   Q.  When and where?

3   A.  I think we got -- so we've never seen the files from

4   Girardi Keese, so we don't know what Girardi Keese did, if

5   they ever got it confirmed.  It sounds like not because they

6   had oversold the shares to every lawyer in town.  But we

7   got -- we got confirmation from the clients within the last

8   few weeks in writing, transcribed in Indonesian as well, that

9   they were confirming the fee split.

10  Q.  This is a confirmation that they made currently?

11  A.  I don't know what you mean by "currently."  It was within

12  the last few weeks.

13  Q.  All right.  Have you ever seen any writing dated on or

14  around April 3, 2019, within 60 days of that date, which

15  confirms the clients' agreement to this fee agreement?

16  A.  No.

17        THE COURT:  I'm confused.  What happened the last

18  couple of weeks?

19        THE WITNESS:  So what -- can I answer?

20        THE COURT:  Yes, please.

21        THE WITNESS:  They raised this issue that they --

22  that they never got confirmations from the clients, and we

23  asked the clients if they would confirm the fee.

24        THE COURT:  Who is "they"?

25        THE WITNESS:  Sorry.  The -- the Girardi Keese

**Edelson - Cross by Matthai**

634

1  attorneys made it clear that they never got a signed -- any

2  signed confirmation from the clients.  So we reached out to

3  the clients --

4          THE COURT:  By Girardi Keese attorneys, you're not

5  talking about the trustee.  You're talking about the attorneys

6  in court here.

7          THE WITNESS:  Correct.

8          THE COURT:  Okay.  And what did they want and what

9  did you do?

10          THE WITNESS:  What did --

11          THE COURT:  What did they want from you and what did

12  you do in response to that?

13          THE WITNESS:  I'm so confused.  I apologize.  Who is

14  the "they."

15          THE COURT:  That was my question.  I started with

16  that one.  All right.  Who the "they" was.

17          Why don't you explain what happened in the last

18  couple of weeks.  That's the part I have not been aware of up

19  until now.

20          THE WITNESS:  So let me try to be more clear, and I

21  apologize.

22          I believe Keith and David raised the issue that there

23  wasn't a fee-sharing agreement that was signed by the clients.

24  So we asked the clients if they would confirm in writing that

25  they agreed to this split, which they then did.

Edelson - Cross by Matthai

635

1        THE COURT:  The clients being the folks in Indonesia?

2        THE WITNESS:  The Indonesian clients, correct.

3        THE COURT:  Are they still your clients?

4        THE WITNESS:  Can I confer with counsel?

5        THE COURT:  Well, we'll do it at the next break.

6        But I thought the four -- the five people who didn't

7   get all the money were now Mr. Wisner's clients.  I don't know

8   whether you ceased being their lawyers, but I know Mr. Wisner

9   took over for Girardi Keese.  He may very well have taken over

10  for you but I don't know that.

11       THE WITNESS:  Okay.  I think I can answer.

12       THE COURT:  If that's a subject you need to talk

13  about --

14       THE WITNESS:  No, no, I can answer that.

15       THE COURT:  Go ahead.

16       THE WITNESS:  With respect to the Lion Air cases,

17  Mr. Wisner and his firm are representing the clients and we

18  are not.  So we are here as an amicus or because you want to

19  hear from us.

20       THE COURT:  Right.

21       THE WITNESS:  But we are absolutely not representing

22  them.  So the fee confirmation had nothing to do with any

23  future work we might do for them.

24       THE COURT:  All right.

25       Go ahead.

**Edelson - Cross by Matthai**

1   BY MS. MATTHAI:

2   Q.  Just one cleanup question.  This statement you currently

3   got within the last couple of weeks says that they now agree

4   to this; is that correct?

5   A.  It depends what the "this" is.

6   Q.  Now agree to this fee-sharing agreement.

7   A.  Yes.

8   Q.  Now, you, Edelson -- the Edelson firm keeps a record of

9   the cases that it is handling, correct?

10  A.  I'm not sure I follow what --

11  Q.  Yeah.  You have a record of who you represent in what

12  cases in your law firm, correct?

13  A.  Sure.  Yes.

14  Q.  Of course.  And so when -- in April of 2019 when you, the

15  Edelson firm, got this letter from Girardi Keese, you knew

16  what cases were covered by that fee-sharing agreement,

17  correct?

18  A.  I'm sure we did.

19  Q.  Okay.  And those cases were the case for Ms. Anice,

20  Ms. Septiana, Ms. Dian, Mr. Bias, and Mr. Multi Rizki,

21  correct?

22  A.  I believe so.

23  Q.  And those were the only cases that were covered by this

24  fee agreement, correct?

25  A.  I don't mean to sound evasive.  These are questions that

**Edelson - Cross by Matthai**

637

1    are in -- Rafey would be able to answer.  This was not the

2    part of the case I was involved in.

3    Q.  Well, you've made affirmative statements to courts that

4    this idea of two sets of cases wasn't accurate or true,

5    correct?

6    A.  Could you say it again?

7    Q.  Sure.  Have you ever told a court that there was never any

8    information that you were given that there were two sets of

9    cases?

10   A.  No.

11   Q.  Okay.  Your firm was later contacted about serving as

12   local counsel for cases that were going to be filed by

13   Mr. Lira, correct?

14   A.  Yes.  Okay.  I'm tracking you now.  Correct.

15   Q.  Okay.  And if we look at Exhibit 249, we see -- well,

16   maybe not.

17            MR. SABA:  Try 239.

18            MS. MATTHAI:  239?

19   BY MS. MATTHAI:

20   Q.  We see a letter dated June 17, 2019.  This one is signed

21   by Mr. Lira, correct?

22   A.  Yes, correct.

23   Q.  Okay.  And this is in June a couple of months later,

24   correct?

25   A.  Yes, correct.

Edelson - Cross by Matthai

1    Q.   And he states that he's going to file approximately ten

2    wrongful death lawsuits arising from the Lion Air disaster.

3    Do you see that?

4    A.   I do.

5    Q.   And he goes on to say that the referral fee paid to your

6    firm in assisting in this matter will be 20 percent of the

7    total attorneys' fees recovered.  Do you see that?

8    A.   Yeah.  I don't think he meant referral fee, but I do see

9    that.

10   Q.   I will agree with you.  It was a local counsel fee.  It

11   was for your work to be done on the case as local counsel,

12   correct?

13   A.   That's right.

14   Q.   So you knew that there was a different set of cases that

15   was covered by this fee agreement, correct?

16   A.   Yes, I did.

17   Q.   Okay.  And those were the cases that you understood had

18   been referred to Mr. Lira, correct?

19   A.   Referred to Mr. Lira?

20   Q.   Yes.

21   A.   No.  We understood that there was one firm.  So I'm

22   perpetually confused when they're talking -- when they've been

23   testifying about like they have a case and a different partner

24   has a case.  To us, it was all Girardi Keese.  But we

25   definitely understood that David, for these cases, wanted to

**Edelson - Cross by Matthai**

1    have a different fee split.

2    Q.  Right.  And he never told you that those cases had been

3    referred to him, directly to him?

4    A.  He may have.  I'm not disputing that.  But I don't even

5    know what that means.  It's a law firm.  But I don't know if

6    it mattered that I understand that.

7    Q.  Is it your understanding that the only clients that were

8    not paid are the ones that were covered in the first group

9    with the fee agreement with Girardi Keese?

10   A.  I believe that's right.

11   Q.  Now, you knew that there was a -- by the way, as to this

12   agreement, did you ask the clients to confirm this agreement a

13   couple of weeks ago?

14            MR. WADE-SCOTT:  Objection.  Relevance.

15            THE COURT:  Well, I'm still confused on what happened

16   a couple of weeks ago, so go ahead.  Overruled.

17   BY THE WITNESS:

18   A.  We can get you that information.  I don't -- I don't know

19   off the top of my head.

20   BY MS. MATTHAI:

21   Q.  Other than a writing that may have been requested and

22   given a couple of weeks ago, are you aware of any other

23   writing that relates to Exhibit 239, this fee agreement?

24   A.  Yeah.  It sounded from the testimony that they had a

25   number of other fee agreements with people and other deals

**Edelson - Cross by Matthai**

1    with people.

2    Q.   I'm talking about an agreement by the Lion Air claimants

3    with regard to Exhibit 239.

4    A.   To the extent I'm following your question, I'm not aware

5    of any other documents.

6    Q.   All right.  Now, you were aware, were you not, that there

7    was a mediation that occurred on October 30, 2019, correct?

8    A.   Was that the -- is that the first mediation?

9    Q.   Well, I suppose it depends.  The first mediation was

10   essentially a meet-and-greet, correct?

11   A.   I described that.  I call that the first mediation.  Was

12   that the one you're -- just tell me the time frame.  I don't

13   mean to be questioning you.  I just want to make sure that

14   we're on the same page.

15   Q.   Sure.

16   A.   That's what I viewed as the first mediation.

17   Q.   Well, let's ask -- let me ask you about the October 30,

18   2019 mediation.

19            You were aware that there was a mediation at the end

20   of October 2019, correct?

21   A.   I need help with dates so I can answer your question

22   precisely.  It was --

23   Q.   Were you at a mediation where there was a settlement that

24   was reached that was initially intended to cover all of the

25   clients that were represented by the Girardi Keese firm?

**Edelson - Cross by Matthai**

1    A.   I was not there.  That was what I was calling the third

2    mediation.

3    Q.   All right.

4    A.   I was not present.

5    Q.   Were you advised that there had been a settlement that was

6    to cover all of the Girardi Keese clients?

7    A.   That's correct.  I was so advised by Ari Scharg.

8    Q.   All right.  And were you also advised after that

9    settlement that there were some of the claimants who had

10   signed the Lion Air release?

11   A.   I was -- I was aware that Boeing was making that argument.

12   David initially said that there were no clients who signed

13   releases and then said, whoops, maybe there are.

14   Q.   Well, you are aware, are you not, that because of the fact

15   that certain clients had signed the Lion Air release, they

16   were ultimately not included in the first group of cases that

17   were settled?

18   A.   Yes.  Yeah, I testified to this.

19   Q.   So what happens is there's a global settlement that's

20   supposed to cover everybody.  It's discovered that certain

21   cases, certain of the families had signed the release and so

22   now they're out of that agreement, correct?

23   A.   The --

24   Q.   Boeing is not going to settle with the group for that

25   total amount which was to include everybody?

**Edelson - Cross by Matthai**

1    A.   The way I understood it was that they wanted to use it as

2    an opportunity to renegotiate with the seven families and get

3    a lower number, but that they were still committed to their

4    approach of inventory settlement.

5    Q.   Okay.

6    A.   And they made that clear.

7    Q.   You knew, did you not, that although they were going to

8    renegotiate with the seven families, that they -- there was a

9    renegotiation so that the four families who had not signed the

10   Lion Air release would have a settlement?

11   A.   That was my understanding of that, correct.

12   Q.   Correct.  And so what happened is that the -- the cases

13   that were Ms. Anice, Ms. Septiana, Ms. Dian, Mr. Bias were

14   separately settled after that mediation which had intended to

15   recover all of the cases, correct?

16   A.   You're talking about mediation four, the way I'm counting

17   them?

18   Q.   Numbering mediations in this case is a very risky thing to

19   do because it's a little unclear.  But suffice it to say that

20   after that mediation where there had been a global settlement

21   for everybody --

22   A.   Yes.

23   Q.   -- seven dropped out because they've signed Lion Air

24   releases, correct?

25   A.   They didn't drop out but Boeing was trying to renegotiate

**Edelson - Cross by Matthai**

1   with them.

2   Q.   Right.  And four remained, correct?

3   A.   Yes, four they were not trying to renegotiate, correct.

4   Q.   And there was a settlement reached as to those four

5   people, or families, more accurately, correct?

6   A.   Yes, which we were papering and going through the whole

7   process.

8   Q.   Correct.  So once that settlement was -- the global -- the

9   number for those four families, which was a number for the

10  four, correct?

11  A.   Okay.

12  Q.   Then that number had to be allocated by a private judge,

13  correct?

14  A.   Yes.

15  Q.   And the releases had to be done based on that allocation,

16  correct?

17  A.   Correct.

18  Q.   And there had to be documents that were gathered from

19  Indonesia with regard to certificates of heirship and

20  confirmation of identities and that sort of thing, correct?

21  A.   Yes.

22  Q.   And then once all of that was done, then Boeing would

23  translate a release and would provide the release to your

24  office and to Girardi Keese, correct?

25  A.   Yes.   I mean, with minors, the Court had to approve as

**Edelson - Cross by Matthai**

644

1   well, but yes --

2   Q.   Correct.

3   A.   -- I agree with you.

4   Q.   And then once you had that release that had been signed by

5   the clients and had been translated, then your office moved

6   forward to obtain the order approving the minor settlement,

7   correct?

8   A.   Correct.  That's right.

9   Q.   Okay.  And you had those releases before you made those --

10  or applied for those orders, correct?

11  A.   I assume so.

12  Q.   And your counsel -- your firm was counsel of record on

13  each and every one of the Lion Air cases that we have been

14  talking about in this proceeding, correct?

15  A.   Firms aren't counsel of record in -- in the Northern

16  District of Illinois, so no, that's not correct.  But to

17  answer your question more substantively, attorneys at our firm

18  were counsel of record.

19  Q.   Fair enough.  My error.  Counsel of record from your firm

20  included yourself, Mr. Scharg, and Mr. -- was Mr. Balabanian

21  counsel appearing of record?

22  A.   I don't recall.  I know that Ari and I were.

23  Q.   You recall that Mr. Balabanian signed the motion for rule

24  to show cause?

25  A.   I don't recall that.

1  Q.  All right.  And had Mr. Griffin appeared as counsel in the

2  case?

3  A.  Explain what you mean by that.  Do you mean had he filed

4  an appearance or had he spoken in court?

5  Q.  Yes.  Had he filed an appearance?

6  A.  I don't know.  I wasn't involved in that, in those issues

7  in the case.  Ari will know all of that.

8  Q.  Okay.

9       MS. MATTHAI:  Well, rather than looking through this

10  document, Your Honor, I'll come back to that after we do take

11  our lunch break.

12       THE COURT:  All right.

13  BY MS. MATTHAI:

14  Q.  The -- in February, there was a mediation involving the

15  remaining seven clients, correct?

16  A.  This is what I'm calling the fourth mediation.  I'm not

17  trying to trip you up.  It's just so I can keep track in my

18  mind.  This is now the mediation for the seven families that

19  they were trying to renegotiate, correct?

20  Q.  Correct.

21  A.  Yes.

22  Q.  And you understood that that happened -- we have an

23  agreed-upon timeline.  It was February 12, 2020.

24  A.  Yes.  That's fine.

25  Q.  And you knew that after that agreement was made on

**Edelson - Cross by Matthai**

646

1    February 12, 2020, there would have to be the same process of

2    allocation, heirship, and releases, correct?

3    A.   That's right.

4    Q.   And at some point you became concerned that this was

5    taking a long time to get these releases to be done, correct?

6    A.   Correct.

7    Q.   So I would like to look at Exhibit 107.  We looked at

8    these e-mails earlier today, and I would like to start at the

9    last page of the exhibit which is -- it's page 107-04.

10          Now, this is an e-mail that you wrote, correct?

11   A.   Sorry.  You're not showing me the e-mail.  You're showing

12   me just the bottom of it.

13          THE COURT:  I think you want to go to 107-3.

14          THE WITNESS:  Yes, I wrote that e-mail, correct.

15   BY MS. MATTHAI:

16   Q.   All right.  And when you wrote this e-mail -- let's go up

17   just a bit -- this is May the 12, 2020, correct?

18   A.   Yes, that's when I wrote the e-mail.

19   Q.   Okay.  And you say that the settlement agreements still --

20   but you say, "Our understanding is that the holdup is that the

21   settlement agreements must be translated."

22          Do you see that?

23   A.   Yes.

24   Q.   Now, this is referring to the translation of the

25   settlement agreements on that second set of cases, correct?

**Edelson - Cross by Matthai**

1   A.   Right.

2   Q.   And you knew at this time that it was referring to the

3   settlement agreement on the second set of cases because you

4   had already filed the motions for approval on the first set of

5   cases?

6   A.   Correct.

7   Q.   So in this first e-mail in this string, we know that this

8   string refers to the second set of cases, correct?

9   A.   It refers in part to it.  I think that -- if I'm tracking

10  where you're going, you're missing the big piece.  It

11  refers -- my answer is it refers in part to that and also

12  refers to the cases more generally.

13  Q.   Well, I think the Court can read the e-mail.  The e-mail

14  refers to releases being translated, and that has to be the

15  second set of cases, correct?

16  A.   Correct.  I agree 100 percent.  But as I testified to, our

17  understanding was that they weren't funding any of the

18  settlements until everything had been signed.

19  Q.   Okay.  We'll come back to that in a minute.

20  A.   That's fine.

21  Q.   So we've -- by the way, this e-mail is one of the things

22  that your firm has pointed to as saying that you were given

23  misinformation by suggesting that there weren't going to be

24  payments as to any of the cases until all of them were funded,

25  correct?  This e-mail is part of your claim on that, right?

**Edelson - Cross by Matthai**

1  A.   That my e-mail is suggesting that they gave us

2  information?

3  Q.   This string of e-mails you've referenced for that purpose,

4  correct?

5  A.   I'm not trying to be difficult.  I'm really just trying to

6  track your question.  You're saying that we're offering this

7  e-mail for what proposition?

8  Q.   Have you offered this e-mail to the Court saying that it

9  proves that the settlements would not fund unless everyone had

10 signed releases?

11 A.   It does not prove that.  That was not -- that's not what

12 we're -- we're trying to explain to the Court what was in our

13 mindset at the time.  As I testified later, when we tried to

14 write up our motion for rule to show cause, it was jello, and

15 this was one of those things which we looked at and it was

16 jello.  They're very effective at creating jello.

17 Q.   Jello?

18 A.   Yep.

19 Q.   So one of the things you said is you couldn't -- you

20 didn't feel it was right to call Boeing because it might

21 indicate some disagreement between counsel, correct?

22 A.   Yes, I said that.

23 Q.   Doesn't it depend on what you say?

24 A.   Yes.

25 Q.   Couldn't you pick up the phone and call Boeing and say,

**Edelson - Cross by Matthai**

1  hey, just want to confirm when the first group of cases were

2  paid?

3  A.   There's -- there's a way we could have done it artfully, I

4  believe, yes.  I've thought about every move we made a million

5  times, and I definitely thought about how could I have made

6  that call artfully.

7  Q.   And you've concluded that, indeed, you could have made

8  that call artfully by just making a seemingly casual inquiry

9  about the date of the funding, correct?

10            MR. WADE-SCOTT:  Objection.

11  BY THE WITNESS:

12  A.   Yes, we should have done that, correct.

13  BY MS. MATTHAI:

14  Q.   And when you keep talking -- you said earlier today that

15  you couldn't file this motion to show cause -- rule to show

16  cause when you first thought about it because it would be

17  jello, you didn't have enough information, right?

18  A.   That's right.

19  Q.   But did you ever think about coming into court and without

20  making any accusations against anybody or without making any

21  claims that anything had been stolen, simply come to court

22  with a motion, whatever it was filed, and said, Your Honor,

23  could you make some inquiry here?  We're not certain what's

24  happening?

25  A.   Yes, of course we thought about that.

**Edelson - Cross by Matthai**

1    Q.  But you didn't do it?

2    A.  I'm happy to explain why or I can just answer the question

3    as it is.

4    Q.  And starting in June of 2020, your office had regular

5    contact directly with Mr. Girardi, correct?

6    A.  Starting in June?  We're not disputing any of the

7    timeline, so if you're saying that -- I don't have an

8    encyclopedic mind for dates as you may have noticed.

9    Q.  Fair enough.

10   A.  So I'm not trying to contradict what we've all agreed on.

11   I know that Rafey at some point was speaking to him.  I

12   guessed in my mind I thought it was July, not June.  But if

13   you're telling me it was June, that's fine.

14   Q.  Fair enough.  Let me try to do this in a more organized

15   fashion.

16          You're familiar, we looked several times at

17   Exhibit 117, correct?

18   A.  Which one is 117?

19   Q.  It is the July 10th letter from --

20   A.  Yes.

21          THE COURT:  Before you flip to that, who is Jake?

22          THE WITNESS:  Jake Courtney -- if you're asking me,

23   Your Honor?

24          THE COURT:  Yes.

25          THE WITNESS:  Jake Courtney was another partner at

1    the firm.  He was actually the person that I think our firm

2    knew the best.

3              THE COURT:  All right.

4              MS. MATTHAI:  He was another lawyer at the Girardi

5    firm.

6              THE COURT:  Okay.  And who is Ben Richman?

7              THE WITNESS:  Ben Richman is the managing partner of

8    our Chicago office at my firm.

9              THE COURT:  Okay.  All right.  Thank you.

10             MS. MATTHAI:  I'm not having any luck with this.

11   When we break for lunch, I'm going to hand the exhibit machine

12   over to Mr. Saba as I demonstrated my inability to do it

13   easily.

14   BY MS. MATTHAI:

15   Q.  You knew in March that the cases that had fully executed

16   releases and had been dismissed were Sutanto, Nawazar -- I'm

17   sorry -- Fitrasyah, and Huzaifah, the same ones that we have

18   named earlier as the first group of cases, correct?

19   A.  Yes.

20   Q.  And you knew that all of those cases had been dismissed,

21   correct?

22   A.  That's right.

23   Q.  Okay.  Now, looking back at Exhibit 107.  We've looked at

24   that initial e-mail that you sent.

25   A.  Yes.

**Edelson - Cross by Matthai**

1   Q.  And the -- Mr. Lira writes on page 107-2 at the bottom of

2   the page that he has received the translated releases for the

3   second group of cases last week.  Do you see that?

4   A.  Yes, I do.

5   Q.  And you understood that that was referring to the second

6   group of cases, correct?

7   A.  By definition.

8   Q.  And then you --

9           THE WITNESS:  I'm sorry, Judge.  There's an amount on

10  the screen that shouldn't be public.

11          THE COURT:  Yeah, let's take it off, please.

12  BY MS. MATTHAI:

13  Q.  And Mr. -- this e-mail also explains that one of the

14  clients has left the fold and is going to be represented by

15  somebody else, correct?

16  A.  We really should take this off, though.

17          THE COURT:  It is off.

18          THE WITNESS:  Oh, it is?  I'm allowed to see it,

19  Judge?

20          THE COURT:  On your screen.  That screen in front of

21  the public box is what the jury sees.

22          THE WITNESS:  I'll keep quiet.  I stand corrected.

23          THE COURT:  It's for everyone's benefit.  It was that

24  way in the other courtroom, too.  That's the best way to check

25  if it's on the public screen is that little screen in front of

**Edelson - Cross by Matthai**

1    the jury box.

2            THE WITNESS:  I just got nervous.  Sorry.  I didn't

3    mean to interrupt.

4            Your question again, please.

5    BY MS. MATTHAI:

6    Q.  Okay.  So we were at 107-2.

7    A.  Correct.

8    Q.  And at the top of that page is the question that is asked,

9    we got to go to 101, which this is an e-mail from you,

10   correct, starts at the bottom of 107-01, right?

11   A.  I'm just trying to find it.  You don't have the body of

12   the e-mail, but I see that an e-mail from me is being

13   responded to.  Yes, that was the e-mail.  Yes, I'm following.

14   Q.  Okay.  And, in fact, your e-mail says, "Do you have any

15   issue with me reaching out to Boeing's attorneys and letting

16   them know the situation and getting them to release the rest

17   of the money as we continue to get their client back on fold?"

18           Correct?

19   A.  Yes.  Correct.

20   Q.  So that was -- you're saying there that you want Boeing to

21   be willing to do the settlements with the rest of the group

22   even if this other client goes somewhere else, correct?

23   A.  Yes, but I think we're talking about two different groups.

24   I saw it as one group.  You're seeing it as two groups.  I'm

25   trying to understand your point.  That wasn't how I was

Edelson - Cross by Matthai

1    interpreting it.

2    Q.   Well, the e-mail that you're responding to is the one in

3    which you're told that there is a client who is leaving the

4    fold --

5    A.   Correct.

6    Q.   -- that's going to be --

7    A.   Correct.

8    Q.   Okay.  And then you say, can we reach out to Boeing and

9    get them to pay everyone else, right?

10   A.   Correct.  That's right.

11   Q.   And Mr. Lira responds, "Boeing's lawyers will release the

12   money once they are in receipt of the executed releases.  I'm

13   hopeful the majority will trickle in by the end of the week so

14   we are good with Boeing," correct?

15           THE WITNESS:  Objection.  That misstates the exhibit.

16   She added a "the" there.

17           But you got the substance of it.  We don't need to

18   quibble with that.

19           MS. MATTHAI:  Okay.

20           THE WITNESS:  You just misread it with one word.

21   That's unimportant.  It's fine.

22           MS. MATTHAI:  I apologize if I misspoke.

23           THE WITNESS:  Your question was clear.

24   BY MS. MATTHAI:

25   Q.   Okay.  So Mr. Lira's response was that we were good with

**Edelson - Cross by Matthai**

1    Boeing and they will release the money once the releases are

2    signed, correct?

3    A.   Correct.

4    Q.   And you understood that the process was ongoing to get

5    those releases signed, correct?

6    A.   Yes, we under- -- go ahead.  I don't want to make

7    argument.

8    Q.   And those releases were, in fact, signed, correct?

9    A.   Yes.

10   Q.   That is the --

11   A.   Yes.

12   Q.   There were clients who had left.  They stayed left.  But

13   the remainder were signed, correct?

14   A.   That's right.

15   Q.   And in that remaining group, there were two families who

16   had minors, correct?

17   A.   I believe so.

18   Q.   And your office filed the motions to have those

19   settlements with the minors approved, correct?

20   A.   I'm sure we did.

21   Q.   Okay.  And the releases for those cases, like every other

22   release, said that Boeing was obligated to fund the money

23   within 30 days of the signature on the release, correct?

24   A.   That's right.

25   Q.   Did you ever ask any lawyer at Boeing whether they had

1    funded the settlements within 30 days of the releases as was

2    required by the releases?

