## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| TERRENCE BUEHLER, Personal Representative and Independent Administrator of the Estate of LIU CHANDRA, Deceased, and on behalf of all heirs of LIU CHANDRA, Deceased; TERRENCE BUEHLER, Personal Representative and Supervised Administrator of the Estate of PERMADI ANGGRIMULJA, Deceased, and on behalf of all heirs of PERMADI ANGGRIMULJA, Deceased,[1] | In re: Lion Air Flight JT 610 crash **Lead Case**: 18-cv-7686 This filing applies to case: 19-cv-1552 |
| *Plaintiffs*, | Honorable Thomas M. Durkin |
| v. | **JURY TRIAL DEMANDED** |
| THE BOEING COMPANY, a corporation, DENNIS A. MUILENBURG, an individual; DAVID L. CALHOUN, an individual; MARK A. FORKNER, an individual, THE UNITED STATES OF AMERICA and its subordinate agencies THE DEPARTMENT OF TRANSPORTATION and THE FEDERAL AVIATION ADMINISTRATION, ROCKWELL COLLINS, INC. n/k/a/ COLLINS AEROSPACE, a corporation, ROSEMOUNT AEROSPACE, INC., a corporation, XTRA AEROSPACE, | |

---

[1] This Third Amended Complaint and the addition of the new Defendants Dennis Muilenburg, David Calhoun, and Mark Forkner applies to Decedent Liu Chandra's case only. Decedent Permadi Anggrimulja's case has settled, and the parties are coordinating on dismissal paperwork. The Permadi Anggrimulja case is repeated in the Caption to preserve the claim until it is dismissed.

| | |
|---|---|
| LLC, a limited liability company. )<br><br>*Defendants.* ) ) | |

## PLAINTIFFS' THIRD AMENDED COMPLAINT

Plaintiffs, by their undersigned counsel, bring their Third Amended Complaint against the above-mentioned Defendants, and in support, allege the following:

### THE AMERICAN INTEREST IN THIS LITIGATION

1. The 737 MAX 8 crashes in Indonesia and Ethiopia resulted in the deaths of 346 people and shook the U.S. aviation industry. The crashes have resulted in the sustained grounding of the 737 MAX fleet; the termination of Boeing's Chairman, President, and CEO; multiple Congressional hearings; investigations into the certification and delegation practices of the Federal Aviation Administration and Boeing's design of the MAX; multiple reports from the legislative and executive branch; a criminal investigation and a Deferred Prosecution Agreement; and a two-minute address by the President of the United States.

2. The crashes have also resulted in bipartisan legislation to reform the manner in which aircraft are certified in the United States and to strengthen oversight of Boeing.

3. Given that Boeing and its component part manufacturers designed and manufactured the defective 737 MAX aircraft in the United States, the Federal Aviation Administration certified the MAX in the United

States, and these crashes have had and will continue to have a profound effect on aviation safety practices in the United States, this litigation should be decided in the United States.

### BACKGROUND

4. On Monday, October 29, 2018, a newly-delivered Boeing 737 MAX 8 commercial aircraft crashed in the Java Sea off the coast of Indonesia killing everyone on board. The Boeing 737 MAX 8 was being operated by the Lion Air airline as Lion Air Flight JT 610.

5. The newly-delivered Boeing 737 MAX 8 crashed as a result of, among other things, a new Boeing flight control system which automatically steered the aircraft toward the ground, and which caused an excessive nose-down attitude, significant altitude loss, and, ultimately, the crash into the Java Sea killing everyone on board.

6. The new automated flight control system on the Boeing 737 MAX 8 is known as the Maneuvering Characteristics Augmentation System (MCAS). Boeing added MCAS because during its redesign of the Boeing 737, Boeing changed the type, size, and placement of the aircraft's engines, which made the aircraft susceptible to stalling and altered the aircraft's handling characteristics.

7. Although the Boeing 737 MAX 8 has two angle of attack (AOA) sensors, Boeing knowingly designed the MCAS system to only rely on data

from a single AOA sensor contrary to federal regulations, Boeing's own design practices, and hard-earned lessons from prior crashes.

8.     Due to this lack of redundancy, if a single AOA sensor is defective, the sensor will feed false information to the MCAS, which, in turn, will cause the MCAS to repeatedly activate, override the pilots, and force the aircraft into an unwarranted nose-dive.

9.     On March 10, 2019, a second Boeing 737 Max 8 aircraft crashed in Ethiopia (Ethiopian Airlines Flight 302) under circumstances which are strikingly similar to the Lion Air JT 610 crash, namely Boeing's MCAS was erroneously activated and forced the aircraft into an unwarranted nose-dive.

10.     Following the Ethiopian Airlines crash, the Boeing 737 Max 8 aircraft was grounded around the world. Congress, the Department of Transportation, the Federal Aviation Administration (FAA), the Department of Justice, and the FBI have launched investigations into the certification and safety of the Boeing 737 MAX.

11.     On April 4, 2019, Boeing's then-Chairman, President, and CEO, Dennis A. Muilenburg, issued a statement wherein he admitted that Boeing's MCAS activated based on erroneous AOA information, and that this was a contributing cause of both the Lion Air JT 610 crash and the Ethiopian Airlines Flight 302 crash.

12.     Investigations into the tragic crashes of Lion Air JT 610 and Ethiopian Airlines Flight 302 suggest Boeing knew the following prior to these crashes:

(a) Boeing was aware that a highly trained Boeing test pilot needed in excess of 10 seconds to react to uncommanded MCAS activation which was deemed "catastrophic";

(b) Boeing concealed the fact that MCAS was a new system and failed to designate it as a safety-critical system in order to avoid increased costs, greater scrutiny from the FAA, and increased training requirements for pilots and airline customers;

(c) Boeing had a financial incentive to minimize differences training between the 737NG and 737 MAX as Boeing was contractually obligated to pay a $1 million rebate for each 737 MAX aircraft sold to Southwest Airlines if simulator training was required for the MAX;

(d) Boeing was aware that MCAS was dependent on and vulnerable to a single AOA sensor failure;

(e) Boeing was aware that the AOA Disagree Alert, which was mandated as standard equipment on all 737 MAX aircraft, was not functional on 80% of the 737 MAX fleet because it was tied to an optional AOA Indicator display for which Boeing charged customers an increased price;

(f) Boeing persuaded the Federal Aviation Administration to omit any reference to MCAS from the Flight Crew Operations Manual (FCOM) and concealed the fact that the AOA Disagree alert was not functional in the FCOM though they knew such alerts were not working on 80% of the 737 MAX fleet, including the Lion Air accident aircraft;

(g) Boeing rejected various design proposals which would have made the 737 MAX safer, including AOA redundancy, a synthetic airspeed system, modern cockpit displays, an Engine Indicating and Crew Alerting System, and an MCAS warning light and aggressively pushed for minimal pilot training because it prioritized profit and market share over the safety of the flying public.

13.    Investigations into the 737 MAX crashes have also revealed that individuals employed by Boeing, including its current President and CEO and former Lead Director, David L. Calhoun, its former Board Chairman, President, and CEO, Dennis A. Muilenburg, and its former Chief Technical Pilot of the 737 MAX program, Mark A. Forkner, placed the financial interests of Boeing over the safety of the general public, which played a causal role in these tragedies. Investigations have revealed that Boeing's senior leaders in Chicago, then-CEO, President, and Chairman Dennis Muilenburg and Lead Boeing Director David Calhoun and the managers they were responsible for leading, overseeing, supervising, managing, and directing:

(a) Prioritized Boeing's stock performance and market position over safety;

(b) Negligently and carelessly allowed the 737 MAX aircraft to be designed, manufactured, sold, and released into the stream of commerce despite the fact that it contained dangerous and defective software (MCAS) in an effort to stay competitive with Airbus;

(c) Set unrealistic production schedules and goals for Boeing's Commercial Airplane Division, which resulted in undue pressure and led to an unsafe safety culture;

(d) Encouraged Boeing employees to seek "Level B" training for the 737 MAX, to compete with Airbus and because of demands from Boeing's airline customers, including Southwest Airlines;

(e) Negligently and carelessly allowed the 737 MAX aircraft to be designed, manufactured, and sold despite the fact that MCAS was dependent on and vulnerable to a single AOA sensor failure.

14.     Investigations have also revealed that the Chief Technical Pilot of the 737 MAX program, Mark A. Forkner, played a critical role in minimizing "differences training" on the 737 MAX and persuaded the Federal Aviation Administration's Aircraft Evaluation Group (FAA AEG) to approve differences training that was no greater than "Level B." Forkner also played a key role in securing the removal of MCAS from the Flight Crew Operations Manual and in dissuading Lion Air from offering simulator training to its pilots on the 737 MAX aircraft before the Lion Air crash. After successfully persuading Lion Air that simulator training on the 737 MAX was unnecessary, Forkner referred to Lion Air as idiots and fools to his Boeing colleague and bragged about the money he saved Boeing. As a result of Forkner's negligent and careless actions, Lion Air pilots were deprived of simulator training on the key differences with the 737 MAX and knew nothing about MCAS and its defective and dangerous conditions before this tragic crash.

