UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE LION AIR<br>FLIGHT JT 610 CRASH | No. 18 C 7686<br><br>Judge Thomas M. Durkin |

MEMORANDUM OPINION AND ORDER

Tragically, on October 29, 2018, Lion Air Flight 610 crashed shortly after takeoff killing all aboard. That tragedy was compounded when attorney Thomas Girardi stole some of the money five of his clients were owed from settlements with defendant Boeing of claims arising out of the crash.

The law firm Edelson P.C. (the "Edelson firm") served as Girardi's local counsel here in Chicago. On December 2, 2020, the Edelson firm filed a motion for rule to show cause alerting the Court to the fact that the clients had not been fully paid and arguing that Girardi and his firm should be held in contempt. *See* R. 842. In his response, Girardi admitted he had not paid the clients the full settlement amount and that he did not have the money to pay them the balance. *See* R. 847 at 2-3 (¶¶ 8-9). On December 14, 2020, the Court found Girardi and his firm, Girardi & Keese, in civil contempt and entered a judgment against them in the amount of the outstanding payments. *See* R. 848.

The Edelson firm's motion also implicated Girardi associates David Lira and Keith Griffin. The Edelson firm, Griffin, and Lira filed briefs and participated in a three-day hearing in December 2021, at which Griffin, Lira, and attorneys from the

Edelson firm testified. Subsequently, the Edelson firm brokered a settlement with its insurance carrier resulting in the clients being paid in full. *See* R. 1360. The Court commends Jay Edelson and his firm for being the first to pursue these issues and for doing what was necessary to see that the clients were made whole.

These settlements with the Edelson firm's insurer satisfy the Court's primary concern in addressing this motion. To the extent the Court was considering sanctioning Griffin, Lira, and/or Edelson firm attorneys for their roles in the misappropriation of the client's funds or their failure to protect the clients from Girardi, that concern is now moot because the clients have received the money to which they are entitled. To the extent any of the conduct at issue here was contemptuous or sanctionable (and at least some of it certainly was), there is no longer any party to be made whole, and no action that needs to be compelled, which removes these issues from the realm of civil contempt and the Court's power to sanction in this case. *See Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 738 (7th Cir. 1999) ("Civil contempt proceedings are coercive and remedial, but not punitive, in nature and sanctions for civil contempt are designed to compel the contemnor into compliance with an existing court order or to compensate the complainant for losses sustained as a result of the contumacy."). For these reasons, the motion for rule to show cause is denied.

Evaluation of counsel's conduct is now left to more proper authorities, whether they be a state bar, criminal prosecutors, or one of the several ongoing civil proceedings addressing the relationship between these parties specifically or

Girardi's actions more generally. The Court alerted the U.S. Attorney for this district to the facts of this case when this motion was first filed because Girardi's conduct is unquestionably criminal. The Court is aware that the State Bar of California (the state in which Griffin and Lira are admitted) is monitoring these proceedings. Girardi and his firm are in bankruptcy proceedings. And the Edelson firm has sued Girardi, Griffin, and Lira. Additionally, Girardi's theft in this case, and apparently many others, has been well publicized nationally. In light of this Court's limited jurisdiction in this matter, and the ongoing investigations and proceedings in other venues, the Court finds that it need not take any further action with respect to Griffin, Lira, and/or the Edelson firm or any of its attorneys. Nevertheless, in the interest of the larger goal of unwinding Girardi's fraud, and identifying those responsible, the Court will review the salient facts that emerged from the three-day hearing.

By March 30, 2020, all the clients' settlements were funded by transfers from Boeing to the Girardi & Keese account. *See* R. 1319-48 at 4 (Ex. 247-4). According to the settlement agreements, the clients should have received their payments from Girardi within 30 days of the funding. But it wasn't until May 11, 2020, after the clients complained about not yet having been paid, *see*, *e.g.*, R. 1296-56 at 2 (Ex. 165-002), that partial payments were made. *See* R. 1319-48 at 11 (Ex. 247-11). Installment payments were of course not part of any agreement with the clients. When Girardi & Keese received the money, it should have been sent to the clients promptly.