3    A.   No, I testified to that.  We did not.

4    Q.   Did you ever ask when you were under this impression, as

5    you've testified to that the money had not come in, did you

6    ever have a conversation with any lawyer at Girardi Keese as

7    to why money had not come in when the releases say pay within

8    30 days?

9    A.   Yes.  I mean, I didn't personally but people in my firm

10   did, yes.

11   Q.   You had no personal conversation about that, correct?

12   A.   Correct.

13   Q.   Now, you -- at some point you learned that Mr. Lira was

14   leaving the firm, correct?

15   A.   Yes, through Ari.

16   Q.   And Mr. Lira asked that a call be set up in order to

17   discuss the Lion Air matters, correct?

18   A.   Okay.  I wasn't part of that communication, but I don't

19   have any reason to doubt that.  I usually get the high points

20   of a conversation.  I don't necessarily hear every logistical

21   part of it.

22   Q.   But you did participate in writing Exhibit 117, correct?

23   That's the July --

24   A.   Yes.

25   Q.   -- 10th letter that your office sent?

Edelson - Cross by Matthai

1  A.  Absolutely.

2  Q.  And in that letter, it states that Mr. Lira on June 11th,

3  days before he left the firm, had asked to set up a call and

4  that that call happened on June the 16th, correct?

5  A.  I don't have the letter in front of me, but sure, if

6  that's what it says, then that was our understanding.

7  Q.  You weren't intending to say anything untruthful in this

8  letter, right?

9  A.  I didn't hear you.

10  Q.  You weren't intending that anything be said in this letter

11  that was not true, correct?

12  A.  That's right.

13  Q.  All right.  And the letter reflects the fact that the call

14  occurred and that the Edelson firm was advised that the

15  settlements had been funded, correct?

16  A.  That's right.

17        MR. WADE-SCOTT:  Objection, Your Honor.  Can we -- if

18  we're going to go over the letter, can we put it up on the

19  screen?

20        THE COURT:  Sure.  Yeah.  Let's put 117 up.

21  BY MS. MATTHAI:

22  Q.  So if we go to the second page of 117, we see that -- if

23  we go to the second paragraph.

24  A.  Yes.

25  Q.  And it says, "Several more weeks passed with Ari and I

1   repeatedly reaching out to Keith and David with limited

2   success until eventually on June 11th we got an e-mail from

3   David asking to set up a call to discuss the status of the

4   cases."

5           Do you see that?

6   A.  Yes.

7   Q.  Now, when you wrote this letter, when you say "with

8   limited success," are you referring to these e-mails that went

9   back and forth about getting the releases done as having

10  limited success?

11  A.  Ask the question again.

12  Q.  Sure.  When you say you had limited success in these

13  communications, were you referring to the communications we've

14  looked at with regard to getting the releases done on the

15  second group of cases?

16  A.  I think it was all of it.  I don't think it was just the

17  e-mails.  It was the constant phone calls.  We were nagging

18  them all the time to try to get answers and it was just

19  squishiness.

20  Q.  Answers to what?  Why the releases weren't done?

21  A.  The -- you'll have to remind me of this.  This -- this

22  specific paragraph was written by Rafey, and I apologize.  I

23  know that because there's a grammatical mistake which he would

24  make and I wouldn't make.  So I'm not 100 percent sure what he

25  was referring to at that point.

1   Q.  All right.  But if we look here, it says on that call --

2   A.  Yes.

3   Q.  -- which occurred on June 16th, David, who had just

4   resigned from GK, explained that the settlements had, in fact,

5   been funded.  You see that?

6   A.  Yes.

7   Q.  And it then says "despite previous representations."  Are

8   you referring to this claim that Mr. Lira told you that all of

9   the cases had to be settled before any cases would be funded?

10  A.  Yeah.  You seem to be looking at it in terms of, like, we

11  only had one piece of information.  We had constant phone

12  calls with them.  So we were getting this narrative constantly

13  which is money hasn't come in, or at least that's how we

14  understood it.

15  Q.  Is it your testimony, sir, that Mr. Lira told you that no

16  money had come in on July -- before July 10, 2020?

17  A.  No.  As I've testified, Mr. Lira and I didn't speak about

18  this.

19  Q.  Right.

20  A.  So he wouldn't have told me anything.

21  Q.  Right.  So whatever confusion may have existed based on

22  this issue of first set of settlements and second set of

23  settlements, there could be no remaining doubt as of June 16,

24  2020 that all of the settlements had funded, correct?

25  A.  The -- that was our understanding based on what he said.

**Edelson - Cross by Matthai**

1  Q.  Okay.  And then if we go down to the bottom paragraph of

2  this letter, it says that after the call that David

3  participated in, there was a call with June -- excuse me --

4  with Keith on June 18th, and you also spoke with him on

5  June 30th, correct?

6  A.  You said "you."  The firm did, not me, as long as we're

7  clear about that.

8          THE COURT:  It says "I spoke to him."  I think the

9  letter is from Mr. Balabanian, so I think it's --

10          MS. MATTHAI:  Fair enough.

11  BY MS. MATTHAI:

12  Q.  The letter was signed by Mr. Balabanian, but this letter

13  was a group project, correct?

14  A.  It was a project between --

15  Q.  You discussed --

16  A.  I didn't mean to interrupt.

17  Q.  I interrupted you.

18  A.  It was -- Rafey and I were the ones who were -- who were

19  co-drafting it.  It may have had other eyes or edits, but it

20  was me and Rafey.

21  Q.  Okay.  And when you participated in drafting this letter,

22  you referred to the conversation with Keith on June 18th and

23  June 30th, correct?

24  A.  I'm sorry.  I'm having trouble hearing I think partly

25  because of your mask.  Is it possible you could just repeat

1    that?

2    Q.  I lost the end of that sentence, but let me --

3            THE COURT:  Just ask the question again.

4            MS. MATTHAI:  Sure.

5    BY MS. MATTHAI:

6    Q.  "Ari spoke with Keith on June 18th and I spoke with him on

7    June 30th"?

8            Correct?

9    A.  And Rafey spoke with him on June 30th, correct.

10   Q.  Okay.  And did Ari and Rafey tell you what had been said

11   in those conversations?

12   A.  Yes.

13   Q.  And at that point, your firm was told that the clients had

14   been paid about half of the settlement funds, correct?

15   A.  No.

16   Q.  Well --

17   A.  I can explain it.

18   Q.  "Since Tom handles the finances of the firm" -- let me

19   read the letter exactly.  I'll try to not do it incorrectly.

20           "Keith's response was that he didn't know for

21   certain" --

22   A.  Correct.

23   Q.  -- "since Tom handles the finances of GK but that he

24   believed that to date the clients had been paid about half of

25   what they are owed."

**Edelson - Cross by Matthai**

1   A.  Correct.  Right.  So he said he didn't know for certain,

2   but that's what he thought.

3   Q.  And -- okay.  And after --

4   A.  Well --

5   Q.  -- when you were told -- that is, Mr. Balabanian confirmed

6   to you, Mr. Scharg confirmed to you -- that it appeared that

7   only half, at least Keith was saying, that he believed that

8   only half had been paid, you recognized that that was a

9   violation of the court order, correct?

10  A.  That -- that what was a violation?  If they had only paid

11  half?

12  Q.  Correct.

13  A.  If they had only paid half, then that would have been a

14  violation of the court order, correct.  That's why we were on

15  DEFCON 5.  That's right.

16  Q.  Okay.  I'm told by somebody who knows these terms better

17  than me that DEFCON 5 is the lowest level and DEFCON 1 is

18  actually the highest level.  Are you trying to say the highest

19  level or the lowest level?

20  A.  My understanding is DEFCON 5 is the highest.  DEFCON 1 is

21  the lowest.  If I'm incorrect, then I am -- I was not

22  attempting to be misleading.  In my view, DEFCON 5 is the

23  highest and it's out of 5.

24  Q.  Okay.  So putting aside which is which, you were -- you

25  were saying that you were at the highest alert because you had

**Edelson - Cross by Matthai**

1    heard from Keith that these families may have only been paid

2    half, correct?

3    A.  Correct.

4    Q.  And you're a plaintiff's firm, correct?

5    A.  Yes.

6    Q.  You have a trust account, right?

7    A.  We do.

8    Q.  And you know that client money is supposed to go into the

9    trust account, correct?

10   A.  Correct.

11   Q.  And you know that the money that is paid for a settlement

12   is supposed to come out of that trust account to the client in

13   full, correct?

14   A.  Not -- not necessarily.  As I --

15   Q.  I forgot the fees.  Fair enough.

16   A.  I wasn't talking -- I wasn't thinking about fees.  But

17   there can be other arrangements, if the client agrees, to be

18   paid in installments.  That's not -- not something that our

19   firm does, but I don't -- I don't recall any situation where

20   we would be involved in anything like that.  But that was a

21   possibility.

22   Q.  When you had a release that said the money was to be paid

23   in full to the plaintiff with wiring instructions as to where

24   the funds were to be wired to the plaintiff, that they were to

25   be paid in full within 30 days?

**Edelson - Cross by Matthai**

1   A.   Yeah.  I've testified to this, that there -- that there

2   are these qualified settlement funds that are -- that

3   people -- people set up.  It -- so -- yes, it's possible that

4   a client can say, for whatever reason, I would rather not get

5   all the money right away.  That's not our practice, but that's

6   possible.  And it would be a technical violation of the court

7   order.

8   Q.   Well, there's never been the idea of a qualified fund

9   anywhere near this case, has there?

10  A.   Yes.  I testified to that.  What do you mean?

11  Q.   You testified it was a possibility.

12  A.   I testified that that is common practice that we see in --

13  in kind of all of our significant cases.

14  Q.   Okay.

15  A.   So that was something that was on my mind.  But no, if

16  you're asking whether -- whether it was ever relayed to me

17  that Mr. Lira or Mr. Griffin said qualified settlement fund,

18  they did not.

19  Q.   Right.

20  A.   Correct.

21  Q.   There was never a claim that any delay was the result of

22  having to set up a qualified settlement fund, right?

23  A.   No, it was always mush.  It was mush that they gave us.

24  Q.   Whether it was mush or not, that mush didn't include an

25  assertion that the delay was because of the need to set up a

1  qualified settlement fund, correct?

2  A.  They didn't say that specifically, but that could have

3  been an understanding of when they just said tax issue.

4  Everything was mush.

5  Q.  Did you say to Mr. Lira or Mr. Griffin at any point, is

6  there a qualified settlement fund in connection with this

7  case?

8  A.  As you know, I didn't speak to them.

9  Q.  Right.  But you did have the releases which specified

10  payment in 30 days?

11  A.  Yes.

12  Q.  And those releases provided where Boeing was to pay the

13  money and also provided the wiring instructions for the

14  payment of those monies to all of the claimant families,

15  correct?  That was in the original release?

16  A.  Yes.

17  Q.  And those releases were provided in connection with

18  getting the orders approving these settlements, and the orders

19  approving these settlements required that the funds be paid to

20  the plaintiffs, I think it's as reasonably -- as soon as

21  reasonably possible.  I'm not sure of the exact language.  I

22  don't have it in front of me.  But it has no provision for

23  delay in those orders, does it?

24  A.  In -- no, I think it was like as soon as practicable.  I

25  don't remember the exact language, but there was words to the

**Edelson - Cross by Matthai**

1    effect of get it done.

2    Q.  Pay them, correct?

3    A.  Yes, correct.

4    Q.  And as of certainly no later than June 30th, the second of

5    the two calls with Mr. Griffin, your firm had been told that

6    only half of the money had been paid to the plaintiffs,

7    correct?

8    A.  I feel like either I'm missing something or I've answered

9    this, but what we were told was -- so Keith said he didn't

10   know.  He's not in charge of the accounting.  But what he

11   thought was that half was paid.  That's what he said.

12   Q.  And that would be a violation of the Court's order,

13   correct?

14   A.  That's right.

15            MS. MATTHAI:  Your Honor, would this be a good point

16   for --

17            THE COURT:  Yes, it's 1:00.  Let's break right now.

18   And is half an hour too short?  Do you need 45 minutes or

19   could we do this in a half an hour?  I'm very cognizant of the

20   time that we've got you in from California.  I would like to

21   finish this testimonial part of everything today.

22            MS. MATTHAI:  I think a half hour will do.

23            THE COURT:  Fine.  Half an hour.  Thank you.

24     (Lunch recess had from 1:01 p.m. to 1:31 p.m.)

25

```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3    WELLY CHANDRA, et al.,           )
                                       )
 4                    Plaintiffs,      )
                                       )
 5    -vs-                             )
                                       ) Case No. 18 C 7686
 6    THE BOEING INTERNATIONAL SALES   )
      CORPORATION, a Washington        ) Chicago, Illinois
 7    State Profit Corporation, et     ) December 14, 2021
      al.,                             ) 1:31 p.m.
 8                                     )
                      Defendants.      )
 9

10               TRANSCRIPT OF PROCEEDINGS - Volume 3
                BEFORE THE HONORABLE THOMAS M. DURKIN
11
      APPEARANCES:
12
      For Edelson PC:        MR. ALEXANDER G. TIEVSKY
13                           MR. JAY EDELSON
                             MR. J. ELI WADE-SCOTT
14                           Edelson PC
                             350 North LaSalle Street, 14th Floor,
15                           Chicago, Illinois  60654

16    For Keith Griffin:     MR. RYAN D. SABA
                             Rosen Saba, LLP
17                           9350 Wilshire Boulevard, Suite 250
                             Beverly Hills, California  90212
18
19    For David Lira:        MS. EDITH R. MATTHAI
                             Robie & Matthai
20                           350 South Grand Avenue, Suite 3950
                             Los Angeles, California  90071
21
22
      Court Reporter:        KELLY M. FITZGERALD, CSR, RMR, CRR
23                           Official Court Reporter
                             United States District Court
24                           219 South Dearborn Street, Room 1420
                             Chicago, Illinois  60604
25                           Telephone:  (312) 818-6626
                             kmftranscripts@gmail.com
```

1      (Proceedings heard in open court:)

2            THE COURT:  Back on the record.

3            I had a question for Mr. Edelson that I meant to ask

4  when he was testifying earlier.

5            You had said that there are a lot of other people

6  involved, and I had clarified.  I had asked you to clarify.

7  You mean on this case.

8            THE WITNESS:  Yes.

9            THE COURT:  What were you talking about?

10           THE WITNESS:  Well, the -- this is -- this is all --

11 we're in speculation, but I'm happy to answer the question.

12           THE COURT:  Sure.

13           THE WITNESS:  I think what's going to be found over

14 time is that this really was a criminal operation.  They were

15 running a Ponzi scheme and that a lot of the other attorneys

16 in their firm were involved in it too.

17           We also have other people like this Mohamed attorney

18 who apparently was taking money through this whole thing.  No

19 one has ever heard a peep from him.  I just think everything

20 that's being investigated, I think that there are a lot of

21 people who knew about this stuff and were just kind of going

22 along for the ride, getting money.

23           THE COURT:  All right.  Well, that was what I wanted

24 to clarify.

25           And then I had a question.  There was a person named

1    Jake who was on that e-mail, 1 --

2            THE WITNESS:  Jake Courtney?

3            THE COURT:  Yes, 107, I believe.

4            THE WITNESS:  Yes.

5            THE COURT:  I have not heard his name other than the

6    context of this e-mail.  Does anyone believe -- was he

7    involved in this, involved -- in this, I mean, was he involved

8    in the Boeing settlements?

9            THE WITNESS:  I could explain why we cc'd him.

10           THE COURT:  Go ahead.

11           THE WITNESS:  It was basically he was the person that

12   we had the -- the firm had the closest connection to.  So it

13   was saying, like, Jake, come on, can you help us out.

14           THE COURT:  All right.

15           Go ahead.

16           THE WITNESS:  We don't have any reason to believe

17   that he was involved.  They would know better than us

18   obviously.

19           THE COURT:  I couldn't hear the last part.

20           THE WITNESS:  David and Keith would know better than

21   we would, but we don't have any reason to believe he was

22   involved.

23           THE COURT:  All right.  Well, I don't see his name on

24   any other e-mails really other than this one.  And if I missed

25   it and it's there in the drafted documents, I'll find out when

I go through each document. But I hadn't seen it earlier which was why I asked. That's all.

Okay. Go ahead, Ms. Matthai.

MS. MATTHAI: Thank you.

I believe the next document while it doesn't have exact numbers in it should nevertheless not go on the public display because somebody can do the math, I fear.

THE COURT: 117-005.

MS. MATTHAI: This is 117-055.

THE COURT: And this should not be on public display? Yeah, I see numbers here.

Go ahead.

JAY EDELSON, WITNESS, PREVIOUSLY SWORN,

CROSS-EXAMINATION (Resumed)

BY MS. MATTHAI:

Q. So, Mr. Edelson, we had been talking about the July 10th Edelson firm letter, and we'll go back to that in a moment.

But, first, this is a letter that was sent to Mr. Scharg and Mr. Balabanian on July 6, 2020, correct?

A. That's right.

Q. And you were made aware of this letter, were you not?

A. I was.

Q. Okay. And the letter states it's a follow-up to our telephone conference on June 16, 2020, correct?

A. Yes, it does.

**Edelson - Cross by Matthai**

1    Q.  It goes on to say, "Five of these cases were referred to

2    Keith Griffin.  The other six cases were directly referred to

3    me."

4            Do you see that?

5    A.  I do.

6    Q.  That's the same distinction between the two groups of

7    cases that we've seen before and in particular in the two

8    different fee agreements with your firm, correct?

9    A.  Yes, I'm following you.  I'm not disagreeing with you.

10   Q.  Okay.  And, in fact, this letter goes on to refer to the

11   fact that there were two different fee agreements with the

12   Edelson firm on the two different groups of cases, correct?

13   A.  Yes.

14   Q.  And the July 6th e-mail -- or excuse me -- the July 6th

15   letter confirms what had been said in the June 16th telephone

16   conversation, that all of the releases in Keith's cases have

17   been delivered to Boeing and have been funded, correct?

18   A.  I don't think that we're -- that we understand that

19   conversation the same.  But I see in the letter it speaks for

20   itself and you're not misreading it.

21   Q.  Doesn't your July 10th letter state that you were told

22   that those cases had funded on the June 16th call?

23   A.  That all of the cases had been funded.  That was our

24   understanding.

25   Q.  All right.  We can look at the letter to verify what it

**Edelson - Cross by Matthai**

1    actually says.

2            Okay.  And then as to the group that was referred to

3    Mr. Lira, he says, "Six have funded due to the delivery of the

4    release."

5            Correct?

6    A.  Yes.

7    Q.  Okay.  And that confirms exactly what he had said in that

8    e-mail, that once Boeing got the releases on these individuals

9    that the settlements would be funded, correct?

10   A.  We have a different understanding of that -- of what he

11   was conveying to us.  So I'm happy to keep debating it.  I

12   understand your view.  I've made my view clear.

13   Q.  Well, the July 6 letter says that six of the cases that

14   were referred to Mr. Lira have funded because the releases

15   have been delivered, correct?

16           MR. WADE-SCOTT:  Objection.

17           THE COURT:  What's the objection?

18           MR. WADE-SCOTT:  The document says something slightly

19   different.

20           THE WITNESS:  I'm tracking it, Eli.  It's okay.

21           MR. WADE-SCOTT:  Okay.

22           THE COURT:  All right.  Well, objection overruled.  I

23   think the witness -- if there's a correction, if there's a

24   summary of the letter that you think is -- should be

25   corrected, you can do so in response to the question.

1    BY MS. MATTHAI:

2    Q.   The letter goes on to say that there are remaining

3    families that have not signed releases, correct?

4    A.   That's right.

5    Q.   So this makes it clear that even though all the families

6    have not signed releases that Boeing has funded the cases

7    where releases have been signed, correct?

8    A.   The -- yeah, is your point that we should have understood

9    that previously they were lying to us by this?  I'm not

10   tracking what your --

11   Q.   No, Mr. Edelson, I don't think you should have figured out

12   they were lying because they never told that lie.  Either

13   there was a misunderstanding or it's a deliberate way to say

14   we didn't know.  But if there was any misunderstanding that

15   remained, it certainly was disabused by this letter of

16   July 6th when Mr. Lira makes it clear that not everybody has

17   signed the release, but the ones where there are releases that

18   have been signed have been funded, correct?

19   A.   So if you're -- and I'm not trying to debate you, but I'm

20   just looking for clarity.  If you remember my testimony in

21   July, that's when Tom started getting involved and said that

22   there was this mistake being made.  So we weren't focused on

23   our previous understanding of what I think is a lie and you

24   think we just misunderstood or fabricating or whatever it was.

25   It was that in July he was then saying, you know, there was

1  some sort of accounting mistake and trying to work it out but

2  I've got cancer.

3  Q.  Okay.  In any event, by July 6th, you couldn't have had

4  any remaining theory that some cases hadn't funded because not

5  everybody had signed the releases, correct?

6  A.  That's not -- that's mostly correct.  It's not entirely

7  correct.  This -- so it was always very hard for me to make

8  heads or tails out of anything they said.  Even this letter

9  when they're talking about -- they're making it seem like

10  there's two different firms here, you know.  The idea that

11  their case is referred to one attorney in a firm and then

12  another case is referred to another attorney in the firm and

13  there are different deals and all of that made very little

14  sense.  This idea that David is taking the money and then he's

15  giving us some portion of fees and then the rest is going to

16  Girardi Keese who also has a portion of fees, none of that

17  made any sense either.

18  Q.  So where's the e-mail that says, Dear Mr. Lira, I do not

19  understand the following things.  Please explain:  No. 1,

20  No. 2, No. 3, No. 4?  There's no such e-mail, is there?

21  A.  We -- we told him we weren't cashing the check because all

22  of this was -- you can wave your hands if you want, but we

23  told him we're not cashing the check which we still have not

24  cashed to this day because it was all mush.

25  Q.  My question --

1    A.   And what we were told was speak to Tom which is what we

2    did.

3    Q.   My question, Mr. Edelson, where is the e-mail that says,

4    we do not understand what you are saying.  Please tell us the

5    following information:   When did Boeing fund each of these

6    settlements?  What happened to the money that Boeing funded

7    with the settlement?  We've received information from

8    Mr. Griffin that only half of the money has been paid to the

9    plaintiff.  If that's true, if that's what's happened, that's

10   not correct.

11   A.   Right.

12   Q.   Why has that happened?

13   A.   Right.

14   Q.   We don't have an e-mail that says that, do we?

15   A.   We do.  We've been over it, like, eight times.  This was

16   the July letter or e-mail that Rafey and I wrote.  We asked

17   those specific questions.  We went through it in detail.  We

18   said all those things.  The only thing I disagree with is that

19   you keeping saying that Keith told us for certain that half

20   had been funded and ask he didn't.  He said he wasn't sure.

21   All of that was in the thing.  We documented it.  We

22   memorialized it very clearly.

23   Q.   Okay.  So in this July --

24   A.   So is your question why did we not then do it again?

25   Q.   So this July 10th letter is what you're pointing to as

1   your firm is making inquiries on all of these subjects,

2   correct?

3   A.  It's not the totality of it.  You are saying why wasn't

4   there ever anything in writing, and my response was there was.

5   But most of the communications were on the phone or text

6   message or e-mail.  It's not that those aren't in writing, but

7   you meant like, you know, a full memorialization which we did.

8   Q.  Okay.  Let's go to 117-3.  Now, you did ask for

9   information in this letter of July 10th, didn't you?

10  A.  Yes, I just testified to that.

11  Q.  I'm -- you ask that information be given on Monday,

12  July 13, 2020, correct?

13  A.  That's right.

14  Q.  And this letter is to Mr. Girardi and Mr. Lira, correct?

15  A.  You'd have to show me, but I'm not sure if Keith was cc'd

16  or not.

17          THE COURT:  Yeah, it's to Girardi and Lira.  It's on

18  the cover.  You don't have the full letter.  You're just

19  seeing the page in front of you.

20          THE WITNESS:  But it was -- I assume it was sent by

21  e-mail, and I don't know if Keith was cc'd.

22          THE COURT:  He is.

23          THE WITNESS:  Okay.  Thank you.

24  BY MS. MATTHAI:

25  Q.  Now, Mr. Lira responded on Monday, July 13, 2020, didn't

**Edelson - Cross by Matthai**

1  he?

2  A.  If you can pull up the letter.

3  Q.  Okay.  We'll get to that in a second.  Mr. Girardi did not

4  provide a response to this letter, correct?

5  A.  If you're saying he didn't provide a written response, he

6  was on the phone with Rafey.  They were talking consistently,

7  and I've explained his response:  I've got cancer, tumor,

8  brain tumor, hospital.

9  Q.  Well, those conversations happened -- we've seen the texts

10  of Mr. Balabanian come back --

11  A.  Oh, is that earlier?  Did I mess up the time frame?  I'm

12  sorry.

13  Q.  Yes, you did.

14  A.  I apologize.  He -- so -- apologies.  The -- we just keep

15  jumping out of order, and I'm -- so no.  So after that letter,

16  then that was when Tom said there was a mistake made and --

17  and he was figuring it out.

18  Q.  Okay.

19  A.  Sorry.  I'm on the right page now.

20  Q.  Okay.  But other than the text messages that memorialize

21  conversations with Mr. Balabanian, you don't have a written

22  response from Mr. Girardi to your letter of July 10th,

23  correct?

24  A.  That's right.

25  Q.  You did get a written response from Mr. Lira, correct?

**Edelson - Cross by Matthai**

 1   A.  You're saying that, and I'm sure you're right.

 2        MS. MATTHAI:  This has no numbers in it so it can be

 3   displayed.

 4        MR. SABA:  It's 118 -- 119 -- or 118.

 5        MS. MATTHAI:  118.

 6        MR. WADE-SCOTT:  Are you looking for 118?

 7        MS. MATTHAI:  I got it.  Somehow it went to page 2.

 8   I'm sure I hit the wrong thing.

 9   BY MS. MATTHAI:

10   Q.  I have up on the screen Exhibit 118.

11        Do you see that?

12   A.  Yes.

13   Q.  Okay.  And this was Mr. Lira's response to your firm's

14   letter of July 10, 2020, correct?

15   A.  Yes, that's right.

16   Q.  And Mr. Lira says that a number of the statements in your

17   letter are factually incorrect, correct?

18   A.  That's right.

19   Q.  He says, "First and foremost, I have never stated or

20   represented that the entirety of the cases would not fund

21   until Boeing received all 11 executed releases."