15.     Investigations into the 737 MAX crashes have also revealed that the Federal Aviation Administration and its employees and agents, including Boeing/FAA Authorized Representatives, failed to:

> (a) assure that MCAS was disclosed and adequately explained to pilots and airlines in the FCOM;
>
> (b) assure that critical safety information regarding MCAS, including its functions and failure modes, its dependency on a single AOA sensor, excessive pilot response time in the event of an unwarranted MCAS activation, was shared between the agency's internal offices so that the FAA could be fully informed

and meaningfully evaluate and scrutinize MCAS and the 737 MAX aircraft to assure it was safe and in compliance with all applicable Federal Aviation Regulations, design requirements, and certification standards;

(c) assure that appropriate training, specifically simulator training, was provided to pilots and airlines so that they would understand the critical differences between the operation of the 737NG and the 737 MAX, especially with regard to MCAS;

(d) excessively delegated critical oversight responsibilities and analysis of the 737 MAX program to Boeing/FAA Authorized Representatives (ARs), including with respect to the new MCAS system, and then failed to supervise and coordinate with the Boeing/FAA ARs regarding key certification and safety issues;

(e) allowed Boeing's commercial interests and production schedule and its fierce competition with Airbus to trump the FAA's independent role and governmental interest in assuring that the 737 MAX aircraft was airworthy and safe for the flying public, and in full compliance with applicable FAA regulations, design requirements, and certification standards;

(f) understand the design of MCAS including that it could repeatedly activate, its failure modes, and MCAS's ability to quickly overwhelm pilots before certifying the 737 MAX aircraft; and,

(g) adequately hire, train, and supervise FAA employees and agents assigned to the 737 MAX program.

### SUBJECT MATTER JURISDICTION

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, diversity of citizenship, because no Defendant is a citizen of the same state as any Plaintiff and because the amount in controversy exceeds $75,000, exclusive of interest and costs. Although Plaintiff Terrence Buehler, the Independent Administrator, is a citizen of Illinois, the citizenship of the Decedent, Liu Chandra, is Indonesia and that's

what counts for diversity purposes. *See* 28 U.S.C. § 1332(c)(2). This Court also has subject matter jurisdiction over this controversy under the Multiparty, Multiforum Trial Jurisdiction Act of 2002, 28 U.S.C. § 1369 (MMTJA), because there is minimal diversity between the parties and the accident involves at least 75 deaths at a discrete location in a single accident. Boeing is a Delaware corporation with its principal place of business in Illinois. Plaintiffs' Decedent Liu Chandra is a citizen of Indonesia as all are of his heirs and surviving family members. In addition, the Defendants reside in different States, namely Illinois, Florida, Iowa, and Minnesota. Jurisdiction under the MMTJA is thus satisfied. The crash of Lion Air Flight JT 610 into the Java Sea resulted in the deaths of all 189 people on board the aircraft.

17.    With respect to the United States of America and its subordinate agencies, the Department of Transportation and the Federal Aviation Administration, this Court has subject matter jurisdiction pursuant to the Suits in Admiralty Act, 46 U.S.C. § 30903, *et seq*.

18.    This Court also has subject matter jurisdiction pursuant to the Death on the High Seas Act, 46 U.S.C. §§ 30302, 30307.

19.    Plaintiffs elect to pursue all admiralty and maritime claims in this Court under the Savings-to-Suitors Clause and preserve their right to a jury trial, which was demanded in the Circuit Court of Cook County and before this Court. *See* 28 U.S.C. § 1333.

## PARTIES & VENUE

20.     Plaintiffs' Decedent Liu Chandra is a citizen of Indonesia as are all his surviving family members. Plaintiff Terrence Buehler was duly appointed as the Personal Representative and Independent Administrator of the Estate of Liu Chandra, who tragically perished in this crash. Plaintiff Terrence Buehler, in his capacity as the Personal Representative and Independent Administrator of the Estate of Liu Chandra, brings this action on behalf of the Estate of Liu Chandra and all heirs of Liu Chandra, Deceased.

21.     Defendant David L. Calhoun is the current President and CEO of The Boeing Company. He formerly served as a Director at Boeing since 2009 and was promoted to Lead Director on April 30, 2018, six months before the Lion air crash.

22.     Defendant Dennis A. Muilenburg is the former President, CEO, and Chairman of The Boeing Company and served in that capacity at the time of the Lion Air crash.

23.     Defendant Mark A. Forkner is the former 737 Max Chief Technical Pilot at The Boeing Company. In his role, Forkner led the 737 Max Technical Team until he left Boeing in July 2018. Forkner interfaced with the FAA AEG as well as Boeing's airline customers, including Lion Air.

24.     Defendant The Boeing Company ("Boeing") is a corporation organized under the laws of Delaware with its worldwide headquarters and principal place of business in Chicago, Illinois. Boeing designed, manufactured, tested, and sold the 737 MAX, including the defective MCAS.

25.     Defendant the United States of America and its subordinate agencies, the Department of Transportation and the Federal Aviation Administration (collectively referred to herein as "the United States") are being sued pursuant to the Suits in Admiralty Act, 46 U.S.C. § 30903, *et seq*., and the Death on the High Seas Act, 46 U.S.C. §§ 30302, 30307, for the negligent acts of the managers, employees, and agents of the Federal Aviation Administration as more fully described herein, which resulted in the deaths of Plaintiffs' Decedents.

26.     Defendant Rockwell Collins, Inc. n/k/a Collins Aerospace ("Rockwell Collins") is a corporation organized under the laws of Delaware with its principal place of business in Iowa. Rockwell Collins designed, manufactured, tested, and sold the flight control computers, including software incorporated into the MCAS on the Subject Aircraft.

27.     Defendant Rosemount Aerospace, Inc. ("Rosemount") is a corporation organized under the laws of Delaware with its principal place of business in Minnesota. Rosemount designed, manufactured, tested, and sold the angle of attack sensors on the Subject Aircraft.

28.    Defendant Xtra Aerospace, LLC ("Xtra Aerospace") is a limited liability company organized under the laws of Delaware with its principal place of business in Florida. Xtra Aerospace repaired, overhauled, calibrated, and tested one of the angle of attack sensors on the Subject Aircraft.

29.    Venue is proper because Boeing's worldwide headquarters and principal place of business is located in Chicago, Illinois, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## GENERAL ALLEGATIONS

### I.  Boeing 737 MAX 8 Design & Manufacture

30.    Boeing's 737 series of aircraft is the highest selling commercial aircraft in history with over 10,000 aircraft delivered.

31.    Boeing's 737 MAX series is the fourth generation of the Boeing 737 series of aircraft and was first announced by Boeing on August 30, 2011; the first flight was several years later, on January 29, 2016.

32.    Prior to March 8, 2017, Boeing designed the 737 MAX 8 model aircraft in the United States.

33.    On March 8, 2017, the Federal Aviation Administration ("FAA") approved the design for the 737 MAX 8 model aircraft, also known as the 737-8.

34.    At all relevant times, Boeing manufactured the 737 MAX 8 model aircraft in the United States.

35.    The 737 MAX 8 is one of Boeing's several 737 MAX series of aircraft, the newest generation of Boeing's 737 series of aircraft, which Boeing initially designed, in the United States, in or around 1964—over 50 years ago.

36.    According to Boeing, as part of its generational redesigns of the 737 series of aircraft, it "has continuously improved the products, features, and services."

37.    At all relevant times, Boeing marketed the 737 MAX aircraft as a seamless continuation of its prior 737 series aircraft in terms of operation and maintenance.

38.    On its website, Boeing states:

Airlines ask for an airplane that fits smoothly in today's fleet

Because of the 737's popularity with airlines everywhere around the world, integrating the new 737 MAX is an easy proposition. As you build your 737 MAX fleet, millions of dollars will be saved because of its commonality with the Next-Generation 737, ease of maintenance, wide availability of 737 pilots, and the global infrastructure that supports the aircraft in operation.[2]

On the same website, Boeing further states that "*737 Flight Crews Will Feel at Home in the MAX*."[3] (emphasis added.)

39.    The Boeing 737 MAX 8, however, had a significantly different design from previous 737-series aircrafts, which were not appropriately disclosed to airlines or pilots.

---

[2] https://www.boeing.com/commercial/737max/by-design/#/operational-commonality
[3] https://www.boeing.com/commercial/737max/by-design/#/advanced-flight-deck

## II. Boeing 737 MAX 8 Defects

40.     Unlike any prior 737, Boeing designed the 737 MAX 8 to automatically dive toward the ground in certain situations, namely, where the aircraft's AOA sensor provided information to the MCAS indicating such a dive was necessary to maintain lift.

41.     A consequence of this unsafe design, however, was that any misinformation from the AOA sensor to the MCAS would cause the Boeing 737 MAX 8 to automatically and erroneously dive toward the ground. This condition can lead to an excessive nose-down attitude, significant altitude loss, and impact with terrain.

## III. Lion Air Flight 610

42.     In or around August 2018, Boeing delivered a newly manufactured 737 MAX 8 aircraft with tail number PK-LQP (the "Subject Aircraft") to Lion Air airlines in Indonesia.

43.     Two months later, on the morning of October 29, 2018, Lion Air was operating the Subject Aircraft on a commercial flight from Jakarta, Indonesia to Pangkal Pinang, Indonesia ("Lion Air Flight JT 610").

44.     Around 6:22 a.m. on the morning of October 29, 2018, shortly after takeoff from Jakarta, the pilot for Lion Air Flight JT 610 asked air traffic control to return to Jakarta because of a problem controlling the subject aircraft.