Upon receipt of partial payments, the clients immediately and understandably inquired about the balance by email to Girardi, Griffin, and Lira. *See*, *e.g.*, R. 1296-

3

63 (Ex. 172). In response, Girardi drafted a letter to one of the clients stating the following:

> I got enough of the problem taken care of so we were able to release 50% of the settlement. I feel pretty good about the next payment. There are tax issues etc. I am working very hard.

R. 1296-57 (Ex. 166-002). A similar letter to another client stated:

> We made an agreement with Boeing that all of the cases would be resolved. They gave us special authorization to distribute 50%. I feel fairly confident the balance will be done within 30 days. There was also a tax issue that came up that I am trying to resolve.

R. 1296-58 at 2 (Ex. 167-002); *see also* R. 1296-61 at 2 (Ex. 170-002) (similar letter claiming that Girardi was "dealing with the head of the IRS" regarding the supposed tax issue). These letters contained outrageous lies. Before sending the letters, Girardi's secretary shared them with Griffin and Lira. *See* R. 1296-57 (Ex. 166); R. 1296-58 (Ex. 167). In response, Lira stated "There are no tax issues." R. 1296-59 at 1 (Ex. 168). Lira also shared the letters with co-counsel at another firm, noting that he (Lira) had "intercepted this letter from going out." R. 1296-60 at 1 (Ex. 169). Co-counsel responded that if the client read the letter, "Tom won't know how to put the fire out." *Id.* at 3. That attorney also cryptically noted that the letter "reminds me of the letter in the Blythe case." *Id.* To which Lira responded, "Indeed." *Id.* at 4. Lira told Girardi's secretary, "I wouldn't send any of these letters. They are lies and can come back to haunt Tom." R. 1296-62 at 7 (Ex. 171).

Griffin and Lira both testified at the hearing on this motion that the statements in these letters were false. *See* R. 1316 at 105 (105:13–106:2) (Griffin); R.

4

1316 at 124 (124:8-15) (Griffin); R. 1317 at 23 (297:2-16) (Lira); R. 1317 at 25 (299:5-7). This series of email communications proves that Griffin and Lira knew that the clients should have been paid the full settlement amounts by April 30, 2020 at the latest and that Girardi was planning to and, in at least two cases where the letters were sent to clients, actually did lie to the clients about the reason for his failure to do so.

Even after Griffin and Lira "intercepted" Girardi's letters to the clients lying to them about the status of the funds, the Edelson firm remained unaware that the settlements had been funded by Boeing more than a month earlier. *See* R. 1317 at 194 (468:19-21); *id.* at 196 (470:8-24) (testimony of Edelson general counsel Rafey Balabanian); R. 1318 at 24 (575:10-14); *id.* at 25 (576:9–577:8) (testimony of Jay Edelson). At this point, the Edelson firm also did not know that Girardi was withholding settlement funds from the clients. Because they were under the impression that the settlements had not funded, getting the settlements funded was their primary concern. They considered independently contacting Boeing to investigate why the settlements had not been funded but decided against it in ultimately ill-advised deference to Girardi & Keese, who were the primary attorneys on the case. *See id.* at 197 (471:5-18) (Balabanian testimony). Apparently neither Griffin nor Lira ever informed anyone at the Edelson firm that Girardi had lied to the clients about the reasons for the delay in payment. *See, e.g.*, R. 1317 at 199 (473:23-25) (Balabanian testimony that Lira never told him); *id.* at 201 (475:8-10) (Balabanian testimony that Griffin never told him).