22        Do you see that?

23   A.  Yes, I see what he said.

24   Q.  And the end of that paragraph says, "I would never agree

25   to a condition whereby individual case funding would be

**Edelson - Cross by Matthai**

1   dependent on other cases satisfying the conditions of

2   settlement."

3           Do you see that?

4   A.  Uh-huh.  Yes, I do.

5   Q.  Okay.  He goes on to talk about the mediation that

6   occurred on February 12, 2020, where the second group of cases

7   were settled.

8           Do you see that?

9   A.  I see all that, yes.

10  Q.  And Mr. Lira goes on to identify those cases, correct, as

11  direct referrals to him by Tony Koushan?

12  A.  That's what he represents, correct.  Correct.

13  Q.  And the four cases that settled in late 2019 were direct

14  referrals to Keith and Tom, correct?

15  A.  I don't know what that means, but sure.

16  Q.  Well, whether or not you understood it --

17  A.  Yes --

18  Q.  -- fully --

19  A.  Yes.  I see it in there.  I didn't mean to add extra

20  commentary.

21  Q.  Well, no, I want to make sure that I have an answer to

22  this question.

23          Whether or not you fully understood this distinction

24  and why it existed, clearly on July 13, 2020, a distinction

25  was being made between the cases that were referred to

**Edelson - Cross by Matthai**

1    Mr. Lira by Mr. Koushan and the cases that had been direct

2    referrals to Keith and to Tom, correct?

3    A.   He was trying to make that distinction, correct.

4    Q.   Well, they were two different groups of cases, were they

5    not, that settled at two different times?

6    A.   Again, I'm happy to debate this with you.  We negotiated

7    it as one group of cases.  We reached a settlement, an

8    inventory settlement; and then they wanted to renegotiate a

9    few based on the Lion Air releases, and that happened.

10   Q.   All right.  You will -- did you read this letter?

11   A.   I did.

12   Q.   Okay.

13   A.   It was fairly shocking.

14   Q.   It was fairly shocking to be told that there were two

15   groups of cases or that it was -- that he didn't know the

16   status of the funding -- excuse me -- the fund -- did not know

17   the current status of the payment to the other four clients?

18   A.   No, that -- thank you for asking.  No, what was shocking

19   was the second paragraph.  He -- he portends that he's this

20   paradigm of integrity, you know, "I would never do any of

21   these things," as he's -- what he's saying is but of course

22   the clients, you know, it was funded before and they didn't

23   get paid.  It was just craziness to read that.  Total

24   craziness.

25   Q.   Well, he told you that he wouldn't agree that money didn't

**Edelson - Cross by Matthai**

1    have to be paid if there was a settlement that didn't go

2    through, correct?

3    A.   But he's fine with the clients -- with the firm stealing

4    the money.  He is fine with that.  But he, he is never going

5    to allow some sort of untoward settlement agreement, but it's

6    okay if he and his boss steal the money.  Yes, I thought that

7    that paragraph was insane.

8         MS. MATTHAI:  I'm going to move to strike as

9    nonresponsive and unfortunate.

10        THE COURT:  All right.  Well, I understand the

11   dispute.  Motion is denied but just ask your next question.

12        Please try and answer the questions that are put to

13   you.

14        THE WITNESS:  Yeah, I apologize.  But she did ask

15   what was remarkable about it, Your Honor, but I hear you.

16        THE COURT:  Yeah.  I mean --

17        THE WITNESS:  I agree.

18        THE COURT:  -- it doesn't advance the cause.  Just

19   state --

20        THE WITNESS:  Your Honor, I hear you.  I apologize.

21        THE COURT:  Go ahead.

22        MS. MATTHAI:  Okay.

23   BY MS. MATTHAI:

24   Q.   The bottom of page 1 of this letter says, "Third, the

25   three cases from my referring source in which fully executed

1    releases had been received are fully funded and the clients

2    have received their settlement monies."

3    A.  Yes.

4    Q.  And that's true, correct?

5    A.  Did you say "and that's true"?

6    Q.  That's true?

7    A.  That's my understanding.

8    Q.  All right.  And then if we go to page 2 of this letter,

9    Exhibit 118.  In the second paragraph on page 2, Mr. Lira

10   says, "I have never represented or stated that my new firm

11   would be responsible for attorneys' fees due your firm.  That

12   would be insanity as I have not, nor will I receive any

13   compensation on the Lion Air cases."

14          So he's responding directly to an assertion that was

15   made in your July 10th letter, correct?

16   A.  Yes.

17   Q.  And then he says, "Lastly, as to the current status of

18   payment to the four clients settled in late 2019 and referred

19   to Keith and Tom, I do not know the current status.  I

20   resigned from Girardi Keese effective June 13, 2020, and do

21   not have access to such information."

22          And then we start having the communications between

23   Mr. Balabanian and Mr. Griffin, as well as the -- as well as

24   the conversations that you've talked about, correct?

25   A.  The --

1   Q.   Telephone calls?

2   A.   With Tom you're saying?

3   Q.   Yes.

4   A.   Yes.

5   Q.   Okay. I have put up 119. We've looked at this exhibit

6   before.

7           MR. WADE-SCOTT: I'm going to -- it's not quite an

8   objection. There's a substitute 119 that we've been using for

9   this proceeding that's -- it's the same content but resolved

10   an issue that Mr. Saba raised before we got here. Do you have

11   the --

12           THE COURT: Do you have the one that's redacted on

13   pages 20 -- I think it's 19, 20, and 21?

14           MR. WADE-SCOTT: It was that, and then there's

15   some -- some of the time stamps are slightly off so we

16   replaced it with a perfectly accurate version. I don't

17   know --

18           THE COURT: Why don't you put it up on the screen

19   from your computer.

20           MR. WADE-SCOTT: Sure. I can do that.

21           THE COURT: Is that okay, Ms. Matthai?

22           MS. MATTHAI: Sure. And maybe that will figure --

23           THE COURT: And just maybe direct him to the page you

24   want.

25           MS. MATTHAI: This has been a nightmare because we

1    keep getting different versions, and frankly, I can't keep

2    track.  And I'm not sure --

3              THE COURT:  I'm working off the version that's in the

4    binder, and I think that's the current version.

5              MR. WADE-SCOTT:  Yeah.  There's one version in all

6    the binders.

7              THE COURT:  And if you want to put that up on the

8    ELMO or have them put it up on their computer screen, either

9    way works.

10             MS. MATTHAI:  Well, I don't want to pout, but the

11   problem is when these got redone, they changed configuration

12   making it nearly impossible to find what you're looking for on

13   these things.

14             THE COURT:  Do you have a page number?

15             MS. MATTHAI:  Well, the page numbers changed.

16             THE COURT:  Oh.

17             MS. MATTHAI:  That's the problem.  So let me -- I

18   will be slightly slow, but I will --

19             MR. SABA:  Ms. Matthai?

20             MS. MATTHAI:  Yes.

21             MR. SABA:  Maybe you could try Exhibit 119-2.  Oh,

22   that's what you have.  I'm sorry.  There's another version.

23   Hold on.  Sorry.  The other version is -- give me one second,

24   Your Honor.

25             MS. MATTHAI:  Yeah.  This is -- this is -- I mean

1    I've had these tabbed like three different times.

2            MR. SABA:  Try Exhibit 3 -- try Exhibit 302-1.

3            MS. MATTHAI:  Well, I'm willing to take suggestions.

4    Let me see what I pull up.

5            MR. SABA:  Actually maybe Edelson's counsel can help

6    us out.  I think that's the best way to do it.

7            MR. WADE-SCOTT:  Yep, I can do that.  If you're

8    looking for a particular date, we can go right there.

9            MS. MATTHAI:  Well, let's see if we can do it that

10   way.

11           MR. SABA:  I think 119-2 is the correct --

12           MS. MATTHAI:  I appreciate the help if I can get

13   to --

14           THE COURT:  One at a time.

15           MS. MATTHAI:  Okay.

16           MR. SABA:  I think the best thing to do is to have

17   Edelson assist in this.  It would be Exhibit 119-2.

18           THE COURT:  All right.

19           MS. MATTHAI:  Okay.  Let's go to the next --

20           MR. WADE-SCOTT:  Is there a plug-in?

21           MS. MATTHAI:  -- which is dated --

22           MR. WADE-SCOTT:  Sorry.  Your Honor, we're working on

23   it.  We've been -- we need a plug-in at this table.

24           THE COURT:  All right.  What date were you looking

25   for?

1     MS. MATTHAI:  Let's start with July 14, 2020.

2     THE COURT:  All right.

3     MR. SABA:  Want to use the ELMO?

4     THE COURT:  All right.  The ELMO --

5     MS. MATTHAI:  This is the ever-changing exhibit.

6     MR. WADE-SCOTT:  This exhibit has been the same since

7  we started this proceeding.  I understand the frustration

8  though I can help if you would like.

9     THE COURT:  All right.  This is 119-02, dated July

10  14th.  It's text messages between Mr. Griffin and

11  Mr. Balabanian, correct?

12     MS. MATTHAI:  Correct.

13     THE COURT:  Okay.  You've got it up on the screen.

14  You might need to reduce it a little so the full amount comes

15  in.

16     MS. MATTHAI:  Right.  And then I've got a -- Mr. Saba

17  has kindly asked -- has kindly agreed to assist me to try to

18  get to the right ones.

19     THE COURT:  All right.

20  BY MS. MATTHAI:

21  Q.  So we're now on July 14, 2020.  And the text from

22  Mr. Balabanian says, "Hey, man, is Girardi going to respond?

23  Want to jump on the phone today?"

24     Do you see that?

25  A.  I do.

**Edelson - Cross by Matthai**

1   Q.  And the response is, "I don't know if he has read it yet.

2   I can do a call later today if that works."

3          Correct?

4   A.  I don't know if I heard you read it correctly, but I

5   assume you did.  "I don't know if he has read it yet."  If

6   that's what you said, yes.

7   Q.  And then Mr. Balabanian responds, "That works.  I'm really

8   trying to manage things on my end, but Tom's got to take this

9   seriously.  I know there's not a whole lot you can do about

10  him though.  Call me at your convenience."

11         And that's July 14, 2020, correct?

12  A.  That's correct.

13  Q.  Okay.  And so instead of getting a written response from

14  Mr. Girardi's office to the letter of July 10th, we have this

15  exchange of text messages, correct?

16  A.  Yeah, I don't think that was the full communications, but

17  it included that.

18  Q.  So now we'll go to July 17, 2020.  And what Mr. Balabanian

19  says is, "Dude, please make sure he calls me today."

20         Do you see that?

21  A.  I don't.  You're now getting it -- yes, I see that.

22  Q.  And he then writes, "Tom called.  He sounded not great.  I

23  hope he gets better.  He promised to figure it out and said he

24  follow back up with me later this week which is fine with us.

25  I'll follow back up with you soon."

**Edelson - Cross by Matthai**

1    That's what Mr. Balabanian wrote, correct?

2  A.  Yes.

3  Q.  And then on July 24, 2020, Mr. Balabanian wrote, "Hey,

4  man, haven't heard from Tom.  He said he'd get back to me by

5  Wednesday but didn't.  Can you talk to him and get this

6  figured out?  I feel for him but we're getting beyond the

7  point of no return soon."

8  A.  Yes.

9  Q.  That's what Mr. Balabanian wrote, correct?

10  A.  That's right.

11  Q.  Okay.  On July 26, two days later, Mr. Balabanian wrote,

12  "We have to figure this out, like by Monday.  Tom's putting us

13  in an untenable position, and I can't hold things off any

14  longer.  I'm not sure what else to say at that point."

15    Then Mr. Griffin responds, "I just talked to him.

16  Explained severity.  He said he is calling you tomorrow."

17    Mr. Balabanian in response to Mr. Griffin's question

18  as to whether Tom had called responds, "Yes, I spoke with him.

19  He said that he would call me next Monday and should have the

20  clients paid, or ready to be paid, by then.  That's fine as

21  long as he keeps his promise."

22    That's what the worldwide general managing partner

23  and general counsel of Edelson wrote back to Mr. Griffin,

24  correct?

25  A.  Global managing partner, not worldwide.

**Edelson - Cross by Matthai**

1   Q.   Sorry.

2   A.   That's okay.

3   Q.   Then we have on August the 3rd, Mr. Balabanian writes, "so

4   I tried him twice and just got transferred to Shirleen."

5        You understood Shirleen was Tom's assistant, one of

6   his assistants?

7   A.   I did not understand that at the time, but that's okay.

8   Q.   "She just sends me to her voicemail.  This is absurd and

9   has run its course.  If I don't hear from him today, I have no

10  choice but to move forward in court."

11       That's what Mr. Balabanian said at that point,

12  correct?

13  A.   That's right.

14  Q.   But you did not -- your firm did not move forward in court

15  as of August the 3rd, correct?

16  A.   That's right.

17  Q.   And Keith writes, "Give him a couple of more days, Rafey.

18  I know he is working on this."

19       Meaning he's working to get the clients the money?

20  A.   First, it's Rafey, not Raffy.  But you're asking me to

21  interpret what Keith was saying.  I'm just trying to answer

22  your question.

23  Q.   Well, what the text reads is, "Give him a couple of more

24  days, Rafey.  I know he's working on this."

25  A.   Yes.

**Edelson - Cross by Matthai**

1   Q.  That's what it reads.  And then Mr. Balabanian replies

2   with a "fine, but" expletive.  "This has been going on for

3   eight months."  That's August the 3rd.

4          The next text is August the 12th asking for an

5   update.  He asks for Tom's cell phone number.  He gets put

6   into voicemail when he calls.

7          And then we have August the 13th, again from

8   Mr. Balabanian starting with "yo."

9          Do you see that?

10  A.  I don't see --

11  Q.  And Mr. Balabanian writes --

12  A.  I don't see -- I'm sorry.  I don't see a "yo."  Oh, there.

13  Okay.

14          THE COURT:  You know, unless the witness is being

15  put -- updated on this on a daily basis, and maybe he was,

16  that's the predicate question, we've gone through all these

17  with Mr. Balabanian and with Mr. Griffin on both sides.  So if

18  this is -- do you understand my point?

19          MS. MATTHAI:  I do.  I do have a couple I would -- I

20  will pass through some of the other ones that I might have

21  referenced.

22          THE COURT:  Okay.  That's fine.  Because I read

23  these, and we've had two witnesses questioned -- the two

24  people who were on them have been questioned about it.  So

25  unless this witness is getting updated or is referred to -- I

1  think he was referred to in a couple -- there's really no need

2  to go beyond what we already heard.

3  BY MS. MATTHAI:

4  Q.  Let's go to 9/22.  On September the 22nd, Mr. Balabanian

5  writes, "Hey, man, I'm sorry to say this, but we're out of

6  time.  I just spoke to Jay, and he flipped out at me that this

7  isn't done.  He wants to file something with the Court this

8  week."

9        And had you told Mr. Balabanian that you wanted to

10  file something in court as of September 22nd?

11  A.  We were having constant conversations about let's nail

12  this down or file.  So I don't remember that specific one, but

13  that was -- it was -- that was in the air at all times of

14  we're just getting jerked around, we got to file something.

15  Q.  Okay.  And if we go to September the 29th, Mr. Balabanian

16  writes in the middle of this e-mail, "Hoping he gets it done."

17        Did you understand that to refer to getting the

18  clients paid?

19  A.  So to answer the predicate question, I was not -- I was

20  not reading these texts as they went on.  So I could give you

21  my thoughts now and try -- and help interpret them if it's

22  helpful, but that -- I was getting big picture stuff.  I was

23  not getting line-by-line texts.  It was more are they giving

24  us answers; it's still squishy; why are we waiting so long.

25  Q.  Right.  Mr. Balabanian was telling you that he was getting

**Edelson - Cross by Matthai**

1   the runaround from Tom Girardi, correct?

2   A.  He was telling me that but also other things as well.

3   Q.  And Mr. Balabanian was telling you that he hadn't gotten

4   any straight answers from Mr. Girardi through this whole

5   period, correct?

6   A.  No, not through the whole period, no.  No, he -- the

7   picture I got was that Tom was saying that a mistake might

8   have been made and he was trying to figure it out.  And...

9   Q.  And that satisfied your office that there may have been

10  some sort of mistake and he was trying to figure it out for

11  three months?

12  A.  It did not satisfy our office at all.

13  Q.  Okay.

14  A.  That's why we were hounding them and -- anyway, go ahead,

15  please.

16  Q.  So on September the 29th, Mr. Balabanian writes, "I've

17  gotten Jay to chill a bit."

18          Did Mr. Balabanian urge you not to go to court?

19  A.  I don't know if that's a fair characterization of -- he

20  didn't say to me "don't file."  I think -- I think he thought

21  that this was all getting worked out, and we're saying, you

22  know, just give me a little bit more time and we'll figure out

23  if a mistake was made.  And this is going to be a lot more

24  efficient rather than filing something in court which is going

25  to blow everything up.

**Edelson - Cross by Matthai**

1    Q.   And throughout this entire period of time, Mr. Girardi was

2    promising that the clients would be paid, correct?

3    A.   Throughout the entire period of time?  No.  I -- this is

4    very tough.  You're asking me to remember conversations I

5    wasn't part of.  So --

6    Q.   Well, let me ask it this way.  After the phone calls in

7    June and which you were advised that Mr. Griffin believed that

8    only half of the money had been paid, did Mr. Girardi make

9    promises to your office that the money would be paid to the

10   clients?

11   A.   That's my understanding.  I think -- I think it was first

12   that he had to try to figure out, you know, what was going on

13   and then that there was a mistake that he would rectify.

14   Q.   Right.  And he said that if the clients were owed money

15   that he would make sure that it got paid, correct?

16   A.   I wasn't on those calls.  That was -- that was my

17   understanding.

18   Q.   Let me ask you your understanding then.

19   A.   That was my understanding.

20   Q.   Your understanding was that Mr. Girardi was promising to

21   pay, correct?

22   A.   Yeah.  I mean, you're making it seem like he was paying

23   with his own money.  That wasn't -- that wasn't -- our

24   understanding.  If you're saying that the firm was going to

25   make sure that the client money went to them, that was our

1  understanding, not that he was going to write some separate

2  check himself.

3  Q.  So when you were told in May that there was a belief that

4  only half had been paid, you didn't have any concern at that

5  point in time that the other half wasn't in the trust?

6          MR. WADE-SCOTT:  Objection.  Misstates the month.

7          THE COURT:  I think it was June.

8          MS. MATTHAI:  Oh, did I say May?

9          THE COURT:  Yes.

10          MS. MATTHAI:  I apologize.  Let me -- if I may, I'll

11  rephrase?

12          THE COURT:  Go ahead.

13  BY MS. MATTHAI:

14  Q.  When you were told in June that Mr. Griffin believed that

15  only half of the money had been paid to the clients, were you

16  concerned that the other half of the money was no longer in

17  the trust account?

18  A.  Yes.  This was where -- what I incorrectly referred to as

19  the DEFCON 5 moment which I will now try to claw back and it

20  was the DEFCON 1 moment where I thought, you know, maybe

21  something really bad happened, correct.

22  Q.  And from that point on, Mr. Girardi made promises that the

23  clients would be paid, correct?  You understood that he was

24  promising that?

25  A.  What I understood, not from Tom but from Rafey, was that

1   he had to -- he had to figure out whether there was a mistake

2   that was made.  And so I think my sense was he was trying to

3   figure out, you know, did everyone -- did everything happen

4   the way that it ought to have or not and then made it clear if

5   not, then the clients would get their money.

6   Q.  If we look at these text messages with Mr. Balabanian,

7   don't they reflect various points in time in which Mr. Girardi

8   made a promise to pay by a specific date?

9   A.  Can you show me where?

10  Q.  Well, no, not without going back to them.  But were you

11  told that he promised to pay by specific dates?

12  A.  Yes, by -- by November 30th.  I remember there was an

13  explicit promise from Jake it would be paid.  I'm not saying

14  that Jake was making the promise.  I think Jake was relaying

15  the promise from Tom that it would be paid by November 30th if

16  not a few days before, if -- but I don't have those in front

17  of me.

18  Q.  So if Mr. Girardi had made promises to pay before

19  November 30, he had broken those promises, correct?

20  A.  It would be much more hopeful if you refresh my

21  recollection with what -- what you're -- what you're referring

22  to.

23  Q.  I'm just asking a general question, Mr. Edelson.

24  A.  Yes.

25  Q.  If Mr. Girardi said, I'm going to pay by X date, or I'll

**Edelson - Cross by Matthai**

1   have it taken care of by X date and we get to a later date,

2   then that means Mr. Girardi didn't meet his promise to pay,

3   correct?

4   A.  You keep saying Mr. Girardi said, I will pay, Tom will

5   pay.

6   Q.  Well, let me rephrase it to make sure that I don't cause

7   you a problem.

8        If Mr. Girardi said the clients would be paid by a

9   certain date and said that on several occasions with different

10  dates attached to that promise, and yet we get to a later date

11  and they are not paid, that means that Mr. Girardi has broken

12  that promise, correct?

13  A.  That would mean that he broke the promise, correct.

14  Q.  Right.  And, in fact, each successive time that occurred,

15  he had broken the prior promise, correct?

16  A.  I don't have these documents in front of me, but if you're

17  saying that he -- that he made those -- those representations,

18  yes, they -- he misrepresented a lot of things to us.

19  Q.  But you didn't file a motion to show cause or rule to show

20  cause earlier because you thought it was incredible that

21  Mr. Girardi wouldn't pay the clients, correct?

22  A.  I'm sorry.  It's not about Mr. Girardi paying the clients.

23  It's not.  It's about whether the -- whether the client money

24  went to them.  So that's why I'm wrestling with your question.

25  This never was his money.  He couldn't -- if that was the

**Edelson - Cross by Matthai**

1  issue, that he was going to write his own personal check to

2  the clients, that would have -- that would have been a big,

3  big issue for us.  So is it possible you could just ask the

4  question in terms of whether -- whether the client money went

5  to them instead of whether Mr. Girardi paid it?

6  Q.  So during this entire period of time, it was your belief

7  that the money was sitting in the Girardi Keese trust account

8  and just nobody had written a -- or transferred it?

9  A.  We didn't --

10 Q.  Let me rephrase it so it's accurate.

11 A.  Yep.

12 Q.  Was it your belief that during this entire period of time

13 the client money was sitting in the Girardi Keese trust

14 account and simply nobody had sent the wire to the clients

15 with the money?

16 A.  That -- that was what -- that's what I understood

17 Mr. Girardi to be saying, that a mistake had been made, but

18 yes, if we had understood that the money had left the client

19 trust account, then it wouldn't have mattered very much what

20 other excuse he had, especially if it went into his pockets.

21 Q.  However, if the money had left -- I mean, it would still

22 theoretically be possible, would it not, even if the correct

23 money had left the trust account that Girardi could satisfy

24 the amount owed to the clients from other assets that he had,

25 correct?

1   A.  I mean, he loses his license.  I mean, I'm not -- I'm not

2   the judge or the bar, but no.  The second you start doing

3   that, if you're taking client money and you're using it for

4   your own purpose, and then you go, oh, but that's okay because

5   later on, you know, I'm going to make a bunch of money and pay

6   them back, that -- no, that is not legitimate behavior by a

7   lawyer.

8   Q.  I agree with you 100 percent.  However, that kind of

9   illegitimate behavior puts money in the client's pocket,

10   correct?  It may not be the right money, but it's money in the

11   client's pocket.  They get paid what they're owed, correct?

12   A.  You're saying from a client's perspective would it be

13   better for -- I don't understand your question.

14   Q.  The client doesn't care whether it's actually a dollar

15   that came from Boeing or it's a dollar that came from

16   Tom Girardi, correct?  It's still a dollar.

17   A.  Absolutely not true.  That's just not true.  But -- but

18   they absolutely care.  When you bring personal injury cases

19   it's not just about compensation.  It's also about some sense

20   of justice.  And so if Boeing isn't paying the money, that

21   actually is an issue.

22         But your broader point in terms of would it be better

23   for the clients even if Tom had stolen the money if he had

24   then found some other way to repay them, yes, that would be

25   better for them.  I think Tom would still be in a heap of

1   trouble for it, but yes, it would be better for them.  I agree

2   with that.

3   Q.  Okay.  Now, at some point in this process toward the end

4   of September, Mr. Balabanian was told by Mr. Girardi or

5   Mr. Griffin, I don't recall which one, but somebody at the

6   Girardi firm long after Mr. Lira had left, told Mr. Balabanian

7   that now the clients had been paid half of the remaining half,

8   correct?

9   A.  Yes.  That sounds right.

10   Q.  That's not proper either, is it?

11   A.  It would only be proper if there was an agreement with the

12   clients.

13   Q.  And you never saw any kind of an agreement whatsoever with

14   these clients suggesting that they had agreed to installment

15   payments, did you?

16   A.  We had no visibility into the communications with the

17   client.  So the answer is no.

18   Q.  And did -- are there any communications from your firm to

19   Girardi Keese asking to see the trust account records?

20   A.  Asking to see the trust account records?  I don't -- I

21   mean, you have all the documents we have.  So I would have to

22   look at what specifically we asked for.  The July letter that

23   we've referred to many times is where we were kind of most

24   explicit in terms of this is the information that we need.

25   Q.  Okay.  So the answer is your firm never asked Tom Girardi

**Edelson - Cross by Matthai**

1  for any records from the trust account, correct?

2  A.  That was not my answer, ma'am.

3  Q.  Is it correct that your firm never asked Mr. Girardi's

4  office for any records from the trust account?

5  A.  So -- sorry.  Maybe I wasn't clear enough.

6        The -- I don't -- I don't have total recall of that

7  letter in July.  It would have been in the letter.  So

8  whatever we said in the letter is what we requested.  And if

9  you're telling me that we didn't ask for that specific

10  information, I believe you.  But -- or you can pull up the

11  letter and we can read it together, whatever is more

12  efficient.

13        THE COURT:  We don't need to do that.  It's on page

14  117 -- it's Exhibit 117, page 3.  It's the first full

15  paragraph.  It sets forth what's being requested.  So I'll --

16  I don't believe there was anything else requested, but if --

17  if there's another exhibit that has a further request,

18  that's -- certainly ask about it.  But I've seen this letter

19  repeatedly now through multiple witnesses.