45.     For nearly 10 minutes, the pilots fought for control of the aircraft but were repeatedly overridden by MCAS, which erroneously activated more than two dozen times and drove the nose of the airplane down to the sea. The first 5 minutes of the flight were over land, and Decedent Liu Chandra experienced fear, terror, panic, anxiety, and physical pain while the aircraft was still over land due to the erratic flight profile, which included erratic ups and downs and a sudden 600-foot drop. Liu Chandra was aware of the danger that he was in and his impending death and experienced pre-impact fear of impending and imminent death and conscious pain and suffering while still over land before the plane crashed in the high seas.

46.     At approximately 6:32 a.m., roughly 10 minutes after the flight began, the Subject Aircraft crashed into the Java Sea at a high speed and disintegrated.

47.     Plaintiffs' Decedents were onboard Flight JT 610 and died in the crash.

48.     At no relevant time prior to the crash of Lion Air Flight JT 610 into the Java Sea did Boeing adequately warn Lion Air or its pilots of the unsafe condition caused by the new "auto-diving" design of the 737 MAX 8 flight system.

49.     As a result of the crash of Lion Air Flight JT 610, on November 7, 2018, the FAA issued "Emergency Airworthiness Directive (AD) 2018-23-51 [to] owners and operators of The Boeing Company Model 737-8 and -9

airplanes," which contained mandatory warning and instructions as to the "unsafe condition . . . likely to exist or develop" in the 737 MAX 8 relating to its new auto-diving feature.

50.    According to reports, prior to the crash of Lion Air Flight JT 610, Boeing 737 pilots "were not privy in training or in any other manuals or materials" to information regarding "the new system Boeing had installed on 737 MAX jets that could command the plane's nose down in certain situations to prevent a stall." [4] Further reports indicate that Boeing "withheld information about potential hazards with the new flight-control feature."[5]

**CAUSES OF ACTION**

**COUNT I – DEFENDANT BOEING
STRICT PRODUCTS LIABILITY – WRONGFUL DEATH**

1-50.   Plaintiffs re-adopt and re-allege general paragraphs 1 through 50 above.

51.    At the time the Subject Aircraft left the control of Boeing, the Subject Aircraft was defective, not fit for its intended purposes and unreasonably dangerous in one or more of the following particulars:

a)    the subject aircraft contained an auto-dive system—known as the MCAS—that was designed, manufactured, and configured to dive the aircraft toward the ground in certain conditions against the pilot's intentions and without adequate warning to the flight crew;

---

[4] https://www.malaymail.com/s/1692841/indonesia-says-situation-facing-lion-air-flight-jt610-crew-not-in-flight-ma

[5] https://www.wsj.com/articles/boeing-withheld-information-on-737-model-according-to-safety-experts-and-others-1542082575

b)   the subject aircraft was designed, manufactured, and configured in a manner in which an auto-dive disengage during flight created an excessive and unrealistic work load on the flight crew;

c)   the subject aircraft lacked proper and adequate instructions and warnings regarding the design and functions of its auto-dive system;

d)   the subject aircraft lacked proper and adequate instructions and warnings and/or limitations regarding flight procedures for a malfunctioning auto-dive system;

e)   the subject aircraft was designed without an electronic alert system to timely inform pilots what was malfunctioning and how to resolve it;

f)   the subject aircraft's auto-dive system was designed based on data fed to it from a single AOA sensor, though the aircraft was equipped with two AOA sensors, which created a single point of failure;

g)   the subject aircraft contained defective AOA sensors;

h)   despite the lack of redundancy in the design of the MCAS, the subject aircraft did not come with safety critical equipment including an AOA indicator or AOA disagree light; Boeing's customers, including Lion Air, had to pay extra for this critical safety equipment;

i)   Designed the aircraft without AOA redundancy or a synthetic airspeed system, modern cockpit displays, an Engine Indicating and Crew Alerting System, and an MCAS warning light.

j)   the subject aircraft was otherwise defective by nature of its design, manufacture, configuration, and/or assembly in particulars to be determined by discovery herein.

52.   As a direct and proximate result of one or more of the foregoing conditions, the Subject Aircraft operating as Lion Air Flight JT 610 crashed

17

after takeoff in the Java Sea, and Plaintiffs' Decedents suffered personal injury and death.

53.     Due to the tragic death of the Decedents, Plaintiffs have been injured and claim all damages available to them, the estate, the survivors, the beneficiaries, and the heirs under applicable law, including substantial pecuniary losses, and grief, sorrow, mental suffering, loss of society, loss of companionship, love, and affection, and loss of advice.

54.     Plaintiffs bring this action pursuant to the Death on the High Seas Act, 46 U.S.C. §§ 30302, 30307, the Illinois Wrongful Death Act, 740 ILCS 180/1 *et seq.*, or such other law as the Court determines to be applicable under the circumstances of this case.

WHEREFORE, the Plaintiffs, as the Personal Representatives and Administrators of the Estates and on behalf of all heirs of the Decedents, pray that the Court enter judgment in their favor and against the Defendants, and award them all damages available under the law, their court costs in this matter, and such other relief as the Court deems just and proper.

## COUNT II – DEFENDANT BOEING
## STRICT LIABILITY – PRODUCTS LIABILITY – SURVIVAL ACT

1-51.   Plaintiffs re-adopt and reallege paragraphs 1-51 of Count I above.

52.     As a direct and proximate result of one or more of the foregoing conditions, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents suffered multiple and

diverse injuries of both a personal and pecuniary nature, inclusive of conscious pain and suffering and sever terror prior to impact and prior to their deaths, and property damage.

53.    Had Plaintiffs' Decedents survived, they would have been entitled to bring an action for damages, and such action has survived them.

## COUNT III – DEFENDANT BOEING
## NEGLIGENCE – PRODUCTS LIABILITY – WRONGFUL DEATH

1-50.    Plaintiffs re-adopt and re-allege general paragraphs 1 through 50 above.

51.    At all relevant times, Boeing owed a legal duty to assure that the Subject Aircraft was properly designed, manufactured, and assembled and free from defects so as not to cause personal injury or death.

52.    Boeing breached its duties under the law and was negligent in one or more of the following ways:

    a) the subject aircraft contained an auto-dive system—known as MCAS—that was designed, manufactured, and configured to dive the aircraft toward the ground in certain conditions against the pilot's intentions and without adequate warning to the flight crew;

    b) the subject aircraft was designed, manufactured, and configured in a manner in which an auto-dive disengage during flight created an excessive and unrealistic workload on the flight crew;

    c) the subject aircraft lacked proper and adequate instructions and warnings regarding the design and functions of its auto-dive system;

d) the subject aircraft lacked proper and adequate instructions and warnings and/or limitations regarding flight procedures for a malfunctioning auto-dive system;

e) the subject aircraft was designed without an electronic alert system to timely inform pilots what was malfunctioning and how to resolve it;

f) the subject aircraft's auto-dive system was designed based on data fed to it from a single AOA sensor, though the aircraft was equipped with two AOA sensors, which created a single point of failure;

g) the subject aircraft contained defective AOA sensors;

h) despite the lack of redundancy in the design of the MCAS, the subject aircraft did not come with safety critical equipment including an AOA indicator or AOA disagree light; Boeing's customers, including Lion Air, had to pay extra for this critical safety equipment;

i) the subject aircraft was otherwise defective by nature of its design, manufacture, configuration, and/or assembly in particulars to be determined by discovery herein;

j) Boeing failed to conduct appropriate testing of the subject aircraft's components and systems prior to delivery to Lion Air;

k) Boeing failed to conduct a thorough failure modes and effects analysis of the subject aircraft's components and systems, including of the MCAS;

l) MCAS commanded more stabilizer input than could be counteracted by the flight crew pulling back on the column; and,

m) Was otherwise negligent.

53. As a direct and proximate result of one or more of the aforementioned acts of negligence by Boeing, the Subject Aircraft operating

as Lion Air Flight JT 610 crashed after takeoff in the Java Sea and Plaintiffs' Decedents sustained fatal injuries.

54.     Due to the tragic death of the Decedents, Plaintiffs have been injured and claim all damages available to them, the estate, the survivors, the beneficiaries, and the heirs under applicable law, including substantial pecuniary losses, and grief, sorrow, mental suffering, loss of society, loss of companionship, love, and affection, and loss of advice.

55.     Plaintiffs bring this action pursuant to the Death on the High Seas Act, 46 U.S.C. §§ 30302, 30307, the Illinois Wrongful Death Act, 740 ILCS 180/1 *et seq.*, or such other law as the Court determines to be applicable under the circumstances of this case.

WHEREFORE, the Plaintiffs, as the Personal Representatives and Administrators of the Estates and on behalf of all heirs of the Decedents, pray that the Court enter judgment in their favor and against the Defendants, and award them all damages available under the law, their court costs in this matter, and such other relief as the Court deems just and proper.

## COUNT IV – DEFENDANT BOEING
## NEGLIGENCE – PRODUCTS LIABILITY – SURVIVAL ACT

1-52.   Plaintiffs re-adopt and reallege paragraphs 1-52 of Count III above.

53.     As a direct and proximate result of one or more of the foregoing conditions, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents suffered multiple and

diverse injuries of both a personal and pecuniary nature, inclusive of conscious pain and suffering and sever terror prior to impact and prior to their deaths, and property damage.

54.    Had Plaintiffs' Decedents survived, they would have been entitled to bring an action for damages, and such action has survived them.

### COUNT V – DEFENDANT BOEING
### NEGLIGENCE -- FAILURE TO WARN – WRONGFUL DEATH

1-50.    Plaintiffs re-adopt and re-allege general paragraphs 1 through 50 above.