5

According to Balabanian, it wasn't until the middle of June 2020 that the Edelson firm first learned that Boeing had funded the settlements previously in March. *See* R. 1317 at 198 (472:16–473:12). Later in June, in a conversation with Griffin, Balabanian learned that Girardi had paid only part of the settlement money to the clients. *See* R. 1317 at 200-01 (474:25–475:7). On July 6, 2020, Lira sent the Edelson firm a check for $77,500 as partial payment for the Edelson firm's attorney's fees. *See* R. 1296-12 (Ex. 116). Balabanian testified that the Edelson firm never cashed this check due to their concerns about the clients not being fully paid. *See* R. 1317 at 201-02 (475:15–476:13). Balabanian told Lira (and Girardi) as much in a letter dated July 10, 2020. The primary purpose of that letter, however, was to express the Edelson firm's concern and displeasure with the fact that they had not been told that the settlements had been funded and that the clients had not been fully paid. *See* R. 1296-13 (Ex. 117). Lira responded with a letter focused on responsibility for paying the Edelson firm's fees and largely ignoring the more important concern of the clients' money. Lira devoted only two sentences to that issue stating: "Lastly as to the current status of payment to the [clients] . . . referred to Keith and Tom, I do not know the current status. I resigned from Girardi [&] Keese effective on June 13, 2020, and I do not have access to such information." R. 1296-14 (Ex. 118).

Balabanian eventually had a phone conversation with Girardi himself later in July. Girardi told him that the delayed payments were due the length of time it took to get releases of the clients claims, tax issues with the IRS, and Girardi's health issues. *See* R. 1317 at 203-04. Balabanian testified that to the extent he and the

6

Edelson firm did not believe Girardi's explanations, they thought Girardi was simply motivated to delay in paying the Edelson firm its share of the attorney's fees. *Id.* at 207 (481:2-5); *see also* R. 1318 at 48 (599:1-10) (Jay Edelson testified similarly). They did not believe that Girardi was attempting to avoid paying the clients the settlement money. *See id.* (481:16-22). Yet, in text messages with Griffin in August 2020, Balabanian twice threatened that the Edelson firm would be forced to alert the Court if the clients were not paid. *See* R. 1296-15 at 8 (Ex. 119-008) (text from Aug. 3, 2020); *id.* at 10 (Ex. 119-110) (text from Aug. 24, 2020). According to Balabanian, however, the Edelson firm "ultimately felt as though the explanations were reasonable in terms of Mr. Girardi's ailments [and] in terms of it being the result of a mistake." R. 1317 at 215 (489:16-19); *see also* R. 1318 at 141 (692) (similar testimony from Jay Edelson).

Girardi made additional partial payment to the clients in September. After further communications with Griffin about these payments, Balabanian spoke with Girardi again on September 30. According to Balabanian, Girardi falsely assured him that he had finally paid the clients in full. *See* R. 1317 at 212-213. Balabanian and the Edelson firm took Girardi at his word.

Then on November 17, 2020, Griffin texted Balabanian that Girardi still had not fully paid the clients. *See* R. 1296-15 at 27-28 (Ex. 119-027-28). The Edelson firm attorneys had a phone call with Griffin thereafter, and Griffin told them he did not believe Girardi or the Girardi & Keese firm had the money to pay the clients and that he had contacted a malpractice attorney on behalf of the clients. *See* R. 1317 at 219 (493:3-14). It turns out, however, that the attorney Griffin recommended was

7

formerly associated with Girardi & Keese, *see* R. 1317 at 85 (359:9-14), and he suspiciously urged the Edelson firm attorneys not to seek court intervention. *See* R. 1317 at 220 (494:14-22). The Edelson firm wisely disregarded this suggestion and finally alerted the Court regarding these circumstances by filing this motion two weeks later on December 2, 2020.