20  BY MS. MATTHAI:

21  Q.  So in paragraph -- I would like to display the motion for

22  rule to show cause which was filed by your firm.

23        MS. MATTHAI:  And this is I believe a public

24  document, and I don't believe I'm going to show anything that

25  was redacted.

Edelson - Cross by Matthai

1          THE COURT:  All right.  What number are you at?

2          MS. MATTHAI:  It's not marked as an exhibit.  It's

3  the filed pleading.  I did tell counsel that I was going to

4  reference it.

5          THE COURT:  Okay.

6          MS. MATTHAI:  So --

7          MR. SABA:  For the record, Your Honor, I believe it's

8  Docket 842.

9          MS. MATTHAI:  Correct.

10         THE COURT:  Okay.

11  BY MS. MATTHAI:

12  Q.  In this document, you say that in paragraph 14, "In the

13  latter half of July, Griffin indicated that despite Boeing

14  fully funding the settlements, he understood from Girardi that

15  the clients had not received the full amount owed to them."

16          Do you see that?

17  A.  Yes.

18  Q.  And, in fact, according to your letter, you had actually

19  been advised of that in June, correct?

20  A.  You've got a carryover sentence which is making it

21  difficult for me.

22  Q.  I'm sorry.  And then I did something worse.  I even

23  switched it while you were trying to look at it which is not

24  fair at all.  I was on paragraph 14.

25  A.  Do you mind -- yeah.

1   Q.   There's the beginning of 14.

2   A.   Okay.  Can we go to the next page?

3   Q.   Okay.

4   A.   Yes.

5   Q.   So you write that in the latter part of July 2020, Griffin

6   indicated that despite Boeing fully funding the settlements,

7   he understood from Girardi that the clients had not received

8   the full amount?

9   A.   I think -- can you read -- if you read the full sentence,

10  I think -- you've got to go back to the previous page.  So in

11  a series of phone calls that took -- okay.  Can you go --

12  oh -- can you now go to page 6?  I'm sorry.

13  Q.   That's okay.

14  A.   Okay.  Yes.  I see that.  I'm with you.

15  Q.   Okay.  And then you go on.  And at some point you do

16  advise the Court that you had been advised that only half of

17  the remaining half had been sent, correct?

18  A.   Where is this?

19  Q.   It's in paragraph 17.

20  A.   Yes.

21  Q.   And you went on to claim that the clients had been paid in

22  full, correct?  You thought they had been paid in full?

23  A.   At the time we thought that.

24  Q.   Then there was also a reply that was filed on this.

25  Hopefully I can use the ELMO on this.  The reply is

Edelson - Cross by Matthai

1   Docket 929.

2           See that, sir?

3   A.  Yes.

4   Q.  Okay.  And then if we go to page 4 of this reply.  At the

5   bottom of this page, it says, "Wire transfers of a portion of

6   the settlement funds were initiated less than two hours

7   later" --

8           THE COURT:  I think you need to push the exhibit up a

9   little to the bottom.

10          MS. MATTHAI:  Oh, thank you, Your Honor.

11  BY MS. MATTHAI:

12  Q.  Okay.  If we go a few lines up from the bottom, there's a

13  sentence that starts "At May 11, 2020."

14  A.  Yes.

15  Q.  Do you see that?

16  A.  I do.

17  Q.  Have you in working on this case learned that that may be

18  a typographical error?  It's actually May 12th?

19  A.  I believe you.  I -- that didn't come to my attention,

20  but --

21  Q.  But in any event, you go on to say that wire transfers of

22  a portion of the settlement funds were initiated less than two

23  hours later, a fact Edelson didn't learn until December.

24          Do you see that?

25  A.  Yes.

**Edelson - Cross by Matthai**

1   Q.  Are you aware of anyplace in this rule to show cause where

2   it says the Edelson firm did learn that only half of the money

3   had been sent to the clients and learned that before December?

4   A.  I mean, you would have to show me the whole document.  If

5   you want me to read the rule to show cause, I could see it.

6   Q.  Okay.  It will speak for itself.

7        I would now like to go to -- excuse me.  I would like

8   you to go to page 5.  There's a paragraph that starts, "In his

9   communications with Edelson up until the June 16th phone

10  conference, Lira did not distinguish between the two groups of

11  clients whatsoever.  Moreover, though he recounts in his

12  response an occasion when he received an inquiry regarding

13  payment of the settlement from one of the clients that had

14  been referred to Mr. Girardi, Lira never advised Edelson of

15  the inquiry or of the fact that he had to tell Mr. Girardi

16  that the funds must be paid immediately but obviously hadn't

17  been up until that point."

18  A.  All right.

19  Q.  Now, you say that Mr. Lira had never distinguished between

20  the two groups of clients.  In fact, the distinction between

21  the two groups of the clients as to the Edelson firm started

22  at the very beginning of the time that the Edelson firm

23  started representing the second group of clients with

24  Girardi Keese and Mr. Lira because there was a different fee

25  split on that second group, correct?

**Edelson - Cross by Matthai**

1   A.  Yes.  I --

2           MR. WADE-SCOTT:  Misstates the testimony as far as

3   who is in what group.

4           THE COURT:  Well, the witness can correct it.

5           Go ahead.

6           MS. MATTHAI:  Then --

7           THE COURT:  Well, I think you were starting to

8   answer.  Go ahead.

9   BY MS. MATTHAI:

10  Q.  Well, the distinction between the two groups had started

11  at the very beginning when the second group came in with a

12  different fee agreement, correct?

13  A.  That's not what we meant by -- in the brief.  We were

14  talking in terms of whether the money had been actually paid

15  by Boeing and then ultimately to the clients.  Obviously there

16  were distinctions that came up during the case.  The fee

17  agreement wasn't -- wasn't relevant to us for purposes of that

18  motion.

19  Q.  Did -- in connection with this reply and on this issue of

20  whether there was a distinction between the first and second

21  group of cases, your firm filed some of the text messages,

22  correct?

23  A.  Yes.

24  Q.  Okay.  And --

25          MR. WADE-SCOTT:  Your Honor, sorry to interrupt.  Can

Edelson - Cross by Matthai

1    I just walk some water up to Mr. Edelson?

2            THE COURT:  Oh, sure.

3            THE WITNESS:  Thank you, Your Honor.

4            Thanks, Eli.

5    BY MS. MATTHAI:

6    Q.  And in this pleading, you claim that Mr. Griffin had said

7    that he didn't know whether the money had come in, correct?

8    A.  I don't have anything on my screen.  Is that intentional?

9    Q.  You don't recall?

10   A.  You're asking me to --

11   Q.  Yeah, I'm just wondering if you recall that.

12   A.  Ask it again?

13   Q.  That you took the position in the brief that you had been

14   told as of the time you filed this reply on the rule to show

15   cause that Mr. Griffin was taking the position that he

16   couldn't tell you whether any of the money had come in?

17   A.  Okay.

18   Q.  So you don't recall one way or the other?

19   A.  What we put in the brief?

20   Q.  Yes.

21   A.  I don't -- I don't have --

22   Q.  Okay.

23   A.  -- photographic memory.  I don't remember exactly what was

24   in our briefs.  I'm sorry.

25   Q.  Okay.  You do recall that you filed as an exhibit to

**Edelson - Cross by Matthai**

1   support that point some of the -- of the text messages,

2   correct?

3   A.  The -- yes, we filed some text messages.

4   Q.  Okay.  I'm going to display on the ELMO the last page of

5   Exhibit 1 to this reply pleading.

6   A.  Okay.

7   Q.  And that's a copy of what was filed with the Court.  And

8   it says, "Hey, Keith, did the Boeing money come in?"

9        And the next text says, "Ari, actually I don't know.

10  I will find out."

11       That's what you filed with the Court, correct?

12  A.  You misread it, but you got the gist of it correct.

13  Q.  Okay.  And do you recall that Mr. Griffin files a pleading

14  in which he stated that this was incomplete, that there was an

15  additional text message?

16  A.  I do not recall that, but I don't -- I don't doubt that.

17  Q.  Okay.  I'm going to ask without spending the time digging

18  for it, the pleadings -- the Court has the pleadings.  But I'm

19  going to assume that -- ask you to assume that Mr. Griffin

20  pointed out the fact that this was not complete.

21       THE COURT:  I recall the brief.  I remember that was

22  written in Mr. Saba's response to the motion.  There are a lot

23  of briefs going back and forth with assertions of

24  completeness, incompleteness, what the law should be and a

25  variety of things.

1           MS. MATTHAI:  Okay.

2    BY MS. MATTHAI:

3    Q.  And after the time that you were told that Mr. Griffin

4    took the position that these texts were incomplete, you filed

5    your exhibits in this case, correct?

6    A.  Yes.

7    Q.  Okay.  I would like -- I've put up Exhibit 104.  And this

8    looks exactly like the last one we looked to ending with,

9    "Ari, I actually don't know.  I will find out."

10   A.  Okay.

11          MS. MATTHAI:  I would now ask to display Exhibit 241.

12   BY MS. MATTHAI:

13   Q.  If we look at Exhibit 241, that's that same string of text

14   messages except this time it includes the next, the very next

15   text message which reads, "David Lira just brought me up to

16   speed on his situation.  Yikes."

17   A.  Yes.

18   Q.  "Anyway, he said those cases have been funded so please

19   let me know."

20   A.  I didn't mean to interrupt you, but yes, I see that.

21   Q.  Okay.  Now, through this period of time -- let me rephrase

22   that to make it exact.

23          In the summer and fall of 2020, your firm didn't

24   believe that Mr. Girardi would commit the incredible criminal

25   conduct of stealing this money from these clients, correct?

**Edelson - Cross by Matthai**

1   A.   During what time?

2   Q.   Yes.

3   A.   No, I asked you a question, during what time?

4   Q.   Summer and fall of 2020.

5   A.   No, that -- the -- we were very concerned about that.

6   The -- it was -- it was both something that seemed incredible

7   to us, fantastical, but also it was something that we were

8   concerned about.

9   Q.   Okay.  When Mr. Girardi made the representations to

10   Mr. Balabanian that the money would be paid to the clients,

11   whether it was the original money or any different money, and

12   Mr. Girardi said the clients would be paid, did you believe

13   it?

14   A.   Did I believe the -- so what he had said -- what I

15   understood he said was a little different than how you

16   characterized it, which was that there was -- that there were

17   mistakes made which I understood, like, clerical

18   accounting-type mistakes and that those would be fixed, those

19   were being fixed and then the funds would go to the clients.

20         So with that kind of rephrasing, did I believe that?

21   I -- I was struggling to believe a lot of what was coming out

22   of their mouths at the time.  That's why you'll see in the

23   conversation -- you'll see reference in the conversations with

24   me and Rafey where he's saying I'm working this out, give me

25   more time, and I'm -- you know, I'm a lot more kind of

Edelson - Cross by Matthai

710

1   energized and anxious, but I also understand that he's the one

2   who's in the room.  You know, he's talking to Tom.  And I was

3   comfortable with -- with what we did.

4   Q.  And Mr. Balabanian calmed you down, as he said, by telling

5   you that he thought the money would be paid to the clients,

6   correct?

7   A.  You keep saying paid to the clients.  That the money would

8   go to the clients.

9   Q.  The money would go to the clients.

10  A.  Yes.

11  Q.  The clients would get money, right?

12  A.  Correct.

13  Q.  And he believed that?

14  A.  That he believed that?  I can't speak to his -- his, you

15  know, state of mind, but yes, I think that, you know, that he

16  spoke to Tom and thought that -- thought that it was just a

17  mistake and everything would get fixed.

18  Q.  And for that reason you waited until December to actually

19  file the motion for rule to show cause, correct?

20  A.  No.

21          MS. MATTHAI:  Okay.  That's all the questions that I

22  have.

23          All right.  Mr. Saba.

24          MR. SABA:  Yes, Your Honor, just a few new issues.  I

25  will keep it brief.

Edelson - Cross by Saba

711

1        THE COURT:  Okay.

2                    CROSS-EXAMINATION

3    BY MR. SABA:

4    Q.  Hello, Mr. Edelson.

5    A.  Good afternoon.

6    Q.  You will agree with me that Ms. Anice, Ms. Septiana,

7    Ms. Dian, Mr. Bias, and Mr. Multi were clients of Edelson?

8    A.  That's right.

9    Q.  Did Edelson ever obtain a written retainer agreement for

10   any of these clients prior to December 2, 2020?

11       MR. WADE-SCOTT:  Objection.  Relevance.

12       THE COURT:  Overruled.

13       THE WITNESS:  Did we have a separate retainer

14   agreement?

15   BY MR. SABA:

16   Q.  Yes.  Did your law firm have a written retainer agreement

17   with your five clients?

18   A.  The -- so I testified that we got confirmation from them

19   recently.  I don't remember the exact date.

20   Q.  No, no.  It's a yes-or-no question.  Prior to December 2,

21   2020 --

22   A.  Oh, I --

23   Q.  -- did your law firm have a written retainer agreement

24   with these five clients?

25   A.  Sorry.  I thought you were talking about 2021.  We did

1    not.

2    Q.   Your sole source of knowledge that you were representing

3    these clients came from Girardi & Keese, correct?

4    A.   Sole source of knowledge?

5    Q.   Right.

6    A.   Okay.  I guess.

7    Q.   Well, did you ever communicate with these five clients?

8    A.   No.

9    Q.   Did anyone at Edelson prior to December 2, 2020, ever

10   communicate with its five clients?

11   A.   No.

12   Q.   So the only way Edelson knew that it was representing

13   these five clients was from Girardi & Keese; is that correct?

14   A.   Okay.  Yes.  That makes sense.

15   Q.   And you understood, Edelson did, that in exchange for your

16   services, at some point your law firm would get paid money.

17   Fair assessment?

18   A.   If we were successful.

19   Q.   And you expected to get a benefit for the services if you

20   were successful, correct?

21   A.   We expected to get a benefit?

22   Q.   A benefit for your services if you were successful?

23   A.   I don't know what you mean by "benefit."  We expected --

24   we expected to be compensated.

25   Q.   Okay.

Edelson - Cross by Saba

1   A.  But also other things as well.

2   Q.  You expected to be paid money, correct?

3   A.  Yes.

4   Q.  That means when you took on the responsibility to

5   represent these five clients, you understood that your firm

6   had duties and responsibilities to these clients, correct?

7   A.  Absolutely.

8   Q.  Now, at any time prior to December 2, 2020, did your law

9   firm ever get written informed consent from any of the clients

10   to co-counsel with Girardi & Keese?

11   A.  Did we?  We didn't have -- we didn't have a lot of

12   communication with the clients.

13   Q.  So the answer is no; is that right?

14   A.  If you're saying did we communicate with them and get

15   that?  No, we did not.

16   Q.  Okay.  Let's make sure we have the record clear, sir.  Did

17   Edelson ever get written informed consent by any of the

18   clients to co-counsel with Girardi & Keese?

19   A.  We got it through the lead counsel but not directly from

20   the clients, if that's what you're asking.

21   Q.  Did Edelson ever get written informed consent from the

22   clients to co-counsel with Girardi & Keese?

23   A.  We got it through lead counsel but not directly from the

24   clients.

25   Q.  Okay.  So no, the law firm never got written informed

1  consent from any of the clients directly; is that correct?

2  A.  I've answered it twice.

3  Q.  No, you keep saying you got written informed consent

4  through Girardi & Keese.

5  A.  Correct.

6  Q.  Did you -- did Edelson ever get written informed consent

7  from the clients?

8  A.  So I'm happy to answer a third time.  So I said each time

9  we got it through Girardi & Keese but not directly from the

10  client.

11  Q.  So Girardi & Keese forwarded you some sort of

12  communication from the clients?

13  A.  They were the lawyers for the clients.  And under the

14  retainer agreement, if I remember correctly, that was entered

15  into, they were entitled to co-counsel with other attorneys.

16  And, yes, we understood that they had the authorization of the

17  client to do that, to retain local counsel.

18  Q.  And Mr. Edelson, I completely understand that you had

19  communications with Girardi & Keese.  My question is very

20  specific.  Did Edelson ever get written informed consent from

21  any of the clients directly to co-counsel with Girardi &

22  Keese?

23  A.  I've answered that.  We did not.

24  Q.  Did Edelson ever get written informed consent from any of

25  the clients that it was delicating -- delegating performance

**Edelson - Cross by Saba**

1  of some of its responsibilities of the representation of the

2  clients to Girardi & Keese?

3  A.  What?  Did it -- did it -- that it was delegating?

4  Q.  Your law firm, did your law firm --

5  A.  Yes.

6  Q.  -- ever get written informed consent from any of the

7  clients that your law firm was going to delegate performance

8  of your law firm's duties and responsibilities to Girardi &

9  Keese?

10  A.  That we were going to delegate our responsibilities to

11  Girardi Keese?  They were lead.  Why -- I don't understand

12  what you're saying.

13  Q.  They were what?  I'm sorry?

14  A.  They were the lead counsel.  Did we ask for permission to

15  delegate our responsibilities to Girardi Keese?

16  Q.  Yes, that's my exact question.  Did you ever get written

17  informed consent from your clients to delegate

18  responsibilities to Girardi & Keese?

19  A.  I don't understand that question.  They were lead.  They

20  were delegating stuff to us.  We weren't delegating stuff to

21  them.

22  Q.  You understand these were your clients, correct?

23  A.  Yes, they were -- yes, along with Girardi & Keese.

24  Q.  Very simple.  Either you did or you didn't.  Just answer

25  the question.  Did Edelson get written informed consent from

**Edelson - Cross by Saba**

1    any of the clients that they were going to delegate

2    performance of some of the responsibilities to Girardi &

3    Keese?

4    A.  Yes.  The initial retainer agreement said that they're

5    hiring Girardi Keese.  I'm so -- I must not be understanding

6    your question.  I apologize.

7    Q.  No, it's very simple, sir.

8            THE COURT:  Well, I think I understand.  You didn't

9    have direct communication with the people in Indonesia,

10   correct?

11           THE WITNESS:  At all.

12           THE COURT:  All right.

13           THE WITNESS:  So any question about that, the answer

14   is we didn't have direct communication.

15           THE COURT:  So the answer would be all these

16   different questions about written informed consent,

17   delegating, et cetera, directly from the clients, the answer

18   is no because you had no contact with the clients; is that

19   correct?

20           THE WITNESS:  Yes, we didn't have any contact with

21   the clients.

22           THE COURT:  All right.  Is that the question you're

23   asking?  I think --

24           MR. SABA:  That's great, Your Honor.  Thank you.

25           THE COURT:  All right.  Go ahead.

Edelson - Cross by Saba

1  BY MR. SABA:

2  Q.  Now, in general, you understand as a lawyer of 25 years

3  and the head of a very successful law firm that if your firm

4  breaches its duties and responsibilities to clients that your

5  firm might be responsible for damages suffered by the clients.

6  Would you agree with that?

7  A.  Sure.  Of course.

8  Q.  Does your firm have legal malpractice insurance?

9  A.  We do.

10  Q.  What do you mean by you did?

11  A.  No, I said we do.  I'm sorry.  We do.

12  Q.  And is it true that in the last ten years Edelson has

13  settled or obtained verdicts in the amount of $3 billion?

14  A.  That our firm has settled or retained -- that's correct.

15  I mean -- yes, that's right.

16  Q.  Well, that's what's written on your web page.

17  A.  Yes, that's correct.

18  Q.  And of that $3 billion, has Edelson collected

19  approximately a billion dollars in attorneys' fees in the last

20  ten years?

21  A.  No.  No.

22  Q.  Mr. Wisner represents the five unpaid clients, former

23  clients of your firm; is that correct?

24  A.  He and his firm, correct.

25  Q.  Has Mr. Wisner made a demand for payment on your insurance

1   policy for legal malpractice?

2   A.   No.

3              MR. WADE-SCOTT:  Ob- --

4              THE WITNESS:  No, not to my knowledge.

5   BY MR. SABA:

6   Q.   Has your firm reached an agreement with Mr. Wisner for him

7   delaying to make a demand on your insurance policy?

8   A.   No.

9   Q.   Has your firm entered into a tolling agreement with

10  Mr. Wisner in order to not file a claim on your insurance

11  policy?

12  A.   No, nothing of the sort.

13  Q.   Now, I thought I heard you say a number of times that your

14  firm is not interested in getting paid its legal fees; is that

15  right?

16  A.   I didn't say -- I didn't say that.  We definitely -- we

17  wouldn't mind getting paid at the end of the day, but what I

18  said is we're not going to take any money until all the

19  clients are paid.  So we understand that we're not going to

20  get that money.  We're aware of that.

21  Q.   I also heard you say that in the last couple of weeks

22  either you or someone from your firm has reached out to the

23  individual plaintiffs to get a document signed; is that

24  correct?

25             MR. WADE-SCOTT:  Objection.  That misstates the

Edelson - Cross by Saba

1    testimony.

2              THE WITNESS:  It's fine.  I can answer.

3              THE COURT:  The witness can correct it if there's

4    anything incorrect about it.

5              Go ahead.

6              THE WITNESS:  I'm sorry, Judge.  I didn't mean to cut

7    you off.

8              THE COURT:  Answer the question, please.

9    BY THE WITNESS:

10   A.  The -- the -- I didn't mean to say that.  We weren't

11   directly -- speaking directly with the clients.  We were

12   speaking with the Wisner firm.

13   BY MR. SABA:

14   Q.  Okay.  So someone from your firm in the last couple of

15   weeks spoke with Mr. Wisner, correct?

16   A.  That's right.

17   Q.  And in that conversation, your firm asked Mr. Wisner to

18   have these individual unpaid clients sign an agreement that

19   your law firm should be entitled to 50 percent of the

20   attorneys' fees?

21   A.  Correct.

22   Q.  Yet there was no discussion about making a claim on your

23   insurance malpractice policies for your firm's breaches of the

24   Illinois Rules of Professional Conduct; is that correct?

25             MR. WADE-SCOTT:  Objection.

1          THE WITNESS:  The --

2          THE COURT:  Well, go ahead.

3          THE WITNESS:  Sorry.  I didn't mean to laugh at that.

4   There were no discussions.

5          THE COURT:  Hang on.  There was an objection.  It's

6   tough to have your boss on the stand.  I know that.

7          THE WITNESS:  Sorry, Judge.

8          THE COURT:  There's an objection.  What's your

9   objection?

10          MR. WADE-SCOTT:  Part of that was testimony.  But if

11   Mr. Edelson wants to answer, go ahead.

12          THE COURT:  All right.  Go ahead.  You can complete

13   your answer.

14   BY THE WITNESS:

15   A.  No, there was no discussion about malpractice claims or

16   anything like that.

17          THE COURT:  And I had misunderstood.  So no one in

18   your firm and you or your firm directly contacted the

19   Indonesian clients.  You spoke to the Wisner firm.

20          THE WITNESS:  Correct.

21          THE COURT:  Okay.  I misunderstood that from earlier.

22          THE WITNESS:  I'm sorry.  I should have been clearer.

23          THE COURT:  All right.

24          Go ahead.

25   BY MR. SABA:

1   Q.  What did your firm get in exchange for Mr. Wisner

2   obtaining written agreements that your firm get paid

3   attorneys' fees in the last couple of weeks?

4   A.  What did we get?  I'm sorry.

5   Q.  What did your firm get in exchange for Mr. Wisner going to

6   the Indonesian clients and obtaining five written consents for

7   your firm to allegedly get paid 50 percent of the attorneys'

8   fees or some other amounts?

9   A.  What did we get in exchange?

10  Q.  What did Mr. Wisner --

11  A.  Oh, what did Mr. Wisner get in exchange?

12  Q.  Or his clients.

13  A.  So, I mean, the answer is nothing practically;

14  conceptually a lot.  I'm happy to explain, but I don't want

15  to --

16  Q.  Do you believe -- do you believe your firm fell below the

17  standard of care in representing these five individuals prior

18  to December 2, 2020?

19  A.  Did we act negligently?  I don't think so.  I mean, we

20  should have acted better.  But that's my answer.

21  Q.  Illinois Rule of Professional Conduct, Rule 1.4(a)(3)

22  requires a lawyer to keep a client reasonably informed about

23  the status of the matter.  Did Edelson ever keep any of the

24  clients informed of the status of the matter prior to

25  December 2, 2020?

**Edelson - Cross by Saba**

1   A.   The -- we -- I've answered that question.  They were the

2   lead.  They were the ones who had the client communication.

3   I'm happy to expand on that if you'd like to.

4   Q.   No, I just want you to answer that yes or no.

5   A.   I did.

6   Q.   Prior to December 20, 2020 --

7   A.   We didn't have any -- sorry.

8   Q.   -- did Edelson keep any of the unpaid clients reasonably

9   informed about the status of the matter?

10  A.   We had no -- we had no communication with them.

11  Q.   Illinois Rule of Professional Conduct Rule 1.2(e) says

12  that after accepting employment on behalf of a client, which

13  your firm did, a lawyer shall not thereafter delegate to any

14  other lawyer not in the lawyer's firm the responsibility of

15  performing or completing that employment without the client's

16  informed consent.  Were you aware of Illinois Rule of

17  Professional Conduct 1.2(e) when you were representing the

18  five unpaid clients?

19  A.   I'm aware of those.

20        MR. WADE-SCOTT:  Objection, Your Honor.

21        THE WITNESS:  Sorry.

22        THE COURT:  What's the objection?

23        MR. WADE-SCOTT:  The objection is relevance.  I don't

24  object to asking some of these questions, but I do note that

25  we did not get into every individual rule of California

**Edelson - Cross by Saba**

1   practice because --

2          THE COURT:  How many more questions do you have like

3   this?

4          MR. SABA:  I'll move on.

5          THE COURT:  What?

6          MR. SABA:  I'll move on.

7          THE COURT:  All right.

8   BY MR. SABA:

9   Q.  Now, is it true that you and your firm have sued

10  Keith Griffin and David Lira to collect your personal

11  attorneys' fees?

12  A.  That would be one way to characterize it.

13  Q.  Well, either you did or you didn't.  Did you file a

14  lawsuit to collect your attorneys' fees from Mr. Griffin and

15  Mr. Lira?

16  A.  We filed a lawsuit which included a request for our

17  attorney fees.