51.    At all relevant times, Boeing had a duty to inform and warn the owners, operators, and pilots of the 737 MAX 8 series of aircraft, including the Subject Aircraft, of the unsafe condition likely to exist or develop by virtue of MCAS and the auto-dive feature.

52.    Boeing breached its duties under the law and was negligent in one or more of the following ways:

a)    the subject aircraft lacked proper and adequate instructions and warnings regarding the design and functions of its auto-dive system known as MCAS;

b)    the subject aircraft lacked proper and adequate instructions and warnings and/or limitations regarding flight procedures for a malfunctioning MCAS;

c)    the subject aircraft lacked an electronic alert system to timely inform pilots what was malfunctioning and how to resolve it;

d)    Boeing failed to inform airlines and pilots, including the Lion Air and its pilots, that unlike prior 737 Models, pulling back on the yoke and raising the nose would NOT

activate breakout switches to stop automated tail movement; and,

e) the 737 MAX 8 Flight Crew Operations Manual failed to appropriately alert pilots, including the pilots of the subject aircraft, to the design, functions, and hazards of Boeing's MCAS and procedures for addressing a malfunctioning MCAS.

f) Failing to properly train pilots to identify an AOA sensor failure and MCAS input.

g) Concealed that a malfunction of MCAS would result in a "catastrophic failure" despite the experience of Boeing test pilots;

h) Deliberately understated the need for simulator training when transitioning from the 737 NG to the 737 MAX because it was in Boeing's financial interest under contracts with airlines, including Southwest Airlines, to minimize differences training;

i) Concealed that the AOA disagree alert was not functional though Boeing knew this fact well in advance of the fatal crash;

j) failed to warn that the flight control system and MCAS commanded more stabilizer input than could be counteracted by the flight crew pulling back on the column; and,

k) failed to warn that the flight control system interfered with the pilots' ability to manually control the airplane; and,

l) was otherwise negligent.

53. As a direct and proximate result of that breach, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents sustained fatal injuries.

54. Due to the tragic death of the Decedents, Plaintiffs have been injured and claim all damages available to them, the estate, the survivors,

the beneficiaries, and the heirs under applicable law, including substantial pecuniary losses, and grief, sorrow, mental suffering, loss of society, loss of companionship, love, and affection, and loss of advice.

55.    Plaintiffs bring this action pursuant to the Death on the High Seas Act, 46 U.S.C. §§ 30302, 30307, the Illinois Wrongful Death Act, 740 ILCS 180/1 *et seq.*, or such other law as the Court determines to be applicable under the circumstances of this case.

WHEREFORE, the Plaintiffs, as the Personal Representatives and Administrators of the Estates and on behalf of all heirs of the Decedents, pray that the Court enter judgment in their favor and against the Defendants, and award them all damages available under the law, their court costs in this matter, and such other relief as the Court deems just and proper.

### COUNT VI – DEFENDANT BOEING
### NEGLIGENCE – FAILURE TO WARN – SURVIVAL ACT

1-52.    Plaintiffs re-adopt and reallege paragraphs 1-52 of Count V above.

53.    As a direct and proximate result of one or more of the foregoing conditions, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents suffered multiple and diverse injuries of both a personal and pecuniary nature, inclusive of conscious pain and suffering and sever terror prior to impact and prior to their deaths, and property damage.

54.     Had Plaintiffs' Decedents survived, they would have been entitled to bring an action for damages, and such action has survived them.

## COUNT VII – DEFENDANT UNITED STATES
## DEATH ON THE HIGH SEAS ACT/SUITS IN ADMIRALTY ACT

1-50.    Plaintiffs re-adopt and re-allege general paragraphs 1 through 50 above.

51.     The Suits in Admiralty Act, 46 U.S.C. § 30903, *et seq*., allows individuals to pursue maritime claims against the United States.

52.     This action against the United States is founded upon the Death on the High Seas Act, 46 U.S.C. §§ 30302, 30307 for the death of Plaintiffs' Decedents due to the negligence of the managers, employees, and agents of the Department of Transportation and the Federal Aviation Administration ("the FAA") related to the 737 MAX, including MCAS.

53.     At all times relevant, the FAA had a non-delegable duty to properly review, analyze, and test safety critical equipment on the Boeing 737 MAX, including MCAS.

54.     At all times relevant, in its capacity as an employer and trainer, the FAA was required to appropriately hire, train, and supervise its employees and agents to assure that they competently perform their job duties and responsibilities, including with respect to assessing the safety and airworthiness of the Boeing 737 MAX, including MCAS, as well as pilot training requirements for the 737 MAX.

55. At all times relevant, the FAA and its employees and agents were required to properly review the Systems Safety Analysis for MCAS and fully understand its functions, failure modes, and hazard level before certifying the Boeing 737 MAX.

56. At all times relevant, the FAA and its employees and agents were required to conduct a proper risk assessment of MCAS and AOA system failures.

57. At all times relevant, the FAA and its employees and agents were statutorily obligated to prioritize public safety and the safety and airworthiness of the Boeing 737 MAX, including fully vetting the design, functions, failure modes, and hazard levels of MCAS, over the commercial interests and production demands of Boeing.

58. At all times relevant, the FAA and its employees and agents were obligated to adequately supervise the FAA's Authorized Representatives at Boeing, including with respect to the design, function, failure modes, and risks presented by MCAS, AOA sensor failures, and to assure that the system was safe and the 737 MAX was airworthy. While the FAA was permitted to delegate certain work to the FAA's Authorized Representatives at Boeing, it had a non-delegable duty to assure that work was performed in accordance with federal law and that those acting on the FAA's behalf were acting in furtherance of a legitimate governmental interest and not Boeing's pecuniary and commercial interests.

59.     Contrary to its duties under the law, the FAA negligently, recklessly, and unlawfully:

(a) hired, trained, and supervised its employees and agents and failed to assure they could competently fulfill their job duties and responsibilities, including inspecting, analyzing, and testing the 737 MAX, the design, function, failure modes, and hazard levels of MCAS, and pilot differences training requirements between the 737NG and the 737 MAX;

(b) hired, trained, supervised, and assigned aviation safety inspectors (ASIs) to the 737 MAX program that were not qualified and appropriately trained to carry out their duties;

(c) failed to assure that MCAS was disclosed and adequately explained to pilots and airlines given its inherent dangers;

(d) failed to assure that appropriate training, specifically simulator training, was provided to pilots and airlines so that they would understand the critical differences between the operation of the 737NG and the 737 MAX, especially with regard to MCAS;

(e) failed to assure that critical safety information regarding MCAS, including its functions and failure modes, its dependency on a single AOA sensor, excessive pilot response time in the event of an unwarranted MCAS activation, was adequately reviewed, tested, assessed, and shared between the agency's internal offices so that the FAA could meaningfully evaluate and scrutinize MCAS and the 737 MAX to assure it was safe and in compliance with all applicable federal requirements before granting certification;

(f) excessively delegated critical oversight responsibilities and analyses of the 737 MAX program to Boeing/FAA Authorized Representatives (ARs), including with respect to the new MCAS system and then failed to supervise, monitor, and coordinate with the Boeing/FAA ARs regarding key certification and safety issues, including regarding MCAS;

(g) allowed Boeing's commercial interests and production schedule to override the FAA's independent safety role in assuring that the 737 MAX aircraft was airworthy and safe for the flying public;

(h) failed to allow FAA technical employees to complete their review of safety critical information, including regarding MCAS, and permitted FAA managers to pressure technical employees, strip technical employees of safety-critical tasks, and allowed managers to sign off on documents without adequately reviewing or understanding what they were signing;

(i) failed to understand the design of MCAS including that it could repeatedly activate, its failure modes, and MCAS's ability to quickly overwhelm pilots before certifying the 737 MAX aircraft;

(j) certified the 737 MAX aircraft and MCAS as safe and airworthy when its design was unacceptably dangerous as illustrated by two crashes in 5 months; and,

(k) otherwise failed to follow federal law and its own established rules and procedures.

60.     As a direct and proximate result of these various breaches, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents sustained fatal injuries.

61.     Due to the tragic death of the Decedents, Plaintiffs have been injured and claim all damages available to them, the estate, the survivors, the beneficiaries, and the heirs under applicable law, including substantial pecuniary losses, and grief, sorrow, mental suffering, loss of society, loss of companionship, love, and affection, and loss of advice.

62.     Plaintiffs bring this action against the United States and its subsidiary agencies, the Department of Transportation and the Federal Aviation Administration, pursuant to the Death on the High Seas Act, 46 U.S.C. §§ 30302, 30307.

WHEREFORE, the Plaintiffs, as the Personal Representatives and Administrators of the Estates and on behalf of all heirs of the Decedents, pray that the Court enter judgment in their favor and against the Defendants, and award them all damages available under the law, their court costs in this matter, and such other relief as the Court deems just and proper.

## COUNT VIII – DEFENDANT UNITED STATES
## NEGLIGENCE – SURVIVAL ACT

1-59. Plaintiffs re-adopt and reallege paragraphs 1-59 of Count VII above.

60. As a direct and proximate result of one or more of the foregoing conditions, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents suffered multiple and diverse injuries of both a personal and pecuniary nature, inclusive of conscious pain and suffering and sever terror prior to impact and prior to their deaths, and property damage.

61. Had Plaintiffs' Decedents survived, they would have been entitled to bring an action for damages, and such action has survived them.

## COUNT IX – DEFENDANT ROCKWELL COLLINS, INC.
## STRICT PRODUCTS LIABILITY – WRONGFUL DEATH

1-50. Plaintiffs re-adopt and re-allege general paragraphs 1 through 50 above.