There was also evidence presented at the hearing regarding checks written to and from the Girardi & Keese accounts and how much money may have been in the accounts at various points in time. *See* R. 1332; R. 1333; R. 1334. There was evidence presented about Lira's authority as a signatory on those accounts and irregularities in the Girardi & Keese firm's compliance with bank signature requirements. *See, e.g.*, R. 1317 at 115-23. The Court was interested in this evidence as it is relevant to whether the delays in alerting the Court to Girardi's failure to pay the clients caused losses to the clients that could have been avoided if the Court had been informed earlier. This analysis is complicated by the large number of clients Girardi & Keese had and the large sums of money coming into and out of the firm's accounts almost daily. Ultimately, the fact that the clients have been made whole by the settlements with the Edelson firm's insurer means it is unnecessary for the Court to pursue these questions further.

While the money trail is complex and unclear, the knowledge of Griffin, Lira, and the Edelson firm is relatively uncontested and straightforward. Griffin and Lira knew from the start that Girardi did not pay the clients when he was supposed to. And they knew at least as early as May 12, 2020 that Girardi was lying to the clients

8

about the reasons for the failure to pay the full amounts. Griffin and Lira both testified that they never believed that Girardi intended to steal the money, and that they always assumed he would eventually pay the clients. The Court is skeptical of these assertions, however. Evidence of Girardi's repeated malfeasance with clients has been well-documented in the press since these allegations surfaced. Griffin and Lira worked with Girardi for many years. Indeed, Lira is his son-in-law. It is not credible that Griffin and Lira were so completely unaware of the prior disputes over client payments that they had no suspicions of Girardi's conduct and motives.

Moreover, the email communications regarding this specific incident indicate that Griffin and Lira were not surprised that Girardi was lying to the clients. First of all, Girardi's secretary apparently found it appropriate and necessary to check with Griffin and Lira before sending the letters. This is a curious process unless the staff had some sense that Girardi was not to be entirely trusted. Furthermore, Griffin stated that he had "intercepted" the letters, implying that he was regularly playing defense with respect to Girardi's conduct. And Lira's communications referenced another previous instance of similar conduct. In short, it is difficult to believe Griffin and Lira were unaware that Girardi was running a Ponzi scheme with client money, which in fact he was.

In any event, even if Griffin and Lira were so naïve as to be unaware that Girardi was willfully misappropriating client money, once they witnessed him lie to clients about the status of settlement money, they should have informed this Court. Griffin and Lira argue that they were under no obligation to make such a report. In

9

making this argument, they rely on the California Rules of Professional Conduct, which require only "reasonable remedial measures," and do not specifically require "disclosure to the tribunal," as do the ABA Model Rules. *See* R. 1343 at 14-15. But when, as was the case here, the attorney who controls the clients' money has already delayed more than a month in making payments and then actively lies to the clients about the reasons for the failure to pay, "reasonable remedial measures" must include alerting the relevant court. That is especially true here where the settlements in question required a Court order because they involved minor plaintiffs. Whether Griffin and Lira were directly beholden to the court orders is irrelevant. They have an obligation as officers of the Court to alert the Court to what amounts to using legal proceedings as cover for criminal activity. Griffin's and Lira's failures to do so here were entirely unreasonable and improper.

These failures were compounded by Griffin's and Lira's lack of candor with the Edelson firm. Once they learned that the settlements had been funded but the clients had not been fully paid, the Edelson firm inquired with Lira and Girardi about the reasons. Unsurprisingly, Girardi reiterated the lies he told his clients. Lira did not repeat Girardi's lies, but he already knew Girardi's excuses were false and kept that information hidden from the Edelson firm. His failure to inform Edelson that Girardi was lying is a lie by omission. This kept the Edelson firm in the dark, so when Balabanian finally had a conversation directly with Girardi, he had no solid basis to immediately question Girardi's excuses. Lira's decision to leave Girardi & Keese and, in his letter to Edelson, to rely on that departure as an implicit excuse to not reveal

10

Girardi's lies and seemingly absolve himself of any additional responsibility for the clients' money, was at best disingenuous and at worst improper.[1]