18  Q.  And isn't it true you filed that lawsuit to collect your

19  attorneys' fees prior to filing the motion for rule cause that

20  we're here for today?

21  A.  I think we filed them at approximately the same time.

22  Q.  In fact, you filed your motion for attorneys' fees, your

23  lawsuit for attorneys' fees, one hour before you filed your

24  motion for rule cause, is that right?

25  A.  To me it was simultaneous.  If you're saying one hit an

1    hour before, that's fine.

2    Q.   Your firm has also made a claim in the bankruptcy court

3    for recovery of your legal fees; is that right?

4    A.   Yep.

5    Q.   Tell me why your firm hasn't written a check to these

6    individual plaintiffs and then made a claim for indemnity in

7    the bankruptcy court.

8            MR. WADE-SCOTT:  Objection.  Relevance.

9            THE COURT:  Well, I think I asked the same question

10   in different form earlier, and I thought the witness said it's

11   a possibility but not the first thing on the list.  That's how

12   I understood the earlier testimony.  I understand your

13   question, and I get the import of it.  So --

14           MR. SABA:  All right.  Let's move on.

15   BY MR. SABA:

16   Q.   Let's talk about the July letter that Mr. Balabanian sent

17   to Mr. Girardi and to Mr. Lira.  You're familiar with this

18   letter?  We've talked about it extensively in --

19   A.   Correct, the July letter that Rafey and I wrote.

20   Q.   And I believe you said that you participated in the

21   drafting of this letter along with Mr. Balabanian, correct?

22   A.   Yes, I just said that.

23   Q.   Did Mr. Scharg also participate in the drafting of this

24   letter?

25   A.   As I testified, I don't remember if there are other eyes

1    on it.  I'm sure -- I don't want to parse words.  I'm sure

2    that we got input from him, but when I think about drafting,

3    it's, you know, typing -- typing the actual -- the letter as

4    opposed to collecting information.  So he definitely would

5    have participated by giving us information.  I can't tell you

6    whether he ever did a round of edits or anything like that.

7    Q.  Mr. Balabanian testified that there was lots of meetings

8    going on in your law firm.  Was there a meeting prior to

9    sending the July letter to Mr. Girardi and Mr. Lira?

10   A.  There were lots of meetings, including -- yes.

11   Q.  Other than Mr. Scharg and Mr. Balabanian, who else was

12   involved in the meetings prior to sending the July 2020 letter

13   to Mr. Girardi and Mr. Lira?

14   A.  Are you assuming there's one -- we had just constant

15   discussions within the firm.

16   Q.  I'm looking for the names of the individuals that were

17   participants in those conversations prior to the July letter

18   being delivered.

19   A.  It was -- it was primarily Rafey, Ari, and me, and then Al

20   Tievsky who is essentially our associate general counsel who I

21   asked for some thoughts from as well.

22   Q.  I believe I heard you say that prior to sending that

23   letter that's when the alarm bells went off and you called it

24   we were at DEFCON 5 or whatever you are classifying the most

25   severe moment of crisis; is that right?

1    A.   Correct.

2    Q.   I mean, you -- the firm created an investigation team; is

3    that right?

4    A.   No.

5    Q.   Well, I'm pretty sure I heard you testify that the firm

6    had an investigation team.

7    A.   Correct.

8    Q.   Okay.  So the investigation team was charged with

9    investigating this issue, correct?

10   A.   That's not -- that's not what I testified to.  What I

11   said -- sorry.  I can explain or just say that's not what I

12   testified to.

13   Q.   Okay.  Well, let me ask it this way: If the firm has an

14   investigation team, the firm did not use that investigation

15   team for the purposes of evaluating whether or not

16   Mr. Girardi's firm properly complied with the court orders,

17   correct?

18   A.   That's wrong.

19   Q.   In any event, you believe that this issue was at the most

20   severe in July of 2020, DEFCON 1, 5, whatever it is, right?

21   A.   Let's just switch to 1 so we're accurate.

22   Q.   Sure.

23   A.   It was not -- it was -- I mean, it was more severe later,

24   but, you know, yes, it was DEFCON 1 back then.

25   Q.   There's lots of meetings.  You're at DEFCON 1.  So that

1  means you as the head of the firm --

2  A.  Yes.

3  Q.  -- must have been picked up the phone and called the head

4  of Girardi & Keese, Tom Girardi.  Tell me about that

5  conversation that you had in July of 2020.

6  A.  You know that I didn't have a conversation with Tom.

7  Q.  Your name is on the door, Edelson PC, right?

8  A.  Yes.

9  Q.  Mr. Girardi's name is on the door, Girardi & Keese, right?

10  A.  Correct.

11  Q.  But you didn't take the moment to pick up the phone and

12  call Mr. Girardi at all; is that accurate?

13  A.  That's 100 percent accurate.

14  Q.  In fact, you didn't reach out to Boeing either, did you?

15  A.  I've testified to that.

16  Q.  Right.  You didn't take the moment to send one e-mail or

17  pick up the phone to call Boeing, right?

18  A.  I've testified to that.  That's correct.

19  Q.  And what you said is we didn't want to step on Mr. Girardi

20  and Girardi & Keese's toes because they were lead counsel;

21  isn't that right?

22  A.  Well, I think you're mixing time frames up a little bit,

23  but I did say that at one point.

24  Q.  Okay.  So here you are in crisis mode.  The house is on

25  fire.  You're on DEFCON 1.  And you didn't feel that you at

**Edelson - Cross by Saba**

1   that moment had the responsibility and the duty to the clients

2   to contact Boeing to find out the answers to any questions

3   that they could potentially answer?

4   A.  Oh.  I mean, you're suggesting that I didn't call Tom.

5   Rafey, the co-owner of the firm, called Tom.  So I'm a little

6   bit confused about your question then.  Based on what he told

7   us, we explained what actions we took.

8   Q.  Mr. Edelson, what I want to know is about your actions.

9   A.  Okay.

10  Q.  As the head of Edelson PC, the CEO of the firm.

11  A.  Yes.

12  Q.  You did not pick up the phone or send an e-mail to Boeing

13  asking questions in July of 2020?

14  A.  That's correct.

15  Q.  You didn't contact the clients at all, correct?

16  A.  Right.  We didn't have -- we had no -- correct, we had no

17  interactions with the clients.

18  Q.  And you didn't contact Mr. Girardi personally, correct?

19          MR. WADE-SCOTT:  Objection.

20          THE WITNESS:  We did.

21          MR. WADE-SCOTT:  Asked and answered.

22  BY THE WITNESS:

23  A.  We did.  We did through Rafey.

24          THE COURT:  Objection is overruled.  The witness has

25  answered.

**Edelson - Cross by Saba**

1          Go ahead.

2     BY MR. SABA:

3     Q.   So even though Mr. Griffin has told your firm that there

4     is a potential that only 50 percent of the money has been

5     paid.

6     A.   Yes.

7     Q.   You didn't use your investigation team to find out whether

8     or not the other -- the money was actually paid, right?

9     A.   That's not true.  I already testified to that.

10    Q.   Okay.  Wait a second.  So now the investigation team is

11    actually investigating this issue?

12    A.   We can read back the transcript.

13    Q.   Well, no.  Let's take our time.

14    A.   Sure.

15    Q.   Was the investigation team working to investigate whether

16    or not the money was paid to the individuals?

17    A.   Yes.

18    Q.   Oh.  Who was on the investigation team?

19    A.   The -- so I think you misunderstand our firm.  We don't

20    have -- so what I was trying to explain was that our firm is a

21    firm that investigates cases and we have an investigations

22    team.  That doesn't mean -- you seem to think it's like

23    siloed, that there's like four people and all they do is

24    investigations.  That's not correct.  So, for example, I would

25    also be part of the investigations team.  I investigate cases

**Edelson - Cross by Saba**

1    all the time.  Rafey does as well.  So I think there's just

2    some confusion there.

3    Q.   So here's my question, Mr. Edelson.

4    A.   Yes.

5    Q.   If this was such a big deal in July of 2020, where are the

6    internal e-mails from Edelson discussing this?

7    A.   What do you mean?

8    Q.   None of them have been displayed in three days' of

9    testimony.  Where are the internal e-mails discussing the

10   investigation, the communications with Girardi, what to do?

11   Where are they?

12   A.   Well, we've already testified -- I've already testified

13   that we went as far as to write a motion for rule to show

14   cause.  There's of course tons of e-mails.

15   Q.   Are there e-mails internal between you, Mr. Balabanian,

16   Mr. Scharg discussing this issue?

17   A.   I don't know if there are e-mails or texts or what about

18   that.

19   Q.   Well, we haven't seen any text messages or e-mails in this

20   case from Edelson, right?

21   A.   There was no discovery that we exchanged.  We only found

22   out about your clients' stuff because we independently found

23   out through the trustee.

24   Q.   Wait a second.  Mr. Edelson, you understand you have the

25   responsibility to be candorous with this court, correct?

**Edelson - Cross by Saba**

1    A.  I'm sorry.  I'm just laughing because you guys buried

2    those e-mails, but yes, of course we've got a duty of candor.

3    Q.  Okay.  So when you say there's no discovery, are you

4    saying that you didn't have the responsibility to produce

5    relevant text messages and e-mails because there was no

6    request to do so in formal discovery?

7              MR. WADE-SCOTT:  Objection.

8              THE WITNESS:  I'm having a surreal moment that you're

9    making this --

10             THE COURT:  Hang on.  Were there formal discovery

11   requests exchanged between the three of you?

12             MR. SABA:  There was no discovery allowed in this

13   case.

14             THE COURT:  Well, nobody asked for me to allow

15   discovery, but my question is more particular.  Did you make a

16   document request to them?  Did they make one to you?

17             MR. SABA:  No.

18             THE COURT:  Okay.  All right.  Move on.

19   BY MR. SABA:

20   Q.  Now, I believe I heard you say, sir --

21             THE COURT:  What I do have a recollection of, though,

22   is that when you were finding some difficulty in getting

23   e-mails from the trustee, I ordered Edelson to provide all

24   e-mails they had because I think you and your client -- not

25   you, your client, two clients from the Girardi Keese firm

1  recognized it was hard to get -- they couldn't get into the

2  firm.  It was shut down.  And the trustee had taken control of

3  things, and I said, well there's no reason the Edelson firm

4  shouldn't be able to produce every e-mail or text in their

5  possession that they had that involved communications with

6  your client.  That's how I recollect the discovery in the case

7  with no request for anything more than that.

8          MR. SABA:  That is my recollection as well.

9          THE COURT:  Okay.

10         THE WITNESS:  And we did that, Your Honor.  We did

11 give those e-mails.

12 BY MR. SABA:

13 Q.  Now, I heard your testimony, sir, that it wasn't until

14 November 17th that was the first time that your firm learned

15 that the clients had not been paid in full.

16         MR. WADE-SCOTT:  Objection.

17 BY MR. SABA:

18 Q.  Is that your testimony, sir?

19         MR. WADE-SCOTT:  Misstates the testimony.

20         THE COURT:  Well, again, my rule on that is the

21 witness gets to correct it, not me.

22         MR. WADE-SCOTT:  I'll stop, Your Honor.

23         THE COURT:  All right.

24         Go ahead.

25

Edelson - Cross by Saba

1    BY THE WITNESS:

2    A.   You would have to remind me.  The November 17th text was

3    when -- was when Keith said -- this was when he said there's

4    kind of good news coming and then -- and then says the clients

5    are going to be meeting with Tom.  And then we say what are

6    you talking about, we thought they were paid.  That's what

7    you're referring to?

8    BY MR. SABA:

9    Q.   Yes, that's exactly what I'm referring to.

10   A.   Okay.  So I'm remembering.  Now, the question again was?

11   Q.   The question was you testified that you did not learn that

12   the clients -- let me rephrase.  There was a double negative.

13          You testified earlier that you did not know the

14   clients had not been fully paid until November 17; is that

15   correct?

16   A.   So we had been told a lot of different things.  That's I

17   think what I testified to.

18   Q.   Okay.  So let's look at exhibit -- and I have to use the

19   ELMO because we don't have the correct page.

20          THE COURT:  Okay.

21          MR. SABA:  It's Exhibit 112 -- sorry.  119-12.

22   BY MR. SABA:

23   Q.   So on September 3rd, Mr. Griffin wrote a text message to

24   Mr. Balabanian saying he sent out a wire this morning to them

25   for about half of their collective balance.

Edelson - Cross by Saba

734

1   A.   Okay.

2   Q.   Do you see that?

3   A.   Yes.

4   Q.   So as of September 3rd, the firm knew the clients had not

5   been paid, correct?

6   A.   I'm sorry.  With respect -- I would much prefer if you'd

7   put an exhibit up you allow it to stay there for a second so I

8   can actually read it.

9   Q.   Sure.  Absolutely.

10          You knew as of September 3, 2020, your firm knew as

11  of September 3, 2020, the clients had not been fully paid,

12  true?

13  A.   We understood that that's what Keith was saying.  But no,

14  the idea that we were putting 100 percent stock into -- into

15  words from them was -- I mean, it was something we were trying

16  to figure out.

17  Q.   What is there to figure out?  The lawyer is telling you

18  they're not paid.  You clearly understood that, right?

19  A.   What's there to figure out?

20          THE COURT:  Well, the incentive at that point, if

21  there was an incentive to lie would be to say they've all been

22  paid.  The fact that a person is giving you really bad news

23  for everybody that they hadn't been paid as of September 3rd

24  has probably got some indicia of reliability because who is

25  going to say -- who is going to say that if it's not true?

1    That's the point.

2             THE WITNESS:  Yeah.  Okay.  I mean, I take that

3    point.

4             THE COURT:  All right.

5             Go ahead.

6    BY MR. SABA:

7    Q.   Your firm then had meetings after receiving the

8    September 3, 2020 text message about this issue, correct?

9    A.   Yeah, it was like rolling conversations.  We're not a

10   formal firm where, you know, we have minutes and everything.

11   But yes.

12   Q.   And we're looking at Exhibit 119-16.

13   A.   Yeah.

14   Q.   At some point Mr. Balabanian and you had a discussion

15   prior to September 2nd -- 22nd, or on that day, where you flat

16   out flipped out at him, correct?

17   A.   That's what he says.

18   Q.   Okay.  When you flip out, does that mean you get angry and

19   yell?

20   A.   People -- people can experience things differently.  I

21   don't experience myself as generally flipping out and

22   screaming and yelling.

23   Q.   Well, whatever you did made an impression on

24   Mr. Balabanian that you were upset.  Would you agree with

25   that?

Edelson - Cross by Saba

1    A.   I was very upset.

2    Q.   So then I think I heard you say, well, but then

3    Mr. Balabanian had a conversation with Mr. Girardi at the end

4    of September, and Mr. Girardi told him all the money had been

5    paid.  Is that what your testimony was?

6    A.   Yes.

7    Q.   So let's look at exhibit -- and just to clarify, because

8    of that telephone conversation that Mr. Balabanian reported to

9    you, that decreased the anxiety of Edelson because you thought

10   the plaintiffs had been paid; is that correct?

11   A.   Yes.

12   Q.   And it was because of the communication from

13   Mr. Balabanian to you that the plaintiffs had been paid that

14   you did not come to this Court in October or November of 2020

15   to tell the Court that the clients had not been paid?

16   A.   That's right.

17   Q.   So let's look at the text message from Mr. Balabanian on

18   September 30th.  It is 119-20.  Mr. Griffin starts, "Did Tom

19   call today?"  And Mr. Balabanian says, "Yes, we spoke.  We had

20   a nice conversation.  Hoping he gets it done and I've got Jay

21   to chill out a bit."

22        Do you see that?

23   A.   Yes.

24   Q.   Hoping he gets it done does not imply or confirm

25   Tom Girardi told me he paid the plaintiffs, does it?

**Edelson - Cross by Saba**

1    A.  I'm not seeing dates here.  So I'm --

2    Q.  Sure, sir.  Let me scroll down and show you where it says

3    September 30.

4    A.  Okay.

5    Q.  So Mr. Balabanian sends a text message to Keith Griffin

6    that says Mr. Girardi is hoping to get it done.

7    A.  Right.

8    Q.  That doesn't mean Mr. Girardi told me he paid the

9    plaintiffs, does it?

10   A.  What?  I don't think -- I don't think you're interpreting

11   that correctly.

12   Q.  Oh, I'm not?

13   A.  No.

14   Q.  How do you interpret hoping he gets it done?

15   A.  I think -- I think if I'm remembering correctly the --

16   once we understood -- or once we thought -- I don't mean to

17   laugh.  It's not funny.  But once we -- once we were led to

18   believe that the clients had been paid then the question was

19   when were we going to get paid.  So I think that that's

20   what -- I think Rafey switched at some point and said okay,

21   they've been -- they've been paid.  We would like to get paid.

22   If you look at the end of that text, if you pull it up a

23   little bit, he's typed out fees.  He says, "The only thing I

24   would ask is that in the next week or so you send me an e-mail

25   or letter just confirming the amount of fees that we stand to

1   get on the case.  On that front we haven't even cashed the

2   check Lira sent us for 70,000."  So I believe he's talking

3   about fees, not about money to the clients.

4   Q.  Did Mr. Balabanian send you a text after his

5   September 30th conversation that says anything to the effect

6   of Tom Girardi just told me he paid all the plaintiffs?

7   A.  I don't know if he sent a text.  We were talking --

8   Q.  Did Mr. Balabanian send you an e-mail in or around

9   September 30, 2020, saying anything to the effect of Tom

10   Girardi just told me he paid all the plaintiffs?

11   A.  I don't remember how he communicated that to me.

12   Q.  I mean, this is big news according to you.  Mr. Girardi

13   since March hadn't paid these plaintiffs, correct?

14   A.  Yes, it's big news.

15   Q.  Big news.  So where are the confirming e-mails, internal

16   memos, text messages that you could have brought to court to

17   conclusively establish this point that Mr. Girardi told

18   Mr. Balabanian that he had paid all of the plaintiffs?

19         MR. WADE-SCOTT:  Objection.  Relevance.

20         THE COURT:  That's more argumentative.  They aren't

21   here.  And there was testimony from Mr. Balabanian that

22   Girardi told him he paid everyone.

23         It's your interpretation, Mr. Edelson, these words in

24   the text -- could you put it back up, please?

25         MR. SABA:  Sorry.

1       THE COURT:  The hoping he gets it done, it's your

2  interpretation, understanding you're not on this text, but you

3  interpret that to mean relating to getting you your fees

4  rather than getting the payments to the clients?

5       THE WITNESS:  I would want to check with Rafey to

6  make sure.

7       THE COURT:  All right.

8       THE WITNESS:  But essentially what I remember is once

9  we thought -- or, you know, believed that the clients had been

10  paid then we switched into mode of can we get paid at some

11  point as well.

12       THE COURT:  All right.  And Mr. Balabanian testified

13  to this and I'll review his testimony.

14       So go ahead.

15       MR. SABA:  Very well.

16       THE COURT:  And Mr. Griffin did.

17  BY MR. SABA:

18  Q.  Okay.  Mr. Edelson, I believe I heard your testimony was

19  that you did not believe your firm -- sorry.  You said the

20  alarm bells went off in November when Erika filed for divorce.

21  And you're referring to the chance that perhaps your firm was

22  not going to get paid; is that right?

23  A.  Yes.

24  Q.  In October when you were having these meetings with your

25  lawyers, was there discussion that Mr. Girardi had been sued

**Edelson - Cross by Saba**

1   for fraud?

2   A.   You're asking me about what I -- my -- say it again.

3   Q.   Sure.

4   A.   When I had discussions with my lawyers?  Who are my

5   lawyers?

6   Q.   The question was in October, one month before Erika

7   Girardi filed for divorce, were there discussions amongst your

8   lawyers that Tom Girardi had been sued for fraud?

9   A.   I'm sorry.  "Your lawyers" doesn't mean lawyers I hired.

10  You mean the people at my firm, that he had been sued for

11  fraud?  We understood that there was a lawsuit by a litigation

12  funder.  Well, I shouldn't say "we."  I understood that, I

13  don't know, probably through like *Law 360* or something where I

14  read about that.

15  Q.   Let me show you Exhibit 119-22.  This is a text message

16  from Rafey Balabanian to Keith Griffin dated October 5, 2020.

17  A.   Okay.

18  Q.   And he sends a photograph that says -- we'll zoom in on it

19  so you could see a little bit better.  "Erika Girardi's

20  husband Tom Girardi is being sued once again, this time for

21  alleged fraud."

22          Do you see that, sir?

23  A.   I do.

24  Q.   I'm going to show you the next page of the text for

25  Mr. Balabanian where he writes, "This is concerning.  My

**Edelson - Cross by Saba**

1  partner just sent me this.  Hoping you can ally my fears.

2  Let's talk tomorrow if you have a couple of minutes."

3  A.  Okay.

4  Q.  Do you see that?

5  A.  Yes.

6  Q.  So in October were there conversations in your firm that

7  Tom Girardi had been sued for fraud?

8  A.  I just testified that I was aware of that.

9  Q.  But that didn't raise concerns to you?

10 A.  It did.  Remember we thought the clients had been paid by

11 then.  So the concern was that he was going to -- that --

12 especially when Erika filed for their divorce the concern was

13 that we might not get paid, which is a concern but that

14 wasn't -- that's not a DEFCON 1 concern.

15 Q.  There was a new exhibit that was entered today by the

16 Edelson firm which I don't have and I don't seem to have a

17 binder.  It's Exhibit 176.

18        MR. SABA:  Could I have Exhibit 176, please?  Thank

19 you so much.

20 BY MR. SABA:

21 Q.  You were only shown part of this e-mail chain during your

22 direct examination but it bears discussing the rest of it.

23        Your testimony was that you had a conversation with

24 Robert Finnerty in or around either November 30th or

25 December 1, 2020, correct?

Edelson - Cross by Saba

1  A.  I don't remember the date, but it was right around that

2  time, correct.

3  Q.  And on 176-2, you wrote an e-mail to Mr. Finnerty

4  effectively saying things that you felt were not appropriate

5  or ethical.  Fair statement?

6  A.  Not appropriate or ethical?  I mean, it says what it says.

7  I was disgusted by the call, and I memorialized the call.

8  Q.  Now, you stated during your call that Mr. Finnerty said

9  allegedly that Mr. Girardi was stealing for many years.

10  A.  Yes.

11  Q.  You didn't put that in your e-mail to Bob Finnerty, did

12  you?

13  A.  The -- we didn't.

14  Q.  Now, in response to your e-mail to Mr. Finnerty --

15  A.  Yes.

16  Q.  -- he wrote back.

17  A.  Mm-hmm.

18  Q.  Approximately three hours later.  Do you see that?

19  A.  Yes.

20  Q.  He writes, "I do not appreciate your attempt to fabricate

21  our conversation."

22  A.  Right.

23  Q.  Do you see that?

24  A.  Yes.

25  Q.  He then says, "You appear more anxious to create drama

**Edelson - Cross by Saba**
1  than to protect clients."

2  A.  Correct.

3  Q.  Do you see that?

4  A.  Yes.

5  Q.  Then he says, "There is no reason to comment further on

6  your statement."

7  A.  Right.

8  Q.  "And other than to state they are inaccurate and yours,

9  not mine."

10         Do you see that?

11  A.  Yes.  I mean, you're skipping a bunch like where he makes

12  it clear he is agreeing with what I said.  The drama would be

13  filing the lawsuit and instead we should take -- the

14  successful tactic -- tactic is to take a swift judgment.

15  That's what we were saying was unbelievably underhanded.  It

16  was to get ahead of all the other creditors that were going to

17  come in.

18  Q.  Mr. Finnerty was disagreeing with everything that you had

19  stated in your e-mail.  Would you agree -- was that an

20  accurate portrayal or what he was trying to convey to you?

21  A.  No, I just explained that he -- that he admitted to some

22  of that.

23  Q.  Mr. Finnerty writes another e-mail to you on December 1st,

24  and this is at 176-001 that says, "Jay, I believe you have

25  misstated everything."

**Edelson - Cross by Saba**

1          Do you see that?

2  A.  Yeah.  I have to look at what he's responding to.  He was

3  responding to an intermediary e-mail.

4  Q.  Your counsel didn't go through these portions of the

5  e-mail with you on your direct examination, did he?

6  A.  The response?

7  Q.  Yeah.  Your counsel didn't?

8  A.  Why take it down?  Why not see what I said?

9  Q.  Mr. Edelson, your counsel didn't show these responses to

10  the Court during your direct examination, did he?

11  A.  I believe -- I would be very confident that my firm gave

12  the full e-mail thread both to the Court and to you which is

13  why you have it.  So I'm not sure what you're saying.

14          THE COURT:  Well, it's not a jury trial.  The

15  exhibits are in.  I've read them all, or will read them all,

16  so it's not -- what was shown during part of the examination

17  isn't all that important as long as I read the whole thing,

18  which I assure you I will and I have.

19          MR. SABA:  Okay.  I have no further questions, Your

20  Honor.

21          THE COURT:  All right.

22          Any redirect?

23          Thank you.

24          MR. WADE-SCOTT:  Your Honor, just very quickly.

25          THE COURT:  All right.

Edelson - Redirect by Wade-Scott

745

1          REDIRECT EXAMINATION

2     BY MR. WADE-SCOTT:

3     Q.  Mr. Edelson, I want to touch briefly on the agreements to

4     confirm the fee arrangements for the four clients at issue

5     here.

6          Did your firm, anyone at the firm, ask the clients to

7     release any claims against Edelson in exchange for confirming

8     the fee arrangement?

9     A.  No.  What we made clear was that any -- any rights that

10    they would have would be preserved.  They didn't ask for that.

11    We -- we put that in there.  So they weren't waiving anything.

12         And we also made clear that if for any reason at all

13    they were unsatisfied with the results of this case that they

14    could have 100 percent money back guarantee.

15         THE COURT:  I understand clients need to know what

16    the overall amount of attorneys' fees will be on any

17    engagement a lawyer agrees to take on for them.  You agree

18    with that, correct?

19         THE WITNESS:  100 percent.

20         THE COURT:  All right.  Do they need to know the

21    split if there's a co-counsel or a referring counsel or

22    anything else?  Is that required for them to know that?

23         THE WITNESS:  Yes.

24         THE COURT:  Okay.

25         THE WITNESS:  They have to confirm it in writing at

1    some point.