51.     At the time the MCAS and its software left the control of Rockwell Collins, it was defective, not fit for its intended purposes and unreasonably dangerous in one or more of the following particulars:

a.     The design did not compare inputs from both AOA sensors;

b.     The flight control system was dependent on a single AOA sensor which are known to malfunction and fail;

c.     The flight control system and MCAS commanded more stabilizer input than could be counteracted by the flight crew pulling back on the column;

e.     The flight control system interfered with the pilots' ability to manually control the airplane;

f.     The flight control system did not screen the quality of the data and information coming from Rosemount's AOA sensors despite known defects with AOA sensors and known issues with spurious data; and,

g.     Defects existed in the flight control computers.

52.     As a direct and proximate result of one or more of the foregoing conditions, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents suffered personal injury and death.

53.     Due to the tragic death of the Decedents, Plaintiffs have been injured and claim all damages available to them, the estate, the survivors, the beneficiaries, and the heirs under applicable law, including substantial pecuniary losses, and grief, sorrow, mental suffering, loss of society, loss of companionship, love, and affection, and loss of advice.

54.     Plaintiffs bring this action pursuant to the Death on the High Seas Act, 46 U.S.C. §§ 30302, 30307, the Illinois Wrongful Death Act, 740

ILCS 180/1 *et seq.*, or such other law as the Court determines to be applicable under the circumstances of this case.

WHEREFORE, the Plaintiffs, as the Personal Representatives and Administrators of the Estates and on behalf of all heirs of the Decedents, pray that the Court enter judgment in their favor and against the Defendants, and award them all damages available under the law, their court costs in this matter, and such other relief as the Court deems just and proper.

### COUNT X – DEFENDANT ROCKWELL COLLINS, INC.
### STRICT LIABILITY – PRODUCTS LIABILITY – SURVIVAL ACT

1-51. Plaintiffs re-adopt and reallege paragraphs 1-51 of Count IX above.

52. As a direct and proximate result of one or more of the foregoing conditions, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents suffered multiple and diverse injuries of both a personal and pecuniary nature, inclusive of conscious pain and suffering and sever terror prior to impact and prior to their deaths, and property damage.

53. Had Plaintiffs' Decedents survived, they would have been entitled to bring an action for damages, and such action has survived them.

### COUNT XI – DEFENDANT ROCKWELL COLLINS, INC.
### NEGLIGENCE – WRONGFUL DEATH

1-50. Plaintiffs readopt and reallege general paragraphs 1-50 above.

51.     At all relevant times, Rockwell Collins owed a legal duty to exercise reasonable care to assure that the MCAS and its software in the Subject Aircraft were properly designed, manufactured, assembled, tested and that the MCAS and its software were free from defects so as not to cause personal injury or death.

52.     At all relevant times, Rockwell Collins knew or should have known of the dangers inherent in the design, coding and programming of MCAS and that a catastrophic failure was foreseeable as a result of the uncommanded and erroneous activation of MCAS.

53.     Rockwell Collins breached its duties under the law and was negligent in one or more of the following ways:

a.      Failed to design or program a flight control system that compared inputs from both AOA sensors;

b.      Designed a flight control system that was dependent on a single AOA sensor which are known to malfunction;

c.      Failed to design or program a flight control system that only activated in non-normal conditions;

d.      Designed and manufactured a flight control system and MCAS that commanded more stabilizer input than could be counteracted by the flight crew pulling back on the column;

e.      Designed and manufactured a flight control system that interfered with the pilots' ability to manually control the airplane;

f.      Failed to conduct an appropriate Safety Requirements Review, Functional Hazard Assessment, or Preliminary System Safety Assessment;

g.      Failed to ensure the quality of the data and information coming from Rosemount's AOA sensors and take into account known defects with AOA sensors; and,

h.      Was otherwise negligent.

54.     As a direct and proximate result of these various breaches, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents sustained fatal injuries.

55.     Due to the tragic death of the Decedents, Plaintiffs have been injured and claim all damages available to them, the estate, the survivors, the beneficiaries, and the heirs under applicable law, including substantial pecuniary losses, and grief, sorrow, mental suffering, loss of society, loss of companionship, love, and affection, and loss of advice.

56.     Plaintiffs bring this action pursuant to the Death on the High Seas Act, 46 U.S.C. §§ 30302, 30307, the Illinois Wrongful Death Act, 740 ILCS 180/1 *et seq.*, or such other law as the Court determines to be applicable under the circumstances of this case.

WHEREFORE, the Plaintiffs, as the Personal Representatives and Administrators of the Estates and on behalf of all heirs of the Decedents, pray that the Court enter judgment in their favor and against the Defendants, and award them all damages available under the law, their court costs in this matter, and such other relief as the Court deems just and proper.

## COUNT XII – DEFENDANT ROCKWELL COLLINS, INC.
## NEGLIGENCE – SURVIVAL ACT

1-53.   Plaintiffs re-adopt and reallege paragraphs 1-53 of Count XI above.

54.     As a direct and proximate result of one or more of the foregoing conditions, the Subject Aircraft operating as Lion Air Flight JT 610 crashed

after takeoff in the Java Sea, and Plaintiffs' Decedents suffered multiple and diverse injuries of both a personal and pecuniary nature, inclusive of conscious pain and suffering and sever terror prior to impact and prior to their deaths, and property damage.

55. Had Plaintiffs' Decedents survived, they would have been entitled to bring an action for damages, and such action has survived them.

### COUNT XIII – DEFENDANT ROCKWELL COLLINS, INC. NEGLIGENCE -- FAILURE TO WARN – WRONGFUL DEATH

1-50. Plaintiffs re-adopt and re-allege general paragraphs 1 through 50 above.

51. At all relevant times, Rockwell Collins had a duty to inform and warn the owners, operators, and pilots of the 737 MAX 8 series of aircraft, including the Subject Aircraft, of the unsafe condition likely to exist or develop by virtue of defects in MCAS and its software.

52. Rockwell Collins breached its duties under the law and was negligent in one or more of the following ways:

    a. the subject aircraft lacked proper and adequate instructions and warnings regarding the design and function of MCAS;

    b. the subject aircraft lacked proper and adequate instructions and warnings and/or limitations regarding flight procedures for a malfunctioning MCAS;

    c. failed to inform airlines and pilots, including Lion Air and its pilots, that unlike prior 737 Models, pulling back on the yoke and raising the nose would NOT activate breakout switches to stop automated tail movement;

d. the 737 MAX 8 Flight Crew Operations Manual failed to appropriately alert pilots, including the pilots of the subject aircraft, to the design, functions, and hazards of Boeing's MCAS and procedures for addressing a malfunctioning MCAS.

e. failed to warn that a malfunction of MCAS would result in a "catastrophic failure";

f. failed to warn that the flight control system did not compare inputs from both AOA sensors;

g. failed to warn that the flight control system was dependent on a single sensor;

h. failed to warn that MCAS commanded more stabilizer input than could be counteracted by the flight crew pulling back on the column;

i. failed to warn that the flight control system interfered with the pilots' ability to manually control the airplane; and,

j. was otherwise negligent.

53. As a direct and proximate result of that breach, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents sustained fatal injuries.

54. Due to the tragic death of the Decedents, Plaintiffs have been injured and claim all damages available to them, the estate, the survivors, the beneficiaries, and the heirs under applicable law, including substantial pecuniary losses, and grief, sorrow, mental suffering, loss of society, loss of companionship, love, and affection, and loss of advice.

55. Plaintiffs bring this action pursuant to the Death on the High Seas Act, 46 U.S.C. §§ 30302, 30307, the Illinois Wrongful Death Act, 740

ILCS 180/1 *et seq.*, or such other law as the Court determines to be applicable under the circumstances of this case.

WHEREFORE, the Plaintiffs, as the Personal Representatives and Administrators of the Estates and on behalf of all heirs of the Decedents, pray that the Court enter judgment in their favor and against the Defendants, and award them all damages available under the law, their court costs in this matter, and such other relief as the Court deems just and proper.

## COUNT XIV - DEFENDANT ROCKWELL COLLINS
## NEGLIGENCE – FAILURE TO WARN – SURVIVAL ACT

1-52. Plaintiffs re-adopt and reallege paragraphs 1-52 of Count XIII above.

53. As a direct and proximate result of one or more of the foregoing conditions, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents suffered multiple and diverse injuries of both a personal and pecuniary nature, inclusive of conscious pain and suffering and sever terror prior to impact and prior to their deaths, and property damage.

54. Had Plaintiffs' Decedents survived, they would have been entitled to bring an action for damages, and such action has survived them.

## COUNT XV – DEFENDANT ROSEMOUNT AEROSPACE, INC.
## STRICT PRODUCTS LIABILITY – WRONGFUL DEATH

1-50. Plaintiffs re-adopt and re-allege general paragraphs 1 through 50 above.

36

51.     At the time the AOA sensors left the control of Rosemount Aerospace, they were defective, not fit for their intended purposes and unreasonably dangerous in one or more of the following particulars:

    a.    The AOA sensors contained dangerous conditions resulting in them suffering an unacceptable rate of failure and malfunction;

    b.    The AOA sensors provide erroneous and spurious data to the MCAS system, which can lead to a catastrophic failure;

    c.    The data from the AOA sensors are not compared with one another and thus a single defective AOA sensor results in unwarranted and unreasonably dangerous MCAS activation;

    d.    The AOA sensors are not designed with sufficient redundancy and robust self-test features;

    e.    The AOA sensors are susceptible to miscalibration due to an unreasonably dangerous design.