Griffin's conduct was just as bad, if not worse. Like Lira, Griffin knew that Girardi's excuses were lies. And like Lira, Griffin abetted the lies by hiding them from the Edelson firm. Griffin was in regular communication with Balabanian through the summer and fall of 2020. Not only did Griffin not reveal Girardi's lies, he came perilously close to repeating them when he told Balabanian in a text message, "I know [Girardi] is working on this." R. 1296-15 at 8 (Ex. 119). Girardi was working on nothing but trying to hide the theft. Even when he finally informed the Edelson firm in November 2020 that the clients had not been fully paid and Girardi didn't have the money to pay them, Griffin did not reveal that he had known since May that Girardi was lying to the clients. Further, he continued to attempt to dissuade the Edelson attorneys from involving the Court by recommending they consult a conflicted former Girardi & Keese attorney who he claimed to have arranged to pursue malpractice claims. This conduct is at best an effort to pass the buck and at worst a knowing cover-up. None of it demonstrates concern with the money owed to clients whose family members were victims of a tragic accident. All of it is simply inexcusable.

---

[1] Lira was a signatory on the account that would have received the clients' settlement money. Lira testified that his signature was forged on some checks written from the account. It is not clear whether Lira signed checks drawing on this account when he should not have, considering his knowledge that the clients had not been paid. Obviously, if Lira signed checks from the account thereby reducing its balance while knowing that the money was owed to the clients from that account, then his culpability here is much greater. Regardless, it is undisputed that both Lira and Griffin accepted salaries from Girardi & Keese knowing that the firm had not met its obligations to the clients.

By contrast, there is no evidence that the Edelson firm ever had knowledge that Girardi was lying to the clients. Balabanian's and Jay Edelson's testimony regarding their communications with Griffin, Lira, and Girardi shows that they regularly inquired to confirm that the clients would be paid. Their inquiries were consistently met with excuses begging forgiveness and more time. The Court understands the desire to extend professional courtesy, but the Edelson firm should have acted sooner than they did. They admitted as much in their testimony. That being said, the evidence in the record indicates that, unlike Griffin and Lira, the Edelson firm never had any reason to believe that Girardi was perpetrating a massive fraud. In effect, they deferred to Girardi, who had a reputation as a titan of the plaintiffs' bar in California and throughout the country. Indeed, Girardi's gaudy displays of wealth and extravagant lifestyle furthered the fiction that he and his firm were successful and solvent. From the Edelson firm's perspective, based on the information available to them, the risk they were running was simply abetting delayed payment, not a risk of non-payment. The delay was contrary to the settlement agreements and to the Court's orders approving the settlements. But delays are often a fact of life for one reason or another, illnesses like Girardi's being one. Delays are not inherently criminal or unethical. And delayed monetary payments can be easily remedied, if necessary, with interest payments. This realm of potential risk the Edelson firm reasonably perceived is not so great that the Court could find that the Edelson firm or any of its attorneys bears any responsibility for the clients' potential losses. To the extent the Edelson firm or any of its attorneys did

12

bear any such responsibility, they more than made up for it in arranging for its insurer to pay the clients, which was the only somewhat positive development from this debacle.

*   *   *   *

Thomas Girardi's actions are a stain on the legal profession and, due to the international nature of this case, have damaged the reputation of the American legal system. All of the plaintiffs in this case were citizens and residents of another country, many of whom do not speak English and have little to no experience with American society and certainly not its court system. Most are not very well-off. They all suffered the tragic loss of family members.

In need of help, they trusted American attorneys to shepherd them through the legal process and achieve at least some relief for their losses with amounts of money that are likely life-changing in their country. Girardi took advantage of vulnerable people at their most vulnerable moments, and he used the prestige of his profession, the reputation of American courts, and the imprimatur of this Court to do it. It is nearly impossible to mend such a breach of trust. The best we can do is demonstrate that the legal system Girardi besmirched has the ability to rectify its errors and bring bad actors to account. With the hearings and settlements initiated by the Edelson firm, a step has been taken in that direction.

For these reasons, the motion for rule to show cause [842] is denied.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: November 2, 2022