2              THE COURT:  All right.  Very good.

3              Go ahead.

4    BY MR. WADE-SCOTT:

5    Q.   I'll cut this relatively short, but you stated what

6    happens to any fees that the firm recovers under that fee

7    arrangement, right?

8    A.   Yes.

9    Q.   Okay.  Why did you do it that way?

10   A.   Well, we think that we've got very good claims against a

11   number of people for our fees.  But we -- when we filed our

12   case which is in front of Judge Kennelly, we filed it really

13   as a vehicle to try to get the clients their money back.  So

14   we sought a constructive trust.  We made it clear that we

15   couldn't ethically take any money until the clients were paid.

16   Judge Kennelly dismissed that count and said no, we couldn't

17   do that.  So we could sue directly for our fees under this

18   agreement if we collect the fees, and it is entirely up to the

19   clients whether they would like to -- to not pay us the fees

20   but get that directly which would be terrific in my mind.

21             MR. WADE-SCOTT:  That's all I have on it.

22             THE COURT:  Any additional questions, Ms. Matthai?

23             MS. MATTHAI:  No, Your Honor.

24             MR. SABA:  No, Your Honor.

25             THE COURT:  I had a couple of more.

Edelson - Examination by the Court

1                        EXAMINATION.

2    BY THE COURT:

3    Q.   Sir, you were personally aware of the court orders in this

4    case, correct?  In other words, the -- or were you?  The fact

5    that I had to approve four of the minor settlements and

6    ordered that the funds, once received from Boeing, had to be

7    transmitted as soon as practicable to the clients, were you

8    aware of that?

9    A.   I was personally aware of that at the time.

10   Q.   Okay.  All right.  And then what was your understanding of

11   Mr. Multi's -- we keep talking about four people who had

12   deficiencies.  What was your understanding and knowledge

13   throughout this of Mr. Multi's settlement and payments to him?

14   A.   So Mr. Multi reached out to us after we filed the motion

15   for rule to show cause and informed us that he hadn't been

16   paid.  And that's when we first learned about it.

17   Q.   And is he the first -- is he the only client, only one of

18   the Indonesian people that actually had communications with

19   you?

20   A.   No.

21   Q.   Who else did you communicate with?

22   A.   I wouldn't know the answer to that.  We -- so this

23   was after -- this was after the rule to show cause.

24   Q.   Right.  But before the rule to show cause, did you have

25   any communications directly with any Indonesian clients?

Edelson - Examination by the Court

1   We've heard there's a lot of e-mails back and forth between

2   members of the Girardi Keese firm and some of these clients.

3   And did you have any?

4   A.  Our firm did not, including me.

5   Q.  All right.  And Mr. Multi is the first of those people who

6   did communicate with you, and that was after the rule to show

7   cause was filed?

8   A.  Yeah.  I mean, I prefer to have someone else at the firm

9   confirm that.  That's my understanding.

10  Q.  Well, all right.  And that's all I can ask for.  How about

11  are there others from Indonesia that contacted your firm

12  beyond Mr. Multi?

13  A.  Yes, we were -- I believe we were speaking to others in

14  terms of the people who the contempt hearing is about, those

15  people.

16  Q.  Who were they communicating with in your firm?

17  A.  I don't know.

18          THE COURT:  If you have -- you don't have to testify

19  but if you have knowledge of that, tell me.

20          MR. WADE-SCOTT:  We do, Your Honor.  I want to be a

21  little bit careful about privilege as to this part because I

22  do think the clients had a right to discuss with us in a

23  privileged way after we had filed the contempt motion.

24          THE COURT:  I'm not asking for the content of the

25  communications.  I'm asking who contacted your firm and who

Case: 1:18-cv-07686 Document #: 1318 Filed: 12/17/21 Page 198 of 262 PageID #:13325
Edelson - Examination by the Court
749

1   they talked to at your firm, not the content of the

2   conversations.

3           MR. WADE-SCOTT:  We can speak to that.

4           THE WITNESS:  I can addresses that.

5           THE COURT:  Go ahead.

6           THE WITNESS:  So they would have reached out to me

7   directly.  And then I -- I would have had Chris Dore who is a

8   partner who is one of the kind of leads of our investigation

9   group speak to them.  I'm fairly certain that's how it worked.

10  BY THE COURT:

11  Q.  And your position now is you represent the five of them

12  along with Mr. Wisner as co-counsel?

13  A.  No.

14  Q.  All right.  What is your firm's position with these five

15  people?

16  A.  The -- our position is that -- with respect to this case

17  or future things?

18  Q.  This case.  I don't know what future things.

19  A.  We're trying to do whatever we can to help them.

20  Q.  Oh, I see.  There may have been discussions with them

21  about representing them in suits relating to this but not --

22  well -- let me rephrase.

23  A.  Well, putting that -- putting that aside, we are not

24  representing them in this action.  We are doing this as

25  officers of the Court because we thought we could be helpful.

1   Q.  All right.  Mr. Wisner, as far as you know, is the sole

2   representative of these five people as it relates to the case

3   in front of me which is the Lion Air case?

4   A.  Mr. Wisner and his firm.

5   Q.  Right.

6   A.  That's my understanding, but he can answer that best.

7   Q.  All right.

8   A.  You know, I'm actually not -- I feel like there actually

9   is a different firm who is involved, who is involved.

10  Q.  All right.

11  A.  So don't take that as gospel.

12          THE COURT:  One second.  I just want to see if I have

13  any other questions.

14          All right.  I have no further questions.  Any

15  questions based on my set of questions?

16          MS. MATTHAI:  Just briefly, Your Honor.

17          THE COURT:  Go ahead.

18                      RECROSS-EXAMINATION

19  BY MS. MATTHAI:

20  Q.  When was it that you were contacted by Mr. Rizki --

21  Mr. Multi?  I'm sorry.

22  A.  I don't -- I mean, what pains me is that these two

23  probably know off the top of their head.  If we're just

24  looking for information, maybe we could to that.  But my

25  answer is to the best of my recollection, it would have been

Edelson - Recross by Matthai

1   after we filed the motion for rule to show cause.

2   Q.   And there was a hearing on the motion for rule to show

3   cause on December the 14th, correct?  That would be 2020.

4   A.   Yes.  Yes.

5   Q.   All right.  And before that hearing, you were aware that

6   Mr. Multi Rizki was a client in the Lion Air cases, correct?

7   A.   Yes.  We knew the -- yes, that he was a client, correct.

8   Q.   So at the time of the December 14th hearing, your firm was

9   silent as to whether or not there was another client.  And it

10  was after that silence that Mr. Lira and his counsel spoke up

11  and identified Mr. Multi Rizki as another involved party,

12  correct?

13          MR. WADE-SCOTT:  Objection.  Best evidence, I guess.

14  There's a transcript.

15          THE COURT:  Overruled.  That's -- overruled.

16  BY THE WITNESS:

17  A.   The best thing -- I'm happy to get you the date of when he

18  reached out to us.  I don't -- I don't remember that.  So it's

19  hard for me to answer kind of the thrust of your question.

20          THE COURT:  All right.  I get the point of your

21  question.  I'll read the transcript.  I'll re-read it.  I

22  understand the nature of your question.

23          All right.  Any additional questions, Ms. Matthai?

24          MS. MATTHAI:  No, Your Honor.

25          THE COURT:  Mr. Saba, any questions?

1            MR. SABA:  No, Your Honor.

2            THE COURT:  All right, sir.  You're excused.

3            THE WITNESS:  Thank you.

4            THE COURT:  All right.  It is 3:30.  Let's break for

5 about ten minutes.  Do you think you're going to be able to

6 finish this witness today?

7            MR. WADE-SCOTT:  Mr. Edelson?

8            THE COURT:  No, no.  He's finished.

9            MR. WADE-SCOTT:  Yes.

10            THE COURT:  Mr. Scharg.

11            MR. TIEVSKY:  Yes.  So with respect to Mr. Scharg,

12 many of the things that we were originally going to have him

13 testify to Mr. Edelson has already been through.  I'm of

14 course not trying to get out of calling him.  He's happy to

15 testify.  But a lot of it has already been gone over.

16            THE COURT:  Well, that's fine.  Let's hear from him.

17 I assume -- does the counsel for Mr. Lira and Mr. Griffin want

18 to hear from Mr. Scharg?  I do.  Let's put an end to it.  I do

19 want to hear from him, but we'll do it in ten minutes.  We've

20 got a hard cutoff at 5:00.  If we need to do more tomorrow, I

21 have a number of other things, but we'll fit you in.  I don't

22 know if you packed a bag, but that's how we're going to do it.

23            MR. SABA:  You may have to see me in the same suit.

24            MS. MATTHAI:  I was going to say the same suit.

25            THE COURT:  What's that?

**Scharg - Direct by Tievsky**

753

```
 1            MR. SABA:  You may have to see me in the same suit,
 2    but that's okay.
 3            THE COURT:  That's okay.
 4            All right.  Ten minutes.  Thank you.
 5            MR. SABA:  Thank you, Your Honor.
 6       (Recess.)
 7            THE COURT:  Please be seated.  Call your next
 8    witness.
 9            MR. SABA:  Thank you, Your Honor.  Ari Scharg.
10       (Witness sworn.)
11            THE COURT:  Okay.  Back on the record.
12            You may begin.
13                 ARI SCHARG, WITNESS, DULY SWORN,
14                      DIRECT EXAMINATION
15    BY MR. TIEVSKY:
16    Q.  If you could state your name for the record, please.
17    A.  Ari Scharg.
18    Q.  Mr. Scharg, where do you work?
19    A.  I'm a partner at Edelson.
20    Q.  And how long have you worked there?
21    A.  For 11 years, since 2010.
22    Q.  And how long have you been an attorney?
23    A.  Since 2008.
24    Q.  You were involved in the Lion Air litigation, right?
25    A.  Yes.
```

**Scharg - Direct by Tievsky**

1   Q.  How did you get involved in that case?

2   A.  I got a phone call in April of 2019 from Keith Griffin

3   asking if my firm would like to serve as local counsel for

4   their Lion Air cases.

5   Q.  And what did you say?

6   A.  Well, I spoke to Jay and a few other partners, and we

7   decided to do it.  So I called him back and told him that

8   we're in.

9   Q.  And who from the Girardi Keese firm did you work with on

10   that Lion Air litigation?

11   A.  Keith and David Lira.

12   Q.  Did you communicate with the clients in Indonesia?

13   A.  No.

14   Q.  How did you -- if you needed to get a message from -- from

15   or to them, what did you do?

16   A.  I would just -- I would reach out to Keith or David.  They

17   would either obtain the information that we needed or put me

18   in touch with somebody at the Hatcher firm who could get the

19   information for us.

20   Q.  Is that an unusual arrangement in your experience?

21   A.  What, that we didn't have the client contact?

22   Q.  That one firm might take the lead on the client contact.

23   A.  Oh, no, it's typical that one firm would take the lead,

24   especially, you know, here in a situation with the clients in

25   a different country, on a different continent.  And we

**Scharg - Direct by Tievsky**

1    understood that the Girardi Keese firm was dealing with a

2    significant language barrier.

3    Q.   So jumping forward, these cases settled, right?

4    A.   Yes.

5    Q.   And some of them, some of the cases also involved minors?

6    A.   Yes.

7    Q.   Did you have to do anything in particular to finalize the

8    settlements with the minors?

9    A.   Yes.  Well, pursuant to the local rule, we were required

10   to seek court approval before releasing their claims.

11   Q.   So I would like to talk about your communications with

12   Keith Griffin.  I will show an exhibit.

13          MR. WADE-SCOTT:  We might not have control.

14          MR. TIEVSKY:  We don't have the hookup over here.

15          THE CLERK:  I'm sorry.  There's no hookup over there?

16          MR. WADE-SCOTT:  There is a hookup.  It doesn't look

17   like we are in control of the monitor.

18          THE CLERK:  It's connected.  I'm not really sure why

19   it's not responding.

20          THE COURT:  Yeah, this was connecting earlier.

21          MR. TIEVSKY:  My computer is showing that it's

22   connected to something, but I'm not seeing it on the display

23   here.  If it's easier, I could step up.

24          THE COURT:  Yeah, why don't you while we work this

25   out, just put the exhibits on the ELMO, or put your laptop up

Scharg - Direct by Tievsky

1    here.

2         MR. TIEVSKY:  Yeah, I think laptop.  I don't --

3         THE COURT:  Okay.

4         MR. TIEVSKY:  There we go.

5         THE COURT:  Okay.

6    BY MR. TIEVSKY:

7    Q.   I'm showing you what's been marked as Exhibit 311 at

8    page 10.  You recognize that these are the texts you had with

9    Keith Griffin?

10   A.   Yes.

11   Q.   And you understand that your texts are on the left in

12   white and his are on the right in blue?

13   A.   Yes.

14   Q.   So looking at page 311-11, you say, "And Perkins is not

15   going to release any of the money until all of the settlement

16   agreements are signed."

17   A.   Yes.

18   Q.   Where did you get that understanding?

19        THE COURT:  What's the date of that one?

20        MR. TIEVSKY:  Sorry.  That is February the 28th.

21        THE COURT:  Okay.

22   BY THE WITNESS:

23   A.   Yeah, I received that information from Keith during a

24   phone call either the day before or the day before that.

25   BY MR. TIEVSKY:

**Scharg - Direct by Tievsky**

1  Q.  And what did Keith say on the phone call?

2  A.  Well, just to put this into context, after we received the

3  first approval order from the Court for the first minor

4  settlement, I reached out to Keith, said all right, we're in

5  business.  Send your lawyer information over to Boeing and

6  make sure that they have it so that we can get -- we can get

7  the settlement funded.

8       The next day or the day after that, I got a phone

9  call saying that he spoke to Boeing or he spoke to their

10  attorneys and heard that -- and they told him that they were

11  not going to be releasing any of the settlement monies until

12  all of the clients signed the settlement agreements.

13  Q.  And you understood that to mean all of the 11 clients that

14  your firms jointly represented, right?

15  A.  Absolutely.  Yes.

16  Q.  Did he give you any reason on that call to think that

17  different groups of clients might be treated differently?

18  A.  No.  I mean, this was coming on the heels of Ms. Anice

19  Kasim, having her settlement approved by the Court, and she

20  was part of the earlier cases that there were no issues with

21  in terms of a Lion Air release.  And the context of this text

22  message actually relates to a client from the seven cases who

23  was apparently being poached.  So, I mean, I understood that

24  this was an issue that affected all of our clients equally.

25  Q.  So when you say that kind of the text message relates to a

**Scharg - Direct by Tievsky**

1  client from the seven, that is you understood this to mean

2  that one of the seven was affecting the payment for one of the

3  previous ones, right?

4  A.  Yes, exactly.

5  Q.  Moving down now to March 17, 2020.  I'm looking at 311-12.

6  You say, "With all this craziness, I think we want to finalize

7  everything with Boeing sooner rather than later."  What do you

8  mean by "this craziness"?

9  A.  Well, I was referring to the COVID pandemic and

10  specifically here the news that Boeing was considering filing

11  for bankruptcy.  And this was sort of a way that I was -- I

12  was trying to gently nudge Keith to get this done because it

13  didn't seem like much was happening.

14  Q.  Why -- why did you follow up on it?

15  A.  Why what?

16  Q.  Why did you send this follow-up?  Just to nudge him?

17  A.  Yeah, because nothing had -- we were still waiting on

18  signatures.  It didn't seem to me like it would be difficult

19  or time consuming to get the clients to sign the releases.

20  Q.  And you were -- and you were under the impression at this

21  point that nobody was getting any money until you got all

22  those signatures?

23  A.  Exactly.  So there's certainly a time urgency that I

24  didn't think was being felt by our co-counsel.

25  Q.  Now, looking at 311-13 on this April 27th text message, is

Scharg - Examination by the Court

1  this effectively the same question you were asking?

2  A.  All of these text messages are, yeah.  I mean, I'm trying

3  to constantly nudge him to move on it because it seemed like

4  there was a holdup, yeah.  So here I asked if there's any

5  updates on Boeing.

6                         EXAMINATION

7  BY THE COURT:

8  Q.  Well, at any of these times, did you understand that there

9  had been funding for any of the clients?

10  A.  Absolutely not.

11  Q.  All right.  So the discussion you're having is on

12  releases?

13  A.  Yes.

14  Q.  And you thought that was a prerequisite for funding?

15  A.  Yes.

16  Q.  And were you unaware that there had been four releases

17  executed and four tranches of the funds -- well, four complete

18  settlement funds being sent by Boeing for four clients that

19  had occurred based on an agreed timeline I think from March

20  through April 2nd.

21  A.  I was aware that the four releases had been executed,

22  absolutely, because we came to the Court to get approval.

23  Q.  Right.

24  A.  I was absolutely -- you know, so after the Court entered

25  the first approval order, I reached out.  I mean, I -- until

Scharg - Examination by the Court

1  February 25th, I was under the impression that Boeing was

2  going to fund the releases as they were signed.  So I reached

3  out and encouraged Keith to send his wire information over to

4  Girardi Keese because, again, it seemed like they were moving

5  slow.  I mean, we had settled the first tranche of four back

6  in October of 2019, and it wasn't until February -- it wasn't

7  until mid-February that we were in a position to put it in

8  front of the Court.  So I wanted to make sure that he was

9  going to get his wire information over to Boeing so that they

10 were in a position to be able to fund it quickly.

11 Q.  Well, did you ever raise the issue that if there had

12 been -- if these had been approved by the Court, the

13 settlement agreement itself said Boeing has got to pay in 30

14 days after the release has been signed; and then after I

15 approved it, it had to be sent to the clients as soon as

16 practicable.

17 A.  Did I raise that with Boeing?  I'm sorry.

18 Q.  Yes.

19 A.  No.  I mean, the order as I understood it -- the order

20 pointed to my declaration and said to disburse the funds as

21 soon as practicable as articulated in your declaration.

22 Q.  Right.

23 A.  My declaration dealt with how the funds would be disbursed

24 once they were received by Girardi Keese.

25 Q.  Right.  But once the settlement -- the releases have been

1   signed prior to March; is that correct?  For at least four of

2   them.

3   A.  For some -- well, for at least some of them.  I think -- I

4   don't know.  Some may have been signed after March.

5   Q.  Well, the disconnect I'm having is if releases were signed

6   and you came and got approval from the Court for the

7   settlement, you knew that money had to be paid by Boeing, and

8   you knew that Girardi Keese had to send the money to the

9   clients.

10  A.  Yes, but not -- I mean, look, I believed Keith.  I didn't

11  have any reason to not believe him.  I mean, at that point in

12  time, I thought the best of the Girardi Keese firm.  Had I

13  known everything that we know now, of course, absolutely.  But

14  this -- this lie played into what happened at the mediation.

15  And I don't know if we're allowed to get into what happened at

16  the mediation, but --

17  Q.  Well, we'll get there in a minute.

18  A.  Okay.

19          THE COURT:  What was the objection?

20          MR. SABA:  Objection to the characterization of law.

21          THE COURT:  That's a -- we've heard that thrown

22  around repeatedly in three days of hearings, and you can

23  cross-examine on it.

24          MR. SABA:  I will, Judge.

25  BY THE COURT:

**Scharg - Examination by the Court**

1    Q.   My question is simply this:   Tell me your understanding of

2    the timing of these four settlements and what the obligations

3    were under the order that I entered, that you had me enter,

4    you or your firm had me enter, and the obligations on Boeing

5    and then on Girardi Keese.

6    A.   As I understood it, the order did not impose an

7    affirmative obligation on Boeing.   The way that I read it and

8    continued to read it, it certainly imposed an obligation on

9    Girardi Keese to distribute the funds as we articulated it in

10   the declaration upon receipt of those funds from Boeing.   But

11   I believed Keith that Boeing was not going to release the

12   settlement funds until all the clients signed the settlement

13   agreements.

14   Q.   All 11?

15   A.   All 11 clients because we're already talking about the

16   first four.

17   Q.   All right.   Go to 111, Exhibit 111.   You can have that up

18   on the screen, or if you --

19   A.   Yes.

20        THE COURT:   And you're probably going to have to keep

21   this off the public screen.

22   BY THE COURT:

23   Q.   All right.   The first is a Girardi Keese memo that you're

24   not party to so we can move past that.

25        The closing statement, have you ever seen that

1  before?  Outside of preparation for this hearing.

2  A.  Yes.  I believe so.  I believe I've seen this -- I believe

3  I used this to fashion the papers that we submitted to the

4  Court.

5  Q.  Yeah, I meant contemporaneous with the creation.  In

6  January 2020, did you see it?

7  A.  Oh, no, not in January of 2020.  No.

8  Q.  All right.  Then look at the settlement and agreement

9  release of all claims.  It's got the English on the left side.

10  A.  Yes.

11  Q.  The Indonesian, whatever the particular language is that

12  it's -- native language for the plaintiffs on the right side.

13  A.  Yes.

14  Q.  Doesn't it obligate Boeing to pay the money 30 days?  Look

15  on page 111-12.

16  A.  Yeah.  It certainly imposes a contractual obligation upon

17  Boeing to fund the settlements.

18  Q.  Okay.

19  A.  But it wasn't crazy to me at all that they were holding

20  off on doing it.

21  Q.  Well --

22  A.  Given especially what happened at the mediation.

23  Q.  We'll get to that in a minute.  It reads, "The aforesaid

24  sum of" blank, the amount's in there, "shall be paid within 30

25  days of the execution of this release and the issuance of all

1   necessary court approvals as agreed by the parties as

2   follows," and then it's broken out between the California

3   Attorney Lending and the amount of money that goes to the

4   Girardi Keese client trust account.  So that's 30 days --

5   within 30 days of the execution of the release and the

6   issuance of all necessary court approvals.

7           After you got the Court approval -- were you the

8   attorney at Girardi Keese primarily responsible -- or not

9   Girardi -- at Edelson primarily responsible for getting it

10  over to me?

11  A.  Yes.

12  Q.  All right.  You know I signed it on a particular day, of

13  course.

14  A.  Yes.

15  Q.  That's docketed.  I think I signed these within a day of

16  getting them.  You knew then that the clock was ticking on

17  Boeing for 30 days to put this money, to issue it to

18  California Lending and Girardi Keese.

19  A.  I knew that's what the contract said.  I mean, that's why

20  I reached out to Keith and said get them your wire

21  information, like we want to get this thing funded and dealt

22  with.

23  Q.  Well, when it didn't happen because there's -- I've heard

24  three days of testimony about how this is stretched out.

25  A.  Yes.

1    Q.  When it didn't happen, did you call Boeing and say, you're

2    in violation of the court order if you don't send that money

3    off for the client that I -- that the Court approved the

4    settlement for?

5    A.  I did not view it as a violation of the court order.  It

6    may have been a violation of the settlement agreement, but --

7    Q.  Well, it's -- the settlement agreement was approved by the

8    Court.

9    A.  Right.  The other issue here too is that really was not my

10   role in this case.  I -- I did speak to Boeing on a number of

11   occasions to schedule the mediations, to get their approval

12   for, you know, stipulations and the joint motions to approve

13   that we filed with the Court.  But I believe -- I believed

14   Keith that they were holding off on funding until all of the

15   settlement agreements were signed.  And looking back on that

16   now, back then I thought the best of them.  I thought they

17   were honorable and trustworthy --

18   Q.  All right.

19   A.  -- and honest.

20   Q.  That's fine.  But it never occurred to you that this

21   agreement required Boeing to do something.  And if you

22   believed Mr. Griffin, then Boeing was violating this agreement

23   that was submitted to the Court as part of an overall

24   settlement that I approved.

25   A.  But that's -- there's two different issues there.  I

1   mean --

2   Q.  Okay.  Pick it apart.

3   A.  -- one is an enforcement issue, a contract enforcement

4   issue.  One is a violation of a court order.

5   Q.  Well, did you think to call Boeing at that point and say,

6   what are you guys doing?  I went to the Court, or --

7   A.  Abso- --

8   Q.  -- my firm went to the Court and we relied upon the -- we

9   asked the Court to approve a minor settlement which required

10  the money be sent from Girardi Keese to the clients as soon as

11  possible, and that the funding, the funding of that money was

12  supposed to take place within 30 days of the Court approval?

13  A.  No, I did not think to do that.  I mean, we never

14  submitted the agreement to the Court.  We submitted the terms

15  as to how much money the minors were going to be receiving.

16  But the Court didn't sign off on a time frame or on any other

17  language that was in the -- in the settlement agreement.

18  Q.  All right.  Fair enough.  My order was very short.  It

19  simply said pay the money to the client as soon as

20  practicable.  And I'll get the language of it if you want.

21  But my order was --

22          THE COURT:  Help me on this.  Where is the order?

23  Can you refer me to --

24          MR. SABA:  It should be Exhibit -- look at

25  Exhibit 205.

**Scharg - Examination by the Court**

1              THE COURT:  All right.

2              MR. SABA:  That's the motion.

3              THE COURT:  It's 205?  No.

4              MR. SABA:  That's the motion.  Sorry.  I think the

5    order is the next page, 206.

6    BY THE COURT:

7    Q.  All right.  And let's put that up -- yeah, there's no

8    amounts in here, so let's put that up on the screen so

9    Mr. Scharg can see it.

10   A.  Yeah, I'm very --

11   Q.  All right.

12   A.  -- aware of this language.

13   Q.  So your name is on this.  I find that you're an attorney

14   who is competent to represent the interests of the minors.

15   Settlement is reached by the parties.  It's fair and

16   reasonable, in the best interest of all the parties.  I

17   dismiss the claims with prejudice and without costs.  I note

18   that the claims of the other plaintiffs and all the other

19   people who brought suit are unaffected by this order.  I

20   approve the amount of money being paid to the minors together

21   with the attorneys' fees charged to the minor plaintiffs.  I

22   dismiss the minor plaintiffs' claims in their entirety with

23   prejudice.  And then I say the settlement funds shall be

24   distributed to plaintiff Anice Kasim in this case individually

25   as legal guardian in accordance with the process identified in

Scharg - Examination by the Court

1    plaintiff counsel's sealed affidavit.

2            THE COURT:  Now, do we have the plaintiff's counsel's

3    sealed affidavit?  Which exhibit is that?

4            MR. SABA:  204.

5            THE COURT:  Okay.  Let's put that up as long as there

6    is no money in there.