52.     As a direct and proximate result of one or more of the foregoing conditions, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents suffered personal injury and death.

53.     Due to the tragic death of the Decedents, Plaintiffs have been injured and claim all damages available to them, the estate, the survivors, the beneficiaries, and the heirs under applicable law, including substantial pecuniary losses, and grief, sorrow, mental suffering, loss of society, loss of companionship, love, and affection, and loss of advice.

54.     Plaintiffs bring this action pursuant to the Death on the High Seas Act, 46 U.S.C. §§ 30302, 30307, the Illinois Wrongful Death Act, 740 ILCS 180/1 *et seq*., or such other law as the Court determines to be applicable under the circumstances of this case.

WHEREFORE, the Plaintiffs, as the Personal Representatives and Administrators of the Estates and on behalf of all heirs of the Decedents, pray that the Court enter judgment in their favor and against the Defendants, and award them all damages available under the law, their court costs in this matter, and such other relief as the Court deems just and proper.

## COUNT XVI – DEFENDANT ROSEMOUNT AEROSPACE, INC.
## STRICT LIABILITY – PRODUCTS LIABILITY – SURVIVAL ACT

1-51.  Plaintiffs re-adopt and reallege paragraphs 1-51 of Count XV above.

52.  As a direct and proximate result of one or more of the foregoing conditions, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents suffered multiple and diverse injuries of both a personal and pecuniary nature, inclusive of conscious pain and suffering and sever terror prior to impact and prior to their deaths, and property damage.

53.  Had Plaintiffs' Decedents survived, they would have been entitled to bring an action for damages, and such action has survived them.

## COUNT XVII – DEFENDANT ROSEMOUNT AEROSPACE, INC.
## NEGLIGENCE – WRONGFUL DEATH

1-50.  Plaintiffs readopt and reallege general paragraphs 1-50 above.

51.  At all relevant times, Rosemount Aerospace owed a legal duty to exercise reasonable care to assure that the AOA sensors were properly

designed, manufactured, assembled, tested and that the AOA sensors were free from defects so as not to cause personal injury or death.

52.     At all relevant times, Rosemount Aerospace knew or should have known of the dangers inherent in the integrated design of the AOA sensors and MCAS and MCAS's dependency on a single AOA sensor.

53.     Rosemount Aerospace breached its duties under the law and was negligent in one or more of the following ways:

> a. Designing and manufacturing AOA sensors containing dangerous conditions resulting in them suffering an unacceptable rate of failure and malfunction;
> b. Designing and manufacturing AOA sensors that provide erroneous and spurious data to the MCAS system, which can lead to a catastrophic failure;
> c. Designing and manufacturing AOA sensors that cause erroneous MCAS activation;
> d. Designing and manufacturing AOA sensors without sufficient redundancy and robust self-test features;
> e. Designing and manufacturing AOA sensors that are susceptible to miscalibration due to an unreasonably dangerous design; and,
> f. Was otherwise negligent.

54.     As a direct and proximate result of these various breaches, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents sustained fatal injuries.

55.     Due to the tragic death of the Decedents, Plaintiffs have been injured and claim all damages available to them, the estate, the survivors, the beneficiaries, and the heirs under applicable law, including substantial pecuniary losses, and grief, sorrow, mental suffering, loss of society, loss of companionship, love, and affection, and loss of advice.

56.     Plaintiffs bring this action pursuant to the Death on the High Seas Act, 46 U.S.C. §§ 30302, 30307, the Illinois Wrongful Death Act, 740 ILCS 180/1 *et seq.*, or such other law as the Court determines to be applicable under the circumstances of this case.

WHEREFORE, the Plaintiffs, as the Personal Representatives and Administrators of the Estates and on behalf of all heirs of the Decedents, pray that the Court enter judgment in their favor and against the Defendants, and award them all damages available under the law, their court costs in this matter, and such other relief as the Court deems just and proper.

## COUNT XVIII – DEFENDANT ROSEMOUNT AEROSPACE, INC. NEGLIGENCE – SURVIVAL ACT

1-53.   Plaintiffs re-adopt and reallege paragraphs 1-53 of Count XVII above.

54.     As a direct and proximate result of one or more of the foregoing conditions, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents suffered multiple and diverse injuries of both a personal and pecuniary nature, inclusive of conscious pain and suffering and sever terror prior to impact and prior to their deaths, and property damage.

55.     Had Plaintiffs' Decedents survived, they would have been entitled to bring an action for damages, and such action has survived them.

## COUNT XIX – DEFENDANT ROSEMOUNT AEROSPACE, INC.
## NEGLIGENCE -- FAILURE TO WARN – WRONGFUL DEATH

1-50.    Plaintiffs re-adopt and re-allege general paragraphs 1 through 50 above.

51.    At all relevant times, Rosemount Aerospace had a duty to inform and warn the owners, operators, and pilots of the 737 MAX 8 series of aircraft, including the Subject Aircraft, of the unsafe condition likely to exist or develop by virtue of defects in MCAS and the AOA sensors.

52.    Rockwell Collins breached its duties under the law and was negligent in one or more of the following ways:

   a.    the AOA sensors and its integration with MCAS lacked proper and adequate instructions and warnings;

   b.    the subject aircraft lacked proper and adequate instructions and warnings and/or limitations regarding flight procedures for a malfunctioning MCAS;

   c.    failed to warn the AOA disagree alert was not functional though this hazard was known prior to the fatal crash.

   d.    failing to warn that the AOA sensors have a high rate of failure, malfunction, and transmit disparate data between the two AOA sensors;

   e.    failing to warn that the AOA sensors provide erroneous data to MCAS, which can lead to a catastrophic failure;

   f.    failing to warn that the AOA sensors lack sufficient redundancy, robust self-test features, and are susceptible to miscalibration due to their design; and,

   g.    was otherwise negligent.

53.     As a direct and proximate result of that breach, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents sustained fatal injuries.

54.     Due to the tragic death of the Decedents, Plaintiffs have been injured and claim all damages available to them, the estate, the survivors, the beneficiaries, and the heirs under applicable law, including substantial pecuniary losses, and grief, sorrow, mental suffering, loss of society, loss of companionship, love, and affection, and loss of advice.

55.     Plaintiffs bring this action pursuant to the Death on the High Seas Act, 46 U.S.C. §§ 30302, 30307, the Illinois Wrongful Death Act, 740 ILCS 180/1 *et seq.*, or such other law as the Court determines to be applicable under the circumstances of this case.

WHEREFORE, the Plaintiffs, as the Personal Representatives and Administrators of the Estates and on behalf of all heirs of the Decedents, pray that the Court enter judgment in their favor and against the Defendants, and award them all damages available under the law, their court costs in this matter, and such other relief as the Court deems just and proper.

### COUNT XX - DEFENDANT ROSEMOUNT AEROSPACE, INC. NEGLIGENCE – FAILURE TO WARN – SURVIVAL ACT

1-52.   Plaintiffs re-adopt and reallege paragraphs 1-52 of Count XIX above.

53.     As a direct and proximate result of one or more of the foregoing conditions, the Subject Aircraft operating as Lion Air Flight JT 610 crashed

after takeoff in the Java Sea, and Plaintiffs' Decedents suffered multiple and diverse injuries of both a personal and pecuniary nature, inclusive of conscious pain and suffering and sever terror prior to impact and prior to their deaths, and property damage.

54.    Had Plaintiffs' Decedents survived, they would have been entitled to bring an action for damages, and such action has survived them.

## COUNT XXI – DEFENDANT XTRA AEROSPACE, LLC NEGLIGENCE – WRONGFUL DEATH

1-50.  Plaintiffs readopt and reallege general paragraphs 1-50 above.

51.    At all relevant times, Xtra Aeropace, LLC owed a legal duty to exercise reasonable care to assure that the AOA sensors which it overhauled, repaired, refurbished, calibrated, and tested were functioning properly, properly calibrated, and were free from defects so as not to cause personal injury or death.

52.    At all relevant times, Xtra Aerospace knew or should have known of the dangers inherent in selling and supplying an AOA sensor to Lion Air that was improperly overhauled, repaired, refurbished, calibrated, tested, misaligned, and contained defects.

53.    Xtra Aerospace breached its duties under the law and was negligent in one or more of the following ways:

    a.    Improperly overhauled, repaired, disassembled, and calibrated the AOA sensor;

    b.    Improperly tested the AOA sensor and approved it for return to service though it was defective;

c.  Failed to discover that the AOA sensor was miscalibrated and defective;

d.  Failed to follow manufacturer and FAA testing procedures;

e.  Was otherwise negligent.

54.  Following this crash, the Federal Aviation Administration revoked Xtra Aerospace's license.

55.  As a direct and proximate result of these various breaches, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents sustained fatal injuries.

56.  Due to the tragic death of the Decedents, Plaintiffs have been injured and claim all damages available to them, the estate, the survivors, the beneficiaries, and the heirs under applicable law, including substantial pecuniary losses, and grief, sorrow, mental suffering, loss of society, loss of companionship, love, and affection, and loss of advice.

57.  Plaintiffs bring this action pursuant to the Death on the High Seas Act, 46 U.S.C. §§ 30302, 30307, the Illinois Wrongful Death Act, 740 ILCS 180/1 *et seq.*, or such other law as the Court determines to be applicable under the circumstances of this case.