7            MR. SABA:  There is at one point.

8            MR. TIEVSKY:  There is, but I believe I've scrolled

9    past it.

10           THE COURT:  Okay.

11           MR. SABA:  Paragraph 11.

12   BY THE COURT:

13   Q.  And this is your declaration?

14   A.  Yes.

15   Q.  Filed with me?

16   A.  Yes.

17   Q.  And you did this with all four of them.

18   A.  Yes.

19   Q.  So just use this as an example.  All right.  And you go

20   through some of the background of the plaintiffs, the ages of

21   the minors, names, et cetera.  The amounts you go through.

22   And paragraph 11 notes that "the settlement funds for the

23   minor plaintiffs in this case shall be initially" -- and this

24   you can put on the screen, that last page.  "The settlement

25   funds for the minor plaintiffs in this case shall be initially

Scharg - Examination by the Court

1    paid to a trust account established by Girardi Keese for the

2    benefit of the plaintiffs, including the minors.  Pursuant to

3    instructions provided to counsel by plaintiff Kasim in her

4    role as legal guardian for the minor plaintiffs, the

5    plaintiff's net proceeds identified above shall be sent as

6    soon as practicable via wire transfer to PT Bank Mandiri,

7    Indonesia's largest bank and leading Islamic banking

8    institution."

9            And this is what you swore to --

10   A.   Yes.

11   Q.   -- that would happen.  And you were aware of the

12   settlement agreement requiring Boeing to fund it within 30

13   days of the signing of that, correct, or signing of the -- all

14   court approvals, so that would -- this was February 21st.

15   Boeing would have had to have funded it by March 21st,

16   correct?

17   A.   According to the settlement agreement, yes.

18   Q.   All right.  And you are aware of the settlement agreement?

19   A.   Yeah.  I don't know that I was specifically aware of the

20   30 days, but I would have assumed that it would have included

21   a 30-day payment deadline.

22   Q.   All right.  Which means by March 21st, if not sooner,

23   Boeing had to fund it.  And then this order takes -- takes

24   control, and the money having been sent to Girardi Keese has

25   to be sent off to Indonesia as soon as practicable.

Scharg - Examination by the Court

1    A.   Yes.

2    Q.   And you were under the impression that Boeing hadn't

3    funded it --

4    A.   Yes.

5    Q.   -- when you're going back and forth with Mr. Griffin,

6    correct?

7    A.   Well, that's what he told me.

8    Q.   I understand.

9    A.   Yes.

10   Q.   And you certainly could have called Boeing, correct?

11   A.   I mean, I had their phone number.  I know the attorneys at

12   Boeing.  But at that point in time there was no reason for me

13   to call Boeing.  I didn't think that Boeing had sent the

14   money, and there was no reason to call to see if they had sent

15   the money.

16   Q.   You didn't think they had sent it?

17   A.   No.  No.  I thought they were holding it until all the

18   clients signed the settlement agreements.

19   Q.   All right.  But if you're representing your clients,

20   wouldn't you want them to get the money as soon as possible?

21   A.   Yes, but, again, I mean, I'm serving as local counsel.

22   I'm hearing from lead counsel that they are speaking to

23   Boeing, and Boeing is telling them -- and lead counsel is okay

24   with this idea that Boeing is not going to -- not going to

25   fund any of the settlements until all of the -- until all of

1    the agreements are signed by the clients.

2    Q.   All right.  Well, you're kind of out front on this because

3    of the affidavit you filed with me.

4    A.   Yes.

5    Q.   And that's why I'm asking these questions.  I understand

6    you believed Mr. Griffin and you thought that Boeing hadn't

7    funded it.  His attorneys, his attorney and Mr. Lira's

8    attorney will have questions about that.  But so we can cut

9    through this, your testimony is despite the settlement

10   agreement which required the payment in 30 days, you were

11   not -- you were relying upon the fact that Boeing wasn't

12   funding it and you weren't going to be coming to court to

13   ask -- or call Boeing to tell them what's going on, you have

14   30 days to have funded this, why haven't you?

15   A.   Well, I didn't have the authority to do that.  We did --

16   we did reach out and ask at some point in May if we can call

17   Boeing and talk about why they're holding the funds, but we

18   were told not to.

19          But to go back to your earlier question --

20   Q.   You were explicitly told not to?

21   A.   Well, the response was something along the lines of the

22   releases are coming in, there's no need.  And then Rafey

23   responds and says, but there's -- but it's not right that

24   Boeing is holding our -- Boeing is holding the settlement

25   funds hostage until all of the clients signed the releases.

Scharg - Examination by the Court

1   Q.  Well, it's not only not right, it's not rational because

2   they didn't.

3   A.  Yeah.

4   Q.  It's not rational that Boeing would do that.  And it's

5   not -- I'm having a lot of trouble with the concept that when

6   an order is submitted to me to sign saying -- and I did see

7   the settlement agreements.  They were submitted to me at the

8   time of this -- these approvals.  I saw the side-by-side

9   translation, and it said Boeing funds within 30 days of this

10  release.  And then once that happens, this other order comes

11  into place.  And the money, that release says in 30 days you

12  send it off to Girardi Keese and to the litigation funder.

13          MR. TIEVSKY:  Your Honor, if I may, I'm sorry.  I

14  don't mean to interrupt you or to object to your question at

15  all, but I do have to point something out.

16          THE COURT:  If I'm wrong on this, point it out

17  because it's important I get it right.

18          Go ahead.

19          MR. TIEVSKY:  But to the extent that we think that

20  the court order imposes that 30-day deadline --

21          THE COURT:  The Court's order doesn't.  The

22  settlement agreement does.  But I -- that was submitted to me

23  as part of the court order where I approved the settlement.

24          MR. TIEVSKY:  I just wanted to point out that around

25  that time, there were orders, general orders extending all

Scharg - Examination by the Court

1    deadlines in all civil cases in this Court.

2         THE COURT:  Well, no, that's -- hang on.  Those

3    general orders were related to filings in the Court, not to

4    settlements and money being exchanged.

5         MR. TIEVSKY:  I just wanted to point it out.  I

6    don't -- I don't know what Boeing would have said to us.  I

7    don't know anything about that.  I just wanted to point

8    out that --

9         THE COURT:  Those general orders did not -- when --

10   those had nothing to do with any of the deadlines in this case

11   which were relating to orders I entered and relating to

12   agreements in the settlement agreement between Boeing and the

13   plaintiff.  So --

14        MR. TIEVSKY:  That may be.  I just -- I didn't bring

15   it up before because I think that -- I didn't think there was

16   any relation either.  But just to the --

17        THE COURT:  That's an uphill climb to convince me on

18   that one.

19        MR. TIEVSKY:  Okay.

20   BY THE COURT:

21   Q.  And if I'm wrong -- I don't mean to be, you know,

22   launching into you on this, but if I'm wrong on some of my

23   facts, tell me if you disagree with what I've just said.  And

24   I know I said a lot, so if you need me to be specific, so be

25   it.  I just want to cut to the chase on this because I would

**Scharg - Examination by the Court**

774

1   like to finish you as a witness today.  If we can't, we won't.

2   But I'm having the trouble I just expressed to you a moment

3   ago.

4   A.   Here's the way that I was looking at it.  I understand the

5   court order, you know, absolutely.  I take that very

6   seriously.  In fact, around this time, I was -- I was dealing

7   with a number of rule to show cause hearings in Cook County.

8   And the last rule to show cause hearing on this was in the

9   context of the Westlake Hospital when we were filing to keep

10  it open.  The last rule to show cause hearing we got -- we got

11  admonished by the Court, which is very close in time to this

12  happening, for not being able to identify a specific part of

13  the order that was actually violated.  And when we looked at

14  the order, we looked at it very closely to understand what the

15  obligations were because this in my mind seemed like a

16  contract enforcement issue as opposed to a breach of a court

17  order issue.  And that's why I kind of shifted my focus into,

18  okay, let me do everything that I possibly can to get all the

19  releases signed and get them -- and get them over to Boeing so

20  that we can close this out because at this time, I didn't

21  think anything nefarious was happening.  I didn't think

22  anything, you know, untoward was happening.

23          So I thought as soon as we got all the settlements

24  signed, the money was going to get released, and that was, to

25  be honest, my focus for the next, you know, several months.

Scharg - Examination by the Court

1   Q.   Now, everyone said they didn't think anything nefarious

2   was going on, everybody, every witness in this case.  The real

3   question is should they have done more than what they did

4   given the variety of red flags that kept popping up in front

5   of every one of the witnesses I've heard today and last week.

6           And so the question your red flag is the settlement

7   agreement that says fund within 30 days and then my order

8   saying once it's funded, get the money off to Indonesia as

9   soon as possible.  And the fund within 30 days wasn't

10  followed, at least you understood.  It was filed by Boeing.

11  A.   Yeah.

12  Q.   They acted completely appropriately.  It was filed by

13  Boeing.  And you're hearing from Mr. Griffin it hadn't

14  happened according to your testimony.  And my reaction is

15  fine, why don't you call Boeing and say what's going on?  And

16  from that --

17  A.   It's not -- sorry.  It's not uncommon for a defendant to

18  not pay us on the settlement on time.  It's not.  And

19  especially what happened -- given what happened at the

20  mediation, I didn't think there was -- I mean, it struck me as

21  a barrier that we had to clear, but it did not even strike me

22  as that odd given what took place at the mediation.

23  Q.   A week or two, fine, but months?  This wasn't a matter of

24  a couple of weeks where Boeing, according to your testimony,

25  that you understand they hadn't funded.  It was months and

Scharg - Examination by the Court

1    months that you were hearing they hadn't funded it.  And to

2    not at least -- maybe I need to hear what happened at the

3    mediation, understanding it was confidential; but if there's

4    something about the mediation that goes to your state of mind,

5    you can testify to that.

6    A.   Absolutely.  There was.

7    Q.   Which mediation?  I understand there were three of them,

8    at least.

9    A.   There were four altogether.

10   Q.   Okay.

11   A.   And, I mean, it was a theme throughout all four but

12   especially in the first -- the first one, we went into the

13   mediation with a plan to, you know, make a presentation for

14   each family separately.  I spent a lot of time with the family

15   documents and the videos that were submitted to us.  I really

16   dove into the -- into the facts of each case.  And I had a

17   number of things that I thought were different about the cases

18   that Boeing should pay, you know, more for this case because

19   of this issue.

20        And Jay and I went in to kind of talk about why we

21   should negotiate these individually, and Boeing's insurance

22   carrier just abjectly refused.  And it got to the point -- I

23   mean, we tried to push back.  It got to the point where the

24   mediator said, "If you are going to insist on negotiating

25   individually, then this mediation is going to -- is going to

Scharg - Examination by the Court

1    end."  So at that point we were resigned to negotiate as part

2    of a global deal for all of the cases, not just one, not just

3    four, it was for all of the cases.

4    Q.  11.

5    A.  I believe by the first mediation we had 11 on file.

6    Q.  All right.

7    A.  But it was for our inventory.  I don't think that they

8    wanted us to come back with another case later.  It was my

9    impression that they were trying to zero out each group of

10   plaintiff's firms.

11   Q.  All right.

12   A.  And we understood that that was -- that was coming from

13   the carrier.  I don't think it was necessarily Boeing.  And I

14   understood that the carrier was funding the lion's share of

15   settlements.

16          So fast forward to February 24th after I -- after we

17   submitted and received approval for the first minor

18   settlement.  In my conversation with Keith, when he told me

19   that they were not going to fund any of the settlements until

20   all of them were signed, it did not -- it made sense that the

21   carrier was going to hold off especially because there was

22   still a number -- I mean, we knew that there were a number of

23   passengers that had not yet filed cases, the families of

24   passengers that had not yet filed cases.  And it made sense to

25   me and us that that was the case.  I mean, we obviously had no

**Scharg - Direct by Tievsky**

1  idea that the -- that what Keith was telling us, you know,

2  over the phone and on a text message was not true.

3       THE COURT:  All right.

4       Go ahead.

5       MR. TIEVSKY:  I think unless Your Honor has further

6  interest in this particular issue then I will jump ahead from

7  it.

8       THE COURT:  Go ahead.

9       MR. TIEVSKY:  I can ask more questions about it if

10  you want.

11       THE COURT:  All right.

12              DIRECT EXAMINATION (Resumed)

13  BY MR. TIEVSKY:

14  Q.  Are you aware of Mr. Lira leaving Girardi Keese?

15  A.  Yes.

16  Q.  Did you speak to him about these cases around that time?

17  A.  Yes.

18  Q.  That was around June 16th that you spoke to him?

19  A.  Yes.

20  Q.  Who was on the call?

21  A.  It was myself, David Lira, and Rafey Balabanian.

22  Q.  And what did he tell you?

23  A.  He told us on the call that he was leaving Girardi Keese,

24  seemed like an incredibly acrimonious split.  It sounded like

25  he was there for a long time and it was a messy split.  I

**Scharg - Direct by Tievsky**

1   mean, at the end of the call, he said, "Oh, and by the way I

2   think that the" -- "that the Boeing funds have come in.  You

3   should check with Keith."

4   Q.  Did you raise that or did he raise that?

5   A.  He raised that.

6   Q.  You didn't prompt it in any way?

7   A.  No.

8   Q.  Did you get the impression that he thought maybe you

9   didn't know?

10  A.  Of course.

11         MS. MATTHAI:  Lacks foundation.

12         THE COURT:  Overruled.

13  BY THE WITNESS:

14  A.  Of course.

15  BY MR. TIEVSKY:

16  Q.  Looking at Exhibit 311-17.  You see your text message

17  where you say, "Hey, Keith, did the Boeing money come in"?

18  A.  Yes.

19  Q.  And did you send that before or after the call with

20  Mr. Lira?

21  A.  It was right after our phone call.

22  Q.  And his response is, "Ari, I actually don't know.  I will

23  find out."

24  A.  Yes.

25  Q.  All right.  Why did you ask him the question?

**Scharg - Direct by Tievsky**

1  A.  What's that?

2  Q.  Why did you ask him that question?

3  A.  Because we just learned for the first time from David Lira

4  that he thought that the Boeing money came in.

5  Q.  And then you responded, "David Lira just brought me up to

6  speed on his situation.  Yikes.  Anyway, he said those cases

7  have been funded, so please let me know.  Thank you."

8        What situation were you referring to?

9  A.  Well, his split from the firm, his very acrimonious split

10  from the firm, from what it sounded like.

11  Q.  And why did you say "yikes"?

12  A.  It sounded like a situation that they were dealing with

13  over there that was negative and, you know, it just sounded

14  like a mess.

15  Q.  Have you ever tried to hide this text message from the

16  Court for any reason?

17  A.  No.

18        MR. TIEVSKY:  Thank you.  I don't have any more

19  questions for Mr. Scharg.

20        THE COURT:  Okay.  Thank you.

21        All right.  What I'm trying to figure out, sir, is

22  whether the settlement agreement -- I thought, and I believe

23  it was submitted along with the approval, the request for

24  approval of the minor settlement, you don't believe it was?

25        THE WITNESS:  No.

Scharg - Cross by Saba

1    THE COURT:  Okay.  And I'm going to have to pull up

2    the docket to look at it because I have a distinct

3    recollection of seeing the side-by-side translation of these

4    which I don't think is in any other document other than the

5    actual settlement agreement itself.

6    MR. TIEVSKY:  Your Honor, I will say that, you know,

7    there were many settlements, many not represented by us.

8    THE COURT:  Say that again.

9    MR. TIEVSKY:  Sorry.

10   Boeing settled with many clients, many of them not

11   represented by us.  They were the ones who put these together.

12   It's very, very possible, and I don't know for sure, that you

13   saw an extremely similar document for a client who isn't ours.

14   THE COURT:  It's possible.  I've approved dozens of

15   settlements in this case.  And it's possible, and that's why I

16   want to be fair to you.  It's possible that this settlement

17   agreement itself was not something that was given to me at the

18   time of the minor approval because I primarily look, candidly,

19   at the amounts of money, the amounts of attorneys' fees and

20   the reasonableness of it.  Because I have seen these

21   side-by-side translations repeatedly throughout this case, and

22   I'll simply look at the docket sheet -- that's what I was

23   going to ask my courtroom deputy but I don't want to interrupt

24   things.  I'll look at the docket and see what was submitted to

25   me relating to these.

**Scharg - Cross by Saba**

1    But your testimony is you don't believe this was

2  submitted with the affidavit that you filed.

3    THE WITNESS:  Right.

4    THE COURT:  Okay.  Fair enough.

5    Go ahead.

6                    CROSS-EXAMINATION

7  BY MR. SABA:

8  Q.  Okay.  Mr. Scharg, you just testified that after we got

9  the first approval order, you called Keith and said to get

10  your wire information to Boeing, yes?  Did I get that right?

11  A.  No.

12  Q.  Okay.

13  A.  I e-mailed him.

14  Q.  Okay.  E-mailed him.  The first court order was issued on

15  February 24th.  You agree with that?

16  A.  Yes.

17  Q.  Okay.  Now, you just described the two -- a couple of the

18  mediations.  You'll agree with me that there was a mediation

19  on October 30, 2019, where there was a discussion of the

20  inventory settlement?

21  A.  I believe that was the date, yes.

22  Q.  And then as a result of that, some of the settlements fell

23  through.  And four of them were ultimately settled which are

24  the first four plaintiffs that you filed the motions for minor

25  approval, correct?

**Scharg - Cross by Saba**

1   A.   Yes.

2   Q.   And then the remaining seven went to another mediation on

3   February 12.

4   A.   Yep.

5   Q.   Do you remember that?

6   A.   Yes.

7   Q.   Okay.  So let's orient ourselves.  February 12, there's a

8   mediation regarding the seven settlements that fell through,

9   correct?

10  A.   Fell through, yeah.  Boeing was renegotiating them, yes.

11  Q.   Okay.  Boeing was renegotiating those on February 12th.

12  Meanwhile, there was already a settlement for the first four

13  in the books, settlement agreements were being signed,

14  correct?

15  A.   Yes, there was -- yeah, the first four settlements.

16  Q.   In fact, you were preparing all the motions with the Court

17  jointly with Boeing?

18  A.   Yes.

19  Q.   Now, you testified that your text message on February 28,

20  which is Exhibit 311-9 -- sorry.  Let's put Exhibit 311 up

21  there.

22       Okay.  So 311 -- okay.  So now after the

23  February 12th mediation --

24       THE COURT:  Sorry.  I don't think he has it up there.

25       MR. SABA:  Oh.

Scharg - Cross by Saba

1          THE COURT:  Do you need this on the ELMO?

2          MR. SABA:  No, it should be on the thing.  I think

3 Ms. Wall might need to flip something.

4          THE CLERK:  It's connected.  It says "trial pad for

5 iPad."

6          MR. SABA:  How about the word "present," will that

7 help?

8          THE COURT:  There you go.  Sorry.

9 BY MR. SABA:

10 Q.  All right.  So let's orient ourselves in time here.  Okay.

11 Sorry.  We took a break.

12          There's a mediation on February 12th, correct?

13 A.  Yes.

14 Q.  Okay.  And after the mediation, there was a discussion of

15 a client of that group being poached.

16          Do you remember that?

17 A.  Yes.

18 Q.  And that's why you wrote a text message, "Which client got

19 poached"?

20          Do you see that?

21 A.  Yes.

22 Q.  Okay.  And Mr. Griffin and you were discussing the poached

23 client, and that poached client came from that second

24 settlement -- or excuse me -- the settlement conference in

25 February, correct?

**Scharg - Cross by Saba**

1  A.  Yes.

2  Q.  Turn to the next page.  Now, you will agree with me you

3  and Mr. Griffin continued to talk about the settlement and the

4  fact that one of the clients got poached, correct?

5  A.  Yes.

6  Q.  And then Mr. Griffin writes, "Trying to get Perkins to

7  give us individual offers."

8       Do you see that?

9  A.  Mm-hmm.

10  Q.  Yes?

11  A.  Yes.

12  Q.  Okay.  Now, at the time as of February 28th, you still

13  were working with a global number, would you agree with me,

14  for that second set of settlements?  There had not been

15  individual breakdowns or allocations by Judge Corral at that

16  point, correct?

17  A.  Correct, but with a caveat, which is at that time -- so a

18  few days before that is when I e-mailed Mr. Griffin and told

19  him to send his wire information to Boeing.  And that's when

20  we had the conversation that they were not going to fund any

21  of the settlements, including the first four, until all of the

22  settlement agreements were signed.

23  Q.  Yeah, yeah.  I heard what you said, but we're going to go

24  through the evidence here.

25  A.  I'm just not sure what you mean when you're referring

**Scharg - Cross by Saba**

1    to -- you're differentiating between the two sets of cases.

2    Q.   Sure.  By February 28th, you knew the first four had been

3    allocated and signed settlement agreements existed, correct?

4    A.   By the 28th?  Around there.

5    Q.   No.  By February 24th, Ms. Anice's order had already come

6    through by this Court.

7    A.   Right.

8    Q.   You filed the motion for Ms. Septiana on March 3rd which

9    means you already had the settlement agreement at hand at that

10   point.

11   A.   I don't think I -- I don't -- I don't know -- so I didn't

12   get all of the settlement agreements ever.  I don't know that

13   I had our settlement agreement in hand at that point.  I may

14   have, but my practice was to be able to -- I mean, once I got

15   information that a case had settled, I would draft up the

16   papers very quickly.  I mean, there wasn't a lot to it that

17   was different.

18   Q.   You wouldn't have drafted a motion to dismiss an approval

19   of a minor settlement without verifying that the client had

20   signed a settlement agreement and Boeing had signed the

21   settlement agreement?

22   A.   That's what I'm saying, yes.  So --

23   Q.   Before you filed any of the motions with this Court that

24   were joint with Boeing, you must have sent a draft and/or

25   discussed the motion with Boeing before you would have filed

**Scharg - Cross by Saba**

1    it, correct?

2    A.   Exactly.  So I don't know if we did that before

3    February 28th.

4    Q.   Sir, I got your answer.  We have to make this go faster or

5    we're --

6    A.   Sure.

7    Q.   Okay.  So before you filed Ms. Septiana's motion on

8    March 3rd, you must have communicated with Boeing about that

9    settlement, correct?

10   A.   Yes.

11   Q.   And you must have communicated with Boeing about that

12   joint motion to dismiss and minors' compromise.

13   A.   Absolutely.

14   Q.   Yes?

15   A.   Absolutely.

16   Q.   Okay.  So between the time you believe that Keith Griffin

17   told you that Boeing was not going to fund all of these

18   settlement agreements, you -- and March 3rd, did you ever

19   discuss that with Boeing when you were on the phone with them,

20   "Hey, we've got a settlement agreement here that says you're

21   paying in 30 days, but Mr. Griffin is telling me that you're

22   not going to fund these at all"?

23   A.   So I -- I don't think I was ever on the phone with Boeing.

24   This was all done over e-mail.  But --

25   Q.   So did you send them an e-mail, sir?

**Scharg - Cross by Saba**

1    A.  Of course not.  Of course not.

2    Q.  On March 4th --

3    A.  My role in these cases --

4    Q.  Sir, you've answered --

5           THE COURT:  One at a time.

6    BY MR. SABA:

7    Q.  You've answered --

8    A.  I'm trying to answer your --

9           THE COURT:  Let him finish his answer, please.

10          Go ahead.

11   BY THE WITNESS:

12   A.  My role in those cases was to act as local counsel.  I'm

13   not going to speak over my co-counsel who is leading the cases

14   and is the one that was negotiating with Boeing.  I mean, I

15   was not part of any of those conversations.  So I would not

16   then jump in and throw a nuclear bomb into the e-mails.

17   BY MR. SABA:

18   Q.  Sir, I would like you to take a look at Exhibit 267.  This

19   is an e-mail string dated February 27th.

20          Do you see that?

21   A.  The e-mail on the bottom is February 27th, yes.

22   Q.  That's right.  It's an e-mail from Keith Griffin addressed

23   to Dan and Mack.  Do you see that?

24   A.  Yes.

25   Q.  And if you look up at the cc's, it says Ari Scharg.  Do

**Scharg - Cross by Saba**

1  you see that?

2  A.  Yes.

3  Q.  You received the February 27, 2020 e-mail from Keith

4  Griffin to Dan and Mack, correct?

5  A.  Yes, I believe so.

6  Q.  Okay.  Now, February 27 was the day before this text

7  message of February 28th from Mr. Griffin where you claim that

8  Mr. Griffin advised you that they were not going to release

9  any of the money for the settlements.

10  A.  I don't claim that.  That's what the text message says.

11  Q.  Okay, sir.  This e-mail says, "Dan and Mack, we may have

12  an issue with one of the seven cases we most recently mediated

13  and resolved in Chicago."

14        Do you see that?

15  A.  Yes.

16  Q.  And that's referring to the February 12th mediation where

17  there was a settlement for the seven remaining cases, correct?

18  A.  Yes.

19  Q.  "We have received word in the last couple of days that one

20  of the cases may have been poached.  We saw the text message

21  exchange between you and Mr. Griffin about the poached

22  client."

23        Correct?

24  A.  Yes.

25  Q.  "Obviously this is massively concerning to us,"

**Scharg - Cross by Saba**

 1  Mr. Griffin writes.  Okay.  And Mr. Griffin says, "We wanted

 2  to advise of this at the outset."

 3          Now, Mr. Griffin then writes, "To that end, we

 4  thought it might make sense to transition our global agreement

 5  on the seven cases into individual case settlements."

 6          Do you see that?

 7  A.  I see that.

 8  Q.  Okay.  And then he asks, "Would you be willing to do so,"

 9  essentially to transfer these individual settlement offers.

10          Do you see that?

11  A.  I do.

12  Q.  And that's because Boeing, when they offered you a global

13  sum of money, wasn't going to pay that same amount of money

14  for six of the cases when they thought they were settling

15  seven cases, right?

16  A.  I -- yeah, the client being poached changed the deal, yes.

17  Q.  Right.  Because Boeing thought they were paying a sum of

18  money for seven cases, and when one of the cases got poached,

19  Boeing wasn't going to pay that same sum of money for six

20  cases, correct?

21  A.  Sure.

22  Q.  Okay.  So when Mr. Griffin alluded to you -- or stated to

23  you that Perkins is not going to release the money until all

24  the settlement agreements are signed, he's referring to this

25  second tranche of settlements, correct?