WHEREFORE, the Plaintiffs, as the Personal Representatives and Administrators of the Estates and on behalf of all heirs of the Decedents, pray that the Court enter judgment in their favor and against the Defendants, and award them all damages available under the law, their court costs in this matter, and such other relief as the Court deems just and proper.

## COUNT XXII – DEFENDANT XTRA AEROSPACE, LLC
## NEGLIGENCE – SURVIVAL ACT

1-53.   Plaintiffs re-adopt and reallege paragraphs 1-53 of Count XXI above.

54.    As a direct and proximate result of one or more of the foregoing conditions, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents suffered multiple and diverse injuries of both a personal and pecuniary nature, inclusive of conscious pain and suffering and sever terror prior to impact and prior to their deaths, and property damage.

55.    Had Plaintiffs' Decedents survived, they would have been entitled to bring an action for damages, and such action has survived them.

WHEREFORE, the Plaintiffs, as the Personal Representatives of the Estates and on behalf of all heirs of the Decedents, pray that the Court enter judgment in their favor and against the Defendants, and award them all damages available under the law, their court costs in this matter, and such other relief as the Court deems just and proper.

## COUNT XXIII – DEFENDANT DAVID L. CALHOUN
## NEGLIGENCE – WRONGFUL DEATH

1-50.   Plaintiffs readopt and reallege general paragraphs 1-50 above.

51.    As a Boeing Director and later Lead Director of Boeing's Board, David L. Calhoun ("Calhoun), had a duty to exercise reasonable care and act in good faith to oversee, provide strategic direction, and provide leadership to

Boeing's executives and senior leadership, including Boeing's former CEO, Dennis A. Muilenburg.

52.     In dereliction of his duties as a Director, Calhoun allowed, failed to remedy, and correct egregious errors made by Boeing's CEO and management team in numerous respects, including setting reckless certification and production schedules for the 737 MAX; focusing on profit margin over safety; aiming to minimize pilot differences training to "Level B" out of concern over competition with Airbus and penalties contained in Boeing's contract with Southwest Airlines; concealing the existence and functionality of MCAS from airlines and pilots despite the clear danger it posed; and allowing the 737 MAX to be designed, manufactured, sold, and released into the stream of commerce with dangerous and defective conditions, including MCAS, inoperable AOA Disagree Alerts, and a lack of warnings.

53.     Although Calhoun was aware of Muilenburg's focus on stock price and profit margin (As Calhoun reportedly said, "*If anybody ran over the rainbow for the pot of gold on stock, it would have been him* [Muilenburg]," Calhoun failed to exercise due care and assure Boeing's CEO and his senior leadership team were laser-focused on what matters most of all: safety.

54.     Calhoun failed to assure that Boeing's Board implemented a robust safety-review system prior to the Lion Air crash to actively monitor,

oversee, and make sure Boeing's CEO and management team remedied the various defects in the 737 MAX so as not to pose a danger to the flying public.

55.     Calhoun knew or should have known that the 737 MAX posed a danger to public safety.

56.     Calhoun breached his duties under the law and was negligent in one or more of the following ways:

a.     Allowed, authorized, and failed to conduct appropriate Board oversight over the unreasonably dangerous design of the 737 MAX, including MCAS;

b.     Failed to implement and conduct a Board-level safety review system of the 737 MAX to identify and remedy hazardous conditions;

c.     Failed to cause the Board to monitor and assess airplane safety, including with respect to the 737 MAX, as a regular part of BBoard meetings;

d.     Allowed, authorized, and failed to correct Boeing's CEO's focus on profit margin over safety;

e.     Allowed, authorized, and failed to remedy Boeing's CEO's and senior management's focus on certification and production schedules for the 737 MAX without conducting appropriate Board oversight to assure best safety practices were followed, such as avoiding single points of failure which existed on the 737 MAX;

f.     Allowed, authorized, and failed to prevent a directive to focus on minimal pilot training requirements in the form of "Level B" training rather than promoting simulator training to assure 737 MAX pilots are fully informed and trained on the critical differences between the 737 NG and the 737 MAX, such as MCAS;

g.     Negligently and carelessly allowed the 737 MAX aircraft to be designed, manufactured, sold, and released into the stream of commerce despite the fact that the AOA Disagree Alert, which was mandated as standard equipment on all 737 MAX aircraft, was not functional on 80% of the 737 MAX fleet;

h.     Negligently and carelessly failed to direct, lead, and set clear safety standards and goals for management at Boeing's business unit, Boeing Commercial Airplanes, and assure that design proposals which would have made the 737 MAX safer, were

incorporated, including: AOA redundancy, a synthetic airspeed system, modern cockpit displays, an Engine Indicating and Crew Alerting System, and an MCAS warning light;

i. Negligently and carelessly allowed, authorized, and failed to correct Boeing employees from concealing the fact that MCAS was a new system and not designating it as a safety-critical system in order to avoid increased costs, greater scrutiny from the FAA, and increased training requirements;

j. Negligently and carelessly allowed, authorized, and failed to correct Boeing's strategy to omit MCAS from the Flight Crew Operations Manual (FCOM) and conceal the fact that the AOA Disagree alert was not functional;

k. Negligently and carelessly allowed, authorized, and failed to correct the defective and unreasonably dangerous design of the 737 MAX aircraft before it was released into the stream of commerce;

l. Negligently and carelessly allowed, authorized, and failed to correct the defective and unreasonably dangerous FCOM, which did not warn of the risks presented by MCAS, the AOA sensors, or the inoperable AOA Disagree Alert; and,

M. Negligently and carelessly allowed, authorized, and failed to correct undue pressure on management and line employees which led to an unsafe safety culture at Boeing.

57. As a direct and proximate result of these various breaches, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents sustained fatal injuries.

58. Due to the tragic death of the Decedents, Plaintiffs have been injured and claim all damages available to them, the estate, the survivors, the beneficiaries, and the heirs under applicable law, including substantial pecuniary losses, and grief, sorrow, mental suffering, loss of society, loss of companionship, love, and affection, and loss of advice.

59. Plaintiffs bring this action pursuant to the Death on the High Seas Act, 46 U.S.C. §§ 30302, 30307, the Illinois Wrongful Death Act, 740

ILCS 180/1 *et seq*., or such other law as the Court determines to be applicable under the circumstances of this case.

WHEREFORE, the Plaintiffs, as the Personal Representatives and Administrators of the Estates and on behalf of all heirs of the Decedents, pray that the Court enter judgment in their favor and against the Defendants, and award them all damages available under the law, their court costs in this matter, and such other relief as the Court deems just and proper.

### COUNT XXIV – DEFENDANT DAVID L. CALHOUN NEGLIGENCE – SURVIVAL ACT

1-56.   Plaintiffs re-adopt and reallege paragraphs 1-56 of Count XXIII above.

54.   As a direct and proximate result of one or more of the foregoing conditions, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents suffered multiple and diverse injuries of both a personal and pecuniary nature, inclusive of conscious pain and suffering and sever terror prior to impact and prior to their deaths, and property damage.

55.   Had Plaintiffs' Decedents survived, they would have been entitled to bring an action for damages, and such action has survived them.

WHEREFORE, the Plaintiffs, as the Personal Representatives of the Estates and on behalf of all heirs of the Decedents, pray that the Court enter judgment in their favor and against the Defendants, and award them all

damages available under the law, their court costs in this matter, and such other relief as the Court deems just and proper.

### COUNT XXV – DEFENDANT DENNIS A. MUILENBURG NEGLIGENCE – WRONGFUL DEATH

1-50.   Plaintiffs readopt and reallege general paragraphs 1-50 above.

51.   At all relevant times, Dennis A. Muilenburg (Muilenburg) was the President, CEO, and Chairman of Boeing. In his capacity as President, CEO, and Chairman, Muilenburg had a duty to exercise reasonable care and act in good faith to provide strategic direction and leadership, set worldwide strategy, and properly manage and direct the leaders of each business unit, including Boeing Commercial Airplanes.

52.   In dereliction of his duties as the President, CEO, and Chairman of Boeing, Muilenburg allowed, authorized, failed to remedy, and correct egregious errors, including setting reckless certification and production schedules for the 737 MAX; focusing on profit margin over safety; aiming to minimize pilot differences training to "Level B" out of concern over competition with Airbus and penalties contained in Boeing's contract with Southwest Airlines; concealing the existence and functionality of MCAS from airlines and pilots despite the clear danger it posed; and allowing the 737 MAX to be designed, manufactured, sold, and released into the stream of commerce with dangerous and defective conditions, including MCAS, inoperable AOA Disagree Alerts, and a lack of warnings.

53.     Due to Muilenburg's focus on stock price and profit margin, he failed to exercise due care and assure Boeing's senior leadership and its employees were laser-focused on what matters most of all: safety.

54.     Prior to the Lion Air crash, Muilenburg failed to assure that Boeing, its Board, and its senior leadership team implemented an appropriate and robust safety-review system to actively identify, monitor, oversee, and remediate defects in the 737 MAX before it was released into the stream of commerce.