1   A.   No.

2   Q.   Well, this e-mail was delivered to you a day before that

3   text message, correct?

4   A.   Yeah, but this e-mail has nothing to do with that funding

5   issue.

6   Q.   Well, by February 28th, you had already received one court

7   order and had reviewed the settlement agreement from Boeing

8   that required Boeing to pay the money within 30 days.  You

9   didn't write back to Mr. Griffin and say, "Wait a second,

10  that's a violation of the settlement agreement," did you?

11  A.   Are you talking about the text messages or the e-mail?

12  Q.   At any time.  Did you ever write back to Mr. Griffin and

13  say, "Hey, wait a second, this is a violation of the

14  settlement agreement"?

15  A.   No.

16  Q.   Your charge within the firm was to file whatever documents

17  were necessary with the Court to get the approvals, correct?

18  A.   Yes.

19  Q.   Okay.  So according to you, by February 28th, you didn't

20  believe Boeing was going to pay any money until all ten or 11

21  cases were signed and settled, correct?

22  A.   Absolutely, right.

23  Q.   Absolutely.  No doubt in your mind?

24  A.   No doubt in my mind.

25  Q.   Great.  So why on March 3rd did you submit another motion

**Scharg - Cross by Saba**

 1   to this Court asking for approval knowing that the settlement

 2   agreement was not going to be complied with by Boeing?

 3          MR. TIEVSKY:  Objection.  That is not supported by

 4   the testimony or the evidence in the record.

 5          THE COURT:  Overruled.  The witness can correct it if

 6   he thinks there's something incorrect in the question.

 7          Go ahead.

 8   BY THE WITNESS:

 9   A.  Why did I submit a motion if -- asking for approval even

10   though I did not believe that the funding obligations would be

11   met?

12   BY MR. SABA:

13   Q.  Let me rephrase it.

14   A.  Sure.

15   Q.  On March 4th, you submitted a joint motion to the Court

16   with Boeing knowing that Boeing was not going to comply with

17   the terms to pay the money in 30 days; is that accurate?

18   A.  No.

19   Q.  Well, you knew Boeing wasn't going to pay the money within

20   30 days, right?

21   A.  Well, if we got the settlement signed and we got all the

22   releases back to Boeing, my understanding was that they would

23   pay as soon as we had everything signed.

24   Q.  But you didn't even have the allocation done by

25   Judge Corral yet.

**Scharg - Cross by Saba**

1   A.  I had nothing to do with that.  I assumed that that had

2   been taken care of.  I had no visibility into how the

3   allocation was working.

4   Q.  You also --

5   A.  I was never consulted on it.  I don't know who was doing

6   it.

7   Q.  You didn't know?

8   A.  No.

9   Q.  Okay.  So on March 4th, the next day when you submitted

10  another joint motion to this Court for Ms. Dian, again, you

11  just assumed Boeing was going to pay according to the

12  settlement agreement; is that right?

13  A.  No.  I didn't -- I didn't -- pay according to the

14  settlement agreement.  I -- my understanding was they would

15  pay once all the settlement agreements were signed and I

16  viewed my -- my job at that point as doing everything that I

17  could to get all the settlement agreements signed and into the

18  Court and the cases dismissed so that we could get our clients

19  funded.

20  Q.  So how about a month later, let's say March, mid-March.

21  At any point did you begin to raise the idea that Boeing

22  hasn't funded these settlement agreements yet or funded the

23  settlements yet?

24          MR. TIEVSKY:  Objection, Your Honor, specificity.

25  Months later from what?

1          THE COURT:  Why don't you rephrase the question.

2          MR. SABA:  Sure.

3          THE COURT:  I believe I asked these same questions.

4          MR. SABA:  Okay.

5          THE COURT:  But go ahead.

6    BY MR. SABA:

7    Q.  Let's just look at Exhibit 311-12.

8          THE COURT:  This should not be on the public screens.

9          MR. SABA:  Oh, this is not public.  You're correct.

10   Sorry.

11   BY MR. SABA:

12   Q.  On March 17, Mr. Griffin wrote an e-mail to you that says,

13   "We have the four cases signed and done."

14          You have those.  You understood Mr. Griffin was

15   referring to the four motions that you had already filed with

16   the Court, correct?

17   A.  Yes.

18   Q.  No doubt, correct?

19   A.  Yes.

20   Q.  Then he writes, "Judge Corral has allocated the amount of

21   money on the other six cases and releases are being prepared

22   for those."

23          Do you see that?

24   A.  Yes.

25   Q.  So you understood that the releases were still being

1   prepared and had not been signed, right?

2   A.  Right.

3   Q.  You did not respond to Mr. Griffin and tell him, "Hey,

4   wait a second; the original settlement agreements required

5   them to pay within the first 30 days," did you?

6   A.  No.  I did not.  But this issue about contract enforcement

7   is not -- and it did not seem like a real issue.  My -- what I

8   was told was that they would all get paid as soon as all the

9   settlement agreements get signed.  I mean, if -- if the

10  settlements had been funded, I would expect Keith to have told

11  me that, of course.  And not only had he not told me that, he

12  told me that they were not going to be funded until everything

13  was signed.  So I'm not sure what you're asking.

14  Q.  Did you ever discuss the fact that Mr. Griffin allegedly

15  told you that Boeing was not going to fund these settlement

16  agreements until all the signatures were obtained with any of

17  your partners?

18  A.  Did I talk about that?

19  Q.  Yes.

20  A.  Of course.

21  Q.  Did you write them any e-mails about that?

22  A.  I don't know.

23  Q.  Did you prepare any memos internally about that issue?

24  A.  No.

25  Q.  How about text messages, did you text anybody about that?

**Scharg - Cross by Saba**

796

1   A.  I don't recall.

2   Q.  Did you prepare for your testimony today?

3   A.  Yes.

4   Q.  Did you have meetings with Rafey Balabanian and

5   Mr. Edelson about what was going to be discussed to testify

6   here today?

7          MR. TIEVSKY:  Objection.  Privilege.

8          THE COURT:  Not to the -- not to whether he had

9   meetings with certain people.  Content of the meetings are

10  privileged, but the fact of a meeting with other witnesses is

11  relevant.

12         So go ahead.

13  BY THE WITNESS:

14  A.  Yes.

15         THE COURT:  Who was in your prep session?  Did you --

16         THE WITNESS:  I mean, I had met separately with Rafey

17  and with Jay.  But neither of them were in my prep session

18  with me when I was preparing for my testimony.

19         THE COURT:  When you said you met with them, you met

20  with them about this hearing?

21         THE WITNESS:  Yeah.

22         THE COURT:  All right.  Did you discuss your -- well,

23  leave it at that.

24         Go ahead.

25  BY MR. SABA:

**Scharg - Cross by Saba**

1   Q.   Did you get a chance to read the transcripts from last

2   week?

3   A.   No.

4   Q.   When is the first time you realized the money had been

5   received by Girardi & Keese for the first four settlements?

6   A.   I believe Rafey learned of that during a phone call with

7   Keith Griffin on June 30th-ish.

8   Q.   My question was is when did you learn?

9   A.   Oh.  Around that time.

10  Q.   Please turn to Exhibit 311-17.  There's a text message

11  from you that says, "David Lira just brought me up to speed on

12  his situation.  Yikes.  Anyway, he said those cases have been

13  funded."

14          Do you see that?

15  A.   Yes.

16  Q.   When you're referring to those cases have been funded, you

17  meant the first four?

18  A.   No.

19  Q.   Oh.  Which ones did you refer to then?

20  A.   I wasn't referring to any of them.  I mean, he -- at the

21  end of the phone call, David Lira said, "Hey, I have no

22  visibility into the finances.  I have no control or access.

23  But I think that Girardi Keese has" -- "has the settlement

24  funds."  So I was asking Keith about that.

25  Q.   "He said those cases have been funded."

**Scharg - Cross by Saba**

1            Are you telling me that's not what Mr. Lira told you?

2    A.   You're making a distinction between the seven and the

3    four.  I don't know that we're speaking in terms of groups of

4    cases.

5    Q.   Let's look at Exhibit 116.  Sorry.  Exhibit 116?

6            MS. MATTHAI:  Probably should not be --

7            MR. SABA:  Oh, that should not be shown publicly.

8    BY MR. SABA:

9    Q.   This is a letter from Mr. Lira to you, yes?

10   A.   Yeah.  Can you scroll up for a minute?  Okay.

11   Q.   Okay.  It says, "All of the releases in Keith's cases have

12   been delivered to Boeing and have been funded."

13           Do you see that?

14   A.   I do.

15   Q.   Okay.  So you knew by July 6 that the cases had been

16   funded, yes?

17   A.   I mean, it's fine that he wrote that in this letter.  But

18   the whole time that he was speaking to Rafey and me on the

19   phone call on June 16th, my understanding was that he had no

20   visibility and had no idea if what he was saying is provable,

21   but he thinks that the cases were funded.

22   Q.   Did you ever ask for proof that the cases had been funded?

23   A.   Well, that's why I reached out to Keith.  I mean, when I

24   reached out to Keith and really in every single communication

25   between me and him since February, only one of us was lying

**Scharg - Cross by Saba**

1   every single time they text messaged the other person.

2   Q.  How --

3   A.  He knew, he knew in every text message that they had

4   received the money.  I know that now.  I did not know that

5   then.

6   Q.  Are you done?

7   A.  Yes.

8           MR. SABA:  Your Honor, we'll strike the "he was lying

9   in every text message."

10          THE COURT:  That's his characterization.  You can

11  cross him.  I understand the position.  It's been repeated

12  throughout the testimony.  So I'm not going to strike it, but

13  that's his position on the -- his conversations with

14  Mr. Griffin.

15  BY MR. SABA:

16  Q.  So on July 6, 2010, did you tell your partners that

17  according to the court orders the money has to be paid as soon

18  as practicable?

19  A.  That was not discussed, no.

20  Q.  Okay.  At any time did you tell your partners that once we

21  had confirmed receipt of the funds at Girardi & Keese the

22  money has to be paid as soon as practicable?

23  A.  My partners were aware of that, absolutely.

24  Q.  And so at what point then did you advise your partners

25  that Edelson should stand down and not come tell this Court

1   that there's been a violation of the Court's order?

2   A.  Should stand down?

3   Q.  Yeah.  You must have told Edelson not to come to the

4   Court, right?

5   A.  I'm not sure that I understand the question.

6   Q.  Did you tell any of your partners at Edelson, "We should

7   not come to court; we should not tell Judge Durkin about the

8   violation of the court order"?

9   A.  It was not my understanding that there was a violation of

10  the court order at this point.

11  Q.  Well, at what point did you think there was a violation of

12  the court order?

13  A.  When we received a phone call I think in late November

14  saying that the money had not actually been paid even though

15  we said that it was.

16  Q.  And you participated in meetings at the firm where that

17  was the -- that was the discussion?

18  A.  No, but you asked me when -- at what point I thought there

19  was -- that there could be a violation of the court order.

20  Q.  Did you learn that the clients had only been paid

21  50 percent of the money at one point?

22  A.  I -- I had -- yeah, I was in the loop on what was going

23  on.  It was described as an administrative error.  It was

24  understood by us that Tom was in the hospital with some sort

25  of cancer behind his eye.  And it was not clear at that point

1  that there was a violation of the court order.

2  Q.  I mean, were you concerned that it was your declarations

3  that were presented to this Court and the orders were obtained

4  under your signature?

5  A.  That wasn't the focus at that point.  The focus was we

6  need to untangle this mess and figure out what actually

7  happened and get the clients their money.

8  Q.  So the last text message we seem to have from you is on

9  June 18, 2020.  Did you text message -- text message Keith

10  Griffin at any time after June 18, 2020?

11 A.  No.  After our -- after our phone call on June 16th, I --

12 I -- I handed the matter off to Rafey and Jay to --

13 Q.  Were you instructed not to talk to Keith Griffin or

14 David Lira after June 16th of 2020?

15 A.  No.

16 Q.  That was just your own personal choice?

17 A.  I got nowhere with Keith.  He -- you know, I got no

18 truthful information from Keith when I texted with him.

19 Q.  That's not -- my question is was it your choice to stop

20 texting in June of 2008 -- 2020 --

21 A.  I mean --

22 Q.  -- or were you instructed to stop?

23 A.  I was not instructed to stop.  But I was -- I was getting

24 nowhere with him.

25 Q.  As of June 18, 2020, did you have any knowledge that

1    Mr. Griffin was allegedly lying to you?

2    A.   As of when?

3    Q.   As of June 18, 2020, did you have any knowledge that Keith

4    Griffin was allegedly lying to you?

5    A.   No.  I mean, there was a suspicion that something was

6    going on if David, who left the firm and on his way out is

7    saying, oh, and by the way, I think that they have the Boeing

8    money, yeah, there was a suspicion that something was going

9    on.  I didn't -- we didn't know what it was.

10   Q.   Your suspicion was that there was potentially a problem?

11   A.   Of course.

12   Q.   Okay.  And the problem was what, that the clients weren't

13   getting paid?

14   A.   I don't -- I don't understand.

15   Q.   Well, you said you had a suspicion there was a problem.

16   Was your suspicion that the clients weren't getting paid?

17   A.   The suspicion was now we're being told different things.

18   At that point we had not yet been -- so at that point Boeing

19   had already funded it months earlier, and no -- neither David

20   nor Keith ever told us that and dodged all of our questions

21   about this up until that point.  At this point we are being

22   told by David, he doesn't know, he doesn't have access or

23   visibility into the funds, but he thinks that Boeing has

24   funded the settlement.  So what did -- are you asking what I

25   thought at that point?

**Scharg - Cross by Saba**

1   Q.  My question was, sir, was it your suspicion in June of

2   2018 that the clients hadn't been paid, yes or no?

3   A.  We knew -- well, June 18 -- well, we knew that we had not

4   yet gotten releases back from all the clients.  All the

5   settlement agreements had not yet been signed.  In June of

6   2020, yeah, I did not think that the clients had been -- had

7   been paid.

8   Q.  And you said you participated in meetings with Jay Edelson

9   and Rafey Balabanian, yes, in around the summer of 2020?

10   A.  In meetings?  Yes.

11   Q.  In the meetings discussing the Lion Air clients and what

12   to do?

13   A.  You'll have to be more specific.  I mean --

14   Q.  Did you participate in meetings with Jay Edelson and/or

15   Rafey Balabanian in the summer of 2020 about how to handle the

16   situation whether or not Girardi & Keese was deceiving you,

17   not being truthful with you, not giving you all the

18   information?

19         MR. TIEVSKY:  I'll object to this because I believe

20   it asks for privileged communications.

21         THE COURT:  Well, first the question is did you have

22   such meetings about how to handle this in the summer of 2020.

23         MR. TIEVSKY:  It was the next, the follow-on question

24   I was more concerned about which discusses --

25         THE COURT:  I understand.  The first question,

Scharg - Redirect by Tievsky

804

1  though, is did you have meetings.

2         THE WITNESS: Yeah. About how to handle it? Yes.

3         THE COURT: All right. I'll sustain the objection on

4  the privileged communications.

5  BY MR. SABA:

6  Q. At any time did you, Mr. Balabanian, Mr. Edelson ever

7  consider getting on an airplane and flying to Los Angeles to

8  meet with Mr. Girardi face to face to figure out what was

9  going on?

10  A. I mean, our understanding was that he was in the hospital

11  dealing with cancer. I don't think that anybody ever raised

12  the idea of flying --

13  Q. Not once --

14  A. -- to visit him in the hospital.

15  Q. Not once did anybody consider coming to Los Angeles to

16  meet with Mr. Griffin, Mr. Lira, or Mr. Girardi face to face

17  to confront them to find out what was going on; is that

18  correct?

19  A. Not that I'm aware of.

20         MR. SABA: No further questions, Your Honor.

21         THE COURT: All right.

22         Ms. Matthai, any additional questions?

23         MS. MATTHAI: I have none.

24         THE COURT: Any redirect? Make it brief or else

25  we're coming back tomorrow.

1           MR. TIEVSKY:  Very brief.

2                     REDIRECT EXAMINATION

3    BY MR. TIEVSKY:

4    Q.  Mr. Scharg, did you fly anywhere between say April 2020

5    and the end of that year?

6    A.  No.  No way.

7    Q.  Why not?

8    A.  Because of COVID.

9           MR. TIEVSKY:  Thank you.  I don't have any more

10   questions.

11          THE COURT:  Okay.  All right.

12          Any additional questions based on that?

13          MS. MATTHAI:  No.

14          THE COURT:  Okay.

15          Sir, you're excused.  Thank you.

16          THE WITNESS:  Thank you, Your Honor.

17          THE COURT:  All right.  I would like a couple of

18   things.

19          One, I would like someone, it can be done jointly or

20   one side can prepare it, the other side can look it over and

21   see if they agree, a chart of the IOLTA account of the Girardi

22   firm showing balances on a monthly basis, actually even a

23   bimonthly basis, and any checks written out of that account by

24   date to either Tom Girardi or the Girardi Keese law firm.  If

25   you have missing records, if the bankruptcy trustee couldn't

1   give you the entirety of that, I would like to note it on the

2   chart where there's a gap in the records.

3           MS. MATTHAI:  The trust accounting is a challenge.

4   There are a couple of issues with such a chart.  We have

5   marked as an exhibit certain of the account statements along

6   with the checks.  But the significant thing is that Mr. Lira

7   understood he was a second signatory on that account.  There

8   are checks written both to Girardi Keese, and there's money

9   coming in from Girardi Keese which doesn't -- isn't as it

10  ought to be.  And there's a number of checks that are forged

11  or there's no signature on them.

12          THE COURT:  Yeah.

13          MS. MATTHAI:  So it's an incomplete -- there needs to

14  be additional information with regard to any listing of checks

15  and additional information with regard to as to the balances

16  that are involved.  There are other clients whose settlement

17  monies came into the account.

18          THE COURT:  All right.

19          MS. MATTHAI:  So that's another issue in trying to

20  figure out this account.

21          THE COURT:  All right.  Well, I would ask you all to

22  do your best, and if there's qualifications that are attached

23  to it, I'll let you argue about that.  But I want to know what

24  was in that account balance-wise and I want to know how much

25  money Tom Girardi or someone, who else who had access to the

1   account was writing out of it for either Girardi, a Girardi

2   expense, the Lamborghini or whatever it was, and any other

3   expenses that went to the Girardi firm.  And it may simply be

4   checks written in the amount of X to Girardi Keese for, you

5   know, attorneys' fees or whatever the reason; but I would like

6   to know from the date you have those records to the end of the

7   records what the balances were and the amounts taken out for

8   the -- what I've just stated.

9              MR. TIEVSKY:  May I ask a clarifying question?

10             THE COURT:  Go ahead.

11             MR. TIEVSKY:  Because I've spent a lot of time

12  looking at these.

13             Basically the way that he would operate is that he

14  would write checks.  There would be two kinds of checks from

15  that trust account.  There's checks to various clients, and

16  there's checks to Girardi Keese.

17             THE COURT:  Right.

18             MR. TIEVSKY:  There's then another account, an

19  operating account in which money that came in from that trust

20  account would be distributed to the Lamborghini and to other

21  such things.

22             And so I guess my question is are you only interested

23  in well, does money from the Girardi Keese -- from the IOLTA

24  account go to this operating account, or are you interested in

25  what happens to it after it gets to the operating account?

1          THE COURT:  Both.

2          MR. TIEVSKY:  Okay.

3          THE COURT:  I want to know what was -- if someone had

4  come -- here's -- I'll lay my cards on the table.  If someone

5  had come to me earlier, whether it be March, April, May,

6  sometime before early December, and said look what's going on,

7  what was the money that apparently was unavailable in December

8  that may have been available sometime in the months before

9  that?  That's the question.

10          MR. SABA:  Your Honor, I think what you'll learn is

11  that unfortunately, let's just say they -- somebody came to

12  your attention in the middle of the summer.  We would have

13  probably had the same result that happened in December,

14  meaning --

15          THE COURT:  Well, and that may be, but I would like

16  to know it.  I think bank accounts give me a better feel for

17  that.  Girardi Keese may have been an empty shell back in

18  March when they were getting all this money or it may have

19  been in December.  I see -- my cursory view of this shows a

20  lot of checks going in and out of it.  And it may have all

21  been client money that was coming in from different clients.

22  Certainly there was testimony that one of these partial

23  payments to the Lion Air clients were made from fees from a

24  different client.  But some way to organize these because

25  otherwise I'm going to have to do it, and I would rather have

1    you do it.

2           MR. TIEVSKY:  Might I suggest one way that we could

3    streamline it a little bit?

4           THE COURT:  Go ahead.

5           MR. TIEVSKY:  I think the Court may not be interested

6    in specifics of exactly where it got disbursed once it got to

7    the operating account.  Perhaps it would be okay to put it

8    into categories of left Girardi Keese or somehow stayed within

9    Girardi Keese?  Or do you want more detail?

10          THE COURT:  No, let's start with that.  See if you

11   can get an agreement from the others attorney as to how it

12   would best -- I told you what I'm looking for.

13          MR. TIEVSKY:  Sure.  Yes.

14          THE COURT:  And if it's going to be helpful to that

15   inquiry, great; if it's not, I don't want you doing needless

16   work.

17          MS. MATTHAI:  And the only other thing that I have to

18   say is that apparently according to the bankruptcy filing,

19   there are 100-some --

20          MR. LIRA:  156.

21          MS. MATTHAI:  156 bank accounts that Girardi Keese

22   had which does not count all of the Tom Girardi bank accounts.

23   It is my understanding that the first forensic accountant that

24   was retained by the bankruptcy trustee to try to sort this out

25   has quit in frustration.  And I don't -- I can't make a

1  representation as to whether or not they've got a new one in

2  place or not.  Maybe other counsel knows.

3           THE COURT:  Well, you don't have all those records.

4  There's a set of records presented to me in this case.  All

5  I'm asking for is for organization of that and if there's a

6  summary that has come out of the bankruptcy court.  I assume

7  there hasn't at this point.

8           MS. MATTHAI:  There has not been because frankly they

9  can't figure it out.

10          THE COURT:  Okay.

11          MS. MATTHAI:  So what my concern is some conclusion

12  that -- of what money was available cannot be complete without

13  far greater knowledge than the accounts that we've been

14  talking about so far.  That's the concern that I've got.

15          THE COURT:  All right.  Well, that's --

16          MR. TIEVSKY:  We do --

17          THE COURT:  That's an argument you can make as to the

18  weight I can attach to it but not as to the fact of trying to

19  organize it in a way where I'm -- in some form.  You can

20  certainly argue the weight I should attach to it, little,

21  none, or a great amount, whatever the answer is that each side

22  wants to argue.  But having it organized is helpful to me, and

23  that's all I'm asking.

24          MR. TIEVSKY:  I do have a little more information

25  about that.  I spoke to one of the banks, and they asked me if

1    I wanted the many, many accounts that were individual accounts

2    for minors that have to be held until they're 18 under

3    California law.

4            THE COURT:  No.

5            MR. TIEVSKY:  I said I wasn't interested in those.

6            THE COURT:  No.  Nor am I.

7            MS. MATTHAI:  No.

8            MR. TIEVSKY:  My guess is that that may be.  I don't

9    know.  But they said, "We've got a lot of these; do you want

10    them?"  And I said, "Don't even show me."

11            THE COURT:  I'm not looking to learn of money that

12    would have been taken from other lawful plaintiffs who --

13    plaintiffs who should have lawfully got their money.  I'm

14    looking for money that went to the firm for purposes of

15    salaries or whatever sundry expenses or, you know, outside

16    expenses that would have been available had people come to me

17    earlier for me to tell Mr. Girardi pay them up.  That's all

18    I'm looking for.

19            MR. TIEVSKY:  Sure.

20            THE COURT:  All right.  Now I have a comment to make.

21            I would like your briefs, because I'm going to ask

22    for more briefs, to address the scope of the Court's inherent

23    power to sanction.  You should start with the Supreme Court's

24    decisions in *Chambers v. NASCO*, 501 U.S. 32, 1991 Supreme

25    Court case; *Goodyear Tire & Rubber v. Haeger*, 137 S. Ct. 1178,

1    a 2017 case; and the Seventh Circuit's decision in *Fuery v.*

2    *City of Chicago*, 900 F.3d 450, Seventh Circuit, 2018.

3           According to these cases, "federal courts possess

4    certain inherent powers not conferred by rule or statute to

5    manage their own affairs so as to achieve the orderly and

6    expeditious disposition of cases."  That's *Goodyear* at 1186.

7           Off the record.

8      (Off the record.)

9           THE COURT:  Back on the record.

10          That authority includes "the ability to fashion an

11   appropriate sanction for conduct which abuses the judicial

12   process."  *Goodyear* at 1186, citing *Chambers*.

13          These decisions indicate that direct violation of the

14   court order is not -- a court order is not always necessary to

15   justify sanctions.  Rather, bad faith conduct is the issue.

16          The Court "must first make a finding of bad faith"

17   that was either "designed to obstruct the judicial process or

18   constitutes a violation of a court order."  That's *Fuery* at

19   463.

20          I added the word "either" to that quote from *Fuery*

21   and emphasize the word "or."  I think these added emphases

22   accurately reflect the Seventh Circuit's intent in that case.

23          Furthermore, these cases contemplate a court's power

24   to impose a sanction "calibrated to the damages caused by the

25   bad faith acts on which the sanction is based."  That's

1    *Goodyear* at 1186.

2            Most often the compensation at issue is shifted

3    attorneys' fees which is what they were generally talking

4    about in these three cases.  But you should also address

5    whether I have the power to order you to compensate the

6    plaintiffs for their lost settlement money not because you

7    directly violated a court order, but because by failing to

8    inform me that Girardi was not paying the plaintiffs, you

9    caused the plaintiffs to lose that money.

10            That is all I have to say for today.  Let's go off

11   the record.

12            Kelly, you are free to go.

13      (Which were all the proceedings heard.)

14

15                            CERTIFICATE

16      I certify that the foregoing is a correct transcript from

17   the record of proceedings in the above-entitled matter.

18   */s/Kelly M. Fitzgerald*              *December 17, 2021*

19   _____      _____

20   Kelly M. Fitzgerald                        Date
     Official Court Reporter

21

22

23

24

25