55.     Muilenburg knew or should have known that the 737 MAX posed a danger to public safety.

56.     Muilenburg breached his duties under the law and was negligent in one or more of the following ways:

a.     Allowed, authorized, and failed to conduct appropriate managerial oversight over the unreasonably dangerous design of the 737 MAX, including MCAS;

b.     Failed to implement and conduct a Board-level safety review system of the 737 MAX to identify and remedy hazardous conditions;

c.     Failed to cause the Board to monitor and assess airplane safety, including with respect to the 737 MAX, as a regular part of Board meetings;

d.     Allowed, authorized, and failed to correct Boeing's focus on profit margin over safety;

e.     Allowed, authorized, and failed to remedy Boeing's focus on certification and production schedules for the 737 MAX without conducting appropriate oversight to assure best safety practices were followed, such as avoiding single points of failure which existed on the 737 MAX;

f.     Allowed, authorized, and failed to prevent a directive to focus on minimal pilot training requirements in the form of "Level B" training rather than promoting simulator training to assure 737

MAX pilots are fully informed and trained on the critical differences, such as MCAS;

g. Negligently and carelessly allowed the 737 MAX aircraft to be designed, manufactured, sold, and released into the stream of commerce despite the fact that the AOA Disagree Alert, which was mandated as standard equipment on all 737 MAX aircraft, was not functional on 80% of the 737 MAX fleet;

h. Negligently and carelessly failed to direct, manage, lead, and set clear safety standards and goals for Boeing's business unit, Boeing Commercial Airplanes, and assure that design proposals brought to management's attention, which would have made the 737 MAX safer, were incorporated, including: AOA redundancy, a synthetic airspeed system, modern cockpit displays, an Engine Indicating and Crew Alerting System, and an MCAS warning light;

i. Negligently and carelessly allowed, authorized, and failed to correct Boeing employees from concealing the fact that MCAS was a new system and not designating it as a safety-critical system in order to avoid increased costs, greater scrutiny from the FAA, and increased training requirements;

j. Negligently and carelessly allowed, authorized, and failed to correct Boeing's strategy to omit MCAS from the Flight Crew Operations Manual (FCOM) and conceal the fact that the AOA Disagree alert was not functional;

k. Negligently and carelessly allowed, authorized, and failed to correct the defective and unreasonably dangerous design of the 737 MAX aircraft before it was released into the stream of commerce;

l. Negligently and carelessly allowed, authorized, and failed to correct the defective and unreasonably dangerous FCOM, which did not warn of the risks presented by MCAS, the AOA sensors, or the inoperable AOA Disagree Alert; and,

m. Negligently and carelessly allowed, authorized, and failed to correct undue pressure on management and line employees which led to an unsafe safety culture at Boeing.

57. As a direct and proximate result of these various breaches, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents sustained fatal injuries.

58.     Due to the tragic death of the Decedents, Plaintiffs have been injured and claim all damages available to them, the estate, the survivors, the beneficiaries, and the heirs under applicable law, including substantial pecuniary losses, and grief, sorrow, mental suffering, loss of society, loss of companionship, love, and affection, and loss of advice.

59.     Plaintiffs bring this action pursuant to the Death on the High Seas Act, 46 U.S.C. §§ 30302, 30307, the Illinois Wrongful Death Act, 740 ILCS 180/1 *et seq.*, or such other law as the Court determines to be applicable under the circumstances of this case.

WHEREFORE, the Plaintiffs, as the Personal Representatives and Administrators of the Estates and on behalf of all heirs of the Decedents, pray that the Court enter judgment in their favor and against the Defendants, and award them all damages available under the law, their court costs in this matter, and such other relief as the Court deems just and proper.

## COUNT XXVI – DEFENDANT DENNIS A. MUILENBURG NEGLIGENCE – SURVIVAL ACT

1-56.   Plaintiffs re-adopt and reallege paragraphs 1-56 of Count XXV above.

57.     As a direct and proximate result of one or more of the foregoing conditions, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents suffered multiple and diverse injuries of both a personal and pecuniary nature, inclusive of

conscious pain and suffering and sever terror prior to impact and prior to their deaths, and property damage.

58. Had Plaintiffs' Decedents survived, they would have been entitled to bring an action for damages, and such action has survived them.

WHEREFORE, the Plaintiffs, as the Personal Representatives of the Estates and on behalf of all heirs of the Decedents, pray that the Court enter judgment in their favor and against the Defendants, and award them all damages available under the law, their court costs in this matter, and such other relief as the Court deems just and proper.

## COUNT XXVII – DEFENDANT MARK A. FORKNER
## NEGLIGENCE – WRONGFUL DEATH

1-50. Plaintiffs readopt and reallege general paragraphs 1-50 above.

51. At all relevant times, Mark A. Forkner (Forkner), was employed by Boeing as the Chief Technical Pilot of the 737 MAX program and led the 737 MAX Flight Technical Team. In his capacity as Chief Technical Pilot, Forkner played a critical role in effectuating Boeing's goal of minimizing differences training on the 737 MAX.

52. Based on Forkner's misleading and careless representations to the FAA Aircraft Evaluation Group (FAA AEG), Forkner successfully secured "Level B" differences training, which was minimal iPad-based training rather than robust and costly simulator training.

53. Forkner also played a pivotal role in obtaining the removal of MCAS from the Flight Crew Operations Manual (FCOM), which deprived

airlines and pilots, including the Lion Air pilots, of any information about the functionality and dangerous propensities of MCAS.

54. Approximately one year before the Lion Air crash, a Lion Air representative contacted Forkner about simulator training for the 737 MAX. Eschewing any consideration of safety, Forkner dissuaded Lion Air from seeking simulator training for its pilots and assured them that it was unnecessary. Forkner subsequently called Lion Air idiots and fools and bragged about the money he saved Boeing.

55. Due to his role as Chief Technical Pilot and his experience with the 737 MAX aircraft, Forkner knew or should have known about the dangers posed by MCAS and the importance of providing information about MCAS to airlines and pilots, both in the form of robust simulator training and in the FCOM.

56. Forkner knew or should have known that the 737 MAX posed a danger to public safety.

57. Forkner breached his duties under the law and was negligent in one or more of the following ways:

    a.    Negligently and carelessly trivialized MCAS when describing it to the FAA AEG in an effort to minimize differences training and to obtain the deletion of MCAS from the Flight Crew Operations Manual;

    b.    Negligently and carelessly implemented Boeing's plan to minimize differences training to "Level B" out of concern for Boeing's financial interests rather than safety;

    c.    Negligently and carelessly informed Lion Air that simulator training on the 737 MAX was unnecessary when in fact

profound differences existed between the 737 NG and the 737
MAX;

d.   Negligently and carelessly secured minimal pilot training for the
737 MAX and the deletion of MCAS from the FCOM;

e.   Negligently and carelessly failed to disclose true, accurate, and
complete information regarding MCAS to the FAA; and,

f.   Was otherwise negligent.

57.   As a direct and proximate result of these various breaches, the
Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in
the Java Sea, and Plaintiffs' Decedents sustained fatal injuries.

58.   Due to the tragic death of the Decedents, Plaintiffs have been
injured and claim all damages available to them, the estate, the survivors,
the beneficiaries, and the heirs under applicable law, including substantial
pecuniary losses, and grief, sorrow, mental suffering, loss of society, loss of
companionship, love, and affection, and loss of advice.

59.   Plaintiffs bring this action pursuant to the Death on the High
Seas Act, 46 U.S.C. §§ 30302, 30307, the Illinois Wrongful Death Act, 740
ILCS 180/1 *et seq.*, or such other law as the Court determines to be applicable
under the circumstances of this case.

WHEREFORE, the Plaintiffs, as the Personal Representatives and
Administrators of the Estates and on behalf of all heirs of the Decedents,
pray that the Court enter judgment in their favor and against the Defendants,
and award them all damages available under the law, their court costs in this
matter, and such other relief as the Court deems just and proper.

## COUNT XXVIII – DEFENDANT MARK A. FORKNER
## NEGLIGENCE – SURVIVAL ACT

1-57.   Plaintiffs re-adopt and reallege paragraphs 1-57 of Count XXVII above.

58.     As a direct and proximate result of one or more of the foregoing conditions, the Subject Aircraft operating as Lion Air Flight JT 610 crashed after takeoff in the Java Sea, and Plaintiffs' Decedents suffered multiple and diverse injuries of both a personal and pecuniary nature, inclusive of conscious pain and suffering and sever terror prior to impact and prior to their deaths, and property damage.

59.     Had Plaintiffs' Decedents survived, they would have been entitled to bring an action for damages, and such action has survived them.

WHEREFORE, the Plaintiffs, as the Personal Representatives of the Estates and on behalf of all heirs of the Decedents, pray that the Court enter judgment in their favor and against the Defendants, and award them all damages available under the law, their court costs in this matter, and such other relief as the Court deems just and proper.

### JURY TRIAL

Plaintiffs demand a jury trial on all claims and issues so triable.

June 9, 2022                Respectfully submitted,

                           By: /s/ *Austin Bartlett*
                           Austin Bartlett (ARDC No. 6273427)
                           **BartlettChen LLC**
                           77 W. Wacker Drive, Suite 4500
                           Chicago, Illinois 60601
                           (312) 624-7711
                           www.bartlettchenlaw.com
                           austin@bartlettchenlaw.com

                           --And--

                           By: /s/ *Manuel von Ribbeck*
                           By: /s/ *Monica R. Kelly*
                           Manuel von Ribbeck (ARDC No. 6230117)
                           Monica Ribbeck Kelly (ARDC No. 6225920)
                           **Ribbeck Law Chartered**
                           505 N. Lake Shore Drive, Suite 102
                           Chicago, Illinois 60611
                           (833) 883-4373
                           (312) 973-0146
                           www.ribbecklaw.com
                           mail@ribbecklaw.com
                           monicakelly@ribbecklaw.com

                           *Counsel for Plaintiffs*